**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMON CAUSE, *et al.*,

                    Plaintiffs,

          v.

U.S. DEPARTMENT OF JUSTICE, *et al*.,

                    Defendants.

Case No. 1:26-cv-01352-SLS

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

    I.     DOJ's Voter List Maintenance Policy ........................................................................... 3

          A.     President Trump's efforts to "nationalize" elections and DOJ's Voter List Maintenance Policy .................................................................................... 3

          B.     Compiling state voter registration lists ................................................................. 5

          C.     Disclosing SVRLs to DHS and external third parties.............................................. 7

          D.     Using DHS's error-riddled SAVE system to check voter eligibility ...................... 8

          E.     Directing states to remove voters........................................................................... 10

          F.     The Administrative Record....................................................................................... 11

    II.    Impact of DOJ's Voter List Maintenance Policy on the Plaintiffs ................................. 11

LEGAL STANDARD................................................................................................................ 12

ARGUMENT .......................................................................................................................... 12

    I.     Plaintiffs have standing................................................................................................. 12

    II.    Plaintiffs challenge final agency action ........................................................................ 19

    III.   Plaintiffs are entitled to summary judgment on Counts I, VI, VII, and VIII of the Complaint...................................................................................................................... 20

          A.     DOJ's Voter List Maintenance Policy lacks statutory authorization (Count I) .... 20

          B.     DOJ's Voter List Maintenance Policy violates the Privacy Act (Count VI) ........ 25

               1.     DOJ violated the Privacy Act's notice-and-comment requirements for revising systems of records ........................................................................ 25

               2.     DOJ is improperly disclosing records in bulk in violation of the Privacy Act ............................................................................................................... 28

               3.     DOJ is maintaining inaccurate and outdated records in bulk in violation of the Privacy Act.................................................................................... 30

               4.     DOJ is maintaining First Amendment protected records in bulk in violation of the Privacy Act ................................................................... 32

          C.     DOJ's Voter List Maintenance Policy violates the Paperwork Reduction Act (Count VII)................................................................................................................ 34

          D.     DOJ's Policy is arbitrary and capricious (Count VIII) ......................................... 37

               1.     Defendants failed to explain the Policy ...................................................... 38

               2.     DOJ failed to explain a rational connection between the facts and the Policy ........................................................................................................ 38

3.    DOJ entirely failed to consider important aspects of the problem............... 39

IV.    Plaintiffs are entitled to their requested relief................................................... 42

A.    The Court should set aside and vacate the Policy under the APA........................ 42

B.    Alternatively, the Court should permanently enjoin the Voter List Maintenance Policy ................................................................................................................. 43

C.    The Court should declare the Policy unlawful..................................................... 45

CONCLUSION........................................................................................................................ 45

## TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Dep't of Lab.*,
   778 F. Supp. 3d 56 (D.D.C. 2025) ................................................................17, 25

*AFSCME v. SSA*,
   172 F.4th 361 (4th Cir. 2026) (en banc) ......................................................16, 44

*Ala. Ass'n of Realtors v. HHS*,
   594 U.S. 758 (2021)..............................................................................................21

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014)...........................................................................42

*Am. Bioscience, Inc. v. Thompson*,
   269 F.3d 1077 (D.C. Cir. 2001)...........................................................................12

*Am. Civ. Rts. Union v. Phila. City Comm'rs*,
   872 F.3d 175 (3d Cir. 2017).................................................................................22

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
   796 F. Supp. 3d 66 (D. Md. 2025)........................................................................39

*Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014)...........................................................................38

*Ames v. DHS*,
   861 F.3d 238 (D.C. Cir. 2017)..............................................................................29

*Amfac Resorts v. U.S. Dep't of the Interior*,
   143 F. Supp. 2d 7 (D.D.C. 2001).........................................................................37

*Bellitto v. Snipes*,
   935 F.3d 1192 (11th Cir. 2019) ...........................................................................22

*Bennett v. Spear*,
   520 U.S. 154 (1997)..............................................................................................19

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
   972 F.3d 83 (D.C. Cir. 2020)...............................................................................37

*Bldg. Trades Unions v. Dep't of Def.*,
   783 F. Supp. 3d 290 (D.D.C. 2025)......................................................................43

*Brakebill v. Jaeger*,
   905 F.3d 553 (8th Cir. 2018) .................................................................................5

*Bridgeport Hosp. v. Becerra*,
   108 F.4th 882 (D.C. Cir. 2024)............................................................................42

*California v. Trump*,
   786 F. Supp. 3d 359 (D. Mass. 2025) ....................................................................4

*Carlson v. Postal Regul. Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019)..............................................................................42

*Chapman v. Hou. Welfare Rts. Org.*,
   441 U.S. 600 (1979)..............................................................................................21

**Cases—Cont.**

*Chastain v. Kelley*,
510 F.2d 1232 (D.C. Cir. 1975) ................................................................................44

*Chichakli v. Tillerson*,
882 F.3d 229 (D.C. Cir. 2018) .................................................................................28

*Church of Scientology of Cal. v. United States*,
506 U.S. 9 (1992) ....................................................................................................44

*City of Billings v. TSA*,
153 F.4th 46 (D.C. Cir. 2025) ..................................................................................43

*Council of Parent Att'ys & Advocs., Inc. v. DeVos*,
365 F. Supp. 3d 28 (D.D.C. 2019) ...........................................................................40

*CREW v. DOJ*,
2026 WL 472589 (D.D.C. Feb. 19, 2026) ................................................................16

*Ctr. for Biological Diversity v. Dep't of Interior*,
144 F.4th 296 (D.C. Cir. 2025) ................................................................................12

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
77 F.4th 679 (D.C. Cir. 2023) ..................................................................................15

*Daimler Trucks N. Am. LLC v. EPA*,
737 F.3d 95 (D.C. Cir. 2013) ...................................................................................43

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ............................................................................................19, 38

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025) .................................................................................................19

*Doctors for America v. OPM*,
766 F. Supp. 3d 39 (D.D.C. 2025) ...........................................................................34

*Dole v. United Steelworkers of Am.*,
494 U.S. 26 (1990) ...................................................................................................36

*Drs. for Am. v. OPM*,
793 F. Supp. 3d 112 (D.D.C. 2025) .........................................................................21

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................................38, 41

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................................................................13

*FEC v. Cruz*,
596 U.S. 289 (2022) .................................................................................................21

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................................................................................................12

*Gerlich v. DOJ*,
711 F.3d 161 (D.C. Cir. 2013) .................................................................................33

*Hyatt v. OMB*,
908 F.3d 1165 (9th. Cir. 2018) ...........................................................................34, 35

**Cases—Cont.**

*Indep. Mkt. Monitor for PJM v. FERC*,
162 F.4th 1167 (D.C. Cir. 2025)..................................................................................15

*Las Ams. Immigrant Advoc. Ctr. v. DHS*,
783 F. Supp. 200 (D.D.C. 2025)...............................................................................42, 43

*League of United Latin Am. Citizens ("LULAC I") v. EOP*,
808 F. Supp. 3d 29 (D.D.C. Oct. 31, 2025) ............................................................4, 21, 45

*League of United Latin Am. Citizens ("LULAC II") v. EOP*,
818 F. Supp. 3d 34 (D.D.C. Jan. 30, 2026)......................................4, 17, 21, 25, 28, 41, 44, 45

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................................................................................13, 15, 44, 45

*League of Women Voters v. DHS*,
2025 WL 3198960 (D.D.C. Nov. 17, 2025) .................................................................32

*MacPherson v. IRS*,
803 F.2d 479 (9th Cir. 1986) .......................................................................................34

*Marin Audubon Soc'y v. FAA*,
121 F.4th 902 (D.C. Cir. 2024)....................................................................................21

*Massachusetts v. Dep't of Educ.*,
2026 WL 918941 (D. Mass. Apr. 3, 2026) ..................................................................43

*Massachusetts v. EPA*,
549 U.S. 497 (2007)......................................................................................................19

*Maydak v. United States*,
363 F.3d 512 (D.C. Cir. 2004)......................................................................................34

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014)....................................................................................19

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) ......................................................................................17

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................................................................................................37, 39

*Nat'l Ass'n of Home Builders v. Norton*,
298 F. Supp. 2d 68 (D.D.C. 2003).................................................................................20

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
595 U.S. 109 (2022) (per curiam).................................................................................25

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
921 F.3d 1102 (D.C. Cir. 2019).................................................................................38, 39, 40

*Orr v. Trump*,
778 F. Supp. 3d 394 (D. Mass. 2025) ............................................................................34

*Purcell v. Gonzalez*,
549 U.S. 1, (2006)..........................................................................................................45

*President v. Vance*,
627 F.3d 353 (D.C. Cir. 1980)......................................................................................45

**Cases—Cont.**

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
  374 F.3d 1209 (D.C. Cir. 2004)........................................................................40

*Pub. Emps. for Env't Resp. v. Hopper*,
  827 F.3d 1077 (D.C. Cir. 2016)........................................................................42

*Pub. Int. Legal Found., Inc. v. Nago*,
  2026 WL 1144703 (9th Cir. Apr. 28, 2026) .....................................................22

*Richardson v. Trump*,
  496 F. Supp. 3d 165 (D.D.C. 2020).................................................................18

*Roudebush v. Hartke*,
  405 U.S. 15 (1972)...........................................................................................21

*Sandusky Cnty. Democratic Party v. Blackwell*,
  387 F.3d 565 (6th Cir. 2004) ............................................................................22

*Sierra Club v. Dep't of Transp.*,
  125 F.4th 1170 (D.C. Cir. 2025).......................................................................42

*Sierra Club v. Salazar*,
  177 F. Supp. 3d 512 (D.D.C. 2016)..................................................................42

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)..........................................................................................16

*Stuttering Found. of Am. v. Springer*,
  498 F. Supp. 2d 203 (D.D.C. 2007)..................................................................12

*U.S. Sugar Corp. v. EPA*,
  113 F.4th 984 (D.C. Cir. 2024).........................................................................21

*United States v. Amore*,
  2026 WL 1040637 (D.R.I. Apr. 17, 2026)....................................................3, 23

*United States v. Benson*,
  2026 WL 362789 (W.D. Mich. Feb. 10, 2026)....................................................3

*United States v. Fontes*,
  2026 WL 1177244 (D. Ariz. Apr. 28, 2026) .......................................................3

*United States v. Galvin*,
  2026 WL 972129 (D. Mass. Apr. 9, 2026) ....................................................3, 23

*United States v. Oregon*,
  2026 WL 318402 (D. Or. Feb. 5, 2026)...............................................................3

*United States v. Weber*,
  816 F. Supp. 3d 1168 (C.D. Cal. Jan. 15, 2026) ...............3, 7, 24, 25, 27, 28, 33, 34

*United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*,
  288 F. Supp. 3d 99 (D.D.C. 2017)....................................................................16

*Venetian Casino Resort, LLC v. EEOC*,
  530 F.3d 925 (D.C. Cir. 2008)..........................................................................19

*Washington v. Trump*,
  2026 WL 73866 (W.D. Wash. Jan. 9, 2026).......................................................4

**Cases—Cont.**

*West Virginia v. EPA,*
  597 U.S. 697 (2022)........................................................................21, 24

**Statutes & Regulations**

5 U.S.C.
  § 552a(a)(3).....................................................................................31, 33
  § 552a(b) ........................................................................................28, 30
  § 552a(b)(3) ..........................................................................................28
  § 552a(b)(7) ....................................................................................29, 30
  § 552a(e)(4) ....................................................................................26, 29
  § 552a(e)(5)......................................................................31, 32, 39, 40
  § 552a(e)(6) ....................................................................................31, 32
  § 552a(e)(7) ....................................................................................33, 34
  § 552a(e)(10) ..................................................................................31, 32
  § 552a(e)(11) ........................................................................................26
  § 703 .....................................................................................................43
  § 706(2)(A) ................................................................................28, 32, 37
  § 706(2)(D) ..........................................................................26, 32, 37, 42

18 U.S.C.
  § 611(a) .................................................................................................30
  § 1015(f)................................................................................................30

42 U.S.C.
  § 1320b-7(d)............................................................................................8
  § 1320b-7 note ........................................................................................8

44 U.S.C.
  § 3501(8)(A) ..........................................................................................36
  § 3502(3)(A) .....................................................................................35, 36
  § 3502(10).........................................................................................35, 36
  § 3506(c)(1) ...........................................................................................35
  § 3506(c)(1)(B)(iii) ...............................................................................35
  § 3506(c)(2) ...........................................................................................35
  § 3507(a)(1) ...........................................................................................35
  § 3507(a)(1)(D)......................................................................................35
  § 3507(a)(2)-(3) .....................................................................................35
  § 3508......................................................................................................35
  § 3518(c)(1) ...........................................................................................37
  § 3518(c)(2) ...........................................................................................37

**Statutes & Regulations—Cont.**

52 U.S.C.
§ 20501(b)..................................................................................................24
§ 20507.......................................................................................................24
§ 20507(a)(4) .................................................................................20, 21, 22
§ 20507(d)(1)(B)........................................................................................24
§ 20510(a) ..................................................................................................22
§ 20511.......................................................................................................22
§ 21083(a)(1)(A) ...................................................................................22, 23
§ 21083(a)(4)(A) ...................................................................................20, 22
§ 21111.......................................................................................................22
§ 21144.......................................................................................................22

Immigration Reform Control Act of 1986, Pub. L. No. 99-603, title I, §121(c)(1),
100 Stat. 3359, 3391 (1986)..............................................................................8

**Other Authorities and Materials**

*Acquired Citizenship,* USCIS Glossary of Terms...............................................9
*Derivative Citizenship,* USCIS Glossary of Terms............................................9
DOJ Civil Rights Division*, About The National Voter Registration Act* ......................................41
Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025)...............................................4
Exec. Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125 (Mar. 31, 2026) .................................4
68 Fed. Reg. 47610 (Aug. 11, 2003)..................................................................27
70 Fed. Reg. 43904 (July 29, 2005)....................................................................27
82 Fed. Reg. 24147 (May 25, 2017) ...................................................................27
DHS, System of Records Notice, 90 Fed. Reg. 48948 (Oct. 31, 2025)..............7
Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica & Texas Tribune (Feb. 13, 2026).......................................................................................10
OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*, (2016) ..........................26, 29
OMB Privacy Act Guidelines, 40 Fed. Reg. 28948 (July 9, 1975) ...................28
S. Rep. No. 93-1183 (1974) ...............................................................................30

**INTRODUCTION**

In service of the President's unlawful attempts to seize control of elections from the states, the Department of Justice ("DOJ") has issued an unprecedented demand to every state: hand over your unredacted voter registration lists and cede to DOJ the authority to determine which voters are eligible to remain on your rolls. To effectuate this new Voter List Maintenance Policy,[1] DOJ is collecting, stockpiling in a centralized system of records, manipulating, and sharing millions of Americans' sensitive personal data without their consent, including their Social Security numbers, driver's license numbers, dates of birth, home addresses, voting history, and party affiliation. And DOJ is funneling entire state voter files to the Department of Homeland Security ("DHS") to run mass citizenship checks using DHS's unreliable Systematic Alien Verification for Entitlements ("SAVE") system, which DHS itself admits is error-prone and likely to wrongly ensnare eligible voters. DOJ intends to then transmit the results of this flawed process back to the states with instructions to purge voters it has unilaterally deemed ineligible.

No statute authorizes DOJ's sweeping new Policy. And the Policy affirmatively violates federal privacy laws and the bedrock requirement of the Administrative Procedure Act ("APA") that federal agencies engage in reasoned, transparent decision making. DOJ instead adopted the Policy "discreetly" and "outside of the view of the public," CRT-3384, without following statutory notice-and-comment procedures, studying the Policy's risks, explaining its reasoning, or even memorializing the decision itself. The upshot of DOJ's unlawful and unreasoned Policy is to

---

[1] Plaintiffs' Complaint referred to DOJ's "Voter Registration Nationalization Policy." But documents in the Administrative Record refer to this policy as the "NVRA 2025 *Voter List Maintenance* Project," "the *list maintenance* project," and "the NVRA *List Maintenance Project*." *See, e.g.*, CRT-0007 (emphasis added); CRT-3387 (emphasis added); CRT-3397 (emphasis added). Accordingly, Plaintiffs will use DOJ's terminology in referring to the Policy as the "Voter List Maintenance Policy."

substantially threaten the privacy, security, and voting rights of millions of lawfully registered American voters. This Court must intervene.

DOJ's Policy inverts the constitutional and statutory design of American elections. The Constitution entrusts the states and Congress, not the President or his appointees, with powers over election administration. Consistent with this constitutional design, Congress has enacted carefully tailored statutes—such as the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA")—to establish uniform minimum standards for voter registration while explicitly giving each individual state discretion to implement the laws and conduct list maintenance for itself. Nowhere in these statutes, or any federal law, has Congress authorized the Executive Branch to commandeer state voter rolls and choose who is eligible to vote.

Because the Administrative Record ("AR") lays bare the many ways that DOJ's Voter List Maintenance Policy violates federal statutes, Plaintiffs move for summary judgment on Counts I, VI, VII, and VIII of their Complaint.[2] First, the AR makes clear that DOJ lacks any legal authority for the Policy. Second, the Privacy Act—passed in response to the Nixon Administration's abuses of executive power—prohibits DOJ from implementing the Policy by secretly creating a centralized record system of Americans' personal data, and widely disclosing data from that system, without a necessary and lawful purpose. Third, the Paperwork Reduction Act ("PRA") requires additional safeguards before an agency may collect personal information, which DOJ has openly defied here. Finally, having submitted a threadbare AR composed entirely of post-hoc

---

[2] Counts II-V assert that DOJ's Voter List Maintenance Policy is unconstitutional. Those claims will draw on evidence beyond the AR and likely require discovery. Depending on how the Court resolves this Motion, Plaintiffs expect to meet and confer with Defendants to propose a schedule and case management plan for resolving the remaining claims.

rationalizations, DOJ cannot demonstrate any "reasoned decisionmaking" to support its Policy; it is therefore arbitrary and capricious.

DOJ's Policy—and the sprawling voter surveillance and purging regime it creates—is as dangerous as it is illegal. Underlying the Policy is DOJ's alarming position that *every registered voter in the United States* is a "subject[]" of DOJ's nationwide dragnet "investigation into voter fraud," even absent particularized suspicion. CRT-3356. Recognizing these dangers and the clear illegality of DOJ's actions, most states and the District of Columbia have refused DOJ's voter data demands. DOJ has sued those states to compel compliance, and every court so far to reach a motion to dismiss in those cases has ruled against DOJ.[3] But some states have capitulated to DOJ's demands, turning over their voters' unredacted personal information without those voters' prior knowledge or consent—including the Voter Plaintiffs and other Common Cause members. To protect these individuals and to prevent erroneous voter purges ahead of approaching midterm elections, Plaintiffs ask this Court to hold unlawful, vacate, and set aside DOJ's Policy.

## BACKGROUND

I.    **DOJ's Voter List Maintenance Policy**

      A.  **President Trump's efforts to "nationalize" elections and DOJ's Voter List Maintenance Policy**

DOJ's Voter List Maintenance Policy flows directly from President Trump's efforts to assert unprecedented—and unconstitutional—control over states' maintenance of their voter rolls. President Trump repeatedly has declared his desire to "nationalize" or "take over" election

---

[3] *See United States v. Weber*, 816 F. Supp. 3d 1168, 1182-95 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, 2026 WL 318402, at *5-12 (D. Or. Feb. 5, 2026); *United States v. Benson*, 2026 WL 362789, at *2-10 (W.D. Mich. Feb. 10, 2026); *United States v. Galvin*, 2026 WL 972129, at *3-6 (D. Mass. Apr. 9, 2026); *United States v. Amore*, 2026 WL 1040637, at *4-6 (D.R.I. Apr. 17, 2026); *United States v. Fontes*, 2026 WL 1177244, at *2-7 (D. Ariz. Apr. 28, 2026).

administration from the states. *See* Hill Decl. ¶¶ 2-3 & Ex. 1. He has wrongly claimed that "the States are merely an 'agent' for the Federal Government in counting and tabulating ballots," and that states "must do what the Federal Government, as represented by the President of the United States, tells them." Hill Decl. Ex. 2. And President Trump has directed the Executive Branch to carry out this effort to nationalize election administration through two executive orders. *See* Hill Decl. Ex. 4, Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) (the "2025 Elections EO"); Hill Decl. Ex. 3, Exec. Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125 (Mar. 31, 2026) (the "2026 Elections EO").[4] Among other things, the Executive Orders direct DOJ, DHS, and the Social Security Administration ("SSA") to take various actions to "identify unqualified voters registered in the States," including through expansive information sharing across agencies. Hill Decl. Ex. 4, 2025 Elections EO, §§ 2(b)-(c), 3(a); *see* Hill Decl. Ex. 3, 2026 Elections EO, § 2.

It is in this context that DOJ crafted and implemented its Voter List Maintenance Policy,[5] which entails DOJ executing the following unauthorized, constituent actions:

- compiling all states' Statewide Voter Registration Lists ("SVRLs") on a generalized and categorical basis, rather than seeking certain states' data based on specific allegations of list maintenance issues or to investigate specific alleged violations of federal law, *see*, *e.g.*, *infra* note 7;

---

[4] Courts nationwide, including in this District, have enjoined federal agencies from implementing key provisions of the 2025 Executive Order on the ground that they violate "the constitutional separation of powers." *League of United Latin Am. Citizens ("LULAC II") v. EOP,* 818 F. Supp. 3d 34, 57-58 (D.D.C. Jan. 30, 2026); *see also League of United Latin Am. Citizens ("LULAC I") v. EOP*, 808 F. Supp. 3d 29, 79-80 (D.D.C. Oct. 31, 2025); *Washington v. Trump*, 2026 WL 73866, at *1 (W.D. Wash. Jan. 9, 2026); *California v. Trump*, 786 F. Supp. 3d 359, 371-72 (D. Mass. 2025).

[5] CRT-3330 ("In response to the President's [2025 Elections EO], . . . the Civil Rights Division . . . proposed to seek statewide voter lists and then to share the lists with Homeland Security Investigations or another unit within DOJ.").

4

- consolidating all states' SVRLs in a centralized system of records at the Civil Rights Division ("CRT") titled "JUSTICE/CRT – 001, Central Civil Rights Division Index File and Associated Records," *see*, *e.g.*, CRT-0004, CRT-0024, CRT-2057, CRT-3387, to build a national record system with every state's SVRL;

- disclosing the voter data from the compiled SVRLs within and outside of DOJ, including to DHS, *see* CRT-0030; CRT-3399-3400; and private contractors, *see*, *e.g.*, CRT-0007, CRT-0027, CRT-2060, CRT-3396;

- comparing the voter data from the SVRLs against other federal datasets, such as DHS's SAVE system, *see*, *e.g.*, CRT-0030;

- testing, assessing, or analyzing the voter data in the SVRLs for "insufficiencies, inadequacies, deficiencies, anomalies, or concerns," *see*, *e.g.*, CRT-0005, CRT-0025, CRT-2058; and

- disclosing to the states the results of DOJ's testing, assessment, or analysis, with instructions that the states "clean" their SVRLs by "removing ineligible voters" identified by DOJ and then "resubmitting" the cleaned SVRLs to DOJ "to verify proper list maintenance has occurred," *see*, *e.g.*, CRT-0005, CRT-2058; *see also* Hill Decl. Ex. 5, p. 70 (*Amore* Hr'g Tr. at 70:12-25).

The AR reveals that DOJ has taken steps to implement each element of this Policy.

### B. Compiling state voter registration lists

DOJ began implementing this Policy no later than May 2025, when it commenced its campaign to amass complete voter rolls from around the country. CRT-2432-2442. Assistant Attorney General for Civil Rights Harmeet Dhillon described this as a "comprehensive effort" to compile "the voter rolls from all states and the District of Columbia" so that CRT can conduct "voter hygiene" by "running" the states' voter rolls to identify purported deceased or non-citizen voters. *See* Hill Decl. ¶ 8. To execute this "comprehensive effort," DOJ sent near-identical demand letters to 49 states[6] and the District of Columbia, seeking "all fields" contained in their full SVRLs,

---

[6] North Dakota did not receive a demand letter as it is the only state that does not maintain a voter registration database. *See Brakebill v. Jaeger,* 905 F.3d 553, 556 (8th Cir. 2018) ("North Dakota has no voter registration requirement, so a resident may appear at the polls on election day and cast a ballot without any previous expression of desire to vote."). References in this brief to the SVRLs of "every" or "all" states thus do not include North Dakota.

including confidential data.[7] SVRLs often contain sensitive Personal Identifying Information ("PII"), and indeed, DOJ's letters demanded (among other things) "the last four digits of [each voter's] social security number." *Supra* note 7; *see also*, *e.g.*, CRT-2346; CRT-2401.

DOJ's demand letters do not disclose what it is doing with the SVRL data. Although DOJ's letters asserted that the "purpose" of its demands is to "ascertain [the states'] compliance with the list maintenance requirements of the NVRA and HAVA," the letters contained no information about how DOJ is analyzing, protecting, or disclosing this information. *Supra* note 7. The letters did not contain OMB-issued control numbers required under the Paperwork Reduction Act for collections of information, nor did they disclose whether DOJ intended to create a new system of records or make use of an existing one to comply with the Privacy Act. *See id.* DOJ officials apparently believed that they had unfettered power to determine how to use the voter data. In internal communications, one official responsible for implementing the Policy asserted: "HAVA, NVRA, CRA - none of them require to give [sic] the states information about what we are going to do with the data. No judge will have authority to limit us beyond a promise of Federal law compliance." CRT-3392.

---

[7] *See* CRT-2346 (DOJ letter to Alaska); CRT-2400 (Arizona); CRT-2411 (Arkansas); CRT-2428 (California); CRT-2496 (Connecticut); CRT-2537 (Delaware); CRT-2558 (Florida); CRT-2572 (Georgia); CRT-2593 (Hawaii); CRT-2647 (Idaho); CRT-2684 (Illinois); CRT-2691 (Indiana); CRT-2702 (Iowa); CRT-2710 (Kansas); CRT-2714 (Kentucky); CRT-2744 (Louisiana); CRT-2759 (Maine); CRT-2770 (Maryland); CRT-2778 (Massachusetts); CRT-2790 (Michigan); CRT-2815 (Minnesota); CRT-2843 (Mississippi); CRT-2858 (Missouri); CRT-2872 (Montana); CRT-2891 (Nebraska); CRT-2905 (Nevada); CRT-2911 (New Hampshire); CRT-2927 (New Jersey); CRT-2945 (New Mexico); CRT-2955 (New York); CRT-2959 (North Carolina); CRT-2986 (Ohio); CRT-2989 (Oklahoma); CRT-3054 (Oregon); CRT-3064 (Pennsylvania); CRT-3071 (Rhode Island); CRT-3076 (South Carolina); CRT-3130 (South Dakota); CRT-3137 (Tennessee); CRT-3144 (Texas); CRT-3184 (Utah); CRT-3187 (Vermont); CRT-3193 (Virginia); CRT-3196 (Washington); CRT-2544 (Washington D.C.); CRT-3200 (West Virginia); CRT-3401 (Wyoming). Three States received communications that did not contain identical language but nonetheless requested the States' full unredacted SVRLs. *See* CRT-2107 (Alabama); CRT-2431, CRT-2432 (Colorado); CRT-3229, CRT-3231 (Wisconsin).

Faced with DOJ's sweeping demands, most states—at least 30 plus the District of Columbia (the "Non-Complying States")—have refused to provide DOJ with voter files containing personal information that is not generally publicly available, and DOJ has sued them to force compliance. All six courts to rule on motions to dismiss have ruled against DOJ. *See supra* note 3. As one of those courts observed, "[t]he government's request is unprecedented and illegal." *Weber*, 816 F. Supp. 3d at 1174. But that has not stopped at least 18 states from acquiescing to DOJ's data demands, including Alabama, Alaska, Arkansas, Florida, Indiana, Iowa, Kansas, Louisiana, Mississippi, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, and Wyoming (the "Complying States").[8]

### C. Disclosing SVRLs to DHS and external third parties

Pursuant to DOJ's Policy, after collecting SVRL data, DOJ will disclose personal voter registration information to DHS by bulk uploading the data to U.S. Citizenship and Immigration Service's ("USCIS's") SAVE system, *see* CRT-0030-0040 (SAVE MOA between USCIS and DOJ), a system DHS itself admits cannot accurately verify the citizenship status of certain categories of U.S. citizens, *see infra* Background § I.D.[9] And DOJ has executed a separate agreement with DHS's Homeland Security Investigations ("HSI") under which HSI will "enrich .

---

[8] CRT-0458 (Alabama compliance letter); CRT-0001 (Alaska MOU); CRT-0946 (Arkansas compliance letter); CRT-1437 (Florida compliance letter); CRT-1511 (Indiana compliance letter); CRT-3259 (Iowa compliance letter); CRT-1533 (Kansas compliance letter); CRT-1622 (Louisiana compliance letter); CRT-3261 (Mississippi compliance letter); CRT-3263 (Montana data transfer email); CRT-3265 (Nebraska compliance letter); CRT-3126 (Ohio compliance letter); CRT-0011 (Oklahoma compliance settlement); CRT-0021 (South Carolina MOU); CRT-1994 (South Dakota compliance letter); CRT-1996, CRT-2002 (Tennessee compliance letters); CRT-2036 (Texas MOU); CRT-3404 (Wyoming compliance letter).

[9] DHS stores and retains records uploaded into SAVE for a minimum of ten years. *See* DHS, System of Records Notice, 90 Fed. Reg. 48948, 48954-55 (Oct. 31, 2025).

. . SVRL datasets" provided by DOJ "with DHS records to allow for vetting via the SAVE system" and then "return" them for DOJ to "query the SAVE system." CRT-3399-3400.

DOJ's Memoranda of Understanding with Alaska, South Carolina, and Texas also reveal that DOJ may disclose voter data *outside* the government to "a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures." CRT-0007 (Alaska MOU); CRT-0027 (South Carolina MOU); CRT-2060 (Texas MOU); *see also* CRT-3396 (internal DOJ email stating that when DOJ receives voter data it may "require processing information in new ways," including "[p]otential analysis of ingested data by [a] litigative consultant"). DOJ has not identified how those contractors will use the highly sensitive data or if any special safeguards are in place.

### D. Using DHS's error-riddled SAVE system to check voter eligibility

Under its Voter List Maintenance Policy, DOJ will run states' entire SVRLs through SAVE to conduct citizenship checks with the explicit aim of identifying individuals whom DOJ will demand that states remove from their voter rolls. *See* CRT-0030-0040; Hill Decl. Ex. 5 (*Amore* Hr'g Tr. at 50:22-23). But SAVE was not designed to check voter eligibility,[10] and is unreliable. As DHS has acknowledged, relying on SAVE poses serious risks of falsely flagging U.S. citizens as non-citizens, many of which DHS has not been able to mitigate. *See* Hill Decl. Exs. 13-16 (DHS-AR-240-243; DHS-AR-260; DHS-AR-302; DHS-AR-484-85).

As the AR here confirms, SAVE cannot reliably confirm citizenship and is especially unreliable for citizens born outside of the United States (e.g., naturalized, derived, and acquired

---

[10] Congress established the system to verify whether non-citizens are entitled to certain government benefits. *See* Immigration Reform Control Act of 1986, Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359, 3391 (1986), *codified at* 42 U.S.C. § 1320b-7 note; *id*. § 121(a)(1)(C), 100 Stat. at 3384-86 (1986), *codified at* 42 U.S.C. § 1320b-7(d) (§ 121 titled "Verification of Immigration Status of Aliens Applying for Benefits under Certain Programs").

citizens).[11] For instance, DHS admits that "SAVE may only be able to verify acquired U.S. citizenship in certain situations," and if DOJ queries "an individual with acquired citizenship who has not applied for a Certificate of Citizenship with [DHS], . . . SAVE may not be able to confirm that individual's acquired citizenship." CRT-0032 (SAVE MOA between USCIS and DOJ). Similarly, SAVE incorporates data collected by the Social Security Administration ("SSA") that SSA has long recognized is incomplete and unreliable for verifying citizenship status of citizens born outside the U.S., because the data only reflects the person's citizenship status when they applied for an SSN, and does not automatically update if the person later becomes a citizen. *See* Hill Decl. Exs. 17-19 (SSA-AR-44; SSA-AR-103; July 13, 2023, Letter from SSA Office of Gen. Counsel to Fair Elections Ctr. 2). A 2006 internal audit estimated that SSA's citizenship data inaccurately identified about 3.3 million citizens as non-citizens "because they had become U.S. citizens after obtaining their SSN." Hill Decl. Ex. 20 (SSA IG Report iii).

In its most recent Privacy Impact Assessment for SAVE, DHS noted that the system "may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual," and that "due to misspelling of names, transposed numbers, or incomplete information, the SAVE Program may produce inaccurate results." *See* Hill Decl. Ex. 13 (DHS-AR-000240-41); *accord* CRT-0032; Hill Decl. Exs. 14-15, 17-18 (DHS-AR-260, recognizing SAVE's "[s]hortfalls in data accuracy"; DHS-AR-302, stating same; SSA-AR-44, stating "citizenship information in SSA's records might not be current"; SSA-AR-103, stating same). These concerns are not hypothetical: Plaintiff Anthony Nel and another

---

[11] Acquired citizenship is "[c]itizenship conferred at birth on children born abroad to a U.S. citizen parent(s)." *Acquired citizenship*, USCIS Glossary of Terms, https://perma.cc/8AB4-9LAX. Derived citizenship is "[c]itizenship conveyed to children through the naturalization of their parents or, under certain circumstances, to foreign-born children adopted by U.S. citizen parents." *Derivative citizenship*, USCIS Glossary of Terms, https://perma.cc/7SXE-ZTYT.

Common Cause member declarant suffered wrongful removal from the voter rolls after their state relied on SAVE for voter list maintenance, and another Common Cause member declarant was forced to provide documentary proof of citizenship ("DPOC") to retain their voter registration. *See infra* Argument § I.[12]

### E.  Directing states to remove voters

The AR shows that if DOJ's Voter List Maintenance Policy "reveals that an alien unlawfully has registered to vote or voted in an election, the [Civil Rights] Division may seek to strike the alien's name from the voter registration list for future elections, refer the alien for prosecution, or both." CRT-3334. Indeed, DOJ has executed Memoranda of Understanding with at least three of the eighteen Complying States providing that DOJ will notify the state of "any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns [] the Justice Department found when testing, assessing, and analyzing your state's VRL [voter registration list] for NVRA and HAVA compliance, i.e., that [the] state's VRL only includes eligible voters," and purporting to commit the states, "within forty-five (45) days of receiving the notice from the Justice Department" to "remov[e]" putatively ineligible voters. *See* CRT-0005 (Alaska); CRT-2058 (Texas); CRT-0025 (South Carolina).[13] DOJ's representations to courts in

---

[12] The public record reveals that improper removals based on SAVE use are widespread. *See* Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica & Texas Tribune (Feb. 13, 2026), https://perma.cc/PR4Q-67NR.

[13] The MOUs with Alaska and Texas state that commitment slightly differently than the MOU with South Carolina. Alaska and Texas each commit to "clean [their] VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance." CRT-0005; CRT-2058. The South Carolina MOU commits the state to "remove any ineligible voters as identified by the Justice Department and confirmed by the [State Election Commission]." CRT-0025. But all MOUs in the AR reveal the crux of the Voter List Maintenance Policy: DOJ's expectation that it will analyze a state's voter roll and dictate the voters that the states will then remove from the SVRLs.

litigation with Non-Complying States likewise confirm that DOJ intends to "run these lists against other databases to be able to tell if there are bad registrations on their rolls" and if DOJ identifies a voter with a purportedly "bad registration," DOJ will contact the states to "verify . . . they have removed [that voter] from the rolls." Hill Decl. Ex. 5 (*Amore* Hr'g Tr. at 70:12-25).

### F.  The Administrative Record

On May 7, 2026, Defendants produced a certified administrative record totaling 522 documents, and on May 18, they supplemented the AR with an additional 34 documents. However, none of those documents pre-dates DOJ's implementation of the Policy in May 2025, when Defendants began demanding states' SVRLs. As the AR consists exclusively of documents post-dating the Policy's roll-out, no concrete reasoning, studies, or public engagement plausibly influenced the agency's decision-making before the Policy's implementation.

## II.    Impact of DOJ's Voter List Maintenance Policy on the Plaintiffs

DOJ's Voter List Maintenance Policy has inflicted and will continue to inflict serious harms on Plaintiffs. *See infra* Argument § I. For the Voter Plaintiffs and other Common Cause members registered to vote in states that have supplied their SVRLs to DOJ, the Voter List Maintenance Policy has caused pervasive unauthorized uses and disclosures of their sensitive personal data across various federal agencies without their consent. *See id.* And DOJ's unprecedented centralization of their personal information in a single federal system of records exposes the voters to profound data-security risks, including data theft or doxxing. *See id.* For Common Cause, DOJ's Policy has directly impaired its mission-critical voter protection services and educational programs and forced it to expend its scarce resources to counteract that harm. *See id.* And all Plaintiffs have been deprived of statutorily guaranteed information and opportunities to comment on the Policy *before* it went into effect. *See id.*

11

**LEGAL STANDARD**

When reviewing agency action under the APA, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007). "[T]he district judge sits as an appellate tribunal[] [and] [t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

**ARGUMENT**

DOJ's Voter List Maintenance Policy far exceeds the agency's statutory authority and violates multiple laws designed to protect Americans' privacy and data security. Plaintiffs, who are directly harmed by DOJ's unlawful actions in many ways, are entitled to summary judgment on Counts I, VI, VII, and VIII of their Complaint.

**I.      Plaintiffs have standing**

To establish Article III standing, a plaintiff must show that (1) "it has suffered an injury in fact" that is "concrete and particularized" and "actual or imminent," (2) "the injury is fairly traceable to the challenged action of the defendant," and (3) "it is likely . . . that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (internal citation omitted). Here, Plaintiffs have demonstrated multiple grounds for standing to challenge DOJ's unlawful Voter List Maintenance Policy.

**Organizational standing.** Common Cause has organizational standing on its own behalf, because DOJ's Voter List Maintenance Policy "'directly affect[s] and interfere[s] with [its] core business activities'" of providing services and educational resources to voters and its mission of promoting political participation. *See Ctr. for Biological Diversity v. Dep't of Interior*, 144 F.4th

12

296, 315 (D.C. Cir. 2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024));

*see also League of Women Voters of U.S. v. Newby,* 838 F.3d 1, 9 (D.C. Cir. 2016).

Common Cause is a national, nonpartisan organization with nearly one million members across all 50 states. Nunez Decl. ¶ 5, 7. Its mission is to create open, honest, and accountable government that serves the public interest; promote equal rights, opportunity, and representation for all; and empower all people to make their voices heard in the political process. Nunez Decl. ¶ 8. As part of its mission, Common Cause devotes significant resources to promoting voter participation and expends resources deploying and supporting on-the-ground staff, including in Complying States such as Texas, Ohio, Nebraska, and Indiana, to carry out its mission. Nunez Decl. ¶¶ 7-12; Geis Decl. ¶¶ 5-7; Vaughn Decl. ¶¶ 5-7; Turcer Decl. ¶¶ 5-7. Common Cause's efforts in those states include monitoring changes in voter registration and election procedures and administration at the state and local level; educating the public about changes in voting and election procedures; direct outreach to encourage people to register and vote; assisting, training and supporting partner organizations that conduct voter registration; and conducting or facilitating poll observation and other election protection programs to ensure that election procedures are followed, that eligible voters are able to vote, and that voters who encounter trouble at the polls have access to assistance. Nunez Decl. ¶¶ 10-13; Vaughn Decl. ¶¶ 7, 10-11, 17; Guttierez Decl. ¶¶ 10-13; Geis Decl. ¶¶ 7-9; Turcer Decl. ¶¶ 7, 10-15. Common Cause devotes resources, including money, staff and volunteer time, and strategic bandwidth to plan and execute these programs. *Id.*

Among other impacts, DOJ's Voter List Maintenance Policy will disrupt Common Cause's existing voter education and protection efforts in three critical ways, hampering its ability to provide those core services and causing it to expend additional resources to accomplish its goal of

13

increasing political engagement and participation. Nunez Decl. ¶¶ 15-16; Vaughn Decl. ¶¶ 9-22; Geis Decl. ¶¶ 8-16; Turcer Decl. ¶¶ 9-16; Gutierrez Decl. ¶¶ 9-11, 15-20.

First, DOJ's actions have increased public concern, requiring Common Cause to divert resources that it would otherwise spend on existing programming—including to register and engage more voters—to instead investigate the scope of DOJ's new Policy and to educate registered and potential voters about the risks and benefits of voting in the face of DOJ's actions. For example, because DOJ is collecting voter data and sharing it with DHS, many more members of the public have expressed concern about how the federal government will use their personal data, including for purposes of retaliation. Geis Decl. ¶ 10; Gutierrez ¶ 15; Vaughn ¶¶ 12-13. In Common Cause's experience, naturalized and derived citizens are more likely to have those concerns. Nunez Decl. ¶ 16; Geis Decl. ¶ 10; Vaughn Decl. ¶¶ 11-12. Common Cause therefore has expended (and will be forced to expend more of) its limited resources (i) to gather necessary information on DOJ's secretive process, (ii) to educate potential registrants, voters, volunteers, and civil society partners about the uses and misuses of voters' private data, and (iii) to address voters' legitimate fears about whether their personal data is secure and whether their political participation will come at a price. Nunez Decl. ¶¶ 16, 20-21; Vaughn Decl. ¶¶ 15, 21-22; Guttierez Decl. ¶¶ 9-11, 15-18; Geis Decl. ¶¶ 10-12, 16; Turcer Decl. ¶¶ 13-16.

Second, DOJ's actions have undermined the effectiveness of Common Cause's core activities promoting political participation. In addition to chilling eligible or registered voters, such as naturalized citizens, from participating in the political process, DOJ's Voter List Maintenance Policy contemplates removing registered voters—people that the states have determined to be qualified—based on data acknowledged to be unreliable. *See supra* Background §§ I.D-E. That

14

directly undermines Common Cause's work "to ensure that once registered, all voters can cast a ballot." Nunez Decl. ¶¶ 8, 12.

Third, Common Cause, as it has done in response to past efforts to purge voters using unreliable data, must divert resources to counteract the direct impact of the Policy itself to ensure that voters are not wrongly disenfranchised. In the Complying States, Common Cause will have to divert resources to educate the public about checking their voter registrations and train volunteers to identify voters whose registrations have been improperly purged due to the Voter List Maintenance Policy and assist those voters in restoring their registration. Nunez Decl. ¶ 21; Vaughn Decl. ¶¶ 20-22; Guttierez Decl. ¶¶ 17-20; Geis Decl. ¶¶ 12, 16. All of this will leave Common Cause with fewer resources to devote to its existing core organizational activities. *Id*.

Common Cause has therefore demonstrated both "injury to its organizational interests" and that it has "used its resources to counteract that harm." *Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1172 (D.C. Cir. 2025). And these injuries are heightened by the ongoing election cycle, for once an election passes, "there can be no do over and no redress." *Newby*, 838 F.3d at 9 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

**Informational standing.** Common Cause also has informational standing on its own behalf. "To prove an informational injury, a plaintiff must show that (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023) (citation modified). Here, DOJ has deprived Common Cause of critical information required by the public notice provisions of the Privacy Act and PRA. *See infra* Argument §§ III.B-C. Without these statutorily mandated disclosures, Common Cause

15

must undertake costly and time-intensive efforts to obtain information about DOJ's use of voter data so that it may be properly informed when engaging in voter education and other advocacy efforts. *See* Vaughn Decl. ¶¶ 15-19; Turcer Decl. ¶¶ 11, 13-14, 16; Gutierrez Decl. ¶¶ 15-16; Geis Decl. ¶¶ 9, 14; Nunez Decl. ¶¶ 18-19, 22; *see also United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99, 106-10 (D.D.C. 2017) (voting rights groups were injured by deprivation of information mandated by PRA regarding federal collection of voter data from states). And this injury is heightened by the "critical public need for timely access to . . . information" about DOJ's "widespread effort to gather sensitive information about vast numbers of registered voters," which will "shed light on important matters concerning voter privacy and the separation of powers in the inherently time-limited context of an active election cycle." *CREW v. DOJ*, --- F. Supp. 3d ---, No. 25-cv-4426, 2026 WL 472589, at *1, *12-13 (D.D.C. Feb. 19, 2026).

**Associational and Voter Plaintiff standing.** Common Cause has associational standing on behalf of its members, based on DOJ Policy's harms to its members' privacy, voting, informational, and procedural rights. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). And the Voter Plaintiffs have standing in their own right based on the same injuries.

As to **privacy injuries**, DOJ's wrongful use and disclosure of the Voter Plaintiffs' and other Common Cause members' protected voter registration data inflicts harms that are sufficiently "concrete" because they are a "'close . . . analogue'" to the harms vindicated by the "common law tort of intrusion upon seclusion." *AFSCME v. SSA*, 172 F.4th 361, 368 (4th Cir. 2026) (en banc) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021)); *see also LULAC II*, 818 F. Supp. 3d at 110 (unauthorized inter-governmental "sharing of sensitive [voter registration]

16

information" through SAVE system bore a sufficiently "close relationship" to "intrusion upon seclusion"); *accord AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025). When each of the Voter Plaintiffs and other Common Cause members registered to vote, they provided sensitive personal information with the expectation that it would be used only for the purpose of registering to vote. Each expected this information to be kept private when they supplied it to state election officials, with assurances in state privacy laws and the typical redactions in public versions of the voter file. *See, e.g.*, Nel Decl. ¶¶ 35-38, 47, 51; Duckworth Decl. ¶¶ 8-10; R. Nasrullah Decl. ¶¶ 8-10; Smith Decl. ¶¶ 10-13; A. Doe Decl. ¶ 20; B. Doe Decl. ¶ 39; Mosse Decl. ¶¶ 11-14; M. Nasrullah Decl. ¶¶ 11-14. They did not consent to it to being obtained, stored, and used by DOJ. *Id*. Nor did they consent to it being shared with, stored, and used by other federal agencies, such as DHS, private contractors and third parties. *Id*. DOJ's Voter List Maintenance Policy also exposes the Voter Plaintiffs and other Common Cause members to the risk that their sensitive data will be misused or stolen. Nel Decl. ¶¶ 39-41, 51-53; Duckworth Decl. ¶¶ 20-24, 29-30; R. Nasrullah Decl. ¶¶ 19-28, 32-33; Smith Decl. ¶¶ 23-27, 30-31; A. Doe Decl. ¶¶ 23-25, 37-39; B. Doe Decl. ¶¶ 41-43, 53-55; Mosse Decl. ¶¶ 29-34, 40-41; M. Nasrullah Decl. ¶¶ 29-35, 39-41. They reasonably fear that DOJ's improper centralization and misuse of their sensitive SVRL data exposes them to risks of identity theft, doxxing, and fraud. Nel Decl. ¶¶ 40-41; Duckworth Decl. ¶¶ 20, 24; R. Nasrullah Decl. ¶¶ 19-20. Smith Decl. ¶¶ 23-25; A. Doe Decl. ¶¶ 24-25; B. Doe Decl. ¶¶ 42-43; Mosse Decl. ¶¶ 29-32; M. Nasrullah Decl. ¶ 39.

Common Cause's members and the Voter Plaintiffs are also suffering cognizable **voting-related injuries** due to Voter List Maintenance Policy's harms to and burdens on their "fundamental right to vote," which is a "cornerstone premise of democracy." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 n.3 (9th Cir. 2025) (citing cases). Courts zealously "guard" and "firmly

and unequivocally reject[]" burdens on the right to vote. *Id.* Even an "increased risk" of disenfranchisement can make an injury "sufficiently 'imminent' for standing purposes." *Richardson v. Trump*, 496 F. Supp. 3d 165, 179 (D.D.C. 2020) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017)) (internal citation omitted).

Certain Voter Plaintiffs and other Common Cause members face an elevated risk of being erroneously removed from the voter rolls due to DOJ's Voter List Maintenance Policy. *See* Nunez Decl. ¶ 14. For example, Plaintiff Nel is a derived U.S. citizen and one of many Texas voters whose voter registration has already been wrongly cancelled by local election officials in Texas due to their use of the flawed SAVE system for statewide voter list maintenance. Nel Decl. ¶¶ 3-6, 13-22, 25-26. Common Cause member Bailey Doe is a naturalized citizen whose voter registration was wrongly canceled due to Texas's use of SAVE and who was prevented from voting, and thereby disenfranchised, in the March 2026 primary election. B. Doe Decl. ¶¶ 11-31. And Common Cause member Alex Doe is a derived citizen who was forced to provide documentary proof of citizenship to retain their voter registration due to Texas's use of SAVE. A. Doe Decl. ¶¶ 11-14. Because the federal government has not updated these voters' citizenship data in SAVE, *see* Nel Decl. ¶ 43; B. Doe Decl. ¶¶ 45, 47; A. Doe Decl. ¶¶ 27, 29, it is likely that DOJ's usage of SAVE for its "list maintenance verification procedures" will cause these voters to again be misidentified as non-citizens and again have their right to vote burdened. CRT-2060. Indeed, DOJ's MOA with DHS to use SAVE for voter verification explicitly contemplates that voters will be forced to provide "proof of U.S. citizenship" if SAVE's unreliable data and methods fail to confirm their citizenship. CRT-0033-0034.

**Procedural standing.** All Plaintiffs have procedural standing due to DOJ violations of the Privacy Act's and PRA's notice-and-comment requirements in ways that impair their above-

18

described "concrete interests in a personal way." *Mendoza v. Perez*, 754 F.3d 1002, 1010, 1013 (D.C. Cir. 2014).

**Causation and redressability.** But for DOJ's unlawful efforts to stockpile and disclose millions of Americans' sensitive voter registration data to create a sprawling new voter purge regime, none of Plaintiffs' injuries would have occurred. "Because Article III 'requires no more than *de facto* causality,' traceability is satisfied here." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (citation modified) (citing cases). And as explained below, *see infra* Argument § IV, Plaintiffs' requested relief is "likely" to redress their injuries. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025); *see also Massachusetts v. EPA*, 549 U.S. 497, 526 (2007) (finding standing where the "risk [of harm] would be reduced to some extent if petitioners received the relief they seek").

## II.    Plaintiffs challenge final agency action

DOJ's Voter List Maintenance Policy, as well as the associated policies and agreements, constitutes "final agency action" subject to APA review, because the Policy "mark[s] the consummation of the agency's decisionmaking process" and is an action by "which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal citations omitted). DOJ's Policy entails demanding, compiling, and consolidating SVRL data from every state; disclosing and comparing voter data from the compiled SVRLs within and outside of DOJ; testing, assessing, or analyzing the data for "insufficiencies" and "inadequacies;" and purporting to require states to remove those ineligible voters identified by DOJ to "clean" their voter rolls. *See supra* Background §§ I.A, E. The AR makes clear that DOJ has definitively adopted the Policy in ways that have legal consequences, including binding MOUs and new data practices. *See, e.g., Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (agency's decision "to adopt a policy of disclosing confidential

19

information without notice" is "surely a consummation of the agency's decisionmaking process") (internal citation omitted); *Nat'l Ass'n of Home Builders v. Norton*, 298 F. Supp. 2d 68, 76 (D.D.C. 2003) (agency "actively soliciting and reviewing input" and "data collected" is final agency action), *aff'd*, 415 F.3d 8 (D.C. Cir. 2005).

### III.    Plaintiffs are entitled to summary judgment on Counts I, VI, VII, and VIII of the Complaint

DOJ's Voter List Maintenance Policy vastly exceeds the agency's statutory authority, *see* Compl. ¶¶ 158-65 (Count I), violates the Privacy Act's procedural and substantive safeguards, *see id.* ¶¶ 188-202 (Count VI), violates the PRA's notice-and-comment procedures, *see id.* ¶¶ 203-17 (Count VII), and was arbitrary and capricious, *see id.* ¶¶ 218-20 (Count VIII). Each claim provides an independent basis to enter summary judgment for Plaintiffs and to hold unlawful, vacate, and set aside DOJ's Policy under the APA.

### A.  DOJ's Voter List Maintenance Policy lacks statutory authorization (Count I)

DOJ has asserted that NVRA and HAVA authorize the Voter List Maintenance Policy. *See supra* note 7. But DOJ is wrong: neither the NVRA, nor HAVA, nor any other law, authorizes its actions here. The NVRA and HAVA are part of a longstanding history of election administration (and in particular, voter list maintenance) being a responsibility of the states. To depart from that established practice—and authorize the momentous power of federalizing voter list maintenance— would require a clear statement from Congress. DOJ can point to no such statement in either the NVRA or HAVA. To the contrary, each law expressly limits DOJ's role to bringing enforcement actions if states lack "reasonable" processes for removing ineligible voters. 52 U.S.C. § 20507(a)(4) (NVRA); § 21083(a)(4)(A) (HAVA). Neither law permits DOJ to cast a dragnet over virtually every jurisdiction's voter list or to dictate the eligibility of every voter down to the individual person.

20

An "agency . . . literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (citation modified); *accord Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 912 (D.C. Cir. 2024). "And if an agency acts without statutory authority, then a court must set that action aside" under the APA. *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 143 (D.D.C. 2025). "To determine 'whether an agency has acted within its statutory authority,' [courts] use 'the traditional tools of statutory construction.'" *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024)). And the Court must "interpret the words of these statutes in light of the purposes Congress sought to serve." *Chapman v. Hou. Welfare Rts. Org.*, 441 U.S. 600, 608 (1979).

In our constitutional order, the responsibility for voter registration has long resided with the states. *See*, *e.g., Roudebush v. Hartke*, 405 U.S. 15, 24 (1972); *LULAC I*, 808 F. Supp. 3d at 43 ("By default, States are tasked with regulating, among other things, voter registration."). The Elections Clause vests power in *Congress* to override that default setting, and "Congress must speak clearly if it intends to delegate any part of that power to the Executive Branch." *LULAC II*, 818 F. Supp. 3d at 100 (citing *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)). A clear expression from Congress is especially important here, because the administration of this nation's elections is undoubtedly a question of "vast economic and political significance." *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (citation modified). Defendants, however, can point to no statement from Congress, clear or otherwise, that authorizes their sprawling takeover of voter list maintenance.

The plain text of both the NVRA and HAVA makes clear that the states—not federal agencies—are responsible for voter list maintenance. Under the NVRA, "each *State* shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters

from the official lists of eligible voters[.]" 52 U.S.C. § 20507(a)(4) (emphasis added); *Bellitto v. Snipes*, 935 F.3d 1192, 1195 (11th Cir. 2019) (explaining that NVRA "centralizes" voter rolls list maintenance "responsibility in the state"); *accord Pub. Int. Legal Found., Inc. v. Nago*, --- F.4th ----, 2026 WL 1144703, at *2 (9th Cir. Apr. 28, 2026).

Likewise, under HAVA, "each *State* . . . shall implement . . . a *single*, *uniform*, *official*, *centralized*, interactive computerized statewide voter registration list defined, maintained, and administered *at the State level*." 52 U.S.C. § 21083(a)(1)(A) (emphasis added); *Am. Civ. Rts. Union v. Phila. City Comm'rs*, 872 F.3d 175, 180-81 (3d Cir. 2017). Specific to list maintenance, each state is required to have a "system . . . that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters[.]" 52 U.S.C.A. § 21083(a)(4)(A). "Nowhere in the language or structure of HAVA as a whole is there any indication that the Congress intended to strip from the States their traditional responsibility to administer elections[.]" *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004).

DOJ has a defined, secondary role under the NVRA and HAVA: to bring enforcement actions to ensure that the statutes' requirements are followed. 52 U.S.C. §§ 20510(a), 20511 (NVRA); §§ 21111, 21144 (HAVA). Specific to list maintenance obligations under these laws, states must have a "program" or "system" that "makes a reasonable effort" to remove ineligible voters. 52 U.S.C. § 20507(a)(4) (NVRA); § 21083(a)(4)(A) (HAVA). DOJ's enforcement authority in this context is therefore limited to circumstances when a state's list maintenance *processes* are not "reasonable." *Id.* Nowhere does the NVRA or HAVA permit DOJ to create a parallel system of voter registration databases and supervise the qualification of voters down to the person, as described in the already executed MOUs and by DOJ elsewhere. *See supra* Background §§ 1.A, E. Indeed, HAVA contemplates a "single" voter list for each state,

"administered at the State level." 52 U.S.C. § 21083(a)(1)(A). And more specifically, nothing in the NVRA or HAVA gives DOJ the authority, on a dragnet basis and without any particularized investigatory purpose, to:

- "conduct searches that assess the List Maintenance of voter registration lists," CRT-3386;

- "test [states'] lists," CRT-3384, and "identify . . . areas that may require maintenance," *id.*;

- facilitate DOJ's "analysis of ingested data by litigative consultant," CRT-3396; *see also* CRT-0007; CRT-0027, CRT-2060;

- "seek to strike [an] alien's name from the voter registration list for future elections," CRT-3334, dictate how states "clean" their own voter rolls, CRT-0005; CRT-2058; Hill Decl. Ex. 5, p. 70 (*Amore* Hr'g Tr. at 70:12-25), or

- require that, after list maintenance, states "resubmit" their SVRLs to DOJ so DOJ can "verify proper list maintenance has occurred," CRT-0005; CRT-2058.

Instead, "federal law largely leaves the finer details of list maintenance to the States' discretion." *Galvin*, 2026 WL 972129, at *1.

Moreover, the undisputed facts show that DOJ's sweeping operation under the Policy bears no resemblance to any reasonable definition of an individualized investigation. DOJ has launched an all-encompassing effort to capture voter data from everywhere it exists in the country, recycling virtually identical, cookie-cutter demands across each jurisdiction and without alleging any specific misconduct. *See supra* note 7. Indeed, DOJ's Policy explicitly presumes that *every registered voter in the country* is a "'subject[]'" of DOJ's nationwide dragnet "investigation into voter fraud"—even absent particularized suspicion. CRT-3356 & n.27 (quoting Justice Manual § 9-11.151 (Jan. 2020), https://perma.cc/9HVT-HLZC). Such a Policy is antithetical to valid enforcement actions, which are predicated on individualized suspicions of specific violations of law. "Neither the NVRA nor HAVA authorize . . . the kind of fishing expedition [DOJ] seeks here." *See United States v. Amore*, 2026 WL 1040637, at *6 (D.R.I. Apr. 17, 2026).

DOJ's actions also undermine the NVRA's purpose. *See* 52 U.S.C. § 20501(b) (stating that NVRA's goal is "to establish procedures that will increase the number of eligible citizens who register to vote" and "enhance[] the participation of eligible citizens as voters"). For instance, the NVRA builds in significant protections for voters, requiring that, once identified, certain potentially ineligible voters *must* stay on the rolls for two election cycles, to limit the likelihood of removing eligible voters by mistake. *Id.* § 20507(d)(1)(B). Under DOJ's MOUs' terms, however, once federal officials identify supposed "ineligible voters," states are required to "remov[e]" these voters "within forty-five (45) days." CRT-0005 (Alaska MOU); CRT-2058 (Texas MOU). Critically, these removals are required notwithstanding the NVRA's procedural protections for voters, including the statute's bar on systematic removals of voters within 90 days of an election, 52 U.S.C. § 20507. DOJ seeks to "use civil rights legislation which was enacted for an entirely different purpose to amass and retain an unprecedented amount of confidential voter data," going "far beyond what Congress intended when it passed the underlying legislation." *Weber*, 816 F. Supp. 3d at 1195.

Finally, DOJ's interpretation of the NVRA and HAVA has no historical basis, and courts should "hesitate" when an agency "'claim[s] to discover in . . . long-extant statute[s] 'an unheralded power' representing a 'transformative expansion [of its] . . . authority.'" *West Virginia*, 597 U.S. at 724 (citation omitted). Congress enacted the NVRA in 1993 and HAVA in 2002. Despite these laws being in place for decades, never before has DOJ asserted that they empower the agency to centralize hundreds of millions of Americans' sensitive voter registration data in a single system of records, disclose that data to third parties, compare it to other databases, analyze it, and then compel states to purge their voter rolls of purportedly "ineligible voters" identified by DOJ's undisclosed methodology. The indisputable "'lack of historical precedent'" for DOJ's

24

actions, "coupled with the breadth of authority that [DOJ] now claims, is a 'telling indication'" that they "extend[] beyond the agency's legitimate reach." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 119 (2022) (per curiam).

## B. DOJ's Voter List Maintenance Policy violates the Privacy Act (Count VI)

Under its Voter List Maintenance Policy, DOJ is centralizing vast volumes of sensitive individual voter registration data in a single federal system of records at CRT. DOJ is also disclosing tens of millions of individuals' SVRL data across federal agencies and contractors, including to DHS to run mass citizenship checks through its flawed SAVE system, in substantially new and different ways without those individuals' consent or statutory authorization. In doing so, DOJ has violated the Privacy Act's core procedural and substantive protections. As one court recently found, DOJ's creation of a "'centralized Federal information system[]'" of Americans' personal voting data endangers the "privacy" of millions of Americans and brings to life the very fears "that animated Congress to pass the Privacy Act—threats to American democracy amidst erosion of public trust regarding the Executive's use of sensitive data." *Weber*, 816 F. Supp. 3d at 1194 (quoting S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Source Book on Privacy at 168 (1976)).[14]

### 1. DOJ violated the Privacy Act's notice-and-comment requirements for revising systems of records

In amassing for the first time millions of Americans' voter registration data in one system *and* in using that system in substantially different ways than it had previously been used, DOJ flouted the Privacy Act's notice-and-comment requirements and thus acted "without observance

---

[14] The APA provides a remedy for DOJ's violations of the Privacy Act. *See, e.g.*, *LULAC II*, 818 F. Supp. 3d at 110-113 (APA remedy to challenge SAVE overhaul); *AFL-CIO*, 778 F. Supp. 3d at 81 (DOGE data access).

of procedure required by law." 5 U.S.C. § 706(2)(D); *see* Compl. ¶¶ 190-95.

The Privacy Act requires agencies to publish a system of records notice ("SORN") in the Federal Register whenever they "establish[] or revis[e]" a "system of records." 5 U.S.C. § 552a(e)(4). And at least 30 days *before* "any new use or intended use of the information in the system," the agency must "publish in the Federal Register notice" of the new use and "provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11). "In no circumstance may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following Federal Register publication." OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*, at 7 & 12 (2016), https://perma.cc/N9QK-SDLE ("OMB Circular No. A-108"). Agencies "shall" review and consider "public comments on a published SORN." *Id.* at 7.

Examples of "significant changes" that require publication of a modified SORN include a "substantial increase in the number, type, or category of individuals about whom records are maintained in the system"; a "change that expands the types or categories of records maintained in the system"; a "change that modifies the purpose(s) for which the information in the system of records is maintained"; and a "new routine use or significant change to an existing routine use that has the effect of expanding the availability of the information in the system." *Id.* at 5-6.

Here, the AR confirms that DOJ has stockpiled millions of Americans' confidential SVRL data for the first time, significantly changing a system of records long-maintained at CRT titled "JUSTICE/CRT – 001, Central Civil Rights Division Index File and Associated Records" ("Central CRT Index File"). *See*, *e.g.*, CRT-0004, -0024, -0031, -2057; *see also* CRT-3396 (acknowledging CRT ingesting "large datasets with PII" that "may potentially introduce new information types or require processing information in new ways," including "[i]ngestion" and

"[s]torage of bulk confidential Voter Registration Data from multiple states"). DOJ has cited three pertinent SORNs for that system: 68 Fed. Reg. 47610 (Aug. 11, 2003), 70 Fed. Reg. 43904 (July 29, 2005), and 82 Fed. Reg. 24147 (May 25, 2017) (collectively, the "CRT SORNs"). *See* CRT-0004, -0024, -0031, -2057; Hill Decl. Exs. 10-12 (CRT SORNs). But none of the CRT SORNs— or any other—contemplates or discloses that the system will contain hundreds of millions of Americans' SVRL data, that DOJ plans to disclose this sensitive personal data in bulk to other agencies and private contractors, and that DOJ plans to send the results of its "verification procedures" to states with instructions to remove purported "ineligible voters" DOJ identifies from their voter rolls. CRT-0005, 0007; CRT-0025, 0027; CRT-2058, 2060.

"[N]one of the SORNs" for the Central CRT Index File put the "American public on notice that specifically, their voter registration data is going to be collected [by DOJ] on an unprecedented level and used for a plethora of government activity . . . as required under the Privacy Act." *Weber*, 816 F. Supp. 3d at 1193-94. The primary SORN, published in 2003, describes the system as consisting of "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." Hill Decl. Ex. 10 (68 Fed. Reg. at 47611). But nothing in this or any CRT SORN notify the American public that the system will be used to retain, analyze, and disclose their personal state-level voter registration data en masse for DOJ's secretive "list maintenance verification procedures." CRT-0007 (Alaska MOU), CRT-0027 (South Carolina MOU), CRT-2060 (Texas MOU). For example, the CRT SORNs do not include registered voters in the "categories of individuals covered by the system," do not include state voter registration data (let alone states' entire SVRLs) in the "categories of records in the system," and do not identify "list maintenance verification" as one of

27

the system's "purposes." *See* Hill Decl. Ex. 10 (68 Fed. Reg. at 47611); Hill Decl. Ex. 11 (70 Fed. Reg. 43904) (adding a routine use); Hill Decl. Ex. 12 (82 Fed. Reg. 24147) (adding routine uses).

Thus, as one court held in dismissing DOJ's voter data demand suit against California, DOJ has "violated" the Privacy Act's notice-and-comment requirements in compiling vast troves of new voter data in the Central CRT Index File. *See Weber*, 816 F. Supp. 3d at 1192-94. This subverts the "Privacy Act's public notice and comment structure," which "is an essential component of the Act and an essential piece of American democracy. Americans deserve to know the nature, scope, and routine uses of the records *before* they are collected by the federal government." *Id.* at 1193 (emphasis added). "If millions of Americans' private information is to be collected by the federal government, they deserve the ability to comment and voice their concerns before this collection occurs." *Id.*; *accord LULAC II*, 818 F. Supp. 3d at 113-15; OMB Privacy Act Guidelines, 40 Fed. Reg. 28948, 28966 (July 9, 1975), https://perma.cc/776J-4L46.

### 2. DOJ is improperly disclosing records in bulk in violation of the Privacy Act

Under the Voter List Maintenance Policy, DOJ is also violating the Privacy Act's prohibition on disclosures of individuals' records without their consent or statutory authorization, *see* Compl. ¶¶ 196-98, and thus has acted "not in accordance with law." 5 U.S.C. § 706(2)(A).

"An agency violates the [Privacy] Act when it 'discloses' information in the form of a 'record' from a 'system of records' and the disclosure is not pursuant to a valid exception under the Act." *Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018) (citing 5 U.S.C. § 552a(b)). Here, none of the Act's 13 exceptions apply, and DOJ's assertions to the contrary are meritless.

DOJ invokes the Act's "routine use" exception, *see, e.g.*, CRT-0004, -0024, -0031, which permits disclosure pursuant to a properly noticed "routine use," 5 U.S.C. § 552a(b)(3). "To fit within the confines of the routine use exception to the Privacy Act, an agency's disclosure of a

record must be both (i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency." *Ames v. DHS*, 861 F.3d 238, 240 (D.C. Cir. 2017) (quoting 5 U.S.C. § 552a(a)(7) and citing § 552a(e)(4)(D)). As OMB's guidelines instruct, "[a]gencies may only establish routine uses for a system by explicitly publishing the routine uses *in the relevant SORN*." OMB Circular No. A-108 at 11 (emphasis added). Where, as here, old routine uses in outdated SORNs "do not accurately and completely describe all routine use disclosures to which the records in the system are subject, the agency *shall* discontinue any disclosures that are not accurately and completely described and revise the routine uses in the SORN to accurately and completely describe those disclosures." *Id.* at 12 (emphasis added).

DOJ is defying this command. Pursuant to its Voter List Maintenance Policy, DOJ has executed agreements and policies freely allowing mass disclosure of SVRL data from the Central CRT File Index, in bulk, to persons within the agency, to DHS and other federal agencies, and to private contractors, as well as allowing DOJ to send its analysis of the SVRLs back to states. *See supra* Background §§ I.C-E. Yet, it is doing so under decades-old, outdated SORNs.

Nor do DOJ's disclosures to DHS—whether to USCIS or HSI—fit the Privacy Act's narrow "law enforcement" exception. That exception allows disclosure to another government agency "for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency . . . has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought." 5 U.S.C. § 552a(b)(7). The AR contains only one "written request" executed under (b)(7), under which U.S. Immigrations and Customs Enforcement ("ICE") broadly requested that DOJ "provide HSI with the public [SVRLs] in its possession, in order for HSI to conduct appropriate

29

investigation of potential violations of federal election law." CRT-3398. The letter failed to identify with any further specificity exactly what "potential violations of federal election law" ICE sought to investigate, *see id.,* falling short of even OLC's assessment that, to satisfy the law enforcement exception, the letter "should specify that DHS seeks the [SVRLs] for the purpose of investigating violations of 18 U.S.C. §§ 611(a) and 1015(f), and specifically to identify illegal aliens who have registered to vote or have voted." CRT-3368. The AR contains no written request from USCIS at all, as is required for DOJ to disclose voter data using SAVE.

And, in any case, 5 U.S.C. § 552a(b)(7) by its terms does not authorize the type of bulk, rolling data disclosures DOJ is making; it instead requires a targeted request specifying the "particular portion" of a record sought and "law enforcement activity" at issue. *Id.* This reading of (b)(7)'s plain text is confirmed by the Act's legislative history. *See* S. Rep. No. 93-1183, at 70, 1974, U.S.C.C.A.N. at 6987 (recognizing that, in contrast to (b)(3)'s routine use exception, (b)(7)'s law enforcement exception allows "non-routine requests only where written requests and permission are given on a case-by-case basis by the agency maintaining the record"). Permitting the government to invoke the law enforcement exception to collect and query the voting records of hundreds of millions of Americans nationwide, without any individualized predicate, would allow the exception to swallow the rule and eviscerate the Privacy Act's core protections.

By disclosing millions of Americans' sensitive personal records with no applicable exception or properly noticed routine use, Defendants are violating 5 U.S.C. § 552a(b).

### 3. DOJ is maintaining inaccurate and outdated records in bulk in violation of the Privacy Act

Per the Policy, DOJ is maintaining inaccurate and outdated records in violation of the Privacy Act's protections of individuals against adverse government determinations based on

30

faulty data. The Privacy Act requires agencies to ensure the records it "maintains"[15] in systems of records are accurate, relevant, up-to-date, and secure. An agency must "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination," 5 U.S.C. § 552a(e)(5); "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes" before "disseminating" them "to any person other than a[] [federal] agency," *id.* § 552a(e)(6); and "establish appropriate. . .safeguards . . . to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness," *id.* § 552a(e)(10). DOJ is violating each of these restrictions by "maintaining" inaccurate, untimely, incomplete records in the Central CRT Index File to determine individuals' eligibility to vote, without taking "reasonable efforts" to protect against the substantial risk DOJ will misidentify lawfully registered voters for purging.

As explained above, a key element of DOJ's Voter List Maintenance Policy involves running millions of voters' SVRL data through DHS's SAVE system to conduct mass citizenship checks, and transmitting those results to states to mandate removal of individuals from voter rolls based on DOJ's analyses. *See supra* Background §§ I.C-E. Yet the government itself admits—as reflected in the AR and other judicially noticeable federal records—that SAVE relies on incomplete and inaccurate citizenship data likely to falsely identify U.S. citizens as non-citizens or to fail to verify their citizenship. *See, e.g.,* CRT-0032 (acknowledging SAVE's inability to

---

[15] The Privacy Act defines "maintain" as "maintain, collect, use, or disseminate," 5 U.S.C. § 552a(a)(3).

verify certain "acquired U.S. citizens"); Hill Decl. Exs. 13-15, 17 (DHS-AR-240, finding "risk" that SAVE "may share inaccurate information with registered agencies"); (DHS-AR-260, recognizing SAVE's "[s]hortfalls in data accuracy"); (DHS-AR-302, stating same); (SSA-AR-44, stating "citizenship information in SSA's records might not be current"); *see also League of Women Voters v. DHS*, 2025 WL 3198960, at *8 (D.D.C. Nov. 17, 2025) ("The Government does not dispute that . . . inaccuracies" in the SSA citizenship data used by SAVE "likely still exist."). These data inaccuracies are known to cause "substantial harm, embarrassment, inconvenience, or unfairness," *id*. § 552a(e)(10), to individuals wrongfully identified as non-citizens or potential non-citizens, including the Voter Plaintiffs and other Common Cause members. *See supra* Argument § I.

Moreover, DOJ acknowledges that states "update[]" SVRLs "regularly with new voter registrations," and thus "the VRLs sent to [DOJ] won't be current for very long – with updates, they will become obsolete." CRT-3385. By DOJ's own admission, then, the SVRL data it is maintaining, using, and disseminating will quickly become untimely and inaccurate.

By ingesting vast volumes of unreliable data in the Central CRT Index File and disclosing that data in bulk as part of DOJ's Voter List Maintenance Policy, without protecting against known and substantial risks of "unfairness" in "determination[s]," *see* 5 U.S.C. §§ 552a(e)(5), (6), and (10), DOJ acted "not in accordance with law," *id.* § 706(2)(A).

### 4. DOJ is maintaining First Amendment protected records in bulk in violation of the Privacy Act

DOJ is also violating the Privacy Act's substantive restrictions by "maintaining" records in the Central CRT Index File that "describ[e] how an individual exercises rights guaranteed by the First Amendment," even though such maintenance is not "expressly authorized by statute or by the individual about whom the record is maintained" and not "pertinent to and within the scope

of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7); *see Weber*, 816 F. Supp. 3d at 1193 (holding that § 552a(e)(7) barred "DOJ's request for California's unredacted voter roll"). DOJ's unprecedented "centralization" of millions of Americans' First Amendment protected voting data has had and will have a profound "chilling effect on voter registration which would inevitably lead to decreasing voter turnout as voters fear that their information is being used for some inappropriate or unlawful purpose." *Id.* at 1195-96.

First, DOJ is "maintaining" SVRLs in every sense of the statutory definition. *See* 5 U.S.C. § 552a(a)(3). DOJ "collected" the SVRLs from each Complying State. It "maintains" the SVRL data in the Central CRT Index File. It "uses" the SVRLs to conduct voter list verification and identify purportedly ineligible voters. And it "disseminates" the SVRLs to DHS and others to carry out DOJ's list maintenance verification procedures. *See* CRT-0005, 0007 (Alaska MOU); CRT-0025, 0027 (South Carolina MOU); CRT-2058, 2060 (Texas MOU); *see also* CRT-0030-0040 (SAVE MOA between USCIS and DOJ)*;* CRT-0003399-3400 (Agreement between HSI and DOJ); CRT-3396 (internal DOJ email describing "[p]otential analysis of ingested data by litigative consultant").

Second, SVRLs are First Amendment protected records. "[V]oter registration, participation in elections, as well as party affiliation are all types of political expression protected by the First Amendment." *Weber*, 816 F. Supp. 3d at 1193 (citing *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999); *see* also *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 69, 75-76 (1990)); *see also Gerlich v. DOJ*, 711 F.3d 161, 172 (D.C. Cir. 2013) (agency's collection of records about individuals' "ideological affiliations," "political party affiliations," or "involve[ment] in organizations committed to [partisan] causes" could violate § 552a(e)(7)). Because every SVRL reflects individuals' registration to vote, SVRLs necessarily document First Amendment activity.

And some of the SVRLs that DOJ has compiled in the Central CRT Index File include even more details about individuals' First Amendment expression, including voter participation history and party affiliation. *See, e.g.*, CRT-0468, CRT-0947, CRT-1661, CRT-1843, CRT-1970.

Third, "none of the exceptions that would allow for agencies to collect information falling under the First Amendment apply in the present case." *Weber*, 816 F. Supp. 3d at 1193. DOJ's maintenance of the SVRL data is not "expressly authorized by statute," 5 U.S.C. § 552a(e)(7), for the reasons explained above. *See supra* Argument § III.A. Nor is DOJ's maintenance of First Amendment protected data pursuant to the Voter List Maintenance Policy "pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). DOJ may not "invok[e] a need to maintain records for generic investigative and informative purposes" under its purported HAVA and NVRA authority. *Maydak v. United States*, 363 F.3d 512, 517 (D.C. Cir. 2004); *see also MacPherson v. IRS*, 803 F.2d 479, 482 (9th Cir. 1986) ("The 'law enforcement activities' exception to the First Amendment protections of section (e)(7) of the Privacy Act is intended merely 'to make certain that political and religious activities are not used as a cover for subversive activities.'") (citing 120 Cong. Rec. H10, 892 (daily ed. Nov. 20, 1974)).

### C. DOJ's Voter List Maintenance Policy violates the Paperwork Reduction Act (Count VII)

As part of its Voter List Maintenance Policy, DOJ has demanded SVRLs without complying with the Paperwork Reduction Act's procedural requirements and thus acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).[16]

---

[16] An agency's failure to adhere to PRA procedures is appropriately enforced through the APA. *See, e.g., Hyatt v. OMB*, 908 F.3d 1165, 1172-73 (9th. Cir. 2018); *Doctors for America v. OPM*, 766 F. Supp. 3d 39, 52 (D.D.C. 2025); *Orr v. Trump*, 778 F. Supp. 3d 394, 425-26 (D. Mass. 2025).

"The PRA provides that agencies cannot 'conduct or sponsor' a 'collection of information' unless they comply with several procedural requirements."[17] *Hyatt*, 908 F.3d at 1171. *First*, the agency must conduct an extensive review of the proposed collection, including (among other things) evaluating "the need for the collection of information," devising "a plan for the collection of information," confirming that the "collection is in accordance with the clearance requirements" provided in the statute. *See* 44 U.S.C. §§ 3506(c)(1) & 3507(a)(1). *Second*, the agency must post a 60-day notice in the Federal Register soliciting comments that allow it, *inter alia*, to "evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency." *Id*. §§ 3506 (c)(2) & 3507(a)(2). *Third*, the agency must certify to the Director of the Office of Management and Budget ("OMB") that the collection of information satisfies several statutory safeguards, including that it "informs the person receiving the collection of information of [] the reasons the information is being collected [and] the way such information is to be used." *Id*. § 3506(c)(1)(B)(iii) & (c)(3). *Fourth*, it must publish a second detailed notice in the Federal Register. *Id.* § 3507(a)(1)(D). After this process, the agency may proceed with the collection of information *only* if the Director of OMB approves the collection and provides it with a "control number to be displayed upon the collection of information." *Id.* § 3507(a)(2)-(3).[18]

---

[17] A "collection of information" is defined broadly to include "the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of format, calling for either [*inter alia*] answers to identical questions posed to, or identical reporting . . . requirements imposed on [] ten or more persons." 44 U.S.C. § 3502(3)(A). The term "person" is defined to include states. *Id.* § 3502(10).

[18] The statute ensures that the OMB Director's review imposes meaningful safeguards: it requires the Director, "[b]efore approving a proposed collection of information," to make an independent determination of whether the collection is "necessary for the proper performance of the functions of the agency." 44 U.S.C. § 3508. If the OMB Director "determines that the collection of information . . . is unnecessary for any reason, the agency may not engage in the collection of information." *Id.*

35

DOJ's demand letters violated each of these clear statutory requirements, and therefore violated the PRA. To start, the demand letters constitute a "collection of information" under the statute. To trigger the statute's requirements, a collection of information must pose "identical questions . . . or reporting requirements" directed to "ten or more persons." 44 U.S.C. § 3502(3)(A). The demand letters satisfy that requirement: DOJ sent demands to 49 states and the District of Columbia, and each demanded "all fields" contained in the state's SVRL, including "the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number." *See supra* note 7.[19] DOJ was therefore subject to the PRA's procedural requirements, yet it ignored them. The letters did not display OMB-issued control numbers, and they could not have, because DOJ did not comply with any of the Act's enumerated procedures.

DOJ's demand for sensitive data about hundreds of millions of Americans is exactly the kind of governmental action that the PRA is meant to regulate. Passed in response to the federal government's "insatiable appetite for data," the PRA requires agencies to observe "procedures for guarding the privacy" of individuals when the government seeks their "confidential information." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990). When it enacted the PRA in 1980, Congress declared its intent (among other things) to "ensure that the creation, collection, maintenance, use, dissemination, and disposition of information by or for the federal Government is consistent with applicable law, including laws relating to [] privacy and confidentiality, including [the Privacy Act]." 44 U.S.C. § 3501(8)(A). If DOJ had adhered to the PRA's procedures, it would have had to consider the legal and practical consequences of amassing a

---

[19] The PRA applies to collections of information directed to state governments or their officials. *See* 42 U.S.C. § 3502(10).

national voter registration database. Flouting the statute's procedures thus undermines the exact interests Congress sought to protect.[20]

### D.  DOJ's Policy is arbitrary and capricious (Count VIII)

DOJ's sweeping Policy—requiring states to surrender their complete confidential voter list data to the federal government, issued without formal rulemaking or even a written memorandum of decision—is also arbitrary and capricious and must be set aside on that basis. 5 U.S.C. § 706(2)(A). The APA "'requires agencies to engage in reasoned decisionmaking'" and "to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020) (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020)). DOJ has failed to meet this foundational requirement, as shown by the certified AR containing all "materials that might have influenced the agency's decision" in establishing the Policy. *See Amfac Resorts v. U.S. Dep't of the Interior,* 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (citation modified). The AR establishes that Defendants have failed to explain the Policy; the Policy decision runs counter to the evidence before the agency; DOJ "entirely failed to consider [] important aspect[s] of the problem;" and it has "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Policy is arbitrary and capricious for each of these independent reasons.

---

[20] DOJ may seek to defend its overt defiance of the PRA's procedural requirements by invoking the exception for requests tied to litigation or administrative enforcement, 44 U.S.C. § 3518(c)(1), but any such argument lacks merit. The PRA specifically *includes* within its scope collections of information in pursuit of "general investigations." *Id.* § 3518(c)(2). DOJ's categorical, nationwide demand for SVRL data epitomizes a "general investigation."

## 1.  Defendants failed to explain the Policy

The D.C. Circuit has repeatedly held that "a fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (cleaned up). Notwithstanding the magnitude of DOJ's Policy – affecting hundreds of millions of voters nationwide – it has not explained its Policy to compile the states' confidential voter files, let alone a reasoned one. The absence of a reasoned explanation for the agency's decision renders it arbitrary and capricious and requires the Court to set it aside. *See FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009) ("we insist that an agency 'examine the relevant data and articulate a satisfactory explanation for its action.'") (citation omitted).

The "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.,* 588 U.S. at, 756. The Policy fails to meet the most fundamental APA requirement that an agency engage in reasoned decisionmaking and must be set aside for this reason alone.

## 2.  DOJ failed to explain a rational connection between the facts and the Policy

An "agency's substantive decision must be supported by 'substantial evidence' in the administrative record." *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n,* 921 F.3d 1102, 1111 (D.C. Cir. *2019)* (quoting *Comcast Corp. v. FCC*, 579 F.3d 1, 5, 7 (D.C. Cir. 2009)). The AR confirms that DOJ fails to meet this independent requirement of reasoned decisionmaking, as DOJ failed to conduct or even consult any research or analysis *before* implementing this nationwide Policy. *See generally* AR.

38

Although Defendants' MOUs with states include conclusory references to Title III of the CRA, HAVA, and the NVRA, *see, e.g.*, CRT-0001, CRT-0017, neither the MOUs nor any other Record document includes any explanation for how these statutes relate to Defendants' data demands.[21] *See generally* AR. The PRA required DOJ to articulate precisely this kind of reasoning before launching a collection of information. *See supra* Argument § III.C. DOJ's "failure to comply with, or apparently even consider, the PRA also lends support for Plaintiffs' argument that the [Voter List Maintenance Policy] is arbitrary and capricious." *Am. Fed'n of Tchrs. v. Dep't of Educ.,* 796 F. Supp. 3d 66, 103 (D. Md. 2025).

### 3. DOJ entirely failed to consider important aspects of the problem

In its decision-making process, DOJ "entirely failed to consider [] important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, including voter participation and disenfranchisement, personal data privacy, and data security. This is an independent basis to set aside the Policy under the APA. *See Nat'l Lifeline Ass'n,* 921 F.3d at 1113 (vacating agency action for failing to consider its effects on impacted groups).

First, the AR is silent on the privacy and cybersecurity risks associated with compiling, centralizing, and sharing the personal data of over 200 million active registered voters. *See generally* AR. The AR contains no notice published in the Federal Register, no privacy impact assessment, no privacy threshold analysis, and no explanation of what measures, if any, Defendants are taking to ensure the data will be maintained with "such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the

---

[21] Post hoc rationalizations suggest that DOJ may seek to justify its Policy by reference to claims of election fraud, voter list maintenance errors, or civil rights violations. *See, e.g*., CRT-0001 (Alaska MOU); CRT-0017 (South Carolina MOU). However, a court may not accept "post hoc rationalizations for agency action." *State Farm*, 463 U.S. at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id*.

determination." 5 U.S.C. § 552a(e)(5). *See also generally* AR. A "statutorily mandated factor, by definition, is an important aspect of any issue before an administrative agency, as it is for Congress in the first instance to define the appropriate scope of an agency's mission." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.,* 374 F.3d 1209, 1216 (D.C. Cir. 2004).

Defendants also failed to consider the substantial risk that the Policy would result in the erroneous removal of eligible voters from states' SVRLs. After Defendants adopted the Policy, they expressed awareness that SAVE *cannot* identify certain eligible voters, namely citizens with acquired citizenship, CRT-0032 n.2. DHS itself has repeatedly confirmed these risks. *See supra* Background § I.D. Critically, the AR confirms that Defendants did not consider any of these risks *before* the Policy was developed and implemented. This alone is evidence of arbitrary and capricious decision-making in violation of the APA. *See Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 54 (D.D.C. 2019) (vacating arbitrary and capricious agency action when "the government failed to adequately account for two relevant factors—the States' reliance cost and the cost of delay on children, parents, and society").

DOJ further failed to consider the reliance interests and reasonable privacy expectations of the millions of Americans who never consented to their voter data being compiled, consolidated, analyzed, and shared by DOJ. *See generally* AR. *See Nat'l Lifeline Ass'n*, 921 F.3d at 1114-15 (failing to consider reliance interests was arbitrary and capricious). Plaintiff Common Cause has relied on its knowledge of longstanding government practices and information disclosed under open government laws to educate and inform the public to achieve its mission of protecting fair and equal access to the ballot box. *See* Nunez Decl. ¶¶ 20, 22. DOJ's Policy ignores those reliance interests, leaving Common Cause and similar organizations in the dark as to how to educate the public about the security of voter data and how the federal government will use voters' sensitive

40

information. *See generally* AR. When an agency's "prior policy has engendered serious reliance interests that must be taken into account." *Fox Television Stations,* 556 U.S. at 515. "It would be arbitrary or capricious to ignore such matters." *Id.* DOJ's failure to even acknowledge the "serious reliance interests" at issue is arbitrary and capricious, as "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516.

Finally, the Policy is antithetical to Congress's goals in enacting the NVRA. As DOJ itself acknowledges, Congress's intent in enacting the NVRA was to make "it easier for all Americans to register to vote and to maintain their registration."[22] "Congress's stated purposes in enacting the NVRA included 'establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office,' helping officials at all levels of government implement the Act's requirements 'in a manner that enhances the participation of eligible citizens as voters in elections for federal office,' 'protect[ing] the integrity of the electoral process,' and ensuring the maintenance of 'accurate and correct voter registration rolls.'" *LULAC II*, 818 F. Supp. 3d at 62 (citations omitted). By increasing the likelihood that eligible voters will be erroneously removed from states' voter rolls, the Policy offends each of Congress's purposes. *See, e.g.*, CRT-0032 (SAVE MOA between USCIS and DOJ) ("SAVE may only be able to verify acquired U.S. citizenship in certain situations," and if DOJ queries "an individual with acquired citizenship who has not applied for a Certificate of Citizenship with [DHS], . . . SAVE may not be able to confirm that individual's acquired citizenship.").

---

[22] DOJ Civil Rights Division, *About The National Voter Registration Act*, https://www.justice.gov/crt/about-national-voter-registration-act.

Defendants' "decision to disregard" each of these crucial concerns when developing its policy involving the collection, maintenance, sharing, and alteration of states' confidential voter lists was "arbitrary and capricious." *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1090 (D.C. Cir. 2016); *accord Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019); *Sierra Club v. Dep't of Transp.*, 125 F.4th 1170, 1182 (D.C. Cir. 2025). Ultimately, having conducted no factfinding or analysis and provided no explanation in developing the Policy, Defendants "acted essentially as a rubber stamp" for the administration's directives to federalize voter list maintenance. *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 541 (D.D.C. 2016). The Policy is arbitrary and capricious for this independent reason.

## IV.    Plaintiffs are entitled to their requested relief

Plaintiffs respectfully request vacatur of the Policy, rescission of the actions taken pursuant to the Policy, and injunctive and declaratory relief.

### A.  The Court should set aside and vacate the Policy under the APA

The APA mandates that "a reviewing court shall. . . hold unlawful and set aside agency action" that is in excess of statutory authority, contrary to law, unconstitutional, arbitrary and capricious, or procedurally defective. 5 U.S.C. § 706(2)(A)-(D). Here, if the Court finds that Plaintiffs have prevailed on any of one or more of the APA claims relevant to this motion (Counts I, VI, VII, and VIII), the Court "shall" apply this default rule and set aside Defendants' Policy. "[T]o 'set aside'" an agency action "is to vacate it." *Bridgeport Hosp. v. Becerra,* 108 F.4th 882, 890 (D.C. Cir. 2024). *See also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("vacatur is the normal remedy" for an APA violation).

The goal of vacatur is to "re-establish the status quo absent the unlawful agency action." *Las Ams. Immigrant Advoc. Ctr. v. DHS,* 783 F. Supp. 200, 233 (D.D.C. 2025). Here, vacatur requires DOJ to set aside the Policy and cease all actions to compile, consolidate, disclose,

42

compare, and analyze SVRL data; withdraw all associated policies and agreements; delete, disentangle, and unlink any SVRL data DOJ has in its possession, custody, or control; and instruct any governmental or nongovernmental third party that has received SVRL data as a result of the Policy to delete, disentangle, and unlink all such data. Such relief is necessary to "re-establish the status quo absent the unlawful agency action," *id.*, and consistent with relief courts have found appropriate in APA cases. *See, e.g., Massachusetts v. Dep't of Educ.,* --- F. Supp. 3d ---, No. 26-cv-11229, 2026 WL 918941, at *19 (D. Mass. Apr. 3, 2026) (granting preliminary injunction and separately ordering the Department of Education to cease collecting data pending trial on the merits, *see* ECF 143 for order). Vacatur is also the "ordinary" remedy for procedural APA violations based on failures to follow statutory "notice-and-comment requirements." *City of Billings v. TSA,* 153 F.4th 46, 54 (D.C. Cir. 2025); *accord Daimler Trucks N. Am. LLC v. EPA,* 737 F.3d 95, 103 (D.C. Cir. 2013) (courts "typically vacate[] rules when an agency 'entirely fail[s]' to provide notice and comment" (citation omitted)).

## B. Alternatively, the Court should permanently enjoin the Voter List Maintenance Policy

In the alternative, if the Court finds vacatur alone does not encompass Plaintiffs' requested relief, the APA also authorizes the Court to issue "writs of prohibitory or mandatory injunction." 5 U.S.C. § 703. A district court vacating an agency action under the APA may issue an injunction where doing so would "'have [a] meaningful practical effect independent of its vacatur.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.,* 783 F. Supp. 3d 290, 312 (D.D.C. 2025) (quoting *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 165 (2010)). Under these principles, this Court may supplement vacatur with injunctive relief as necessary to fully remedy Plaintiffs' injuries. Thus, to the extent such relief is not encompassed within vacatur, Plaintiffs request a permanent injunction (1) prohibiting DOJ's actions to compile, consolidate, disclose, compare, and analyze SVRL data

43

pursuant to the Voter List Maintenance Policy; (2) ordering DOJ to withdraw all associated policies and agreements; and (3) ordering DOJ to delete, disentangle, and unlink any SVRL data it has in its possession, custody, or control and instruct any governmental or nongovernmental third party that has received SVRL data as a result of the Policy to do the same.[23]

Such a remedy is necessary to fully redress Plaintiffs' injuries because, as discussed above, *supra* Argument § I, those ongoing injuries stem from the misappropriation of sensitive voter records. When an improper disclosure of sensitive information occurs in violation of statute or the Constitution, a court can remedy the ongoing injury resulting from "the Government's continued possession of those materials." *Cf. Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12-13 (1992). "Even though it is now too late to prevent, or to provide a fully satisfactory remedy for, the invasion of privacy that occurred . . . a court does have the power to effectuate a partial remedy by ordering the Government to destroy . . . any and all copies it may have in its possession." *Id.*; *see also AFSCME*, 172 F.4th at 373 (observing that permanent injunction "order[ing] the relevant employees to destroy any illegally obtained data or work derived from such data" would be appropriate remedy for unlawful disclosure); *Chastain v. Kelley,* 510 F.2d 1232, 1235 (D.C. Cir. 1975) ("The federal courts are empowered to order the expungement of Government records where necessary to vindicate rights secured by the Constitution or by statute.").

---

[23] DOJ's Policy will "irreparably harm Plaintiffs' interests in the absence of an injunction because, in the inherently time-constrained context of an election cycle, the Court cannot provide meaningful redress for lost opportunities." *LULAC II,* 818 F. Supp. 3d at 102. Specifically, Common Cause will lose the opportunity to use its limited resources to educate and register more voters in furtherance of its mission, and its members, including the Voter Plaintiffs, could lose their right to vote or face significant hurdles to voting. *See supra* Argument § I. Because "agencies have no legitimate interest in the perpetuation of unlawful practices" and "the public interest 'favors permitting as many qualified voters to vote as possible,'" the "balance of hardships and the public interest weigh in favor of a permanent injunction." *LULAC II*, 818 F. Supp. 3d at 102 (quoting *Newby*, 838 F.3d at 9).

The permanent injunction Plaintiffs seek is also necessary to afford them complete relief. Because Common Cause is a national organization with nearly one million members and a presence in all fifty states and the District of Columbia, *see* Nunez Decl. ¶¶ 5, 7, enjoining DOJ from collection, maintenance, and disclosure of SVRL data and requiring DOJ to delete the existing data in its possession, custody, and control is a party-specific remedy. *See LULAC I,* 808 F. Supp. 3d at 85 (holding that because organizational plaintiffs operated and had members nationwide, a national injunction "is a remedy that is 'specific' to the Plaintiffs because no other remedy would afford complete relief.") (citation omitted). Additionally, Plaintiffs' challenge "do[es] not involve the case-by-case enforcement" of the policy but rather concerns the Policy in its entirety. *Id.*

### C. The Court should declare the Policy unlawful

Plaintiffs also seek a declaratory judgment that DOJ's Policy and all associated policies and agreements are unlawful. These are issues of unquestionable public importance, particularly given looming nationwide elections. Such declaratory relief will both "serve a useful purpose in clarifying the legal relations at issue" and "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *President v. Vance,* 627 F.3d 353, 364 n.76 (D.C. Cir. 1980) (citations omitted). A declaratory judgment is warranted here for each independent reason. *See LULAC II,* 818 F. Supp. 3d at 90-91. *Cf. Newby*, 838 F.3d at 13 ("Confusion will create a disincentive for citizens who would otherwise attempt to register to vote" (citing *Purcell*, 549 U.S. at 4-5)).

### CONCLUSION

The Court should grant Plaintiffs' motion for partial summary judgment.

Dated: May 19, 2026

Respectfully submitted,

*/s/ Nikhel S. Sus*
Nikhel S. Sus (D.C. Bar No. 1017937)
John B. Hill (N.Y. Bar No. 5505508)*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
Tel: (202) 408-5565
nsus@citizensforethics.org
jhill@citizensforethics.org

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #340
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Jane Bentrott (D.C. Bar No. 1029681)
Naomi Gilens (D.C. Bar No. 90037831)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington DC 20006
Tel: (202) 579-4582
jane.bentrott@protectdemocracy.org
naomi.gilens@protectdemocracy.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

John Haubenreich*
PROTECT DEMOCRACY PROJECT
1108 McKennie Ave., Suite #223
Nashville, TN 37206
Tel: (202) 579-4582
john.haubenreich@protectdemocracy.org

Laurence M. Schwartztol (D.D.C. Bar No. MA0007)
DEMOCRACY AND RULE OF LAW CLINIC,
HARVARD LAW SCHOOL

46

1525 Massachusetts Avenue
Cambridge, MA 02138
Tel: (617) 998-1877
lschwartztol@law.harvard.edu

Ming Cheung*
Ari J. Savitzky*
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
Tel: (212) 549-2500
mcheung@aclu.org
asavitzky@aclu.org
tlee@aclu.org
slakin@aclu.org

Laura K. Follansbee (D.C. Bar No. 1782046)
Arthur B. Spitzer (D.C. Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
Tel: (202) 457-0800
lfollansbee@acludc.org
aspitzer@acludc.org

* Admitted *pro hac vice*

*Counsel for Plaintiffs*

47