**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

COMMON CAUSE, *et al.*,

          *Plaintiffs*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

          *Defendants*.

No. 1:26-cv-01352-SLS

Hon. Sparkle L. Sooknanan

**DEFENDANTS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

I.     Statutory Background ......................................................................................... 2

II.    Factual Background .......................................................................................... 5

LEGAL STANDARD.................................................................................................... 9

ARGUMENT................................................................................................................ 10

I.     Plaintiffs Lack Article III Standing.................................................................. 10

     A.    Plaintiffs Lack Standing to Challenge DOJ's Enforcement Discretion................ 10

     B.    Plaintiffs' Asserted Privacy-Related Injuries Do Not Create Standing ................ 13

     C.    Plaintiffs' Alleged Voting-Related Injuries Are Speculative And, In Any Event, Not Caused By Defendants. .......................................... 17

     D.    Plaintiffs Do Not Have Informational Standing ...................................... 20

     E.    Common Cause Lacks Organizational Standing. ................................... 24

     F.    Plaintiffs' Remaining Theories of Standing Fail .................................. 26

II.    Plaintiffs Do Not Challenge a Discrete and Final Agency Action. ................................ 28

III.   Plaintiffs Lack a Cause of Action For Certain Claims. .................................... 32

     A.    Plaintiffs' *Ultra Vires* Claims Are Not Cognizable (Counts III and V) ............... 32

     B.    Plaintiffs Cannot Bring an APA Claim Predicated on Privacy Act Violations (Count VI) ....................................................... 33

IV.   Plaintiffs' Claims Fail On The Merits. ............................................................ 36

     A.    DOJ's Actions Are Not Contrary to Election Laws (Count I)............................. 36

     B.    DOJ Has Not Violated The Privacy Act (Count VI) ........................................... 42

     C.    DOJ Has Not Violated The Paperwork Reduction Act (Count VII) ................... 47

     D.    Plaintiffs' Constitutional Claims Fail as a Matter of Law (Counts II–V)............. 49

E.    DOJ Did Not Act Arbitrarily or Capriciously (Count VIII) ................................. 50

V.    The Equitable Factors Do Not Support a Permanent Injunction ..................................... 52

VI.   Plaintiffs' Requested Relief is Overbroad and Subject to Equitable Limits.................... 53

CONCLUSION.................................................................................................................................. 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFL-CIO v. Dep't of Lab.,*
   778 F. Supp. 3d 56 (D.D.C. 2025).................................................................. 17, 35

*Air Brake Sys., Inc. v. Mineta,*
   357 F.3d 632 (6th Cir. 2004) ............................................................................. 31

*Alabama ex rel. Gallion v. Rogers,*
   187 F. Supp. 848 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney General of U.S.,*
   285 F.2d 430 (5th Cir. 1961) ........................................................................ 39, 41

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. SSA,*
   172 F.4th 361 (4th Cir. 2026)........................................................................ 16, 17

*Am. Fed'n of Teachers v. Bessent,*
   152 F.4th 162 (4th Cir. 2025)........................................................................ 16, 17

*\* Am. First Leg. Found. v. Greer,*
   153 F.4th 1311 (D.C. Cir. 2025) ............................................................. 12, 26, 41

*Am. Foreign Serv. Ass'n v. Trump,*
   2025 WL 1742853 (D.C. Cir. June 20, 2025) ..................................................... 32

*Am. Nat'l Ins. Co. v. FDIC,*
   642 F.3d 1137 (D.C. Cir. 2011)........................................................................ 9, 37

*Am. Oversight v. DOJ,*
   45 F.4th 579 (2d Cir. 2022) ............................................................................... 43

*Anatol Zukerman and Charles Krause Reporting, LLC v. USPS,*
   64 F.4th 1354 (D.C. Cir. 2023) ..................................................................... 52, 53

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
   570 U.S. 1 (2013) .............................................................................................. 49

*Arrington v. United States,*
   473 F.3d 329 (D.C. Cir. 2006)......................................................................... 9, 10

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................................ 9

*Bark v. U.S. Forest Serv.,*
   37 F. Supp. 3d 41 (D.D.C. 2014).................................................................. 29, 30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................ 9

*Bell v. Marinko*,
  367 F.3d 588 (6th Cir. 2004) ............................................................................. 41

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................................................... 28, 30

*Bensman v. U.S. Forest Serv.*,
  408 F.3d 945 (7th Cir. 2005) ............................................................................. 23

*Bierly v. Dep't of Def.*,
  2024 WL 4227154 (D.D.C. Sep. 18, 2024) ...................................................... 35

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) .......................................................................................... 34

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) .......................................................................................... 33

*Cal. Cmtys. Against Toxics v. EPA*,
  934 F.3d 627 (D.C. Cir. 2019) .......................................................................... 32

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .......................................................................................... 54

*California v. Texas*,
  593 U.S. 659 (2021) .......................................................................................... 55

*Cell Assocs., Inc. v. Nat'l Insts. of Health, Dep't of Health, Educ. & Welfare*,
  579 F.2d 1155 (9th Cir. 1978) .......................................................................... 35

*Centro de Trabaja-dores Unidos v. Bessent*,
  167 F.4th 1218 (D.C. Cir. 2026) ................................................................. 28, 31

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ...................................................................................... 13, 18

*City of New York v. U.S. Dep't of Def.*,
  913 F.3d 423 (4th Cir. 2019) ............................................................................. 30

* *Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................ 10, 13, 14, 17, 19

*Citizens for Resp. & Ethics in Wash. v. FEC*,
  993 F.3d 880 (D.C. Cir. 2021) .......................................................................... 12

*Coal. For Humane Immg. Rts v. DHS*,
　780 F. Supp. 3d 79 (D.D.C. 2025)......................................................................... 25

*Cobell v. Kempthorne*,
　455 F.3d 301 (D.C. Cir. 2006)............................................................................... 28

*Coleman v. Kennedy*,
　313 F.2d 867 (5th Cir. 1963) ................................................................................. 38

*Coventry Health Care of Mo., Inc. v. Nevils*,
　581 U.S. 87 (2017) ................................................................................................ 37

*Cross v. EEOC*,
　810 F. Supp. 3d 88 (D.D.C. 2025)......................................................................... 12

*Ctr. for L. & Educ. v. Dep't of Educ.*,
　396 F.3d 1152 (D.C. Cir. 2005)............................................................................. 26

*DaimlerChrylser Corp. v. Cuno*,
　547 U.S. 332 (2006) ........................................................................................ 20, 23

*Dalton v. Specter*,
　511 U.S. 462 (1994) .............................................................................................. 33

*Deters v. U.S. Parole Comm'n*,
　85 F.3d 655 (D.C. Cir. 1996)................................................................................. 46

*Dick v. Holder*,
　67 F. Supp. 3d 167 (D.D.C. 2014)......................................................................... 46

*Dole v. United Steelworkers of Am.*,
　494 U.S. 26 (1990) ................................................................................................ 23

*DSCC v. Trump*,
　— F. Supp. 3d —, 2026 WL 1487833 n.7 (D.D.C. May 28, 2026) ................................. 17, 18

*Elec. Priv. Info. Ctr. v. Dep't of Educ.*,
　48 F. Supp. 3d 1 (D.D.C. 2014)............................................................................. 25

*Elec. Priv. Info. Ctr. v. PACEI*,
　878 F.3d 371 (D.C. Cir. 2017)......................................................................... 21, 22

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*,
　928 F.3d 95 (D.C. Cir. 2019)............................................................... 22, 23, 26, 48

*FAA v. Cooper*,
　566 U.S. 284 (2012) .............................................................................................. 34

v

\* *FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ................................................................ 10, 18, 24, 25, 26, 27

*FDA v. Wages & White Lion Invs., LLC*,
   604 U.S. 542 (2025) ................................................................................................ 52

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ......................................................................... 24, 26

*Foster v. Love*,
   522 U.S. 67 (1997) ................................................................................................. 49

*Gadelhak v. AT&T Servs., Inc.*,
   950 F.3d 458 (7th Cir. 2020) ................................................................................. 15

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) ............................................................................... 33

*Garey v. James S. Farrin, P.C.*,
   35 F.4th 917 (4th Cir. 2022) .................................................................................. 15

*Gill v. Whitford*,
   585 U.S. 48 (2018) ................................................................................................. 54

*Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) .................................................................................. 33

*Gonzalez v. Arizona*,
   677 F.3d 383 (9th Cir. 2012) ........................................................................... 49, 50

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ............................................................................................... 19

*Haleem v. Dep't of Def.*,
   2024 WL 230289 (D.D.C. Jan. 22, 2024) ............................................................. 35

*Harrison v. Fed. Bureau of Prisons*,
   248 F. Supp. 3d 172 (D.D.C. 2017) ...................................................................... 35

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944) ............................................................................................... 55

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................................................... 12

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ......................................................................................... 27, 54

vi

*Indep. Equipment Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ................................................................. 31

*Jabara v. Webster*,
    691 F.2d 272 (6th Cir. 1982) ................................................................. 47

*Johnson v. Becerra*,
    111 F.4th 1237 (D.C. Cir. 2024) ............................................................ 12

*Kennedy v. Bruce*,
    298 F.2d 860 (5th Cir. 1962) ................................................................. 41

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) ................................................................. 11

*Khalid v. TSA*,
    172 F.4th 866 (D.C. Cir. 2026) .............................................................. 41

*League of United Latin American Citizens v. Executive Off. of the President*,
    818 F. Supp. 3d 34 (D.D.C. 2026) ......................................................... 17

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .............................................................................. 10

*\* Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................... 28, 29, 30

*Lupia v. Medicredit, Inc.*,
    8 F.4th 1184 (10th Cir. 2021) ................................................................ 15

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................................ 53

*Maydak v. United States*,
    363 F.3d 512 (D.C. Cir. 2004) ............................................................... 47

*McIntyre v. Morgan*,
    624 F. Supp. 658 (S.D. Ind. 1985) ......................................................... 37

*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) ................................................................ 41

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011) .............................................................................. 37

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) .............................................................................. 37

*Murthy v. Missouri*,
603 U.S. 43 (2024) ................................................................................................ 19, 20

*Nat'l Ass'n for Latino Cmty. Asset Builders v. CFPB*,
581 F. Supp. 3d 101 (D.D.C. 2022) ............................................................................. 26

*Nat'l Taxpayers Union, Inc. v. United States*,
68 F.3d 1428 (D.C. Cir. 1995) .................................................................................... 25

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .................................................................................................... 20

*\* Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ............................................................................................. 2, 28, 30

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .................................................................................................... 32

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .................................................................................................... 17

*Open Tech. Fund v. Pack*,
470 F. Supp. 3d 8 (D.D.C. 2020) ................................................................................ 53

*PETA v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015) .................................................................................. 24

*Poss v. Kern*,
2024 WL 4286088 (D.D.C. Sep. 25, 2024) ................................................................ 35

*Prisology, Inc. v. Fed. Bureau of Prisons*,
852 F.3d 1114 (D.C. Cir. 2017) ............................................................................ 21, 22

*Pub. Emps. For Env't Resp. v. Zeldin*,
— F. 4th —, 2026 WL 1191153 (D.C. Cir. May 1, 2026) .......................................... 27

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ........................................................................................................ 43

*Randolph v. ING Life Ins. & Annuity Co.*,
486 F. Supp. 2d 1 (D.D.C. 2007) ................................................................................ 14

*Robert F. Kennedy Hum. Rts. v. Dep't of State*,
2026 WL 820811 (D.D.C. Mar. 25, 2026) .................................................................. 31

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
540 F. Supp. 3d 45 (D.D.C. 2021) .............................................................................. 53

*Starbucks Corp. v. McKinney,*
  602 U.S. 339 (2024) ............................................................................................. 55

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ............................................................................................... 13

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ............................................................................................. 22

*Sussman v. U.S. Marshals Serv.,*
  494 F.3d 1106 (D.C. Cir. 2007) ........................................................................... 34

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ....................................................................................... 10, 11

*Trump v. CASA, Inc.,*
  606 U.S. 851 (2025) ............................................................................................. 54

*United States v. Indiana,*
  No. 1:06-cv-1000 (S.D. Ind. July 5, 2006) .......................................................... 42

*United States v. Lynd,*
  301 F.2d 818 (5th Cir. 1962) ............................................................................... 38

*United States v. Maine,*
  2007 WL 1059565 (D. Me. Apr. 4, 2007) ............................................................ 42

*United States v. Morton Salt Co.,*
  338 U.S. 632 (1950) ............................................................................................. 40

*United States v. New Jersey,*
  No. 2:06-cv-4889 (D.N.J. Oct. 12, 2006) ............................................................ 42

*United States v. Richardson,*
  418 U.S. 166 (1974) ............................................................................................. 21

* *United States v. Texas,*
  599 U.S. 670 (2023) ....................................................................... 10, 11, 12, 27

*United to Protect Democracy v. PACEI,*
  288 F. Supp. 3d 99 (D.D.C. 2017) ....................................................................... 22

*Univ. of Cal. Student Ass'n v. Carter,*
  766 F. Supp. 3d 114 (D.D.C. 2025) ..................................................................... 14

*Weinberger v. RomeroBarcelo,*
  456 U.S. 305 (1982) ............................................................................................. 55

*Westcott v. McHugh*,
  39 F. Supp. 3d. 21 (D.D.C. 2014) ............................................................................ 35

*Wilderness Society, Inc. v. Rey*,
  622 F.3d 1251 (9th Cir. 2010) ................................................................................. 22

*Wolf v. Regardie*,
  553 A.2d 1213 (D.C. 1989) ..................................................................................... 15

**U.S. Constitution**

U.S. Const. art. I, § 4, cl. 1 ........................................................................................... 49

**Statutes**

5 U.S.C. § 552a(a)(2) ..................................................................................................... 35

5 U.S.C. § 552a(a)(7) ..................................................................................................... 42

5 U.S.C. § 552a(b)(3) ..................................................................................................... 42

5 U.S.C. § 552a(b)(7) ................................................................................................ 44, 45

5 U.S.C. § 552a(e)(4) ......................................................................................... 20, 21, 42

5 U.S.C. § 552a(e)(5) ............................................................................................... 45, 46

5 U.S.C. § 552a(e)(6) ..................................................................................................... 45

5 U.S.C. § 552a(e)(7) ............................................................................................... 46, 47

5 U.S.C. § 552a(e)(10) ............................................................................................. 45, 46

5 U.S.C. § 552a(e)(11) ............................................................................................. 21, 42

5 U.S.C. § 552a(g) ................................................................................... 34, 35, 36, 45

5 U.S.C. § 702 ................................................................................................................ 55

5 U.S.C. § 704 .......................................................................................................... 16, 33

5 U.S.C. § 706 ................................................................................................................ 35

7 U.S.C. § 2020(a) ......................................................................................................... 16

8 U.S.C. § 1373(c) ............................................................................................... 7, 31, 46

18 U.S.C. § 611 .................................................................................................... 5, 6, 40

18 U.S.C. § 1015 ............................................................................................................ 5

42 U.S.C. § 1320b-7 .................................................................................................... 46

42 U.S.C. § 1396b(r) ................................................................................................... 16

44 U.S.C. § 3501 .......................................................................................................... 23

44 U.S.C. § 3502 .................................................................................................... 48, 49

44 U.S.C. § 3506 .................................................................................................... 21, 47

44 U.S.C. § 3507 .................................................................................................... 21, 47

44 U.S.C. § 3512 .......................................................................................................... 23

44 U.S.C. § 3518 .......................................................................................................... 49

52 U.S.C. § 20501(b)(3) ............................................................................................... 3

52 U.S.C. § 20501(b)(4) ........................................................................................ 40, 52

52 U.S.C. § 20507(a)(1) ............................................................................................... 3

52 U.S.C. § 20507(a)(4) ............................................................................ 3, 19, 38, 45

52 U.S.C. § 20507(c)(2) ............................................................................................... 3

52 U.S.C. § 20507(i)(1) ............................................................................................... 3

52 U.S.C. § 20510 ........................................................................................ 1, 3, 10, 39

52 U.S.C. § 20511 ............................................................................................ 1, 10, 39

52 U.S.C. § 20701 ........................................................................................ 3, 36, 37, 39

52 U.S.C. § 20703 .................................................................................. 3, 10, 33, 36, 38

52 U.S.C. § 20705 .......................................................................................................... 3

52 U.S.C. § 21083(a)(1) ........................................................................................ 4, 20, 48

52 U.S.C. § 21083(a)(2) ........................................................................................... 4, 19

52 U.S.C. § 21083(a)(4) ...................................................................................... 19, 20, 39

52 U.S.C. § 21083(a)(5) ............................................................................................... 4

52 U.S.C. § 21111 ........................................................................................ 1, 4, 10, 39

Civil Rights Act of 1960,
   Pub. L. No. 86-449, 74 Stat. 86 (1960) ................................................................. 2, 3

Immigration Reform and Control Act of 1986,
   Pub. L. No. 99-603, 100 Stat. 3359 (1986) ............................................................. 7

## Rules

Federal Rule of Civil Procedure 12(b) .......................................................................... 9

Federal Rule of Civil Procedure 56(a) .......................................................................... 9

## Administrative and Executive Materials

Privacy Act of 1974; Systems of Records,
   68 Fed. Reg. 47610 (Aug. 11, 2003) ....................................................... 42, 43, 44, 45

Preserving and Protecting the Integrity of American Elections,
   Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ...................................... 5

## Other Authorities

Black's Law Dictionary (5th ed. 1979) ........................................................................ 37

Restatement (Second) of Torts (A.L.I. 1977 ........................................................... 15, 16

U.S. Citizenship & Immigration Servs., *About SAVE*, (Oct. 13, 2015)
   https://perma.cc/5888-TH46 ................................................................................. 7, 30

U.S. Citizenship & Immigration Servs., *DHS, USCIS, DOGE Overhaul Systematic Alien
   Verification for Entitlements Database*, (Apr. 22, 2025),
   https://perma.cc/Y8A5-YX3M ................................................................................. 8

U.S. Citizenship & Immigration Servs., *Guide to Understanding SAVE Verification
   Responses* (Apr. 2022),
   https://perma.cc/BW9M-WJUT ............................................................................... 7

U.S. Citizenship & Immigration Servs., *SAVE Agency Search Tool*, (Jun. 1, 2026)
   https://perma.cc/3VHT-72KE .................................................................................. 18

Webster's New World College Dictionary (4th ed. 2008) ........................................... 48

Webster's New World Dictionary of the American Language (8th coll. ed. 1960) ..................... 37

Webster's Seventh New Collegiate Dictionary (1967 ed.) ........................................... 37

Webster's Third New International Dictionary (1971 ed.) ........................................... 37

**INTRODUCTION**

When Congress directs a federal agency to enforce a statute, the law does not countenance vague and wide-ranging civil lawsuits challenging every aspect of how the agency undertakes that enforcement. This action is such a suit. Plaintiffs admit that Congress expressly authorized the Attorney General to enforce the National Voter Registration Act (NVRA) and the Help America Vote Act of 2002 (HAVA). *See* Mem. in Supp. of Mot. for Partial Summ. J. at 22, ECF No. 29-1 (Pls. Mot.); 52 U.S.C. §§ 20510(a), 20511, 21111. Pursuant to that statutory authorization and a directive from the head of the Executive Branch, the Department of Justice (DOJ) has taken multiple steps to enforce those two statutes, including requests for voter registration lists from almost every State. Congress explicitly provided the Attorney General authority to request election records, and its grant of enforcement discretion to DOJ encompasses storing those lists in secure locations and cross-referencing them against the SAVE database, a system used by almost 4,000 state and local agencies, in order to ensure that States are following their statutory mandates. That last step is key because without it, DOJ cannot assess the accuracy of lists maintained by each State, an assessment that DOJ is entitled to make as part of its investigation to determine whether States are complying with federal laws. And for States that refuse to provide voter rolls, DOJ has brought enforcement actions that are not before this Court.

Plaintiffs' suit challenges not just one element of these investigations, but all of them—in the abstract and upstream of any specific investigative request. As an initial matter, bedrock Article III principles do not permit Plaintiffs to ask this Court to order DOJ as to how it exercises its investigatory and enforcement discretion, including by pretermitting ongoing enforcement actions against other States in other courts. And Plaintiffs' other theories of standing, whether informational, privacy, voting, organizational, associational, or procedural, all fail for one reason

1

or another. But even if there is jurisdiction, the Administrative Procedure Act (APA) does not allow this type of programmatic challenge. Rather than identify one "constituent action[]" of DOJ's investigation that has wronged them, Pls. Mot. 4, Plaintiffs challenge the entire project, including each individual information request that DOJ sent to 49 States. Supreme Court precedent requires an APA suit to challenge a "discrete" agency action, and Plaintiffs do not. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 64 (2004). And because Plaintiffs lack a cause of action for their two *ultra vires* claims, the Court should dismiss the Complaint at the threshold.

Nonetheless, even if the Court does reach the merits, every element of DOJ's program to investigate and enforce the election statutes is authorized by law, not only by the NVRA and HAVA, but by Title III of the Civil Rights Act of 1960. DOJ has not violated the Privacy Act or the Paperwork Reduction Act, and the administrative record reflects that DOJ did not act in an arbitrary or capricious manner. DOJ is therefore entitled to summary judgment if this suit is not dismissed. And if the Court disagrees, Plaintiffs merit relief resolving only the injuries they have shown. The Court should therefore rebuff Plaintiffs' request for a nationwide stay or a nationwide injunction against DOJ's investigation, which necessarily implicates other parties that are not part of this lawsuit.

## BACKGROUND

### I.    Statutory Background

In 1960, Congress passed and President Eisenhower signed the Civil Rights Act of 1960 (CRA). *See* Pub. L. No. 86-449, 74 Stat. 86. Title III of that law—titled "Federal Election Records"— required state and local election officers to "retain and preserve" election records for 22 months following an election. *See id.* § 301, 74 Stat. 88. By law, the Attorney General enforces these provisions. Specifically, Section 303 requires election records "to be made available for

2

inspection, reproduction, and copying" when the Attorney General or his representative requests those records in writing from "the person having custody, possession, or control of such [voting] record[s] or paper[s][.]" *Id.* § 303, 74 Stat. 88 (codified at 52 U.S.C. § 20703). Congress further provided that federal courts in the district where the Attorney General requested records would have jurisdiction "to compel the production of such record or paper[.]" *Id.* § 304, 74 Stat. 88 (codified at 52 U.S.C. § 20705).

Since the CRA, Congress has enacted additional laws that affect what "records and papers . . . come into [election officials'] possession[.]" 52 U.S.C. § 20701. Relevant here are the National Voter Registration Act (NVRA) and the Help America Vote Act of 2002 (HAVA), which help the federal government ensure that States are overseeing federal elections in a fair and honest manner and thus "protect the integrity of the electoral process[.]" *Id.* § 20501(b)(3).

The NVRA directs that, when administering voter registration for federal elections, each State "shall [] ensure that any eligible applicant is registered to vote[.]" *Id.* § 20507(a)(1). States also must conduct programs which "make[] a reasonable effort to remove the names of ineligible voters" from official lists of eligible voters "by reason of . . . death . . . or . . . change in residence[.]" *Id.* § 20507(a)(4). The NVRA further requires States to complete, at least 90 days before an election for federal office, "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." *Id.* § 20507(c)(2)(A). To document these various programs and efforts, States must "maintain for at least 2 years and [] make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" *Id.* § 20507(i)(1). The Attorney General "may bring a civil action . . . for such declaratory or injunctive relief as is necessary to carry out [the NVRA]." *Id.* § 20510(a).

For its part, HAVA requires States to implement a "single, uniform, official, centralized, interactive computerized statewide voter registration list . . . that contains the name and registration information of each legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State[.]" *Id.* § 21083(a)(1)(A). States must "perform list maintenance with respect to the computerized list on a regular basis[,]" *id.* § 21083(a)(2)(A), including removing "individuals" in accordance with the NVRA, *id.* § 21083(a)(2)(A)(i), and by "remov[ing] the names of ineligible voters from the computerized list in accordance with State law[,]" *id.* § 21083(a)(2)(A)(iii). Consequently, election officials who oversee lists with registrations of individuals who are illegally registered (like underage voters or noncitizens), assign them unique HAVA identifiers, and fail to perform list maintenance to remove those persons, has violated the statute. *See id.* § 20183(a)(2)(A). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" a numeric identifier—namely, an applicant's "driver's license number" if he or she has one; "the last 4 digits of the applicant's social security number"; or, if the applicant has neither a driver's license nor a social security number, a state-assigned "unique identifying number[.]" *Id.* § 21083(a)(5)(A)(i)–(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." *Id.* § 21083(a)(5)(A)(iii). The Attorney General can enforce these requirements—HAVA permits the Attorney General to bring a civil action "against any State or jurisdiction" for "such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under" various sections of HAVA, including "section 21081[.]" *Id.* § 21111.

## II.    Factual Background

In March 2025, President Trump signed Executive Order 14,248, titled "*Preserving and Protecting the Integrity of American Elections*," 90 Fed. Reg. 14005 (Mar. 25, 2025) ("EO §"). That Order emphasized the importance of "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion" to "maintaining our constitutional Republic." *Id.* § 1.  The Order also noted that, even though foreign nationals cannot register to vote in federal elections, *see* 18 U.S.C. §§ 611, 1015, "States fail adequately to vet voters' citizenship, and, in recent years, the Department of Justice has failed to prioritize and devote sufficient resources for enforcement of these provisions," EO § 1.  The President's Order added that "[m]aintaining accurate voter registration lists is a fundamental requirement in protecting voters from having their ballots voided or diluted by fraudulent voters." *Id.*  Accordingly, the Order directed the Attorney General to "prioritize enforcement of 18 U.S.C. 611 and 1015(f) and similar laws that restrict non-citizens from registering to vote or voting, including through use of databases or information maintained by the Department of Homeland Security[.]" *Id.* § 2(e)(i).

DOJ's Civil Rights Division (sometimes abbreviated as CRT) followed the President's directive.  To "ensure that states have list maintenance programs and that the maintenance programs are working," CRT-3384, in mid-2025, Assistant Attorney General Harmeet Dhillon sent distinct letters to almost every state and the District of Columbia seeking information about how each state complies with the NVRA.[1]  Specifically, the letters requested "a list of the election

---

[1] North Dakota did not receive a letter because it does not have voter rolls.  The administrative record contains the initial letters sent to a majority of States.  For other States, the record contains follow-up letters sent by DOJ, but not the initial letters.  *See infra* at n.2.  Regardless, the administrative record contains correspondence related to all 49 States and DC.  For the initial letters, see   CRT-2107 (Alabama), CRT-2327 (Alaska), CRT-2396 (Arizona), CRT-2407 (Arkansas), CRT-2428 (California), CRT-2432 (Colorado), CRT-2489 (Connecticut), CRT-2522 (Delaware), CRT-2548 (D.C.), CRT-2593 (Hawaii), CRT-2647 (Idaho), CRT-2679 (Illinois), CRT-

5

officials who are responsible for implementing" the State's program of voter registration list maintenance and "[t]he current electronic copy" of the State's "computerized statewide voter registration list" as required by HAVA. *E.g.* CRT-2522. The letters requested "all fields contained within the list" in electronic form. *Id.* Many letters also cited various statistics from the most recent Election Administration and Voting Survey (Survey), published by the Election Assistance Commission, *see* CRT-41–CRT-346 (full Survey), specific to each State and prompted each state to explain actions underlying those statistics. *See, e.g.*, CRT-2429 ("No data was listed in the EAVS survey for Question A12h for California . . . Please explain California's process for determining duplicates and what happens to the duplicate registrations."); CRT-2689 ("Confirmation Notice data was missing in the EAVS survey for Questions A10a through A10i in Indiana. . . . Please explain Indiana's process for sending out and keeping track of the results of Confirmation Notices."). The letters further asked States to describe their process to identify registered voters who are ineligible to vote as well as the procedures used to remove those ineligible voters from the registration list. Other letters did not mention the Survey. *See, e.g.*, CRT-2818 (Minnesota); CRT-2952 (New York), CRT-3196 (Washington).

In response, many States electronically submitted their publicly available voter registration lists with redactions for each voter's personally identifiable information. *See, e.g.*, CRT-3252 (New Jersey). At least one refused to provide the list electronically, *see* CRT-960 (California),

---

2688 (Indiana), CRT-2699 (Iowa), CRT-2730 (Kentucky), CRT-2744 (Louisiana), CRT-2763 (Maine), CRT-2766 (Maryland), CRT-2774 (Massachusetts), CRT-2783 (Michigan), CRT-2818 (Minnesota), CRT-2838 (Mississippi), CRT-2891 (Nebraska), CRT-2923 (New Jersey), CRT-2948 (New Mexico); CRT-2952 (New York); CRT-2959 (North Carolina); CRT-2989 (Oklahoma); CRT-3501 (Oregon), CRT-3068 (Pennsylvania), CRT-3159 (Utah), CRT-3187 (Vermont); CRT-3190 (Virginia). CRT-3196 (Washington), CRT-3200 (West Virginia), CRT-3229 (Wisconsin).

and other states did not provide the list at all, redacted or otherwise, *see, e.g.*, CRT-1890 (New York).

DOJ determined that testing of state voter lists to ensure compliance with the law would be "more reliable" with more information on each voter. CRT-3384. Identifiers like a driver's license number or the last four digits of a Social Security Number would ensure "that the voters on the [list] are unique," CRT-3385, and for that reason, DOJ intended to "facilitate a review for noncitizens and dead voters via DHS," CRT-3375. Specifically, DOJ entered into an agreement to use the Systematic Alien Verification for Entitlements (SAVE) system that Congress created in 1986. *See* Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391. SAVE "is an online service administered by" U.S. Citizenship and Immigration Services (USCIS) "that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies." USCIS, *About SAVE*, https://perma.cc/5888-TH46. SAVE does not, however, "[d]etermine applicant eligibility for a specific benefit or license." *Id.* "That determination is made by the benefit issuing or licensing agency," *id.*—often, a State or local government agency. And as a component of DHS, USCIS is required to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual . . . by providing the requested verification or status information." 8 U.S.C. § 1373(c).

Although SAVE has been used for years to confirm the citizenship or immigration status of voters, *see* ECF No. 77-2 ¶ 20, *League of Women Voters, et al. v. U.S. Dep't of Homeland Sec., et al.*, No. 25-cv-3501-SLS (Apr. 2, 2026) (Broderick Decl.), it was not until recently that SAVE was technically capable of verifying immigration status without a DHS-specific immigration number, such as an "A-Number," *see* USCIS, *Guide to Understanding SAVE Verification Responses* (Apr. 2022), https://perma.cc/BW9M-WJUT. In May 2025, however, DHS announced

7

that SAVE would henceforth integrate more databases, permitting users to search by Social Security Number and perform searches in bulk. *See generally* USCIS, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M.

To use the enhanced SAVE database and to ensure the accuracy of all records, DOJ requested unredacted voter rolls from all States.[2]  *See, e.g.*, CRT-1782 (Missouri), CRT-2759 (Maine), CRT-3144 (Texas).  DOJ also offered to each State a Memorandum of Understanding (MOU) that would govern the transfer of voter lists and assuage "all reasonable concerns regarding privacy and data security."  CRT-2727.  Many States refused to provide the unredacted lists or to enter a Memorandum of Understanding.  *See, e.g.*, CRT-1002 (Colorado saying it would not "be producing unredacted voter files or signing the MOU").  For many States that refused entirely to provide the unredacted lists, DOJ has since initiated actions under the CRA to obtain them.  Some States did comply, however.  Three States signed MOUs with DOJ "to establish the parties' understanding as to the security protections" for the transferred data.  *See* CRT-5 (Alaska); CRT-21 (South Carolina); CRT-2054 (Texas).  Fourteen States provided the unredacted lists without

---

[2] CRT-2346 (Alaska), CRT-2400 (Arizona), CRT-2424 (Arkansas), CRT-2496 (Connecticut), CRT-2537 (Delaware), CRT-2544 (D.C.), CRT-2558 (Florida), CRT-2572 (Georgia), CRT-2593 (Hawaii), CRT-2647 (Idaho), CRT-2684 (Illinois), CRT-2691 (Indiana), CRT-2702 (Iowa), CRT-2710 (Kansas), CRT-2714 (Kentucky), CRT-2744 (Louisiana), CRT-2759 (Maine), CRT-2770 (Maryland), CRT-2778 (Massachusetts), CRT-2790 (Michigan), CRT-2815 (Minnesota), CRT-2843 (Mississippi), CRT-2858 (Missouri), CRT-2872 (Montana), CRT-2891 (Nebraska), CRT-2905 (Nevada), CRT-2911 (New Hampshire), CRT-2927 (New Jersey); CRT-2945 (New Mexico, had received voter roll), CRT-2955 (New York), CRT-2959 (North Carolina), CRT-2986 (Ohio), CRT-2989 (Oklahoma), CRT-3054 (Oregon), CRT-3064 (Pennsylvania), CRT-3071 (Rhode Island), CRT-3076 (South Carolina), CRT-3130 (South Dakota), CRT-3137 (Tennessee), CRT-3144 (Texas), CRT-3184 (Utah), CRT-3187 (Vermont), CRT-3193 (Virginia).

signing MOUs but with a cover letter to DOJ regarding the transfer.[3]  And one State, Oklahoma, provided the unredacted list pursuant to a settlement agreement with DOJ.  *See* CRT-11.

Earlier in 2026, DOJ signed a Memorandum of Agreement (MOA) with USCIS to "facilitate information sharing between DHS-USCIS and [DOJ] and establish the terms and conditions for [DOJ's] participation in SAVE."  CRT-31.  By signing the MOA, DOJ agreed to abide by federal privacy laws when "safeguarding, maintaining, and disclosing any data provided or received pursuant to the [agreement]."  CRT-35.

### LEGAL STANDARD

To resolve a motion to dismiss under Rule 12(b)(1), a court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged[.]"  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation omitted)).  To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Arrington v United States*, 473 F.3d 329, 333 (D.C. Cir. 2006) (citation

---

[3] CRT-3255 (Alabama), CRT-946 (Arkansas), CRT-1437 (Florida), CRT-1511 (Indiana), CRT-3259 (Iowa), CRT-1533 (Kansas), CRT-1622 (Louisiana), CRT-3261 (Mississippi), CRT-1800 (Montana), CRT-3265 (Nebraska), CRT-3126 (Ohio), CRT-1994 (South Dakota), CRT-3275 (Tennessee), CRT-3283 (Wyoming).

omitted).  "And, in assessing a motion for summary judgment, a court must view all of the evidence in the light most favorable to the nonmoving party."  *Id.*

<strong>ARGUMENT</strong>

**I.    Plaintiffs Lack Article III Standing**

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To support standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose[.]  To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly* impending to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient."  *Id.* (citation omitted); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative[.]").

**A.  Plaintiffs Lack Standing to Challenge DOJ's Enforcement Discretion**

Plaintiffs lack standing because suits that attempt to control the Executive's exercise of investigatory and enforcement discretion "run up against the Executive's Article II authority to enforce federal law."  *United States v. Texas*, 599 U.S. 670, 678 (2023).  As the statutory background above explains—and as Plaintiffs admit, *see* Pls. Mot. 22—DOJ has the authority to enforce the NVRA and HAVA, and it has the statutory authority to request voter records from States.  *See* 52 U.S.C. §§ 20510, 20511, 20703, 21111.  Plaintiffs' Complaint is premised on disagreement with how DOJ conducts that investigation.  For example, Plaintiffs apparently want

10

DOJ to proceed via "individualized investigation[s]"—though it is unclear whether this means one State at a time, one alleged violation at a time, or something else—rather than how it has acted here. Pls. Mot. 23. Members of the public like these Plaintiffs, however, "lack[] standing to contest the policies of the prosecuting authorit[ies] when he himself is neither prosecuted nor threatened with prosecution." *Texas*, 599 U.S. at 674. Affording Plaintiffs standing here "would entail expansive judicial direction" of DOJ's investigatory discretion. *Id.* at 681.

The Supreme Court in *Texas* "decline[d] to start the Federal Judiciary down that uncharted path[,]" *id.* at 681, when various states challenged DHS's arrest policies in a way that would force DHS "to make more arrests[,]" *id.* at 674. The Supreme Court addressed whether a court "may in effect order the Executive Branch to take enforcement actions against violators of federal law[,]" and concluded that, after a review of "this Court's Article III precedents and the historical practice, the answer is no." *Id.* at 685. As the Court pointed out, the Executive Branch "possesses authority to decide how to prioritize and how to aggressively pursue legal actions against defendants who violate the law." *Id.* at 678 (citing *TransUnion LLC*, 594 U.S. at 429). And courts "generally lack meaningful standards for assessing the propriety of enforcement choices" given that "the Executive Branch must balance many factors when devising" its enforcement priorities. *Id.* at 679–80. Allowing the suit in *Texas* would spawn "complaints in future years about alleged Executive Branch under-enforcement" of federal laws, suits that courts could not entertain given their "restricted role" under the separation of powers. *Id.* at 681.

The result should be the same here. As discussed further below, DOJ's actions in this case stem from its authority to request voting records under the CRA, an authority that "is investigative in nature." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962). And DOJ has initiated multiple enforcement actions against recalcitrant States, actions that Plaintiffs apparently want this Court

11

to enjoin even though none of those actions are before it.  "[F]ederal courts are 'not the proper forum for resolving claims that the Executive branch' should 'bring more' investigations and enforcement actions."  *Cross v. EEOC*, 810 F. Supp. 3d 88, 95 (D.D.C. 2025) (quoting *Texas*, 599 U.S. at 680); *see also Am. First Leg. Found. v. Greer*, 153 F.4th 1311, 1315 (D.C. Cir. 2025) (noting that courts "generally may not compel" how agencies should "choose to exercise [their] enforcement discretion").  Whether an order would forbid an investigation or compel one, it is beyond the power of a federal court.  *See Citizens for Resp. & Ethics in Wash. v. FEC*, 993 F.3d 880, 887 (D.C. Cir. 2021) (declining to review "nonenforcement decision").  In the same way that the D.C. Circuit could not order a government agency to enforce certain conditions against home health agencies, *see Johnson v. Becerra*, 111 F.4th 1237, 1245–46 (D.C. Cir. 2024), this Court cannot "order [DOJ] to pursue a certain investigative approach[,]" *Cross*, 810 F. Supp. 3d at 95. After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing[,]"and "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985).

And because the decision to investigate is "treated as a discretionary function" of the agency's that might lead to prosecution, *Cross*, 810 F. Supp. 3d at 96 (citation omitted), third parties do not have standing to challenge investigatory choices unless they are the target of prosecution.  Plaintiffs thus invite this Court to cross a clear line between executive and judicial authority to micromanage the "many factors" that the DOJ must consider when determining how and where to allocate its scarce resources.  *Texas*, 599 U.S. at 680.  The separation of powers does not allow that kind of judicial review.

12

**B. Plaintiffs' Asserted Privacy-Related Injuries Do Not Create Standing**

Plaintiffs also rely on impacts to their supposed privacy interests to justify standing. In a nutshell, Plaintiffs worry that they face some increased risk that their data will be transferred from states to the federal government pursuant to federal law and, if that occurs, someone will hack or otherwise misuse their data someday. This causes them stress. *See, e.g.*, Decl. of Anthony Nel ¶ 39, ECF No. 29-8 ("I am disturbed, uneasy, anxious, and frustrated that the government has violated my trust by collecting, disclosing, matching, and repurposing my personal information."); Decl. of Linda Duckworth ¶ 20, ECF No. 29-9 ("Further, I am concerned about the potential that DOJ may disclose my personal information to external parties and I feel threatened by the possibility of that occurring."); Decl. of Alex Doe ¶ 38, ECF No. 29-12 (similar); Decl. of Mohammed Nasrullah ¶ 38, ECF No. 29-15 (similar).

These sorts of speculative and emotional fears are not enough. In general, "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). Instead, "it is the *reality* of the threat of [future] injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). The "emotional consequences" of government action "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*

The Supreme Court rejected a very similar (but arguably stronger) theory of standing in *Clapper*, 568 U.S. at 409. The Second Circuit had found standing where the plaintiffs "assert[ed] that they suffer present costs and burdens that are based on a fear of surveillance[.]" *Id.* at 416. The Supreme Court reversed, explaining that the Second Circuit's approach "improperly waters down the fundamental requirements of Article III." *Id.* Those plaintiffs could not "manufacture

13

standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.*

So too here. Plaintiffs proffer nothing more than allegations of a possible future injury. They say that the Department's method of storing information "exposes [them] to the risk that their sensitive data will be misused or stolen," such as "risks of identity theft, doxxing, and fraud." Pls. Mot. 17. But Plaintiffs assert only a fear of potential future misuse—they do not suggest details about when or if their data will be hacked or misused that would allow the Court to conclude that such a fear is objectively reasonable and any harm is certainly impending. *See, e.g.*, Nel Decl. ¶ 40 ("I am also deeply worried that my data will be stored or transferred in an unsecured manner, exposing me to a data breach and identity theft and fraud."); Decl. of Bailey Doe ¶ 42, ECF No. 29-13 (same); Decl. of Ruth Nasrullah ¶ 19, ECF No. 29-10 ("I am deeply concerned about this administration's ability to protect [the data]."); Such allegations providing "no evidence, beyond sheer speculation," of future data misuse do not assert an imminent injury. *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 122 (D.D.C. 2025); *see also Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 8 (D.D.C. 2007) ("[M]ere speculation that at some unspecified point in the indefinite future [plaintiffs] will be victims of identity theft" do not allege a sufficiently imminent injury.). For the Court to hold otherwise would improperly "endorse [a] standing theor[y] that rest[s] on speculation about the decision of independent actors"; namely, future hackers. *Clapper*, 568 U.S. at 414.[4] Accordingly, Plaintiffs' assertions about the risk of identity theft and other data misuse cannot confer standing.

Plaintiffs' asserted injuries are not analogous to the tort of intrusion upon seclusion.

---

[4] The case for standing is weaker here than in *Clapper*, where the plaintiffs had "incurred certain costs as a reasonable reaction to a risk of harm." *Clapper*, 568 U.S. at 416. By contrast, these Plaintiffs are mostly just worried about those risks.

14

*Contra* Pls. Mot. 16.  That tort makes liable anyone "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person."  Restatement (Second) of Torts § 652B (A.L.I. 1977); *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989).  The tort has three elements:

> (1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person."

*Id.* (citation modified).  "[T]he kind[s] of invasion that this cause of action seeks to redress" are various forms of offensive "invasions" including harassment, peeping, eavesdropping, and so on. *See id.* at 1217–18.  Or, as then-Judge Barrett termed it, "irritating intrusions." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020).

Plaintiffs' alleged injuries stem mainly from the provision of their information to (1) Department of Justice; (2) Department of Homeland Security; and (3) third-party contractors. *See* Pls. Mot. 17.  But these injuries bear no resemblance to the types of conduct that have been deemed "highly offensive to an ordinary, reasonable person" for purposes of the tort. *Wolf*, 553 A.2d at 1217.  For example, mailing unsolicited advertising materials to a plaintiff's home creates an intrusion upon seclusion-type injury for standing purposes. *See Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919, 922 (4th Cir. 2022).  So too would unwanted telephone calls or text messages. *See, e.g.*, *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (telephone communications); *Gadelhak*, 950 F.3d at 462 (text messages).  In both of those examples, someone targets the individual whose peace will be interrupted and takes steps to interrupt it.  DOJ has engaged in no similarly targeted activity here.  It sent letters to almost all States asking for voter rolls in their entirety.  Unlike a telephone call or text message to a particular person, DOJ

15

sought records of all voters.  Plaintiffs cannot assert, then, that they are subject to targeted action by the DOJ, as would a plaintiff bringing a run-of-the-mill intrusion upon seclusion claim.

Moreover, Plaintiffs' theory of standing is breathtakingly broad.  States share information about individuals with the federal government across a variety of contexts.  *See, e.g.*, 42 U.S.C. § 1396b(r) (requiring States to provide data on patients for federal medical assistance).  It is hardly offensive, much less highly so, for a state to do so in the context of voting laws, and it cannot be true that any time a State shares information with the federal government, the harm experienced is analogous to a common law tort.  Indeed, Congress has authorized that sharing for years.  *See, e.g.*, 7 U.S.C. § 2020(a)(3) (authorizing inspection of SNAP records by federal government).  And Congress explicitly authorized sharing in this context through the CRA.  As for DOJ sharing data with DHS, harm from general access by some government employees to a vast database that includes personal information is dramatically "different in kind" from the harm felt when a reporter accosts a convalescing patient in the hospital, when a private detective peers through a bedroom window for weeks, and when a photographer snaps an opportunistic photo of a woman's underwear, all examples given in the Restatement of Torts.  *See* Restatement (Second) of Torts § 652B cmt. b, illus. 1,2; cmt. c, illus. 7; *see also Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. SSA*, 172 F.4th 361, 387 (4th Cir. 2026) (Richardson, J., concurring in judgment).  Those actions cause "knowledge that a third party is engaged in targeted snooping," and that knowledge causes harm.  *Am. Fed'n of Teachers v. Bessent*, 152 F.4th 162, 172 (4th Cir. 2025), *abrogated by AFL-CIO*, 172 F.4th 361.  Unsolicited mailings, phone calls, or text messages cause similar injuries, but generalized access to a large-scale database creates no similar knowledge of targeted

16

snooping.[5] *See DSCC v. Trump*, — F. Supp. 3d —, 2026 WL 1487833, at *7 n.7 (D.D.C. May 28, 2026).

### C. Plaintiffs' Alleged Voting-Related Injuries Are Speculative And, In Any Event, Not Caused By Defendants

Plaintiffs allege that they "face an elevated risk of being erroneously removed from the voter rolls due to DOJ's List Maintenance Policy." Pls. Mot. 18. As the theory goes, DOJ will use SAVE to identify voters that should be removed from voter rolls, and States will then burden the voting rights of those individuals, either by cancelling their voter registration or requesting confirmation of citizenship. Plaintiffs back up this theory with three declarants, two of whom had their voting registrations canceled by Texas for failure to provide proof of citizenship in response to a request from that State. *See* Nel Decl. ¶ 26; B. Doe Decl. ¶¶ 30–31. The third declarant received the same Texas request but avoided cancellation by providing proof of citizenship. *See* A. Doe Decl. ¶¶ 11–14.

This theory cannot confer standing because there is no reason to think that any future injury to any of the Plaintiffs (or their members) is likely, let alone imminent or "certainly impending." *Clapper*, 568 U.S. at 409 (citation omitted). As an initial matter, Plaintiffs are not seeking to redress any past injuries suffered by their declarants. They want prospective relief to remedy a *future* injury, namely that these individuals will "again be misidentified as non-citizens." Pls. Mot. 18. Previous instances of misidentification, however, are insufficient to allege that the exact same injury will recur in the immediate future. *See O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)

---

[5] Plaintiffs cite a few recent district-court opinions to the contrary, such as *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025) and *League of United Latin American Citizens v. Executive Off. of the President*, 818 F. Supp. 3d 34 (D.D.C. 2026). Defendants respectfully disagree with those decisions for the reasons stated in this brief and in the relevant opinions from the Fourth Circuit. *See Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025) (majority opinion); *AFL-CIO*, 172 F.4th at 387 (Richardson, J., concurring in judgment).

("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief."); *see also Lyons*, 461 U.S. at 105–06 (same).

Plaintiffs also overstate the risks of misidentification through SAVE. As DHS has attested in another declaration before this Court, approximately 59.7 million SAVE verifications were completed for purposes of voter-verification in 2025 and up to April 2026. *See* Broderick Decl. ¶ 22. With numbers like that, finding only three mistakes strongly suggests that SAVE is working well, not poorly, as evidenced by almost 4,000 state and federal agencies signing up to use SAVE for one reason or another. *See* USCIS, *SAVE Agency Search Tool*, https://perma.cc/3VHT-72KE (last accessed Jun. 1, 2026). Plaintiffs' declarations further undermine their cause. Each of the declarants says that, according to state officials, Texas identified "2,724 potential noncitizens" out of "more than 18 million voters" whose information had been run through SAVE—an error rate of 1.5%. Nel Decl. ¶ 30; A. Doe Decl. ¶ 16; B. Doe Decl. ¶ 33. And of those 2,724, surely some are, in fact, non-citizens. It also bears noting that two declarants, Anthony Nel and Alex Doe, have confirmed their citizenship with Texas. *See* Nel Decl. ¶ 28; A. Doe ¶ 14. As for Bailey Doe, she has a passport that she can use to confirm her citizenship, *see* B. Doe Decl. ¶¶ 7, 28, but provides no reason why she has not yet submitted it.

Ultimately, to support standing, "the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA*, 602 U.S. at 381. Under these circumstances, the inability to identify even a full handful of voters who faced issues significantly undermines the credibility of Plaintiffs' predictions about the likelihood of future harm to these Plaintiffs in this suit (or their members). Plaintiffs also mistakenly "assume that certain States *will* rely on" DOJ's representations about certain voters and remove them, but "it remains highly speculative [whether] they will do so." *DSCC*, 2026 WL 1477833, at *7.

Multiple States who sent their full voter lists asked DOJ to include along with the name of any potentially ineligible voters "any and all identifying information used along with the reason they are suspected to be ineligible."  CRT-3261; *see also* CRT-1800; CRT-1995; CRT-3126; CRT-3276.  States requested this additional information "to confirm the records match and to determine the appropriate next steps for the record in question."  CRT-3276.  In other words, States will review the information before deciding whether removal is appropriate.  *See, e.g.*, CRT-25 (MOU requiring South Carolina to remove ineligible voters "as identified by [DOJ] *and confirmed by* [South Carolina]" (emphasis added)).  And States will still need to undertake a process for removal consistent with the NVRA and in some cases, as set out in state law, 52 U.S.C. § 21083(a)(2)(A)(iii), and Plaintiffs are not guaranteed to be removed, either once or, in the case of the declarants, again.  Such "allegations of *possible* future injury are not sufficient" to support standing.  *Clapper*, 568 U.S. at 409.

Plaintiffs' voting-related theories are even more tenuous because the role of State officials creates a straightforward traceability and redressability problem.  "[A] federal court cannot redress injury that results from the independent action of some third party not before the court."  *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted).  When it comes to their fears of being removed from voter rolls, Plaintiffs have sued the wrong government.  *See Haaland v. Brackeen*, 599 U.S. 255, 292 (2023) ("[E]njoining the federal parties would not remedy the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements.").  States are ultimately responsible for removing voters from the state voter registration lists, not DOJ, *see* 52 U.S.C. § 20507(a)(4), (c)(2); *see also id.* § 21083(a)(2), (4).  Indeed, the declarants received notices form Texas, not DOJ.  *See* Nel Decl. ¶ 13; A. Doe Decl. ¶ 11; B. Doe Decl. ¶ 11.  And to the extent Plaintiffs suggest that States are going to erroneously

remove voters from rolls after receiving data back from DOJ, Plaintiffs offer mere "guesswork" that States will respond that way, not that State officials "will likely react in predictable ways" to DOJ's conduct. *Murthy*, 603 U.S. at 57–58. After all, States are always required to maintain "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters[,]" 52 U.S.C. § 21083(a)(4)(B). That obligation does not disappear once a State receives voter information from DOJ. *See* CRT-3266 (Nebraska noting that providing voter roll to DOJ does not alter that state's duties for list maintenance). States will still need to ensure that voters are not removed in error, and Plaintiffs cannot assume that States will blithely disenfranchise U.S. citizens. *See Nieves v. Bartlett*, 587 U.S. 391, 400 (2019) (discussing the "presumption of regularity" that attaches to State law-enforcement officials).

Moreover, if the Court determines that Plaintiffs have identified a risk of voter removals, they have proffered that risk only as to voters in Texas. Plaintiffs submit no declarations from voters with cancelled registrations from other States and cannot assume that cancellations in Texas are likely to result in cancellations elsewhere. And because "a plaintiff must demonstrate standing separately for each form of relief sought," the most relief Plaintiffs can get from these injuries is an injunction as to DOJ's use and collection of voter data from Texas. *DaimlerChrylser Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted).

### D. Plaintiffs Do Not Have Informational Standing

Plaintiffs also assert informational injuries stemming from DOJ's failure to abide by the "public notice provisions of the Privacy Act and PRA." Pls. Mot. 15. The Privacy Act requires publication in the Federal Register of a systems of records notice (SORN) in the Federal Register whenever an agency "establish[es] or revis[es]" a system of records. 5 U.S.C. § 552a(e)(4). The PRA similarly requires agencies to publish a notice in the Federal Register before initiating a

20

statutorily defined "collection of information."  *See* 44 U.S.C. §§ 3506(c)(2)(A), 3507(a)(1)(D).

Common Cause says that, without the disclosures required under the Privacy Act and the PRA, it

"must undertake costly and time-intensive efforts to obtain information about DOJ's use of voter

data." Pls. Mot. 15–16.  Other individual Plaintiffs do not mention these statutes by name, so it is

unclear whether they actually assert an information injury theory of standing.   But their

declarations similarly assert a need "to know why the federal government is collecting voter

registration information from the states."  R. Nasrullah Decl. ¶ 31; *see also, e.g.*, Duckworth Decl.

¶ 28.  These assertions do not create standing because neither statute creates informational rights.

The D.C. Circuit has "recognized that a denial of access to information can, in certain

circumstances, work an 'injury in fact' for standing purposes."  *Elec. Priv. Info. Ctr. v. PACEI*,

878 F.3d 371, 378 (D.C. Cir. 2017) (*EPIC*).  But, "[t]o carry its burden of demonstrating a

sufficiently concrete and particularized informational injury, the plaintiff must show that (1) it has

been deprived of information that, on its interpretation, a statute requires the government or a

third party to disclose to it, and (2) it suffers, by being denied access to that information, the

type of harm Congress sought to prevent by requiring disclosure."  *Id.*

Before even getting to these two factors, a plaintiff must identify a particularized injury—

as contrasted with a "generalized grievance" that is "undifferentiated and common to all members

of the public."  *United States v. Richardson*, 418 U.S. 166, 176-77 (1974) (citation omitted).  The

Privacy Act and the PRA, however, require agencies to make publications in the Federal Register

to the entire public, *see* 5 U.S.C. § 552a(e)(4), (e)(11); 44 U.S.C. §§ 3506(c)(2), 3507(a)(1)(D).

Failure to disclose information to the general public, rather than to these specific Plaintiffs, cannot

create standing because "the impact on [them] is plainly undifferentiated and common to all

members of the public."  *Richardson*, 418 U.S. at 176–77 (citation omitted); *see also Prisology,*

21

*Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114, 1116–17 (D.C. Cir. 2017) (alleged failure to make records electronically available electronically to the public, as required by FOIA, was "a harm common to everyone" that cannot "stat[e] an Article III case or controversy").

In any event, notice-and-comment provisions of the type identified by Plaintiffs create only a procedural right, not an informational one.[6]  As the Ninth Circuit recognized in *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251, 1259 (9th Cir. 2010), "[n]otice, of course, is a form of information (information that certain projects are being proposed)[;]" but the purpose behind notice in the statute at issue "was not to disclose information but rather to allow the public opportunity to comment on the proposals.  Notice is provided as a predicate for public comment." The PRA's and the Privacy Act's notice provisions fulfill the same function.  Furthermore, "[e]ven though these rights necessarily involve the dissemination of information, they are not thereby tantamount to a right to information per se."  *Id.*  Here, as in *Wilderness Society*, plaintiffs "reframe[] every procedural deprivation in terms of informational loss."  *Id.* at 1260.  "This approach would allow an end run around the Supreme Court's procedural injury doctrine."  *Id.* (discussing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)).

In any event, Plaintiffs have not demonstrated that they have suffered "the type of harm Congress sought to prevent by requiring disclosure" in the Privacy Act and the PRA.  *EPIC*, 878 F.3d at 378.  The Privacy Act "was not designed to vest a general right to information in the public" but rather to "protect individual privacy by focusing agency analysis and improving internal agency decision-making."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 103 (D.C. Cir. 2019) (discussing the E-Government Act).  "In this respect," the Privacy Act "is

---

[6] Plaintiffs cite *United to Protect Democracy v. PACEI*, 288 F. Supp. 3d 99 (D.D.C. 2017), to support their informational standing under the PRA, *see* Pls. Mot. 16.  Defendants respectfully disagree with the holding in that case for the reasons stated herein.

fundamentally different from statutes like the Freedom of Information Act (FOIA) where the harm Congress sought to prevent was a lack of information itself." *Id.* Accordingly, "[b]ecause the lack of information itself is not the harm that Congress sought to prevent," Plaintiffs must show how the violations of the notice provisions caused them "to suffer the kind of harm that Congress did intend to prevent: harm to individual privacy." *Id.* at 103–04. And again, for all the reasons above, Plaintiffs cannot make that showing.

Similarly, the PRA is a "comprehensive scheme designed to reduce the paperwork burden" on individuals, states, and local governments, *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990), and to improve the quality, benefit, and cost-effectiveness of federal government information, *see* 44 U.S.C. § 3501(1)–(11) (discussing purposes of the PRA). The PRA's motivation is to improve the government's information collection processes, not to create an informational interest in the general public. *See, e.g.*, *Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 958 (7th Cir. 2005) ("In short, statutes like FOIA and FACA that have served as the basis for informational standing have a goal of providing information to the public; the [PRA's] goal is simply to increase public participation in the decision-making process."). Consistent with this scheme, the Paperwork Reduction Act provides administrative and judicial protections for injured parties, which are "persons" from whom information collection is improperly sought, and not for members of the public generally, like Plaintiffs. 44 U.S.C. § 3512.

And even assuming Plaintiffs do have informational standing, the most they can get are the specific Federal Register disclosures required by the Privacy Act and the PRA. *See Cuno*, 547 U.S. at 352 (plaintiff must have standing for each form of relief sought). They do not have standing to seek, as they do, an injunction requiring DOJ to cease collecting information or to destroy information already collected. *See* Compl. Prayer for Relief ¶ 3, ECF No. 1. Plaintiffs

cannot, therefore, use their purported informational injury as a substitute for challenging other constituent actions of the alleged Policy.

### E. Common Cause Lacks Organizational Standing

Even if the individual Plaintiffs have standing in their own right, Common Cause does not. An organization may show standing to sue by satisfying the traditional criteria applicable to individuals—*i.e.*, a cognizable injury in fact, causation, and redressability. To satisfy the injury-in-fact requirement, an organizational plaintiff must show "more than a frustration of purpose," since the mere hindrance to a nonprofit's mission "is the type of abstract concern that does not impart standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted). Instead, the organization must have "suffered a concrete and demonstrable injury to [its] activities." *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (citation omitted). It is not enough, however, if the organization merely "diverts its resources in response to a defendant's actions." *FDA*, 602 U.S. at 395. Otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike[.]" *Id.* An organization cannot "spend its way into standing" that way. *Id.* at 394.

Common Cause asserts that DOJ's actions have interfered with a core mission by "disrupt[ing] Common Cause's existing voter education and protection efforts in three critical ways[.]" Pls. Mot. 13. First, Common Cause has expended resources to "investigate the scope of DOJ's new Policy" and "to educate registered and potential voters about the risks and benefits of voting in the face of DOJ's actions." *Id.* at 14. Second, because DOJ's actions "contemplates removing registered voters" from rolls, Common Cause's work "to ensure that once registered, all voters can cast a ballot" is undermined. *Id.* at 14–15 (citation omitted). Third and finally, Common

24

Cause will need to "divert resources" to educate the public about voter registrations and to train volunteers to identify voters that will supposedly be removed from voter rolls. *Id.* at 15.

These statements are precisely the kind of abstract frustration of mission and diversion of resources theories that are insufficient to create organizational standing. Common Cause admits that, to advance its mission to "empower all people to make their voices heard in the political process[,]" Compl. ¶ 146, it "educat[es] the public about changes in voting and election procedures[,]" Pls. Mot. 13. The organization's efforts to educate voters about DOJ's alleged Policy thus fulfill that mission, not impair it, and Common Cause's "self-serving observation that it has expended resources to educate its members and others regarding [the alleged Policy] does not present an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). In other words, DOJ's alleged Policy "has not impeded [Common Cause's] programmatic concerns and activities, but fueled them." *Elec. Priv. Info. Ctr. v. Dep't of Educ.*, 48 F. Supp. 3d 1, 23 (D.D.C. 2014); *see also Coal. For Humane Immg. Rts v. DHS*, 780 F. Supp. 3d 79, 90 (D.D.C. 2025) ("Arguably, these enhanced advocacy efforts are a *fulfillment* of an organization's mission."). Moreover, the Supreme Court has expressly held that an organization does not suffer an Article III injury based on expenditures to "conduct [its] own studies . . . so that [it] can better inform [the organization's] members and the public." *FDA*, 602 U.S. at 394. Common Cause's injuries are similar, if not identical.

True enough, Common Cause asserts that it must address the fears stated by "many more members of the public," Pls. Mot. 14, but again that is simply an expansion of education and counseling services that Common Cause already offers. And although Common Cause says that it must expend resources to "gather necessary information on DOJ's secretive process," *id.*, the "[e]xpenditure of resources in response to agency action alone is not enough to establish a

25

cognizable injury," *Nat'l Ass'n for Latino Cmty. Asset Builders v. CFPB*, 581 F. Supp. 3d 101, 106 (D.D.C. 2022).  Common Cause cannot "spend its way into standing simply by expending money to gather information" about the alleged Policy.  *FDA*, 602 U.S. at 394.  As for Common Cause's assertion about the alleged Policy "undermin[ing] the effectiveness of Common Cause's activities," Pls. Mot. 14, that bland assertion raises an abstract "frustration of an organization's objectives," which cannot impart standing, *Food & Water Watch*, 808 F.3d at 919.

### F.  Plaintiffs' Remaining Theories of Standing Fail

Plaintiffs say that they "have procedural standing" due to alleged violations of the Privacy Act 's and the PRA's notice-and-comment requirements.  Pls. Mot. 18.  Those allegations of procedural injury—which apply only to Counts VI and VII—add nothing to Plaintiffs' other theories of standing.  "[T]he 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient' to confer Article III standing."  *Greer*, 153 F.4th at 1314 (D.C. Cir. 2025) (citation omitted).   In other words, even when a plaintiff alleges a violation of some procedural right, the plaintiff still "must show that the violation of a procedural right 'resulted in injury' to some 'concrete, particularized interest.'" *Id.* at 1315 (quoting *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005)). So, if Plaintiffs cannot show a separate concrete injury, then allegations of procedural violations come no closer to standing.  *See, e.g.*, *Dep't of Com.*, 928 F.3d at 102 ("EPIC must allege harm that is distinct from a simple failure to comply with the procedural requirements of § 208."). The question thus remains the same: whether Plaintiffs can demonstrate a concrete interest connected to the alleged violation of law.  For the reasons already explained above, they cannot.

Common Cause also cannot rely on associational standing.  *Contra* Pls. Mot. 16. Generally, "an association has standing to bring suit on behalf of its members when: (a) its

members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Common Cause identifies multiple members through declarations, but for all the reasons described above, those individuals do not have standing. Common Cause has failed to identify members that "have standing to sue in their own right[.]" *Id.*

In addition, Plaintiff Common Cause Education Fund receives no mention in Plaintiffs' brief, despite being a named Plaintiff. *See* Compl. ¶ 17. The Complaint indicates that Common Cause and the Education Fund "bring this action jointly[,]" *id.*, but the Fund has provided no evidence that it is a "traditional membership association" or functional equivalent thereof that can even assert associational standing, *Pub. Emps. For Env't Resp. v. Zeldin*, — F. 4th —, 2026 WL 1191153, at *5 (D.C. Cir. May 1, 2026). The Fund thus may rely at most and exclusively on Common Cause's organizational standing, which fails for the reasons stated above.

\*   \*   \*

Standing "is 'built on a single basic idea—the idea of separation of powers.'" *FDA*, 602 U.S. at 378 (quoting *Texas*, 599 U.S. at 675). Federal "courts do not opine on legal issues in response to citizens who might roam the country in search of governmental wrongdoing." *Id.* at 379 (citation omitted). To enforce that principle, this suit should be dismissed, in its entirety. At an absolute minimum, the Court should dismiss any Plaintiffs (and any claims, or requests for relief) for which Plaintiffs have failed to carry their standing burden at summary judgment.

27

## II.    Plaintiffs Do Not Challenge a Discrete and Final Agency Action.

"The APA authorizes courts to review only 'final agency action[s].'" *Centro de Trabaja-dores Unidos v. Bessent*, 167 F.4th 1218, 1235 (D.C. Cir. 2026) (quoting 5 U.S.C. § 704) (alteration in original). "To be final and thus reviewable, an agency action must (1) mark the 'consummation' of the agency's decisionmaking process" and (2) determine 'rights or obligations,' or produce 'legal consequences.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "Each prong of *Bennett* must be satisfied independently for agency action to be final." *Id.* (citation omitted). The agency action in question must also be "circumscribed" and "discrete." *Norton*, 542 U.S. at 62, 64. Plaintiffs cannot, for example, "seek wholesale improvement of" an agency "program by court decree," they instead "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Id.* at 64 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)).

Here, Plaintiffs do not challenge an identifiable "discrete" action. Far from presenting a "narrow question to resolve," *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006), Plaintiffs challenge a self-described purported "Voter List Maintenance Policy" that they acknowledge entails various "constituent actions[.]" Pls. Mot. 4; *see also* Compl. ¶ 15 (asking Court to set aside three things—(1) "DOJ's Voter Registration Nationalization Policy," (2) "[DOJ's] decisions to compile the Confidential Voter List data in a system of records," and (3) "[DOJ's] policies and agreements to disclose that data"). Those actions include compiling state voter rolls, disclosing those rolls to various parties, comparing those rolls against "other federal datasets," analyzing those rolls for "insufficiencies," and disclosing those rolls to the States. Pls. Mot. 5.

Some of those "constituent actions" might be discrete under the APA, but Plaintiffs' challenge is different. They are not challenging specific document requests or specific provisions

28

of individual MOUs.  Instead, Plaintiffs lump together those discrete actions as well as the interactions between DOJ and 49 States to invent an ill-defined and amorphous agency "Policy." The record bears out that DOJ did not take a one-size-fits-all approach to its data requests from each State.  Each request sought slightly different information based on data that State reported in the Survey.  DOJ identified few Survey items in letters to some States and a lot of items in letters to other States.  *Compare* CRT-2327 (mentioning one item to Alaska), *with* CRT-2679, CRT-2783, CRT-3501 (requesting information in response to six survey items for other States).  From there, DOJ corresponded with each State, and those discussions unfolded in different ways depending on the State.  The key point, however, is that DOJ tailored its interactions to each State, even negotiating the terms of the MOU with South Carolina.  *See* CRT-17 (South Carolina noting "DOJ's willingness" to negotiate "refinements reflected in the final MOU").  DOJ's alleged Policy, therefore, covers not just the decision to seek voter rolls but everything it has done since then to collect those rolls, including storing them and making plans to run them through SAVE.  And if the alleged Policy truly includes "consolidating all states' [voter rolls] in a centralized system of records," Pls. Mot. 5, then it necessarily includes DOJ's one-off decisions to seek enforcement actions against States that have not provided their voter rolls.

"Such a program is no more an identifiable agency action—much less a final agency action—than a weapons procurement program of the Department of Defense or a drug interdiction program of the Drug Enforcement Administration." *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50–51 (D.D.C. 2014) (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 890).  Like those types of programs, DOJ's alleged Policy encompasses the choices that DOJ has made as to each individual State and each individual list.  Plaintiffs cannot "attach[] a policy label" to such varied practices

29

to circumvent the APA's restrictions on judicial review. *Id.* at 50 (citation omitted); *see also Norton*, 542 U.S. at 64 (holding that the APA precludes a "broad programmatic attack")

That DOJ personnel referred to a "NVRA List Maintenance *Project*" does not create a discrete agency action. *See* Pls. Mot. 1, n.1. If anything, the term "project" implies a larger programmatic effort encompassing multiple individual actions. "All governmental programs are the aggregation of individual decisions," and the APA "ensures that it is the individual decisions that are assessed as agency action[.]" *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 433 (4th Cir. 2019). Again, Plaintiffs admit that the alleged Policy involves multiple "element[s]" that run the gamut of actions from requests for data to analysis of data to disclosure of data. Pls. Mot. 5. In that sense, the alleged Policy as pleaded involves "a number of different types of administrative action," just like the land management plan that the Supreme Court said was too broad to be a discrete agency action in *National Wildlife Federation*. 497 U.S. at 877. Plaintiffs cannot obtain such "*wholesale* improvement" through "court decree" of how DOJ plans to investigate violations of elections laws and enforce those statutes. *Norton*, 542 U.S. at 64. Instead, Plaintiffs must identify what, exactly, the agency did that they are seeking to challenge.

Of the individual actions that Plaintiffs do mention, some of them are not final agency actions under the APA. Consider first DOJ's letters to individual States, which do not determine "rights or obligations" or carry "legal consequences." *Bennett*, 520 U.S. at 177–78. States were free to refuse to provide data, as many did. The letters themselves therefore do not impose any consequences on Plaintiffs because they are not self-executing. Similarly, sharing data with SAVE results in, at most, a statement that the voter in question is dead or likely not a citizen. SAVE also does not "[d]etermine applicant eligibility for a specific benefit or license[,]" but leaves that determination—which would have legal consequences—to other agencies. *About SAVE*, *supra*.

30

Similarly, sharing with ICE does not itself create legal consequences since ICE still needs to investigate and act upon that information as to any individual.  And, as discussed above, States are the ones who must take steps to remove individuals from voter rolls.  Thus, even when DOJ "disclos[es] to the states the results of [its] testing, assessment, or analysis," Pls. Mot. 5, it is the State's subsequent response—*i.e.*, whether to move to remove those voters from the rolls—that causes any direct and legal consequences for Plaintiffs.  If the State does remove them, *that* action has legal consequences for Plaintiffs and their members.  If not, legal consequences from these Defendants will accrue only if DOJ files an enforcement action against that State, something that has not happened as to the States who have complied with DOJ's requests.

Finally, the MOU between DOJ and USCIS regarding SAVE merely memorializes and explains how the two agencies "will administer a process established by statute and make explicit existing requirements."  *Centro de Trabajadores Unidos*, 167 F.4th at 1236 (citation omitted).  DHS is required to respond to requests by a sister state or local agency for the immigration status of any individual.  *See* 8 U.S.C. § 1373(c).  Any substantive change attributable to the MOU thus stems not from the MOU, but from DOJ's "decision to use statutorily authorized tools" to "further its objectives."  *Robert F. Kennedy Hum. Rts. v. Dep't of State*, 2026 WL 820811, at *18 (D.D.C. Mar. 25, 2026) (citation modified).

In sum, that these various transfers could potentially lead to indirect, "[p]ractical consequences" for Plaintiffs and their members at the hands of other agencies or States does not mean that DOJ's actions create legal consequences for those individuals.  *Indep. Equipment Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (Roberts, J.) (citation omitted).  Adverse effects "accompany many forms of indisputably non-final government action."  *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004).  What matters is that the alleged decisions here

31

have no "direct and appreciable legal consequences" for Plaintiffs. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019).

### III. Plaintiffs Lack a Cause of Action For Certain Claims

### A. Plaintiffs' Ultra Vires Claims Are Not Cognizable (Counts III and V)

Plaintiffs lack a cause of action for their *ultra vires* claims challenging DOJ's actions as violating the separation of powers (Count III) and federalism, the Elections Clause, the Voter Qualifications Clause, and the Seventeenth Amendment (Count V). *See* Compl. ¶¶ 175–77; 185–87. *Ultra vires* review is improper "if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted); *see also Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (*Ultra vires* review "is strictly limited when other judicial-review statutes are present[.]" (citation omitted)). Here, the APA provides Plaintiffs with a "meaningful and adequate opportunity" to challenge DOJ's actions. *Nuclear Regul. Comm'n*, 605 U.S. at 681. Plaintiffs implicitly recognize this fact by bringing *ultra vires* and APA claims premised on the same alleged constitutional violations. *See, e.g.*, Compl. ¶ 187 (alleging in Count V that the Department's actions violate various constitutional provisions "[f]or the same reasons set forth above in Count IV").

For other reasons, Count III is foreclosed by recent D.C. Circuit precedent. In that claim, Plaintiffs assert that DOJ violated the separation of powers "[f]or the same reasons set forth above in Count II." *Id.* ¶ 177. Count II, in turn, alleges that DOJ "has violated the separation of powers" because it "lacks any statutory authority" for its actions. *Id.* ¶¶ 171, 173. However, not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso*

*facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994).    Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases).    The D.C. Circuit recently reaffirmed that principle.    *See Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025) ("*Armstrong* as well as *Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review."). Here, Defendants' actions are predicated on their statutory right to information under the CRA and their rights to enforce certain federal laws. *See, e.g.*, 52 U.S.C. § 20703.  Plaintiffs disagree with the exercise of that right, but their disagreement does not transform a statutory claim into a constitutional one.    Plaintiffs therefore cannot assert in Count III a freestanding separation-of-powers claim based on alleged statutory violations.

### B.  Plaintiffs Cannot Bring an APA Claim Predicated on Privacy Act Violations (Count VI)

In addition to lacking a cause of action for their *ultra vires* claims, Plaintiffs cannot bring Count VI, which seeks to enforce the Privacy Act via the APA.  The APA does not grant a cause of action where there is "[an]other adequate remedy in a court."  5 U.S.C. § 704. "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).  Accordingly, a plaintiff has adequate relief—and thus cannot rely on the APA—"where a statute affords an opportunity for *de novo* district-court review of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (citation omitted). Stated differently, where an agency action is subject to review in some manner under a separate statutory scheme, that action generally must be reviewed within the confines of that scheme.  This is true even when a statutory review scheme provides for review of issues by only certain parties; other parties are presumptively precluded from obtaining review of

33

those issues under the APA. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded.").

Under these principles, Plaintiffs may not challenge purported violations of the Privacy Act under the APA. The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, *see* 5 U.S.C. § 552a(g)(1)(D). They can sue the United States if an agency (1) does not "amend [their] record in accordance with [a] request," *id.* § 552a(g)(1)(A); (2) refuses to comply with their request to access records, *see id.* § 552a(g)(1)(B); (3) fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual[,]" *id.* § 552a(g)(1)(C); or (4) "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," *id.* § 552a(g)(1)(D).

Specific civil remedies are available in each type of suit. For actions under subsections (C) and (D), a plaintiff can obtain actual damages. *See id.* § 552a(g)(4)(A); *see also Cooper*, 566 U.S. at 291, 299 (limiting actual damages to proven pecuniary or economic harm). Injunctive relief is also available to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A), and to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A). Otherwise, injunctive relief is unavailable. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("[O]nly monetary

34

damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs[.]" (citation omitted)).  Congress thus concluded that suits for money damages provide an adequate remedy for violations of § 552a(b), and it limited relief to those suits. That congressional determination forecloses any APA claim like Count VI here.

Numerous courts have recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d. 21, 33 (D.D.C. 2014); *see also, e.g.*, *Poss v. Kern*, 2024 WL 4286088, at *6 (D.D.C. Sep. 25, 2024); *Haleem v. Dep't of Def.*, 2024 WL 230289, at *13–14 (D.D.C. Jan. 22, 2024); *Bierly v. Dep't of Def.*, 2024 WL 4227154, at *8–9 (D.D.C. Sep. 18, 2024); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017).  Indeed, were injunctive relief freely available for violations of the Privacy Act generally—such as through the sort of generic APA claims that Plaintiffs bring here— "the detailed remedial scheme adopted by Congress" in the Privacy Act "would make little sense." *Cell Assocs., Inc. v. Nat'l Insts. of Health, Dep't of Health, Educ. & Welfare*, 579 F.2d 1155, 1160 (9th Cir. 1978).  The Privacy Act also applies only to individuals—not organizational entities. *See* 5 U.S.C. § 552a(g) (authorizing a cause of action for adversely affected "individuals"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence[.]").  It would therefore flout Congress's scheme created to allow an organizational plaintiff like Common Cause to assert a Privacy Act violation via the APA that could not be asserted under the Privacy Act itself.[7]

In short, Congress specified the remedies that are available for APA violations, *see id.* § 706.  Congress likewise specified the remedies that are available to "individual[s]" (but not

---

[7] Defendants recognize that other courts have reached the opposite conclusion.  *See, e.g.*, *AFL-CIO*, 778 F. Supp. 3d at 79–82.  Defendants respectfully disagree with those decisions for the reasons set forth herein.

organizations) for Privacy Act violations, *see id.* § 552a(g).  Both the substantive arguments advanced and the relief requested in Count VI make a mess of those choices.  Congress's decision to provide narrow, targeted causes of action for damages and particular kinds of injunctive relief under the Privacy Act strongly suggests that it did not intend to allow plaintiffs to end-run that carefully constructed scheme via APA claims.  This Court should respect that congressional choice.

### IV.   Plaintiffs' Claims Fail On The Merits.

#### A.  DOJ's Actions Are Not Contrary to Election Laws (Count I)

In a clarifying display of why their challenge is too broad under the APA, Plaintiffs argue that "neither the NVRA, nor HAVA, nor any other law, authorizes [DOJ's] actions here."  Pls. Mot. 20.  Plaintiffs make no effort to specify which of DOJ's actions are supposedly unauthorized. Ultimately, it doesn't matter because DOJ's actions are authorized by multiple laws.

Start with DOJ's requests for data rolls from individual States.  As explained already, the CRA requires state and local election officials to retain "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in" the most recent election.  52 U.S.C. § 20701.  The CRA further permits the Attorney General to "demand in writing" that those records "be made available for inspection, reproduction, and copying."  *Id.* § 20703.  The Attorney General must "contain a statement of the basis and the purpose" for the Attorney General's request.  *Id.*  DOJ's requests meet each of these statutory elements.[8]

---

[8] Defendants acknowledge that multiple district courts have dismissed DOJ's enforcement actions under the CRA.  *See* Pls. Mot. 3 n.3.  Defendants respectfully disagree with those decisions.

State voter rolls are obviously records "relating to" voter "registration[.]" *Id.* § 20701. The ordinary meaning of the term "relating to[,]" the Supreme Court has explained, "is a broad one[.]" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (citation omitted). This term means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with[.]" *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 566 n.1 (2011) (the term "related" is "expansive"). Since a statewide voter roll identifies who is registered to vote, that list "has 'a connection with, or reference to,' the topics" at issue, *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384)—namely, voter "registration[s]," 52 U.S.C. § 20701; *see also McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (Section 301 "encompasses, among other things, voting registration records[.]").

That voter list also has "come into [the] possession" of the State and local election officials to whom DOJ sent requests. 52 U.S.C. § 20701. Although how each State treats its voter rolls depends on the intricacies of State law—again laying bare that Plaintiffs' undifferentiated challenge is too broad to be cognizable under the APA—the ordinary meaning of "possession" encompasses the official's "having or taking into control" those lists. *Possession*, Webster's Seventh New Collegiate Dictionary 663 (1967 ed.); *see also Possession*, Webster's Third New Int'l Dictionary 1770 (1971 ed.). It is undisputed that State and local election officials who can authorize the release of voter rolls have control of those lists. Nor do the words "come into" suggest otherwise. As a matter of common sense, an election official "come[s] into" possession of a record when he "get[s] or acquire[s]" it. *Possession*, *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). That acquisition occurs once the election official creates or compiles the state voter roll.

37

Further, DOJ's requests "contain[ed] a statement of the basis and the purpose" for the request. 52 U.S.C. § 20703. DOJ requested voter lists as "information regarding [each] state's procedures for complying with the state-wide voter registration list maintenance provisions of the [NVRA]," CRT-2688, and to "ascertain [each State's] compliance with the list maintenance requirements of the NVRA and HAVA," CRT-3197. Moreover, although this would properly be the subject of a challenge to a specific request, not a purported facial challenge to a "policy" writ large, DOJ also notified each State in these letters that DOJ was "conduct[ing] an independent review of each state's list." *E.g.*, CRT-2647 n.1. That is a statement of the basis and purpose for the request, which is all that the CRA requires. The Fifth Circuit in the immediate aftermath of the CRA held that DOJ need only "identify in a general way the reasons for [a] demand" under Section 303 and that an "assertion that the demand was made for the purpose of investigating possible violations of a Federal statute" was "[c]learly a sufficient statement." *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam); *see also United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (in Section 303 proceeding, affirming that a "simple assertion by the Attorney General of the United States that there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights" is sufficient).

That basis and purpose furthers DOJ's enforcement role under both the NVRA and HAVA. Plaintiffs acknowledge that DOJ can enforce those statutes' requirements for voter list maintenance efforts, *see* Pls. Mot. 22, but Plaintiffs would wholly deprive DOJ of key information about those programs and their effectiveness. A State's voter registration list must be used to ensure accuracy of the official list of eligible voters and thus is perhaps the best evidence about whether States' list maintenance efforts are effective at "remov[ing] the names of ineligible voters." 52 U.S.C. § 20507(a)(4). Similarly, Congress permitted the Attorney General to enforce

38

the "uniform and nondiscriminatory election technology *and administration* requirements" in HAVA. *Id.* § 21111 (emphasis added). One such requirement is that States' "election system[s] shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* § 21083(a)(4). Again, a State's voter list is directly relevant evidence of how a State's election system "ensure[s] that voter registration records in the State are accurate." *Id.* DOJ reasonably determined that it needs that evidence to effectively enforce the NVRA and HAVA, and the CRA entitles DOJ to ask for such a record "relat[ed] to" voter "registration." *Id.* § 20701. That Congress designated DOJ as the federal enforcer of these statutes and allowed DOJ to request the relevant records plainly states that DOJ is entitled to obtain state voter rolls. *Contra* Pls. Mot. 21.

DOJ's enforcement of these statutes and investigations of potential violations also is not limited to requests for information. By giving DOJ the power to enforce the NVRA and HAVA, 52 U.S.C. §§ 20510(a), 20511, 21111, Congress necessarily gave DOJ the antecedent power to investigate potential violations of those statutes. Indeed, DOJ's authority under the CRA is a "purely investigative" one. *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney General of U.S.*, 285 F.2d 430 (5th Cir. 1961). That authority entitles DOJ to conduct investigations into potential violations of the NVRA and HAVA. But DOJ cannot know whether the state measures required by those statutes are effective or even "reasonable" without knowing the extent to which state voter rolls include ineligible voters, such as dead people, former residents who have moved or people who submitted false information when registering to vote online. Pls. Mot. 22; *see also* CRT-3384 (goal of requests and other actions is "to ensure that states have list maintenance programs and that the maintenance programs are

39

working"). Like a forensic accountant using large-scale bank records to investigate potential fraud, DOJ is entitled to confirm the accuracy of the lists it has received. DOJ pursues that investigatory approach through the SAVE database. Nothing in the NVRA or HAVA prohibits DOJ from taking that investigatory approach.

Plaintiffs say that DOJ cannot investigate potential violations of NVRA and HAVA "on a dragnet basis and without any particularized investigatory purpose[.]" Pls. Mot. 23. But Plaintiffs point to no statutory text limiting the Attorney General to investigate only one State, one violation, or even one voter. Nor did Congress require the Attorney General to know ahead of time the exact nature of the NVRA or HAVA violation being investigated. The better reading is that Congress empowered DOJ to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950). Regardless, DOJ identified in many of its letters to States some facts from the Survey that prompted DOJ's requests. *See, e.g.*, CRT-2730 (Kentucky), CRT-3159 (Utah). And because DOJ's investigation is "to ensure that accurate and current voter registration rolls are maintained"—one of the express purposes behind the NVRA, 52 U.S.C. § 20501(b)(4)—that investigation does not "undermine the NVRA's purpose[,]" Pls. Mot. 24, nor is it "antithetical to Congress's goals in enacting the NVRA[,]" *id.* at 41.

DOJ's identification to States of entries that SAVE flags are also not contrary to law. The SAVE database can identify noncitizens, *see* Broderick Decl. ¶ 4, who are statutorily prohibited from voting in federal elections, *see* 18 U.S.C. § 611. By identifying entries flagged as ineligible voters and asking States to investigate them, DOJ is both identifying and then notifying States of potential violations of federal law (*i.e.*, noncitizen voters, *see id.*). States can disagree with DOJ's interpretation of the law and can refuse to act if they choose. Indeed, many States have affirmed

40

that they will need to confirm the accuracy of DOJ's assertions about ineligibility.  *See* CRT-25; CRT-1800; CRT-1995; CRT-3126; CRT-3261; CRT-3276.  DOJ perhaps could then bring an enforcement action challenging the State's decision.  But until then, Plaintiffs identify no statutory language prohibiting DOJ from notifying States of potential NVRA and HAVA violations and asking them to fix those violations or risk an enforcement action.  The Court cannot "compel" in that way how DOJ should "choose to exercise its enforcement discretion."  *Greer*, 153 F.4th at 1315 (citation omitted).

Plaintiffs also challenge MOUs requiring States to remove ineligible voters within 45 days.  *See* Pls. Mot. 24.  Plaintiffs say that these provisions violate the NVRA's "procedural protections for voters."  *Id.*  Those protections, however, do not apply to those "who were ineligible and improperly registered to vote in the first place."  *Bell v. Marinko*, 367 F.3d 588, 591–92 (6th Cir. 2004).  Noncitizens are ineligible to vote in the first place and thus cannot rely on protections for eligible registrants who later become ineligible, including the 90-day protection against removal located in 52 U.S.C. § 21083.  *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 752–57 (9th Cir. 2025) (Bumatay, J., dissenting).

Finally, Plaintiffs cannot invoke the major questions doctrine.  *See* Pls. Mot. 24.  The Supreme Court has applied that doctrine "in certain extraordinary cases[,]" including "when an agency claims to discover in a long-extant statute an unheralded power."  *Khalid v. TSA*, 172 F.4th 866, 875 (D.C. Cir. 2026) (cleaned up).  There is nothing extraordinary about DOJ wanting to investigate potential violations of statutes when "Congress has expressly authorized" DOJ to do so.  *Id.*  There is also no "indisputable lack of historical precedent for DOJ's actions[.]"  Pls. Mot. 24–25 (citations omitted).  DOJ has requested voting records from States since 1960.  *See, e.g.*, *Gallion*, 187 F. Supp. at 851; *Kennedy v. Bruce*, 298 F.2d 860, 862 (5th Cir. 1962).  And DOJ has

41

previously enforced the NVRA and HAVA against a State. *See United States v. Maine*, 2007 WL 1059565 (D. Me. Apr. 4, 2007) (consent decree); Dkt. 2, *United States v. New Jersey*, No. 2:06-cv-4889 (D.N.J. Oct. 12, 2006) (stipulated order); Dkt. 5, *United States v. Indiana*, No. 1:06-cv-1000 (S.D. Ind. July 5, 2006) (consent decree). The major questions doctrine is inapplicable here.

### B. DOJ Has Not Violated The Privacy Act (Count VI)

The Privacy Act requires each agency maintaining a system of records to publish in the Federal Register a SORN of any new use and allow at least a 30-day period for "interested parties" to submit comments. 5 U.S.C. § 552a(e)(4)(D), (e)(11). That "notice shall include," as relevant here, both "the categories of individuals on whom records are maintained in the system" and "the categories of records maintained in the system." *Id.* § 552a(e)(4)(B)–(C). The Privacy Act also prohibits disclosure of an individual's information unless disclosure meets one of the exceptions set forth in the Act. *See id.* § 552a(b). One exception allows disclosure for a "routine use," *id.* § 552a(b)(3), meaning a use that is "compatible with the purpose for which [that record] was collected," *id.* § 552a(a)(7). That routine use must also be properly noticed. *See id.* § 552a(b)(3), (e)(4)(D).

***Published SORN Covers Storage of The Voter Rolls.*** As Plaintiffs say, DOJ stores the state voter rolls in a system of records called the Central Civil Rights Division Index File and Associated Records ("Central Index File"). *See* CRT-896 (identifying SORN for Central Index File); CRT-3383 (similarly identifying "CRT-1"). Published SORNs for that system permit the storing of voter rolls there such that DOJ was not required to go through new notice-and-comment procedures via a new SORN before adding the voter rolls to the Central Index File. *Contra* Pls. Mot. 25–28. The operative SORN that announced the Central Index File's establishment states that "categories of individuals covered by the system . . . may include: [s]ubjects of investigations"

42

and "victims." 68 Fed. Reg. 47610, 47611 (citation modified).  The term "subject" is a "term[] of art in the context of DOJ investigations" that refers to any person "whose conduct is within the scope of" an investigation.  *Am. Oversight v. DOJ*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (quoting Justice Manual § 9-11.151 (Jan. 2020)).   Persons who appear in a statewide voter registration list are "[s]ubjects of investigations" 68 Fed. Reg. at 47611, because their voter registrations are within the scope of the Division's investigation into violations of the NVRA and HAVA.  *See supra* at 36–41.  Moreover, legitimate voters appearing on these lists are potential "victims" of voter fraud, 68 Fed. Reg. at 47611, because their vote will be diluted due to the illegal participation of noncitizens in federal elections, *see Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (recognizing that dilution of a citizen's vote can deny the right to suffrage).

The same SORN also covers the statewide voter registration lists themselves.  The SORN notifies everyone that records in the Central Index File "consist of case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division."  68 Fed. Reg. at 47611. As discussed already, state voter lists "relat[e]" to efforts by the Division to "enforce[] . . . civil rights laws." *Id.*; *see supra* at 37.  The lists thus fall within the plain language of the SORN's scope.

***Published SORN Covers Disclosure of Voter Rolls.***  That SORN also covers the disclosure of these lists to DHS, States, and any contractors. *Contra* Pls. Mot. 28–29.  The simplest disclosure is to DOJ's contractors.   The eighth routine use in the SORN permits disclosure "[t]o contractors . . . performing or working on a contract . . . when necessary to accomplish an agency function related to this system of records."  68 Fed. Reg. 47612.  DOJ therefore can disclose the voter lists to contractors that are assisting in maintenance of the Central Index File, as those involved here are.  *See* CRT-3325 (contract for litigation support).

Disclosure to DHS straightforwardly follows from the first two routine uses. *See* CRT-31 (SAVE MOU invoking these routine uses). The first covers disclosures (1) "[i]n the event that a record . . . indicates a violation of law—criminal, civil, or regulatory in nature," to "the appropriate Federal [agency] . . . charged with the responsibility for investigating or prosecuting such violation or charged with enforcing or implementing such law[.]" 68 Fed. Reg. 47611. ICE is charged with investigating violations of immigration law, and because the voter lists indicate the presence of aliens, DOJ can disclose them to ICE.

Even if the Court disagrees, the transfer to ICE is authorized by the law enforcement exception, which permits disclosure to another government agency "for a civil or criminal law enforcement activity if [that] activity is authorized by law" so long as "the head of the agency has made a written request to the agency" maintaining the record in question. 5 U.S.C. § 552a(b)(7). The written request must "specif[y] the particular portion desired and the law enforcement activity for which the record is sought[.]" *Id.* Here, the Acting Director of ICE notified DOJ that ICE was "undertaking a Voter Fraud initiative to ensure the integrity of the electoral process within [ICE's] authority." CRT-3398. That initiative is authorized by law, and the head of ICE made the request.[9] As for the "particular portion desired" language, that phrase does not restrict ICE to asking for only a portion of a record. 5 U.S.C. § 552a(b)(7). ICE specified the "portion" it wanted, which was the entirety of the voter rolls. *Id.*

The second routine use allows disclosure to USCIS. That use covers disclosure "[i]n the course of the administration by CRT of . . . the investigation or litigation of a case or matter" to a

---

[9] Plaintiffs argue that ICE's letter should have "specif[ied] exactly what potential violations of federal election law ICE sought to investigate." Pls. Mot. 30 (citation omitted). The Privacy Act does not require ICE to identify specific violations, it requires identification only of the relevant "law enforcement activity." 5 U.S.C. § 552a(b)(7). ICE fulfilled that requirement by identifying its voter fraud initiative.

federal agency "if there is reason to believe that such agency . . . possesses information or has the expertise in an official or technical capacity to assist in the administration of such program or to analyze information relating to the investigation" and "the dissemination is reasonably necessary to elicit such assistance, information or expert analysis[.]"  68 Fed. Reg. 47611.  As discussed above, USCIS manages SAVE, which is the only database which can verify citizenship.  USCIS therefore has the "technical capacity" to "analyze" the voter rolls, which "relate[] to" DOJ's "investigation" of violations of the NVRA and HAVA.  *Id.*

Disclosure to States follows from the first routine use.  As Plaintiffs acknowledge, States are "primarily responsible for voter list maintenance[,]" Pls. Mot. 21, and the NVRA gives States the authority to remove voters from rolls, *see* 52 U.S.C. § 20507(a)(4), (c).  States are therefore charged with "enforcing or implementing" those laws such that DOJ can, under the first routine use, share voter rolls with them.  68 Fed. Reg. 47611.

***DOJ Has Not Violated the Accuracy Provisions of the Privacy Act.***  Plaintiffs assert that, because SAVE has some errors, DOJ is "likely to falsely identify U.S. citizens as non-citizens," violating multiple Privacy Act provisions requiring accurate records and technical safeguards.  Pls. Mot. 31 (citing 5 U.S.C. § 552a(e)(5), (e)(6), (e)(10)).  Plaintiffs do not say or estimate how accurate a record must be to comply with these provisions, but apparently any errors in SAVE mean that DOJ cannot maintain records that have passed through SAVE.  *See id.* at 31–32.

Things cannot work this way.  Congress acknowledged in the Privacy Act that records in the hands of agencies would be imperfect, going so far as to allow courts to order agencies to "amend [an] individual's record in accordance with his request" to do so.  5 U.S.C. § 552a(g)(2)(A).  Such relief would be unnecessary, as would the de novo review directed by Congress, *see id.*, if every use of a database that is imperfect is *per se* legal error.  Moreover,

Congress has statutorily authorized the SAVE system and its use by other agencies. *See* 42 U.S.C. § 1320b-7 note; 8 U.S.C. § 1373(c). Plaintiffs do not suggest that SAVE has always been error-free, resulting in the illogical conclusion that, on their telling, agencies that have relied on a statutorily authorized database have been violating the Privacy Act since the late 1980s.

Moreover, this argument lays bare the impropriety of using the APA to assert a Privacy Act violation. A claim under 5 U.S.C. § 552a(e)(5) requires a plaintiff to experience an "adverse determination" caused by an agency's "reliance on the inaccurate records." *Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996). Multiple Plaintiffs here have experienced no determinations at all and thus should not be able to circumvent the pleading standard for that kind of claim via the APA. Similarly, a claim under § 552a(e)(10) requires the plaintiff to "identify a rule or safeguard . . . that [DOJ] should have established but did not." *Dick v. Holder*, 67 F. Supp. 3d 167, 186 (D.D.C. 2014) (citation omitted). Plaintiffs have identified no such safeguard except that DOJ apparently should not use SAVE at all, despite statutory authorization. *See* 42 U.S.C. § 1320b-7 note.

*The Privacy Act's First Amendment Activities Provision Does Not Bar DOJ's Actions.* DOJ's maintenance of the state voter rolls also does not violate the Privacy Act's First Amendment protections. The Privacy Act prohibits an agency from "maintain[ing]" records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute . . . or unless pertinent to and within the scope of an authorized law enforcement activity[.]" 5 U.S.C. § 552a(e)(7). For all the reasons discussed above, the CRA "expressly authorize[s]" DOJ to request the state voter rolls. *Id.* And because Congress designated DOJ to enforce the NVRA and HAVA, DOJ is "expressly authorized" to use those rolls in its investigation of potential violations of those statutes. *Id.*

46

DOJ's maintenance of the voter rolls is "within the scope of an authorized law enforcement activity" for the same reasons. *Id.* Both Congress and the courts have recognized that "law enforcement" extends beyond "investigation of . . . criminal activity." *Jabara v. Webster*, 691 F.2d 272, 279 (6th Cir. 1982) (5 U.S.C. § 552a(e)(7)'s exception for authorized law-enforcement activities not limited "to investigation of . . . criminal activity"). DOJ's investigation of violations of the NVRA and HAVA is therefore a "law enforcement activity," a phrase the D.C. Circuit has interpreted "broadly." *Maydak v. United States*, 363 F.3d 512, 517 (D.C. Cir. 2004) (citing D.C. Circuit authorities). Plaintiffs misconstrue *Maydak* as helping them. *See* Pls. Mot. 34. There, the D.C. Circuit held that the Bureau of Prisons could, consistent with the Privacy Act, examine First Amendment records "for conduct that may threaten . . . security" of the prison. *Maydak*, 363 F.3d at 517. The responsibility to preserve prison security gave rise to "an authorized law enforcement activity." *Id.* So too with DOJ's responsibility to enforce the NVRA and HAVA. To be sure, the D.C. Circuit in *Maydak* also wrote that the Bureau could not bypass the Privacy Act by invoking "generic investigative and informative purposes." *Id.* DOJ does more—it has identified the statutes it wishes to enforce and the steps to investigate violations of those statutes. This activity is far from "generic." *Id.*

## C.  DOJ Has Not Violated The Paperwork Reduction Act (Count VII)

DOJ's requests from States did not violate the Paperwork Reduction Act. *Contra* Pls. Mot. 34–37. That statute imposes various procedural requirements before an agency undertakes a "collection of information." *See* 44 U.S.C. §§ 3506, 3507. That phrase is defined as:

(A) "[T]he obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for either—

47

(i) answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States [ . . .]

(B) shall not include a collection of information described under section 3518(c)(1)[.]

*Id.* § 3502(3).  "[P]erson" includes States.  *See id.* § 3502(10).

The requests do not fit into this statutory definition for multiple reasons.  DOJ did not send "identical" letters to ten or more States.  Rather, many letters asked for information unique to each State based on data in the Survey.  *See, e.g.*, CRT-2407 (requesting information from Arkansas related to 7 Survey items); CRT-2699 (same for Iowa); CRT-2396 (requesting information from Arizona related to 1 survey item, but with six subparts).  At least one letter requested information related not just to Survey items, but to a state report.  *See* CRT-2766 (Maryland).  And other letters simply requested voter rolls without any additional information.  *See, e.g.*, CRT-3187 (Vermont), CRT-3200 (West Virginia).  True, certain requests were shared by all letters, but to be identical the requests must be "the very same" or "exactly alike or equal."  *Identical*, Webster's New World College Dictionary 708 (4th ed. 2008).  Because the letters differ by State, their information requests are not identical as required by the PRA.

DOJ's letters also did not pose "questions" to the states.  Paradigmatic "questions" are those found on the decennial-census questionnaire.  *See Dep't of Com.*, 928 F.3d at 99.  DOJ's requests do not ask, "What is all the information in your statewide voter registration list?"  Rather, they direct States to provide certain information, much like an administrative subpoena does.  An administrative subpoena does not, however, ask questions.  And to the extent Plaintiffs argue that the requests impose "reporting or recordkeeping requirements," 44 U.S.C. § 3502(3), the requests are for data that HAVA requires States to maintain, *see* 52 U.S.C. § 21083(a)(1)(A).  HAVA imposes any requirements, not the requests.

Even if the Court disagrees, however, the PRA excludes any "collection of information described under section 3518(c)(1)[,]" 44 U.S.C. § 3502(3)(B). Section 3518(c)(1) generally excludes the collection of information in federal criminal investigations, *see id.* § 3518(c)(1)(A), and most "administrative action[s] or investigation[s] . . . against specific individuals or entities[,]" *id.* § 3518(c)(1)(B)(ii). As said multiple times by now, DOJ's requests sought information related to an investigation into potential violations of the NVRA and HAVA committed by specific entities; namely, States.

### D. Plaintiffs' Constitutional Claims Fail as a Matter of Law (Counts II–V)

Once Plaintiffs' statutory claims are resolved, their constitutional claims follow as a matter of course. In Counts II and III, Plaintiffs' primary allegation is that DOJ "has violated the separation of powers" because it "lacks any statutory authority" for its actions. Compl. ¶¶ 171, 173. For all the reasons discussed above, *see supra* at 36–48, that is incorrect. DOJ's actions fall comfortably within the authority conferred by Congress in the NVRA and HAVA.

Plaintiffs also assert in Counts IV and V that DOJ's actions violate federalism, the Elections Clause, the Voter Qualifications Clause, and the 17th Amendment. *See* Compl. ¶¶ 178–87. Those claims lack merit as well. Notwithstanding that the Constitution gives States broad authority over the conduct of federal elections, Congress can override those state choices, as it did in the NVRA and HAVA. *See* U.S. Const. Art. I, § 4, Cl. 1. In that sense, "[t]he Elections Clause establishes a unique relationship between the state and federal governments." *Gonzalez v. Arizona*, 677 F.3d 383, 390 (9th Cir. 2012) (en banc), *aff'd sub nom.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). The Elections Clause "invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "Thus, unlike

49

virtually all other provisions of the Constitution, the Elections Clause gives Congress the power to conscript state agencies to carry out federal mandates" without otherwise offending federalism principles. *Gonzalez*, 677 F.3d at 391 (citation omitted). Congress exercised that power when it authorized the Attorney General to request records related to voter registration and when it gave DOJ the authority to enforce (and therefore investigate potential violations of) the NVRA and HAVA. DOJ's actions pursuant to those authorities thus do not offend federalism or the Elections Clause.

As for the Voter Qualifications Clause and the Seventeenth Amendment, it is unclear how those provisions could be violated here. To the extent Plaintiffs argue that DOJ's actions, taken under enforcement authority conferred by Congress, unconstitutionally burden the methods of voting for members of the House (the subject of the Voter Qualifications Clause) and for Senators (the subject of the Seventeenth Amendment), that argument would render unconstitutional a host of voting-rights laws that permit enforcement by the Federal Government.

### E. DOJ Did Not Act Arbitrarily or Capriciously (Count VIII)

Plaintiffs' arbitrary-and-capricious claim fails based on a straightforward application of the law and of the facts in the record. As stated throughout this brief, DOJ acted pursuant to its enforcement authority. Plaintiffs nevertheless lead with a charge that DOJ "has not explained its Policy to compile the states' confidential voter files[.]" Pls. Mot. 38. As an initial matter, this argument asks DOJ to explain not just one decision or action but a whole host of them, including requests to States, facilitating transfers of information, etc. Requesting an explanation for each of those different types of things reiterates why this suit is too broad. Regardless, DOJ has explained its actions. The requests to the States asked for information "to ascertain [each State's] compliance with the list maintenance requirements of the NVRA and HAVA." *E.g.*, CRT-3185 (letter to

Utah).  DOJ further explained that it was acting "to ensure that . . . th[ose] maintenance programs are working," including by testing voter lists against SAVE.  CRT-3384.  Plaintiffs may disagree with the assumptions underlying that explanation—namely that DOJ acted legally—but they cannot contend that DOJ has not explained itself.

Plaintiffs' next argument is confounding.  They say the record contains no "explanation for how [the CRA, HAVA, and the NVRA] relate to Defendants' data demands."  Pls. Mot. 39.  But the record contains letters to 49 States and D.C. stating that DOJ was requesting data "to ascertain [the State's] compliance with the list maintenance requirements of the NVRA and HAVA," "pursuant to Title III of the Civil Rights Act of 1960."  *E.g.*, CRT-2791.  There is nothing "post-hoc" about the invocations of those legal authorities.  Pls. Mot. 39 n.21.  DOJ stated up front that those statutes applied and the relationship between their requirements and the voter lists being requested.  As for the PRA, that statute does not apply for the reasons stated above.

Plaintiffs argue that DOJ "failed to consider important aspects of the problem," such as "privacy and cybersecurity risks."  *Id.* at 39 (citation modified).  This is basically a rehash of Plaintiffs' fatally compromised Privacy Act claim, and it is also belied by the record.  One DOJ attorney told State officials that DOJ was "tak[ing] enormous precautions in all things we do to protect privacy as part of routine procedure[.]"  CRT-1875.  Another attorney wrote a State official to say "we are Privacy [A]ct compliant and have secure data sharing capabilities."  CRT-1794.  If those aren't enough, DOJ committed in its MOA with USCIS to follow all relevant privacy laws when "safeguarding, maintaining, and disclosing any data provided or received pursuant to th[e] MOA."  CRT-35.  And in its MOUs with States, DOJ agreed that "[o]nly a limited number of staff members who are assigned a specific identification code will be able to" access the stored information.  CRT-4–CRT-5; *see also* CRT-3381 (DOJ attorney emailing to ensure "that everyone

knows their obligations in working with the data"). The record is far from "silent" on privacy issues, and it reflects that DOJ did consider the "privacy expectations" of voters. Pls. Mot. 40.

Plaintiffs also contend that DOJ "failed to consider reliance interests" of voters. *Id.* This argument fails because Plaintiffs' reliance interests are based on DOJ's previous failure—what Plaintiffs call a "longstanding government practice[]"—to enforce the NVRA and HAVA. Pls. *Id.*; *see id.* at 24 (asserting that DOJ's actions are "unprecedented"). But Plaintiffs also recognize that DOJ can enforce the NVRA and HAVA. *See id.* at 22. Thus, the "longstanding" practice is the choice of previous Attorney Generals not to enforce those statutes. *See* CRT-3384 (acknowledging that previous DOJs "have [not] really enforced these elections statutes"). Plaintiffs cannot rely on that discretionary choice for their reliance interests because, as the Supreme Court said recently, "a belief about how an agency is likely to exercise its . . . discretion"—which is the same belief that Plaintiffs assert—"is not a serious reliance interest." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 585 (2025) (citations omitted). In any event, DOJ has enforced these statutes in the not-too-distant past. *See supra* at 42.

Plaintiffs' final argument is that DOJ's actions are "antithetical to Congress's goals in enacting the NVRA." Pls. Mot. 41. This argument disregards one of the express purposes of the NVRA, as written by Congress, which is "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4). Congress gave DOJ the ability to enforce the NVRA, and DOJ's efforts to do so are pursuant to that purpose, not contrary to it.

## V.    The Equitable Factors Do Not Support a Permanent Injunction

Plaintiffs have not shown that a permanent injunction is "appropriate on the merits" because none of their claims succeed for the reasons stated above. *Anatol Zukerman and Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1363 (D.C. Cir. 2023) (citation omitted). But

even if their claims do succeed, Plaintiffs are not entitled to a permanent injunction.  To obtain that relief, Plaintiffs must  demonstrate"(1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the[m] [] and [DOJ], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  When the defendant is the government, factors (3) and (4) merge." *Id.* at 1364 (citations omitted).

Here, Plaintiffs have not suffered an irreparable injury because, as discussed, none of their harms are cognizable, including because their voting-related and privacy injuries are too speculative. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45, 63 (D.D.C. 2021) (citing authorities that speculative injuries are not irreparable).  As for the balance of the equities, DOJ is lawfully exercising its authority under the CRA, the NVRA, and HAVA. An injunction would therefore "thwart[] the lawful exercise of authority of a duly appointed official," namely the Attorney General and his designee. *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020).  Any preliminary relief would thus "be inequitable and disserve the public interest" while disabling DOJ from acting under its legal authorities. *Id.*  "[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).

## VI.    Plaintiffs' Requested Relief is Overbroad and Subject to Equitable Limits

Even if Plaintiffs could prevail on any of their claims, their requested relief is overbroad in several respects and subject to important equitable limitations.  First, any relief should be narrowly tailored to remedy Article III injuries of parties who have established standing.  A court "may

administer complete relief between the parties," but that is "the maximum [relief] a court can provide." *Trump v. CASA, Inc.*, 606 U.S. 851, 854 (2025). Any equitable relief the Court may decide to enter "must be limited to the inadequacy that produced [the] injury in fact." *Gill v. Whitford*, 585 U. S. 48, 66 (2018) (citation omitted); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." (citation omitted)).

That relief would accrue to the individual Plaintiffs, but not to every member of Common Cause, which as a membership association is entitled to relief only on behalf of those members that can establish standing "in their own right." *Hunt*, 432 U.S. at 343. At most, the only Common Cause members that might conceivably be harmed are those members in "states that have supplied their [voter lists] to DOJ[.]" Pls. Mot. 11. This Court thus cannot rely on associational standing for a nationwide injunction.

Nor can it rely on Common Cause's "presence in fifty states and the District of Columbia." *Id.* at 45. As described above, the alleged Policy differs by State, *i.e.* on a "case-by-case" basis. *Id.* DOJ has obtained voter lists from 18 States, and Common Cause has provided no evidence that it expended resources in all 50 States to respond to DOJ's alleged Policy. At most, Common Cause has made that showing for Nebraska, Indiana, Ohio, and Texas. *See* Decl. of Gavin Geis, ECF No. 29-4 (Nebraska); Decl. of Julia Vaughn, ECF No. 29-5 (Indiana); Decl. of Catherine Turcer, ECF No. 29-6 (Ohio); Decl. of Anthony Gutierrez, ECF No. 29-7 (Texas). Indeed, Common Cause admits that it does not even have staff in some of the States that have provided lists. *See* Decl. of Elena Nunez ¶ 7, ECF No. 29-3. Thus, to the extent the Court decides to enter an injunction based on Common Cause's organizational standing, the injunction can restrain at most DOJ's actions as to data received from Nebraska, Indiana, Ohio, and Texas.

54

Plaintiffs would rather this Court vacate the alleged Policy, implicitly arguing that the APA is not bound by the equitable principles discussed above. *See* Pls. Mot. 42–43. To the contrary, the APA does not displace the traditional equitable limitation of relief to the parties before the court. Section 702 of the APA explains that "[n]othing herein . . . affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702. Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Courts "do not lightly assume that Congress has intended to depart from established principles" of equity, *Weinberger v. RomeroBarcelo*, 456 U.S. 305, 313 (1982) (citation omitted), and ordinarily expect that Congress will make "an unequivocal statement" if it intends to make "a drastic departure from the traditions of equity practice," *Hecht Co.*, 321 U.S. at 329. After all, remedies "ordinarily operate with respect to specific parties[,]" rather than "on legal rules in the abstract," but reading § 706 to authorize universal vacatur would do the opposite. *California v. Texas*, 593 U.S. 659, 671–72 (2021) (citations omitted). The Court should "not lightly assume that Congress has intended to depart from established principles of equity" by entering here a nationwide vacatur of the alleged Policy. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted).

## CONCLUSION

For all these reasons, the Court should dismiss Plaintiffs' suit or, in the alternative, deny Plaintiffs' motion for summary judgment and grant summary judgment to Defendants.

Dated: June 2, 2026     Respectfully submitted,


           BRETT A. SHUMATE
           Assistant Attorney General
           Civil Division

           JOSEPH E. BORSON
           Assistant Director
           Federal Programs Branch

           */s/ Christian Dibblee*
           CHRISTIAN DIBBLEE
           Trial Attorney
           U.S. Department of Justice
           Civil Division, Federal Programs Branch
           1100 L Street, N.W.
           Washington, D.C. 20005
           Tel: (202) 353-5980
           Email: Christian.R.Dibblee@usdoj.gov


           *Counsel for Defendants*