**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMON CAUSE, *et al.*,

              Plaintiffs,

       v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

              Defendants.

Case No. 1:26-cv-01352-SLS

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN THE
ALTERNATIVE FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

    I.    Plaintiffs have Article III standing. .............................................................................. 2

        A.    Common Cause has organizational standing. ....................................................... 2

        B.    Common Cause also has informational standing. .................................................. 8

        C.    Common Cause also has associational standing and the Voter Plaintiffs have standing. ...................................................................................................... 12

        D.    Article II does not shield DOJ's affirmative actions from judicial review. ........ 19

    II.    DOJ's Voter List Maintenance Policy is final agency action. ...................................... 20

        A.    Plaintiffs challenge a discrete action. ................................................................. 20

        B.    The Voter List Maintenance Policy has legal consequences. ............................. 25

    III.    DOJ's Voter List Maintenance Policy lacks statutory authorization. ........................... 26

        A.    DOJ's Policy is not authorized by the NVRA and HAVA. ................................. 26

        B.    DOJ's Policy is not authorized by Title III of the Civil Rights Act. .................. 31

    IV.    DOJ's Voter List Maintenance Policy violates the Privacy Act. .................................... 34

        A.    The APA permits Plaintiffs to challenge DOJ's Privacy Act violations. .......... 34

        B.    DOJ violated the Privacy Act's notice-and-comment requirements for revising systems of records. ............................................................................... 37

        C.    DOJ is improperly disclosing records in bulk in violation of the Privacy Act. . 39

        D.    DOJ is maintaining inaccurate and outdated records in bulk in violation of the Privacy Act. ......................................................................................... 41

        E.    DOJ is maintaining First Amendment protected records in bulk in violation of the Privacy Act. ............................................................................. 42

    V.    DOJ's Voter List Maintenance Policy violates the Paperwork Reduction Act. .............. 44

    VI.    DOJ's Voter List Maintenance Policy is arbitrary and capricious. ................................ 46

        A.    Defendants' post hoc, conclusory "explanation" does not satisfy the APA. ...... 46

        B.    Defendants do not dispute the absence of rational support for the Policy. ......... 48

        C.    DOJ failed to consider important aspects of the problem. ................................. 49

    VII.    Plaintiffs have adequately pleaded their constitutional claims. ..................................... 50

        A.    Motion to dismiss standard. ................................................................................ 50

        B.    Violation of Federalism Principles (Counts IV and V). .................................... 50

        C.    Violation of Separation of Powers (Counts II and III). ..................................... 51

    VIII.    Plaintiffs are entitled to their requested relief .................................................. 53

      A.     The Court should set aside and vacate the Policy under the APA. ..................... 53

      B.     DOJ does not contest the types of injunctive relief requested by Plaintiffs. ..... 54

      C.     Neither vacatur nor an injunction should be geographically limited. ................ 54

CONCLUSION .................................................................................................................... 55

## TABLE OF AUTHORITIES

**Cases**

*Action All. of Senior Citizens of Greater Phila. v. Sullivan*,
  930 F.2d 77 (D.C. Cir. 1991) ................................................................................. 45

*AFL-CIO v. Dep't of Lab.*,
  778 F. Supp. 3d 56 (D.D.C. 2025) ........................................................ 13, 22, 25, 36

*AFL-CIO v. Dep't of Lab.*,
  2025 WL 1783899 (D.D.C. June 27, 2025) ............................................................. 13

*AFL-CIO v. Dep't of Lab.*,
  2026 WL 879518 (D.D.C. Mar. 31, 2026) ......................................................... 13, 14

*AFSCME v. SSA*,
  172 F.4th 361 (4th Cir. 2026) .................................................................... 13, 14, 15

*All. for Retired Ams. v. Bessent*,
  770 F. Supp. 3d 79 (D.D.C. 2025) ..................................................................... 13, 14

*Allentown Mack Sales & Serv., Inc. v. NLRB.*,
  522 U.S. 359 (1998) ................................................................................................ 50

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014)) ............................................................................. 54

*Am. Fed'n of Tchrs. v. Bessent*,
  152 F.4th 162 (4th Cir. 2025) ................................................................................. 13

*Am. Oversight v. Dep't of Just.*,
  45 F.4th 579 (2d Cir. 2022) .................................................................................... 38

*Anderson v. Raffensperger*,
  497 F. Supp. 3d 1300 (N.D. Ga. 2020) ................................................................. 16

*Arcia v. Fla. Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) ........................................................................ 17, 31

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013) ............................................................................................... 51, 52

*Attias v. Carefirst, Inc.*,
  865 F.3d 620 (D.C. Cir. 2017) ............................................................................... 18

*Bark v. U.S. Forest Serv.*,
  37 F. Supp. 3d 41 (D.D.C. 2014) ........................................................................... 23

*Bell v. Marinko*,
  367 F.3d 588 (6th Cir. 2004) .................................................................................. 31

*Bellitto v. Snipes*,
  935 F.3d 1192 (11th Cir. 2019) .............................................................................. 31

*Bennett v. Spear*,
  520 U.S. 154 (1997)............................................................................................ 20, 25

*Bhd. of Locomotive Eng'rs. & Trainment v. Fed. R.R. Admin.*,
  972 F.3d 83 (D.C. Cir. 2020)................................................................................... 21

*Block v. Messe*,
  793 F.3d 1303 (D.C. Cir. 1986)................................................................................ 18

*Bowen v. Mich. Acad. of Fam. Physicians*,
  476 U.S. 667 (1986)................................................................................................. 34

*Britt v. Naval Investigative Serv.*,
  886 F.2d 544 (3d Cir. 1989) .................................................................................... 40

*Bus. Roundtable v. S.E.C.*,
  647 F.3d 1144  (D.C. Cir. 2011)............................................................................... 49

*Butte Cnty. v. Hogen*,
  613 F.3d 190 (D.C. Cir. 2010)................................................................................. 47

*California v. Trump*,
  786 F. Supp. 3d 359 (D. Mass. 2025) ...................................................................... 4

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005) ............................................................................... 18

*City & Cnt.y of S.F. v. EPA*,
  604 U.S. 334 (2025)................................................................................................. 35

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)................................................................................................... 16

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006).................................................................................. 23

*Common Cause Ind. v. Lawson*,
  937 F.3d 944 (7th Cir. 2019) ......................................................................... 4, 6, 7, 8

*Common Cause Ind. v. Lawson*,
  327 F. Supp. 3d 1139 (S.D. Ind. 2018).................................................................... 6

*Common Cause/Georgia v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) ............................................................................... 18

*Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024).................................................................................................. 53

*CREW v. FEC*,
  993 F.3d 880 (D.C. Cir. 2021).................................................................................. 20

*CREW v. OMB*,
  791 F. Supp. 3d 29 (D.D.C. 2025)............................................................................ 12

*Cross v. U.S. EEOC*,
  810 F. Supp. 3d 88 (D.D.C. 2025)............................................................................ 20

iv

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
  637 F.3d 408 (D.C. Cir. 2011) .......................................................................... 47

*Ctr. for Biological Diversity* ("*CBD*") *v. U.S. Int'l Dev. Fin. Corp.*,
  77 F.4th 679 (D.C. Cir. 2023) ............................................................... 8, 9, 10, 12

*Ctr. for Biological Diversity v. Zeldin*,
  171 F.4th 356 (D.C. Cir. 2026) .......................................................................... 17

*Ctr. for Taxpayer Rts. v. IRS*,
  815 F. Supp. 3d 1 (D.D.C. 2025) .............................................................. 4, 13, 14, 22

*Davis v. United States*,
  554 U.S. 229 (2011) ......................................................................................... 15

*Democracy Forward Found. v. OMB*,
  780 F. Supp. 3d 61 (D.D.C. 2025) ...................................................................... 50

*Democracy N.C. v. Hirsch*,
  2025 WL 4033053 (M.D.N.C. July 21, 2025) ........................................................ 6

*Democratic Cong. Campaign Comm. v. Kosinski*,
  614 F. Supp. 3d 20 (S.D.N.Y. 2022) .................................................................... 16

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
  601 U.S. 42 (2024) ........................................................................................... 37

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ............................................................................... 18, 22, 46

*Deters v. U.S. Parole Comm'n*,
  85 F.3d 655 (D.C. Cir. 1996) .............................................................................. 42

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ............................................................................................. 47

*Dinh Tran v. Dep't of Treas.*,
  351 F. Supp. 3d 130 (D.D.C. 2019) ............................................................... 38, 40

*Doe v. Chao*,
  540 U.S. 614 (2004) ......................................................................................... 36

*Doe v. Stephens*,
  851 F.2d 1457 (D.C. Cir. 1988) .......................................................................... 36

*Drs. for Am. v. Off. of Pers. Mgmt.*,
  793 F. Supp. 3d 112 (D.D.C. 2025) ..................................................................... 49

*DSCC v. Trump*,
  2026 WL 1487833 (D.D.C. May 28, 2026) ...................................................... 14, 18

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*,
  396 F.3d 1265 (D.C. Cir. 2005) .......................................................................... 34

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*,
  928 F.3d 95 (D.C. Cir. 2019) .............................................................................. 11

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ................................................................................................. 47, 48

*Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
  28 F.3d 1268 (D.C. Cir. 1994) ........................................................................................ 7

*FDA v. All. for Hippocratic Medicine*,
  602 U.S. 367 (2024) ............................................................................................... 2, 3, 6

*FEC v. Akins*,
  524 U.S. 11 (1998) .......................................................................................................... 8, 9

*FEC v. Cruz*,
  596 U.S. 289 (2022) ......................................................................................... 15, 29, 30

*First Choice Women's Res. Ctrs. v. Davenport*,
  146 S. Ct. 1114 (2026) ................................................................................................. 15

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) ................................................................................ 18

*Fla. State Conf. of NAACP. v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ................................................................................... 7

*Friends of Animals v. Jewell*,
  824 F.3d 1033 (D.C. Cir. 2016) .......................................................................... 8, 9, 12

*Ga. Coal. for the Peoples' Agenda v. Raffensperger*,
  2022 WL 22866291 (N.D. Ga. Sept. 29, 2022) ..................................................... 18

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) ............................................................................... 34, 36

*Get Loud Ark. v. Jester*,
  171 F.4th 1058 (8th Cir. 2026) .................................................................................... 6

*Gray v. Sanders*,
  372 U.S. 368 (1963) ...................................................................................................... 18

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ...................................................................................................... 19

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .................................................................................................... 2, 4

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) ................................................................................................ 53, 54

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ...................................................................................................... 20

*Hisp. Affs. Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) ................................................................................... 22

*Hyatt v. OMB*,
  998 F.3d 423 (9th Cir. 2021) ............................................................................... 44, 45

*Ind. State Conf. of NAACP v. Lawson,*
  326 F. Supp. 3d 646 (S.D. Ind. 2018) .................................................................... 4

*Indep. Mkt. Monitor for PJM v. FERC,*
  162 F.4th 1167 (D.C. Cir. 2025) ........................................................................... 3

*Jicarilla Apache Nation v. U.S. Dep't of Interior,*
  613 F.3d 1112 (D.C. Cir. 2010) .......................................................................... 48

*Joseph v. U.S. Civ. Serv. Comm'n,*
  554 F.2d 1140 (D.C. Cir. 1977) .......................................................................... 16

*League of United Latin Am. Citizens v. Exec. Off. of President,*
  780 F. Supp. 3d 135 (D.D.C. 2025) ................................................................. 3, 4, 6

*League of United Latin American Citizens v. EOP,*
  808 F. Supp. 3d 29 (D.D.C. Oct. 31, 2025) ...................................................... 54, 55

*League of United Latin Am. Citizens v. EOP,*
  818 F. Supp. 3d 34 (D.D.C. 2026) ..................... 13, 14, 18, 25, 36, 50, 52, 53, 55

*League of Women Voters of N.C. v. North Carolina,*
  769 F.3d 224 (4th Cir. 2014) .............................................................................. 37

*League of Women Voters of N.H. v. Kramer,*
  2025 WL 919897 (D.N.H. Mar. 26, 2025) ............................................................ 7

*League of Women Voters of United States v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ....................................................................... 3, 7, 37, 55

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ..................................................................................... 11, 19

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ............................................................................. 21, 22, 23, 24

*Maloney v. Carnahan,*
  45 F.4th 215 (D.C. Cir. 2022) ............................................................................. 11

*Maydak v. United States,*
  363 F.3d 512 (D.C. Cir. 2004) ...................................................................... 11, 35, 43

*Mi Familia Vota v. Fontes,*
  129 F.4th 691 (9th Cir. 2025) .......................................................................... 16, 31

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ..................................................................................... 46, 48, 49

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ............................................................................................ 19

*N.H. Youth Movement v. Scanlan,*
  2026 WL 1500857 (D.N.H. May 28, 2026) .......................................................... 6, 7

*N.H. Youth Movement v. Scanlan,*
  2026 WL 323171 (D.N.H. Feb. 6, 2026) ............................................................. 18

*Nat'l Council of Nonprofits v. OMB,*
  775 F. Supp. 3d 100 (D.D.C 2025) ................................................................. 22

*Nat'l Fuel Gas Supply Corp. v. FERC,*
  468 F.3d 831 (D.C. Cir. 2006) ....................................................................... 49

*New Mexico v. Musk,*
  784 F. Supp. 3d 174 (D.D.C. 2025) ............................................................... 13

*New York v. Trump,*
  133 F.4th 51 (1st Cir. 2025) ..................................................................... 21, 22

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ....................................................................................... 16

*P.R. Higher Educ. Assistance Corp. v. Riley,*
  10 F.3d 847 (D.C. Cir. 1993) ......................................................................... 47

*Persinger v. Sw. Credit Sys.,*
  20 F.4th 1184 (7th Cir. 2021) ........................................................................ 14

*PETA v. U.S. Dep't of Agric.,*
  797 F.3d 1087 (D.C. Cir. 2015) ....................................................................... 3

*Pileggi v. Wash. Newspaper Publ'g Co.,*
  146 F.4th 1219 (D.C. Cir. 2025) .................................................................... 14

*Prisology, Inc. v. Fed. Bureau of Prisons,*
  852 F.3d 1114 (D.C. Cir. 2017) ....................................................................... 9

*Pub. Citizen v. U.S. Dep't of Just.,*
  491 U.S. 440 (1989) ......................................................................................... 8

*Quinn v. Stone,*
  978 F.2d 126 (3d Cir. 1992) ........................................................................... 42

*Randolph v. ING Life Ins. & Annuity Co.,*
  973 A.2d 702 (D.C. 2009) .............................................................................. 14

*Rexnord Corp. v. Laitram Corp.,*
  274 F.3d 1336 (Fed. Cir. 2001) ..................................................................... 41

*Richman v. United States,*
  350 F.R.D. 401 (D.D.C. 2025) ....................................................................... 36

*RNC v. N.C. State Bd. of Elections,*
  120 F.4th 390 (4th Cir. 2024) .......................................................................... 7

*Sandusky Cnty. Democratic Party v. Blackwell,*
  387 F.3d 565 (6th Cir. 2004) ......................................................................... 15

*Starbucks Corp. v. McKinney,*
  602 U.S. 339 (2024) ....................................................................................... 54

*Texas v. United States,*
  798 F.3d 1108, 1110 (D.C. Cir. 2015) ........................................................... 39

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ................................................................................................ 13

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................................................................... 53, 55

*United States v. Amore*,
2026 WL 1040637 (D.R.I. Apr. 17, 2026) .................................... 1, 26, 28, 30, 32, 33

*United States v. Bellows*,
2026 WL 1430481 (D. Me. May 21, 2026) .............................. 1, 26, 28, 29, 30, 32, 33, 43, 51

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) ....................................................... 1, 26, 33

*United States v. Fontes*,
2026 WL 1177244 (D. Ariz. Apr. 28, 2026) ................................................. 1, 26, 33

*United States v. Galvin*,
2026 WL 972129 (D. Mass. Apr. 9, 2026) ..................................................... 1, 33, 49

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ................................................................................................ 29

*United States v. Oregon*,
2026 WL 318402 (D. Or. Feb. 5, 2026) ....................................... 1, 26, 28, 30, 32, 33, 47, 51

*United States v. Richardson*,
418 U.S. 166 (1974) .................................................................................................. 9

*United States v. Texas*,
599 U.S. 670 (2023) ................................................................................................ 20

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........................ 1, 26, 28, 29, 30, 32, 33, 34, 40, 49, 52

*United States v. Wis. Elections Comm'n*,
2026 WL 1430354 (W.D. Wis. May 21, 2026) ....................................... 1, 26, 32, 33

*United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*,
288 F. Supp. 3d 99 (D.D.C. 2017) .......................................................... 8, 9, 11

*Va. Coal. for Immigrant Rts. v. Beals*,
803 F. Supp. 3d 454 (E.D. Va. 2025) ............................................................. 6, 7

*Voice of the Experienced v. Ardoin*,
813 F. Supp. 3d 600 (M.D. La. 2025) .............................................................. 6, 7

*Waterkeeper All. v. EPA*,
853 F.3d 527 (D.C. Cir. 2017) .............................................................................. 12

*Weinberger v. Romero-Barcelo*,
456 U.S. 305, (1982) ............................................................................................... 54

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......................................................................................... 28, 29

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001) ............................................................................................................ 25

*Xirum v. ICE*,
  2024 WL 3718145 (S.D. Ind. Aug. 8, 2024) ..................................................................... 23, 24

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................................................ 52

*Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ................................................................................................................. 52

**Constitutional Provisions**

U.S. Const. Art. I, sec. 4, cl. 1 ................................................................................................ 51

**Statutes and Regulations**

44 U.S.C. § 3501(1) ................................................................................................................ 45

44 U.S.C. § 3501(11) .............................................................................................................. 11

44 U.S.C. § 3501(4) ................................................................................................................ 11

44 U.S.C. § 3502(3)(A) ........................................................................................................... 44

44 U.S.C. § 3502(3)(A)(i) ....................................................................................................... 45

44 U.S.C. § 3506 ............................................................................................................ 10, 12, 44

44 U.S.C. § 3506(c)(1)(B)(iii)(I) ............................................................................................ 10

44 U.S.C. § 3506(c)(1)(B)(iii)(II) ........................................................................................... 10

44 U.S.C. § 3506(c)(1)(B)(iii)(III) .......................................................................................... 10

44 U.S.C. § 3506(d) ................................................................................................................ 12

44 U.S.C. § 3507 .................................................................................................................... 44

44 U.S.C. § 3518(c)(2) ........................................................................................................ 45, 46

5 C.F.R. § 1320.3(c)(1) ........................................................................................................... 44

5 U.S.C. § 551(2) .................................................................................................................... 10

5 U.S.C. § 552(a)(2) ............................................................................................................. 9, 37

5 U.S.C. § 552a(a)(3) .............................................................................................................. 43

5 U.S.C. § 552a(b)(7) ........................................................................................................... 40, 41

5 U.S.C. § 552a(e)(11) ............................................................................................................ 10

5 U.S.C. § 552a(e)(4) ........................................................................................................... 9, 10

5 U.S.C. § 552a(e)(4)(B) .......................................................................................................... 9

5 U.S.C. § 552a(e)(4)(C) .......................................................................................................... 9

5 U.S.C. § 552a(e)(4)(D) ........................................................................................ 10

5 U.S.C. § 552a(e)(4)(E) ......................................................................................... 10

5 U.S.C. § 552a(e)(4)(F) ......................................................................................... 10

5 U.S.C. § 552a(e)(4)(G) ........................................................................................ 10

5 U.S.C. § 552a(e)(4)(H) ........................................................................................ 10

5 U.S.C. § 552a(e)(4)(I) .......................................................................................... 10

5 U.S.C. § 552a(e)(5) .............................................................................................. 42

5 U.S.C. § 552a(e)(6) .............................................................................................. 42

5 U.S.C. § 552a(g) ................................................................................................... 36

5 U.S.C. § 552a(g)(1)(D) ......................................................................................... 37

5 U.S.C. § 552a(v)(1) .............................................................................................. 11

5 U.S.C. § 702 ......................................................................................................... 12

5 U.S.C. § 706(2)(A) ............................................................................................... 12

5 U.S.C. § 706(2)(D) ............................................................................................... 12

5 U.S.C. 704 ............................................................................................................ 12

52 U.S.C. § 20507 ............................................................................................. 27, 29

52 U.S.C. § 20507(a)(4) ............................................................................... 27, 31, 52

52 U.S.C. § 20507(i) .................................................................................................. 29

52 U.S.C. § 20510(a) ........................................................................................ 27, 29

52 U.S.C. § 20701 .................................................................................................... 33

52 U.S.C. § 20704 .................................................................................................... 33

52 U.S.C. § 21081, *et seq.* ...................................................................................... 28

52 U.S.C. § 21083 ............................................................................................. 29, 52

52 U.S.C. § 21083(a)(4) ........................................................................................... 31

52 U.S.C. § 21083(a)(4)(A) ..................................................................................... 27

52 U.S.C. § 21085 .................................................................................................... 52

52 U.S.C. § 21111 ............................................................................................. 27, 29

68 Fed. Reg. at 47611 ......................................................................................... 38, 40

Judicial Redress Act of 2015, Pub. L. No. 114-126, § 2(a)-(c), (h),130 Stat. 282, 283-284, (codified at 5 U.S.C. § 552a (2016)) .......................................................................... 35

Privacy Act of 1974, Pub. L. No. 93-579, §§ 2(b), (b)(4), 88 Stat. 1896 (codified at 5 U.S.C. § 552a) ...................................................................................................................... 35

**Other Authorities and Materials**

Dep't of Just., Justice Manual § 9-11.151 (2020)..........................................................................38

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica & Tex. Trib. (Feb. 13, 2026)........................17

Judd Legum & Rebecca Crosby, *The Federal Database That Could Upend the Midterm Elections*, Mother Jones (Apr. 9, 2026) .........................................................................17

Off. of Mgmt. & Budget, OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act* 5-6 (2016)................................................39

OMB Privacy Act Implementation: Guidelines and Responsibilities, 40 Fed. Reg. 28948 (July 9, 1975) .....................................................................................................................35

*Portion*, Black's Law Dictionary (12th ed. 2024..........................................................................41

*Random House Unabridged Dictionary* 1507 (2d ed. 1993)........................................................41

S. Rep. No. 93-1183 (1974) ...............................................................................................10

Staff of H. & S. Comms. on Gov't Operations, 94th Cong., *Source Book on Privacy* 217 (Comm. Print 1976) ...................................................................................................10, 34, 39

**INTRODUCTION**

For the first time in American history, DOJ seeks to federalize voter list maintenance. Plaintiffs are entitled to summary judgment to vacate that unprecedented Voter List Maintenance Policy, and Defendants' opposition only confirms that conclusion. Defendants concede that they demanded full Statewide Voter Registration Lists ("SVRLs")—including "all fields"—from every state that has them, Defs.' Combined Mem. of Law ("Defs.' Mem.") (Dkt. 32-1) 6, that eighteen Complying States have already acquiesced and turned over \\\their SVRLs to DOJ, *id.* at 8-9, and that, "[l]ike a forensic accountant," *id*. at 40, DOJ is now auditing states' voter records for "DOJ's maintenance of the state voter rolls," *id.* at 46. Nor do Defendants dispute that DOJ's plan under the Policy is to run the sensitive data for every voter in the country through the Systematic Alien Verification for Entitlements ("SAVE") system—using SAVE's incontrovertibly inaccurate citizenship data to "flag[]" voters, *id.* at 40—so DOJ can "ask[] States to investigate" and "requir[e] States to remove" supposed ineligible voters, *id.* at 40, 41. In the words of Assistant Attorney General for Civil Rights Harmeet Dhillon, the Policy represents a "comprehensive effort" to compile "the voter rolls from all states and the District of Columbia" so that DOJ can conduct "voting hygiene" by "run[ning]" the states' voter rolls to identify purported deceased or non-citizen voters. *See* Hill Decl. (Dkt. 29-2) ¶ 8.

DOJ's Policy is unlawful. It lacks statutory authority, *see* Pls.' Mem. of Law ("Pls.' Mem.") (Dkt. 29-1) 20-25; violates the Privacy Act, *id.* at 25-32; violates the Paperwork Reduction Act ("PRA"), *id.* at 34-37; and is arbitrary and capricious, *id.* at 37-39. Eight federal courts have now rejected DOJ lawsuits to compel the disclosure of voter registration data, with decisions in Wisconsin and Maine since Plaintiffs moved for summary judgment.[1] Because no court has agreed

---

[1] *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *United States v. Bellows*, 2026 WL 1430481 (D. Me. May 21, 2026); *United States v. Wis. Elections Comm'n*, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Fontes*, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore*, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Galvin*, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Oregon*, 2026 WL 318402 (D. Or. Feb. 5, 2026).

with them to date, the best argument Defendants can muster in response is: "Defendants respectfully disagree with those decisions." *See* Defs.' Mem. 36, n.8.

Indeed, Defendants' respectful disagreement with directly relevant caselaw is a common refrain in this case. On standing, *see id.* at 17 n.5, 22 n.6, on Plaintiffs' ability to enforce the Privacy Act, *see id.* at 35 n. 7, and on the merits, *see id.* at 36 n.8, Defendants can only ask the Court to look away from well-reasoned and on-point decisions showing why Plaintiffs are entitled to relief here. And in the few places where courts have not already rejected the precise arguments Defendants are making, Defendants' positions are untenable. On Defendants' theory, Common Cause's voter members and all registered voters in the country are currently "subjects of investigations" because of DOJ's Voter List Maintenance Policy. CRT-3356. The result of this unprecedented policy: injuries to Common Cause's mission and its members' fundamental rights. Defendants' opposition offers no reason to deny the relief necessary to cure that harm.

## ARGUMENT

### I.   Plaintiffs have Article III standing.

Plaintiffs' unrebutted evidence demonstrates multiple, independent Article III standing grounds for each of their claims. *See* Pls.' Mem. 12-19. Defendants' arguments do not change that.

#### A.   Common Cause has organizational standing.

DOJ's Voter List Maintenance Policy directly interferes with Common Cause's core activities of assisting, educating, and protecting voters, and has caused and will continue to cause Common Cause to expend resources to counteract those harms. *See id.* at 12-15; Nunez Decl. (Dkt. 29-3) ¶¶ 9-22; Geis Decl. (Dkt. 29-4) ¶¶ 7-16; Vaughn Decl. (Dkt. 29-5) ¶¶ 6-22; Turcer Decl. (Dkt. 29-6) ¶¶ 7-16; Gutierrez Decl. (Dkt. 29-7) ¶¶ 7-20. Because Defendants cannot overcome this overwhelming and unrefuted evidence, they rest their challenge to Common Cause's organizational standing on a misreading of *FDA v. All. for Hippocratic Medicine* ("*AHM*"), 602 U.S. 367 (2024). *See* Defs.' Mem. 24-26. *AHM* reaffirmed and applied the standard from *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982): an organization has standing to challenge actions

2

that "directly affect[] and interfere[] with [its] core business activities." 602 U.S. at 395. Defendants not only ignore this but also elide that after *AHM*, the D.C. Circuit continues to ask two questions to assess organizational standing: "whether the [plaintiff] has shown an injury to its organizational interests" and "whether the [plaintiff] has 'used its resources to counteract that harm.'" *Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1172 (D.C. Cir. 2025) (internal citation omitted) (citing *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)).

Accordingly, after *AHM*, courts still routinely conclude that non-profit voter-services organizations like Common Cause have standing to challenge conduct that directly impairs core activities and mission-critical functions. For example, a court in this District recently concluded that non-profit voter services organizations had standing to challenge practices that "would be a direct impediment to one of the organizations' 'core business activities': registering eligible voters." *See, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of President*, 780 F. Supp. 3d 135, 188-90 (D.D.C. 2025) ("*LULAC (Apr. 2025)*") (quoting *AHM*, 602 U.S. at 395).[2] In this case, DOJ's Voter List Maintenance Policy is impairing Common Cause's interest in its core activity—promoting voter participation—and is making it more difficult for Common Cause to execute its mission, causing the organization to divert and expend resources to counteract that harm. Plaintiffs have therefore established standing. *See* Pls.' Mem. 12-15.

*1. DOJ is injuring Common Cause's interests.* The Policy directly impairs and hinders Common Cause's efforts to increase political participation. Nunez Decl. ¶ 8; Pls.' Mem. 13, 14-15; *see League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding organizational standing because challenged policy "unquestionably make[s] it more difficult" for plaintiff "to accomplish [its] primary mission" of assisting voters).

First, the Policy is chilling potential voters from registering, particularly naturalized citizens who are concerned about the sharing of their household's data with immigration agencies

---

[2] Though decided prior to the cases designated as "*LULAC I*" and "*LULAC II*" in Plaintiffs' Memorandum of Law (Dkt. 29-1) ("Pls.' Mem."), this case is referred to as "*LULAC (Apr. 2025)*" in this brief to maintain consistent short-form citations across Plaintiff's briefing.

and other misuses. Vaughn Decl. ¶ 11; Geis Decl. ¶ 10; Nunez Decl. ¶¶ 14, 17; Turcer Decl. ¶ 16; *see Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 27-29 (D.D.C. 2025), *appeal docketed*, No. 26-5006 (D.C. Cir. Jan. 13, 2026) (finding harm to organization because IRS's disclosure of data to immigration agency eroded public trust and reduced demand for organization's tax services). Even when Common Cause is successful at encouraging citizens to register to vote notwithstanding those concerns, that "work will have to be done again because of wrongful cancellations of voter registrations," making Common Cause's registration efforts less effective and more difficult. *Ind. State Conf. of NAACP v. Lawson*, 326 F. Supp. 3d 646, 662 (S.D. Ind. 2018), *aff'd sub nom.*, *Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019)) ; Nunez Decl. ¶¶ 13-15; Vaughn Decl. ¶ 22; Turcer Decl. ¶ 16; Geis Decl. ¶ 16; Gutierrez Decl. ¶ 19.

Second, DOJ's mass collection of voter data is straining Common Cause's workstreams by forcing them to respond to many new inquiries about misuse of voters' sensitive information. Pls.' Mem. 14 (describing efforts); *e.g.*, *LULAC (Apr. 2025)*, 780 F. Supp. 3d at 201 (finding cognizable harm when plaintiff is forced to address increased voter confusion); *California v. Trump*, 786 F. Supp. 3d 359, 379 (D. Mass. 2025) (similar).

Third, DOJ's failure to disclose how voters' data will be maintained and used is making it more difficult for Common Cause to accurately inform voters about the List Maintenance Policy and its likely impact on voters. Vaughn Decl. ¶ 16; Turcer Decl. ¶¶ 13-14; Geis Decl. ¶ 13; Gutierrez Decl. ¶ 16; *see PETA*, 797 F.3d at 1094 (finding impairment of organizational interests because agency withheld "key information that [the plaintiff] relies on to educate the public").

*2. Common Cause is expending resources to counteract those mission-centric harms*. The undisputed evidence shows that DOJ's Voter List Maintenance Policy has already forced and will continue to force Common Cause to divert resources to counteract the harm that it is causing— and such expenditures will multiply if the Policy is not vacated. That "drain on the organizations' resources" confirms that the harm to Common Cause's interests is "concrete," not "abstract." *Havens*, 455 U.S. at 379.

4

The Policy has forced Common Cause to create new materials to alert its members and the public about the Policy and its burdens on voters, including the increased risk of erroneous voter registration cancellations. Pls.' Mem. 14; Nunez Decl. ¶ 20; Gutierrez Decl. ¶ 10. Such assistance is necessary to prepare voters to seek timely assistance in correcting the issues in casting their ballots as they arise to mitigate the harm caused by the Policy. Nunez Decl. ¶ 21. And with the start of the November 2026 election season, Common Cause staff will soon have to expend even more resources to update and revise additional materials, including for training poll observers and other volunteers to assist erroneously purged voters and to address concerns about data security and misuse and registration purges. Nunez Decl. ¶¶ 16, 20; Vaughn Decl. ¶¶ 15, 18, 21-22; Gutierrez Decl. ¶¶ 10-11, 15-18; Geis Decl. ¶¶ 11-12, 16; Turcer ¶ 11.

Next, Common Cause also has had to investigate the scope of DOJ's undisclosed policy so that Common Cause staff can provide accurate information to voters about possible risks to and uses of their data. Nunez Decl. ¶¶ 16, 20-21; Vaughn Decl. ¶¶ 15, 21-22; Gutierrez Decl. ¶¶ 9-11, 15-18; Geis Decl. ¶¶ 10-12, 16; Turcer Decl. ¶¶ 12-16; Pls.' Mem. 14.

Finally, unless the Policy is vacated, Common Cause will have to respond, as it has in the past, to ensure that voters are not erroneously purged based on unreliable SAVE responses. That would again require diverting Common Cause's limited resources to engage in massive public education campaigns to remind voters to, among other things, confirm their registration status to ensure that they have not been erroneously purged from the voter rolls. Vaughn Decl. ¶¶ 20-22; Gutierrez Decl. ¶¶ 17-20; Geis Decl. ¶¶ 12, 16; Nunez Decl. ¶¶ 13, 21; Pls.' Mem. 15. This is not speculative: Common Cause's voter assistance efforts typically begin three to four months before an election, and the November midterms are less than five months away. Geis Decl. ¶ 14; Turcer Decl. ¶ 11. In fact, Common Cause has already begun public education for November—earlier than normal—because the Policy is causing concerns about voters' data privacy. Gutierrez Decl. ¶ 15.

Common Cause's mission-centric efforts to counteract the harmful effects of DOJ's Voter List Maintenance Policy undoubtedly confer standing. *See Common Cause Ind.*, 327 F. Supp. 3d 1139, 1146-47 (S.D. Ind. 2018) (finding injury because Common Cause "devoted time and resources to conducting activities such as training sessions aimed at educating voters and community activists about the increased risk of erroneous voter registration cancellations" and also "changed some of its training materials to address the increased risk of voters being wrongly removed from the voter rolls"), *aff'd,* 937 F.3d 944 (7th Cir. 2019).

*3. Defendants' arguments ignore and misconstrue the law.* Defendants' contention that Common Cause lacks organizational standing overlooks the critical distinction between organizations that only engage in political advocacy versus non-partisan voter assistance organizations (like Common Cause) that educate and assist people in the voting process. Political advocacy organizations do not have standing when a policy they oppose merely poses a setback to their "abstract social interests." *AHM*, 602 U.S. at 394. But courts have repeatedly held, both before and after *AHM*, that voter assistance organizations have standing to challenge policies that make their work more difficult or less effective.

Cases holding that voter assistance organizations like Common Cause have standing to challenge voting-related changes and requirements are legion—yet Defendants discuss none of them. *See, e.g.*, *LULAC (Apr. 2025)*, 780 F. Supp. 3d at 188-90; *see also Get Loud Ark. v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026) (holding that organization has standing to challenge wet-signature requirement that interfered with organization's voter registration work); *N.H. Youth Movement v. Scanlan*, 2026 WL 1500857, at *25 (D.N.H. May 28, 2026) (collecting cases); *Va. Coal. for Immigrant Rts. v. Beals*, 803 F. Supp. 3d 454, 465 (E.D. Va. 2025); *Voice of the Experienced v. Ardoin*, 813 F. Supp. 3d 600, 640-41 (M.D. La. 2025); *Democracy N.C. v. Hirsch*, 2025 WL 4033053, at *2 (M.D.N.C. July 21, 2025).

Notably, those decisions all applied *AHM* and found standing. They are also all consistent with longstanding D.C. Circuit precedent that organizations like Common Cause, whose mission

includes providing voter assistance and education, have standing to challenge voting-related policies that make their work more difficult and less effective. *Newby*, 838 F.3d at 9. Defendants superficially analogize Common Cause's injuries to those of the advocacy-only organization in *AHM, see* Defs.' Mem. 25-26. But Common Cause is not "spend[ing] its way into standing" based on ideological opposition to the DOJ Policy, *contra* Defs.' Mem 24; Common Cause's expenditures are instead a "manifestation" of the harm that the Policy is inflicting on "the organization's non-economic interest[s]." *See Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); *accord Fla. State Conf. of NAACP. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008). The resources that Common Cause has expended (and will expend) are not for expressing ideological opposition to DOJ's new policy, but for concrete actions to counteract the harmful effects that the new policy has had and will have on the voters that Common Cause is committed to serving (such as educating voters to confirm that they have not been erroneously removed from the rolls) and Common Cause's mission. Numerous courts have expressly recognized that distinction after *AHM*.[3]

Finally, Defendants suggest, perhaps sardonically, that DOJ's Policy is actually doing Common Cause a favor by giving the organization work to do. *See* Defs.' Mem. 25. But as the Seventh Circuit said of an identical attack on Common Cause's standing, "[i]t is hard to take that [argument] seriously." *Common Cause Ind.*, 937 F.3d at 953-54. Common Cause does not need or want DOJ to cause voter confusion and erroneous voter removals to give it a reason to exist—in truth, it "would like nothing better than to go out of business because all voter suppression has ceased, the system is running perfectly, and 100% of the electorate is registered and votes." *Id*. at 954. As Common Cause's unrebutted declarations explain, the organization has plenty of work—too much, in fact—including priorities that are being sacrificed to ensure that voters are informed,

---

[3] *See, e.g.*, *Scanlan*, 2026 WL 1500857, at *24; *Beals*, 803 F. Supp. 3d at 465 (citing *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 395-96, 409 (4th Cir. 2024)); *League of Women Voters of N.H. v. Kramer*, 2025 WL 919897, at *9-10 (D.N.H. Mar. 26, 2025); *Ardoin*, 813 F. Supp. 3d 600, 640-41.

able to register to vote, and can cast a ballot without being erroneously purged. Vaughn Decl. ¶¶ 20-22; Gutierrez Decl. ¶¶ 17-20; Geis Decl. ¶¶ 12, 16; Nunez Decl. ¶¶ 13, 21. "Under *Havens,*" such sacrifices "are concrete injuries." *Common Cause Ind.*, 937 F.3d at 954.

### B.    Common Cause also has informational standing.

DOJ has inflicted textbook informational injuries on Common Cause by depriving it of critical information to which it is entitled under the Privacy Act and PRA. *See* Pls.' Mem. 15-16. The parties agree on the governing two-part test for informational standing. *Compare* Pls.' Mem. 15, *with* Defs.' Mem. 21. But Defendants wrongly insist that neither the Privacy Act nor the PRA "create[]" cognizable "informational rights." Defs.' Mem. 21. Binding precedent says otherwise.

First, Defendants incorrectly claim that Common Cause's informational injuries constitute an impermissible "generalized grievance" because the "Privacy Act and the PRA" require agencies to disclose information "in the Federal Register to the entire public," rather than to "these specific Plaintiffs." Defs.' Mem. 21. The D.C. Circuit repeatedly has held otherwise, affirming that an informational injury can be based on an agency withholding information it was statutorily required to publish in the Federal Register or otherwise disclose to the public. *See, e.g.*, *Ctr. for Biological Diversity* ("*CBD*") *v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 686 (D.C. Cir. 2023) (plaintiff "easily clear[ed] the informational injury hurdle" because agency failed to publish notices in Federal Register and comply with Sunshine Act's disclosure requirement); *accord Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016); *United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99, 106-10 (D.D.C. 2017). These cases faithfully applied Supreme Court precedents finding informational injury where a statute required disclosing information to the public generally, rather than the plaintiff specifically. *See FEC v. Akins*, 524 U.S. 11, 21 (1998) (Federal Election Campaign Act); *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 446-47 (1989) (Federal Advisory Committee Act). Under these decisions, Common Cause "need not receive a specific denial" of a request for information from DOJ "to sustain an informational injury." *CBD*, 77 F.4th at 686. It suffices that Common Cause

8

has shown the deprivation of information had a particularized impact on its specific, mission-critical functions. *See* Pls.' Mem. 15-16 (citing declarations).

Defendants' cited cases, *see* Defs.' Mem. 21-22, do not alter this conclusion. *United States v. Richardson*, 418 U.S. 166 (1974), "predates modern standing doctrine" and "[s]ubsequent Supreme Court precedent limited *Richardson* to 'taxpayer standing' cases." Statement Respecting Denial of Stay at 10 n.4, *CREW v. OMB*, No. 25-5266 (D.C. Cir. Aug. 9, 2025), (Henderson, J.) (quoting *Akins*, 524 U.S. at 22-23). And  in *Prisology, Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114 (D.C. Cir. 2017), the plaintiff lacked standing to challenge a violation of the Freedom of Information Act's reading room requirement, 5 U.S.C. § 552(a)(2), because it failed to show either that it made a specific request for information or that it suffered any other form of particularized harm. *See Prisology, Inc.*, 852 F.3d at 1117. Here, by contrast, Common Cause has demonstrated particularized harm to its mission-critical functions. *See* Pls.' Mem. 15-16 (citing declarations).

Second, Defendants erroneously claim that the Privacy Act and PRA merely require "notice," not "information." *See* Defs.' Mem. 22. "[T]he D.C. Circuit has held on multiple occasions that litigants have adequately alleged informational injuries based solely on notice statutes." *United to Protect Democracy*, 288 F. Supp. 3d at 109 (citing cases); *see also, e.g.*, *CBD*, 77 F.4th at 686; *Friends of Animals*, 824 F.3d at 1040-41. In any event, the Privacy Act and PRA are not merely "notice" statutes; each mandates disclosing extensive substantive information about agencies' collection, use, and disclosure of Americans' personal data.

Defendants do not dispute that they were required to comply with the Privacy Act's System of Records Notice ("SORN") requirements. *See* Defs.' Mem. 42-43. But by failing to publish a revised SORN for the system at issue, the Central CRT Index File, *see* Pls.' Mem. 25-28, *infra* Section IV.B, as required by the Privacy Act, DOJ has deprived Common Cause of critical information, including: the categories of individuals on whom DOJ is maintaining voter data, 5 U.S.C. § 552a(e)(4)(B); the categories of voter data DOJ is maintaining, *id.* § 552a(e)(4)(C); each routine use of the voter data, including the categories of users and the purpose of such use,

9

*id.* § 552a(e)(4)(D); DOJ's policies and practices regarding storage, retrievability, access controls, retention, and disposal of the voter data, *id.* § 552a(e)(4)(E); the title and business address of the DOJ official responsible for the voter data, *id.* § 552a(e)(4)(F); DOJ's procedures for notifying voters whose voter data DOJ is maintaining, *id.* § 552a(e)(4)(G); DOJ's procedures for notifying voters who want to gain access to and contest the accuracy of the voter data, *id.* § 552a(e)(4)(H); and the categories of sources of voter data DOJ is maintaining, *id.* § 552a(e)(4)(I). Similarly, by refusing to publish information required by the PRA, DOJ is depriving Common Cause of the reasons voter data is being collected, 44 U.S.C. § 3506(c)(1)(B)(iii)(I); the way(s) such voter data is to be used, *id.* § 3506(c)(1)(B)(iii)(II); and an estimate of the burden of the collection, *id.* § 3506(c)(1)(B)(iii)(III). DOJ depriving Plaintiffs of this statutorily mandated information "easily clears" the first prong of the informational standing test. *See CBD*, 77 F.4th at 686.

Third, Defendants also miss the mark in arguing that Plaintiffs have not suffered "'the type of harm Congress sought to prevent by requiring disclosure' in the Privacy Act and the PRA," because the Privacy Act and PRA were indeed "designed to vest a general right to information in the public." Defs.' Mem. 22 (citations omitted). The plain text of the Privacy Act's public notice provisions confirms that they are designed to ensure that interested organizations—like Common Cause—are timely apprised of how federal agencies collect, use, and disclose Americans' personal data. The Privacy Act broadly defines the universe of "interested persons" entitled to review SORNs and "submit written data, views, or arguments to the agency" to include organizations. 5 U.S.C. § 552a(e)(4), (11); *id.* § 551(2). The Act's legislative history reinforces its pro-transparency purpose. *See, e.g.*, S. Rep. No. 93-1183, at 71 (1974) (Act "intends to make available to the press and the public all possible information concerning the operations of the Federal Government in order to prevent secret data banks and unauthorized investigative programs on Americans"); Staff of H. & S. Comms. on Gov't Operations, 94th Cong., *Source Book on Privacy* 217 (Comm. Print 1976), https://perma.cc/9W9F-R5ZL. The Office of Management and Budget's ("OMB") contemporaneous 1975 Privacy Act guidelines, issued pursuant to a statutory delegation, *see* 5

U.S.C. § 552a(v)(1),[4] recognize that "one of the basic objectives of the Act" is "fostering agency accountability through a system of public scrutiny." *Source Book on Privacy*, *supra* p. 1064. Thus, when DOJ deprived Common Cause of information about DOJ's collection of millions of Americans' voter data in a single system of records, Common Cause suffered exactly the type of harm Congress sought to prevent.

In arguing otherwise, Defendants rely solely on a single case that does not address the Privacy Act at all. *See* Defs.' Mem. 22 (citing *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 103 (D.C. Cir. 2019)). That case is instead about section 208 of the E-Government Act—an entirely different statute than the Privacy Act. In quoting that case, Defendants substitute the words "Privacy Act" for "section 208," as if the two were interchangeable. *See id.* But Defendants offer no argument that this is so, and do not otherwise address why the Court should apply case law about another statutory scheme to the Privacy Act. Nor can they. The Privacy Act undeniably establishes a "right to obtain information" from "federal agencies." *Maloney v. Carnahan*, 45 F.4th 215, 217 (D.C. Cir. 2022) (en banc) (Millett, J., concurring in denial of reh'g en banc) (including the Privacy Act among five "accountability and transparency" statutes, and omitting E-Government Act).

The PRA's purposes likewise include "improv[ing] the quality and use of Federal information to strengthen . . . openness in Government and society," 44 U.S.C. § 3501(4), and "improv[ing] the responsibility and accountability of the [OMB] and all other Federal agencies to Congress and to the public," *id.* § 3501(11). "These statements evince Congress's clear intent that information concerning the government's data collection efforts be shared with the public so that the public might hold the government to account." *United to Protect Democracy*, 288 F. Supp. 3d at 107; *accord CREW v. OMB*, 791 F. Supp. 3d 29, 47 (D.D.C. 2025).

---

[4] OMB's "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time," are "especially useful in determining [an Act's] meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)); *see also Maydak v. United States*, 363 F.3d 512, 518 (D.C. Cir. 2004) (relying on OMB's Privacy Act Guidelines in construing statute).

The PRA, like the Privacy Act, thus creates a notice-and-comment system and requires agencies to "consider" those public comments. 44 U.S.C. § 3506(d). Congress was not merely pursuing transparency in the abstract; it was ensuring the public has enough information to respond to agencies' future decisions.

Finally, Defendants likewise misstate the law in arguing that informational standing can only enable a plaintiff to obtain informational relief. Defs.' Mem. 23-24. The D.C. Circuit has repeatedly held that a plaintiff can seek vacatur of agency action under the APA to redress informational injuries. *See, e.g.*, *Waterkeeper All. v. EPA*, 853 F.3d 527, 530 (D.C. Cir. 2017) (granting vacatur); *CBD*, 77 F.4th at 686 (plaintiff's informational standing allowed it to seek vacatur); *Friends of Animals*, 824 F.3d at 1040 (same).  This conclusion follows from the APA's plain text, which authorizes any person "adversely affected or aggrieved" by a "final agency action" to obtain judicial review, 5 U.S.C. §§ 702, 704, and mandates that a reviewing court "shall" "hold unlawful and set aside agency action" that is "not in accordance with law" or "without observance of procedure required by law." *Id.* §§ 706(2)(A), (D); *see also infra* Section VIII.

### C.    Common Cause also has associational standing and the Voter Plaintiffs have standing.

Common Cause has associational standing based on DOJ's Policy's harms to its members' privacy, voting, informational, and procedural rights and the Voter Plaintiffs have standing on their own to remedy the same injuries. *See* Pls.' Mem. 16-19. Defendants' only response—that Common Cause "failed to identify members that 'have standing to sue in their own right,'" Defs.' Mem. 27 (citation omitted)—is wrong across each of the Voter Plaintiffs' independent bases for standing.

*1. Plaintiffs have established privacy-related injuries.* Undisputed evidence shows that the Voter Plaintiffs and other Common Cause members have suffered violations of their privacy rights sufficient to establish standing. *See* Pls.' Mem. 16-17. By illicitly compiling, using, and disclosing voters' highly sensitive personal information, DOJ is inflicting injuries that are a close . . . analogue' to the harms vindicated by the "common law tort of intrusion upon seclusion."

*AFSCME v. SSA*, 172 F.4th 361, 368 (4th Cir. 2026) (en banc) (alteration in original) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-26 (2021)).[5]

Defendants do not contest the facts underlying Plaintiffs' claims of privacy injuries. Nor do they disagree that injuries closely analogous to intrusion upon seclusion are sufficiently concrete to give rise to standing. Rather, Defendants rely primarily on an abrogated Fourth Circuit panel decision to suggest that, for harm to be similar enough to intrusion upon seclusion to establish standing, a plaintiff must "know[] that a third party is engaged in targeted snooping." Defs.' Mem. 16 (quoting *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 172 (4th Cir. 2025), *abrogated by AFSCME*, 172 F.4th at 369). This theory was rejected by the en banc Fourth Circuit and other judges in this District, and is meritless.

First, the injury caused by intrusion into seclusion does not depend on the victim's immediate awareness of the harm. *See AFSCME*, 172 F.4th at 371; *AFL-CIO v. Dep't of Lab.*, 2025 WL 1783899, at *7 n.10 (D.D.C. June 27, 2025). Nonetheless, the very existence of this lawsuit leaves no question that Plaintiffs and Common Cause's members across the country are aware of the intrusion and find it highly offensive, and their declarations confirm as much. *See, e.g.*, Complaint ("Compl.") (Dkt. 1) ¶¶ 127-134; Pls.' Mem. 17 (citing declarations).

Second, DOJ's compiling of "records of all voters," Defs.' Mem. 15-16—and not just Plaintiffs' records—does not undermine the concreteness of Plaintiffs' injury. Indeed, Defendants do not "explain[] why invading the privacy of millions of people is 'different in kind' from invading the privacy of just one—much less in a way that *helps the defendant[s]*." *AFSCME*, 172 F.4th at 371; *see also AFL-CIO v. Dep't of Lab.*, 2026 WL 879518, at *10 (D.D.C. Mar. 31, 2026). The suggestion that Plaintiffs were not sufficiently harmed by DOJ's unlawful dragnet because

---

[5] *See also League of United Latin Am. Citizens v. EOP ("LULAC II")*, 818 F. Supp. 3d 34, 110 (D.D.C. 2026) (unauthorized inter-governmental "sharing of sensitive [voter registration] information" through SAVE system bore sufficiently "close relationship" to "intrusion upon seclusion"); *accord All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025) (financial information); *New Mexico v. Musk*, 784 F. Supp. 3d 174, 195 (D.D.C. 2025) (same); *Ctr. for Taxpayer Rts.*, 815 F. Supp. at 33-35 (taxpayer addresses); *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025) (SSNs and other PII).

13

their individual records were sought along with those of almost every other voter in the country defies logic. Defendants cannot inoculate their violation of Plaintiffs' privacy rights by hiding behind their violation of the rights of millions of other Americans.

Defendants err, too, in claiming that the privacy violations here are not offensive enough to constitute intrusion upon seclusion. Defs.' Mem. 15-16. DOJ's violations of Plaintiffs' privacy rights parallel both elements of intrusion upon seclusion: (1) an intentional intrusion in "private affairs," which (2) would be "highly offensive to a reasonable person." *All. for Retired Ams.*, 770 F. Supp. 3d at 102 (quoting Restatement (Second) of Torts, § 652B). Plaintiffs' "injuries—the wrongful sharing of sensitive information—bears a close relationship to the harms traditionally redressable through suits for intrusion upon seclusion." *LULAC II*, 818 F. Supp. 3d at 110; *see also, e.g., AFL-CIO*, 2026 WL 879518, at *10 (collecting cases).[6] Nothing more is needed. Whether an intrusion is "*highly* offensive . . . goes to the degree of harm, not the injury's recognition at common law, and so does not affect the concreteness of [Plaintiffs'] injury under Article III." *Pileggi v. Wash. Newspaper Publ'g Co.,* 146 F.4th 1219, 1229 (D.C. Cir. 2025); *see also Gadelhak v. AT&T Servs.,* 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (what matters is "a 'close relationship' in kind, not degree"). Whether Plaintiffs "would prevail in a lawsuit for common law invasion of privacy is irrelevant." *AFSCME*, 172 F.4th at 369 (quoting *Persinger v. Sw. Credit Sys.*, 20 F.4th 1184, 1192 (7th Cir. 2021)).[7]

---

[6] *See also Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 34 ("D.C. common law makes clear that '[i]n this age of identity theft and other wrongful conduct through the unauthorized use of electronically-stored data, . . . conduct giving rise to unauthorized viewing of personal information such as a plaintiff's Social Security number and other identifying information can constitute an intrusion that is highly offensive to any reasonable person.'" (alteration in original) (quoting *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009)).

[7] *DSCC v. Trump*, 2026 WL 1487833 (D.D.C. May 28, 2026), which addressed a "purely *intra-federal government*" "sharing of non-sensitive personal information," *id.* at *7 & n.7 (emphasis added), does not help Defendants. Plaintiffs here challenge the collection of sensitive personal information from sources outside the federal government, use of that data, and disclosure in and outside of the federal government—including to third-party contractors.

14

Finally, Defendants are wrong to suggest that Plaintiffs lack standing because DOJ is purportedly authorized by Congress to collect, use, and disclose voter registration data. Defs.' Mem. 16. It is not authorized. *See infra* Section III. But in any event, this argument "confus[es] a possible 'weakness on the merits with [an] absence of Article III standing.'" *AFSCME*, 172 F.4th at 370 (alteration in original) (quoting *Davis v. United States*, 554 U.S. 229, 248 n.10 (2011)). "'For standing purposes, [this Court must] accept as valid the merits of [Plaintiffs'] legal claims.'" *Id.* (quoting *FEC v. Cruz*, 596 U.S. 289, 298 (2022)). And here, Plaintiffs' merits theory is that DOJ is not authorized to collect, use, or disclose the SVRLs, "which is what renders such [handling of the data] an unlawful and highly offensive 'intrusion.'" *Id.*[8]

**2. Plaintiffs have established voting-related injuries.** DOJ's Voter List Maintenance Policy also injures the Voter Plaintiffs and Common Cause's members by creating an "increased risk" of burdens on voting, which is all that Article III requires for a voting injury to be "sufficiently 'imminent' for standing purposes.'" Pls.' Mem. 18 (citing cases); *accord Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (holding organizations had standing to challenge policy likely to burden right to vote because while "a voter cannot know in advance that his or her name will be dropped from the rolls," "[i]t is inevitable . . . that there will be such mistakes"). DOJ's arguments to the contrary are unavailing.

Defendants wrongly assert that no future injury to Plaintiffs is likely. *See* Defs.' Mem. 17. Ignoring directly relevant case law cited by Plaintiffs, *compare* Pls.' Mem. 17-18, *with* Defs.' Mem. 17-20, Defendants rest on the general principle that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," Defs.' Mem. 17-18 (citing *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974) and *City of Los Angeles v. Lyons*, 461 U.S.

---

[8] Although no further consideration of Plaintiffs' privacy injuries is necessary, Defendants are wrong to downplay Plaintiffs' reasonable fears that DOJ's collection, use, and disclosure of their personal information to other federal agencies and third-party contractors expose them to increased risks of identity theft, doxxing, and fraud. Defs.' Mem. 13-14. Despite Defendants' assurances that the records will be safeguarded, the reality is that even when the government makes such assurances, sensitive information "might wind up in the public domain due to a hack or leak." *First Choice Women's Res. Ctrs. v. Davenport*, 146 S. Ct. 1114, 1130 (2026).

15

95, 105-06 (1983)). But Plaintiffs do not just rely on past harms alone. Rather, they identify "past wrongs [as] evidence bearing on whether there is a real and immediate threat of repeated injury," *O'Shea*, 414 U.S. at 496, citing undisputed facts and DOJ's ongoing conduct. *See*, *e.g.*, Nel Decl. (Dkt. 29-8) ¶¶ 42-45.

*O'Shea* and *Lyons* also do not address standing in the voting or elections contexts. Indeed, in the context of prospective activities affecting voting and elections, a "[p]ast injury to others in so nearly identical situations as [Plaintiffs]" is sufficiently predictive of future injuries to confer standing. *Joseph v. U.S. Civ. Serv. Comm'n*, 554 F.2d 1140, 1149 (D.C. Cir. 1977) (citing *O'Shea*, 414 U.S. at 496). "This is particularly so when," as here, "the system that produced the alleged past harms has not changed such that there is 'no reason to think those harms will not continue.'" *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 39 (S.D.N.Y. 2022) (quoting *Anderson v. Raffensperger*, 497 F. Supp. 3d 1300, 1317 (N.D. Ga. 2020)) (cleaned up).

*O'Shea* and *Lyons* are also factually distinguishable. The plaintiffs in those cases could not establish that the defendants' illegal conduct, were it to continue, would likely affect the specific plaintiffs in the future. *See O'Shea*, 414 U.S. at 496; *Lyons*, 461 U.S. at 111. The evidence here, by contrast, shows that future burdens on the Plaintiffs' right to vote are likely, because their (and countless other voters') information in SAVE likely remains outdated. *See* Nel Decl. ¶ 43; A. Doe Decl. (Dkt. 29-12) ¶ 29; CRT-0032 & n.2. Thus, when DOJ runs Complying States' SVRLs through SAVE, it is likely to continue misidentifying naturalized and derived citizens as noncitizen voters and force them to provide documentary proof of citizenship ("DPOC") or be removed from the voter rolls. Pls.' Mem. 18.

Plaintiffs here also have an even stronger basis for standing than plaintiffs in prior cases where courts held list maintenance practices (including using SAVE) caused cognizable Article III injuries, based on the likelihood of future burdens on voting. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708-09 (9th Cir. 2025) (standing established based on evidence that "SAVE may not" have up-to-date "naturalization records," creating "danger" that "properly registered

voters . . . may have their voter registrations cancelled" even though plaintiffs identified no voter whose registration was actually cancelled); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014) (similar). Plaintiffs here have shown not just of "potential errors," but actual cases where the SAVE data DOJ is relying on generated inaccurate citizenship responses and burdened these specific Common Cause members' voting rights, including by causing them to be purged.

Nor do Plaintiffs "overstate the risks of misidentification through SAVE." *Contra* Defs.' Mem. 18. Defendants erroneously assert that Plaintiffs have identified "only three mistakes" by SAVE, but the three Common Cause member declarants (including Plaintiff Nel) are merely examples of injured voters. Plaintiffs need only identify one injured member with standing and certainly need not identify every harmed voter or even a specific percentage. *See Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 374 (D.C. Cir. 2026).

Nonetheless, as Plaintiffs have already established, the public record amply demonstrates the scope and scale of SAVE's harmful effects.[9] In Texas, depending on the county, its size, and the number of voters who actually responded to DPOC notices, at least 10% *and as many as 100%* of the voters SAVE identified as potential non-citizens and threatened with purging were confirmed to actually be U.S. citizens. *See* Decl. of Christopher Davis, *League of Women Voters v. DHS,* Dkt. 68-1 ¶ 19, No. 25-cv-03501-SLS (D.D.C. Mar. 20, 2026).[10] Likewise, other localities across the country have had similar issues with SAVE, with error rates as high as 81%.[11]

Defendants next claim that Plaintiffs lack standing because voters are purportedly unlikely to be disenfranchised when DOJ inevitably misidentifies eligible voters as non-citizens. Defs.' Mem. 18-19. This overstates the burden to show injury in voting cases, which recognizes that "any person whose right to vote is *impaired* has standing to sue." *Gray v. Sanders*, 372 U.S. 368, 375

---

[9] *See* Pls.' Mem. 10, n. 12 (citing Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica & Tex. Trib. (Feb. 13, 2026), https://perma.cc/PR4Q-67NR).

[10] *See also* Judd Legum & Rebecca Crosby, *The Federal Database That Could Upend the Midterm Elections*, Mother Jones (Apr. 9, 2026), https://perma.cc/8YXC-WU7U; Fifield & Despart, *supra.*

[11] *See* Legum & Crosby, *supra.*

(1963) (internal citations omitted) (emphasis added); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) (voters "need not have the franchise wholly denied to suffer injury"). If misidentified, Voter Plaintiffs and other Common Cause members will likely be forced to provide DPOC to retain their voter registration. Pls.' Mem. 18; *see also* CRT-33-34 (DOJ SAVE MOA with USCIS stating voters will be forced to provide "proof of U.S. citizenship" if SAVE fails to confirm citizenship). Forcing voters to provide DPOC to establish eligibility is an impairment sufficient to confer standing, even if the voter can provide such documentation. *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1119-20 (10th Cir. 2020); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009); *LULAC II*, 818 F. Supp. 3d at 95-96; *N.H. Youth Movement v. Scanlan*, 2026 WL 323171, at *11 (D.N.H. Feb. 6, 2026); *Ga. Coal. for the Peoples' Agenda v. Raffensperger*, 2022 WL 22866291, at *7 (N.D. Ga. Sept. 29, 2022).[12]

Finally, Defendants try in vain to dispute causation and redressability by insisting that "[s]tates are ultimately responsible" for removing voters from their rolls. Defs.' Mem. 19-20. But Article III "requires no more than *de facto* causality." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); (quoting *Block v. Messe*, 793 F.3d 1303 (D.C. Cir. 1986)); *see also Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017) (rejecting "the most immediate cause" standard because injuries "only" need be "'fairly traceable' to the defendant"). That standard is easily met here. Even if some states will send out notices requesting DPOC before purging voters from the voter rolls, there is no "guesswork" required to know that DOJ is the de facto cause by identifying these

---

[12] Defendants' reliance on *DSCC v. Trump*, Defs.' Mem. 18, is misplaced. In *DSCC*, the court held it was "highly speculative" how states would rely on voter registration lists that the government has not created yet because the Executive Order directing the creation of those lists does not "require any State to do anything with the State Citizenship List it is provided, let alone to remove otherwise eligible individuals on State voter registration lists." 2026 WL 1487833, at *6. Here, however, DOJ's MOUs with Complying States direct the states to use "notice from the Justice Department of any issues" to "clean" their voter rolls "by removing ineligible voters." CRT-5; *see also* Pls.' Mem. 10-11.

18

voters and demanding that the states purge them. Defs.' Mem. 20.[13] Indeed, in describing the Policy, DOJ's Office of Legal Counsel ("OLC") acknowledged that if DOJ's "search reveals that an alien unlawfully has registered to vote or voted in an election, the [Civil Rights] Division may seek to strike the alien's name from the voter registration list for future elections, refer the alien for prosecution, or both." CRT-3334; *see also* CRT-5 (Alaska) (directing state to use DOJ's notice of voter roll issues to clean voter rolls); CRT-2058 (Texas) (same); Pls.' Mem. 10-11. DOJ cannot escape its own claims that its unprecedented Policy is a manifestation of its intent to "ensure" the States are complying with DOJ's demands. Defs.' Mem. 1.[14]

### D.    Article II does not shield DOJ's affirmative actions from judicial review.

Defendants' argument that Article II precludes Plaintiffs' standing to challenge the legality of the Voter List Maintenance Policy, Defs.' Mem. 10-12, is incorrect. Plaintiffs claim that the Policy lacks statutory authorization and violates the Privacy Act, Paperwork Reduction Act, and APA. Defendants attempt to recharacterize these claims as a mere challenge to DOJ's "investigatory and enforcement discretion." Defs.' Mem. 10. But the Executive Branch has no such "discretion" to adopt and implement an unconstitutional and illegal policy.

Federal courts routinely adjudicate federal agencies' interpretations of their statutory authority to enforce the law, and strike down agency actions that exceed those bounds. *See Loper Bright Enters.*, 603 U.S. at 391-92 (generally requiring courts to decide all questions of law and set aside agency action inconsistent with the law). Defendants cite no authority to the contrary. Instead, they rely on an inapposite line of cases that limits judicial review of discretionary Executive Branch decisions *not* to enforce the law. *See* Defs.' Mem. 10-12 (citing *United States v.*

---

[13] Defendants' cited cases, Defs.' Mem. 19, are readily distinguishable. Unlike here, the plaintiffs in those cases did not provide evidence that federal actors were a but-for cause of their injuries. *See Murthy v. Missouri*, 603 U.S. 43 (2024); *Haaland v. Brackeen*, 599 U.S. 255 (2023).

[14] Defendants' response to Plaintiffs' claim of procedural injury is that Plaintiffs must also show a separate concrete injury. Defs.' Mem. 26. Plaintiffs said the same thing, *see* Pls.' Mem. 18-19, and demonstrated the many concrete ways DOJ's Voter List Maintenance Policy is causing organizational, informational, and associational/voter injuries, each of which is a sufficient concrete injury to go with Plaintiffs' procedural injury.

19

*Texas*, 599 U.S. 670 (2023); *Cross v. U.S. EEOC*, 810 F. Supp. 3d 88, 95 (D.D.C. 2025); *Heckler v. Chaney*, 470 U.S. 821 (1985); *CREW v. FEC*, 993 F.3d 880 (D.C. Cir. 2021)).

But as Defendants' primary source of authority, *United States v. Texas*, emphasized, these cases address "only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law." 599 U.S. at 684-85. And the cases make clear that despite the Executive Branch's discretion over decisions *not* to bring investigations or enforcement actions, where, as here, "an agency does act to enforce, that action itself provides a focus for judicial review." *Heckler*, 470 U.S. at 832; *see also Texas*, 599 U.S. at 684 ("[T]he Federal Judiciary of course routinely and appropriately decides justiciable cases involving statutory requirements or prohibitions on the Executive."). Plaintiffs here do not seek to compel DOJ to enforce the law; they instead challenge the lawfulness of a policy DOJ has affirmatively adopted and executed. Reviewing the legality of such agency action is the ordinary business of Article III courts, and Defendants offer no authority to disrupt that hallmark.

## II.    DOJ's Voter List Maintenance Policy is final agency action.

Defendants argue that APA review is inappropriate because the challenged policy is not a sufficiently "discrete" agency action, and because the Policy does not "determine 'rights or obligations' or carry 'legal consequences." Defs.' Mem. 28-30 (quoting *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997)). Both contentions are wrong.

### A.    Plaintiffs challenge a discrete action.

Simply put, and in Defendants' own words, Plaintiffs are challenging "DOJ's maintenance of the state voter rolls." Defs.' Mem. 46. "In response to [President Trump's 2025 Executive Order], to identify those who may be voting illegally (whether by reason of alienage or otherwise)," DOJ decided to "seek statewide voter lists, and then to share the lists with Homeland Security Investigations ('HIS') or another unit within DHS," for purposes of "enabl[ing] cross-referencing the lists against existing databases in order to identify illegal aliens who are ineligible

20

to vote" in which case DOJ "may seek to strike the alien's name from the voter registration list for future elections." CRT-3330, 3334 (OLC memo describing DOJ Voter List Maintenance Policy); *accord* Defs.' Mem. 5. That "categorical" decision to obtain and review all SVRLs, in compliance with the Presidential Directive, without "individualized assessments," constitutes a reviewable agency action. *See New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025).[15]

Defendants ask the Court to ignore the forest and fixate on individual trees, insisting that what Plaintiffs challenge is not a distinct agency action to adopt and implement the Voter List Maintenance Policy, but an amalgamation of subsequent "discrete actions" that Plaintiffs have "lump[ed] together." Defs.' Mem. 28-30. This argument misunderstands the law and mischaracterizes the undisputed factual record.[16]

When an agency decides to adopt a categorical policy that requires implementation by individual officials in specific instances, that does not shield the Policy from APA review. Here, DOJ decided no later than May 2025 (when it began demanding unredacted SVRL data from 49 states and the District of Columbia) to adopt its Voter List Maintenance Policy. That DOJ then implemented that decision over the following months through a series of demand letters, MOUs, and interagency agreements does not change the fact that it was a categorical policy decision.

In identifying a final agency action, courts routinely focus on an agency's categorical decision to act, rather than its subsequent steps to implement that decision, and "in reviewing the record, a court is 'not required to exhibit a naiveté from which ordinary citizens are free.'" *New*

---

[15] While DOJ sought to implement this decision "outside of the view of the public," CRT-3384, and therefore never publicly announced its decision or released any document memorializing it, "[a]gency action generally need not be committed to writing to be final and judicially reviewable." *Bhd. of Locomotive Eng'rs. & Trainment v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020). [16] Even if the Court concludes that DOJ's categorical adoption of the Policy is not subject to challenge, Defendants' decisions to launch a collection of information without a PRA control number, depart from routine uses of a system of records, enter into interagency agreements for the sharing of SVRL data, and unlawfully direct states to remove individual voters from their voter rolls are each a "particular 'agency action' that causes [] harm." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891 (1990). *See also New York*, 133 F.4th at 68 ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.").

*York* 133 F.4th at 69 (citing *Dep't of Com. v. New York*, 588 U.S. at 785 (2019)). For example, in *AFL-CIO v. Dep't of Lab.,* the court rejected a similar effort to fragment the defendants' adoption of a policy into subsidiary actions by individual officials. 778 F. Supp. 3d 56, 73 (D.D.C. 2025). The plaintiffs in that case alleged that various agencies maintained a policy of unlawfully disclosing access to sensitive information to employees of the U.S. DOGE Service ("USDS"). The court held that defendants "missed the mark" in defining the alleged agency action as "*individual decisions* of the agency defendants to give particular USDS personnel access to agency systems." *Id*. at 77 (emphasis in original). Rather, the court held, the plaintiffs challenged "across the board *policies . . .* to grant USDS personnel access to sensitive record systems." *Id*. (emphasis in original). Putting those policies in place amounted to final agency action. *Id.* at 77-78.

Similarly, in *Hispanic Affairs Project v. Acosta*, the D.C. Circuit reversed the dismissal of a challenge to the Department of Homeland Security's "across-the board" policy of "approving and extending H-2A visas for lengthy periods of time." 901 F.3d 378, 388 (D.C. Cir. 2018) (internal quotations omitted). Although the government argued that Plaintiffs' claims amounted to a "programmatic challenge to Homeland Security's general governance and administration of the H-2A program," the D.C. Circuit disagreed, finding that the policy constituted a final agency action. *Id.* at 388 (citing *Lujan,* 497 U.S. at 890 n.2); *see also Venetian Casino Resort LLC v. EEOC,* 530 F.3d 925, 931 (D.C. Cir. 2008) (decision "to adopt a policy of disclosing confidential information without notice" constituted final agency action); *New York,* 133 F.4th at 66-67 (rejecting government assertions that plaintiffs' challenge to a "Federal Funding Freeze" was improper programmatic attack*,* and holding that plaintiffs may challenge "categorical" decision to freeze many grants); *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 40-42 (plaintiffs' allegations that IRS "made a final decision to adopt and implement" an "Address-Sharing Policy" was 'substantially likely to constitute final agency action"); *Nat'l Council of Nonprofits v. OMB,* 775 F. Supp. 3d 100, 115, 123 (D.D.C 2025) (holding funding pauses were a categorical decision and rejecting suggestion that "countless federal agencies. . . suddenly began exercising their own

22

discretion to suspend funding across the board at the exact same time"), *appeal docketed*, No. 25-5148 (D.C. Cir. Apr. 25, 2025); *Xirum v. ICE*, 2024 WL 3718145 at *10, 12 (S.D. Ind. Aug. 8, 2024) (rejecting argument that plaintiffs challenged "numerous" "disparate" acts and holding that plaintiffs' challenge was to the "discrete decision" to adopt a challenged policy).[17]

The Policy challenged here is precisely the kind of categorical decision that constitutes final agency action. As noted above, DOJ adopted the Policy "in response" to an executive order, rather than on the basis of specific facts about any particular state. CRT-3330; *see also* Defs.' Mem. 5 (admitting DOJ "followed the President's directive" as basis for demands for "information about how each state complies with the NVRA"). Apparently for this reason, DOJ has provided the White House with updates about its "progress" implementing the Policy across the country. CRT-3379-80. Thus, DOJ is carrying its policy out "across the board," *Lujan*, 497 U.S. at 890 n.2, applying it to every state that "h[as] voter rolls," Defs.' Mem. 5 n.1. It subjects SVRL data to a standard protocol of "[i]ngestion of bulk confidential Voter Registration Data," "[s]torage of bulk confidential Voter Registration Data," and "analysis of ingested data." CRT-3396; *see also* CRT-3330, 3334 (OLC memo describing the Policy), and DOJ stores all Complying States' SVRLs in one folder. CRT-3387.

Defendants suggests that Plaintiffs seek to "lump together" disconnected agency actions, Defs.' Mem. 29, but that characterization is refuted by the undisputed record evidence. Defendants assert that "DOJ did not take a one-size-fits-all approach to its data requests from each state." *Id*.

---

[17] Defendants point to *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006), and *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50-51 (D.D.C. 2014), to support their arguments. Defs.' Mem. 28-29. But these cases are inapposite, as neither considered an effort to vacate a categorical policy decision. Defendants cite *Cobell* for the proposition that Plaintiffs must present a "narrow question to resolve." Defs' Mem. 28. That proposition gets Defendants nowhere. In *Cobell* (a decision addressing whether certain agency computer systems should be disconnected from the internet), the court noted that APA review is not appropriate for "generalized complaints about agency behavior" or to "require an agency to follow a detailed plan of action." 455 F.3d at 307. Neither principle is implicated by Plaintiffs' effort to vacate a specific and unprecedented DOJ policy. Similarly, in *Bark* the plaintiffs challenged the agency's discretionary decision to grant permits in specific instances, without alleging any policy from which those decisions flowed. 37 F. Supp. 3d at 49-50. That case sheds no light on this one.

Yet they concede that every demand letter sought "'[t]he current electronic copy' of the State's 'computerized statewide voter registration list,'" as well as "'all fields contained within the list' in electronic form." *Id*. at 6 (citing CRT-2522). Defendants also claim that "DOJ tailored its interactions to each State, even negotiating the terms of the MOU with South Carolina." *Id*. at 29. Yet the Administrative Record ("AR") reveals that DOJ took the position that "[t]he MOU was constructed as an offer to all states . . . . For multiple reasons, it cannot be redlined in any fashion." CRT-1875.[18] Defendants proclaim that DOJ makes "one-off decisions to seek enforcement actions against States that have not provided their voter rolls." Defs.' Mem. 29. Yet DOJ has sued every state that has declined to produce full unredacted SRVL data. *See* Defs.' Mem. 1 ("And for States that refuse to provide voter rolls, DOJ has brought enforcement actions that are not before this Court."). And of course, DOJ never denies that it is consolidating the states' SVRL data in the same system of records, disclosing it to DHS pursuant to the same memorandum of agreement, or analyzing it by the same methods and for the same purposes. *See* Pls.' Mem. 4-5 (citing AR).

Defendants are therefore wrong to suggest that Plaintiffs seek to wage a "broad programmatic attack" on DOJ's enforcement priorities. Defs.' Mem. 2, 30. "Unlike in *Lujan v. National Wildlife Federation*, Plaintiffs do not challenge a wholesale failure of the agency to comply with an array of loosely related legal requirements." *Xirum*, 2024 WL 3718145, at *12 (citing *Lujan*, 497 U.S. at 891). Nothing in this lawsuit invites the Court to superintend DOJ's discretion about whether to pursue specific enforcement actions or prioritize certain civil-rights imperatives over others. Rather, it is DOJ who is trying to superintend the states' prerogative to administer elections, with DOJ, for the first time ever, launching (in the words of the Assistant Attorney General for Civil Rights) a "comprehensive effort" to compile "the voter rolls from all states and the District of Columbia" so that DOJ can conduct "voting hygiene" by "running" the

---

[18] The record does not reveal why South Carolina appears to have received a special dispensation that allowed it to negotiate narrow modifications to the MOU. *See* Defs.' Mem. 29 (citing CRT-17). But granting a specific exception in the implementation of a policy does not somehow un-consummate that policy. Defendants offer no authority to support that novel proposition.

24

states' voter rolls to identify supposedly ineligible voters. *See* Hill Decl. ¶ 8. Establishing that Policy is a paradigmatic agency action suitable for APA review.

### B.    The Voter List Maintenance Policy has legal consequences.

Contrary to Defendants' assertions, Defs.' Mem. 30-31, the challenged policy is one by "which rights or obligations have been determined, or from which legal consequences will flow." *Bennett,* 520 U.S. at 178 (cleaned up).[19]

Defendants proclaim that the demand letters carry no legal consequences because "States were free to refuse to provide data, as many did." Defs.' Mem. 30. This assertion might surprise the 30 states that refused to provide unredacted SVRL data, every one of which found itself in federal court defending against enforcement litigation to compel compliance. *See e.g.,* Compl. ¶¶ 48-49, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Sep. 25, 2025) (alleging that state's "refusal to provide these records as requested constitutes a continuing violation of federal law"); *see also Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 479 (2001) (looking to agency's "own behavior" to evaluate finality). Indeed, DOJ viewed the purpose of the demand letters as "compel[ling] states to turn over statewide voter lists," CRT-3335 (OLC memo), and the letters expressed DOJ's view that states were obligated to comply, *see, e.g.*, CRT-3184 ("[T]he electronic copy of the statewide VRL must contain *all fields*[.] . . . Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Utah's complete and current VRL.") (DOJ letter to Utah) (emphasis in original). This unequivocally satisfies *Bennett*.

Likewise, DOJ sharing SVRL data it has obtained with SAVE, HSI, SSA, and other federal agencies imposes legal consequences on the individuals whose data is shared without consent. *See AFL-CIO*, 778 F. Supp. 3d at 78 (policy allowing disclosure of confidential information "determines the rights of those whose information is being disclosed and the obligations of the agency defendants"); *LULAC II*, 818 F. Supp. 3d at 112 (DHS's and SSA's decision to "share[]

---

[19] Defendants do not deny that this lawsuit meets the other core requirement of *Bennett*, which is that the challenged action "mark[s] the consummation of the agency's decisionmaking process." 520 U.S. at 178. *See* Pls.' Mem. 19-20.

data across agencies or outside the Federal Government" to identify unqualified registered voters "is an action by which rights or obligations have been determined." (cleaned up)). These rights and obligations are affected when voters' sensitive information is shared with DOJ under the Policy, not, as Defendants argue, only after other agencies "act upon that information as to any individual." Defs.' Mem. 30-31; *see also* CRT-3356 (stating all voters now investigation subjects).

## III.    DOJ's Voter List Maintenance Policy lacks statutory authorization.

Every court that has addressed the question has concluded DOJ lacks its claimed authority for the Voter List Maintenance Policy. *See Weber*, 816 F. Supp. 3d at 1182-91; *Benson*, 819 F. Supp. 3d at 759-70; *Wis. Elections Comm'n*, 2026 WL 1430354, at *5; *Bellows*, 2026 WL 1430481, at *6-10; *Fontes*, 2026 WL 1177244, at *2-7; *Amore*, 2026 WL 1040637, at *4-6; *Oregon*, 2026 WL 318402, at *5-13. DOJ ignores the weight of authority and instead tries to decouple each element of its Policy from the others. But there is judicial consensus that DOJ's list maintenance-related actions are unlawful for good reason: as set forth below, the NVRA and HAVA do not permit DOJ to superintend states' list maintenance procedures, and Title III of the Civil Rights Act does not authorize DOJ to seek the SVRLs at-issue here in the first instance.

### A.    DOJ's Policy is not authorized by the NVRA and HAVA.

Defendants repeatedly mischaracterize DOJ's role under the NVRA and HAVA in a failed attempt at conjuring statutory authorization for the Voter List Maintenance Policy where there is none. To do so, Defendants try to disaggregate and defend the elements of DOJ's Policy—in their words "obtain[ing] state voter rolls," Defs.' Mem. 39, "investigat[ing]" possible NVRA and HAVA violations by reviewing every voter roll "[l]ike a forensic accountant using large-scale bank records to investigate potential fraud," *id.* at 39-40, "identifying entries flagged as ineligible voters and asking States to investigate them," *id.* at 40, and "requiring States to remove ineligible voters within 45 days," *id.* at 41. But the Court need not determine whether, in some hypothetical scenario, DOJ might have authority to take any one of these steps individually. Here, Plaintiffs challenge the sum of the parts, each of which does not exist alone in a vacuum: the Voter List

Maintenance Policy's constituent actions are all part of DOJ's "comprehensive effort" to conduct "voting hygiene" on behalf of all of the states. Hill Decl. ¶ 8; *see supra* Section II.

The NVRA does not give DOJ any such blanket authority. Rather, regarding required list maintenance, Congress limited DOJ's power to enforce the NVRA and HAVA to bringing civil actions seeking equitable relief when states fail to maintain "a 'program' or 'system' that 'makes a reasonable effort' to remove ineligible voters." Pls.' Mem. 22; *see also* 52 U.S.C. §§ 20507(a)(4), 20510(a) (NVRA); §§ 21083(a)(4)(A), 21111 (HAVA). In other words, when it comes to list maintenance, DOJ can only enforce the NVRA and HAVA by preparing and bringing litigation, in circumstances when DOJ suspects a state's programmatic or systemic list maintenance processes are not "reasonable." Pls.' Mem. 22.

Applying the Major Questions Doctrine to the record drives this home, because DOJ is taking unheard-of and transformative action that strongly counsels against Defendants' atextual interpretation of the NVRA and HAVA. *See* Pls.' Mem. 24-25. Defendants seek to minimize DOJ's sprawling new Voter List Maintenance Policy, claiming "[t]here is nothing extraordinary about DOJ wanting to investigate potential violations of statutes when 'Congress has expressly authorized' DOJ to do so." Defs.' Mem. 41 (citation omitted). But none of the "historical precedent" Defendants cite for this proposition, *see id.* at 41-42, involved anything remotely close to DOJ simultaneously demanding that *all states* provide their full SVRL data to DOJ, *see id.* at 5, DOJ taking the position that *each of the tens of millions of registered voters* in the country are the "subjects" of a federal dragnet investigation into voter fraud, CRT-3356, or DOJ telling states who to remove from their voter rolls, *see* CRT-3334.[20] DOJ is doing precisely what the major questions

---

[20] Defendants' cited precedent underscores the lawlessness and novelty of DOJ's Policy—including a dragnet investigation of the whole country, seeking to dictate which individuals to remove from SVRLs—as compared to the lawfulness of DOJ's previous enforcement of HAVA—consisting of filing civil actions against individual states premised upon specific, identified concerns with those states' *programmatic* obligations. In *United States v. Maine*, the Court entered a consent decree in HAVA litigation against Maine for its delay implementing a computerized voter registration *system*—not individual list maintenance issues—and the parties agreed *the state* would engage in certain programmatic list maintenance activities. 2007 WL 1059565 (D. Me. Apr. 4, 2007). In *United States v. New Jersey*, DOJ alleged that New Jersey had not "completed a

doctrine forbids: "claim[ing] to discover in . . . long-extant statute[s] 'an unheralded power' representing a 'transformative expansion [of its] . . . authority,'" with no clear congressional authorization. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (citation omitted); *see also* Pls.' Mem. 24-25.

"Together, the NVRA and HAVA create a comprehensive scheme for the creation and upkeep of states' computerized SVRLs, and for the enforcement of the list maintenance requirements imposed by those statutes." *Bellows*, 2026 WL 1430481, at *8. While this statutory scheme "gives the Attorney General the power to 'bring a civil action' against a state that has violated those provisions, . . . it does not contemplate the line-by-line audit of each state's computerized SVRL by the federal government to assess compliance with those provisions." *Id.*; *accord Amore*, 2026 WL 1040637, at *6 ("Neither the NVRA nor HAVA authorize . . . the kind of fishing expedition [DOJ] seeks here."). Given Congress' carefully calibrated legal framework, the Policy "represent[s] an overreach and misuse of those limited constitutional exceptions designed to ensure decentralized election regulation." *Oregon*, 2026 WL 318402, at *13.

Defendants' individual defenses of the Policy's constituent actions fare no better.

**1. *DOJ's SVRL demands violate the NVRA and HAVA.*** Defendants claim that DOJ may demand information under the NVRA and HAVA. *See* Defs.' Mem. 38-39. HAVA, however, does not contain a document production or inspection provision. *See generally* 52 U.S.C. § 21081, *et seq.*; *Weber*, 816 F. Supp. 3d at 1190. And the NVRA's public disclosure provision only applies to "records concerning the implementation of *programs and activities* conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i) (emphasis

---

computerized statewide voter registration list" or performed various list maintenance programs. *See* Compl., No. 2:06-cv-4889 (D.N.J. Oct. 12, 2006), Dkt. 1. The resulting stipulated order included New Jersey enacting a programmatic remedy, but DOJ did not instruct the state whom to remove from its voter rolls. *See* Stipulated Order, No. 2:06-cv-4889 (D.N.J. Oct. 12, 2006), Dkt. 2. Similarly, in *United States v. Indiana*, DOJ alleged Indiana was not conducting adequate list maintenance programs, Compl., No. 1:06-cv-1000 (S.D. Ind. June 27, 2006), Dkt. 1, and the Court entered a consent decree wherein *the state* was responsible for various list maintenance activities. Consent Decree, No. 1:06-cv-1000 (S.D. Ind. July 5, 2006), Dkt. 5.

added). Individual voter rolls are not such programmatic records. *See*, *e.g.*, *Weber*, 816 F. Supp. 3d at 1188 ("[T]he NVRA only permits investigations into states' policies regarding reasonable voter roll maintenance. Nothing in the statute suggests as acceptable the deep level of intrusive digging DOJ is proposing in its request for line-by-line voter roll data.").

        **2. *DOJ does not have carte-blanche authority to investigate election administration.*** Defendants next assert DOJ "necessarily" has broad investigative powers based on its limited authority to bring civil actions for injunctions redressing HAVA and NVRA violations. Defs.' Mem. 39-40. But Defendants cite no authority for this proposition, because there is none. Neither the NVRA nor HAVA appointed DOJ as the "forensic accountant" for the states' voter rolls. *Compare* Defs.' Mem. 40, *with* 52 U.S.C. §§ 20507, 20510(a), 21083, 21111. If DOJ "wants to enforce HAVA and the NVRA, it must use the pre-suit investigation and enforcement mechanisms that Congress provided in those statutes—which do not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of the state election official to point out and demand the correction of inaccuracies in the list." *Bellows*, 2026 WL 1430481, at *8. DOJ's Policy flunks that test.

        Defendants also assert DOJ has authority to "investigate potential violations of NVRA and HAVA" on a dragnet basis and without any particularized investigatory purpose, because DOJ's investigations need not be limited to "one State, one violation, or even one voter." Defs.' Mem. 40. The only authority Defendants cite for this proposition is dicta stating that grand juries can "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* (quoting *United States v. Morton Salt Co.*, 1, 642-43 (1950)). DOJ does not have any such newly found, abstract, and unlimited power to investigate states' election administration. *See West Virginia*, 597 U.S. at 724. Congress gave DOJ specific tools to ensure states adequately maintain voter lists, which DOJ has eschewed to instead unlawfully appoint itself Grand Inquisitor. *See Cruz*, 596 U.S. at 301.

29

**3.** ***DOJ is not authorized to conduct or superintend states' list maintenance****. Defendants' citation to "some facts" from the Election Administration and Voting Survey ("EAVS") report in certain DOJ demand letters to states, *see* Defs.' Mem. 40, also does not legitimize DOJ superseding states' list maintenance duties. Because although some of DOJ's demand letters did request specific answers to questions based on facts from the EAVS report and asked the states to "provide a description of the steps" they had taken to identify ineligible voters, *see, e.g.*, CRT-2731-32, CRT-3160-61, the same letters also made the separate, independent demand that, "[p]ursuant to Section 20507(i) of the NVRA," each state must provide a "current electronic copy of [state's] computerized statewide voter registration list . . . as required by Section 303(a) of the Help America Vote Act," CRT-2730, CRT-3159. Of course, the NVRA and HAVA impose no such requirement that states produce full unredacted voter rolls to DOJ. *See Weber*, 816 F. Supp. 3d at 1188-91; *Bellows*, 2026 WL 1430481, at *8; *Amore*, 2026 WL 1040637, at *6; *Oregon*, 2026 WL 318402, at *13. Indeed, the very portions of the demand letters on which DOJ selectively relies— their references to the EAVS report—demonstrates an arguably proper way DOJ might conduct a pre-enforcement litigation review of states' programmatic and systemic list maintenance procedures, as actually contemplated by the NVRA and HAVA. But DOJ's discrete demand for states' entire unredacted SVRLs so it can conduct list maintenance itself by "strik[ing]" ineligible voters "from the voter registration list for future elections," CRT-3334, is anathema to the federal/state balance created by federal election law.

Finally, Defendants identify no authority for DOJ to identify and remove individual voters. Defs.' Mem. 40-41. An "agency . . . literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301 (cleaned up). Defendants claim that DOJ's use of SAVE to identify purported noncitizens and then sending those identifications to Complying States is "not contrary to law," Defs.' Mem. 40, but regardless of whether DOJ's actions *violate* any statute, DOJ must in the first instance have statutory authorization for its actions. And here, no statute authorizes DOJ to do the states' job of identifying and removing potentially ineligible

voters. Under the NVRA and HAVA, the states alone are responsible for "conduct[ing] a general program that makes a reasonable effort to remove the names of ineligible voters," 52 U.S.C. § 20507(a)(4) (NVRA), and "ensur[ing] that voter registration records in the State are accurate and are updated regularly," *id.* § 21083(a)(4) (HAVA).

Defendants also wrongly argue that the NVRA's prohibition on voter purges within 90 days of an election (the "quiet period") does not apply to the Voter List Maintenance Policy, because DOJ's Policy only seeks to remove voters they claim "were ineligible and improperly registered to vote in the first place." Defs.' Mem. 41 (quoting *Bell v. Marinko*, 367 F.3d 588, 591-92 (6th Cir. 2004)). But this presupposes voters' ineligibility. As Plaintiffs have shown, the systems DOJ is relying on to identify ineligible voters are woefully inadequate and likely to misidentify eligible voters as ineligible ones. *See* Pls.' Mem. 8-10. That is exactly why the NVRA's quiet period exists in the first place: "to balance competing objectives," ensuring that reasonable list maintenance occurs while protecting and promoting the right to vote. *Bellitto v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019); *see also* 52 U.S.C. § 20501(a), (b). For precisely that reason, court after court has made clear that the quiet period applies to all systematic removals—including of purported non-citizens—because these types of removals are error-prone and risk disenfranchising qualified voters. *See, e.g.*, *Mi Familia Vota*, 129 F.4th at 715; *Arcia*, 772 F.3d at 1346. Moreover, DOJ is not only seeking to remove potential noncitizen voters; it is also seeking to remove "former residents who [may] have moved," Defs.' Mem. 39, who would have been eligible and properly "registered to vote in the first place," meaning even DOJ does not dispute that the quiet period applies to those voters, who likewise may also be misidentified by the purge process. *See id.* at 41. The NVRA reflects Congress's policy choices. DOJ has no authority to alter that careful balance by pursuing list maintenance at all costs.

**B.     DOJ's Policy is not authorized by Title III of the Civil Rights Act.**

Defendants wrongly suggest that Title III authorizes the DOJ's Voter List Maintenance Policy. *See* Defs.' Mem. 2-3, 36-38. DOJ has sued thirty states for refusing to produce their voter

31

list, *Bellows*, 2026 WL 1430481, and DOJ cannot identify a single case in which it has prevailed thus far. *See* Pls.' Mem. 3; Defs.' Mem. 36 n.8. At the time of Plaintiffs' motion, six courts had already dismissed DOJ's complaint. *See* Pls.' Mem. 3 n.3. Since then, two other courts have rejected Defendants' arguments, including under Title III. *Bellows*, 2026 WL 1430481, at *7; *Wisconsin Elections Comm'n*, 2026 WL 1430354, at *5. Those courts' well-reasoned decisions rest on multiple, alternative grounds.

As an initial matter, Defendants' statutory background, Defs.' Mem. 2-3, omits that Congress enacted Title III as "strong medicine" to combat persistent discrimination and disenfranchisement in the South. *See*, *e.g.*, *Bellows*, 2026 WL 1430481, at *9; *Wis. Elections Comm'n*, 2026 WL 1430354, at *2. Prior to Title III, states were frustrating DOJ's ability to investigate voter complaints by destroying or refusing to turn over evidence of "literacy tests, arbitrary registration tactics, voter ID laws, and poll taxes." *Weber*, 816 F. Supp. 3d at 1175. Congress enacted Title III to ensure that DOJ can obtain the records necessary "for a proper evaluation of complaints" of voting-rights violations. Hearings before Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary, 86th Cong., 1st Sess. (1959) 210-12. Title III does not require states to remove registered voters from voter lists—indeed, it does not refer to the removal of voters at all.

Consistent with that history, at least three courts have held that Title III only authorizes DOJ to seek records for purposes of investigating cases of discrimination or disenfranchisement. *Weber*, 816 F. Supp. 3d at 1175, 1182-83; *Amore*, 2026 WL 1040637, at *4; *Oregon*, 2026 WL 318402, at *10. And in the AR here, "DOJ cites no disenfranchisement concerns for their extraordinary request for the personally identifying information of millions of" Americans, and Title III cannot justify DOJ's Policy. *See Weber*, 816 F. Supp. 3d at 1175.

Even if Title III were not limited to investigating cases of discrimination or disenfranchisement, it still cannot be used to enforce the NVRA or HAVA or to conduct list maintenance. For instance, the district court in *Bellows* held that, "whatever investigatory purposes

32

may support a Title III records demand, voter list maintenance is not among them." 2026 WL 1430481, at *7. Another court observed that "Title III was not passed as a tool for NVRA compliance. . . . [B]ecause the passage of Title III in 1960 preceded the NVRA by several decades." *Weber*, 816 F. Supp. 3d at 1183. Similarly, the "[u]niform, centralized statewide voter registration lists . . . were not even required until the passage of HAVA in 2002." *Id.*

Further, even if Title III could be used to enforce the NVRA or HAVA, SVRLs are nonetheless not subject to Title III's disclosure requirements because such lists are created by each state and therefore do not "come into [the state's] possession" "from an external source." *See* 52 U.S.C. § 20701; *Benson*, 819 F. Supp. 3d at 768-70; *accord Fontes*, 2026 WL 1177244, at *5; *Bellows*, 2026 WL 1430481, at *7; *Wis. Elections Comm'n*, 2026 WL 1430354, at *4.

Courts have also found that DOJ's stated purpose or basis for seeking SVRLs under Title III is either insufficient or pretextual and that the data demanded is not necessary to achieve DOJ's stated interests. *See*, *e.g.*, *Galvin*, 2026 WL 972129, at *6; *Oregon*, 2026 WL 318402, at *10; *Amore*, 2026 WL 1040637, at *5. DOJ is in uncharted territory here: As one court pointedly stated, "[t]he presumption of regularity that has been previously extended to [DOJ] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds." *Oregon*, 2026 WL 318402, at *11 (noting that DOJ's public statements and demands "cast[] serious doubt as to the true purposes for which [DOJ] is seeking voter registration lists in this and other cases, and what it intends to do with that data").

Finally, Defendants admit that DOJ intends to disclose the data it obtains to private contractors, *see* Defs.' Mem. 15, 43, which is prohibited by Title III's restrictions on further disclosure of voter records. *See* 52 U.S.C. § 20704. Section 20704 expressly limits DOJ's ability to share Title III records with anyone other than Congress, governmental agencies, or in the course of a court or grand jury proceeding.

For all of those reasons, Title III provides no authority for DOJ's Policy.

**IV.     DOJ's Voter List Maintenance Policy violates the Privacy Act.**

"Congress passed the Privacy Act to prevent the creation of 'formal or de facto national data banks' or 'centralized Federal information systems' because of the risks posed to the privacy of individual Americans." *Weber*, 816 F. Supp. 3d at 1194 (quoting *Source Book on Privacy, supra* p. 168). DOJ's collection and use of the SVRLs violates the Privacy Act multiple times over and embodies the very harm that Congress sought to prevent. *See* Pls.' Mem. 25-34. DOJ's arguments to the contrary fall flat in the face of undisputed facts and clear authorities establishing that: (1) the APA is a proper means for Plaintiffs to bring a Privacy Act challenge to DOJ's Policy; (2) DOJ was required to and failed to issue a revised SORN before initiating the unprecedented collection of the sensitive voter data of millions of Americans; (3) DOJ's current SORNs do not put the public on notice of how DOJ is using and disclosing this data; (4) DOJ is unlawfully maintaining and disclosing inaccurate and outdated records in bulk; and (5) DOJ is unlawfully maintaining First Amendment protected records in bulk.

**A.     The APA permits Plaintiffs to challenge DOJ's Privacy Act violations.**

Defendants are wrong that Plaintiffs lack an APA remedy for violations of the Privacy Act. *See* Defs.' Mem. 33-36. Defendants get the law backwards when they argue that, as a "general[]" rule, "where an agency action is subject to review in some manner under a separate statutory scheme, that action . . . must be reviewed within the confines of that scheme." *Id.* at 33. That argument reverses "the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). The presumption of judicial review cannot be overcome, nor APA review restricted, except "upon a showing of clear and convincing evidence of a contrary legislative intent," *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (cleaned up), and where an alternative remedial scheme provides the "same genre" of relief, rather than "only doubtful and limited relief," *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009). Neither condition is met here.

***1. Congress did not intend to preclude APA review of Privacy Act claims.*** Defendants'
mischaracterization of the Privacy Act as allowing only "limited relief," *see* Defs.' Mem. 35, is
devoid of context. Nothing about the Privacy Act's structure or history suggests its true purpose
was to limit judicial review under the APA. To the contrary, Congress enacted the Privacy Act to
establish new "safeguards for an individual against an invasion of personal privacy" by federal
agencies. Privacy Act of 1974, Pub. L. No. 93-579, §§ 2(b), (b)(4),
(codified at 5 U.S.C. § 552a). OMB's contemporaneous 1975 Privacy Act guidelines recognize
that "an individual may have grounds for action under other provisions of the law in addition to
those provided" by the Privacy Act, including "seek[ing] judicial review under other provisions of
the Administrative Procedure Act." OMB Privacy Act Implementation: Guidelines and
Responsibilities, 40 Fed. Reg. 28948, 28968 (July 9, 1975), https://perma.cc/776J-4L46. OMB's
"interpretations issued contemporaneously with the statute at issue, and which have remained
consistent over time," are "especially useful in determining the [Privacy Act's] meaning." *Loper
Bright*, 603 U.S. at 394; *see also Maydak*, 363 F.3d at 518 (relying on OMB Privacy Act
Implementation, 40 Fed. Reg. 28948, in construing statute). And in later amendments to the
Privacy Act, Congress demonstrated that when it wants to make the Act's remedies exclusive, it
does so expressly. *See* Judicial Redress Act of 2015, Pub. L. No. 114-126, § 2(a)-(c), (h),130 Stat.
282, 283-284, (codified at 5 U.S.C. § 552a (2016)) (extending Act to newly covered persons and,
only as to this category of newly covered persons, specifying that "[t]he remedies set forth" by the
Privacy Act "are the exclusive remedies available to a covered person under this section"). That
the Act omits such express preclusion of the remedies sought here must be treated as a deliberate
congressional choice. *See City & Cnt.y of S.F. v. EPA*, 604 U.S. 334, 344 (2025) (reiterating the
*expressio unius est exclusio alterius* canon).

Both the Supreme Court and D.C. Circuit have indicated that the APA authorizes the type
of relief for Privacy Act violations Plaintiffs seek here. In *Doe v. Chao*, the Supreme Court noted
the "inattention" of the Privacy Act to certain "standards of proof governing equitable relief . . .

35

may be . . . explained by the general provisions for equitable relief within the" APA. 540 U.S. 614, 619 n.1 (2004). In *Doe v. Stephens*, the D.C. Circuit considered whether an agency improperly disclosed medical records in violation of the Act. 851 F.2d 1457, 1460-61, 1463 (D.C. Cir. 1988). After finding that the "Privacy Act [did] not by itself authorize the injunctive relief sought by Doe," the court explained that such relief nevertheless *was* available under the APA, because Doe's "clearly [was] a case of agency action 'not in accordance with law' within the meaning of 5 U.S.C. 706(2) . . . [where] the disclosure of Doe's psychiatric records violated . . . the Privacy Act." *Id.* at 1463, 1466. And several judges in this District have expressly held that the Privacy Act does not preclude the type of APA relief Plaintiffs seek here. *See, e.g., LULAC II*, 818 F. Supp. 3d at 110-13 (APA remedy to challenge DHS's 2025 expansion of SAVE); *AFL-CIO*, 778 F. Supp. 3d at 81 (APA remedy to challenge DOGE data access).

   ***2. The Privacy Act does not provide Plaintiffs an adequate remedy.*** Nor does the Privacy Act provide Plaintiffs an adequate alternative remedy for Count VI of the Complaint. An "alternative remedy will not be adequate . . . if the remedy offers only doubtful and limited relief." *Garcia*, 563 F.3d at 522 (cleaned up). Count VI does not seek the same "genre" as the remedies offered by the Privacy Act. *Id.*, 563 F.3d at 522 (cleaned up). The Privacy Act only authorizes individuals to seek injunctive relief to compel the release or modification of their records and monetary damages for unlawful disclosures. *See* 5 U.S.C. § 552a(g). Plaintiffs here seek vacatur of DOJ's illegal Voter List Maintenance Policy, corresponding injunctive relief, and deletion of all unlawfully obtained data. *See* Compl., Prayer for Relief. The Privacy Act affords none of these remedies to Plaintiffs, but the APA does.

   If relegated to the Privacy Act's limited remedies as to Count VI, Common Cause's members and the Voter Plaintiffs would have no recourse for their ongoing privacy injuries, *see* Pls.' Mem. 16-17; *supra* Section I.C.1, which are "non-monetary" injuries "not fully redressable by damages alone," *Richman v. United States*, 350 F.R.D. 401, 420 (D.D.C. 2025). Nor does the Privacy Act's belabored deletion process provide a remedy for the ongoing and imminent threats

36

to the fundamental voting rights of Common Cause's members and the Voter Plaintiffs, *see* Pls.' Mem. 17-18; *supra* Section I.C.2; *Newby*, 838 F.3d at 9 (once an election passes, "there can be no do over and no redress") ((quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)). Common Cause has also directly suffered organizational injuries as a result of Defendants' Privacy Act violations. *See* Pls.' Mem. 12-15; *supra* Section I.A. Because Common Cause is not an "individual" within the meaning of the Act, the statute does not offer it *any* remedy, let alone an adequate one. *See* 5 U.S.C. §§ 552a(a)(2), (g)(1)(D). But the APA does provide such relief.

While Defendants cite some cases where judges in this District did not allow APA claims to proceed for violations of the Privacy Act, those cases reinforce Plaintiffs' position: in each, the plaintiffs sought relief that was clearly otherwise available to them under the Privacy Act or the Freedom of Information Act. *See* Defs.' Mem. 35 (citing cases about individuals seeking amendment, removal, deletion, or production of individual personal records). Not so here.

In short, nothing in the Privacy Act precludes Plaintiffs' requested APA relief. *Cf. Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (government did not carry its "heavy burden" of showing the Privacy Act "displace[d] . . . complementary" remedies under the Fair Credit Reporting Act).

### B. DOJ violated the Privacy Act's notice-and-comment requirements for revising systems of records.

The facts underlying DOJ's procedural violations of the Privacy Act are undisputed: (1) pursuant to the Voter List Maintenance Policy, DOJ has stockpiled millions of Americans' confidential voter registration data for the first time; (2) DOJ stores this data in a system of records at the Civil Rights Division (the Central CRT Index File); (3) according to the operative SORN, published in 2003, this system consists of "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division," and the categories of individuals covered by the system may include "[s]ubjects of investigations" and "victims," Hill Decl., Ex. 10 (Privacy Act of 1974; System of Records,

37

68 Fed. Reg. 47610 (Aug. 11, 2003) (the "2003 CRT SORN")); (4) DOJ did not publish a new SORN detailing the collection, use, and distribution of millions of Americans' voter registration data, as required by the Privacy Act before revising a system of records; and (5) DOJ did not engage in the notice-and-comment processes required by the Privacy Act for new uses. *See* Pls.' Mem. 25-28. Defendants do not contest these points. *See* Defs.' Mem. 42-43.

Instead, in two anemic paragraphs, Defendants insist that the plain language of the 2003 CRT SORN permits DOJ's unprecedented collection and use of private voter data and it therefore was not required to issue a new SORN or engage in the notice-and-comment process. This is not serious. The terms "subjects of investigations" and "victims" cannot be read to fairly encompass every registered voter in America.[21] Nor would anyone reasonably understand the 2003 CRT SORN to contemplate the collection and use of millions of voter records nationwide when the SORN merely refers to "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights law." Hill Decl., Ex. 10 (68 Fed. Reg. at 47611). Defendants' expansive reading would leave the system of records unbounded—effectively swallowing the protections of the Privacy Act by reading elephants into mouseholes. *Cf. Dinh Tran v. Dep't of Treas.*, 351 F. Supp. 3d 130, 136-37 (D.D.C. 2019) (rejecting "far-reaching," "open definition" of term in SORN's routine use, noting its failure to "provide adequate notice" and that "reliance on such overbroad terms . . . frustrates [the Privacy Act's] publication requirement"), *aff'd sub nom. Tran v. U.S. Dep't of Treas.*, 798 F. App'x 649 (D.C. Cir. 2020).

But even if Defendants' implausible interpretation of the 2003 CRT SORN were correct, a new SORN would still be required. As Plaintiffs explained in their opening brief, Pls.' Mem. 26,

---

[21] Defendants' insistence that "[t]he term 'subject' is a 'term of art in the context of DOJ investigations' that refers to any person 'whose conduct is within the scope of' an investigation," Defs.' Mem. 43, is particularly disingenuous. Both the case upon which Defendants rely and the Justice Manual itself make clear that "subject" is not a freewheeling term that would encompass nearly all voting Americans, as suggested by Defendants, but is limited to "a person whose *conduct* is within the scope of [a] *grand jury's* investigation." *Am. Oversight v. Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (emphasis added); *see also* Dep't of Just., Justice Manual § 9-11.151 (2020) (same).

OMB guidelines require the publication of a SORN for "significant changes" to a system of records, which among other things include a "substantial increase in the number, type, or category of individuals about whom records are maintained in the system." Off. of Mgmt. & Budget, OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act* 5-6 (2016), https://perma.cc/N9QK-SDLE. This is certainly the case here. *See, e.g.*, CRT-3396 (acknowledging ingestion of "large datasets with PII" that "may potentially introduce new information types or require processing information in new ways," including "[i]ngestion" and "[s]torage of bulk confidential Voter Registration Data from multiple states"). Defendants have not addressed this argument, and thus have conceded it. *See Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015).

> **C.    DOJ is improperly disclosing records in bulk in violation of the Privacy Act.**

With limited exceptions, the Privacy Act prohibits disclosing individuals' records without their consent or statutory authorization. No exception applies to DOJ's bulk disclosures of SVRL data. *See* Pls.' Mem. 28-30. Defendants' arguments that exceptions apply when DOJ discloses SVRLs to DHS, the Complying States, and contractors, *see* Defs.' Mem. 43-45, are wrong.

*1. The routine use exception does not apply.* Defendants are incorrect that *any* routine use in the 2003 CRT SORN applies to DOJ's bulk disclosure of millions of Americans' SVRL data. According to Defendants, 2003 CRT SORN Routine Use Eight applies to DOJ's disclosure of SVRL data to contractors, *see* Defs.' Mem. 43, and one or both of Routine Uses One and Two apply to disclosures of SVRL data to USCIS and HSI, *see id.* 44-45. But Defendants ignore that routine uses must "accurately and completely describe" how an agency is disclosing data. OMB Circular No. A-108, *supra* p. 12. Identifying routine uses in SORNs and "[t]he public notice function and the exercise of rights which it serves are to be meaningful," as Congress wrote the Privacy Act in response to "complaints about the difficulty which organizations and individuals have in keeping track of the scattered, obscurely worded public notices filed by agencies which may affect privacy and civil liberties." *Source Book on Privacy*, *supra* p. 211.

The 2003 CRT SORN falls far short of these benchmarks. Nothing in the SORN—not the routine uses and not any other provision—puts the "American public on notice that specifically, their voter registration data is going to be collected [by DOJ] on an unprecedented level and used for a plethora of government activity . . . as required under the Privacy Act." *Weber*, 816 F. Supp. 3d at 1193-94. Because the "breadth" of each of the routine uses on which DOJ relies "does not provide adequate notice to individuals as to what information concerning them will be released and the purposes of such release," they are not sufficient under the Privacy Act. *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548 (3d Cir. 1989); *accord Dinh Tran*, 351 F. Supp. 3d at 136. Indeed, given the breadth of the 2003 CRT SORN's routine uses, "one could only conclude from the . . . published notice that [DOJ] might disclose any information it possessed to virtually any agency in the executive branch. Such breadth fails to constrain in a meaningful manner [DOJ's] discretion to disclose information." *Britt*, 886 F.2d at 548.

Defendants' reliance on Routine Use One in the 2003 CRT SORN—for DOJ's disclosures to immigration agencies and the states, *see* Defs.' Mem. 44, 45—is also improper for a separate reason. Routine Use One only permits disclosure of "relevant records" "[i]n the event that *a record* in this system . . . *indicates* a violation or potential violation of law." 68 Fed. Reg. at 47611 (emphasis added). DOJ is disclosing far more than records indicating potential legal violations, though: it is disclosing entire SVRLs with records of millions of voters who, undisputedly, have done nothing wrong. This far exceeds the scope of Routine Use One.

   **2. The law enforcement exception does not apply**. For DOJ's disclosure of SVRL data to HSI only, Defendants invoke the Privacy Act's law enforcement exception for disclosure, 5 U.S.C. § 552a(b)(7). *See* Defs.' Mem. 44. As Plaintiffs explained, this exception does not apply here for two independent reasons: (1) HSI's Section 552a(b)(7) request failed to identify with any further specificity exactly what "potential violations of federal election law" ICE sought to investigate; and (2) the law enforcement exception does not authorize the type of bulk, rolling data disclosures DOJ is making. Pls.' Mem. 29-30. DOJ's responses do not move the needle.

40

First, DOJ argues the Section 552a(b)(7) request adequately "specified . . . the law enforcement activity for which the record is sought," § 552a(b)(7), by stating that HSI is "undertaking a Voter Fraud initiative to ensure the integrity of the electoral process." Defs.' Mem. 44. But this conclusory statement does not even identify the particular statutes at issue in HSI's investigation, which OLC itself identifies as a prerequisite to invoking Section 552a(b)(7). *See* Pls.' Mem. 30 (citing CRT-3368).

Second, while Section 552a(b)(7) provides that an agency must identify the "particular portion" of the record desired, Defendants claim that DOJ may disclose records in bulk because the "portion" HSI wanted "was the entirety of the voter rolls." Defs.' Mem. 44. Such a boundless reading of Section 552a(b)(7) would allow the exception to swallow the rule. If Congress had intended to authorize agencies transferring entire databases (such as complete SVRLs) at once under the law enforcement exception, it would have said so. By instead using the term "particular portion," Congress necessarily limited the law enforcement exception to disclosure of only "a share" or "allotted part" of a record. *Portion*, Black's Law Dictionary 1323 (4th ed. 1968); *accord Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) ("definition of 'portion' is 'a part of any whole, either separated from or integrated with it.'" (quoting *Random House Unabridged Dictionary* 1507 (2d ed. 1993))). DOJ's reading is also inconsistent with the Privacy Act's legislative history. *See* Pls.' Mem. 30.

As no statutory exception authorizes DOJ to disclose millions of Americans' sensitive voter records under its Voter List Maintenance Policy, the Policy violates 5 U.S.C. § 552a(b).

**D. DOJ is maintaining inaccurate and outdated records in bulk in violation of the Privacy Act.**

Defendants do not dispute that DOJ is knowingly maintaining and disclosing inaccurate, outdated SVRL records in the Central CRT Index File. Defendants concede that "SAVE has some errors," Defs.' Mem. 45, and do not respond to the undisputed fact that DOJ is maintaining SVRL data that will, by DOJ's own admission, "quickly become untimely and inaccurate." *Compare* Pls.' Mem. 32 *with* Defs.' Mem. 45-46. Rather, Defendants' response is essentially: so what?

41

According to Defendants, even though the Privacy Act requires agencies to "maintain all records . . . with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness," 5 U.S.C. § 552a(e)(5), and "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes" before "disseminating" them "to any person other than a[] [federal] agency," *id.* § 552a(e)(6), it does not matter that DOJ is knowingly maintaining and disclosing inaccurate records. *See* Defs.' Mem. 45-46. DOJ's only argument in support of this proposition is to point to another provision of the Privacy Act that permits courts to order agencies to "amend" an individual's inaccurate records upon request. *See* Defs.' Mem. 45 (citing 5 U.S.C. § 552a(g)(2)(A)). DOJ claims this means Congress must have intended to allow agencies to keep records that are "imperfect." Defs.' Mem. 45. But the existence of a remedy to cure inaccuracies when they are discovered does not erase agencies' obligation to take affirmative steps to ensure their records are accurate in the first place. *See Quinn v. Stone*, 978 F.2d 126, 134 (3d Cir. 1992) (avoiding interpretation that "would render superfluous the [Privacy Act's] detailed statutory scheme"). In knowingly maintaining and disclosing inaccurate records, DOJ is violating the Privacy Act.[22]

### E. DOJ is maintaining First Amendment protected records in bulk in violation of the Privacy Act.

Defendants offer only two, equally ill-fated arguments for why they are not violating the Privacy Act's prohibition on maintaining records describing how individuals exercise their First Amendment right. First, according to Defendants, DOJ can maintain the SVRL data because it is "expressly authorized by statute" to do so. Defs.' Mem. 46-47. But, for the reasons set forth above, and as every federal court to rule on the question has held, DOJ's maintenance of the SVRLs here

---

[22] Defendants also mistakenly argue that because an individual plaintiff's claim for money damages under the Privacy Act requires the "plaintiff to experience an 'adverse determination' caused by an agency's 'reliance on the inaccurate records,'" the Court should not grant relief under the Privacy Act here. Defs.' Mem. 46 (quoting *Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996)). But of course, Plaintiffs are challenging DOJ's maintenance of an entire system relying on inaccurate records—SAVE citizenship data—writ large. Plaintiffs' claims do not map onto relief available under the Privacy Act, which is precisely why they are pursuing remedies under the APA here instead.

is not expressly authorized by any statute. *See supra* Section III. The Court need not make a blanket statement about all voter roll collections by DOJ: even if DOJ is permitted to inspect and use portions of SVRL data in some limited other circumstances, none of the statutes DOJ cites—Title III of the Civil Rights Act, the NVRA, and HAVA—authorize DOJ's current actions to "maintain" the Complying States' full unredacted SVRLs, as that term is used in the Privacy Act. Congress defined "maintain" to include "collect, use, or disseminate." 5 U.S.C. § 552a(a)(3). Here, DOJ is doing each of these things with the SVRLs. *See* Pls.' Mem. 4-5.

Second, DOJ's Voter Roll List Maintenance Policy is not an authorized law enforcement activity. DOJ made the same generic demands to all states, "request[ing] voter lists as information regarding each state's procedures for complying with the state-wide voter registration list maintenance provisions of the NVRA, and to ascertain each State's compliance with the list maintenance requirements of the NVRA and HAVA." Defs.' Mem. 38 (cleaned up). This is precisely the sort of "generic investigative and informative purpose[]," *Maydak*, 363 F.3d at 517, that is insufficient to invoke the law enforcement exception. *See* Pls.' Mem. 34.

Although Defendants try to analogize their list maintenance activities here to the law enforcement activity at issue in *Maydak*, *see* Defs.' Mem. 47, the two are decidedly different in kind. Congress unquestionably tasked the Bureau of Prisons with "preserving prison security," and "examining photographs for conduct that may threaten that security" is squarely within the scope of that authorization. *Maydak*, 363 F.3d at 517. And as the court in *Maydak* made clear, the government cannot "simply . . . invok[e] a need to maintain records for generic investigative and informative purposes." *Id*. Just because Congress permits DOJ to sue states for alleged NVRA and HAVA violations for failing to conduct "reasonable" list maintenance, it does not endow DOJ with an unlimited "responsibility to enforce" each statute as Defendants claim. Defs.' Mem. 47; *see Bellows*, 2026 WL 1430481, at *9-10 (noting that DOJ failed to identify NVRA or HAVA violations and that the agency has "only limited mechanisms for verification" of voter rolls). And the fact that DOJ "identified the statutes it wishes to enforce and the steps to investigate

43

violations," Defs.' Mem. 47, does not change the fact that DOJ is generically investigating every state and registered voter in the country without any reason to believe the overwhelming majority have any list maintenance issues. DOJ is thus maintaining First Amendment data to undertake a generic investigation for informative purposes as prohibited by the Privacy Act.

**V.    DOJ's Voter List Maintenance Policy violates the Paperwork Reduction Act.**

Defendants agree that the PRA "imposes various procedural requirements before an agency undertakes a 'collection of information.'" Defs.' Mem. 47 (citing 44 U.S.C. §§ 3506, 3507). But they say that DOJ's demand letters were not a "collection of information" because they were not "identical" and they "did not pose 'questions' to the states." *Id*. at 48. Both assertions are meritless.

Defendants argue that DOJ's demand letters were not "identical" because "many letters asked for information unique to each State . . . . [a]nd other letters simply requested voter rolls without any additional information." *Id.* But Defendants concede that every letter demanded "'[t]he current electronic copy' of the State's 'computerized statewide voter registration list,'" including "'all fields contained within the list' in electronic form." Defs.' Mem. 6.[23] Their argument boils down to the idea that this identical set of demands is exempt from the PRA because some of them also impose additional demands or questions. Defendants offer no authority to support this easily gamed understanding of the PRA. It is inconsistent with the statute's text, which refers not to identical documents or communications, but instead to "identical questions posed to, or identical reporting or recording keeping requirements imposed on, ten or more persons." 44 U.S.C. § 3502(3)(A). Indeed, the PRA applies to identical questions or reporting requirements "regardless of form or format." *Id.*; *see also* 5 C.F.R. § 1320.3(c)(1); *cf. Hyatt v. OMB*, 998 F.3d 423, 429 n.4 (9th Cir. 2021) (rejecting "assertion that only collections that . . . use standardized forms impose 'identical' requirements").

Defendants' proposed workaround would also undermine the PRA's purpose. In passing the PRA, "Congress sought to 'minimize the Federal paperwork burden for individuals, small

---

[23] *See* Pls.' Mem. 6 n.7 (citing DOJ's demand letters to the states).

businesses, State and local governments, and other persons.'" *Action All. of Senior Citizens of Greater Phila. v. Sullivan*, 930 F.2d 77, 78 (D.C. Cir. 1991) (citing 44 U.S.C. § 3501(1)). On Defendants' theory, an agency can circumvent the PRA's requirements by starting with identical questions and then adding bespoke additional questions for some recipients—an approach that would inevitably make collections more burdensome. The Court should reject this upside-down interpretation of the PRA.

Defendants' insistence that the demand letters do not pose "questions" or "reporting or recordkeeping requirements" is similarly farfetched. Defs.' Mem. 48. Defendants concede that the demand letters would have been subject to the PRA if they had said, "What is all the information in your statewide voter registration list?" *id.*; but they ask this Court to rule that the PRA exempts this query: "[T]he Attorney General requests that you produce for inspection . . . [t]he current electronic copy of [your state's] computerized statewide voter registration list[.] . . . Please include all fields contained within the list," CRT-2407 (letter to Arkansas). Defendants' punctuation-based theory of the PRA has no support in the statute. Rather, the PRA focuses on "the nature of the request – that is, the inquiry or prompt to which a member of the public is being asked to respond." *Hyatt*, 998 F.3d at 429. In any event, the demand letters certainly constitute a "reporting . . . requirement[] imposed on" the recipient. 44 U.S.C. § 3502(3)(A)(i).[24]

Finally, Defendants suggest that the demand letters fall under the PRA's exception for collections of information in federal criminal investigations or certain administrative actions "against specific individuals or entities." Defs.' Mem. 49 (citing 44 U.S.C.§§ 3518(c)(1)(A)-(B)). But Defendants fail to mention 44 U.S.C. § 3518(c)(2), which makes clear that this exception does not apply to "general investigations . . . undertaken with reference to a category of individuals or entities such as a class of licensees or an entire industry." 44 U.S.C. § 3518(c)(2). Demanding complete SVRL data from every state that maintains it is a paradigmatic "general investigation." Indeed, Defendants say that the letters' goal was to investigate "potential violations of the NVRA

---

[24] Defendants claim that HAVA, not the demand letters, "imposes" the requirement to give SVRLs to DOJ. Defs.' Mem. 48. That argument is frivolous and refuted on the statute's face.

and HAVA," Defs.' Mem. 49, but this only underscores that the demands fall within § 3518(c)(2)'s scope. The NVRA and HAVA impose obligations on states. It is hard to imagine a more "general" investigation than one directed at the entire "category of . . . entities" subject to those statutes.

## VI.    DOJ's Voter List Maintenance Policy is arbitrary and capricious.

Because Defendants' AR does not reflect contemporaneous reasoning explaining the Policy, facts justifying the Policy, or the consideration of important aspects of the problem, the AR "is *not* sufficient to enable [a court] to conclude that the [agency's decision] was the product of reasoned decisionmaking[.]" *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). Defendants do not dispute that the AR includes no document pre-dating DOJ's implementation of the Policy; thus it has no "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785.

### A.    Defendants' post hoc, conclusory "explanation" does not satisfy the APA.

Responding to Plaintiffs' argument that Defendants failed to provide a reasoned, contemporaneous explanation for the Policy, Defendants point only to two perfunctory, post hoc explanations: (1) the demand letters to the states "asked for information 'to ascertain each State's compliance with the list maintenance requirements of the NVRA and HAVA,'" Defs.' Mem. 50 (alterations omitted) (quoting CRT-3185), and (2) after sending the letters, DOJ "further explained that it was acting 'to ensure that . . . those maintenance programs are working,' including by testing voter lists against SAVE," Defs.' Mem. 51 (alterations omitted) (quoting CRT-3384). These statements comprise the totality of the "explanation" on which Defendants rely which fails for two independent reasons.

First, these explanations constitute "impermissible *post hoc* rationalizations." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020). "The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted." *Id.* at 24. But DOJ gave *no* reasons when it created its Voter List Maintenance Policy and decided to send demand letters to every

46

state; the record on which Defendants rely to explain their decision-making (the letters themselves and subsequent internal emails) necessarily post-dates the underlying decision, which was finalized no later than May 2025. *See supra* Section II; *see also Oregon*, 2026 WL 318402, at *9 (holding that DOJ's "patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis' fails"). Accordingly, this record does not provide Defendants' contemporaneous reasoning for the Policy. *See, e.g.*, *Butte Cnty. v. Hogen*, 613 F.3d 190, 195-96 (D.C. Cir. 2010) (refusing to credit agency's "argument that several statements in an environmental assessment supplied the missing reasoning," because the assessment "came after" the agency decision).

Second, even if Defendants' so-called "explanation," Defs.' Mem. 51, did not constitute invalid post hoc rationalization, it would still be conclusory, lacking the detail or support that would permit a court to conclude that the agency engaged in reasoned decisionmaking. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) (holding agency action arbitrary and capricious where "the agency in fact gave almost no reasons at all"). DOJ's cursory references to HAVA, the NVRA, and Title III in its demand letters do not even attempt to explain the Department's novel interpretation of those statutes, how they authorize its unprecedented Policy, or why the Policy is necessary now. *See CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 416 (D.C. Cir. 2011) ("Given [the agency's] complete failure to explain its reading of the statute, we find it impossible to conclude that the agency's cease-and-desist order was anything other than arbitrary and capricious, and hence unlawful."); *P.R. Higher Educ. Assistance Corp. v. Riley*, 10 F.3d 847, 852 (D.C. Cir. 1993) ("Nowhere in its denial letter did the Department articulate the statutory interpretation upon which its waiver determination was based.").

DOJ's failure is especially pronounced because the Voter List Maintenance Policy departs radically from past agency practice. "Reasoned decision making necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (cleaned up); *Encino Motorcars*, 579

47

U.S. at 223-24 (agency "did not analyze or explain why the statute should be interpreted" as it had). Defendants effectively concede that the Policy is a departure from prior agency practice, in that "previous Attorney Generals" have not wielded the NVRA, HAVA, and Title III the way DOJ now seeks to do. *See* Defs.' Mem. 52.[25] Under established agency precedent, DOJ enforced HAVA, the NVRA, and Title III through discrete and targeted agency investigations and legal actions grounded in articulated and well-supported factual bases. *See supra* note 20. DOJ's abrupt reversal—both in its manner of enforcement and its interpretation of the underlying statutes—demands a reasoned explanation for the change, which DOJ failed to provide until after DOJ had already adopted and implemented the Policy and this litigation was filed. *See* CRT-3330 (OLC memo dated May 12, 2026);[26] *State Farm*, 463 U.S. at 50 ("courts may not accept . . . counsel's post hoc rationalizations for agency action").

**B.    Defendants do not dispute the absence of rational support for the Policy.**

Defendants do not contest Plaintiffs' argument that DOJ "failed to conduct or even consult any research or analysis before implementing this nationwide Policy." Pls.' Mem. 38. In fact, Defendants concede that the explanation underlying the Policy is based on "assumptions." Defs.' Mem. 51 ("DOJ further explained that it was acting to ensure that those maintenance programs are working[.] . . . Plaintiffs may disagree with *the assumptions* underlying that explanation—namely that DOJ acted legally—but they cannot contend that DOJ has not explained itself.") (cleaned up) (emphasis added)).[27] In substituting "assumptions" for analysis, DOJ failed to meet the basic

---

[25] Although Defendants invoke a handful of consent decrees involving the NVRA, Defs.' Mem. 52, 42, those discrete actions bear no resemblance to the nationwide federal takeover of state voter list maintenance at issue here. *See supra* note 20.

[26] The AR confirms that OLC did not provide legal advice to DOJ before the Policy was adopted in May 2025. CRT-3335 n. 6 (claiming that oral advice was provided "in mid-September 2025").

[27] Several federal courts have concluded that DOJ's SVRL demands were not grounded in or explained by any factually supported basis. *See*, *e.g.*, *Weber*, 816 F. Supp. 3d at 1191 ("DOJ also simply fails to allege any violations of HAVA" and DOJ's SVRL demand "appears to be a telltale 'fishing expedition'" with "no basis other than 'gross speculation'"); *Galvin*, 2026 WL 972129, at *2 (DOJ's SVRL demand letter to "did not cite any concerns with or complaints about Massachusetts's compliance with the NVRA, HAVA, or other federal requirements.").

48

requirement that it "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43 (cleaned up). This is an independent reason to set aside the Policy. *See Bus. Roundtable v. S.E.C.*, 647 F.3d 1144, 1150 (D.C. Cir. 2011) (finding agency action arbitrary and capricious where it "presented no evidence" that a problem existed to justify the regulation); *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006) (same).

### C.    DOJ failed to consider important aspects of the problem.

Defendants do not dispute that voter participation and disenfranchisement, personal data privacy, and data security are "important aspects of the problem." *Compare* Pls.' Mem. 39-41, *with* Defs.' Mem. 50-52. Nor do they contest the absence in the AR of any document pre-dating the Policy's implementation. Accordingly, DOJ failed to consider each of these important aspects of the problem before adopting the Policy. As such, the Policy is arbitrary and capricious as a matter of law. *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 144 (D.D.C. 2025) ("If the agency failed to examine the relevant data and articulate a satisfactory response—such as by failing to consider an important aspect of the problem or relevant reliance interests—then the action was not 'the product of reasoned decisionmaking' and must be set aside.") (quoting *State Farm*, 463 U.S. at 52)).

Plaintiffs also established that Defendants failed to consider, first, Plaintiffs' reliance interests on DOJ's longstanding government practice and, second, that the likelihood that the Policy will disenfranchise voters is "antithetical to Congress's goals in enacting the NVRA." Pls.' Mem. 40-41. In response, Defendants emphasize that DOJ's conduct is (in its view) statutorily authorized. *See* Defs.' Mem. 52. But even statutorily authorized agency action—which this is not, *see supra* Section III—must be set aside as arbitrary and capricious for failing to consider important interests or competing concerns that should influence how the agency wields its statutory authority. *See Allentown Mack Sales & Serv., Inc. v. NLRB.*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by

49

which it reaches that result must be logical and rational."). Because DOJ does not contest that it failed to consider reliance interests or the Policy's negative impact on voters, the Policy is arbitrary and capricious for these independent reasons, as well.

## VII.    Plaintiffs have adequately pleaded their constitutional claims.

### A.    Motion to dismiss standard.

Plaintiffs did not move for summary judgment on Counts II-V, so the Court should evaluate Defendants' effort to dismiss those claims pursuant to the Rule 12(b)(6) standard.[28] "In evaluating a motion under Rule 12(b)(6), the court must treat the complaint's factual allegations as true and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Democracy Forward Found. v. OMB*, 780 F. Supp. 3d 61, 69 (D.D.C. 2025) (cleaned up).

### B.    Violation of Federalism Principles (Counts IV and V).

DOJ's Policy violates the federalism principles embedded in Article I. Defendants' entire argument to dismiss these claims consists of a cross-reference to its arguments relating to DOJ's authority under the NVRA and HAVA. Defs.' Mem. 49. This response is not persuasive.

When it comes to regulating the procedures governing federal elections, "the Constitution vests authority first in the states." *LULAC II*, 818 F. Supp. 3d at 59. Congress retains authority to supersede state regulation of the "Times, Places and Manner of holding Elections for Senators and Representatives," U.S. Const. Art. I, sec. 4, cl. 1, but the Executive Branch may not displace the states' discretion absent congressional authorization.

DOJ's actions transgress this constitutional allocation of power. As explained in Section III, no federal statute authorizes DOJ's policy. Rather, the policy emanates from President Trump's stated desire to "take over" and "nationalize" elections, based on the premise that "the States are

---

[28] Defendants state generally that they are moving to dismiss under Rule 12 or "in the alternative" for summary judgment. *See* Pls.' Mem. They do not specify which counts they believe should be adjudicated under Rule 56, and they do not reference any putatively undisputed material facts. To the extent Defendants ask the Court to consider their attacks on Counts II-V under Rule 56, Plaintiffs would seek leave to make a showing under Rule 56(d) that the court should allow time to take discovery. *See* Pls.' Mem. at 2 n.2 (noting that Counts II-V "will draw on evidence beyond the AR and likely require discovery").

merely an 'agent' for the Federal Government" and that they "must do what the Federal Government, as represented by the President of the United States, tells them." Compl. ¶¶ 61-62. Pursuant to the President's directive, DOJ has demanded unredacted SVRL's for purposes of stockpiling voter data, analyzing it using unreliable methods, and ultimately directing the removal of specific voters. *Id.* ¶¶ 69-75. All of this represents an effort by DOJ to "federalize voter list maintenance." *Id*. ¶ 3. DOJ's Voter List Maintenance Policy thus "represent[s] an overreach and misuse of those limited constitutional exceptions designed to ensure decentralized election regulation" and "disturb[s] the framework of federalism envisioned and enshrined in our Constitution." *Oregon*, 2026 WL 318402, at *13; *accord Bellows*, 2026 WL 1430481, at *9 (accepting DOJ's interpretation of the CRA here "would . . . require [the court] to turn a blind eye to traditional principles of federalism and how those principles have found expression in American elections—the backdrop against which Congress enacted the NVRA and HAVA").[29]

## C.    Violation of Separation of Powers (Counts II and III).

DOJ's Policy also violates the separation of powers between Congress and the Executive Branch. "The Framers of our Constitution recognized that power over election rules could be abused, either to destroy the national government or to disempower the people from acting as a check on their elected representatives." *LULAC II*, 818 F. Supp. 3d at 53. "[S]ince the founding of our nation, the Elections Clause has constitutionally prevented the centralization of election management in the Executive[.]" *Weber*, 816 F. Supp. 3d at 1175. While the Constitution confers important powers over federal elections to the states and in some instances to Congress, the Framers "assigned no role at all" to the Executive Branch. *LULAC II*, 818 F. Supp. 3d at 53.

---

[29] Plaintiffs have also sufficiently pleaded that the Policy violates the Article I Qualifications Clauses and the Seventeenth Amendment. DOJ claims authority to inform states of "voter list maintenance issues," expecting that the states will then "remov[e]" voters from the rolls on that basis. Compl. ¶ 75. But the federal government has no role in defining voter qualifications. *See Arizona v. Inter Tribal Council of Ariz., Inc. ("ITCA")*, 570 U.S. 1, 16-17 (2013). By demanding that states remove SAVE-flagged voters, DOJ seeks to make SAVE approval a new voting qualification.

51

Under the familiar *Youngstown* framework, the President's power is "at its lowest ebb" when he seeks to interfere with voter registration. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). Congress's power under the Elections Clause is "'broad' and 'comprehensive.'" *LULAC II*, 818 F. Supp. 3d at 90 (citing *ITCA*, 570 U.S. at 8 and U.S. Const. art. I, § 4, cl. 1). And, as explained in Section III, Congress has spoken clearly on the issue of voter list maintenance specifically: it is the province of the states. In enacting the NVRA, Congress decided that states are responsible for making "a reasonable effort to remove the names of ineligible voters from the official lists." 52 U.S.C. § 20507(a)(4). Similarly, in HAVA, Congress mandated that the "specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State," 52 U.S.C. § 21085, and that voter registration databases be maintained at the state level, 52 U.S.C. § 21083(a).

DOJ's attempts under the Policy to federalize voter list maintenance, stockpile voter data, and force the removal of voters from state rolls violate the "manifest[] congressional intent" present in the NVRA and HAVA. *LULAC II*, 818 F. Supp. 3d at 89 (discussing the NVRA). As such, the Policy cannot be sustained absent a showing that the President possesses "'exclusive' and 'conclusive'" constitutional authority over this domain. *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)). Because the President "has no relevant constitutional power on which to rely," *LULAC II*, 818 F. Supp. 3d at 90, the Voter List Maintenance Policy is unconstitutional.

This is precisely the reasoning that Judge Kollar-Kotelly applied in *LULAC II*, 818 F. Supp. 3d 34. In that case, the plaintiffs challenged various provisions of Executive Order No. 14,248, including a directive that certain heads of federal agencies "assess citizenship" before providing the federal voter registration form to enrollees of public assistance programs. *Id.* at 83-92. Applying *Youngstown*, the court held that the President did not have the authority "to intrude on the exclusive powers of Congress and the States, including the power to regulate federal elections," and concluded that the Presidential directive therefore violated the separation of powers. *Id.* at 90.

52

Defendants do not so much as acknowledge this precedent, much less offer any grounds for distinguishing its reasoning from this case.

## VIII.    Plaintiffs are entitled to their requested relief.

### A.    The Court should set aside and vacate the Policy under the APA.

Defendants are correct that Plaintiffs seek vacatur as the primary remedy here. *See* Defs.' Mem. 55. This is consistent with the default rule favoring vacatur in APA cases. *See* Pls.' Mem. 42-43. Defendants object, citing only non-APA cases and completely ignoring Plaintiffs' cited authority and the default rule. Defs.' Mem. 55. Indeed, Defendants' argument ignores the Supreme Court's assurance that its recent decision addressing the scope of universal injunctions did not implicate the "distinct" authority of federal courts under the APA "to vacate federal agency action." *Trump v. CASA, Inc.*, 606 U.S. 831, 847 n. 10 (2025) (citing 5 U.S.C. § 706(2)).

However, Defendants double down, insisting that vacatur is unavailable because Congress made no "unequivocal statement" that it intended to make "a drastic departure from the traditions of equity practice." Defs.' Mem. 55 (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). Not so. The APA is an unequivocal statement indicating Congressional intent to allow parties to "obtain relief" they "would not be able to obtain . . . through any remedy other than vacatur." *Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 603 U.S. 799, 828, 838 (2024) (Kavanaugh, J., concurring); *see also* 5 U.S.C. § 706(2) (courts "shall" "hold unlawful and set aside agency action"). Indeed, it is black letter law that "vacatur is the normal remedy" for an APA violation. Pls.' Mem. 42 (citing *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)). The cases cited by Defendants do not even address the APA and do nothing to support their assertion.[30]

---

[30] The non-APA cases (one predating the APA) upon which Defendants rely stand for the proposition that, when statutory text offers various potential forms of relief, Congress did not necessarily intend to cabin courts' discretion in ordering appropriate relief. *See Hecht Co.*, 321 U.S. at 329 (absent "unequivocal statement" from Congress, court maintains discretion to grant or withhold statutorily provided relief); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (same); *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (same).

**B.    DOJ does not contest the types of injunctive relief requested by Plaintiffs.**

Plaintiffs request several types of injunctive relief in the alternative, or as a supplement to, vacatur. Pls.' Mem. 43-45. These include (1) prohibiting DOJ's actions to compile, consolidate, disclose, compare, and analyze SVRL data; (2) ordering DOJ to withdraw all associated policies and agreements; and (3) ordering DOJ to delete, disentangle, and unlink any SVRL data it has in its possession, custody, or control and instruct any governmental or nongovernmental third party that has received SVRL data as a result of the Policy to do the same. *Id.* at 43-44. DOJ does not contest, nor even address these types of relief, arguing only that such relief should be geographically limited in scope. Defs.' Mem. 53-54.

**C.    Neither vacatur nor an injunction should be geographically limited.**

DOJ incorrectly seeks to cabin Plaintiffs' relief to—at most—four states. Defs.' Mem. 54-55. Whether through vacatur, an injunction, or a combination of the two, Plaintiffs are entitled to relief that sets aside Defendants' unlawful policy, unconstrained by geographic limitation.

Should the Court order an injunction, as in *League of United Latin American Citizens ("LULAC I") v. EOP*, 808 F. Supp. 3d 29 (D.D.C. Oct. 31, 2025)*,* cabining Plaintiffs' requested relief to only a handful of states would not afford complete relief to Plaintiffs. 808 F. Supp. 3d at 87-88. In *LULAC I*, Defendants argued similarly that Plaintiffs sought a "nationwide" or "universal" injunction in violation of *Trump v. CASA, Inc.*, yet the court granted the Plaintiffs' Partial Motion for Summary Judgment and entered a permanent injunction wholly enjoining the implementation of the challenged policy. *Id.* at 84-85.

The court also specifically rebutted the DOJ's argument here: "awarding narrower relief—such as by enjoining the named Defendants from implementing Section 2(a) only in certain States, under certain circumstances, or with respect to certain categories of individuals—would not 'offer complete relief to the plaintiffs before the court.'" *Id.* at 85 (quoting *CASA*, 606 U.S. at 852). The same is true of Common Cause, which is a nationwide organization with members in all 50 states and the District of Columbia and which is currently suffering harm across the country due to the Policy. *See supra* Section I; Pls.' Mem. 13; Nunez Decl. ¶¶ 5, 7, 10-17, 20, 22 (detailing nationwide

54

efforts to register, protect, and assist voters). Plaintiff has supplied declarations from several states as examples, it is not required to submit 50 declarations in order to demonstrate the need for a complete injunction against the Policy.[31] *See Newby*, 838 F.3d at 8-9 (injury and irreparable harm to organization in one state fairly support inference of similar harm in other states); *LULAC I*, 808 F. Supp. 3d at 59, 80-81 (finding irreparable harm and entering permanent injunction on the basis of declarations from national leaders and several state-based members).

Finally, Defendants erroneously argue that "[a]t most, the only Common Cause members that might conceivably be harmed are those members in states that have supplied their voter lists to DOJ." Defs.' Mem. 54 (cleaned up). However, DOJ does not dispute that it continues to seek voter lists from all states, admitting that "for States that refuse to provide voter rolls, DOJ has brought enforcement actions that are not before this Court," Defs.' Mem. 1. Defendants' assertion that the greatest "conceivable" harm is limited to those four states does not align with its conduct.

## CONCLUSION

The Court should grant Plaintiffs' motion for partial summary judgment and deny Defendants' motion to dismiss or, in the alternative, for summary judgment.

---

[31] DOJ also challenges Plaintiffs' assertion of irreparable harm, but Common Cause's loss of limited resources in having to respond to the Policy constitutes irreparable harm under this Court's recent decision in *LULAC II* and similar cases. *See* Pls.' Mem. 12-19, 44, citing 818 F. Supp. 3d at 102. Likewise, all injuries to the Voter Plaintiffs and Common Causes members are irreparable. *See, e.g.*, *Newby*, 838 F.3d at 9 (once an election passes, "there can be no do over and no redress").

Dated: June 12, 2026                    Respectfully submitted,

                    By:    */s/ Sara Chimene-Weiss*
Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #340
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Nikhel S. Sus (D.C. Bar No. 1017937)
John B. Hill (N.Y. Bar No. 5505508)*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596 Washington, DC 20044
Tel: (202) 408-5565
nsus@citizensforethics.org
jhill@citizensforethics.org

Jane Bentrott (D.C. Bar No. 1029681)
Naomi Gilens (D.C. Bar No. 90037831)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington DC 20006
Tel: (202) 579-4582
jane.bentrott@protectdemocracy.org
naomi.gilens@protectdemocracy.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

John Haubenreich*
PROTECT DEMOCRACY PROJECT
1108 McKennie Ave., Suite #223
Nashville, TN 37206
Tel: (202) 579-4582
john.haubenreich@protectdemocracy.org

Laurence M. Schwartztol (D.D.C. Bar No. MA0007)
DEMOCRACY AND RULE OF LAW CLINIC,
HARVARD LAW SCHOOL
1525 Massachusetts Avenue

56

Cambridge, MA 02138
Tel: (617) 998-1877
lschwartztol@law.harvard.edu

Ming Cheung*
Ari J. Savitzky*
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
Tel: (212) 549-2500
mcheung@aclu.org
asavitzky@aclu.org
tlee@aclu.org
slakin@aclu.org

Laura K. Follansbee (D.C. Bar No. 1782046)
Arthur B. Spitzer (D.C. Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
Tel: (202) 457-0800
lfollansbee@acludc.org
aspitzer@acludc.org

* Admitted *Pro hac vice*

Counsel for Plaintiffs

57