**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMON CAUSE, *et al.*, | |
| Plaintiffs, | Case No. 1:26-cv-01352-SLS |
| v. | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | Hon. Sparkle L. Sooknanan |
| Defendants. | |

**[PROPOSED] BRIEF OF NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE AND THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AS *AMICI CURIAE* IN SUPPORT OF COMMON CAUSE**

**TABLE OF CONTENTS**

**Page**

INTEREST OF AMICI.................................................................................................... 1

INTRODUCTION ........................................................................................................... 2

ARGUMENT................................................................................................................... 4

    I.      DOJ's Policy Violates the First Amendment and Unconstitutionally
           Infringes on the Right to Vote. ............................................................... 4

    II.     DOJ's Policy Violates the Administrative Procedure Act. ................................. 13

         A.     DOJ's Policy Exceeds Its Statutory Authority........................................ 13

         B.     DOJ's Policy Fails to Comply with the APA's Notice and
             Comment Requirements.............................................................................. 17

         C.     DOJ's Policy Is Arbitrary and Capricious. ............................................. 22

CONCLUSION................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appalachian Power Co. v. E.P.A.*,
208 F.3d 1015 (D.C. Cir. 2000) ................................................................................................ 22

*Buckley v. Am. Const. L. Found., Inc.*,
525 U.S. 182 (1999) ............................................................................................... 5, 6, 7, 12

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025), appeal docketed, No. 25-01726 (1st Cir. Aug. 1,
2025) .......................................................................................................................................... 7

*City of Billings v. Transportation Sec. Admin.*,
153 F.4th 46 (D.C. Cir. 2025) .................................................................................................. 19

*Clark v. Martinez*,
543 U.S. 371 (2005) ................................................................................................................. 13

*DHS v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ..................................................................................................................... 24

*Elec. Priv. Info. Ctr. v. DHS*,
653 F.3d 1 (D.C. Cir. 2011) ................................................................................. 17, 18, 20, 21

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................................................................... 4

*Fed. Election Comm'n v. Cruz*,
596 U.S. 289 (2022) ................................................................................................................. 14

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993) ......................................................................................... 5, 6, 12

*Harper v. Va. State Bd. of Elections*,
383 U.S. 663 (1966) ................................................................................................................... 4

*Hoctor v. U.S. Dep't of Agric.*,
82 F.3d 165 (7th Cir. 1996) ..................................................................................................... 20

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) ................................................................................................................... 6

*League of United Latin Am. Citizens v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025) ............................................................................................. 7

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................................................................. 14

*Michigan v. E.P.A.*,
576 U.S. 743 (2015) ................................................................................................................. 23

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................................................................................................... 22, 23, 24

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ........................................................................................... 1

*Nat'l Min. Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ........................................................... 17, 19, 21

*Nat'l Mining Ass'n v. Kempthorne*,
  512 F.3d 702 (D.C. Cir. 2008) ........................................................................ 13

*Nat'l Council for Adoption v. Blinken*,
  4 F.4th 106 (D.C. Cir. 2021) ..................................................................... 18, 21

*Paul v. Fed. Aviation Admin.*,
  168 F.4th 672 (D.C. Cir. 2026) ...................................................................... 13

*Pub. Int. Legal Found., Inc. v. Bellows*,
  92 F.4th 36 (1st Cir. 2024) ............................................................................. 18

*Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*,
  996 F.3d 257 (4th Cir. 2021) .......................................................................... 11

*Reynolds v. Sims*,
  377 U.S. 533 (1964) .......................................................................................... 4

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ........................................................................................ 15

*U.S. Sugar Corp. v. EPA*,
  113 F.4th 984 (D.C. Cir. 2024) ...................................................................... 14

*United States v. Benson*,
  819 F. Supp. 3d 753 (W.D. Mich. 2026) ......................................................... 2

*United States v. LaSalle Nat'l Bank*,
  437 U.S. 298 (1978) ........................................................................................ 16

*United States v. Lynd*,
  301 F.2d 818 (5th Cir. 1962) .......................................................................... 15

*United States v. McLeod*,
  385 F.2d 734 (5th Cir. 1967) .......................................................................... 16

*United States v. Oregon*,
  2026 WL 318402 (D. Or. Feb. 5, 2026) ........................................................... 3

*United States v. Powell*,
  379 U.S. 48 (1964) .......................................................................................... 16

*United States v. Rumely*,
  345 U.S. 41 (1953) .......................................................................................... 14

*United States v. Weber,*
  816 F. Supp. 3d 1168 (C.D. Cal. 2026) .................................................... passim

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Statutes**

5 U.S.C. § 553 .............................................................................................................. 21

5 U.S.C. § 553(b) .......................................................................................................... 17

5 U.S.C. § 706 ............................................................................................................... 14

52 U.S.C. § 20501(b)(1) ............................................................................................... 23

52 U.S.C. § 20507(a)(4) ................................................................................................ 18

52 U.S.C. § 21083(a)(1)(A) .......................................................................................... 18

Pub. L. No. 107-252, 116 Stat. 1666 ............................................................................ 23

**Other Authorities**

106 Cong. Rec. 3683 (1960) .......................................................................................... 15

Alanna Durkin Richer & Ali Swenson, *Top DC Prosecutor, Who Promoted False 2020
Voter Fraud Claims, Forms 'Election Accountability' Unit*, AP (Mar. 17, 2026),
https://apnews.com/article/ed-martin-us-attorney-election-fraud-trump-
2cd97f08064705e3c0110b72d30d3578 ................................................................... 9

Ashley Lopez, *How We Know Voter Fraud Is Very Rare in U.S. Elections*, NPR (Oct. 11,
2024), https://perma.cc/VA8M-LVUZ ..................................................................... 8

Br. of Amicus Curiae the United Black Agenda,
*United States v. Caldwell*, No. 3:26-cv-02025 (D.N.J. Feb. 26, 2026), ECF No. 78 ............... 12

Charlie Savage et al., *Trump Steps Up Threats to Imprison Those He Sees as Foes*, N.Y.
Times (Jan. 23, 2026), https://www.nytimes.com/2024/09/09/us/politics/trump-prison-
threats-opponents.html ............................................................................................... 9

Complaint, *United States v. Weber*,
No. 2:25-cv-09149 (C.D. Cal.), ECF No. 1 ..................................................... 20, 22

Decl. of Anthony Ashton,
*United States v. Raffensperger*, No. 1:26-cv-00485 (N.D. Ga. Feb. 24, 2026) ........................ 12

Decl. of Cynthia Wilson,
*United States v. Simon*,
No. 0:25-cv-03761 (D. Minn. Feb. 27, 2026), ECF No. 134-4 ............................................ 12

Decl. of Helen Butler,
*United States v. Raffensperger*, No. 1:26-cv-00485 (N.D. Ga. Feb. 24, 2026), ECF No.
42-3 ............................................................................................................................ 12

Decl. of Quinette Westbrooks,
*United States v. Raffensperger*, No. 1:26-cv-00485 (N.D. Ga. Feb. 24, 2026), ECF No.
42-4 ............................................................................................................................ 12

DOJ's Notice of Supp. Authority,
*United States v. Raffensperger*, 1:26-cv-00495 (N.D. Ga. May 15, 2025), ECF No. 101 ....... 19

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

DOJ's Opp. to Pl.'s Mot. to Dismiss,
*United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Nov. 18, 2025), ECF No. 63 ......... 5, 19

Donald J. Trump, *Addressing Risks from Chris Krebs and Government Censorship*, The
White House (April 9, 2025), https://www.whitehouse.gov/presidential-
actions/2025/04/addressing-risks-from-chris-krebs-and-government-censorship/ ................... 8

H.R. Rep. No. 86-956 (1959).................................................................................................... 15

Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates
Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025),
https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-
program-exacerbates-risks-voters .......................................................................................... 11

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter
Citizenship Keeps Making Mistakes*, ProPublica and Texas Tribune (Feb. 13, 2026),
https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion............... 10

Juana Summers, *Trump Push to Invalidate Votes In Heavily Black Cities Alarms Civil
Rights Groups*, NPR (Nov. 24, 2020),
https://www.npr.org/2020/11/24/938187233/trump-push-to-invalidate-votes-in-
heavily-black-cities-alarms-civil-rights-group .......................................................................... 10

Kaylie Martinez-Ochoa et al., *Tracker of Justice Department Requests for Voter
Information*, Brennan Center for Justice (June 8, 2026),
https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-
requests-voter-information...................................................................................................... 19

Melanie Mason, *Trump Turns Shutdown Into Weapon Against Blue America*, Politico
(Oct. 3, 2025), https://www.politico.com/news/2025/10/03/trump-shutdown-weapon-
blue-america-00592573 .......................................................................................................... 10

Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*,
N.Y. Times (Feb. 25, 2026), https://www.npr.org/2024/10/11/nx-s1-5147732/voter-
fraud-explainer........................................................................................................................ 9

Naftali Bendavid, *Trump Escalates His Use of Federal Power to Target Democratic
States*, The Washington Post (Oct. 12, 2025),
https://www.washingtonpost.com/politics/2025/10/12/trump-blue-states-target-red-
states/ ..................................................................................................................................... 10

Office of Public Affairs, *Federal Grand Jury Charges Southern Poverty Law Center for
Wire Fraud, False Statements, and Conspiracy to Commit Money Laundering*, DOJ
(April 21, 2026), https://www.justice.gov/opa/pr/federal-grand-jury-charges-southern-
poverty-law-center-wire-fraud-false-statements-and............................................................... 13

Perry Stein, *FBI Searches Offices of Ohio Voter Registration Group, Seizing Computers*,
Washington Post (June 12, 2026), https://www.washingtonpost.com/national-
security/2026/06/12/fbi-searches-offices-ohio-voter-registration-group-seizing-
computers/............................................................................................................................... 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Reid J. Epstein & Nick Corsaniti, *How Trump's 2020 Election Claims Have Been Debunked Again and Again*, N.Y. Times (Jan. 29, 2026), https://www.nytimes.com/2026/01/29/us/politics/trump-2020-election-claims-fact-check.html ...................................................................................................................... 9

Tierney Sneed et al., *Inside the Justice Department's Pursuit of Trump's 2020 Election Fraud Fixations*, CNN (May 28, 2026), https://www.cnn.com/2026/05/28/politics/inside-justice-department-2020-election-fraud ........................................................................................................................................ 8

*Trump Defends Use of the U.S. Military Against the 'Enemy Within'*, NPR (Sept. 30, 2025), https://www.npr.org/2025/09/30/nx-s1-5557232/hegseth-generals-trump ..................... 3

U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States*, 148 (2018), https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf?inline=1 .......... 11

U.S. Comm'n on Civ. Rts., *Report of the United States Commission on Civil Rights* 131 (1959) ............................................................................................................................... 15

**Constitutional Provisions**

U.S. Const. Art. I, § 4, Cl. 1 ....................................................................................................... 6

**INTEREST OF AMICI[1]**

*Amicus curiae* the National Association for the Advancement of Colored People (NAACP) is a national civil rights organization dedicated to advancing policies and practices that expand human and civil rights, eliminate discrimination, and promote the well-being, education, and economic security of Black people and all persons of color. For decades, NAACP has championed the civil rights of Black voters confronting racial discrimination and voter intimidation. That advocacy helped spur passage of the Civil Rights Act of 1960—the very statute the United States Department of Justice (DOJ) now invokes to compel disclosure of sensitive voter data. In the years since, NAACP has continued its voter protection work on behalf of voters nationwide, striving to ensure that the law is honored and that the right to vote is respected and protected. Alongside its voter protection work, NAACP has long fought to shield its members' personal information from compelled disclosure. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458–66 (1958) (prohibiting compelled disclosure of NAACP's membership list).

Given this enduring commitment to safeguarding its members' voting and privacy rights, NAACP has a substantial interest in preventing the DOJ's Voter List Maintenance Policy[2] from infringing those rights—particularly for voters of color, who have historically been targets of voter intimidation. NAACP therefore submits this brief in support of Common Cause's motion for summary judgment to explain how DOJ's Policy will chill the exercise of the franchise and infringe voters' First Amendment rights.

---

[1] Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 29, undersigned counsel certifies that (i) no party or party's counsel authored this brief in whole or in part, (ii) no one other than amici or their counsel has contributed money toward the preparation or submission of this brief, and (iii) all parties are not opposed to the filing of this brief.

[2] *See* Mem. of Law in Support of Pls.' Mot. for Partial Summary J. 1 n.1, ECF No. 29-1 (adopting this terminology for DOJ's policy).

*Amicus curiae* the Lawyers' Committee for Civil Rights Under Law is a nonpartisan, nonprofit organization formed in 1963 at the request of President John F. Kennedy to enlist the private bar in the fight for civil rights.  The Lawyers' Committee has worked for decades to enforce federal voting rights protections, combat voter intimidation and suppression, and ensure fair and equal access to the democratic process.  The Lawyers' Committee regularly represents voters and civic organizations harmed by unlawful election practices and has a substantial interest in ensuring that election administration laws are not distorted in ways that undermine voter participation or enable misuse of sensitive voter information.

## INTRODUCTION

Premised on long-debunked theories of voter fraud, the current federal administration seeks to federalize state voter roll maintenance and in doing so claims the power to preemptively investigate and target everyone who has registered to vote.  To this end, DOJ has demanded that every State surrender its full, unredacted state voter registration list (SVRL), including partial Social Security numbers, driver's license numbers, and other sensitive personal information about every registered voter in the country.  DOJ's admitted purpose?  To create a federal voter registration database, concoct a sweeping federal voter verification apparatus, and unilaterally force states to purge certain individuals from their voter rolls.  DOJ also claims the power to share this information with other agencies and to use it to investigate any possible violation of law. Together, these actions form DOJ's Voter List Maintenance Policy.

DOJ's Policy chills both First Amendment rights and the right to vote.  *United States v. Benson,* 819 F. Supp. 3d 753, 761 (W.D. Mich. 2026) (requiring disclosure of private information submitted for voter registration "would potentially . . . impose an unconstitutional burden on the right to vote guaranteed by the First Amendment"); *United States v. Weber,* 816 F. Supp. 3d 1168, 1176 (C.D. Cal. 2026) (DOJ effort to obtain sensitive information has "a chilling effect" on

political minorities and immigrants who may not register or cast a ballot "because they are worried about how their information will be used"); *United States v. Oregon,* 2026 WL 318402, at \*13 (D. Or. Feb. 5, 2026) (the "possibility" that registration list could be used "to create a nationwide database of confidential voter information" for "immigration enforcement" and other purposes "may very well lead to an erosion of voting rights and voting participation").  It forces prospective voters to make a choice no American should face: exercise their First Amendment rights and become the subject of a DOJ hunt for any excuse to prosecute, especially people of color, or surrender those rights altogether.  Americans will reasonably fear that registering to vote or casting a ballot could trigger the misuse of their sensitive information and expose themselves or their relatives to investigation and harm. Minority voters—the historic victims of voter disenfranchisement and the current targets of the Administration's unprecedented immigration crackdown that sweeps in citizens and migrants alike—will face the most pressure to cede their constitutionally guaranteed rights rather than risk becoming the Government's next target. Already the administration has weaponized levers of government against its perceived enemies "within."[3]

This impermissible burden on voting and associational rights provides an independent, additional reason why the Court must hold that none of the statutes DOJ invokes authorize its Policy—not the National Voter Registration Act (NVRA), the Help America Vote Act (HAVA), Title III of the Civil Rights Act of 1960 (CRA), nor any other authority.  Construing any of these statutes to permit DOJ to collect and investigate the sensitive voter data of *any and all* registered voters for *any* purpose, as DOJ would have it, will chill voter participation and First Amendment

---

[3] *Trump Defends Use of the U.S. Military Against the 'Enemy Within'*,  NPR (Sept. 30, 2025), https://www.npr.org/2025/09/30/nx-s1-5557232/hegseth-generals-trump

activity. Such "infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). Same with any "significant impairment of First Amendment rights," which similarly must "survive exacting scrutiny." *Elrod v. Burns*, 427 U.S. 347, 362 (1976). Consistent with this heightened scrutiny, the Court must avoid any construction of the NVRA, HAVA, and CRA that raises such serious constitutional concerns. DOJ's Policy therefore lacks authorization and violates the Administrative Procedure Act (APA).

That is not the only way in which DOJ's Policy violates the APA. As set forth below, DOJ expanded its own authority beyond that recognized under law, failed to comply with the APA's notice and comment requirements, and entirely failed to consider the Policy's chilling effect on the right to vote. For these reasons, the Court should grant Plaintiffs' motion for summary judgment.

## ARGUMENT

### I.   DOJ's Policy Violates the First Amendment and Unconstitutionally Infringes on the Right to Vote.

DOJ's Voter List Maintenance Policy compels the nationwide disclosure of confidential voter information so that the federal government may investigate, without limitation, the voting records and citizenship status (or anything else it cares to investigate) of every registered voter in the country. In near-identical letters sent to 49 states, DOJ demanded the States produce "*all fields*" in their voter registration lists, including each registrant's "state driver's license number" or partial "social security number." *See, e.g.*, CRT-3144-46 (representative DOJ demand for voter rolls) (emphasis in original); *see also* Mot. for Part. Summ. J. at 6 n.7 (compiling administrative record citations to DOJ's demand letters), ECF No. 29-1 at 6 n.7. When States refused to hand over voters' sensitive data, DOJ sued, arguing that federal law authorized it to collect sensitive

4

voter data for *any* purpose and without *any* basis for believing the collection was necessary. *See* CRT-3344 ("[T]he Civil Rights Act does not limit the purposes for which [voter roll] information may be sought (or on what basis) . . . ."); *see, e.g.*, DOJ's Opp. to Pl.'s Mot. to Dismiss at 12, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Nov. 18, 2025), ECF No. 63 ("[I]f the Attorney General has stated in writing the basis and purpose of the demand, Title III [of the CRA] is satisfied, and the records must be produced"). While DOJ initially misrepresented that it would use voter data exclusively to assess states' compliance with their obligation to maintain voter lists, it then openly admitted that even at the time it made those representations, it had already planned to "share [States' voter] lists with [the Department of Homeland Security] . . . to identify illegal aliens who are ineligible to vote," "refer [those individuals] for prosecution," CRT-3334, and "investigat[e] voter fraud," CRT-3335. DOJ has not limited its request for information to those suspected of violating federal law nor has it limited the recipients of the sensitive information to specific federal government employees or agencies responsible for enforcement under identified statutory authority.

This unprecedented expansion of federal authority is unsupported by law and impermissibly chills the rights of citizens, raising significant constitutional concerns. The First Amendment prohibits the Government from compelling disclosures that "discourage[] participation" in the electoral process. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 200 (1999). For example, in *Buckley*, a Colorado law that compelled individuals circulating ballot-initiative petitions to wear name badges violated the First Amendment because it "discourage[d] participation in the petition circulation process." *Id.* Similarly, in *Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993), the Fourth Circuit struck down a Virginia statute that compelled individuals registering to vote to disclose their Social Security numbers to the public because "the possibility

5

of a profound invasion of privacy when exercising the fundamental right to vote" would deter voters, *id.* at 1354 (holding that by "condition[ing] the right to vote on . . . the public disclosure of a would-be voter's SSN," *id.* at 1352, Virginia statute "substantially burdened" the right to vote and made it "eminently reasonable" "not to provide [a] SSN" and thus not participate in the voting process, *id.* at 1354).[4]   As a general matter, if there is "a reasonable probability that the compelled disclosure of personal information will subject [individuals] to threats, harassment, or reprisals from either Government officials or private parties," then "those resisting disclosure can prevail under the First Amendment." *John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010) (denying First Amendment challenge only because Plaintiffs provided "scant evidence or argument" that disclosure would subject them to harm).

These constitutional concerns are only heightened where, as here, the *executive branch* of the federal government is acting.   Traditionally, "the Elections Clause has constitutionally prevented the centralization of election management in the Executive," *Weber*, 816 F. Supp. 3d at 1175, leaving administration of federal elections to the states except as "*Congress*" chooses to "make or alter such [r]egulations," U.S. Const. Art. I, § 4, Cl. 1 (emphasis added).   The Executive Branch cannot coercively impose policy preferences on states in the elections context. *See League*

---

[4] The court in *Greidinger* noted in dicta that the statute might not burden the right to vote if social security numbers were disclosed to the Virginia state government. *See* 988 F.2d at 1354 n.10. But that does not alter *Greidinger*'s application to this case. Constitutionality does not hinge on whether disclosure is public or not, but whether it will discourage participation in elections, *Buckley*, 525 U.S. at 200, or otherwise significantly burden the right to vote, *Greidinger*, 988 F.2d at 1354. In *Greidinger*, the court had no reason to believe that Virginia would misuse voters' social security numbers or that such disclosure would otherwise discourage participation in the electoral process, so such disclosure posed no constitutional barrier. *See* 988 F.2d at 1352–54. Here, by contrast, DOJ openly admits it is using voters' data to federalize elections and prosecute purported voter fraud. CRT-3334–35. For the reasons described below, this chills the right to vote in the same way the public disclosure of social security numbers did in *Greidinger*. *See infra*, 7–13.

*of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 72–74 (D.D.C. 2025) ("The Elections Clause provides that Congress—not the President—is the Check on States' authority to regulate federal elections . . . ."); *California v. Trump*, 786 F. Supp. 3d 359, 371–72 (D. Mass. 2025) (President did not have authority to force states "to assess citizenship prior even to providing the federal voter registration form" because "the Elections Clause gives power over federal elections to Congress"), appeal docketed, No. 25-01726 (1st Cir. Aug. 1, 2025).  Our system of "[s]tate run elections" is designed to preserve election integrity and trust, allowing voters to "believe that they will not be targeted because of what they look like or who they vote for." *Weber*, 816 F. Supp. 3d at 1176.  DOJ's Voter List Maintenance Policy federalizes election administration, without authorization by the people's representatives in Congress, undermining this "inherent level of trust." *Id.* at 1175.

The Policy, in fact, does exactly what the Constitution forbids, as articulated in *Buckley* and *Greidinger*: it chills participation in the electoral process through forced disclosure.  The Policy allows DOJ to collect and investigate voters' sensitive data whenever, wherever, and for whatever purpose it pleases.  The prospect of such unbounded intrusion and disclosure will discourage participation in the voter registration process just as Colorado's name badge requirement "discourage[d] participation in the petition circulation process." *Buckley*, 525 U.S. at 200.  Like Colorado's requirement, DOJ's Policy puts voters at risk of "harassment." *Id.* at 198.  An administration could share compelled voter data with state and local partners to facilitate targeted voter roll purges, signature-match challenges, or eligibility investigations.  Or it could use the data to initiate an IRS audit of swing-state voters registered with the opposition party.  Unscrupulous officials could dox voters or facilitate identity theft.  Even if the Government ultimately refrains from abusing its authority, the threat persists.  The Policy thus "stands to have

7

a chilling effect on American citizens like political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used." *Weber*, 816 F. Supp. 3d at 1176 (warning of the electoral chilling effect of DOJ's voter roll demands in California).

Voters have every reason to fear that DOJ will weaponize their sensitive data against them, particularly those in vulnerable minority communities already being targeted in other ways. DOJ itself telegraphed this intent when it asked the Attorney General's Office of Legal Counsel ("OLC") whether it could use voters' sensitive information "for the purpose of investigating *voter fraud*," CRT-3335 (emphasis added), a familiar refrain the Administration deploys when targeting political adversaries, *see, e.g.*, Donald J. Trump, *Addressing Risks from Chris Krebs and Government Censorship*, The White House (April 9, 2025)[5] (instructing the Attorney General to investigate former head of the Cybersecurity and Infrastructure Security Agency for "inappropriately . . . dismissing" purported reports of "widespread election malfeasance and serious vulnerabilities with voting machines"); Tierney Sneed et al., *Inside the Justice Department's Pursuit of Trump's 2020 Election Fraud Fixations*, CNN (May 28, 2026)[6] (FBI agents sought interviews with Milwaukee election officials to find evidence of voter fraud). The premise of that justification is demonstrably false: voter fraud in American elections is vanishingly rare. *See, e.g.*, Ashley Lopez, *How We Know Voter Fraud Is Very Rare in U.S. Elections*, NPR (Oct. 11, 2024).[7] Yet the Administration has persistently and falsely claimed otherwise, and threatened to prosecute perpetrators of these imagined crimes. *See, e.g.*, Michael Gold, *Trump*

---

[5] https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-chris-krebs-and-government-censorship/

[6] https://www.cnn.com/2026/05/28/politics/inside-justice-department-2020-election-fraud

[7] https://www.npr.org/2024/10/11/nx-s1-5147732/voter-fraud-explainer

*Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 25, 2026)[8] (describing President Trump's "often repeated—and equally often debunked—claims of widespread election fraud"). President Trump has promised that "those people that CHEATED [in the 2020 election] will be prosecuted to the fullest extent of the Law." Charlie Savage et al., *Trump Steps Up Threats to Imprison Those He Sees as Foes*, N.Y. Times (Jan. 23, 2026).[9] The Administration has even established a dedicated "Election Accountability" Special Unit to pursue claims of alleged fraud. Alanna Durkin Richer & Ali Swenson, *Top DC Prosecutor, Who Promoted False 2020 Voter Fraud Claims, Forms 'Election Accountability' Unit*, AP (Mar. 17, 2026).[10]

But there was no widespread voter fraud in 2020. Reid J. Epstein & Nick Corasaniti, *How Trump's 2020 Election Claims Have Been Debunked Again and Again*, N.Y. Times (Jan. 29, 2026).[11] Continuing "voter fraud" investigations of non-crimes necessarily target non-criminals— voters who cast *lawful* ballots. Voters may reasonably fear that DOJ will wield its Policy to cross-reference their sensitive voter data with other federal databases and race to prosecute based upon any minor irregularity, all in furtherance of DOJ's pretextual purpose of "investigating voter fraud," CRT-3335. That fear is especially potent given that urban, majority-minority communities historically favor the Democratic Party, an affiliation voter-registration and primary-voting records lay bare. Voters in urban areas and minority communities have borne the brunt of the Administration's political attacks, *see, e.g.*, Juana Summers, *Trump Push to Invalidate Votes In*

---

[8] https://www.nytimes.com/2026/02/24/us/politics/trump-congress-voting-save-america-act.html
[9] https://www.nytimes.com/2024/09/09/us/politics/trump-prison-threats-opponents.html
[10] https://apnews.com/article/ed-martin-us-attorney-election-fraud-trump-2cd97f08064705e3c0110b72d30d3578
[11] https://www.nytimes.com/2026/01/29/us/politics/trump-2020-election-claims-fact-check.html

*Heavily Black Cities Alarms Civil Rights Groups*, NPR (Nov. 24, 2020),[12] because of their race or because they are caught up in the Administration's repeated attacks on communities with concentrated Democrat-aligned voters—or both, *see, e.g.*, Naftali Bendavid, *Trump Escalates His Use of Federal Power to Target Democratic States*, The Washington Post (Oct. 12, 2025);[13] Melanie Mason, *Trump Turns Shutdown Into Weapon Against Blue America*, Politico (Oct. 3, 2025)[14] ("Trump appeared jubilant . . . at the 'unprecedented opportunity' to slash 'Democratic Agencies.'").  Against this backdrop, voters have good reason to fear that granting federal agencies unfettered access to sensitive voter data could enable the Administration to identify them as perceived political opponents and direct investigations against them.  That prospect chills the exercise of the franchise.

Just as chilling is DOJ's promise to use voters' sensitive information to "identify illegal aliens" and "refer [them] for prosecution," CRT-3334, a threat that affects more than just the undocumented.  The Administration's supposedly revamped tool for identifying noncitizens—the SAVE database—consistently misidentifies U.S. citizens as noncitizens.  For example, in Boone County, Missouri, more than half of the 74 people the system flagged as potential noncitizens were actually citizens.  Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica and Texas Tribune (Feb. 13, 2026).[15] The Administration's recent overhaul of the SAVE system introduced new errors, *see* Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*,

---

[12] https://www.npr.org/2020/11/24/938187233/trump-push-to-invalidate-votes-in-heavily-black-cities-alarms-civil-rights-group
[13] https://www.washingtonpost.com/politics/2025/10/12/trump-blue-states-target-red-states/
[14] https://www.politico.com/news/2025/10/03/trump-shutdown-weapon-blue-america-00592573
[15] https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion

Brennan Ctr. for Just. (July 21, 2025),[16] but these flaws are built into the system itself, which was never intended for widescale immigration enforcement.  Indeed, as a 2018 report by the U.S. Commission on Civil Rights noted, "SAVE is not a comprehensive list of U.S. Citizens," "[i]t is not updated to include all naturalized citizens, and it does not include derivative citizens born to U.S. parents outside the country."  U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States*, 148 (2018).[17]  Even a Memorandum of Understanding (MOU) between DHS and DOJ, designed to "facilitate" key "information sharing" aspects of DOJ's Voter List Maintenance Policy, acknowledged SAVE's limitations.  CRT-31–32.  The MOU conceded that "SAVE does not provide information regarding citizenship or immigration status at points of time other than at the time of the SAVE case response" and "may only be able to verify acquired U.S. Citizens in certain situations."  CRT-32; *see also Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*, 996 F.3d 257, 261 (4th Cir. 2021) (describing a North Carolina report finding that "SAVE information had a high rate of inaccuracy").

DOJ's Policy thus forces individuals to weigh the risk that registering to vote—and thereby disclosing sensitive information to the federal government, not just to state election authorities—will trigger immigration enforcement, which DOJ has now openly admitted is a purpose for which it is using voter data.[18]  CRT-3334.  The Policy also forces individuals to weigh the risk of investigation for other possible violations of law, or the investigation of their closest relations and associations.  Indeed, naturalized citizens and relatives of recent immigrants may not register to

---

[16] https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-program-exacerbates-risks-voters

[17] https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf?inline=1

[18] This is a particularly potent risk for recently naturalized citizens, who will not appear as citizens in the SAVE database that DHS and DOJ use to determine whether to initiate an immigration enforcement action.  *See supra* at 10–11.

vote for fear that DOJ will share their home address and other personal information with DHS for use in immigration raids targeting their relatives and close associates who lack legal status. In other words, voters face the same poisoned choice the Fourth Circuit condemned in *Greidinger*: register to vote and risk "misuse" of your sensitive information, or abandon the right to vote entirely. 988 F.2d at 1352–55. Forcing voters to make that choice "discourages participation" in the electoral process and violates the First Amendment. *Buckley*, 525 U.S. at 200.

This impact on voters is not speculative. DOJ's nationwide demand for sensitive voter data has already provoked alarm among leaders of local and national civil rights organizations, who warn that the prospect of Government misuse of their members' information alone is enough to chill civic participation. *See, e.g.*, Decl. of Anthony Ashton ¶¶ 10–19 ("Ashton Decl."), *United States v. Raffensperger*, No. 1:26-cv-00485 (N.D. Ga. Feb. 24, 2026), ECF No. 42-2; Decl. of Helen Butler ¶¶ 9–11, *Raffensperger*, ECF No. 42-3; Declaration of Quinette Westbrooks ¶¶ 13–21, *Raffensperger*, ECF No. 42-4; Decl. of Cynthia Wilson ¶¶ 9–11, *United States v. Simon*, No. 0:25-cv-03761 (D. Minn. Feb. 27, 2026), ECF No. 134-4. That chilling effect is especially potent for NAACP members and voters of color more broadly. *See* Br. of Amicus Curiae the United Black Agenda at 18–22, *United States v. Caldwell*, No. 3:26-cv-02025 (D.N.J. Feb. 26, 2026), ECF No. 78. These communities have long been targeted by government officials hostile to their mission and advocacy efforts. *Id.*; Ashton Decl. ¶¶ 11–12. In light of that history, NAACP's members have concrete and legitimate reason to fear that DOJ's Policy will invite retaliation from the federal government—especially toward members who hold political views and engage in civic activities the current Administration disfavors, *see, e.g.*, Office of Public Affairs, *Federal Grand Jury Charges Southern Poverty Law Center for Wire Fraud, False Statements, and Conspiracy to*

12

*Commit Money Laundering*, DOJ (Apr. 21, 2026);[19] *see also supra* at 8–11.  Some, no doubt, will vote anyway.  But others, understandably, will stay home.

## II.   DOJ's Policy Violates the Administrative Procedure Act.

The chilling effect of the Voter List Maintenance Policy underscores its illegality in three ways.  First, this court must avoid constitutional issues where it is reasonable to do so, and it is reasonable to read the NVRA, HAVA, and CRA as not authorizing the limitless data collection DOJ seeks.  Second, the Policy's significant intrusion into Americans' privacy illustrates that it must undergo notice-and-comment rulemaking.  And third, DOJ's failure to consider the chilling effect of its Policy on speech and voting rights renders the Policy arbitrary and capricious.

### A.   DOJ's Policy Exceeds Its Statutory Authority.

Constitutional avoidance—not to mention the plain meaning of the applicable statutes—dictates that the Court hold that the Voter List Maintenance Policy falls outside DOJ's statutory authority.  Courts must avoid statutory constructions that raise constitutional concerns.  *Paul v. Fed. Aviation Admin.*, 168 F.4th 672, 679 (D.C. Cir. 2026) ("Per the constitutional avoidance canon, if one reading will raise 'serious constitutional doubts' and another 'plausible' reading will not, [courts] will adopt the latter.") (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)).  Indeed, "the judiciary must rightly presume that Congress acts consistent with its duty to uphold the Constitution," and so courts must, in turn, "make every effort to construe statutes so as to find their constitutional foundations and thus avoid needless constitutional confrontations."  *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008).

---

[19] https://www.justice.gov/opa/pr/federal-grand-jury-charges-southern-poverty-law-center-wire-fraud-false-statements-and ("'The SPLC is manufacturing racism to justify its existence,' said Acting Attorney General Todd Blanche.")

13

A federal agency has "literally no power to act . . . unless and until Congress authorizes it to do so by statute." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022).  Consequently, the APA grants courts the authority to "hold unlawful and set aside agency action" if an agency acts "in excess" of its statutory authority, 5 U.S.C. § 706, an inquiry courts conduct "us[ing] 'the traditional tools of statutory construction,'" *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024)).

Interpreting the NVRA, HAVA, or CRA as authorizing the Government to collect and investigate the sensitive voter data of *any* registered voter for *any* purpose, including protected associational activity, and without any basis or reasonable suspicion, will undoubtedly "have a chilling effect" on voter participation, *see Weber*, 816 F. Supp. 3d at 1176, that "raises doubts of constitutionality in view of the prohibition of the First Amendment," *United States v. Rumely*, 345 U.S. 41, 46 (1953); *see supra* at 7–13.  In the face of such doubts, the Court must reject DOJ's interpretations.  *See Rumely*, 345 U.S. at 46–48 (construing statute authorizing investigation of "all lobbying activities" to reach only "representations made directly to Congress" to avoid "doubts of constitutionality in view of the First Amendment").  Without the NVRA, HAVA, or CRA to provide legislative support, DOJ's Policy lacks statutory authorization and thus violates the APA. *See, e.g.*, CRT-3144-46 (representative voter records demand citing only the NVRA, HAVA, and CRA as statutory authority for DOJ's Policy).

Even absent constitutional avoidance, the statute DOJ primarily invokes as the basis for its statutory authority, the CRA,[20] does not authorize its Policy.  None of DOJ's stated purposes—not expanding federal control over elections and voter-list maintenance nor immigration

---

[20] While DOJ's demands that States produce voter data often invoke the NVRA and HAVA, *see, e.g.*, CRT-3144–46, in its briefing, DOJ primarily invokes the CRA as the basis for its statutory authority, Mem. in Opp. to Pls.' Partial Mot. for Summ. J. at 36–42, ECF No. 33.

enforcement—has anything to do with the lawful purpose of Title III of the CRA: investigating and remedying discriminatory voting practices.  Title III's history makes its purpose clear.  Title III was enacted to address obstacles blocking efforts to enforce the Civil Rights Act of 1957's prohibitions on racial discrimination in voting.  After the passage of the 1957 Act, systematic disenfranchisement of Black citizens continued unabated across much of the South as local officials heightened registration and ballot access restrictions against Black voters by imposing literacy tests and other discriminatory election devices, vacated public offices to evade injunctions against proper party defendants, and enacted laws requiring the destruction of voter registration records.  *See* 106 Cong. Rec. 3683 (1960) (describing an Alabama state law allowing registrars to destroy evidence of voter discrimination by disposing of records pertaining to unsuccessful voter registration applicants).  At the same time, federal efforts to enforce civil rights laws and halt these discriminatory practices were often hampered because the 1957 Act provided no pre-litigation mechanism to compel production of voting records necessary to prove discrimination.  U.S. Comm'n on Civ. Rts., *Report of the United States Commission on Civil Rights* 131 (1959).  In response, Congress enacted the Civil Rights Act of 1960, including Title III, which authorized the government to "inspect [] voting records" as long as it had "reasonable grounds for belief that certain voters [were] being discriminatorily denied their voting rights."  *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962).  Title III thus acted as a "necessary supplement" to the 1957 Act, helping to "implement federal enforcement" of prohibitions against discrimination in voting.  H.R. Rep. No. 86-956, at 15 (1959); *see also South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966).

DOJ's expansive interpretation of authority conferred unto it by the CRA is unmoored from this statutory history.  DOJ cannot commandeer the CRA—a statute Congress enacted to combat voter discrimination—to federalize list maintenance or to aid immigration enforcement.  When the

15

government initiates an investigative request for information, it must do so "pursuant to a legitimate purpose" through an inquiry "relevant to [that] purpose." *United States v. Powell*, 379 U.S. 48, 57–58 (1964); *see also United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 318 (1978) (government demands for production must be made "in good-faith pursuit of the congressionally authorized purposes of" the statute authorizing the demand).  DOJ's Policy satisfies neither requirement.  Its admitted purpose, *see* CRT-3334, is federal list maintenance and immigration enforcement—two purposes entirely unrelated to the CRA's "legitimate purpose" of combating voter discrimination, *Powell*, 379 U.S. at 57–58.  More than that, by intimidating Black voters and obstructing registration efforts with threats of investigations, arrests, and prosecution, the Policy repeats the very practices the CRA was intended to *prevent*, not facilitate.  *Compare United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (describing "arrests, initiated prosecutions," and "other intimidating and coercive activity" orchestrated by Dallas County in the 1960s and "designed to interfere with the right of [Black people] to vote"), *with* Perry Stein, *FBI Searches Offices of Ohio Voter Registration Group, Seizing Computers*, Washington Post (June 12, 2026) (reporting on recent federal "raid" of a voting rights organization's offices to investigate its "2024 voter registration efforts," which Representative Shontel Brown warned was "an effort to use federal law enforcement to intimidate and halt voter registration"),[21] *and supra* at 8–10 (describing the Administration's voter fraud investigations and their impact on voters in urban areas and minority communities).  This is yet another reason why DOJ's Policy exceeds its statutory authority and violates the APA.

---

[21] https://www.washingtonpost.com/national-security/2026/06/12/fbi-searches-offices-ohio-voter-registration-group-seizing-computers/

**B.      DOJ's Policy Fails to Comply with the APA's Notice and Comment Requirements.**

Creation of a national voter registration database and verification procedure pursuant to DOJ's Policy is a legislative rule that requires notice and comment under the APA. That it burdens privacy, association, and voting rights while deliberately avoiding transparency is an independent reason to hold that the Policy violates the APA.

Any agency action or policy that "impose[s] legally binding obligations . . . on regulated parties" is "a legislative rule" for which the agency must provide notice and opportunity for comment. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014); *see also* 5 U.S.C. § 553(b). The "most important factor" is whether the policy has "actual legal effect." *McCarthy*, 758 F.3d at 252. Any policy that "effects 'a substantive regulatory change' to the statutory or regulatory regime" and "substantially changes the experience" of those regulated is a legislative rule requiring notice and comment. *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011) (*EPIC*).

In *EPIC*, for example, the D.C. Circuit held that the Transportation Security Administration's (TSA) policy of screening airline passengers with advanced imaging technology was a legislative rule because it "substantially change[d] the experience of airline passengers" by "intrud[ing] upon" airline passengers' "personal privacy."[22] *Id.* at 6–7. The court held this was "a substantive regulatory change to the statutory" regime because the statute authorizing TSA's policy, while "requir[ing] the TSA to develop and test advanced screening technology," did "not specifically require the TSA to deploy [advanced imaging technology] scanners let alone use them for primary screening." *Id.* at 7.

---

[22] Although the court addressed TSA's intrusion on personal privacy and the substantial change to travelers' experiences in separate parts of the opinion, it expressly tied its "substantial change" conclusion back to its earlier personal privacy finding. *EPIC*, 653 F.3d at 6–7.

17

Like TSA's policy in *EPIC*, DOJ's Policy "substantially change[d] the experience" of registered voters nationwide and "intrud[ed] upon" their "personal privacy"—making it, too, a legislative rule requiring notice and comment. *See id.* at 6–7.  Before DOJ's Policy, states—and states alone—oversaw voter list maintenance.  52 U.S.C. § 20507(a)(4) (NVRA provision that "each State" is in charge of list maintenance); *id.* § 21083(a)(1)(A) (HAVA provision that "each State" must implement and maintain a centralized voter registration list meeting certain requirements).  Voter roll data could be disclosed beyond a state's elections officials, but only with personal data like Social Security and driver's license numbers redacted.  *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (authorizing the redactions of "uniquely or highly sensitive personal information").  But DOJ's Policy "substantially change[d] [that] experience." *EPIC*, 653 F.3d at 7.  Now, DOJ's Policy allows it to conduct list maintenance at the federal level and amass and retain—for unlimited purposes—*all* registered voters' unredacted, sensitive personal information.  CRT-3334–35; *see supra* at 4–5.  Even assuming this was lawful (it is not), DOJ cannot "intrude[] upon [voters'] personal privacy" or "effect a substantive regulatory change to the statutory [and] regulatory regime" governing list maintenance and sensitive voter data without complying with the APA's notice and comment requirements.  *EPIC*, 653 F.3d at 6–7.

DOJ's actions since enacting its Policy have made clear that the Department adopted a legislative rule infused "with the force of law." *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021).  When States refused to comply with the Policy's directive to hand over unredacted voter data, DOJ sued.  *See, e.g.*, Kaylie Martinez-Ochoa et al., *Tracker of Justice*

*Department Requests for Voter Information*, Brennan Center for Justice (June 8, 2026).[23]  It argued in federal courts around the country that States had no choice but to comply with DOJ's demands, *see, e.g.*, *Weber* Opp. to Pl.'s Mot. to Dismiss, thereby signaling that its Policy "impose[d] legally binding obligations" on States, *McCarthy*, 758 F.3d at 252 ("An agency action that purports to impose legally binding obligations . . . is a legislative rule.").  DOJ even expressly cited its Policy as "the basis for [its] enforcement action[s]," *id.* at 251, in  a memorandum from its Office of Legal Counsel that DOJ filed in each active case.  The OLC memorandum asserted that DOJ's voter roll demand in each case was based on a new nationwide policy to "compel states to produce their voter registration lists" and "share such lists with DHS for the purpose of identifying illegal aliens who are ineligible to vote."  CRT-3330; *see, e.g.*, DOJ's Notice of Suppl. Authority, *United States v. Raffensperger*, 1:26-cv-00495 (N.D. Ga. May 15, 2025), ECF No. 101 (filing OLC Memo in support of DOJ's opposition to defendants' motions to dismiss and its motion to compel).

DOJ's Policy is not merely an "interpretive rule" or more informal policy exempt from the APA's notice and comment requirements.  Interpretive rules "lack the force of law and instead 'only advise the public of the agency's construction of the statutes and rules which it administers.'" *City of Billings v. Transportation Sec. Admin.*, 153 F.4th 46, 52 (D.C. Cir. 2025) (citations omitted).  Critically, they have "no legal impact"; States "are free to ignore" them. *McCarthy*, 758 F.3d at 252 (EPA Final Guidance was an interpretive rule because it did "not tell regulated parties what they must do or may not do in order to avoid liability").  Here, States cannot "ignore" DOJ's Policy. *Id.*  They have tried—and DOJ has sued them.  DOJ cannot plausibly argue its Policy has no "legal impact" while simultaneously suing thirty States for failing to comply. *See id.*

---

[23] https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information

To be sure, an administrative subpoena does not become a legislative rule whenever the Government tries to enforce it. But DOJ's demands differ from a typical subpoena enforcement action in the context of a discrete investigation. DOJ has made a blanket demand for the sensitive data of every voter in the country, *see, e.g.*, Complaint at 16, *Weber*, No. 2:25-cv-09149 (C.D. Cal.) ("*Weber* Compl."), ECF No. 1, with the purpose of creating a federal database of registered voters for unrestricted use, including authority to share the data with other federal agencies so they, too, can search for violations of other potential laws or regulations, including immigration law, *see* CRT-3330. None of those statutes authorizes DOJ to make such demands, nor can that authority "be derived from the [statutes] by a process reasonably described as interpretation." *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 170 (7th Cir. 1996). Because DOJ's records requests purport to "impose a duty" that "binds" the States to produce more voter data, for more purposes, than the relevant federal statutes require, the authority underlying those requests must derive from something broader than the statutes themselves—i.e., DOJ's Voter List Maintenance Policy. *See id.* at 168–70 (Department of Agriculture citations for violating a rule requiring dealers in "dangerous animals" to "enclose their compounds with eight-foot-high fences" required notice and comment—even though the rule was "consistent with" a regulation that generally required animals to be enclosed—because the rule was "intended to bind" parties to "dut[ies]" beyond those imposed by statute).

Saying that the Policy only clarifies or interprets election statutes like the NVRA, HAVA, and CRA doesn't make it so. The "purpose of the APA would be disserved if an agency with a broad statutory command . . . could avoid notice-and-comment rulemaking simply by . . . invoking its power to interpret that statute" in a way that "bind[s] the public to a strict and specific set of obligations." *EPIC*, 653 F.3d at 3, 7 (policy of screening passengers with advanced imaging

20

technology was not an interpretive rule even though agency argued it was simply "resolv[ing] an ambiguity" in a statute requiring TSA to "develop[]" and "deploy[]" new technology "that detects . . . weapons[] and explosives"). To bypass the APA's notice and comment requirements, an interpretive rule must be "compelled or logically justified" by the authority it purports to interpret. *Blinken*, 4 F.4th at 115 (agency policy prohibiting "soft referrals" from international adoption agencies was not an interpretive rule because it was not "compelled or logically justified" by statute requiring "intercountry adoptions take place in the best interests of children"). There is no way to "logically justif[y]" the leap from the NVRA, HAVA, and CRA—statutes meant to expand voter registration, bolster *state* list maintenance programs, and enhance the right to vote, *infra* at 22–23—to a Policy authorizing the federal government to commandeer the list-maintenance functions the NVRA and HAVA themselves assign to States in an attempt to "strike" voters from the rolls. CRT-3334–35.

DOJ's Policy does not fall within any of the other exemptions to the APA's notice and comment requirement, either. *First*, the Policy is not a procedural rule. By collecting voters' sensitive information to use for unrelated purposes, the Policy "intrudes upon [voters'] personal privacy" and adds a "new *substantive* burden" that "substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *EPIC*, 653 F.3d at 6 (emphasis added) (policy of screening passengers with advanced imaging technology was not a procedural rule because it intruded on passengers' personal privacy).

*Second*, unlike "general statements of policy," 5 U.S.C. § 553, DOJ's Policy does not "merely explain[] how the agency will enforce" various election statutes. *McCarthy*, 758 F.3d at 252 (guidance document that "[did] not tell regulated parties what they must do or may not do in order to avoid liability" not subject to notice and comment requirement). The Policy "demand[s]

21

an electronic copy of [each State's] complete and current [voter roll list]," *see, e.g.*, CRT-0003145, sues states that do not comply, *see, e.g.*, *Weber* Compl., retains the records outside a limited investigation file, "share[s] such lists with DHS," CRT-3330, "strike[s]" individuals "from [] voter registration list[s] for future elections," and "refer[s] [individuals] for prosecution," CRT-3334. The Policy "reads like a ukase.  It commands, it requires, it orders, it dictates." *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023, 1028 (D.C. Cir. 2000) (policy that "significantly broadened" agency authority was a legislative rule even though agency labeled the policy as "guidance"). Policies with such legal effect are subject to the APA's notice and comment requirements.

In sum, the Court should hold DOJ violated the APA and insist it comply with notice and comment requirements, which are particularly important given that DOJ's Policy raises such significant constitutional concerns.

## C.    DOJ's Policy Is Arbitrary and Capricious.

The APA requires that government agencies, like DOJ, offer "a satisfactory explanation for its actions, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted).  At minimum, this requires an agency to "consider[] . . . the relevant factors" before acting.  *Id.* at 42.  Conversely, courts must set aside agency action as arbitrary and capricious if an agency "entirely fail[s] to consider an important aspect of the problem."  *Id.* at 43.

DOJ's Policy is arbitrary and capricious for exactly that reason (and those above): it "entirely failed to consider" that the mass collection and investigation of voters' sensitive data would chill the freedom of speech and the right to vote.  *See id.*  This is undoubtedly "an important aspect of the problem" DOJ's Policy purportedly sought to address.  After all, DOJ represented that the purpose of its Policy was to ascertain States' compliance with the NVRA and HAVA, two statutes Congress enacted to *increase* the number of people participating in the democratic process.

*See, e.g.*, CRT-3150 ("The Justice Department is requesting your state's [voter roll list] to test, analyze, and assess states' [voter roll lists] for proper list maintenance and compliance with federal law."); CRT-3144–45 (DOJ seeks States' voter roll lists to assess compliance with the NVRA and HAVA). Congress enacted the NVRA for the express purposes of "increas[ing] the number of eligible citizens who register to vote" and "enhanc[ing] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1). And it passed HAVA "to help prevent election failures and improve voting accessibility." *Weber*, 816 F. Supp. 3d at 1175 (citing Pub. L. No. 107-252, 116 Stat. 1666). Neither statute provides DOJ with authority to federalize state voter list maintenance nor create a national voter database. And surely whether DOJ's Policy would ultimately *deter* prospective voters from registering is "an important aspect" to considering the appropriate and least burdensome means by which to assess States' compliance with list-maintenance statutes designed to *expand* the franchise. *State Farm*, 463 U.S. at 43. Indeed, "[a]gencies have long treated cost"—meaning "any disadvantage"—"as a centrally relevant factor when deciding whether to regulate." *Michigan v. E.P.A.*, 576 U.S. 743, 752–53 (2015) (agency action arbitrary and capricious because agency did not consider cost). Yet DOJ makes no mention of the chilling effect of its own limitless and conveniently self-delegated authority under the Policy in the Administrative Record, even in OLC's 40-plus-page memorandum analyzing the issue. That omission is reason enough to hold DOJ's Policy arbitrary and capricious.

But there is more. DOJ also entirely failed to consider obvious "alternative[s] within the ambit of the existing standard" to its Policy of collecting and investigating unredacted voter rolls. *State Farm*, 463 U.S. at 51. Take the Supreme Court's decision in *State Farm*. There, the Court held that the National Highway Traffic Safety Administration's repeal of passive restraint requirements in vehicles was arbitrary and capricious because the agency gave no "consideration

23

whatsoever [to] an airbags-only requirement." *State Farm*, 463 U.S. at 51.  DOJ's error here is just as deficient: it enacted its Policy "without any consideration whatsoever" to *any* alternative options.  *Id.*; *see also DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (rescinding Deferred Action for Childhood Arrivals (DACA) program in full was arbitrary and capricious where DHS failed to consider whether it could remove only the part of the policy contrary to federal law while retaining other portions).  DOJ's letters, MOUs, and OLC memorandum "contain[] no discussion" of considered alternatives.  *Regents*, 591 U.S. at 30.  "That omission alone renders [DOJ's Policy] arbitrary and capricious." *Id.*

## CONCLUSION

DOJ's Policy exploits the CRA and other federal election statutes to mount an unprecedented intrusion into private voter registration files with no indication that the affected voters committed or suffered any voting rights discrimination or other election-related harm. Nowhere does the Constitution or any federal statute—including the CRA—hand DOJ unbounded authority to conduct dragnet investigations of citizens for any potential crimes.  Any interpretation of DOJ's authority that permits such a policy will chill the right to vote, full stop.  For this reason, and the reasons stated above, DOJ's Policy exceeds its statutory authorization and is arbitrary and capricious.  The Court should grant summary judgment to Plaintiffs.

24

Dated:  June 16, 2026

Respectfully submitted,

/s/ Gillian Cassell-Stiga

Anton Metlitsky*
Andrew Frackman*
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10018
Tel: (212) 326-2000
ametlitsky@omm.com
afrackman@omm.com


*Pro Hac Vice forthcoming
Attorneys for *Amicus Curiae* National
Association for the Advancement of Colored
People

Ed Caspar
Leah Frazier
Robert N. Weiner
Gillian Cassell-Stiga
Catherine Meza
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, D.C. 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org
lfrazier@lawyerscommittee.org
rweiner@lawyerscommittee.org
gcassell-stiga@lawyerscommittee.org
cmeza@lawyerscommittee.org

Attorneys for *Amici Curiae* National
Association for the Advancement of Colored
People and Lawyers' Committee for Civil
Rights Under Law

25

**CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2026, I electronically filed a true and correct copy of the foregoing Brief of National Association for the Advancement of Colored People and Lawyers' Committee for Civil Rights Under Law as *Amici Curiae* in support of Common Cause with the Clerk via the CM/ECF system, which will send notification of such filing and service upon all counsel of record.

/s/ Gillian Cassell-Stiga
Gillian Cassell-Stiga

26