# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COMMON CAUSE, et al.,

        Plaintiffs,

  v.

U.S. DEPARTMENT OF JUSTICE, et al.,

        Defendants.

Civil Case No.: 1:26-cv-1352-SLS

**BRIEF OF *AMICI CURIAE* FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE**

Noah B. Bokat-Lindell
(Bar No. D00519)
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006
(202) 383-5321
nbokat-lindell@omm.com

*Attorney for* Amici Curiae *Former Employees of the U.S. Department of Justice*

**TABLE OF CONTENTS**

**Page**

INTEREST OF *AMICI* ................................................................................................. 1

SUMMARY OF ARGUMENT ...................................................................................... 1

ARGUMENT ................................................................................................................. 3

    I.     THE 1960 CIVIL RIGHTS ACT DOES NOT AUTHORIZE DOJ TO COLLECT EVERY VOTER'S PERSONAL DATA AND CONDUCT ITS OWN LIST MAINTENANCE, ACTIONS THAT WOULD EXCEED DOJ'S POWER TO ENFORCE THE NVRA AND HAVA ................................. 3

          A.    DOJ Lacks a Factual "Basis" for Collecting Voter Records for All Registered Voters in the Country.............................................. 5

          B.    DOJ's Proffered "Purpose" of Ascertaining Compliance with the NVRA's and HAVA's List-Maintenance Provisions Cannot Justify the Policy ....................................................................... 7

          C.    The Civil Rights Division Has Previously Used The CRA To Seek Targeted Information Based On Reasonable Law-Enforcement Concerns ...................................................................... 11

    II.    THE VOTER LIST MAINTENANCE POLICY IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW, AS THE PURPOSE ORIGINALLY PROFFERED FOR THE POLICY IS CONTRIVED............... 15

    III.   THE POLICY VIOLATES THE PRIVACY ACT ........................................... 21

CONCLUSION............................................................................................................. 23

APPENDIX A ...............................................................................................................1a

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Schs.*,
854 F.3d 683 (D.C. Cir. 2017) ............................................................................. *passim*

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .............................................................................................. *passim*

*FEC v. Cruz*,
596 U.S. 289 (2022) ..................................................................................................... 3

*Guam Indus. Servs., Inc. v. Rumsfeld*,
383 F. Supp. 2d 112 (D.D.C. 2005) ............................................................................ 4

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ............................................................................... 1, 2, 5

*Mi Familia Vota v. Fontes*,
719 F. Supp. 3d 929 (D. Ariz. 2024), *aff'd in part, vacated in part, remanded*,
129 F.4th 691 (9th Cir. 2025) ................................................................................... 13

*Nielsen v. Preap*,
586 U.S. 392 (2019) ................................................................................................... 18

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ................................................................................................... 19

*Project Vote/Voting for Am., Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) ...................................................................................... 9

*Project Vote/Voting For Am., Inc. v. Long*,
752 F. Supp. 2d 697 (E.D. Va. 2010) ....................................................................... 14

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .......................................................................................... 9

*Pub. Int. Legal Found., Inc. v. Matthews*,
589 F. Supp. 3d 932 (C.D. Ill. 2022) .......................................................................... 9

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021) .................................................................................... 14

*Pub. Int. Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2,
2026) ............................................................................................................................ 8

*Pub. Int. Legal Found. v. Sec'y Commonw. of Pa.*,
136 F.4th 456 (3d Cir. 2025) .................................................................................... 10

*Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*,
25 F.4th 12 (D.C. Cir. 2022) ....................................................................................... 4

*True the Vote v. Hosemann*,
43 F. Supp. 3d 693 (S.D. Miss. 2014) ...................................................................... 10

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*United States v. Amore*,
  2026 WL 1040637 (D.R.I. Apr. 17, 2026)...................................................................4, 5, 6

*United States v. Galvin*,
  2026 WL 972129 (D. Mass. Apr. 9, 2026), *appeal docketed*, No. 26-1657 (1st
  Cir. June 10, 2026)..............................................................................................................6

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950)............................................................................................................6

*United States v. Oregon*,
  2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th
  Cir. Mar. 3, 2026) ...............................................................................................................8

*United States v. Powell*,
  379 U.S. 48 (1964)........................................................................................................5, 19

*United States v. Weber*,
  816 F. Supp. 3d 1168 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232
  (9th Cir. Mar. 3, 2026) ...............................................................................................6, 8, 22

*In re USAA Data Sec. Litig.*,
  621 F. Supp. 3d 454 (S.D.N.Y. 2022)...............................................................................10

*Veasey v. Perry*,
  71 F. Supp. 3d 627 (S.D. Tex. 2014), *aff'd in part, vacated in part sub nom.*
  *Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *aff'd in part, vacated in part,*
  *rev'd in part*, 830 F.3d 216 (5th Cir. 2016) .....................................................................13

*Voter Reference Found., LLC v. Torrez*,
  160 F.4th 1068 (10th Cir. 2025) .........................................................................................9

**Statutes**

5 U.S.C. § 552a(e)(1)..............................................................................................................22

5 U.S.C. § 552a(e)(4)..............................................................................................................21

5 U.S.C. § 552a(e)(11).............................................................................................................21

18 U.S.C. § 2721(a)(1).............................................................................................................10

52 U.S.C. § 10101(a)(2)(B) .....................................................................................................13

52 U.S.C. § 20507(a)(4)..........................................................................................................7, 8

52 U.S.C. § 20507(c)(2)...........................................................................................................12

52 U.S.C. § 20507(i)..................................................................................................................9

52 U.S.C. § 20507(i)(1) .......................................................................................................9, 10

52 U.S.C. § 20510(a) .................................................................................................................8

52 U.S.C. § 20701......................................................................................................................4

52 U.S.C. § 20703.............................................................................................................. *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

52 U.S.C. § 20704.................................................................................................................13

52 U.S.C. § 21083(a)(4)(A) ....................................................................................................8

52 U.S.C. § 21085...................................................................................................................8

52 U.S.C. § 21111...................................................................................................................7

**Regulations and Executive Orders**

Exec. Order No. 14,248, § 2(b)(iii), 90 Fed. Reg. 14005 (Mar. 25, 2025)...........................16

Exec. Order No. 14,399, § 2(a), 91 Fed. Reg. 17125 (Mar. 31, 2026) ..................................18

Exec. Order No. 14,399, § 2(b), 91 Fed. Reg. 17125 (Mar. 31, 2026)..................................18

Exec. Order No. 14,399, § 5, 91 Fed. Reg. 17125 (Mar. 31, 2026).......................................18

*Privacy Act of 1974; Systems of Records*, 68 Fed. Reg. 47,610 (Aug. 11, 2003) ........................21

**Rules**

Fed. R. Civ. P. 34....................................................................................................................13

Fed. R. Civ. P. 45....................................................................................................................13

**Other Authorities**

*2024 Presidential Election Voting and Registration Tables Now Available*, U.S.
    Census Bur. (Apr. 30, 2025), https://www.census.gov/newsroom/press-
    releases/2025/2024-presidential-election-voting-registration-tables.html..............................21

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build
    National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/9PM4-
    2A6R .......................................................................................................................................16

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y.
    Times (Nov. 16, 2025),
    https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-
    department-staff-attorneys.html..............................................................................................16

Glenn Thrush et al., *Administration Targets Noncitizen Voting, Despite Finding It
    Rare*, N.Y. Times (Feb. 18, 2026),
    https://www.nytimes.com/2026/02/18/us/politics/voting-trump-immigrants-
    midterms.html .........................................................................................................................17

Jen Fifield and Zach Despart, *"Not Ready for Prime Time." A Federal Tool to
    Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026),
    https://perma.cc/BB2L-SAG9.................................................................................................16

Justice Manual § 9-11.151, https://www.justice.gov/jm/jm-9-11000-grand-jury#9-
    11.151.......................................................................................................................................22

Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minnesota
    (Jan. 24, 2026), https://perma.cc/34U4-3SK3 .......................................................................17

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Memorandum of Understanding*, U.S. Dep't of Just. (May 13, 2008),
    https://perma.cc/U73L-FRX6 ..................................................................................14

*Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for
    Just. (last updated June 8, 2026), https://perma.cc/G2PC-PP6V ............................16

*U.S. and World Population Clock*, U.S. Census Bur. (last accessed June 13,
    2026), https://www.census.gov/popclock ..............................................................22

## INTEREST OF *AMICI*[1]

*Amici curiae* are all former attorneys who worked on voting enforcement in the Civil Rights Division of the U.S. Department of Justice (DOJ).  *Amici*'s experience is widespread and varied.  Some worked at DOJ decades ago; others worked there until last year.  Some were line attorneys; others were managers who reviewed their work.  Most worked in the Division's Voting Section, directly enforcing federal voting rights law; others worked alongside them as Appellate Section attorneys or political appointees.  Many *amici* have made, reviewed, and approved information requests to States and localities under Title III of the Civil Rights Act of 1960 (CRA), or have litigated under the CRA, the National Voter Registration Act (NVRA), and the Help America Vote Act (HAVA) on behalf of the United States.  *Amici* file this brief to explain that, even though DOJ retains significant authority to investigate potential violations of federal election law, DOJ's Voter List Maintenance Policy exceeds its statutory authority and is arbitrary and capricious, all in violation of the Administrative Procedure Act (APA).

A full list of *amici* can be found in Appendix A.

## SUMMARY OF ARGUMENT

Among Plaintiffs' many claims, *amici* address three.  The Voter List Maintenance Policy (1) exceeds DOJ's authority under the CRA to request information relevant to enforcing the NVRA and HAVA, (2) rests on a contrived rationale and is therefore arbitrary and capricious, and (3) violates the Privacy Act.

First, Title III of the Civil Rights Act of 1960 does not provide the requisite statutory authority.  DOJ has attempted to ground the Voter List Maintenance Policy on its authority under

---

[1] All parties have consented to or do not oppose the filing of this brief.  No counsel for a party authored this brief in whole or in part, and no person other than amici or their counsel has made any monetary contributions intended to fund its preparation or submission.

Title III to seek information to help search for violations of the NVRA or HAVA. Title III is a vital tool that helps the Attorney General make "preliminary investigations of registration practices," determine whether to file voting lawsuits, and obtain evidence for those suits. *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962). Though "[w]ide scope must be accorded the Attorney General in the facilities for adequate investigation," *id*. at 228, that scope has limits. Title III requires DOJ to provide "a statement of the basis and the purpose" for its information requests. 52 U.S.C. § 20703. Here, DOJ has overstepped its bounds by requesting "all fields" of States' registration lists for every voter in the country—including partisan affiliation, full birthdates, partial Social Security Numbers (SSNs), and driver's license numbers—without a sufficient basis and in furtherance of an improper purpose.

The record shows that DOJ cannot satisfy Title III's dual basis and purpose requirements. DOJ has not provided any basis at all for thinking that many States might be violating federal statutes, much less a basis that would justify requesting sensitive voter data about all American voters. And DOJ has proffered a purpose—enforcing the NVRA and HAVA—that cannot justify the massive requests for sensitive data at issue here. The NVRA and HAVA place *States*, not the federal government, in charge of developing and maintaining voter registration lists, subjecting them only to certain procedural list-maintenance requirements. DOJ's sweeping policy of requesting all States' unredacted voter rolls, made without adequate investigative rationale, is a radical departure from the sorts of targeted, justified requests that *amici* and others in the Voting Section have historically made under Title III.

Second, DOJ's proffered purpose is also pretextual, rendering the Policy arbitrary and capricious. It is a stalking horse for a different purpose: to enable the federal government to conduct its own list maintenance to discover whether noncitizens or undocumented immigrants

2

are registered to vote, and to refer them for prosecution.  This lack of transparency violates Title III's requirement that DOJ provide "*the* purpose"—its *true* purpose—for all of its information requests.  It also violates the APA's reasoned decision-making requirement, which prohibits putting forth contrived rationales for agency actions.

Third, the Policy violates the Privacy Act in at least two ways.  Given the massive amounts of information DOJ seeks to collect for new purposes, it was required to issue a new System of Records Notice (SORN) and receive and respond to public comment.  It has not done so.  And its claim that an existing CRT SORN already covers the Policy's record collection so mangles that SORN's language as to render its limitations entirely meaningless.  Moreover, the Privacy Act requires agencies to collect no more data than is necessary to conduct required programs.  DOJ does not need to collect every voter's most personal information, including their SSNs or driver's license numbers, to investigate potential violations of the NVRA's and HAVA's procedural list-maintenance requirements.

## ARGUMENT

I.   **THE 1960 CIVIL RIGHTS ACT DOES NOT AUTHORIZE DOJ TO COLLECT EVERY VOTER'S PERSONAL DATA AND CONDUCT ITS OWN LIST MAINTENANCE, ACTIONS THAT WOULD EXCEED DOJ'S POWER TO ENFORCE THE NVRA AND HAVA**

Agencies are literally without power to act absent statutory authorization for their activities. *FEC v. Cruz*, 596 U.S. 289, 301 (2022).  DOJ has cited Title III of the CRA as the source of its authority to implement the Voter List Maintenance Policy, asserting that it plans to collect voter data to ensure compliance with the NVRA and HAVA.  Defs.' Combined Mem. of Law 2, 36-41, Doc. 33 ("DOJ Br.").  But because DOJ's power to seek States' voter rolls "is created solely by statute," courts must "determine whether [DOJ] complied with [Title III's] statutory requirements" before deciding whether *any* information request made under Title III is valid.  *Consumer Fin.*

3

*Prot. Bureau v. Accrediting Council for Indep. Colleges & Schs.*, 854 F.3d 683, 690 (D.C. Cir. 2017).  DOJ's Policy does not comport with Title III's requirements.  It therefore exceeds DOJ's statutory authority.

Title III of the Civil Rights Act of 1960 gave election officials a new duty to preserve, and granted DOJ a new power to request, certain election-related documents.  It provides DOJ with broad investigative authority to seek at least some of the information at issue in this case—but subject to important guardrails.  Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for" federal office "are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."  52 U.S.C. § 20701.  DOJ may then seek "inspection, reproduction, and copying" of "[a]ny record or paper required by section 20701 of this title to be retained and preserved."  52 U.S.C. § 20703.  But the government must have, and provide its targets with, both a "purpose" for conducting an inquiry and a "basis" for thinking there may be a legal violation to which the requested records would be relevant.  *Id.*

DOJ's Voter List Maintenance Policy triggers the 1960 CRA's written demand requirement.  Under Title III, any demand for records "shall contain a statement of *the basis and the purpose* therefor."  52 U.S.C. § 20703 (emphasis added).  As with any statute, this provision must be interpreted to avoid "render[ing] a word superfluous or ineffective."  *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 23 (D.C. Cir. 2022).  Here,  the statute uses the word "and" to connect "the basis" with "the purpose"—and "in an instance in which two items [are] separated by the conjunctive 'and' it makes little sense to interpret those items as synonymous."  *Guam Indus. Servs., Inc. v. Rumsfeld*, 383 F. Supp. 2d 112, 119 n.5 (D.D.C. 2005).

4

Thus, the purpose and the basis must be read as independent requirements, both of which must be satisfied. *See United States v. Amore*, 2026 WL 1040637, at \*5 (D.R.I. Apr. 17, 2026) (citing cases), *appeal docketed*, No. 26-1665 (1st Cir. June 10, 2026).

The *purpose* of a records request is the rationale for the investigation—*e.g.*, determining whether a State is complying with the NVRA or the Voting Rights Act (VRA).  The *basis* is the statement indicating why DOJ believes, or what evidence suggests, that it should investigate this particular State or locality, or what other suspected violation the records are needed to investigate. Or, put another way, the "purpose" is the "legal" reason for the request while the "basis" is the "factual" foundation for it.  *Id.*  Combined, the basis and purpose requirements make explicit what is implicitly true for many other coercive, investigative information requests: the agency seeking information must have both a legitimate *purpose* within its enforcement ambit for pursuing an investigation and a sufficient *basis* for suspecting a potential violation to which the requested records would be relevant.  *See United States v. Powell*, 379 U.S. 48, 58 (1964) (noting administrative summons must have proper purpose "reflecting on the good faith of the particular investigation"); *Accrediting Council*, 854 F.3d at 688-89 (requiring that administrative subpoenas be based in legitimate authority, and that requested information "is relevant" and not requested for "improper purpose").  The Policy does not adhere to Title III's basis or purpose requirements.

### A. DOJ Lacks a Factual "Basis" for Collecting Voter Records for All Registered Voters in the Country

DOJ has not provided an adequate basis for the broad requests the Policy contemplates. Although Title III does not impose a high standard for DOJ's basis in demanding records, it does not authorize fishing expeditions.  *See Accrediting Council*, 854 F.3d at 689 ("Agencies are also not afforded 'unfettered authority to cast about for potential wrongdoing.'").  Rather, the statutory requirement that the Attorney General articulate in writing "the basis" for a Title III demand means

5

that DOJ must know of specific, articulable facts suggesting that a violation of federal law may have occurred. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6.

Here, DOJ has provided no basis at all, much less an adequate basis, for demanding sensitive data about every American voter. DOJ's supposed *purpose* is "to ascertain [each State's] compliance with the list maintenance requirements of the NVRA and HAVA." DOJ Br. 38; *but see infra* Part II. But DOJ has provided no *basis* for thinking that every State might be violating the NVRA or HAVA in a manner that would justify its request for each State's full, unredacted voter rolls. Indeed, DOJ tacitly admits that it provided some States no basis for its requests. *See* DOJ Br. 40. And several courts have rejected DOJ's requests to particular States for failure to provide any basis for them. *See Amore*, 2026 WL 1040637, at *5 ("Absent from the demand are any factual allegations suggesting that Rhode Island may be violating the list maintenance requirements of the NVRA and HAVA, let alone the CRA."); *United States v. Galvin*, 2026 WL 972129, at *3-6 (D. Mass. Apr. 9, 2026) ("Here, the Attorney General offered no basis—none— and the demand was therefore facially inadequate."), *appeal docketed*, No. 26-1657 (1st Cir. June 10, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168, 1184 (C.D. Cal. Jan. 15, 2026) ("Here, the DOJ failed to provide an explanation for why it believed the NVRA was violated in its letter to the Secretary. And there was no explanation for why unredacted voter files for millions of Californians, an unprecedented request, was necessary for the DOJ's investigation."), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026).

Invoking *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950), DOJ insists (Br. 40) that it may "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, however, dealt with agencies' general investigative powers. Here, because DOJ's power to seek voter rolls "is created solely by statute," courts would

6

have to "determine whether [DOJ] complied with [Title III's] statutory requirements in the issuance of" any information request. *Accrediting Council*, 854 F.3d at 690. And Title III does not allow DOJ to seek States' election-related records unless it can provide a factual "basis" for doing so. 52 U.S.C. § 20703. Because the Voter List Maintenance Policy seeks to collect all States' voter rolls without regard to whether DOJ has any "basis" for suspecting any potential legal violation, the Policy exceeds DOJ's authority.

### B.    DOJ's Proffered "Purpose" of Ascertaining Compliance with the NVRA's and HAVA's List-Maintenance Provisions Cannot Justify the Policy

The Policy also exceeds DOJ's statutory authority under Title III because it seeks collection of data from States that cannot be justified by DOJ's ostensible purpose in seeking that data. Title III requires DOJ to provide targets with "the purpose" of its records requests, 52 U.S.C. § 20703, and no administrative subpoena may be "unduly burdensome or unreasonably broad" given the agency's need, *Accrediting Council*, 854 F.3d at 689. As noted, DOJ has attempted to justify its Policy and the resulting information requests by claiming the information is needed to "ascertain [each State's] compliance with the list maintenance requirements of the NVRA and HAVA." DOJ Br. 38. Despite occasional mention of investigating the existence of dead or non-resident registrants on voter lists, *see id.* at 39, both the record evidence and DOJ's summary judgment brief confirm that the Policy's primary purpose is to examine whether noncitizens are registered to vote, *see* CRT-3330, 3333-34 & n.3, 3375; DOJ Br. 7, 40-41.

Even assuming DOJ were only seeking to investigate compliance with the NVRA and HAVA's list-maintenance requirements for dead or non-resident registrants, *see* 52 U.S.C. § 20507(a)(4), or that it could investigate whether States were meeting those same requirements as to noncitizen registrants, the Policy is woefully ill-matched to that task. DOJ claims it needs to determine "the extent to which state voter rolls include ineligible voters" to "effectively enforce

7

the NVRA and HAVA." DOJ Br. 39. But it is not DOJ's role under the NVRA or HAVA to conduct list maintenance for the States. It may only ensure that States are complying with the statutes' requirements. 52 U.S.C. §§ 20510(a), 21111.

And States' list-maintenance requirements under the NVRA and HAVA are *procedural*. The statutes DOJ invokes only require States to conduct a "general program" of list maintenance that makes a "reasonable effort" to remove deceased or relocated voters. 52 U.S.C. § 20507(a)(4); *see* 52 U.S.C. § 21083(a)(4)(A) (HAVA requiring a "system of file maintenance" following NVRA standards). "[T]he attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2, 2026). A snapshot of a State's voter file at one point in time is unlikely to convey whether a State is engaging in that reasonable effort through a continuing program. And even the existence of tens of thousands of ineligible voters on a State's voter rolls would not be considered prima facie evidence of a violation of the NVRA's or HAVA's procedural requirements. *See, e.g.*, *id.* (rejecting identification of "27,000 'potentially deceased' voters on Michigan's registration rolls" as evidence of NVRA violation). Indeed, HAVA provides that "[t]he specific choices on the methods of complying with [the list maintenance mandate] shall be left to the discretion of the State." 52 U.S.C. § 21085. Whether some ineligible voters remain on a State's voter roll at one point in time thus has little relevance to whether that State's removal *process* meets the NVRA's and HAVA's minimum standards.[2]

At the very least, DOJ exceeds its CRA authority in seeking the sort of highly private data

---

[2] The questions DOJ asked many States about their list-maintenance processes, and about any potential issues DOJ perceived with their responses to the latest Election Administration and Voting Survey issued by the Election Assistance Commission, were far better targeted to assessing compliance with the NVRA's and HAVA's procedural requirements. *See* DOJ Br. 6.

on every registered American voter that it could not receive under the NVRA itself. *See, e.g.*, *United States v. Oregon*, 2026 WL 318402, at \*12 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *Weber*, 816 F. Supp. 3d at 1183-84. DOJ claims its scrub of States' files would be "more reliable" with voters' SSNs and driver's license numbers. DOJ Br. 7 (quoting CRT-3384). But the standard is not whether having such highly sensitive data would make DOJ's job marginally easier, but rather whether the Policy mandates requests that are "unreasonably broad" for DOJ's legitimate investigative purposes, *Accrediting Council*, 854 F.3d at 689, or for which DOJ cannot articulate a legitimate "purpose," 52 U.S.C. § 20703. And as private requestors' experience seeking voter rolls under the NVRA itself illustrates, such private data generally are not needed to conduct the investigation and enforcement the NVRA contemplates. While DOJ may have need for sensitive information in its governmental investigations that private requestors may not, that such data is not available under the NVRA itself only highlights how important it is that DOJ show that "the basis and the purpose" of its requests are legitimate. 52 U.S.C. § 20703.

The NVRA contains its own disclosure provision that Congress designed specifically to enable monitoring of States' compliance with the NVRA and to enable private and governmental NVRA enforcement. *See* 52 U.S.C. § 20507(i); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). That provision lacks Title III's "basis and purpose" requirement, requiring disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Yet many courts have held that States may withhold "highly sensitive personal information," such as SSNs, when they release records under that disclosure provision—including in cases in which election integrity organizations have sought States' voter rolls to investigate their compliance with the NVRA's list-maintenance requirements. *Pub. Int. Legal*

9

*Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *accord Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Project Vote/Voting for Am.*, 682 F.3d at 339; *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 944 (C.D. Ill. 2022); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014).  Driver's license numbers, too, would fall within this set of sensitive personal information: public disclosure of "drivers' license numbers, in addition to other personal information" provided in voter registration files, "can provide an opening for fraud, including applying for credit cards or loans or opening bank accounts." *In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2022); *see also* 18 U.S.C. § 2721(a)(1) (prohibiting state "department[s] of motor vehicles" from disclosing driver's license numbers except in delineated circumstances).[3]  Notably, CRT consistently has advised courts of these very limits in amicus briefs and urged courts to adopt them.[4]

Thus, the NVRA itself does not contemplate that those seeking to monitor States' compliance with their list-maintenance requirements would be able to seek States' full, unredacted voter rolls.  Again, the limits of the NVRA's public-disclosure provision do not map precisely onto the CRA, and DOJ can request sensitive personal information under Title III when it is conducting a legitimate investigation.  But the fact that Congress generally did not require disclosure of such information under the NVRA's own disclosure provision only heightens how important it is that

---

[3] As the NVRA authorizes "public inspection" without differentiation among members of the public, 52 U.S.C. § 20507(i)(1), any records to which courts rule DOJ can have access pursuant to this provision must likewise be made available to any other requestor.  The rules regarding disclosure under the NVRA itself thus must be the same regardless of the requestor's identity.

[4] *See* Br. for the U.S. as Amicus Curiae 28, *Pub. Int. Legal Found. v. Sec'y Commonw. of Pa.*, 136 F.4th 456 (3d Cir. 2025) (Nos. 23-1590 & 23-1591) (Dkt. No. 96, at 5), https://www.justice.gov/crt/media/1324146/dl; Br. for U.S. as Amicus Curiae 27-28, *Bellows*, *supra* (No. 23-1361) (Dkt. No. 96, at 19), https://www.justice.gov/crt/media/1307451/dl; Br. for U.S. as Amicus Curiae 24 & n.5, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809) (Dkt. No. 96, at 33), https://www.justice.gov/sites/default/files/crt/legacy/2011/10/19/projectvotebr.pdf.

10

DOJ provide a legitimate legal purpose and factual basis for any Title III requests that purport to seek such information for NVRA enforcement.  The Policy provides neither.

### C. The Civil Rights Division Has Previously Used The CRA To Seek Targeted Information Based On Reasonable Law-Enforcement Concerns

Finally, the Policy is also out of step with the way CRT historically has used Title III's records-inspection authority: as a focused investigative tool tethered to concrete, articulable concerns about unlawful registration or voting laws or practices.  When CRT has invoked Title III, it has typically done so to obtain discrete categories of records keyed to a specific, preexisting, and articulated enforcement concern.  Several examples illustrate how CRT has traditionally wielded its Title III investigative authority:

- When necessary to investigate potential violations of Section 2 of the VRA, the Voting Section has sent Title III requests to specific jurisdictions under investigation based on definite, articulable discriminatory practices, seeking, for example, a voter registration list to conduct racial bloc voting analysis of elections held within the jurisdiction.  DOJ has not generally needed, and has rarely made, Title III requests for SSNs or driver's license numbers to conduct any such analyses.

- In 2021, the United States challenged several provisions of Georgia's new omnibus voting law, SB202, as having been adopted with a discriminatory purpose.  *See* Compl. ¶ 161, *United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga. June 25, 2021), Dkt. No. 1.  Counties with records relevant to the case were not parties to the lawsuit, and the district court froze discovery while deciding the defendants' motions to dismiss.  *See* Min. Order of Aug. 6, 2021, *Georgia*, *supra*.  DOJ used its authority under Title III to request county records that were relevant to the allegations that DOJ had already made in its lawsuit: (1) the Numbered Lists of Provisional Voters from each polling place in a county—paper lists of provisional

11

voters, with voters' names and their reasons for casting a provisional ballot—which were relevant to DOJ's challenge to SB202's "prohibition on counting most out-of-precinct provisional ballots," Compl. ¶ 161(g); and (2) Drop Box Ballot Transfer Forms—paper records of how many ballots a county picked up from each mail-in ballot drop box on each day—which were relevant to DOJ's challenge to SB202's "cutback in the number of drop boxes permitted" and limitations on their dates and times of use, *see id.* ¶ 161(e). *See, e.g.*, Decl. of Dr. Barry C. Burden, 35, 51, *In re Georgia Senate Bill 202*, No. 1:21-mi-55555 (N.D. Ga. May 30, 2023), Dkt. No. 566-42.

- In 2024, DOJ sued Alabama for systematically removing several thousand people from its voter rolls within 90 days of a federal election, which would violate the NVRA's Quiet-Period Provision, 52 U.S.C. § 20507(c)(2). *See* Compl. ¶¶ 2-4, *United States v. Alabama*, No. 2:24-cv-1329 (N.D. Ala. Sept. 27, 2024), Dkt. No. 1. DOJ sent a letter to state election officials explaining that DOJ had "reviewed reports" (which it cited) suggesting that the State was implementing within 90 days of the 2024 federal election a "program" to identify and remove registrants identified as noncitizens, in violation of the Quiet-Period Provision. Letter, *Alabama*, *supra*, Dkt. No. 11-7, at 2. DOJ then requested a defined set of materials tailored to that asserted concern, including (i) a list of the voters removed under the State's new processes; (ii) a list of any additional voters sent notices of intent to cancel on similar grounds; and (iii) a "complete description" of the methodology used, including contacts with or requests to federal agencies. Letter, *Alabama*, *supra*, at 2-3. The letter did not explicitly invoke Title III. *Id.* But in later conversations, DOJ did "assert[]" that authority, and the State "produced" the requested records "in compliance with Title III." Letter, *Alabama*, *supra*, Dkt. No. 11-9, at 1. DOJ did not request SSN or driver's license data, but

12

the State did provide it for those registrants who were ensnared in its program.

Thus, in the rare instances when DOJ has requested or received sensitive information like SSNs and driver's license numbers, it was because this information was vital to investigating or proving a potential legal violation in a particular jurisdiction, and there was already an articulable reason to believe that a violation might have occurred. DOJ does not usually request such data under Title III.

To the extent DOJ has need of sensitive voter data, it has instead tended to obtain it through traditional civil litigation tools. *See, e.g.*, Fed. R. Civ. P. 34 (discovery of documents); Fed. R. Civ. P. 45 (issuance of subpoenas to nonparties). For instance, DOJ may need a State's entire voter file (including SSNs and driver's license numbers) to analyze whether a voter ID law violates the VRA, because having this information allows DOJ to compare the voter file to other state and federal databases to determine (1) how many people registered in a State do not have driver's licenses or the other forms of ID allowed under the voter ID law and (2) whether there are significant racial disparities in possession of those IDs. *See, e.g.*, *Veasey v. Perry*, 71 F. Supp. 3d 627, 659 (S.D. Tex. 2014), *aff'd in part, vacated in part sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *aff'd in part, vacated in part, rev'd in part*, 830 F.3d 216 (5th Cir. 2016) (en banc). Likewise, it may need such information to determine whether a required field on a voter-registration form is "not material in determining whether" an applicant "is qualified under State law to vote" and so violates the Civil Rights Act of 1964. 52 U.S.C. § 10101(a)(2)(B); *see, e.g.*, *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 962 (D. Ariz. 2024), *aff'd in part, vacated in part, remanded*, 129 F.4th 691 (9th Cir. 2025).

The sensitive data that the United States has gotten in discovery has been subject to strict court supervision and detailed protective orders that prescribe procedures for exchange, handling,

storage, protection, and deletion.  *See, e.g.*, Protective Order, *Mi Familia Vota*, *supra* (No. 22-cv-509), Dkt. No. 353.  Title III does not offer these kinds of safeguards.  *See* 52 U.S.C. § 20704.

It is true that in 2006 and 2008, DOJ sent Title III requests to Georgia and Texas seeking the States' voter files with SSNs or driver's licenses to ensure compliance with the NVRA.  *See* Compl. ¶¶ 9-10, *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Dkt. No. 1; *Memorandum of Understanding*, U.S. Dep't of Just. (May 13, 2008), https://perma.cc/U73L-FRX6.  But neither request was litigated to a court decision.  DOJ and Georgia agreed to a consent order approved by the court shortly after DOJ filed a complaint, *see* Consent Judgment and Decree, *Georgia*, *supra*, Dkt. No. 4, and DOJ and Texas signed a memorandum of understanding, obviating any litigation, *Memorandum of Understanding*, *supra*.  These two isolated requests did not even approach what DOJ attempts here: a nationwide policy of collecting every State's voter data to conduct federal checks on every American voter.

* * *

In short, the information DOJ seeks is (at best) marginally useful for investigating any ostensible violation of the NVRA or HAVA's list-maintenance provisions, and the Policy's national scope and lack of predication far exceeds DOJ's past information-collection efforts under Title III.  Meanwhile, the potential for misuse of the information sought—including partisan affiliation, partial SSNs, and driver's license numbers—is high, as courts have recognized in allowing States to shield highly personal information from NVRA disclosure requests.  *See, e.g.*, *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264, 266-67 (4th Cir. 2021); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711-12 (E.D. Va. 2010). DOJ recently admitted that Department of Government Efficiency (DOGE) staffers agreed to help an outside advocacy group—whose aim was "to find evidence of voter fraud and to overturn

14

election results in certain States"—match Social Security Administration data against States' voter rolls. Notice of Corrections to the Record 5 & n.1, *Am. Fed'n of State and Mun. Emps. v. Soc. Sec. Admin.*, No. 1:25-cv-00596 (D. Md. Jan. 16, 2026), Dkt. No. 197, https://storage.courtlistener.com/recap/gov.uscourts.mdd.577321/gov.uscourts.mdd.577321.197. 0.pdf. These revelations highlight the concerns raised by the mass requests for voters' SSNs the Policy mandates—requests that are unnecessary for law-enforcement purposes. The Policy thus requires an "unreasonably broad" collection of data, *Accrediting Council*, 854 F.3d at 689, and exceeds DOJ's Title III authority.

**II.    THE VOTER LIST MAINTENANCE POLICY IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW, AS THE PURPOSE ORIGINALLY PROFFERED FOR THE POLICY IS CONTRIVED**

The Voter List Maintenance Policy also must fall because DOJ has not been transparent about the reason for the Policy, thereby violating both Title III's "purpose" requirement and the APA's reasoned explanation requirement. Although courts' "review" of an information request's purpose is deferential, courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). News reports and the Administration's own statements—most notably a recent Office of Legal Counsel (OLC) Memo purporting to justify DOJ's Policy, *see* CRT-3330-3370—have revealed that DOJ's true rationale for promulgating the Policy does not match "the agency's contemporaneous explanation" for it, *Dep't of Com.*, 588 U.S. at 780. When it first revealed its Policy, DOJ stated in its information requests to States that its purpose was to ensure States' compliance with the NVRA's and HAVA's list-maintenance requirements. But that proffered rationale has turned out to be a pretext for other aims: collecting all States' voter data and then sharing that information with the Department of Homeland Security (DHS) to check for individual undocumented immigrants who CRT believes are unlawfully voting, and to refer such people for prosecution. *See* CRT-3330, 3334, 3349.

15

DOJ is "compiling the largest set of national voter roll data it has ever collected" in an attempt "to prove long-running, unsubstantiated claims that droves of undocumented immigrants have voted illegally." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/9PM4-2A6R. This purpose, long reported in national media, has recently been confirmed by OLC. *See* CRT-3330, 3334, 3349. DOJ is acting "[i]n response to" an executive order, issued in March 2025, that directed federal voting-enforcement efforts toward the specter of noncitizen voting. CRT-3330. As part of this effort, the executive order required DHS and DOGE to crosscheck state voter rolls against a citizenship list maintained by DHS. *See* Exec. Order No. 14,248, § 2(b)(iii), 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025). This database, called SAVE, is notoriously inaccurate. *E.g.*, Jen Fifield and Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/BB2L-SAG9.

To accomplish its real goals, DOJ has requested voter-roll data from at least 48 States and so far has sued 30 of them and the District of Columbia. *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated June 8, 2026), https://perma.cc/G2PC-PP6V. And DOJ has now entered into an agreement with DHS to send States' voter lists through DHS's SAVE database. CRT-30-40.

There are also indications that federal agencies may use voters' data to engage in broader immigration enforcement. An attorney in the Housing Section of CRT, who was "detailed to work in the Voting Section enforcing the [NVRA]" and participated in making the requests for States' voter rolls, told the *New York Times* in November that DOJ leadership "had a DOGE person who could go through all the data and compare it to the [DHS] data and Social Security data," ostensibly "to identify undocumented immigrants that have registered to vote." Emily Bazelon & Rachel

Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.  The attorney "had a concern that the data would be used not for purging voter rolls of people who aren't eligible to vote but for broader immigration enforcement." *Id.*

Then, in response to intense outrage in January over a sustained Immigration and Customs Enforcement (ICE) operation in Minneapolis—including two fatal attacks by ICE officers on citizens—Attorney General Pam Bondi sent a letter to Minnesota Governor Tim Walz outlining three "common sense solutions" to "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota."  Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minnesota 2 (Jan. 24, 2026), https://perma.cc/34U4-3SK3.  One of the solutions was to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law."  *Id.* at 3.  And "Homeland Security Investigations, an arm of Immigration and Customs Enforcement [(ICE)], recently issued a two-page memo," citing the March 2025 executive order, "requiring its employees to 'review all open and closed voter fraud cases' involving immigrants who registered to vote, or actually voted, before they became naturalized U.S. citizens."  Glenn Thrush et al., *Administration Targets Noncitizen Voting, Despite Finding It Rare*, N.Y. Times (Feb. 18, 2026), https://www.nytimes.com/2026/02/18/us/politics/voting-trump-immigrants-midterms.html.

In just the past two months, the Administration repeatedly has reiterated the connection between voter-roll collection and immigration enforcement.  First, when asked by a judge whether voter data could be used "for ICE going to people's homes and arresting them," Mr. Neff responded: "Good question, your Honor, because the Civil Rights Division cannot promise what any other agency will or will not do."  Mar. 26, 2026 Hr'g Tr. 66:8-9, 66:12-14, *Amore*, *supra*

17

(No. 25-CV-639). Second, President Trump issued a new executive order requiring DHS to create federal citizenship lists and threatening loss of federal funds for noncompliance and prosecution of election officials who send ballots to those the federal government deems ineligible. Exec. Order No. 14,399, §§ 2(a)-(b), 5, 91 Fed. Reg. 17125, 17125-27 (Mar. 31, 2026). And third, the OLC Memo, though disclaiming a desire on *DOJ*'s part to use the voter lists for immigration enforcement, acknowledged both that *DHS* would use the voter data to investigate voter fraud among noncitizens and that the Policy would have "immigration consequences by providing DHS updated information regarding the location of illegal aliens." CRT-3334, 3355-56; *see also* DOJ Br. 44 (arguing disclosure of data to DHS comports with Privacy Act because "ICE is charged with investigating violations of immigration law, and because the voter lists indicate the presence of aliens").

The government's use of the CRA for this purpose—*i.e.*, to maintain its own voter lists and then use those lists to falsely claim widespread voter fraud by noncitizens and further immigration enforcement—is improper twice over.

First, it exceeds DOJ's authority under Title III because it is not the "purpose" that DOJ set forth in its "statement" to States. 52 U.S.C. § 20703. Title III requires DOJ to provide a "demand in writing" to the target at the time it requests information. *Id.* This "demand *shall* contain a statement of . . . *the purpose therefor*." *Id.* (emphases added). The mandate to provide "the purpose" for its demands, *id.*, is one of Title III's "statutory requirements," and failure to fulfill it can render DOJ's requests nugatory, *Accrediting Council*, 854 F.3d at 690. And DOJ cannot provide whatever reason it wants for the demand—it must provide "*the* purpose therefor." 52 U.S.C. § 20703 (emphasis added). "[G]rammar and usage establish that 'the' is 'a function word indicating that a following noun or noun equivalent is definite or has been previously

18

specified by context.'"  *Nielsen v. Preap*, 586 U.S. 392, 408 (2019).  By requiring Section 20703 demands to contain a statement of "*the* purpose therefor," Congress specified that DOJ cannot simply give any reason for seeking information; the reason given must actually be the real reason for the request.  Given the evidence that DOJ's true purposes are not what it told States—*i.e.*, to "ascertain [States'] compliance with the list maintenance requirements of the NVRA and HAVA," *e.g.*, CRT-3144—the Policy exceeds DOJ's Title III authority.

Second, DOJ's use of a misleading rationale when first applying its Policy renders the Policy arbitrary and capricious.  "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them."  *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021).  An agency's action thus cannot be sustained when there is "a significant mismatch between the decision [an agency] made and the rationale [it] provided."  *Dep't of Com.*, 588 U.S. at 783.  This principle is especially important for a policy that will lead (and has led) to numerous attempts to enforce administrative process in court, since it would be an abuse of courts' *own* process to invoke it when there are doubts about "the good faith of the particular investigation."  *Powell*, 379 U.S. at 58.  Yet DOJ's public explanations for its Policy—the rationales it provided States for seeking their voter rolls—failed to notify the public that the actual purpose behind the Policy was for DOJ to conduct its own list maintenance, to cajole States into scrubbing individual voters from the rolls, and to refer those registrants for prosecution.

This is not an instance in which "an agency's stated reasons for acting" can be upheld even though it "might also have had other unstated reasons."  *Dep't of Com.*, 588 U.S. at 781.  As already discussed, the only purpose DOJ provided the States—ensuring compliance with the NVRA and HAVA's list-maintenance requirements—cannot explain DOJ's decision to seek every

State's full voter rolls, including every registered voter's personal data. *See supra* Part I.B. Thus, "unlike a typical case in which an agency may have both stated and unstated reasons for a decision, here the [NVRA/HAVA] enforcement rationale—the sole stated reason—seems to have been contrived." *Dep't of Com.*, 588 U.S. at 784.

DOJ also plainly attempted to hide its true purpose from the States and voters subject to the Policy. As the OLC Memo indicates, DOJ asked OLC last year whether it "may share [States' voter] lists with DHS for the purpose of identifying illegal aliens who are ineligible to vote." CRT-3330. CRT told OLC that, if "the search reveals that an alien unlawfully has registered to vote or voted in an election, the Division may seek to strike the alien's name from the voter registration list for future elections, refer the alien for prosecution, or both." CRT-3334. This purpose differs greatly from the purpose DOJ provided to the States. CRT claimed that it only decided to use voter lists to investigate voter fraud "after issuing" its Title III requests to the States. CRT-3349. Yet CRT informed OLC of its intentions last summer, and OLC provided its informal advice by early September 2025. CRT-3330. This was *before* DOJ sent requests to some States, *see, e.g.*, CRT-1603, 1780, 1883, 2080, *before* it sent follow-up communications to other States clarifying its requests and their purpose, *see, e.g.*, CRT-2496, 2509, 2592, and *before* DOJ filed suits against *any* State under Title III, *see* Brennan Ctr., *supra*. Yet in all this correspondence and in its complaints, DOJ continued to proffer only its contrived NVRA-compliance rationale, never so much as hinting at its true voter-fraud-related purpose for seeking voter rolls and voters' personal data. *E.g.*, CRT-2497, 2510; Compl. ¶ 13, *United States v. Dist. of Columbia Bd. of Elections*, No. 1:25-cv-4403 (D.D.C. Dec. 18, 2025). Indeed, CRT itself continues to obscure its true purposes in this litigation, failing to discuss its search for individual noncitizens or its potential referral of individual registrants for prosecution, despite the OLC Memo's discussion of CRT's desire to do

20

these very things for the past year.  *See* DOJ Br. 5-9.  The Court is thus confronted "with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process."  *Dep't of Com.*, 588 U.S. at 785.  The Policy violates the "reasoned explanation requirement of administrative law," *id.*, and so is arbitrary and capricious.

## III.    THE POLICY VIOLATES THE PRIVACY ACT

The Policy also violates multiple provisions of the Privacy Act.  DOJ has not filed a new SORN, and existing SORNs do not reasonably cover the records and uses at issue here.  Nor has DOJ shown that its law-enforcement functions necessitate the collection of every registered American voter's most personal data to trawl for allegedly ineligible registrants.

1.  Before developing a new system of records, DOJ must publish a SORN, and the public must be able to provide comments on the proposed system.  5 U.S.C. § 552a(e)(4), (e)(11).  DOJ has not complied with these requirements here: it has not issued a new SORN or sought comment.

Instead, DOJ claims an existing SORN, Central Civil Rights Division Index File and Associated Records, CRT-001 ("Central Index File"), already covers the records the Policy seeks to collect and the uses to which DOJ intends to put them.  *See* DOJ Br.  42-46.  In making this claim, DOJ distorts that SORN's language and scope beyond recognition.  The Central Index File covers, among other people, the "[s]ubjects of investigations," "victims," and "potential witnesses" in "potential or actual cases and matters of concern to CRT."  *Privacy Act of 1974; Systems of Records*, 68 Fed. Reg. 47,610, 47,611 (Aug. 11, 2003).  These terms naturally refer to  the sorts of particular people, entities, or jurisdictions that one would expect to find in any individual case investigation.  DOJ claims that *all* registered American voters are considered subjects within the SORN's meaning, because DOJ seeks to conduct a dragnet investigation of *every* registrant in the country.  DOJ Br. 43.  Nothing in the SORN, however, so much as hints that is was designed to

21

include personal information about more than half of the entire U.S. population.[5]  The SORN also uses the words "subject" interchangeably with "investigation targets," 68 Fed. Reg. at 47,611, underscoring the limited nature of this category of person covered.[6]

Even more preposterously, DOJ asserts that "legitimate voters appearing on these lists" are covered by the Central Index File SORN because they "are potential 'victims' of voter fraud" in that they may have their votes diluted by illegal ones.  DOJ Br. 43.  Under such logic, anyone in the country who sees the results of an election allegedly tainted by a single fraudulent vote would be considered a "witness," 68 Fed. Reg. at 47,611, allowing DOJ to compile information on every person in the country.  Under DOJ's interpretation, the SORN's language limiting the system of records to subjects, victims, or witnesses in investigations would be rendered completely meaningless.  Properly read, the SORN "does nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level and used for a plethora of government activity." *Weber*, 816 F. Supp. 3d at 1193-94.

2.  DOJ's decision to require *unredacted* voter rolls, in particular, violates the Privacy Act for an additional reason.  Agencies may "maintain in [their] records only such information about an individual as is *relevant and necessary* to accomplish a purpose of the agency required to be accomplished by statute."  5 U.S.C. § 552a(e)(1) (emphasis added).  But as discussed above, *see*

_____

[5] *Compare* Press Release, *2024 Presidential Election Voting and Registration Tables Now Available*, U.S. Census Bur. (Apr. 30, 2025) (noting 174 million Americans were registered to vote by 2024 election), https://www.census.gov/newsroom/press-releases/2025/2024-presidential-election-voting-registration-tables.html, *with U.S. and World Population Clock*, U.S. Census Bur. (last accessed June 13, 2026) (noting U.S. population as of November 5, 2024 was 340,716,101), https://www.census.gov/popclock.

[6] DOJ policy does differentiate between these two terms:  "A 'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation," while "[a] 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." Justice Manual § 9-11.151, https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.151.

22

*supra* at 7-8, individual list-maintenance checks are not "a purpose of" DOJ "required to be accomplished by" the NVRA or HAVA, 5 U.S.C. § 552a(e)(1). Moreover, DOJ has not shown that retention of SSNs and driver's license numbers is "necessary" to accomplish the agency's law-enforcement function. *Id.*; *see supra* at 8-10. The Privacy Act prohibits collecting and retaining such broad swathes of personal data when it is not necessary, as it is not here.

More broadly, the Policy conflicts with the Privacy Act's core purpose of protecting Americans' private information from government overreach. A policy to mass-collect data on more than 170 million registered voters, cross-check this data against an inaccurate citizenship database, and refer people for prosecution for voter registration fraud implicates the very concerns "that animated Congress to pass the Privacy Act—threats to American democracy amidst erosion of public trust regarding the Executive's use of sensitive data." *Weber*, 816 F. Supp. 3d at 1194. As former DOJ employees who were charged with upholding that public trust, *amici* are deeply concerned about the Policy's intrusion on the privacy of hundreds of millions of Americans and the chilling effect the Policy may have on Americans' participation in our Nation's elections.

## CONCLUSION

For the reasons discussed above, the Court should grant defendants' Motion for Partial Summary Judgment and deny DOJ's Motion to Dismiss and Cross-Motion for Summary Judgment.

Dated: June 17, 2026

Respectfully submitted,

/s/ Noah B. Bokat-Lindell

Noah B. Bokat-Lindell
(Bar No. D00519)
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006

(202) 383-5321
nbokat-lindell@omm.com

*Attorney for* Amici Curiae *Former Employees of the U.S. Department of Justice*

## APPENDIX A

### *Alphabetic List of* Amici Curiae[*]

**David Becker**
U.S. Department of Justice (1998-2005): *Trial Attorney*, Voting Section (1998-2005)

**Gregory Friel**
U.S. Department of Justice (1989-2022): *Attorney*, Appellate Section (1992-2006); *Special Litigation Counsel*, Appellate Section (2006-2011); *Senior Counsel*, Office of the Assistant Attorney General (2011); *Deputy Assistant Attorney General* (2012-2022)

**Bradley Heard**
U.S. Department of Justice (2010-2022): *Trial Attorney*, Voting Section (2010-2022)

**Brian Heffernan**
U.S. Department of Justice (1978-2011): *Trial Attorney*, Voting Section (2000-2009); *Special Litigation Counsel*, Voting Section (2009-2011)

**Robert Kengle**
U.S. Department of Justice (1984-2005): *Trial Attorney*, Voting Section (1984-1996); *Special Counsel*, Voting Section (1996-1999); *Deputy Chief*, Voting Section (1999-2005)

**Timothy Lambert**
U.S. Department of Justice (2001-2004): *Trial Attorney*, Voting Section (2001-2004)

**Justin Levitt**
U.S. Department of Justice (2015-2017): *Deputy Assistant Attorney General*, Civil Rights Division (2015-2017)

**Steven Mulroy**
U.S. Department of Justice (1991-2000): *Trial Attorney*, Voting Section (1991-1995)

**Stephen B. Pershing**
U.S. Department of Justice (1996-2005): *Trial Attorney*, Voting Section (1996-2005)

**John Powers**
U.S. Department of Justice (2007-2015, 2021-2024): *Civil Rights Analyst & Senior Civil Rights Analyst*, Voting Section (2007-2015); *Counsel*, Office of the Assistant Attorney General (2021-2024)

---

[*] *Amici* submit this brief in their personal capacities. *Amici*'s institutional affiliations are for identification purposes only.

1a

**Joseph Rich**
U.S. Department of Justice (1968-2005): *Trial Attorney*, Southern Section (1968);
*Chief*, Voting Section (1999-2005)

**Bob Rush**
U.S. Department of Justice (1970-1973): *Trial Attorney*, Voting Section (1970-1973)

**Bryan Sells**
U.S. Department of Justice (2010-2015): *Special Litigation Counsel*, Voting Section
(2010-2015)

**Avner Shapiro**
U.S. Department of Justice (2000-2007, 2013-2016): *Trial Attorney*, Voting Section
(2000-2007, 2013-2016)

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of June, 2026, I caused to be served a copy of the above document on all counsel of record and parties via the ECF system.

/s/ Noah B. Bokat-Lindell

Noah B. Bokat-Lindell