**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

COMMON CAUSE, *et al.*,

               *Plaintiffs*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

               *Defendants*.

No. 1:26-cv-01352-SLS

Hon. Sparkle L. Sooknanan

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 2

I.      Plaintiffs Lack Article III Standing................................................... 2

    A.      Plaintiffs Lack Standing to Challenge DOJ's Enforcement
    Discretion............................................................................. 2

    B.      Plaintiffs' Asserted Privacy-Related Injuries Do Not Create
    Standing .............................................................................. 3

    C.      Plaintiffs' Alleged Voting-Related Injuries Are Speculative And,
    In Any Event, Not Caused By Defendants ................................... 4

    D.      Plaintiffs Do Not Have Informational Standing ......................... 7

    E.      Common Cause Lacks Organizational Standing ....................... 9

II.     Plaintiffs Do Not Challenge a Discrete and Final Agency Action ...................... 12

III.    Plaintiffs Lack a Cause of Action For Certain Claims ......................... 14

    A.      Plaintiffs Do Not Dispute That Counts III and V Are Not Cognizable.... 14

    B.      Plaintiffs Cannot Bring an APA Claim Predicated on Privacy Act
    Violations (Count VI) ............................................................ 15

IV.     Plaintiffs' Claims Fail On The Merits .................................................. 17

    A.      DOJ's Actions Are Not Contrary to Election Laws................................. 17

        1.      Title III of the Civil Rights Act Permits The Requests................. 17

        2.      The NVRA and HAVA Permit DOJ's Investigation.................... 20

    B.      DOJ Has Not Violated The Privacy Act .................................... 24

    C.      DOJ's Letters to States Do Not Violate The Paperwork Reduction
    Act....................................................................................... 26

    D.      Plaintiffs' Constitutional Claims Fail as a Matter of Law. ...................... 27

i

E.    DOJ Did Not Act Arbitrarily or Capriciously (Count VIII) ..................... 27

V.    Plaintiffs' Requested Relief is Overbroad and Subject to Equitable Limits......... 29

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Tchrs. v. Bessent*,
   152 F.4th 162 (4th Cir. 2025) ................................................................. 16

*Am. First Leg. Found. v. Greer*,
   153 F.4th 1311 (D.C. Cir. 2025) ............................................................... 3

*Am. Forest Res. Council v. United States*,
   77 F.4th 787 (D.C. Cir. 2023) ................................................................. 12

*Balt. Gas and Elec. Co. v. FERC*,
   252 F.3d 456 (D.C. Cir. 2001) ................................................................... 3

*Bell v. Marinko*,
   367 F.3d 588 (6th Cir. 2004) ................................................................... 22

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................ 14

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ................................................................................ 15

*Britt v. Naval Investigative Serv.*,
   886 F.2d 544 (3d Cir. 1989) .................................................................... 24

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ................................................................................ 30

*California v. Texas*,
   593 U.S. 659 (2021) ................................................................................ 30

*Cell Assocs., Inc. v. NIH*,
   579 F.2d 1155 (9th Cir. 1978) ........................................................... 15, 16

*Centro de Trabajadores Unidos v. Bessent*,
   167 F.4th 1218 (D.C. Cir. 2026) .............................................................. 14

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) .................................................................................... 6

*Coal. for Humane Immg. Rts v. DHS,*
   780 F. Supp. 3d 79 (D.D.C. 2025) .................................................................. 11

*Coleman v. Kennedy,*
   313 F.2d 867 (5th Cir. 1963) ................................................................... 18, 20

*Cross v. EEOC,*
   810 F. Supp. 3d 88 (D.D.C. 2025) .................................................................. 3

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.,*
   637 F.3d 408 (D.C. Cir. 2011) ...................................................................... 28

*Ctr. for Bio. Diversity v. Burgum,*
   — F. Supp. 3d —, 2026 WL 180258 (D.D.C. Jan. 23, 2026) ...................... 13

*Ctr. for Responsible Sci. v. Gottlieb,*
   346 F. Supp. 3d 29 (D.D.C. 2018) ................................................................ 10

*Davis v. FEC,*
   554 U.S. 724 (2008) ..................................................................................... 12

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ....................................................................................... 6

*Dinh Tran v. Dep't of Treasury,*
   351 F. Supp. 3d 130 (D.D.C. 2019) .............................................................. 24

*Doe v. Chao,*
   540 U.S. 614 (2004) ..................................................................................... 16

*Doe v. Stephens,*
   851 F.2d 1457 (D.C. Cir. 1988) .................................................................... 16

*Dole v. United Steelworkers of Am.,*
   494 U.S. 26 (1990) ......................................................................................... 8

*DSCC v. Trump,*
   — F. Supp. 3d —, 2026 WL 1487833 (D.D.C. May 28, 2026) ................. 3, 4, 5, 11

*EPIC v. Dep't of Educ.,*
   48 F. Supp. 3d 1 (D.D.C. 2014) .................................................................... 11

*EPIC v. PACEI,*
   878 F.3d 371 (D.C. Cir. 2017) ....................................................................... 8

*EPIC v. U.S. Dep't of Com.*,
    928 F.3d 95 (D.C. Cir. 2019) .................................................................. 7, 8

*FAA v. Cooper*,
    566 U.S. 284 (2012) ............................................................................ 15

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ......................................................................... 9, 10

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................................ 18

*FDA v. Wages & White Lion Investments, L.L.C.*,
    604 U.S. 542 (2025) ............................................................................ 29

*FEC v. Akins*,
    524 U.S. 11 (1998) ............................................................................... 9

*Gill v. Whitford*,
    585 U.S. 48 (2018) ......................................................................... 9, 29

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009) ............................................................................ 18

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ............................................................................ 18

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ....................................................................... 10, 11

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ............................................................................ 30

*Hisp. Affs. Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018) ............................................................. 13

*Holistic Candlers and Consumers Ass'n v. FDA*,
    664 F.3d 940 (D.C. Cir. 2012) ............................................................. 14

*Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*,
    238 F. Supp. 2d 174 (D.D.C. 2002) ...................................................... 15

*In re Coleman*,
    208 F. Supp. 199 (S.D. Miss. 1962) ...................................................... 20

v

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004)............................................................................................... 14

*Indep. Mkt Monitor for PJM v. FERC*,
  162 F.4th 1167 (D.C. Cir. 2025)............................................................................................ 11

*Jibril v. Mayorkas*,
  20 F.4th 804 (D.C. Cir. 2021).................................................................................................. 6

*John Doe v. Metro. Police Dep't of D.C.*,
  445 F.3d 460 (D.C. Cir. 2006)............................................................................................... 15

*Jones v. U.S. Secret Serv.*,
  143 F.4th 489 (D.C. Cir. 2025)................................................................................................ 6

*Kennedy v. Bruce*,
  298 F.2d 860 (5th Cir. 1962) ................................................................................................ 20

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962) ................................................................................................ 19

*League of United Am. Citizens v. EOP*,
  818 F. Supp. 3d 34 (D.D.C. 2026)......................................................................................... 27

*League of United Latin Am. Citizens v. EOP*,
  808 F. Supp. 3d 29 (D.D.C. 2025)......................................................................................... 29

*League of Women Voters v. DHS*,
  — F. Supp. 3d —, 2026 WL 1784297 (D.D.C. Jun. 22, 2026)................................................. 2

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................................................................ 9

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ................................................................................................................ 2

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .............................................................................................................. 13

*Mass. Coal. for Immigr. Reform v. DHS*,
  621 F. Supp. 3d 84 (D.D.C. 2022)......................................................................................... 13

*Mi Familia Vota v. Fontes*,
  129 F.4th 691 (9th Cir. 2025)................................................................................................ 22

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ........................................................................................... 5, 6

*Nat'l Council of Nonprofits v. OMB*,
    775 F. Supp. 3d 100 (D.D.C. 2025).................................................................. 12

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995)......................................................................... 10

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025) ............................................................................ 12

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................................... 12

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) ......................................................................................... 18

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ........................................................................................... 6

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
    587 U.S. 601 (2019) ......................................................................................... 19

*Parks v. IRS*,
    618 F.2d 677 (10th Cir. 1980) ......................................................................... 15

*Pileggi v. Washington Newspaper Publ'g Co., LLC*,
    146 F.4th 1219 (D.C. Cir. 2025)........................................................................ 4

*Prisology, Inc. v. Fed. Bureau of Prisons*,
    852 F.3d 1114 (D.C. Cir. 2017).......................................................................... 7

*Pub. Citizen v. DOJ*,
    491 U.S. 440 (1989) ........................................................................................... 9

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ............................................................................................. 18

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................................... 9

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007)........................................................................ 15

*Sw. Airlines Co. v. Saxon,*
  596 U.S. 450 (2022) ......................................................................................... 18

*Tex. State LULAC v. Elfant,*
  52 F.4th 248 (5th Cir. 2022) ........................................................................... 11

*TransUnion, LLC v. Ramirez,*
  594 U.S. 413 (2021) ...................................................................................... 3, 7

*United States v. Benson,*
  — F.4th —, 2026 WL 1815425 (6th Cir. June 24, 2025) ........................... 17, 19, 20

*United States v. Fausto,*
  484 U.S. 439 (1988) ......................................................................................... 19

*United States v. Hansen,*
  599 U.S. 762 (2023) ......................................................................................... 24

*United States v. Powell,*
  379 U.S. 48 (1964) ................................................................................ 21, 22, 23

*United States v. Schmidt,*
  — F. Supp. 3d —, 2026 WL 1850016 (W.D. Pa. June 27, 2026) ........................... 17

*United States v. Texas,*
  599 U.S. 670 (2023) ...................................................................................... 2, 3

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ......................................................................................... 23

*Venetian Casino Resort, L.L.C. v. EEOC,*
  530 F.3d 925 (D.C. Cir. 2008)......................................................................... 13

*Verizon v. FCC,*
  740 F.3d 623 (D.C. Cir. 2014)..................................................................... 16, 17

*Waterkeeper All. v. EPA,*
  853 F.3d 527 (D.C. Cir. 2017).......................................................................... 9

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ......................................................................................... 23

*Westcott v. McHugh,*
  39 F. Supp. 3d 21 (D.D.C. 2014)...................................................................... 15

**Constitutions**

U.S. Const. art. II ............................................................................................................... 3

**Rules**

Fed. R. Civ. P. 56................................................................................................................ 27

**Statutes**

5 U.S.C. § 552a................................................................................................... 8, 15, 24, 25

8 U.S.C. § 1373(c) .............................................................................................................. 14

18 U.S.C. § 611.................................................................................................................... 22

38 U.S.C. § 5701................................................................................................................. 16

42 U.S.C. § 1320b-7 ........................................................................................................... 25

44 U.S.C. § 3501.................................................................................................................. 8

44 U.S.C. § 3502.................................................................................................................. 26

44 U.S.C. § 3518(c) ............................................................................................................. 26

52 U.S.C. § 10101(a) ........................................................................................................... 18

52 U.S.C. § 20507........................................................................................................ 19, 21, 22, 23

52 U.S.C. § 20510................................................................................................... *passim*

52 U.S.C. § 20511............................................................................................................ 1, 3, 22

52 U.S.C. § 20701................................................................................................... 17, 20

52 U.S.C. § 20703................................................................................................... *passim*

52 U.S.C. § 20704.................................................................................................... 20, 21

52 U.S.C. § 21083.................................................................................................... 19, 21

52 U.S.C. § 21111................................................................................................... *passim*

Judicial Redress Act of 2015,
    Pub. L. No. 114-126, 130 Stat. 282 ................................................................................ 17

**Regulations**

28 C.F.R. § 0.50 ........................................................................................................ 25

Privacy Act of 1974,
  68 Fed. Reg. 47610 (Aug. 11, 2003) ................................................................ 24, 25

**Other Authorities**

Justice Manual (Mar. 2024),
  https:// perma.cc/9JXJ-2X9U ............................................................................ 24

Merriam-Webster Online,
  https://www.merriam-webster.com/dictionary/question (last visited Jun. 24, 2026) ............... 26

Tex. Sec'y of State, *Texas Completes Citizenship Verifications in the SAVE Database*
  (Oct. 20, 2025), https://perma.cc/9FLK-HBSE .......................................................... 7

Webster's New World College Dictionary (4th ed. 2008) ............................................. 26

Webster's New World Dictionary of the American Language (8th coll. ed. 1960) ..................... 19

**INTRODUCTION**[1]

There is nothing new or strange—much less unlawful—about the Department of Justice (DOJ) investigating potential violations of the National Voter Registration Act (NVRA) or the Help America Vote Act of 2002 (HAVA). Congress explicitly gave the Attorney General the authority to bring lawsuits to enforce those statutes, *see* 52 U.S.C. §§ 20510(a), 20511, 21111, and to obtain information necessary to determine whether violations have occurred, *see id.* § 20703.

Plaintiffs want to halt that program to investigate the NVRA and HAVA. Asserting that DOJ has adopted a "Policy," Plaintiffs seek an order that would cease every aspect of DOJ's investigation, even including the enforcement actions that are pending in other jurisdictions. Such a challenge is plainly programmatic and therefore not cognizable under the Administrative Procedure Act (APA). Article III also does not allow this Court to micromanage an executive agency's investigative discretion and force it to dismiss valid lawsuits elsewhere. And even if it did, Plaintiffs' complaint should be directed to the States, who not only are the ones choosing whether to comply with DOJ's requests for information but who are also the actors who would theoretically impose burdens on voters after DOJ's investigation. Plaintiffs cannot use this lawsuit to seek a nationwide injunction out of frustration that some States have agreed with DOJ and to prohibit other courts from agreeing with DOJ down the road. Plaintiffs' charges of "federalize[d] voter list maintenance" are therefore untrue, Opp. 1, and the Court lacks subject matter jurisdiction over this suit against DOJ and the Acting Attorney General (collectively, DOJ).

In addition, Plaintiffs' other arguments still fail. Their combined opposition and reply does not rescue their insufficient theories of standing, nor does it show that DOJ has violated the NVRA, HAVA, the Privacy Act, or the Paperwork Reduction Act (PRA). DOJ also did not act arbitrarily

---

[1] DOJ has adopted in this brief the same spacing as Plaintiffs' combined opposition and reply. *See* ECF No. 35 (Opp.). Neither of the opening briefs used that format, and DOJ affirmatively sought more pages (with Plaintiffs' consent) to avoid cramped formatting that would render its brief less legible for the Court. *See* ECF No. 31. DOJ consented to Plaintiffs receiving the same extension on the reasonable assumption that Plaintiffs would not adjust their spacing format in order to submit an even longer brief.

or capriciously, as the administrative record demonstrates.  And, in the event the Court disagrees, Plaintiffs still lack any legitimate argument for why relief should be on a nationwide level.  DOJ's alleged Policy (if it even qualifies as a policy) affects each State differently and therefore should be enjoined or vacated only as to those States where Plaintiffs have shown an injury in fact.

**ARGUMENT**[2]

### I.      Plaintiffs Lack Article III Standing

#### A.  Plaintiffs Lack Standing to Challenge DOJ's Enforcement Discretion

Plaintiffs fail to meaningfully grapple with the Supreme Court's binding decision in *United States v. Texas*, 599 U.S. 670, 678 (2023), *see* Opp. 19–20.  The Supreme Court in *Texas* relied on the "fundamental Article III principle" that a party "lacks standing to contest the policies of the prosecuting authorit[ies] when he himself is neither prosecuted nor threatened with prosecution." *Texas*, 599 U.S. at 674 (citation omitted).  This is not a new rule; the Supreme Court first recognized it more than 50 years ago.  *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.").  Plaintiffs never explain how they can circumvent this fundamental principle given that they are not the object of DOJ's efforts to enforce the NVRA and HAVA.  As the administrative record reflects, DOJ's actions have all been focused on States via requests for voter rolls and, in many cases, active litigation against States.  Plaintiffs, then, are not the object of these actions, and they never suggest otherwise.  True enough, federal courts "routinely adjudicate federal agencies' interpretations of their statutory authority to enforce the law," Opp. 19, but not in challenges from a third-party member of the public who "himself is neither prosecuted nor threatened with prosecution," *Texas*, 599 U.S. at 674.

To avoid *Texas*, Plaintiffs try to limit its rule to challenges against an agency's decision "*not* to enforce the law." Opp. 19.  Plaintiffs' distinction has no legal basis and is, in fact, contrary

---

[2] DOJ acknowledges that the Court has rejected many of its arguments in *League of Women Voters v. DHS*, — F. Supp. 3d —, 2026 WL 1784297 (D.D.C. Jun. 22, 2026).  DOJ nonetheless makes those arguments here for, among other things, preservation purposes.

2

to law.  The principle that a third party lacks standing to challenge discretionary enforcement decisions applies when the Government is "allegedly unlawful[ly] regulat[ing]" someone else, not just refusing to regulate them.  *Texas*, 599 U.S. at 678.  This principle originates from the notion that "how to prioritize and how aggressively to pursue legal actions . . . falls within the discretion of the Executive Branch[.]"  *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 429 (2021).  That question of prioritization necessarily encompasses both non-enforcement and enforcement decisions.  After all, one aspect of the Executive's power to take care that laws be faithfully executed, *see* U.S. Const. art. II, § 3, "is the prerogative to decline to enforce a law, *or to enforce a law in a particular way*," *Balt. Gas and Elec. Co. v. FERC*, 252 F.3d 456, 459 (D.C. Cir. 2001) (emphasis added).  Plaintiffs therefore cannot "ask[] the Court to order the [DOJ] to pursue a certain investigative approach[,]" whether that be one of enforcement or non-enforcement, when they are not the object of DOJ's approach.  *Cross v. EEOC*, 810 F. Supp. 3d 88, 95 (D.D.C. 2025).  Indeed, another court in this District recently ruled that private plaintiffs lacked standing to challenge a directive that the Attorney General prioritize enforcement of certain federal laws.  *See DSCC v. Trump*, — F. Supp. 3d —, 2026 WL 1487833, at *11 n.11 (D.D.C. May 28, 2026), *appeal filed*, 26-5193 (D.C. Cir. June 4, 2026).

Plaintiffs here similarly lack standing to challenge how DOJ chooses to enforce the NVRA and HAVA, statutes that Congress expressly allows DOJ to enforce.  *See* 52 U.S.C. §§ 20510, 20511, 20703, 21111.  And since the alleged Policy has spawned DOJ's lawsuits against certain States, vacatur of the alleged Policy—as Plaintiffs request—would necessarily require ordering DOJ to dismiss those lawsuits.  This Court cannot "compel" DOJ to drop those actions because that would dictate how DOJ "choose[s] to exercise its enforcement discretion."  *Am. First Leg. Found. v. Greer*, 153 F.4th 1311, 1315 (D.C. Cir. 2025).  It is for those courts to decide whether the actions are legally viable or not.

### B.  Plaintiffs' Asserted Privacy-Related Injuries Do Not Create Standing

Plaintiffs have now basically abandoned a significant portion of their alleged privacy-related harms.  After offering extensive allegations and declarations about how the sharing of their

3

information causes them stress, Plaintiffs never explain how their vague fears about data hacking and misuse are concrete enough to confer standing beyond noting the omnipresent risk that sensitive data might wind up in the public domain. *See* Opp. 15, n.8.

Instead, Plaintiffs rely on attenuated analogies to the common-law tort of intrusion upon seclusion. Their lead retort is that DOJ "rel[ies] primarily on an abrogated Fourth Circuit panel decision" that "was rejected by the en banc Fourth Circuit and other judges in this District[.]" Opp. 13. Defendants know that the Fourth Circuit and other courts have rejected that opinion's reasoning—and made that clear to the Court, *see* ECF No. 32-1 at 16–17 & n.5 (Defs. MSJ)—but none of those contrary decisions are binding on this Court. In short, the original Fourth Circuit panel got it right, and the Court should still follow that reasoning. *See id.* at 15–17.

Regardless, Plaintiffs' arguments do not engage with Defendants' key points. For instance, Plaintiffs do not refute Defendants' observation that Congress authorizes States to share information about citizens with the Government in a variety of contexts. *See id.* at 16. "[I]t cannot be true that any time a State shares information with the federal government, the harm experienced is analogous to a common law tort." *Id.* That common-sense conclusion has particular force here, since a citizen cannot reasonably expect their Social Security Number to remain secret *from the government* since that information originated *from the government* in the first place. That distinguishes this case from the D.C. Circuit's decision in *Pileggi v. Washington Newspaper Publishing Co., LLC*, 146 F.4th 1219, 1228 (D.C. Cir. 2025), where the D.C. Circuit found an injury analogous to intrusion-upon-seclusion because a person's "private video viewing history" was disclosed to a third party. The government has no role in creating or monitoring a person's video viewing history, unlike with a Social Security Number, which is a government identifier "already known to the federal government." *DSCC*, 2026 WL 1487833, at *7.

### C. Plaintiffs' Alleged Voting-Related Injuries Are Speculative And, In Any Event, Not Caused By Defendants

Nothing in Plaintiffs' brief changes the fact that Plaintiffs' alleged voting-related injuries are speculative and, regardless, not traceable to the Defendants here. As DOJ explained, Plaintiffs

4

cannot rely on declarations from less than a handful of voters extrapolate that voting injuries are imminent in every State where DOJ obtains state voter rolls. *See* Defs. MSJ 17–19.  And even if they could, any future *actual* voter removal would be undertaken by State governments, not DOJ. *See id.* at 19–20.

In response, Plaintiffs assert that voters will be "force[d]" to provide documentary proof of citizenship once DOJ identifies them as potentially ineligible to vote.  Opp. 16; *see id.* at 18. Plaintiffs ignore the record evidence that States will not unquestionably rely on DOJ's identifications.  Multiple States have explicitly asked DOJ to provide information explaining why a potential voter is ineligible so that those States can confirm DOJ's determination.  *See* Defs. MSJ 19.  Voters are not likely to be disenfranchised until States rely in some form on the identifications that DOJ makes, but Plaintiffs have not shown "*how* they will do so" with enough precision to say that burdens on voters are likely.  *DSCC*, 2026 WL 1487833, at \*6.  As for Plaintiffs' contention that the Memorandum of Agreement (MOA) between DOJ and USCIS will force voters to prove citizenship, Plaintiffs cite a provision that directs DOJ to request "proof of U.S. citizenship . . . in accordance with . . . Federal and state law, where applicable."  CRT-34. Applicable laws do not on their face permit DOJ to make such a request.  The MOA likewise requires provision of "notice and hearing or other due process available under applicable law" before voter removals, which would occur under State law.  CRT-36.

In general, Plaintiffs proffer only a "speculative chain of possibilities." *Murthy v. Missouri*, 603 U.S. 43, 70 (2024) (citation omitted).  They say that given the inaccuracies in SAVE, "when DOJ runs Complying States' SVRLs through SAVE, it is likely to continue misidentifying naturalized and derived citizens as noncitizen voters and force them to provide documentary proof of citizenship or be removed from the voter rolls."  Opp. 16.  But there is no record evidence about what steps each State will take in response to identification of voters by DOJ.  True enough, the record reflects that Texas has asked some voters to confirm their citizenship, but those isolated examples alone cannot solve Plaintiffs' speculation problem given hornbook Supreme Court precedent that past injuries cannot by themselves undergird a request for prospective relief.  *See*

*O'Shea v. Littleton*, 414 U.S. 488, 495 (1974); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983).[3]  And those actions by Texas—which is not a defendant—are also not evidence of "a real and immediate threat" of injury to residents in other States. *Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) (citation omitted).

Separate from SAVE's accuracy, however, is that the likelihood of any voting burdens depends on each particular State.  As the record reflects, States are not predetermined to act in a particular way in response to DOJ's identifications.  For States that have complied with DOJ's request for information, many have explicitly reserved the right to act once they confirm a registrant's ineligibility, not based only on DOJ's identifications. *See* Defs. MSJ 19.  To the extent some complying States are required to take actions based only on DOJ's identifications, *see, e.g.*, CRT-2058, those are the only States in which it might be likely that an injury will occur.  And for States that have not complied, the outcomes of any lawsuits involving them are too speculative for Plaintiffs to say that burdens on voting are likely to happen.  In short, there is no "system" that will burden voters.  Opp. 16.  Each State has and will respond differently to DOJ's requests for information and its identification of any voters as possibly ineligible.

This fact reinforces that any voting injuries are traceable to the States, not DOJ—another reason why Plaintiffs lack standing. *See* Defs. MSJ 19–20.  As noted, States will not "react in predictable ways" to DOJ's identification of potentially ineligible voters. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).  Moreover, it is entirely speculative that "DOJ is the de facto cause" of any future actions by States regarding flagged voters.  Opp. 18.  Multiple States have signed agreements to use SAVE and can run their voter rolls themselves.  Any effort to seek proof of citizenship thus could result from the State's own use of SAVE, not DOJ's use of SAVE for that State's voter roll.  Indeed, two of Plaintiffs' declarants in Texas received correspondence requesting proof of citizenship in October 2025, *see* Decl. of Anthony Nel Ex. 1, ECF No. 29-8 at

---

[3] These cases are not somehow inapplicable to election cases. *Contra* Opp. 16.  The Supreme Court and D.C. Circuit cite *O'Shea* and *Lyons* in many contexts different from those cases' facts. *See Murthy*, 603 U.S. at 73; *Jones v. U.S. Secret Serv.*, 143 F.4th 489, 495–96 (D.C. Cir. 2025).

15; Decl. of Alex Doe Ex. 1, ECF No. 29-12 at 13; months before Texas and DOJ signed an MOU, *see* CRT-2062 (dated Dec. 9, 2025).  And there is no evidence that the correspondence received in December by the third declarant, *see* Decl. of Bailey Doe Ex. 1, ECF No. 29-13 at 17, stemmed from DOJ's query of SAVE or from Texas's own use of SAVE two months earlier, *see* Tex. Sec'y of State, *Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025), https://perma.cc/9FLK-HBSE.

In sum, the voting-related injuries asserted by Plaintiffs are not likely to occur and the small group of voters who have suffered voting injuries is insufficient to conclude otherwise.  There are *no* States where voting injuries are *both* likely to occur *and* traceable to DOJ.  But if this Court disagrees, Plaintiffs at most have standing to challenge DOJ's actions as to only those States where voting-related injuries are likely to happen and are traceable to DOJ.  *See TransUnion*, 594 U.S. at 431 ("[S]tanding is not dispensed in gross[.]").

### D.  Plaintiffs Do Not Have Informational Standing

Plaintiffs' arguments for why they have informational standing still fail.  To begin, Common Cause cannot duck its obligation to assert a particularized injury.  Although Common Cause asserts a deprivation of "information to which it is entitled under the Privacy Act and PRA," Opp. 8, that is true of every member of the public and thus insufficient to confer standing on Common Cause.  The D.C. Circuit acknowledged this in *Prisology, Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114 (D.C. Cir. 2017), holding that the plaintiff's alleged injury in the nonpublication of information that an agency was required to make available "to the public" was "a harm common to everyone" and thus insufficient for standing.  *Id.* at 1115–17.  So too here, where the Privacy Act and the PRA require information be transmitted to the public at large.

Regardless, and as explained already, Plaintiffs have not suffered the type of harm Congress sought to prevent by requiring disclosure in the Privacy Act and the PRA.  *See* Defs. MSJ 22–23.  Starting first with the Privacy Act, Plaintiffs do not persuasively distinguish *EPIC v. U.S. Department of Commerce*, 928 F.3d 95, 103 (D.C. Cir. 2019).  *EPIC* did address claims brought under the E-Government Act, not the Privacy Act, *see* Opp.11, but the D.C. Circuit's

treatment of the E-Government Act offers an apt analog for the Privacy Act: Just like the E-Government Act, the Privacy Act "was not designed to vest a general right to information in the public." *EPIC*, 928 F.3d at 103. Rather, the Privacy Act "was designed to protect individual privacy by focusing agency analysis and improving internal agency decision-making," and "is fundamentally different from statutes like the Freedom of Information Act (FOIA) where the harm Congress sought to prevent was a lack of information itself." *Id.* In short, the Privacy Act and the E-Government Act are each "directed at individual *privacy*." *EPIC v. PACEI*, 878 F.3d 371, 378 (D.C. Cir. 2017).

Plaintiffs also assert, based on a variety of authorities, that the Privacy Act has a "pro-transparency purpose," Opp. 10, and "establishes a right to obtain information from federal agencies," *id.* at 11 (citation omitted). At that level of generality, the same thing could be said for the E-Government Act, which requires the publication of Privacy Impact Assessments, *see* 44 U.S.C. § 3501 (note), and the APA, which requires publication of rulemaking documents that provide information "concerning the operations of the Federal Government." Opp. 10. But generic notions of the value of information and transparency are insufficient to conclude that, by including a disclosure provision, Congress sought to vest a general right to information. Other provisions of the Privacy Act that involve the conditions of disclosure and how an individual can access his own record, *see* 5 U.S.C. § 552a(c), (d), make clear that the Act is not about a "right to obtain information from federal agencies," but rather to protect individual privacy. Opp. 11.

As for the PRA, it promotes efficient governmental operations, not disclosure in a way contemplated by other statutes that can justify informational standing. Congress enacted the PRA in response to the Government's "seemingly insatiable appetite for data." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990). It is intended to "maximize the utility," 44 U.S.C. § 3501(2), "improve the quality," 44 U.S.C. § 3501(4), and "minimize the cost," *id.* § 3501(5), of information used by federal agencies, and to minimize the burden of information collections, *id.* § 3501(6). True, there are public disclosure elements of the PRA, but the purpose is not to provide information to the public, but rather to improve the effectiveness of information collection.

The PRA differs in this way from the Federal Election Campaign Act (designed to disclose information about political contributors and to remedy injuries from nondisclosure of that information, *see FEC v. Akins*, 524 U.S. 11, 20 (1998)) or the Federal Advisory Committee Act (designed to allow members of the public to scrutinize the activities of advisory committees, *see Pub. Citizen v. DOJ*, 491 U.S. 440, 459–60 (1989)). The PRA uses public notice and comment as a mechanism for improving government operations, a common element which, if sufficient, would give anyone informational standing to challenge an agency's failure to comply with notice-and-comment provisions, contrary to binding precedent. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (denial of the ability to file comments by itself does not confer standing).

DOJ did not "misstate the law" when noting that informational standing begets only specific relief. Opp. 12; *see also* Defs. MSJ 23. A judicial remedy must "be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Because any "remedy must of course be limited to the inadequacy that produced the injury in fact," informational injuries can beget only informational remedies. *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Thus, Plaintiffs' informational injuries can be redressed only by the specific Federal Register disclosures under the Privacy Act and the PRA. Of course, a plaintiff with an informational injury can seek vacatur of the action that caused that injury, such as a final rule that should have gone through notice and comment. *See, e.g.*, *Waterkeeper All. v. EPA*, 853 F.3d 527, 537–38 (D.C. Cir. 2017). But a plaintiff cannot rely on informational injuries to seek vacatur of actions that don't cause informational injuries. For example, Plaintiffs' informational injuries from the PRA stem only from the letters sent by DOJ because those are the only things that Plaintiffs say are subject to the PRA's terms. *See* ECF No. 29-1 at 36 (Pls. MSJ). If Plaintiffs succeed on that claim, the most relief they can get is a withdrawal of those letters.

### E. Common Cause Lacks Organizational Standing

DOJ's motion explained that Common Cause's diversion-of-resources theory of standing is inconsistent with *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). *See* Defs. MSJ 24–26. Plaintiffs respond in their opposition that *FDA* "reaffirmed and applied the standard

from *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)," but that isn't the full story.  Opp. 2.  Although the Supreme Court did not formally overrule *Havens*, it made clear that "*Havens* was an unusual case" and emphasized that courts should be "careful not to extend the *Havens* holding beyond its context."  *FDA*, 602 U.S. at 396.  Plaintiffs fail to heed that lesson.  They continue to emphasize the resources Common Cause expends in response to DOJ's alleged Policy, but *FDA* expressly rejected that "standing exists when an organization diverts its resources in response to a defendant's actions" and corrected the notion that *Havens* "support[s] such an expansive theory of standing."  *Id.* at 395.

Plaintiffs' repeated references to how the alleged Policy is "making it more difficult for Common Cause to execute its mission" cannot square with *FDA* or other binding precedent.  Opp. 3.  For example, Common Cause claims a need to "investigate the scope of DOJ's . . . policy" to "provide accurate information to voters."  *Id.* 5.  But in *FDA*, the Supreme Court held that an organization cannot "spend its way into standing simply by expending money to gather information," which is precisely what Common Cause says it must do.  *FDA*, 602 U.S. at 394.  Plaintiffs further say Common Cause has had to "create new materials" to alert members and the public about the alleged Policy.  Opp. at 5.  But again, the Supreme Court expressly held in *FDA* that an organization does not suffer an Article III injury based on expenditures to "conduct [its] own studies . . . so that [it] can better inform [the organization's] members and the public."  *FDA*, 602 U.S. at 394.  Common Cause's creation of "new materials" to inform its members and the public is the identical alleged injury.  Opp. 5; *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (expenditure of resources to educate members and the public is not an injury in fact).  Common Cause's diversion of resources for "massive public education campaigns" are likewise the kind of injury that *FDA* rejected as insufficient to establish standing.  Opp. 5; *see Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 39–40 (D.D.C. 2018) (an educational campaign that is "functionally similar to the organization's normal-course campaigns" does not confer standing), *aff'd sub nom. Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10 (D.C. Cir. 2020).

Those education efforts are not an impairment of Common Cause's mission, but rather "a fulfillment" of it. *Coal. for Humane Immg. Rts v. DHS*, 780 F. Supp. 3d 79, 90 (D.D.C. 2025). Common Cause does not disclaim its previous statement that part of its mission is "educating the public about changes in voting and election procedures." Pls. MSJ 13. Common Cause admits that it has undertaken those education efforts on multiple fronts. In other words, DOJ's alleged Policy "has not impeded [Common Cause's] programmatic concerns and activities, but fueled them." *EPIC v. Dep't of Educ.*, 48 F. Supp. 3d 1, 23 (D.D.C. 2014). By the same token, Common Cause's expenditure of resources to allegedly "respond to many new inquiries" is not contrary to Common Cause's mission, Opp. 4, but rather an expansion of services that Common Cause already offers as part of its mission. *See Coal. for Human Immig. Rts.*, 780 F. Supp. 3d at 90. The D.C. Circuit case cited by Plaintiffs does not hold otherwise or help their argument. Not only did the D.C. Circuit in that case not find an organizational injury in fact, but it also specifically warned against "extending *Havens Realty*" beyond its own unique facts. *Indep. Mkt Monitor for PJM v. FERC*, 162 F.4th 1167, 1173 (D.C. Cir. 2025).

None of this applies, Common Cause says, because it is a "non-partisan voter assistance organization[]" and cases finding standing for such organizations are "legion." Opp. 6. Common Cause has not identified a single case, however, that identifies this distinction in the law. Indeed, multiple courts have determined that voting organizations lack organizational standing. *See DSCC*, 2026 WL 1487833, at *7–8; *Tex. State LULAC v. Elfant*, 52 F.4th 248, 253–56 (5th Cir. 2022). Common Cause therefore must meet (and it has not) the same standard for organizational standing as every other organization.

Plaintiffs must identify a concrete injury, and they have not.[4] And Plaintiffs proffer no response to Defendants' argument about Plaintiff Common Cause Education Fund. *See* Defs. MSJ 27. That entity should be dismissed (as should the entire suit for lack of standing). At an absolute minimum, the Court should dismiss any Plaintiffs (and any claims, or requests for relief) for which

---

[4] For that reason, Plaintiffs' asserted procedural injuries are insufficient. *See* Defs.' MSJ 26–27; *contra* Opp. 19 n.14.

11

Plaintiffs have failed to carry their standing burden at summary judgment.  *See Davis v. FEC*, 554 U.S. 724, 734 (2008).

**II.      Plaintiffs Do Not Challenge a Discrete and Final Agency Action**

DOJ explained at length in its opening brief why the alleged Policy with which Plaintiffs take issue is not the kind of "discrete" agency action that a plaintiff can challenge under the APA. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *see* Defs. MSJ 28–30.  In that argument, Defendants restated Plaintiffs' own description of the Policy as encompassing "constituent actions," Pls. MSJ 4, and multiple "element[s], *id.* at 5.  Plaintiffs now change tack, asserting that the alleged Policy is "categorical" and therefore reviewable.  Opp. 21.

The record disproves Plaintiffs' new theory that DOJ has acted categorically.  *Contra* Opp. 23–24.  Once DOJ decided to investigate violations of the NVRA and HAVA, it requested information in letters that, as the record shows, asked for different responses from each State.  *See* Defs. MSJ 29.  Plaintiffs do not suggest otherwise.  Moreover, DOJ's next steps depended on each State's reaction.  Some States signed MOUs, *see, e.g.*, CRT-5, others provided data under a cover letter, and one reached a settlement agreement with DOJ before disclosing the information, *see* CRT-11.  DOJ therefore adopted no across-the-board decision similar to funding freezes or pauses "implemented categorically" by every agency.  *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 123 (D.D.C. 2025); *see New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025).  Instead, DOJ made decisions unique to each State's approach.  The South Carolina MOU exemplifies this.  Although DOJ took the position in mid-December that its MOU was "an offer to all states" that could not "be redlined in any fashion," CRT-1875, South Carolina requested incorporation of "several clarifications" in its MOU to which DOJ agreed, CRT-17.  If the alleged Policy really was categorical in the way Plaintiffs say, DOJ would not have been willing "to adopt language" requested by a particular State.  *Id.*; *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023) (challenge to Bureau of Land Management timber sales was targeted at "site-specific decisions" rather than a discrete agency action).

Plaintiffs also have not persuasively rebutted DOJ's argument that they have mounted an improper programmatic challenge. The "constituent actions," as Plaintiffs call them, encompass "compiling" voter rolls through requests, "consolidating" them, "disclosing" them to particular entities, "comparing" them to other datasets, and "testing" them for errors. Pls. MSJ 5. Those pieces all involve voting, but that does not mean Plaintiffs can unilaterally tether them together and label them one policy. *See Mass. Coal. for Immig. Reform v. DHS*, 621 F. Supp. 3d 84, 97 (D.D.C. 2022) (rejecting a challenge to "numerous immigration-related agency actions"). If anything, the presence of so many different types of administrative actions—requests, storage, disclosures, analysis, and even lawsuits—reinforces that Plaintiffs are challenging DOJ's program to enforce the NVRA and HAVA. All paradigmatic programs that cannot be challenged under the APA, like a "weapons procurement program of the Department of Defense or a drug interdiction program of the Drug Enforcement Administration, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990) (citation omitted), are the encapsulation of a series of smaller decisions, just like DOJ's here. That Plaintiffs challenge "all aspects" of DOJ's program dooms their complaint as an improper programmatic challenge. *Id.* at 890 n.2. Put differently, Plaintiffs cannot "jumble[] together a boatload of individual agency actions" and fly it under a "Policy" banner. *Ctr. for Bio. Diversity v. Burgum*, — F. Supp. 3d —, 2026 WL 180258, at *11 (D.D.C. Jan. 23, 2026).

The binding precedents that Plaintiffs cite do not help them. In fact, *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018), helps DOJ. The D.C. Circuit there ruled that an agency's decision to disregard a "cabined and direct" statutory command was sufficiently discrete because the plaintiff challenged "an identified transgression." *Id.* at 388. This case is different— Plaintiffs here argue that DOJ has transgressed multiple statutes, including the NVRA, HAVA, PRA, and the Privacy Act. Moreover, the D.C. Circuit distinguished the challenge in *Hispanic Affairs Project* from a challenge to an agency's "exercise of broad, unspecified discretion." *Id.* Unlike DHS there, DOJ is explicitly claiming a "discretionary cloak for its actions," *id.*, based on its authority to (*inter alia*) enforce the NVRA and HAVA, *see infra* § IV.A.1. As for *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008), an agency's policy about

13

when "to disclose confidential information" is plainly more narrow than what Plaintiffs challenge here.  Plaintiffs challenge not just that DOJ "disclos[es]" voter data, Pls. MSJ 5, but also (at the very least) how DOJ obtains the data in question, analyzes it, and stores it.

Even if Plaintiffs challenge a sufficiently discrete action, some elements are not actions "by which rights or obligations have been determined, or from which legal consequences will flow," as is necessary to be a final agency.  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted).  For example, legal consequences for States do not kick in until, at the very earliest, DOJ brings an enforcement action.  Failure to respond to DOJ's letter might increase the hypothetical probability that a State will face such an action in the future, but that is at most a "practical consequence."  *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (citation omitted).  And contrary to Plaintiffs' argument, nothing in the letters "commits [DOJ] to taking enforcement action," *Holistic Candlers and Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012), meaning that the sending of the letters themselves did not determine the States' rights or create legal consequences.

As for "DOJ sharing [voter roll] data it has obtained with" SAVE and HSI,[5] Opp. 25, Plaintiffs do not address *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1236 (D.C. Cir. 2026).  Like the information-sharing agreement there, DOJ's memorandum with USCIS memorializes sharing that is "established by statute," and the memorandum is not final agency action under *Bennett*.  *Id.* (citation omitted); *see* 8 U.S.C. § 1373(c).  And sharing data with Homeland Security Investigations (HSI) does not create legal consequences until HSI actually uses the data in some way, which the record here does not show has happened.

III.    **Plaintiffs Lack a Cause of Action For Certain Claims**

A.  **Plaintiffs Do Not Dispute That Counts III and V Are Not Cognizable**

DOJ proffered multiple reasons for why Plaintiffs' *ultra vires* claims are not cognizable under binding precedent.  *See* Defs. MSJ 32–33.  Plaintiffs do not respond to those arguments and

---

[5] Sharing data with "SSA[] and other federal agencies," Opp. 25, is not at issue in this case.

therefore implicitly concede them.    *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002). To the extent Plaintiffs raise the motion-to-dismiss standard to avoid this consequence, *see* Opp. 50, an argument that a plaintiff lacks a cause of action is cognizable and appropriate at the motion-to-dismiss stage.    *See, e.g.*, *John Doe v. Metro. Police Dep't of D.C.*, 445 F.3d 460, 466 (D.C. Cir. 2006).

### B.    Plaintiffs Cannot Bring an APA Claim Predicated on Privacy Act Violations (Count VI)

As explained in detail in DOJ's motion (at 33–36), the Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information.    *FAA v. Cooper*, 566 U.S. 284, 287 (2012). Congress also specified a detailed set of civil remedies that are (and are not) available for violations of the statute.    For example, the statute makes relief available to individuals (but not organizations) in 5 U.S.C. § 552a(g)(1)(D) and it allows for injunctive relief in two (and only two) circumstances. *See id.* § 552a(g)(1)(A), (g)(2)(A); 552a(g)(1)(B), (g)(3)(A); *accord Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007).

Plaintiffs suggest that Congress's careful construction of the Privacy Act was all a waste of its time. In Plaintiffs' view, *any* litigant (whether an individual or an organization) can get an injunction for *any* violation of the Privacy Act, at any time, if a plaintiff simply styles his claim as arising under the APA.    *See* Opp. 35.    Plaintiffs are wrong.    "[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."    *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984).    Such is the case here: "where, as here, [a] statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief."    *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir. 1980) (citing *Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161–62 (9th Cir. 1978)).    Until 2025, this exact proposition was largely taken for granted by courts interpreting the Privacy Act.    *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also* Defs. MSJ 35 (citing other cases).

15

Plaintiffs respond that "several judges in this District have expressly held that the Privacy Act does not preclude the type of APA relief Plaintiffs seek here." Opp. 36. DOJ is aware of those (non-binding) decisions and proactively disclosed them. *See* Defs. MSJ 35 n.7. Respectfully, those courts are mistaken for the reasons explained here and in other more persuasive authority that comes out the other way. *See Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175 (4th Cir. 2025) ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here."), *abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026) (en banc); *Cell Assocs.*, 579 F.2d at 1160 ("We think it unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board.").

Plaintiffs' other authorities do not help them. In *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988), the D.C. Circuit granted an injunction for an APA claim alleging violations of "the Veterans' Records Statute, as amended by the Privacy Act." The Veterans' Records Statute, today codified at 38 U.S.C. § 5701, incorporates the Privacy Act's disclosure standards (but not its causes of action). *See* 38 U.S.C. § 5701(j) ("[A]ny disclosure made pursuant to this section shall be made in accordance with the provisions of section 552a of title 5."). The plaintiff there had, in addition to asserting an APA claim, brought a separate claim for injunctive relief under the Privacy Act, which the court rejected because it was not one of the two specific situations in which the Privacy Act authorized the entry of injunctive relief. *See Stephens*, 851 F.2d at 1463. The court *granted* injunctive relief under the APA due to the agency's "violat[ion] [of] the Veterans' Record Statute," *not* the Privacy Act. *Id.* at 1466. As for the Supreme Court's footnote in *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004), cited by Plaintiffs, that footnote is plainly dicta and not a sufficient basis for this Court to overturn the statutory scheme enacted by Congress.

Plaintiffs next resort to an inference based on subsequent legislative history of the Judicial Redress Act of 2015, *see* Opp. 35, even though the D.C. Circuit has described such history as "an unreliable guide to legislative intent." *Verizon v. FCC*, 740 F.3d 623, 639 (D.C. Cir. 2014). It is

16

also unclear that they interpret the Judicial Redress Act correctly. Plaintiffs believe the Act explicitly precludes *all* non-Privacy Act remedies for a certain category of individuals—*i.e.*, that the Privacy Act remedies are exclusive—but they cite language that could be read to foreclose only other remedies "under this section." *Id.* (quoting Pub. L. No. 114-126, 130 Stat. 282, 283–84). Plaintiffs' naked policy arguments also cannot overcome Congress's decisions in the text of the statute. For example, Plaintiffs list some of the relief they request and suggest that injunctive relief under the APA must be available because some Plaintiffs otherwise "would have no recourse for their ongoing privacy injuries." Opp. 36. But that is exactly the point. Plaintiffs are seeking judicial remedies for alleged violations of the Privacy Act that are unavailable under the Privacy Act, confirming that Plaintiffs' interpretation of the statute is *wrong*, not right. And the organizational nature of Common Cause is a meritorious argument for *dismissal* since, as Plaintiffs acknowledge, the Privacy Act "does not offer [Common Cause] *any* remedy." *Id.* at 37.

## IV. Plaintiffs' Claims Fail On The Merits

### A. DOJ's Actions Are Not Contrary to Election Laws

Plaintiffs raise multiple reasons for why DOJ's actions violate various election laws, but none of them is persuasive. As an initial matter, Plaintiffs want to have their cake and eat it too. They simultaneously assert that they "challenge the sum of the parts," Opp. 26, but they then give arguments as to each of the "constituent actions," *id.* at 28–31. Plaintiffs cannot simultaneously say that they are challenging a discrete agency "action" and then attack each sub-action inside the action. *See supra* § II. Regardless, their arguments fail.[6]

### 1. Title III of the Civil Rights Act Permits The Requests.

Title III of the Civil Rights Act (CRA) of 1960 authorizes DOJ's request for state voter rolls. *See* Defs. MSJ 36–38. Plaintiffs do not contest that voter rolls are records "relating to" registration, 52 U.S.C. § 20701, but they object on multiple other unpersuasive grounds.

---

[6] Recently, the Western District of Pennsylvania has dismissed DOJ's lawsuit seeking records from that State. *See United States v. Schmidt*, 2026 WL 1850016 (W.D. Pa. June 27, 2026). And the Sixth Circuit has affirmed another district-court dismissal of DOJ's suit to obtain voter rolls from Michigan. *See United States v. Benson*, — F.4th —, 2026 WL 1815425 (6th Cir. June 24, 2025).

Plaintiffs first say that, based on the legislative history of Title III, the CRA "only authorizes DOJ to seek records for purposes of investigating cases of discrimination or disenfranchisement." Opp. 32. But this Court's interpretation "begins and ends with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), on "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). No language limiting Title III to individual voting-rights violations or violations based on discrimination appears anywhere in the statutory text of Title III. Plaintiffs cannot "elevate vague invocations of statutory purpose over the words Congress chose." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 463 (2022). In fact, Congress made clear elsewhere in the CRA when it intended a remedy to be limited to racial discrimination. *See, e.g.*, 52 U.S.C. § 10101(a)(1) (establishing that all citizens shall be qualified to vote "without distinction of race, color, or previous condition of servitude"). This Court should draw "a negative inference . . . from the exclusion of [race-based] language from" Title III, *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006), and conclude that "investigating possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963), is a valid purpose of a demand for federal election records under the statute. And, in any event, the Supreme Court has recognized that "debasement or dilution of the wight of a citizen's vote" can "just as effectively" deny suffrage "as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted). Thus, even if Title III is limited in the way Plaintiffs say, DOJ's investigation about the presence of votes by ineligible voters that might "outweigh[]" legitimate votes is permissible. *Id.*

Non-compliance with the NVRA and HAVA also is a permissible purpose of a CRA demand even though Title III predates those statutes "by several decades." Opp. 33 (citations omitted). Nothing prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes. The default rule is the opposite: "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133

18

(2000); *see also United States v. Fausto*, 484 U.S. 439, 453 (1988) ("Th[e] classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute."). Once the NVRA was enacted, its enforcement certainly became a permissible "purpose" for a Title III request. *See Benson*, 2026 WL 1815425, at *10 (Nalbandian, J., dissenting) ("The NVRA, HAVA, and Title III form one harmonious arrangement—just not in the way the majority assumes.").

The lack of a comparable tool for records inspection by the Attorney General in the NVRA and HAVA supplies additional support for this position. Both statutes impose record-keeping requirements and may be enforced by the Attorney General. *See* 52 U.S.C. §§ 20507(a)(4)(A)–(B), 20507(i)(1), 20510(a) (NVRA); 21083(a)(1)(A), (a)(2)(A), 21111 (HAVA), but neither provides its own equivalent to Title III's broad request provision. It is implausible to assume, as Plaintiffs seem to, that Congress intended for the Attorney General to lack the ability to inspect complete records so pertinent to his enforcement authority. Because "Congress legislates against the backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (citation omitted), the better inference is that Congress saw no need to provide an identical inspection provision for the Attorney General in these later-enacted statutes.

The CRA also covers the voter rolls, contrary to courts which have held that a voter roll does not come into the "possession" of a State election official. 52 U.S.C. § 20703; *see* Opp. 33. Reading the CRA as those courts do would effectively carve out vast numbers of federal election records, including voter rolls, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962). The plain terms of Section 20701 dictate otherwise. An officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). And even accepting those courts' interpretation as correct, a State election official still comes into possession of a voter roll "when her employees send it to her," as

19

Judge Nalbandian has explained. *Benson*, 2026 WL 1815425, at *11 (Nalbandian, J., dissenting).

As for decisions by courts that DOJ's stated purpose is "either insufficient or pretextual," Opp. 33, those decisions ignore that the CRA identifies only the scope of the "records and papers" that the Attorney General may demand, 52 U.S.C. § 20701, and includes a requirement that he communicate "the basis and the purpose" for his request, 52 U.S.C. § 20703—not any standard against which to measure his stated basis or purpose. Instead, the Attorney General need only "identify in a general way the reasons for his demand" for federal election records. *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible* violations of a Federal [voting-related] statute." *Id.* (emphasis added); *see, e.g.*, *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) ("The purpose of this demand is to examine the aforesaid records to ascertain whether or not violations of Federal law in regard to registration and voting have occurred."); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962) (verbatim), *aff'd sub. nom. Coleman v. Kennedy*, *supra*. DOJ's citations in its letters of each State's obligations under the NVRA and HAVA, as well as identification of potential abnormalities within each State's voting registration data, were more than sufficient under this standard.[7]

### 2.  The NVRA and HAVA Permit DOJ's Investigation

Plaintiffs are incorrect about the power conferred on DOJ by the NVRA and HAVA. Congress empowered DOJ specifically to enforce those statutes by initiating lawsuits. *See* 52 U.S.C. §§ 20510(a) (NVRA), 21111 (HAVA). Plaintiffs acknowledge this, but they say that DOJ can bring lawsuits only when it "suspect[s] a state's programmatic or systemic list maintenance process are not reasonable." Opp. 27 (citation omitted). And how should DOJ suspect that processes are unreasonable? Plaintiffs appear to suggest that DOJ should just suspect violations and then initiate lawsuits on the basis of that suspicion with minimal pre-suit inquiry or diligence.

---

[7] The CRA does not prohibit DOJ from sharing data with its contractors, who are "other representative[s] of the Attorney General" that can access records disclosed by States. 52 U.S.C. § 20704; *contra* Reply 33.

The NVRA and HAVA do not accommodate such a cabined view of DOJ's authority. As DOJ explained in its motion, whether a State's process is reasonable depends on the output of that process, *i.e.*, whether the State is effective at "remov[ing] the names of ineligible voters" from its voter rolls. 52 U.S.C. § 20507(a)(4). A State's voter registration list is perhaps the best evidence of that. It also is probative evidence for whether a State's election system and process "ensure[s] that voter registration records in the State are accurate." *Id.* § 21083(a)(4). Because the NVRA and HAVA give DOJ the explicit power to enforce those requirements, those statutes also give DOJ the power to investigate potential violations of those requirements. The NVRA's "public disclosure provision" does not undermine this conclusion. Opp. 28. That provision requires States to make records "available for public inspection," 52 U.S.C. § 20507(i)(1), but it says nothing about DOJ's inspection authority. Rather, the statute governing DOJ's ability to demand voting-related documents—which are specifically not subject to public disclosure, *see id.* § 20704—remains 52 U.S.C. § 20703.

Plaintiffs resist this conclusion by arguing that DOJ cannot investigate violations of the NVRA and HAVA "on a dragnet basis and without any particularized investigatory purpose." Opp. 29. As an initial matter, DOJ has stated its investigatory purpose—to ascertain compliance with these election statutes, and it noted in its letters that each investigation is particularized to possible irregularities identified in the EAVS report. *See* Defs. MSJ 40. Regardless, Plaintiffs cite no statutory text that restricts DOJ to investigating only one State's compliance with the NVRA and HAVA. The default rule is still that DOJ can "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Powell*, 379 U.S. 48, 57 (1964). That statement is not "dicta," and the Supreme Court has used it to describe the actions of a federal agency, not simply "grand juries." Opp. 29; *see Powell*, 379 U.S. at 57. Pursuant to that authority, DOJ can investigate multiple States at once if it chooses. Plaintiffs also identify nothing that would allow DOJ to *ask* States to respond regarding potential irregularities in the EAVS report—which Plaintiffs characterize as "an arguably proper way DOJ might conduct a pre-enforcement litigation review," Opp. 30—but also *forbid* DOJ from investigating the

21

effectiveness of those processes through requested voter rolls.  After all, both measures stem from a "suspicion that the law is being violated" in some way.  *Powell*, 379 U.S. at 57.

Another permissible way for DOJ to proceed is by identifying potential wrongdoers.  *See* Defs. MSJ 40–41.  To be clear, the record reflects that DOJ is not "removing potentially ineligible individual voters."  Opp. 30–31.  In portions of the administrative record that Plaintiffs do not dispute, many States have affirmed that they will need to confirm the accuracy of DOJ's assertions about ineligibility before removing anyone.  *See* Defs. MSJ 41.  Those States can disagree with DOJ's identifications or explore them and determine that DOJ is mistaken.  But the issue of removal remains with the States, not DOJ.  And there is no problem with DOJ identifying *potentially* ineligible voters to States.  *See* Defs. MSJ 40–41.  Plaintiffs claim DOJ lacks "statutory authorization" for this action, but DOJ has already described that the identification of potential wrongdoers stems from the express ability to enforce the NVRA and HAVA and, by extension, to investigate violations of those statutes.  *See* Defs. MSJ 39–40 (citing 52 U.S.C. §§ 20510(a), 20511, 21111).

Regarding the MOUs with Texas and Alaska, Plaintiffs appear not to dispute that the NVRA's protections for registered voters do not apply to noncitizens who "were ineligible and improperly registered to vote in the first place."  *See Bell v. Marinko*, 367 F.3d 588, 591–592 (6th Cir. 2004).  They suggest instead that the 90-day period applies because SAVE is "woefully inadequate" such that any program to remove voters cannot occur within 90 days of an election.  Opp. 31.  This argument is confounding.  If the 90-day period does not apply to noncitizens, then States can undertake a process within 90 days of an election to identify those noncitizens.  To read the 90-day provision otherwise leads to the absurd result that States can, within 90 days of an election, permissibly remove voters convicted of a crime, found mentally incapacitated, or dead, *see* 52 U.S.C. § 20507(c)(2)(B), but cannot remove noncitizens despite a ban on their voting in elections, *see* 18 U.S.C. § 611; *see also Mi Familia Vota v. Fontes*, 129 F.4th 691, 756 (9th Cir. 2025) (Bumatay, J., dissenting).  Congress did not pass a law that would "effectively grant, and then protect, the franchise of persons not eligible to vote" in this way.  *Bell*, 367 F.3d at 592.  And

22

the 90-day period prohibits only "systematic[]" programs to remove voters, not individualized removals of voters, including those who no longer reside in the State.  52 U.S.C. § 20507(c)(2)(A).

Overarching these arguments, Plaintiffs raise the major questions doctrine as limiting DOJ's supposedly "unheard-of and transformative powers of investigation."  Opp. 27; *see also id.* at 29.  As DOJ explained, *see* Defs. MSJ 41–42, the enforcement of federal election laws is nothing new.  DOJ has used the CRA since the 1960s and has enforced the NVRA and HAVA in recent years.  In addition to the historical examples DOJ gave in its motion, *see id.* at 42, DOJ also sent a letter in 2024 to Alabama election officials explaining that DOJ had "reviewed reports" (which it cited) suggesting that the State was implementing within 90 days of an election a "program" to identify and remove registrants identified as noncitizens, in violation of the Quiet-Period Provision.  Compl. 1–2, *United States v. Alabama*, No. 2:24-cv-1329 (N.D. Ala. Sept. 27, 2024) (Doc. 1).  In short, DOJ's enforcement of these laws is not "newfound."  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022); *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).  And although Plaintiffs suggest that the historical examples are different because they were based on "specific, identified concerns" with each State, Opp. 27 n.20, Plaintiffs cite nothing requiring DOJ to act only on "specific" concerns about a particular State.  "[A]ssurance that [the law] is not" being violated is enough.  *Powell*, 379 U.S. at 57.

In any event, the major-questions precedents are particularly inapt here because they analyze the scope of delegations of traditionally *congressional* authority, not an executive official's mode of investigation based on a concededly lawful federal statute.  Rather, in those cases, an agency claimed a delegation of authority that explicitly belonged to Congress.  *See, e.g.*, *West Virginia*, 597 U.S. at 706 (regulatory power); *Util. Air Regul. Grp.*, 573 U.S. at 324 (same).  But here, DOJ asserts only the investigative authority that naturally belongs to the Executive Branch.  DOJ is not exercising delegated authority or regulating private conduct or exercising some other authority typically enjoyed by Congress.  DOJ is simply investigating potential violations of the NVRA and HAVA, as Congress permitted it to do.

### B. DOJ Has Not Violated The Privacy Act

***Published SORN Covers Storage of The Voter Rolls.***  The current SORNs for the Central Civil Rights Division Index File and Associated Records (Central Index File) state that it may include records on "[s]ubjects of investigations" and "victims."  Privacy Act of 1974, 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003) (citation modified).  Plaintiffs accuse of DOJ of making an "anemic" argument about these terms, Opp. 38, but the context of these words "indicates that [the SORN] used them as terms of art."  *United States v. Hansen*, 599 U.S. 762, 775 (2023).  The Justice Manual "sets forth internal [DOJ] policies and procedures" for all Department components, Justice Manual § 1-1.100 (Mar. 2024), https:// perma.cc/9JXJ-2X9U—including the Division, the author of the SORN, *cf. id.* § 8-1.010.  Context thus suggests that the SORN uses the term "subject" to mean a person whose conduct is within an investigation's scope:  Persons who appear in a state voter list are therefore subjects of DOJ's investigation into voter fraud.  And legitimate voters who appear on those lists are potential victims of voter fraud due to the prospect of "unlawful dilution," CRT-3357, a prospect that Plaintiffs do not rebut.  As for the argument that DOJ should have published a new SORN, *see* Opp. 37, the Privacy Act requires agencies to publish SORNs only when they "revis[e]" a system of records, 5 U.S.C. § 552a(e)(4).  Because the current SORN covers DOJ's activities here, there was no revision necessitating a new SORN.

***Routine Uses and the Law Enforcement Exception Apply.***  Plaintiffs argue that the routine uses in the SORN for the Central Index File do not "put[] the American public on notice" about the use of their data.  Opp. 40 (citation omitted).  This argument subjects DOJ to a heightened level of notice that is not required by the Privacy Act, which simply lists what each "notice shall include."  5 U.S.C. § 552a(e)(4).  Plaintiffs rely on non-binding decisions for their argument that impose a heightened requirement based on the legislative history of the Privacy Act, not its text.  *See Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548 (3d Cir. 1989); *Dinh Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 136–37 (D.D.C. 2019) (citing *Britt*), *aff'd sub nom. Tran v. Dep't of Treasury*, 798 F. App'x 649 (D.C. Cir. 2020).  Here, the SORN states that records are kept "in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the

24

provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611.  The cited regulation, in turn, makes clear that the Civil Rights Division is responsible for enforcing all statutes "affecting civil rights, including those pertaining to elections and voting," which would include the CRA, the NVRA, and HAVA.  28 C.F.R. § 0.50(a).

Plaintiffs also fail to explain why the law enforcement exception does not apply.  *See* Defs. MSJ 44.  They apparently want ICE to have identified "the particular statutes" implicated by its investigation, Opp. 41, but the Privacy Act requires ICE to identify the "law enforcement activity," 5 U.S.C. § 552a(b)(7), which it undoubtedly did, *see* CRT-3398.  The Office of Legal Counsel's opinion similarly acknowledged that this requirement "is not particularly onerous."  CRT-3367. And although Plaintiffs wax about the meaning of "portion," 5 U.S.C. § 552a(b)(7), the entirety of a record is still a 100% portion of that record.  The Privacy Act therefore does not restrict a request to only part of a record.

**DOJ Has Not Violated the Accuracy Provisions of the Privacy Act.**  The Privacy Act exists in part because records will be inaccurate.  Congress acknowledged this when it authorized courts to order amendments to an individual's record.  *See* 5 U.S.C. § 552a(g)(2)(A).  Plaintiffs' response is essentially that such things don't matter because the Privacy Act apparently requires accurate records at all times and in all places.  *See* Opp. 42.  The Privacy Act cannot impose such an obligation, particularly for databases that, like SAVE, are established to fulfill a statutory mandate from Congress.  *See* 42 U.S.C. § 1320b-7 (note).

**The Privacy Act's First Amendment Activities Provision Does Not Bar DOJ's Actions.** DOJ will not belabor the argument, made previously and throughout this brief, that it can maintain voting-related records because doing so is "expressly authorized by" statute, namely the CRA, the NVRA, and HAVA.  5 U.S.C. § 552a(e)(7); *contra* Pls. MSJ 43.  Moreover, Plaintiffs' argument that DOJ cannot enforce those statutes "[j]ust because Congress permits DOJ to sue states for alleged NVRA and HAVA violations" flouts the express text of Congress.  Opp. 43.  Plaintiffs apparently want DOJ to investigate States based on no information whatsoever about whether their list maintenance activities are reasonable and effective.  *See supra* § IV.1.  That investigation is

25

not "generic," Opp. 43, but targeted at specific potential violations of statutes that Plaintiffs admit DOJ is empowered to enforce.  Rather than enforce "for informative purposes," DOJ has identified the statutes it wishes to enforce and the steps to investigate violations of those statutes.  Opp. 44.

### C.  DOJ's Letters to States Do Not Violate The Paperwork Reduction Act

As DOJ explained, to have a collection of information under the PRA, an agency must ask "identical questions."  44 U.S.C. § 3502(3)(A).  DOJ's letters to States were not identical.  Some asked for information unique to a particular State, while others asked only for voter rolls.  *See, e.g.*, CRT-2407 (requesting information from Arkansas related to 7 Survey items); CRT-3187 (asking Vermont for only the state voter list).  Those letters are therefore not "identical."  *See Identical*, Webster's New World College Dictionary 708 (4th ed. 2008).  Plaintiffs say that this interpretation is "easily gamed," Opp. 44, but they are the ones disregarding the common definition of the word "identical."

DOJ's letters also did not pose "questions" to the states.  *See* Defs. MSJ 48.  A question is "an interrogative expression."  *Question*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/question (last visited Jun. 24, 2026).  DOJ's letters do not pose interrogative expressions beginning with classic prefaces like "Is it true that . . ." or "What are you doing to . . ."  Plaintiffs dismiss this argument as "punctuation-based," Opp. 45, but they again ask the Court to disregard the common definition of "question."

In any event, the PRA excludes from its definition any collection of information in most "administrative action[s] or investigation[s] . . . against specific individuals or entities[,]" 44 U.S.C. § 3518(c)(1)(B)(ii).  Plaintiffs raise the carveout from the exclusion in § 3518(c)(2) for "general investigations" of "a category of individuals or entities such as a class of licensees or an entire industry."  Opp. 45 (quoting 44 U.S.C. § 3518(c)(2)).  That carveout does not apply.  Although DOJ's inquiry is widespread, the phrasing of § 3518(c)(2) indicates that a "general investigation" of a class or industry refers to an investigation of the group as a group rather than a widespread investigation of such a group or industry's members.  *See* CRT-3362.

26

### D.  Plaintiffs' Constitutional Claims Fail as a Matter of Law

"Once Plaintiffs' statutory claims are resolved, their constitutional claims follow as a matter of course."  Defs. MSJ 49.  That remains true for Plaintiffs' federalism claim, which is based on their incorrect statement that "no federal statute authorizes DOJ's policy."  Opp. 50; *see supra* § IV.A, IV.B, IV.C.  Moreover, Plaintiffs are simply incorrect that "DOJ seeks to make SAVE approval a new voting qualification."  Opp. 51 n.29.  Those qualifications still vary by State, and DOJ is not changing them.

That fact differentiates this case from *League of United American Citizens v. EOP*, 818 F. Supp. 3d 34 (D.D.C. 2026) (cited at Opp. 52).  The plaintiffs there challenged an Executive Order that (at least as interpreted by that court) required significant changes to voter-registration rules in all 50 States.  *See id.* at 94 (discussing how the challenged section directed the Secretary of Defense to add a documentary proof of citizenship requirement to the Federal Post Card Application).  By contrast, DOJ is not "federaliz[ing] list maintenance" responsibilities or otherwise changing the responsibilities of States.  Opp. 52.  States are still the entities charged with list maintenance.  DOJ may enforce how each State undertakes those responsibilities, but that does not mean DOJ has taken those responsibilities upon itself.

Finally, Plaintiffs say in a footnote that, to the extent DOJ moves for summary judgment on these claims, Plaintiffs plan to request discovery.  *See* Opp. 50 n.28.  To be clear, DOJ moves the Court to dismiss the constitutional claims under Rule 12 and, in the alternative, Rule 56.  The Court should not wait to dismiss those claims under Rule 56 for Plaintiffs to notice discovery, which would be unnecessary and improper in any event.  Plaintiffs have waited too long under Rule 56(d), which requires notice to "justify [their] opposition" to DOJ's now-filed motion for summary judgment.  Fed. R. Civ. P. 56(d).

### E.  DOJ Did Not Act Arbitrarily or Capriciously (Count VIII)

Plaintiffs make multiple arguments in support of their arbitrary-and-capricious claim that simply do not make sense.  To start, they say that DOJ's explanations, which are well-established in the record, are somehow "post hoc."  Opp. 46.  That is not the case.  The earliest letter that DOJ

27

sent to a State about which DOJ had not received a complaint specifically asked for information regarding that State's compliance with HAVA.[8] *See* CRT-3061 (letter to Pennsylvania dated June 23, 2025). DOJ gave the same explanation when it sent letters two days later. *See* CRT-2818, CRT-2908. The record thus clearly rebuts that DOJ's explanation for its actions was post hoc; DOJ made this purpose clear up front when it started sending correspondence to States.

Plaintiffs further argue that DOJ's explanation was too "cursory," Opp. 47, but again the record is replete with letters where DOJ explained itself. DOJ said that it was writing "to request information regarding [each State's] procedures for complying with the statewide voter registration list maintenance provisions of the [NVRA]." *E.g.*, CRT-2489. The same letters also noted that "[s]ection 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions." *Id.* Further, the administrative record shows that DOJ provided States with its interpretation of the relevant statutes. *See* CRT-3384 (recapping in August 2025 a call between DOJ and various States that explained DOJ's basis for its actions); CRT-1877 (thanking DOJ for "taking the time to provide an explanation of DOJ's position regarding its request"). This is not a situation where DOJ "failed to address [a] critical issue" at any time, as was the case in Plaintiffs' main cited case. *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 416 (D.C. Cir. 2011) (cited at Opp. 47).[9]

Finally, DOJ did not fail to consider important aspects of the problem. *See* Defs. MSJ 51; *contra* Opp. 49. Plaintiffs' main response is that there is no document in the record "pre-dating the Policy's implementation." Opp. 49. As with so many of Plaintiffs' arguments, this one assumes that DOJ instituted an across-the-board policy when, in truth, its actions depended on the

---

[8] The record contains letters sent earlier to Colorado and Wisconsin based on complaints the Civil Rights Division had received about those States or information the Division had learned about their processes. Both letters expressly said that they were requesting information to assess compliance with HAVA. *See* CRT-2432 (Colorado), CRT-3226 (Wisconsin).

[9] Plaintiffs say that DOJ has somehow conceded that its actions are based on assumptions and not analysis. *See* Opp. 48. They are misreading DOJ's motion. DOJ rebutted Plaintiffs' argument that there was no explanation at all, *see* Pls.' MSJ 38–39, and observed that Plaintiffs' disagreement with that explanation does not mean no explanation was given, *see* Defs.' MSJ 51.

response of each State. *See supra* § II. Regardless, the administrative record includes letters from the very beginning of the alleged Policy, all of which discuss HAVA and the NVRA. And as for States' reliance interests, *see* Opp. 49, and the argument that DOJ must explain a deviation from past "precedent," *id.* at 48, Plaintiffs have no response to *FDA v. Wages & White Lion Investments, L.L.C.*, 604 U.S. 542 (2025) (cited at Defs. MSJ 52). The Supreme Court made clear there that beliefs about how an agency will exercise its discretion do not create serious reliance interests and that previous discretionary enforcement choices do not provide enough precedent to require the agency to explain later, different enforcement choices. *Id.* at 583–85.

## V.       Plaintiffs' Requested Relief is Overbroad and Subject to Equitable Limits

Plaintiffs cannot prevail on their claims, but even if they could, their proposed relief should be limited geographically and to the Plaintiffs before the Court. *See* Defs. MSJ 53–55. On geography, Plaintiffs do not dispute that DOJ's obtaining, maintenance, and usage of States' data depends on whether each State discloses that data. For States that have not disclosed data, there is no injury, so any relief must be limited at maximum to the 18 States that have disclosed data.[10] This is a noted difference from the case cited by Plaintiffs, where a court entered a nationwide injunction because, based on that court's determination, an executive order provision affected one form used "throughout the nation." *League of United Latin Am. Citizens v. EOP*, 808 F. Supp. 3d 29, 85 (D.D.C. 2025) (citation omitted) (cited at Opp. 54). In contrast, DOJ's alleged Policy does not affect every State, but rather only those States that have elected to disclose their data to the Department.

But the relief should be narrowed even further to be "limited to the inadequacy that produced [the] injury in fact." *Gill*, 585 U.S. at 66. Plaintiffs have shown at most an injury in fact based on DOJ's collection and usage of data in Texas, where some Plaintiffs attest to being asked to confirm their citizenship. But they point to no other State where voters will likely be or have

---

[10] DOJ continues to assert that any injury is not irreparable and that the balance of the equities and the public interest do not support an injunction based on those injuries. *See* Defs.' MSJ 52–53; *contra* Opp. 55 n.31.

been asked to do the same.  And although Common Cause has "members in all 50 States," Opp. 54, it cannot have expended resources in response to DOJ's alleged Policy in States that have not handed over their data.  Common Cause has thus submitted declarations from four states.  *See* Decl. of Gavin Geis, ECF No. 29-4 (Nebraska); Decl. of Julia Vaugh, ECF No. 29-5 (Indiana); Dec. of Catherine Turcer, ECF No. 29-6 (Ohio); Decl. of Anthony Gutierrez, ECF No. 29-7 (Texas).  To the extent the Court decides to enter an injunction based on Common Cause's organizational standing, the injunction can restrain at most DOJ's actions as to data received from those four States.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").  In short, a nationwide injunction is not permitted here.

Neither is a universal vacatur for the same reasons and some additional ones.  *See* Defs. MSJ 55.  Contrary to what Plaintiffs say now, *see* Opp. 53, Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).  One such limitation is that a remedy must operate on "specific parties." *California v. Texas*, 593 U.S. 659, 671 (2021) (citation omitted).  Vacatur under the APA must therefore be limited to the specific parties before the Court.

## CONCLUSION

For all these reasons, the Court should dismiss Plaintiffs' suit or, in the alternative, deny Plaintiffs' motion for summary judgment and grant summary judgment to Defendants.

30

Dated: June 29, 2026                 Respectfully submitted,


                                     BRETT A. SHUMATE
                                     Assistant Attorney General
                                     Civil Division

                                     JOSEPH E. BORSON
                                     Assistant Director
                                     Federal Programs Branch

                                     */s/ Christian Dibblee*
                                     CHRISTIAN DIBBLEE
                                     Trial Attorney
                                     U.S. Department of Justice
                                     Civil Division, Federal Programs Branch
                                     1100 L Street, N.W.
                                     Washington, D.C. 20005
                                     Tel: (202) 353-5980
                                     Email: Christian.R.Dibblee@usdoj.gov

                                     *Counsel for Defendants*

31