# JOINT APPENDIX

# VOLUME I

**U.S. Department of Justice**

Civil Rights Division

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

### I. PARTIES & POINTS OF CONTACT.

Requester
Federal Agency Name: Civil Rights Division, U.S. Department of Justice
VRL/Data User:
Title:
Address:
Phone:

VRL/Data Provider
State Agency Name: Alaska Division of Elections
Custodian: Carol Beecher
Title: Director
Address: PO Box 110017, Juneau AK 99811
Phone: (907) 465-4611

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Alaska ("Alaska").

### II. AUTHORITY.

By this Agreement, Alaska has agreed to, and will, provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department"). The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's

social security number as required under the HAVA to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*.
- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. See 52 U.S.C. § 20501(a).
- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq.*
- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111.
- Attorney General authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.
- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

## III. PURPOSE.

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred to as "voter roll," compiled by a state – often from information submitted by counties – containing a list of all the state's *eligible* voters. Regardless of the basis for ineligibility, ineligible voters do not appear on a state's VRL when proper list maintenance is performed by states. The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law. In the event the Justice Department's analysis of a VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the Justice Department will notify your state's point of contact of the issues to assist your state with curing.

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

## IV. TIMING OF AGREEMENT – TIME IS OF ESSENCE.

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you. Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

## V. TIMING OF VRL/DATA TRANSFER.

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

## VI. METHOD OF VRL/DATA ACCESS OR TRANSFER.

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS"). A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk. JEFS implements strict access controls to ensure that each user can only access their own files. All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized. This process guarantees that users can only access files and folders only where they have permission. Users are also limited to the authorized type of interaction with each file or folder. Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

## VII. LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use. The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a. The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records. Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

the stored information. However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII. NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX. CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data. Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage. In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

**X. LOSS OR BREACH OF DATA.**

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

**XI. DESTRUCTION OF DATA.**

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed. When the project is complete and such retention requirements by law expires, the Justice Department will:

1. Destroy all hard copies containing confidential data (e.g., shredding);
2. Archive and store electronic data containing confidential information offline in a secure location; and

3. All other data will be erased or maintained in a secured area.

## XII. OTHER PROVISIONS.

A. Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B. Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C. Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU. To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D. Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E. Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.*, as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq.*, as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq.*, as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F. Confidentiality of MOU. To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

by the parties as "confidential." Any disclosures therefore could be made, if at all, pursuant to applicable laws or court orders requiring such disclosures.

**SIGNATURES**

VRL/Data Provider
State Agency Name: Alaska Division of Elections
Signature: ______________________ Date of Execution: 12/19/2025

Authorized Signatory Name Printed: Carol Beecher

Title: Director

Requester
Federal Agency Name: Civil Rights Division, U.S. Department of Justice

Signature: ______________________ Date of Execution: 12/22/2025

Authorized Signatory Name Printed: Harmeet K. Dhillon

Title: Assistant Attorney General

**SETTLEMENT AGREEMENT**

WHEREAS, Plaintiff, the United States of America ("Plaintiff"), filed the Complaint in the action styled *United States of America v. Paul Ziriax*, No. 5:26-cv-00361 (W.D. Okla. Feb. 26, 2026), pursuant to Title III of the Civil Rights Act of 1960, 52 U.S.C. §§ 20701-20706 ("CRA"), against Defendant, Paul Ziriax, in his official capacity as Secretary of the Oklahoma State Election Board ("Defendant").

WHEREAS, the CRA provides, in pertinent part, that "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election...." 52 U.S.C. § 20701.

WHEREAS, pursuant to the CRA, the Attorney General or her representative may "demand in writing" such records from the "person having custody, possession, or control" of those records. 52 U.S.C. § 20703.

WHEREAS, Defendant is the chief election officer for the State of Oklahoma, and retains custody of election records that fall within the scope of the CRA for the State of Oklahoma, including Oklahoma's computerized statewide voter registration list ("SVRL").

WHEREAS, a representative of the Attorney General made a demand in writing under the CRA for a current copy of Oklahoma's SVRL with all fields—including identifiers required by the Help America Vote Act ("HAVA"), such as the last four digits of social security numbers or full driver's license numbers—in order to ascertain Oklahoma's compliance with HAVA and the National Voter Registration Act ("NVRA").

WHEREAS, the requested SVRL was not produced in the form requested, which resulted in the filing of the foregoing styled action pursuant to 52 U.S.C. § 20705. The Secretary had instead offered to provide the SVRL in redacted form, without the driver's license and social security numbers.

WHEREAS, Plaintiff and Defendant (collectively, the "Parties") desire to resolve this matter without the need for further litigation. Accordingly, they have engaged in good faith negotiations and have agreed to the following terms of this Settlement Agreement, without admitting or denying any wrongdoing, as an appropriate resolution to all claims alleged in this litigation:

1. Defendant shall provide to the Attorney General or her representative the current (as of the date of extraction for uploading) electronic copy of Oklahoma's computerized SVRL, with all fields, including each registrant's full name, date of birth, residential address, and either their full state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier, as well as the

date of extraction of the SVRL, as required by 52 U.S.C. § 21083, as soon as practicable but no later than five (5) business days from the execution of this Settlement Agreement. As Oklahoma's chief election official, Defendant has sole and unencumbered authority to complete performance for this Settlement Agreement. The SVRL shall be limited to data on file in the computerized voter registration system as of the date of extraction. Nothing in this settlement shall be construed as prohibiting Plaintiff from making another demand or a subsequent demand for the SVRL pursuant to CRA election record retention requirements. Nothing in this Settlement Agreement requires the creation or compilation of data beyond what is contained in the extracted SVRL, other than noting the date of extraction for the purposes of the transmittal. Defendant shall transmit the SVRL via the U.S. Department of Justice's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"), or via the Department's secure, encrypted email system. Nothing in this Settlement Agreement shall be construed as prohibiting Defendant or the State of Oklahoma from additionally entering into a memorandum of understanding and user agreement with the U.S. Department of Homeland Security to access the Systemic Alien Verification for Entitlements ("SAVE") program. Nor shall anything in this Settlement Agreement prohibit Defendant or the State of Oklahoma from additionally uploading the SVRL directly to SAVE.

2. The Civil Rights Division shall use the copy of the SVRL information solely to assess the State's compliance with NVRA, 52 U.S.C. § 20507, the HAVA, 52 U.S.C. § 21083, other purposes outlined in 28 C.F.R. §§ 0.50-.51, and for no other purpose.

3. Upon execution of this Settlement Agreement, Plaintiff shall dismiss the above-referenced legal action without prejudice pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure. All Parties shall be responsible for their own attorney's fees and costs associated with this action.

4. The Parties represent they have the authority to enter into this Settlement Agreement. The terms of this Agreement shall be final and binding upon the Parties and their successors, and the Parties warrant and represent that the persons signing this Settlement Agreement possess full authority to bind the Parties and their successors to the terms of the Settlement Agreement. This Settlement Agreement may be terminated with the written consent of the Parties. This Agreement shall expire on December 31, 2027, unless otherwise extended by mutual consent or court order.

5. The Civil Rights Division will comply with all laws, including but not limited to the Privacy Act of 1974 in the handling and protection of the SVRL that is produced by Defendant.

6. This Settlement Agreement constitutes the entire agreement and commitments of the Parties. Any modifications to this Settlement Agreement must be mutually agreed upon and memorialized in a writing signed by all Parties.

7. If any provision of this Settlement Agreement is found to be invalid by a court of competent jurisdiction, only the specific provision in question shall be affected and the other provisions shall remain in full force and effect.

8. This Settlement Agreement may be executed in separate counterparts, which may be in original or electronic image copy (facsimile, pdf, etc.).

9. The Parties waive any right to contest the validity of the terms of this Settlement Agreement. Either party may bring an action to enforce the terms of this Settlement Agreement in the United States District Court for the Western District of Oklahoma, or move for such enforcement in the action styled *United States of America v. Paul Ziriax*, No. 5:26-cv-00361, to the extent permitted by law and the Federal Rules of Civil Procedure.

10. Nothing in this Agreement shall be construed as a waiver of any rights, claims, or remedies available to either party, and failure to enforce any provision shall not constitute a waiver of that or any other provision.

**AGREED AND CONSENTED TO:**

**FOR THE UNITED STATES OF AMERICA:**

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division
U.S. Department of Justice

**FOR DEFENDANT PAUL ZIRIAX:**

PAUL ZIRIAX
Secretary of Oklahoma State Election Board

PAUL ZIRIAX

GENTNER DRUMMOND
Oklahoma Attorney General

GARRY M. GASKINS, II
Oklahoma Solicitor General

SOUTH CAROLINA
ELECTION COMMISSION

April 28, 2026

The Honorable Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

RE: Memorandum of Understanding Between the S.C. State Election Commission and the U.S. Department of Justice

Dear Assistant Attorney General Dhillon:

On behalf of the South Carolina State Election Commission ("SEC"), I am hereby transmitting the enclosed countersigned, fully executed copy of the Memorandum of Understanding ("MOU") between the SEC and the United States Department of Justice ("Department") concerning the SEC's voter registration list and certain associated data ("VRL/Data"). At today's meeting, the SEC authorized the Executive Director to enter into this agreement and to execute the MOU pursuant to S.C. Code Ann. § 7-5-186(C), which expressly authorizes the SEC to enter into information- and data-sharing agreements for purposes of voter registration list maintenance.

I want to express the SEC's sincere appreciation for the professional and constructive dialogue with DOJ throughout this process, and in particular for DOJ's willingness to incorporate several clarifications or considerations requested by the SEC. By way of example, the SEC particularly appreciates the following refinements reflected in the final MOU:

- Providing for transmission of the voter registration list and associated data through DOJ's encrypted Justice Enterprise File Sharing system, with the requested last four digits of registrants' Social Security Numbers transmitted in hashed form using a mutually agreed cryptographic method—an approach consistent with that used by the Electronic Registration Information Center ("ERIC") and other States. We appreciate DOJ's recognition that this approach materially reduces the risk associated with transmitting sensitive personal identifying information while preserving DOJ's ability to perform meaningful list-maintenance review.
- Clarifying, in Section VIII, that the SEC will review the relevant data and remove any ineligible voters "as identified by [DOJ] and confirmed by the SEC." The SEC appreciates DOJ's willingness to adopt language that accurately reflects the SEC's independent role and statutory responsibility in making eligibility determinations.
- Recognizing, also in Section VIII, that the section is not intended to prevent the SEC from complying with any federal or state law that may require notice to be provided to registrants before they are removed from the voter rolls.

COMMISSIONERS
ROBERT BOLCHOZ
Chairman
JOANNE DAY
CLIFFORD J. EDLER
SCOTT MOSELEY
ANGELA STRINGER

Conway Belangia
Executive Director

1122 Lady Street
Suite 500
Columbia, SC 29201

P.O. Box 5987
Columbia, SC 29250

803.734.9060
Fax: 803.734.9366
www.scvotes.gov

- Specifying the MOU's effective date, duration, and termination, while also permitting either party to terminate the MOU, with or without cause, upon ninety (90) days' advance written notice.

From the SEC's perspective, the resulting MOU is an apolitical agreement that responsibly balances DOJ's legitimate governmental interests under the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA") with the SEC's statutory obligations under South Carolina law and its duty to safeguard, simultaneously, the integrity of South Carolina's elections and the personal information of South Carolina's registered voters.

Consistent with the position the SEC has communicated to DOJ throughout this process, please be advised that, contemporaneously with execution of the MOU, the SEC intends to release publicly a copy of the MOU. The SEC believes that doing so aligns with the revised confidentiality language and serves the public's legitimate interest in transparency regarding intergovernmental agreements concerning voter information. Indeed, the SEC has publicly disclosed similar data-sharing agreements with other States.

The SEC remains committed to maintaining the accuracy, security, and integrity of South Carolina's voter rolls in compliance with applicable South Carolina law. To these ends, the SEC looks forward to working cooperatively with DOJ under the terms of the MOU to ensure every eligible citizen has the opportunity to register to vote and participate in fair and impartial elections with the assurance that every vote will count

Should you or your team have any questions regarding this letter, the executed MOU, or the SEC's implementation of the same, please do not hesitate to contact me.

Respectfully,

Conway Belangia
Executive Director
South Carolina State Election Commission

Enclosures
cc w/ enc: Eric Neff, Esquire
Acting Chief, Voting Section
Civil Rights Division
United States Department of Justice

**RESOLUTION OF THE**
**SOUTH CAROLINA STATE ELECTION COMMISSION**
**Resolution No. 2026-01-A**

**A RESOLUTION AUTHORIZING THE EXECUTIVE DIRECTOR TO EXECUTE A MEMORANDUM OF UNDERSTANDING WITH THE UNITED STATES DEPARTMENT OF JUSTICE PURSUANT TO S.C. CODE ANN. § 7-5-186(C) AND TO TAKE ALL ACTIONS NECESSARY AND APPROPRIATE TO IMPLEMENT THE SAME**

**WHEREAS,** the South Carolina State Election Commission ("Commission") is the state agency responsible for establishing standardized processes for the administration of elections and voter registration, ensuring that the Commission and the county boards of voter registration and elections comply with applicable state and federal election law, maintaining a statewide voter registration database, and conducting, by and through the Commission's Executive Director, an annual general registration list maintenance program to maintain accurate voter registration records in the statewide voter registration system; and

**WHEREAS,** S.C. Code Ann. § 7-5-186(C) authorizes the Commission to enter into agreements with other States, groups of States, governmental entities, persons, or organizations, as the Commission considers necessary, related to maintaining the statewide voter registration database or engaging in legitimate governmental purposes related to the maintenance of the statewide voter registration database; and

**WHEREAS,** the United States Department of Justice ("Department"), through its Civil Rights Division, has requested access to South Carolina's voter registration list and certain associated data pursuant to the Department's authority and enforcement responsibilities under the National Voter Registration Act, the Help America Vote Act, Title III of the Civil Rights Act of 1960, and the Privacy Act of 1974; and

**WHEREAS,** the Commission has received a proposed Memorandum of Understanding ("MOU") from the Department, dated April 23, 2026, and executed by Acting Chief of the Voting Section of the Department's Civil Rights Division, setting forth the terms and conditions under which certain voter registration data will be transmitted, used, safeguarded, and returned or destroyed, and incorporating certain provisions and protections the Commission considers necessary and appropriate, to include providing for the secure transmission of data and cryptographic hashing of personal identifying information, acknowledging potentially applicable notice requirements under state or federal law, recognizing the Commission's authority and responsibility with respect to maintaining the statewide voter registration database, and clarifying terms related to the effective date, duration, and termination of the parties' obligations; and

**WHEREAS,** the Commission has reviewed the MOU, a copy of which is attached hereto, and finds that execution of the MOU is consistent with the Commission's statutory authority under South Carolina law, including S.C. Code Ann. § 7-5-186(C), and is in the public interest.

**NOW, THEREFORE, BE IT RESOLVED BY THE SOUTH CAROLINA STATE ELECTION COMMISSION AS FOLLOWS:**

1. The Commission authorizes and directs the Executive Director, on behalf of the Commission, to execute the MOU with the Department in substantially the form reviewed by the Commission, with such non-substantive technical or conforming changes as the Executive Director, in consultation with the Chairman, deems necessary or appropriate.
2. The Executive Director is further authorized to transmit the executed MOU, together with any appropriate correspondence, to the Department.
3. The Executive Director is further authorized to take any and all actions necessary and appropriate to implement the MOU and to perform the Commission's obligations thereunder, in each case consistent with applicable state and federal law.
4. The Commission authorizes the contemporaneous public release of the executed MOU.
5. This Resolution shall take effect immediately upon its adoption by the Commission.

**ADOPTED** this 28th day of April, 2026, by the South Carolina State Election Commission, at its duly noticed, called, and convened meeting in Columbia, South Carolina.

Robert Bolchoz, Chairman
South Carolina State Election Commission

**ATTEST:**

Conway Belangia, Executive Director
South Carolina State Election Commission

**U.S. Department of Justice**

Civil Rights Division

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

## I. PARTIES & POINTS OF CONTACT

**Requester**

Federal Agency Name: Civil Rights Division, U.S. Department of Justice
VRL/Data User: Chris Hayes
Title: IT Specialist
Address: 150 M St. NE, Ste. 9.926, Washington DC 20002
Phone: 202-532-3879

**VRL/Data Provider**

State Agency Name: South Carolina State Election Commission
Custodian: Conway Belangia
Title: Executive Director
Address: 1122 Lady St; Suite 500, Columbia, SC 29201
Phone: (803) 734-9060

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the U.S. Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the South Carolina State Election Commission ("SEC" or "the State").

## II. AUTHORITY

By this Agreement, the SEC has agreed to, and will, provide an electronic copy of South Carolina's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Justice Department. The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's Social Security Number, as required by the Help America Vote Act of

2002 ("HAVA"), 52 U.S.C. § 20901, *et seq.*, for States to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The Justice Department is requesting this information pursuant to its authority under the following federal laws:

- Attorney General's authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.*;
- National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501, *et seq.*;
- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a);
- Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 20901, *et seq.*;
- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111; and
- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

## III. PURPOSE

A VRL is a statewide Voter Registration List pursuant to the NVRA and HAVA, commonly referred to as "voter roll," compiled by a State – often from information submitted by counties – containing a list of all the State's *eligible* voters. Regardless of the basis for ineligibility, ineligible voters should not be on a State's VRL when proper list maintenance is performed by the State. The Justice Department is requesting South Carolina's VRL to test, analyze, and assess the State's VRL/Data for proper list maintenance and compliance with federal law. In the event the Justice Department's analysis of the State's VRL/Data identifies list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the Justice Department will notify the SEC's point of contact (identified above) of the issues to assist the SEC with curing any identified and confirmed ineligible voters and other list maintenance issues.

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Justice Department of the electronic copy of the State's VRL/Data, including all fields requested by the Justice Department.

## IV. TIMING OF AGREEMENT – TIME IS OF ESSENCE

The parties agree that time is of the essence. Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and entered into at the SEC's request as part of its transmission of South Carolina's VRL/Data to the Justice Department, this Agreement is to be fully executed by the SEC within seven (7) days of the Justice Department presenting this Agreement to the SEC. Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of the State's VRL/Data to the Justice Department for analysis.

## V. TIMING OF VRL/DATA TRANSFER

The SEC agrees to transfer an electronic copy of South Carolina's complete statewide VRL/Data to the Justice Department as described in Section III of this Agreement no later than five (5) business days from the Effective Date of this Agreement., as defined below.

## VI. METHOD OF VRL/DATA ACCESS OR TRANSFER

The VRL/Data will be submitted by the SEC via the Justice Department's encrypted secure file-sharing system, i.e., Justice Enterprise File Sharing ("JEFS"), with the requested last four digits of a registrant's Social Security Number hashed using an agreed-upon algorithm or one-way cryptographic hashing software. A separate application to use JEFS must be completed and submitted by SEC staff through the Civil Rights Division's Help Desk. JEFS implements strict access controls to ensure that each user can only access their own files. All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (*e.g.*, read, write, or read-only).

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized. This process guarantees that users can only access files and folders only where they have permission. Users are also limited to the authorized type of interaction with each file or folder. Within the Justice Department, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

## VII. LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY

The parties mutually agree that the Justice Department (specifically, the Civil Rights Division) will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this Agreement to prevent unauthorized use. The information that the Justice Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a. The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN. Information in computer form is safeguarded and protected in accordance with applicable Justice Department security regulations for systems of records. Only a limited number of staff members who are assigned a specific identification code will be able to use the computer

to access the stored information. However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL/Data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (*e.g.*, requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII. NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST

After analysis and assessment ofSouth Carolina's VRL/Data, the Justice Department will securely notify the SEC of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns that the Justice Department found when testing, assessing, and analyzing the State's VRL/Data for NVRA and HAVA compliance, *i.e.*, that the State's VRL only includes eligible voters.

The SEC agrees that within forty-five (45) days of receiving notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns with the State's VRL/Data, the SEC will review the State's VRL/Data and remove any ineligible voters, as identified by the Justice Department and confirmed by the SEC, and will resubmit the updated VRL/Data to the Justice Department to verify that the SEC has conducted proper list maintenance and brought South Carolina's VRL into compliance with the NVRA and HAVA. This section is not intended to prevent the SEC from complying with any federal or state law that may require notice to be provided to registrants before they are removed from voter rolls.

## IX. CONFIDENTIALITY & DEPARTMENT SAFEGUARDS

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and

confidentiality of such data. Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Justice Department will activate audit logging for the records, files, and data containing the State's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage. In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be

identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information provided by the SEC for certain routine, or pre-litigation or litigation purposes, including presentation of VRL/Data to a court, magistrate, or administrative tribunal; or to a contractor with the Justice Department who needs access to the VRL/Data in order to perform duties related to the Department's list maintenance verification procedures. Recipients of such VRL/Data shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

## X. LOSS OR BREACH OF DATA

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

## XI. DESTRUCTION OF DATA

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records

retention pursuant to applicable law has passed. When the project is complete and such retention requirements by law expires, the Justice Department will:

1. Destroy all hard copies containing confidential data (e.g., shredding);
2. Archive and store electronic data containing confidential information offline in a secure location; and
3. All other data will be erased or maintained in a secured area.

## XII. OTHER PROVISIONS

A. Conflicts. This MOU constitutes the full agreement between the Justice Department and the SEC regarding the subjects addressed herein. Any inconsistency or conflict between or among the provisions of this MOU will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (*e.g.*, transaction charges).

B. Severability. Nothing in this MOU is intended to conflict with any current law or regulation or the directives of the Justice Department or the SEC. If any part of this MOU is held by a court to be unconstitutional or otherwise invalid as contrary to law, the parties agree that, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C. Assignment. The SEC may not assign this MOU, nor may it assign any of its rights or obligations under this MOU. To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and the SEC without restriction.

D. Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E. Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the Justice Department (i.e.,

the User Agency) under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.*, as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq.*, as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq.*, as amended; and the Civil Rights Act, 52 U.S.C. § 10101 *et seq.*, as amended.

F. Confidentiality of MOU. To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed by the parties as "confidential." Any disclosures therefore may be made, if at all, pursuant to applicable laws or court orders requiring such disclosures.

G. Effective Date & Period of MOU. This MOU shall be effective immediately upon execution by the last signatory hereto ("Effective Date"), and it shall remain in effect until December 31, 2028, unless otherwise expressly stated herein or modified, amended, or extended by mutual written consent of the parties, or unless earlier terminated by either party upon 90 days advance written notice to the other party.

**SIGNATURES**

**VRL/Data Provider**

State Agency Name: South Carolina State Election Commission

Signature: [signature] Date of Execution: 4/28/26

Name Printed: Conway Belangia

Title: Executive Director

**Requester**

Federal Agency Name: Civil Rights Division, U.S. Department of Justice

Signature: [signature] Date of Execution: 4/23/26

Name Printed: Eric V. Neff

Title: Acting Chief, Voting Section

U.S. Citizenship and Immigration Services

# MEMORANDUM OF AGREEMENT

**BETWEEN THE DEPARTMENT OF HOMELAND SECURITY,
U.S. CITIZENSHIP AND IMMIGRATION SERVICES
AND
U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS DIVISION
REGARDING
PARTICIPATION IN THE SAVE PROGRAM FOR
VOTER REGISTRATION AND LIST MAINTENANCE OVERSIGHT**

## I. PARTIES.

The parties to this Systematic Alien Verification for Entitlements (SAVE) Memorandum of Agreement (MOA) are the Department of Homeland Security, U.S. Citizenship and Immigration Services (DHS-USCIS), and the **U.S. Department of Justice, Civil Rights Division** (User Agency).

## II. AUTHORITY.

The authorities governing this MOA include, but are not limited to, the following:

- Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended.
- Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, as amended.
- Section 642 of Div. C, Title VI of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended (8 U.S.C. §1373(a) and (c)).
- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.
- The Federal Information Security Management Act of 2014 (Pub. L. 113-283), as amended.
- National Voter Registration Act of 1993, 52 U.S.C. § 20501 *et seq.*, Pub. L. No. 103-31, 107 Stat. 77, as amended.
- Help America Vote Act of 2002, 52 U.S.C. § 20901, et seq., Pub. L. No. 107-252, § 303 *et. seq.*, 116 Stat. 1666, as amended, including the additional criminal penalties listed under 52 U.S.C. § 21144 (a) & (b).

Additionally, the authorities governing this MOA that are specific to this User Agency's request to use SAVE, include but are not limited to the following:

- 18 U.S.C. §§ 601, 1015
- 52 U.S.C. §§ 10307, 10308, 20510, 20511, 20703, 20704, 21081, 21082, 21083, 21083a, and 21111.
- 28 CFR Ch. 1, Part 0 §§ 0.50 and Appendix to Subpart J of Part 0.

The full list of routine uses for Department of Justice records can be found in the System of Records Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). The statutes cited for routine use in the SORN include the NVRA, HAVA, and the CRA. The records in the SORN are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

The Department of Justice SORN provides that:

> (1) In the event that a record in this system, either alone or in conjunction with other information, indicates a violation or potential violation of law— criminal, civil, or regulatory in nature— the relevant records may be referred to the appropriate Federal, State, local, foreign, or Tribal law enforcement authority or other appropriate agency charged with the responsibility for investigating or prosecuting such violation or charged with enforcing or implementing such law;
>
> (2) In the course of the administration by CRT of a federally mandated program, or the investigation or litigation of a case or matter, a record may be disseminated to a Federal, State or local agency, or to an individual or organization, if there is reason to believe that such agency, individual or organization possesses information or has the expertise in an official or technical capacity to assist in the administration of such program or to analyze information relating to the investigation, trial or hearing and the dissemination is reasonably necessary to elicit such assistance, information or expert analysis, or to obtain the cooperation of a prospective witness or informant.

Central Civil Rights Division Index File and Associated Records, 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003).

The full list of routine uses for SAVE records can be found in the System of Records Notice ("SORN") titled, "Department of Homeland Security/U.S. Citizenship and Immigration Services (USCIS)-004 Systematic Alien Verification for Entitlements Program (SAVE)," 90 Fed. Reg. 48948 (Oct. 31, 2025).

**III. PURPOSE.**

The purpose of this MOA is to facilitate information sharing between DHS-USCIS and the User Agency and establish the terms and conditions for the User Agency's participation in SAVE to

verify the U.S. citizenship and immigration status information of registrants or registered voters on state voting rolls provided to User Agency in order to help ensure that state and local voting administration agencies within the United States are properly conducting **voter registration and voter list maintenance** as required by the National Voter Registration Act and the Help America Vote Act, and to enforce all Federal laws related to voting to help ensure that only eligible voters remain on state voter registration lists and vote in Federal elections.[1]

SAVE verifies User Agency-provided information against DHS-accessed records, including immigration, naturalization, and U.S. citizenship records using an immigration enumerator issued by DHS (immigration enumerator) or other government issued enumerator(s) permitted by SAVE. SAVE does not provide information regarding citizenship or immigration status at points of time other than at the time of the SAVE case response but does provide grant date information for naturalized and derived citizenship determinations and other immigration benefits, including lawful permanent resident status determinations. SAVE may only be able to verify acquired U.S. citizens in certain situations.[2]

SAVE will provide information to the User Agency by:

1) Initial response (initial verification) to an online inquiry by the User Agency; and

2) Additional verification procedures, where applicable.

**IV. RESPONSIBILITIES.**

**A. DHS-USCIS agrees to:**

(1) Provide to the User Agency, in a manner determined by DHS-USCIS, an immigration status and U.S. citizenship information verification process under SAVE;

(2) Respond to properly submitted verification requests from the User Agency by providing the limited information noted in the **PURPOSE** section above, i.e., a verification case number and U.S. citizenship or immigration status, if any;

(3) Process and respond to properly submitted additional verification requests[3] from the User Agency or from associated state and local voting administrators. Response time to additional

[1] "Participation" in SAVE is as described in the DHS/USCIS/SAVE Privacy Impact Assessment - 006. See Systematic Alien Verification for Entitlements (SAVE) Program | Homeland Security (dhs.gov).

[2] "Acquired citizenship" is defined as citizenship conveyed to children through the naturalization of parents or, under certain circumstances, at birth to foreign-born children of U.S. citizens, provided certain conditions are met. SAVE is only able to verify information that relates to information found in the databases accessed by the system. Accordingly, if the User Agency provides an immigration enumerator for an individual with acquired citizenship who has not applied for a Certificate of Citizenship with USCIS, the agency may not have that individual's citizenship information available in the databases accessed, and SAVE may not be able to confirm that individual's acquired citizenship.

[3] "Additional verification" is as described in the DHS/USCIS/SAVE Privacy Impact Assessment - 006. See Systematic Alien Verification for Entitlements (SAVE) Program | Homeland Security (dhs.gov).

verification requests may vary depending upon DHS-USCIS workload, available resources, and the registrant's or registered voter's specific circumstances;

(4) Provide to the User Agency operating instructions necessary for the User Agency to designate users within the purview of the User Agency;

(5) Provide to the User Agency SAVE point of contact information for questions or problems regarding the User Agency's participation in SAVE;

(6) Provide access to training and information regarding the laws, policies, and procedures that govern verifying, safeguarding, using, maintaining, and disclosing certain citizenship and immigration status information;

(7) Provide the User Agency access to additional verification processes, with requirements identified by SAVE;

**B. User Agency agrees to:**

(1) SAVE System Use.

(a) Provide the necessary information in the manner SAVE requires to respond to User Agency requests for verification of immigration status or U.S. citizenship information. The following information from the registrant or registered voter is required to create and submit a request for initial automated verification:

- First name and last name;
- Date of birth; and
- At least one of the following:
  - A DHS issued citizenship or immigration enumerator (for example, A-Number/USCIS Number, Certificate of Naturalization Number, Certificate of Citizenship Number, I-94 Number, Card Number / I-797 Receipt Number, or SEVIS ID); or
  - Other government issued enumerator permitted by SAVE.

SAVE may modify requirements for SAVE cases and will provide written notification (e.g., by e-mail or update to SAVE website) to User Agency of any changes. Only enumerators accepted in SAVE will be used for verification or additional verification.

Cases submitted for additional verification may require different enumerators than what the User Agency used to create the SAVE case and submit for initial verification. User Agency will only submit requests for additional verification using enumerators permitted by SAVE. Additional information obtained from the applicant's immigration or citizenship documentation may be required for additional verification. Scanned documents and other electronically submitted information may also be required for additional verification.

User Agency must institute additional verification when required by SAVE for any registrant or registered voter that does not verify as a U.S. citizen on initial verification, including in all cases where the User Agency receives any SAVE response other than that of U.S. citizen. If the User Agency does not request and receive an additional verification response or SAVE does not verify the registered voter as a U.S. citizen after conducting additional verification, the User Agency must contact the registrant or registered voter to obtain proof of U.S. citizenship, if necessary under the circumstances to fulfill the purpose of this MOA, and in accordance with the provisions of this MOA and Federal and state law, where applicable.

User Agency consents to electronic-only submission of all verification requests and additional information, including all information submitted for SAVE additional verification. SAVE will reject non-electronic (i.e., paper or fax) verification requests and information submissions.

(b) Ensure and report to DHS-USCIS that, before using SAVE and whenever subsequently required by DHS-USCIS (e.g., for SAVE system enhancements), all users performing verification procedures complete SAVE-required training, including: reviewing the SAVE Program Guide, taking the latest version of SAVE tutorial(s), and maintaining a working knowledge of requirements contained therein and in this MOA, as updated. These instructional materials will address the policies and procedures governing use of the program, including (1) program access, (2) verification procedures, (3) disclosure of information and privacy protections, (4) non-discrimination requirements, and (5) records correction procedures for registrants and registered voters;

(c) Ensure users are provided with, maintain, and use SAVE User IDs and access SAVE only while they need to perform verification procedures and promptly terminate user access when requested by SAVE, or if the user separates from the User Agency or otherwise no longer needs SAVE access;

(d) Ensure all users performing verification procedures only use SAVE with respect to verification of registrant or registered voter U.S. citizenship information or immigration status information for the specified purpose and comply with all other requirements contained in the SAVE Program Guide and other SAVE guidance, the SAVE tutorial, and this MOA, and updates to these requirements;

(e) Ensure that all Users performing verification procedures have contact information for SAVE and DHS-USCIS;

(f) Ensure all users perform any additional verification procedures SAVE requires and/or the registrant or registered voter requests after the User Agency initiates a verification request. User Agency cannot deny or have voter registration or continued voter registration denied based on a SAVE response where additional verification is required by SAVE or requested by the applicant but has not been completed;

(g) Use any information provided by DHS-USCIS under this MOA solely for lawful purposes, namely the purpose above of verifying U.S. citizenship information and immigration status

information of registrants and registered voters to help ensure that state and local voting administration agencies within the United States are properly conducting voter registration and voter roll list maintenance as required by the National Voter Registration Act and the Help America Vote Act, and to enforce all Federal laws related to voting to help ensure that only eligible voters remain on state and local voter registration lists and vote in Federal elections, and limit use of such information in accordance with this and all other provisions of this MOA;

(h) Comply with the requirements of the Federal Information Security Modernization Act of 2014 (Pub. L. No. 113-283, as amended) and OMB guidance as applicable to access, electronic storage, transport of records between agencies, and the internal processing of records received by either agency under the terms of this MOA;

(i) Maintain physical, administrative, and technical safeguards for SAVE information and access methods to ensure that it is not used for any other purpose than described in this MOA and protect its confidentiality, including ensuring that it is not disclosed to any unauthorized person(s) without the prior written consent of DHS-USCIS;[4]

(j) Comply with the Privacy Act of 1974, 5 U.S.C. § 552a, as amended, and other applicable laws, regulations, and policies, including but not limited to all OMB and DHS privacy guidance, in conducting verification procedures pursuant to this MOA, and in safeguarding, maintaining, and disclosing any data provided or received pursuant to the MOA. Information shared as a result of this MOA shall be considered DHS-USCIS information. Responses to third party requests for such information should be consistent with federal law and DHS policy, including but not limited to the provisions of the Freedom of Information Act, 5 U.S.C. § 552;

(k) Comply with federal laws prohibiting discrimination against registrants or registered voters and discriminatory use of SAVE based upon the national origin, color, race, sex, religion, age, or disability of the registrant or registered voter, including but not limited to the National Voter Registration Act, 52 U.S.C. § 20501 et seq., as amended; the Help America Vote Act, 52 U.S.C. § 20901, as amended; the Voting Rights Act, 52 U.S.C. § 10301 et seq., as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended. In accordance with the Rehabilitation Act of 1973, as amended, and related agency implementing regulations, User Agency will provide reasonable modifications for individuals with disabilities to ensure effective communication;

(l) Provide or cause to be provided to all registrants or registered voters who are not verified as U.S. citizens based solely or in part on the SAVE response with the opportunity to use the User Agency's or the state or local agency's existing process to appeal the denial and to contact DHS-USCIS to correct their immigration records prior to a final decision, if necessary. (Information for how to contact DHS to correct immigration records is available in the SAVE Records Fast

[4] Each registrant or registered voter seeking access to information regarding himself/herself may do so by submitting a written signed request to DHS-USCIS. Instructions for submitting such requests may be found on the Freedom of Information/Privacy Act page of www.uscis.gov.

Facts for Benefit Applicants on the SAVE and USCIS websites.) Registrants and registered voters may need to correct their records with other government agencies depending on the error;

(m) Provide or cause to be provided to all individuals with respect to whom User Agency or another agency intends to deny registration or proceed with any removal from a voter roll or other action removing or limiting the right to vote, or with civil or criminal enforcement action, because or based in whole or in part upon any information received pursuant to this MOA, with any right to notice and hearing or other due process available under applicable law;

(n) Refrain from using SAVE, or assisting any person or entity, to comply with the employment eligibility verification requirements of section 274A of the Immigration and Nationality Act, 8 U.S.C. § 1324a.

(2) Account Compliance.

(a) Provide DHS-USCIS with the current e-mail, U.S. postal service address, physical address, name, and telephone number of the User Agency authorized representative for any notifications, questions or problems that may arise in connection with the User Agency's participation in SAVE and with notification of changes in the use of SAVE by the User Agency;

(b) Notify DHS-USCIS immediately whenever there is reason to believe a violation of this MOA has occurred;

(c) Notify DHS-USCIS immediately whenever there is reason to believe a breach of personally identifiable information has occurred as a result of User Agency action or inaction pursuant to OMB Memorandum M-17-12, "Preparing for and Responding to a Breach of Personally Identifiable Information" or successor guidance;

(d) Allow DHS-USCIS to monitor and review all records and documents related to the use, abuse, misuse, fraudulent use or improper use of SAVE by the User Agency, including, but not limited to original registrant or registered voter consent documents required by the Privacy Act, 5 U.S.C. § 552a or other applicable authority;

(e) Allow DHS-USCIS to conduct desk audits and/or site visits to review User Agency's compliance with this MOA and all other SAVE-related policies, procedures, guidance and laws applicable to conducting verification and safeguarding, maintaining, and disclosing any data provided or received pursuant to this MOA;

(f) Allow DHS-USCIS to perform audits of User Agency's user IDs use and access, SAVE Training Records, SAVE financial records, SAVE biographical information, system profiles and usage patterns and other relevant data;

(g) Allow DHS-USCIS to interview any and all User Agency SAVE system users and any and all contact persons or other personnel within the User Agency regarding any and all questions or problems which may arise in connection with the User Agency's participation in SAVE;

(h) Allow DHS-USCIS to monitor system access and usage and to assist SAVE users as necessary to ensure compliance with the terms of this MOA and SAVE requirements by its authorized agents or designees; and

(i) Take corrective measures in a timely manner to address all lawful requirements and recommendations on every written finding including, but not limited to, those of DHS-USCIS regarding waste, fraud, and abuse, and discrimination or any unauthorized use or misuse of the SAVE system or SAVE data, non-compliance with the terms, conditions and safeguards of this MOA, SAVE procedures or other applicable law, regulation or policy.

**V. POINTS OF CONTACT.**

**DHS-USCIS**
U.S. Citizenship and Immigration Services
Department of Homeland Security
Attn: SAVE Operations
5900 Capital Gateway Drive, Mail Stop 2620
Camp Springs, MD 20588-0009
Phone: (877) 469-2563
E-mail: SAVE.help@uscis.dhs.gov

**USER AGENCY**
U.S. Department of Justice, Civil Rights Division
Harmeet K Dhillon
Assistant Attorney General
950 Pennsylvania Ave., N.W.
Washington, D.C.
Phone:
202-616-3781
E-mail: harmeet.dhillon@usdoj.gov

**VI. OTHER PROVISIONS.**

A. MOA Responsibilities. Consistent with applicable laws, regulations, and policies, and the availability of User Agency resources, User Agency will commit personnel and resources sufficient to support this MOA. Only authorized employees, agents, or designees of DHS-USCIS and the User Agency will carry out the requirements of this MOA. In carrying out these responsibilities, they will operate within the scope of applicable regulations, specifically delegated authorities, the program authorities and funding limitations and terms and conditions of this MOA. The User Agency will also ensure that all state and local officials responsible for voter registration and voter list maintenance use information obtained from SAVE by User Agency pursuant to this MOA in accordance with the terms and conditions of this MOA.

B. Determining Benefit Eligibility. This MOA is limited to the provision of verification services. DHS-USCIS will verify limited citizenship and immigration status information but will not recommend to the User Agency or other agencies whether to approve or deny registration or maintenance on a voting roll. The DHS-USCIS response is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right to register to vote, be maintained on a voting roll, or vote.

C. Criminal Penalties.

(1) DHS-USCIS reserves the right to use information from the User Agency for any purpose permitted by law, including, but not limited to, the prosecution of violations of Federal administrative or criminal law.

(2) The User Agency acknowledges that the information it receives from DHS-USCIS may be governed by the Privacy Act of 1974, 5 U.S.C. Section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this MOA may be subject to criminal penalties.

D. Third Party Liability.

(1) Each party to this MOA shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution and/or performance of this MOA, whether civil or criminal, and retain responsibility for the payment of any corresponding liability.

(2) Nothing in this MOA is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any third party against the United States, its agencies, officers, or employees or the User Agency.

E. Disputes. Disagreements on the interpretation of the provisions of this MOA that cannot be resolved between SAVE and the User Agency point of contact should be provided in writing to the authorized officials at both agencies for resolution. If settlement cannot be reached at this level, the disagreement will be elevated to the next level in accordance with DHS-USCIS procedures for final resolution.

F. Conflicts. This MOA constitutes the full MOA on this subject between DHS-USCIS and the User Agency. Any inconsistency or conflict between or among the provisions of this MOA, will be resolved in the following order of precedence: (1) this MOA and (2) other documents incorporated by reference in this MOA (e.g., transaction charges).

G. Severability. Nothing in this MOA is intended to conflict with current law or regulation or the directives of DHS, DHS-USCIS, or the User Agency. If a term of this MOA is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOA shall remain in full force and effect. In the event of a conflict

that prevents either party from fulfilling its obligations, this MOA may be immediately canceled without providing the 30-day notice period referenced in Section IX.

H. Assignment. The User Agency may not assign this MOA, nor may it assign any of its rights or obligations under this MOA. To the extent allowable by law, this MOA shall inure to the benefit of, and be binding upon, any successors to DHS-USCIS and the User Agency without restriction.

I. Waiver. No waiver by either party of any breach of any provision of this MOA shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOA shall not be construed to be a waiver thereof.

J. Compliance with Other Laws. Nothing in this MOA is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency, or state or local voting administrators, under the National Voter Registration Act, 52 U.S.C. § 20501 et seq., as amended; the Help America Vote Act, 52 U.S.C. § 20901 et seq., as amended; the Voting Rights Act, 52 U.S.C. § 10301 et seq., as amended; the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended; and all applicable state law.

**VII. EFFECTIVE DATE.**

This MOA shall be effective when the DHS-USCIS authorized official and User Agency authorized official have both signed the MOA. This MOA shall continue in effect until and unless modified or terminated in accordance with the provisions of this MOA.

**VIII. MODIFICATION.**

A. This MOA is subject to periodic review by DHS-USCIS, its authorized agents or designees, and, if necessary, periodic modification and/or renewal to assure compliance with current law, policy, and standard operating procedure(s). This MOA constitutes the complete MOA between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of both parties evidenced in writing and signed by both parties and appended to this agreement.

B. Either party may accomplish a unilateral administrative modification to change POC information. A written bilateral modification (i.e., agreed to and signed by authorized officials of both parties) is required to change any other term of this MOA.

**IX. TERMINATION.**

Either party may terminate this MOA at any time by providing 30 days written notice of intent. DHS-USCIS and User Agency, when feasible, will consult with the other party and attempt to reconcile issues before terminating this MOA. Notwithstanding any other provision in the MOA, DHS-USCIS may suspend or terminate this MOA, and thereby the Agency's use of SAVE for voter registration and voter list maintenance purposes, without prior notice if deemed

necessary because of a requirement of law or policy, upon a determination by DHS-USCIS that there has been a breach of system integrity or security by the User Agency or a failure by the User Agency to comply with established procedures or legal requirements, including but not limited to failure to pay.

Written notices shall be sent to the addresses of the POCs listed herein and shall be effective upon receipt. Either party may change its POC by written notice to the other party.

The foregoing, in conjunction with the incorporated references, constitutes the full agreement on this subject between DHS-USCIS and the User Agency. This MOA supersedes all previous agreements governing the provision of verification services related to voter registration and voter list maintenance. Those agreements are explicitly acknowledged to be null and void.

The undersigned represent that they are authorized to enter into this MOA on behalf of DHS-USCIS and the User Agency, respectively.

BRIAN J BRODERICK Digitally signed by BRIAN J BRODERICK Date: 2026.01.23 16:50:35 -05'00'

**Brian J. Broderick**
**(Acting) Chief, Verification Division**
**U.S. Citizenship and Immigration Services**
**Department of Homeland Security**

**Date**

**Eric V. Neff**
**Acting Chief, Voting Section**
**Civil Rights Division**
**U.S. Department of Justice**

1/20/26
**Date**

# Election Administration and Voting Survey 2024 Comprehensive Report

A Report from the U.S. Election Assistance Commission to the 119th Congress

ELECTION ASSISTANCE COMMISSION UNITED STATES

This report by the U.S. Election Assistance Commission is the result of a contract to collect and analyze data for the 2024 Election Administration and Voting Survey and Election Administration Policy Survey. The contract was carried out by Fors Marsh, an applied research company based in Arlington, VA.

Published June 2025
U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001
www.eac.gov

# Executive Summary

The U.S. Election Assistance Commission (EAC) has conducted the Election Administration and Voting Survey (EAVS) following each federal general election since 2004. The EAVS asks all 50 U.S. states, the District of Columbia, and five U.S. territories — American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands — to provide data about the ways Americans vote and how elections are administered. Since 2008, this project has included a separate survey, the Election Administration Policy Survey (Policy Survey), that collects information about state election laws, policies, and practices.

The EAVS provides the most comprehensive source of state- and local jurisdiction-level data about election administration in the United States. These data play a vital role in helping election officials, policymakers, and other election stakeholders identify trends, anticipate and respond to changing voter preferences, invest resources to improve election administration and the voter experience, and better secure U.S. election infrastructure. The EAVS data make it possible to examine the details of U.S. election infrastructure and to produce a general understanding of core aspects of the election process and the management challenges faced by election officials. The survey data provide policymakers and the public with crucial information about how federal elections are conducted every two years and help the EAC fulfill its congressionally mandated reporting requirements. The EAVS is also invaluable to election officials who use the data to manage election oversight, conduct issue analysis and strategic planning, and create training and informational materials. The EAC also uses EAVS data when creating resources to advance the agency's mission to better support election officials and voters, as well as to inform lawmakers and national-level stakeholders about the impact of federal voting laws and the changing landscape of U.S. elections.

In the past several election cycles, American elections have undergone many changes to the policy landscape, how Americans cast their ballots, how individuals register to vote, and how military and overseas Americans receive and return ballots. As the most comprehensive source of election administration data in the nation, the 2024 EAVS provides a unique insight into how election dynamics have and have not changed. To this end, the EAC is pleased to present to the 119th U.S. Congress its report on the 2024 EAVS.

This report describes in detail how the 2024 federal general election was administered and how voters cast their ballots. Data from the EAVS and the accompanying Policy Survey are used to provide an overview of each of the following aspects of the election process:

- Turnout, voting methods, polling places, ballot drop boxes, ballot curing, poll workers, and election technology are covered in Chapter 1, "Overview of Election Administration and Voting in the 2024 General Election";
- Key laws, rules, policies, and procedures that govern U.S. elections are covered in Chapter 2, "Election Law and Procedure: The Policy Survey";
- Voter registration and list maintenance are covered in Chapter 3, "Voter Registration: The NVRA and Beyond";
- Voting by individuals covered under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) is described in Chapter 4, "Military and Overseas Voting in the 2024 General Election"; and

- The methodological procedures that the EAC followed to collect the EAVS and Policy Survey data and a description of the survey questions are discussed in Chapter 5, "Survey Methodology."

## Voting and Election Administration Findings

The 2024 EAVS data allow the EAC to meet its mandate under the Help America Vote Act (HAVA) to serve as a national clearinghouse and resource of federal election administration information. Data from the 2024 EAVS show that 64.7% of the citizen voting age population (CVAP) in the United States voted in the 2024 general election, and over 158 million ballots were cast by voters and were counted. Turnout for this election decreased by 3 percentage points compared to the last presidential election held in November 2020, with six states showing turnout increases between these two elections.

The EAVS also tracks data on how voters cast their ballots — in person on Election Day, in person before Election Day (which is known in many states as early voting), by mail, or by another mode of voting. In-person voting levels dropped during the 2020 general election as many states expanded early and mail voting opportunities in response to the COVID-19 pandemic, but increased to pre-pandemic levels starting with the 2022 general election. The majority of voters in the 2024 general election cast their ballots in person, with 35.2% voting in person before Election Day and 37.4% voting in person on Election Day. Although levels of Election Day voting decreased from 2022 to 2024, there was a corresponding increase in the percentage of individuals who voted early in person. Mail voting comprised 30.3% of the turnout for the 2024 election, which is down from the high water mark for mail voting seen in 2020 (43%) but still larger than the percentage of the electorate that voted by mail in pre-pandemic elections.

Nearly 15 million mail ballots were returned at ballot drop boxes in the 36 states that allow for drop boxes, which account for just under half of the ballots returned in these states. Among states that made ballot drop boxes available for both the 2022 and 2024 general elections, the percentage of mail ballots returned by voters at these drop boxes increased by nearly 10 percentage points between these two elections. More than 585,000 mail ballots entered the cure process for this election, and more than half of these ballots were successfully cured and included in the vote totals for the 2024 general election.

EAVS data also allow the EAC to identify trends in poll worker characteristics and election jurisdictions' experiences with recruiting poll workers. The age distribution of poll workers was significantly younger in the 2020 EAVS than for previous elections, but skewed older in 2022 and 2024. For the 2024 general election, the majority of poll workers were at least 61 years old. The 2020 election also marked the beginning of a trend of jurisdictions reporting that poll worker recruitment was becoming easier; this continued with the 2024 EAVS data. More than 770,000 individuals served as poll workers for the 2024 general election, with 15.5% being first-time poll workers.

The EAVS also collects data on the equipment that jurisdictions use to assist with registering voters, checking them in at polling places, and casting and counting ballots. Data from the 2022 and 2024 EAVS show that states are continuing to acquire voting systems that use paper ballots or produce auditable paper records. These include direct electronic recording (DRE) devices with a voter-verified paper audit trail (VVPAT), ballot marking devices (BMD), scanners that tabulate paper

records marked by voters or by BMDs, and hand counting of paper ballots. The use of DRE without VVPAT declined between 2022 and 2024 and nearly every EAVS jurisdiction in the country reported using election equipment that uses paper ballots or generates a VVPAT. The percentage of jurisdictions that reported hand counting paper ballots increased from 17.8% in 2022 to 21% in 2024. The use of electronic poll books increased from 35.1% of jurisdictions in the 2022 general election to nearly 40% in 2024.

## Election Administration Policy Survey Findings

The EAC collected data through the 2024 Policy Survey to provide context to the data that states reported in the EAVS and to track changes in election policy over time in areas that include voter registration and list maintenance, voting by mail, UOCAVA voting, in-person voting, voter identification, provisional voting, election technology, recounts, audits, and election certification. This survey supports the EAC's mandate to collect data under federal law.

Some of the notable findings from the 2024 Policy Survey include that a strong majority of states reported having voter registration databases that functioned in a top-down manner. A majority of states permitted one or more forms of automatic or electronic voter registration, with all of these states using the state's motor vehicles agency to process these registrations and some states making the program available at other state agencies. More than 80% of states made online voter registration available to their citizens in some format, just over 50% of states allowed individuals to register to vote on the same day that they cast a ballot, and nearly all states provide a way for individuals to pre-register to vote before they turn 18 years old. Fifty-four states send confirmation notices to voters to assist in maintaining the state's voter registration lists and ensuring they are up-to-date and accurate.

State policies on the availability of mail voting have evolved rapidly over the past few election cycles. About one-fifth of states conduct all-mail elections either statewide or in certain jurisdictions — that is, they automatically mail a ballot to all registered voters or to all active registered voters without the voter having to complete a mail ballot application. For the 2024 election, about two-thirds of states allowed voters to return mail ballots at ballot drop boxes and more than three-quarters of states allowed voters to cure their ballots and correct missing information or errors on their mail ballots in order for them to be counted for this election. For the first time, all states reported offering some form of in-person voting before Election Day. Two-thirds of states allowed the use of vote centers and just over half of states permitted curbside voting.

States also reported information on the auditing and review activities they conduct. Audits are conducted to ensure that voting systems operate accurately, election officials comply with regulations, procedures, or internal policies, and discrepancies are identified and resolved so that the public can be confident in the election administration process. The most commonly reported auditing activities were logic and accuracy testing (used in over 90% of states) and post-election tabulation audits (used in two-thirds of states).

## The National Voter Registration Act (NVRA) Findings

The EAC collected voter registration data to satisfy the agency's data reporting requirements established by the NVRA and HAVA. More than 211 million individuals were active registered voters

for the 2024 general election, representing 86.6% of the CVAP. However, the active voter registration rate was lower in 2024 than in 2020 nationally and for about two-thirds of states.

More than 103 million registration transactions were processed in the period between the close of registration for the 2022 general election and the close of registration for the 2024 general election. State motor vehicle offices and automatic voter registration (AVR) combined accounted for almost 60% of all registration transactions processed, with motor vehicle offices representing nearly one-third and AVR representing slightly more than one-quarter of all transactions. Other common sources of registration transactions were online voter registration portals, in-person registrations, and paper registrations received by mail, fax, or email. More than half of all registration transactions involved updates to existing voter registration records, and one-quarter were new and valid registrations.

States also reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance. For the 2024 EAVS, states reported sending nearly 40 million confirmation notices to verify continued eligibility from registered voters. Nearly half of these confirmation notices were sent as part of routine mailings made to all registered voters, and another one-quarter of confirmation notices were sent to individuals who may have moved from the address listed in their voter registration record. Nearly 70% of confirmation notices were not returned by voters. More than 21 million voter registration records were removed from states' voter lists between the close of registration for the 2022 general election and the close of registration for the 2024 general election. The most common reasons for removal were failing to return a confirmation notice and not voting in two consecutive federal general elections, and moving out of the voting jurisdiction.

## The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) Findings

UOCAVA outlines special voting procedures and protections for two categories of voters: members of the uniformed services absent from their voting residence and their eligible family members, and U.S. citizens living overseas. The 2024 EAVS data show that the voting residences of UOCAVA voters tend to be highly concentrated: almost half of these voters held legal voting residence in just four states, whereas nearly half of EAVS jurisdictions reported having just 10 or fewer registered UOCAVA voters. Continuing a trend that began with the 2016 EAVS, 2024 data show that overseas citizens made up a larger share of the UOCAVA voting population than did uniformed services voters.

More than 1.3 million ballots were transmitted by election offices to UOCAVA voters for the 2024 general election. Seventy percent of these ballots were transmitted to overseas citizens, marking the largest gap compared to uniformed services voters since the 2014 EAVS. Email was the most common method election offices used to transmit ballots to UOCAVA voters, although a majority of uniformed services ballots were transmitted by postal mail. Over two-thirds of transmitted UOCAVA ballots were returned by voters, a rate that decreased since the 2020 general election. Postal mail was the most common method for all categories of UOCAVA voters to return their ballots. Nationwide, more than 96% of returned UOCAVA ballots were counted and less than 4% were rejected, most commonly because the ballot was received after the state's deadline for returning ballots.

UOCAVA voters can use Federal Write-In Absentee Ballots (FWAB) as a backup ballot in case their regular absentee ballot cannot be received and returned in time. States reported that more than 28,000 FWABs were submitted by voters for the 2024 general election. This represents a decrease from the number of FWABs received for the 2020 general election. The FWAB allowed more than 20,000 additional UOCAVA voters to have their ballots counted for the 2024 general election; nearly three-quarters of counted FWABs were received from overseas citizens and less than one-quarter were from uniformed services voters.

## Appendix A: Descriptive Tables

### Executive Summary Table 1: 2024 EAVS at a Glance

| State | Total EAVS Jurisdictions | Total Active Registered Voters | Total CVAP | Total Voter Turnout | Turnout as % of Active Reg. | Turnout as % of CVAP |
|---|---|---|---|---|---|---|
| Alabama | 67 | 3,466,606 | 3,871,866 | 2,272,911 | 65.6% | 58.7% |
| Alaska [1] | 1 | 565,242 | 540,681 | 340,981 | 60.3% | 63.1% |
| American Samoa [2] | 1 | 15,948 | -- | 10,215 | 64.1% | -- |
| Arizona [3] | 15 | 4,366,786 | 5,384,019 | 3,477,975 | 79.6% | 64.6% |
| Arkansas | 75 | 1,359,659 | 2,270,663 | 1,122,278 | 82.5% | 49.4% |
| California | 58 | 22,836,602 | 26,042,367 | 16,164,330 | 70.8% | 62.1% |
| Colorado | 64 | 4,074,612 | 4,390,366 | 3,240,754 | 79.5% | 73.8% |
| Connecticut [4] | 169 | 2,292,818 | 2,660,107 | 1,820,891 | 79.4% | 68.5% |
| Delaware | 3 | 742,370 | 770,737 | 514,367 | 69.3% | 66.7% |
| District of Columbia | 1 | 469,969 | 508,689 | 328,871 | 70.0% | 64.7% |
| Florida [5] | 67 | 14,028,831 | 16,313,597 | 10,999,125 | 78.4% | 67.4% |
| Georgia | 159 | 7,174,961 | 7,917,054 | 5,297,500 | 73.8% | 66.9% |
| Guam | 1 | 62,098 | -- | 30,283 | 48.8% | -- |
| Hawaii | 5 | 765,998 | 1,053,254 | 522,236 | 68.2% | 49.6% |
| Idaho [6] | 44 | 1,178,750 | 1,445,124 | 917,469 | 77.8% | 63.5% |
| Illinois [7] | 108 | 8,104,485 | 9,036,650 | 5,717,147 | 70.5% | 63.3% |
| Indiana | 92 | 4,288,091 | 5,058,179 | 2,986,839 | 69.7% | 59.0% |
| Iowa | 99 | 2,016,967 | 2,387,401 | 1,674,011 | 83.0% | 70.1% |
| Kansas | 105 | 1,871,857 | 2,146,714 | 1,342,102 | 71.7% | 62.5% |
| Kentucky | 120 | 3,219,361 | 3,414,611 | 2,086,090 | 64.8% | 61.1% |
| Louisiana [8] | 64 | 2,734,059 | 3,398,688 | 2,021,588 | 73.9% | 59.5% |
| Maine [9] | 497 | 1,041,826 | 1,126,987 | 842,447 | 80.9% | 74.8% |
| Maryland | 24 | 4,231,112 | 4,411,478 | 3,028,813 | 71.6% | 68.7% |
| Massachusetts | 351 | 4,369,280 | 5,136,750 | 3,512,930 | 80.4% | 68.4% |
| Michigan [10] | 83 | 7,267,666 | 7,646,222 | 5,706,503 | 78.5% | 74.6% |
| Minnesota | 87 | 3,853,668 | 4,258,921 | 3,271,069 | 84.9% | 76.8% |
| Mississippi [11] | 82 | 1,965,948 | 2,222,109 | 1,225,176 | 62.3% | 55.1% |
| Missouri | 116 | 4,075,977 | 4,698,865 | 3,126,837 | 76.7% | 66.5% |
| Montana [12] | 56 | 691,534 | 888,190 | 612,423 | 88.6% | 69.0% |
| Nebraska [13] | 93 | 1,190,813 | 1,420,996 | 965,145 | 81.0% | 67.9% |

| State | Total EAVS Jurisdictions | Total Active Registered Voters | Total CVAP | Total Voter Turnout | Turnout as % of Active Reg. | Turnout as % of CVAP |
|---|---|---|---|---|---|---|
| Nevada | 17 | 2,052,976 | 2,243,354 | 1,486,297 | 72.4% | 66.3% |
| New Hampshire [14] | 320 | 1,008,603 | 1,117,113 | 829,090 | 82.2% | 74.2% |
| New Jersey [15] | 21 | 6,066,940 | 6,397,695 | 4,321,921 | 71.2% | 67.6% |
| New Mexico | 33 | 1,254,851 | 1,552,694 | 927,923 | 73.9% | 59.8% |
| New York | 62 | 12,429,981 | 13,945,400 | 8,389,626 | 67.5% | 60.2% |
| North Carolina [16] | 100 | 6,986,365 | 8,017,902 | 5,756,106 | 82.4% | 71.8% |
| North Dakota | 53 | -- | 589,860 | 371,974 | -- | 63.1% |
| Northern Mariana Islands | 1 | 19,329 | -- | 12,610 | 65.2% | -- |
| Ohio | 88 | 7,054,966 | 8,948,378 | 5,851,625 | 82.9% | 65.4% |
| Oklahoma | 77 | 2,095,952 | 2,953,778 | 1,573,274 | 75.1% | 53.3% |
| Oregon [17] | 36 | 3,060,374 | 3,212,722 | 2,269,608 | 74.2% | 70.6% |
| Pennsylvania [18] | 67 | 8,407,874 | 9,930,217 | 7,074,875 | 84.1% | 71.2% |
| Puerto Rico [19] | 1 | 1,987,317 | 2,670,201 | 1,283,628 | 64.6% | 48.1% |
| Rhode Island | 39 | 734,885 | 824,795 | 522,164 | 71.1% | 63.3% |
| South Carolina | 46 | 3,417,493 | 4,065,128 | 2,566,404 | 75.1% | 63.1% |
| South Dakota | 66 | 627,248 | 683,617 | 435,739 | 69.5% | 63.7% |
| Tennessee | 95 | 4,458,851 | 5,329,651 | 3,090,161 | 69.3% | 58.0% |
| Texas | 254 | 16,611,078 | 20,149,798 | 11,488,820 | 69.2% | 57.0% |
| U.S. Virgin Islands | 1 | 31,171 | -- | 15,952 | 51.2% | -- |
| Utah | 29 | 1,793,182 | 2,327,211 | 1,466,896 | 81.8% | 63.0% |
| Vermont [20] | 247 | 460,415 | 523,322 | 361,604 | 78.5% | 69.1% |
| Virginia | 133 | 5,898,922 | 6,397,071 | 4,511,853 | 76.5% | 70.5% |
| Washington [21] | 39 | 5,013,112 | 5,604,117 | 3,949,810 | 78.8% | 70.5% |
| West Virginia | 55 | 1,118,468 | 1,404,377 | 769,206 | 68.8% | 54.8% |
| Wisconsin [22] | 1,851 | 3,933,068 | 4,518,555 | 3,434,185 | 87.3% | 76.0% |
| Wyoming [23] | 23 | 296,960 | 442,989 | 271,123 | 91.3% | 61.2% |
| U.S. Total | 6,461 | 211,144,275 | 244,271,230 | 158,211,780 | 74.8% | 64.7% |

| State | Total In-Person Election Day Ballots Cast and Counted | Total Mail Ballots Cast and Counted (Excluding UOCAVA) | Total In-Person Early Ballots Cast and Counted | Total Polling Places | Total Poll Workers |
|---|---|---|---|---|---|
| Alabama | -- | 126,055 | -- | 2,010 | 7,835 |
| Alaska [1] | 175,541 | 48,744 | 92,281 | 524 | 2,979 |
| American Samoa [2] | 9,035 | 189 | 991 | 41 | 300 |
| Arizona [3] | 496,753 | 2,597,974 | 349,129 | 781 | 7,642 |
| Arkansas | 294,235 | 23,843 | 810,714 | 1,030 | 5,720 |
| California | 1,836,518 | 13,062,318 | 878,489 | 3,818 | 41,643 |
| Colorado | 141,556 | 2,957,550 | 109,209 | 366 | 7,587 |
| Connecticut [4] | -- | 118,362 | 715,275 | 739 | 3,590 |
| Delaware | 268,718 | 33,659 | 210,295 | 282 | 3,797 |
| District of Columbia | 82,396 | 168,111 | 72,914 | 75 | 1,367 |
| Florida [5] | 2,596,761 | 2,945,893 | 5,364,821 | 4,162 | 46,833 |
| Georgia | 1,239,125 | 268,751 | 3,768,395 | 2,658 | 18,580 |
| Guam | 24,291 | 104 | 5,774 | 22 | 360 |
| Hawaii | 0 | 483,078 | 39,158 | 13 | 301 |
| Idaho [6] | 508,734 | 179,777 | 225,973 | 856 | 6,140 |
| Illinois [7] | 2,666,185 | 1,016,208 | 2,001,203 | 5,213 | 41,042 |
| Indiana | 1,372,508 | 1,603,815 | 1,397,345 | 1,654 | 16,957 |
| Iowa | -- | -- | -- | 1,663 | -- |
| Kansas | 604,319 | 147,276 | 557,906 | 1,177 | 9,468 |
| Kentucky | 1,267,653 | 116,324 | 687,057 | 1,580 | 12,641 |
| Louisiana [8] | 1,047,445 | 119,694 | 849,784 | 2,032 | 16,580 |
| Maine [9] | 463,500 | 215,242 | 157,116 | 514 | 6,253 |
| Maryland | 1,145,134 | 744,244 | 974,945 | 1,991 | 22,986 |
| Massachusetts | 1,713,191 | 1,173,112 | 600,225 | 1,634 | 9,556 |
| Michigan [10] | 2,453,252 | 2,017,704 | 1,214,409 | 5,169 | 45,363 |
| Minnesota | 1,960,360 | 446,576 | 850,705 | 2,685 | 34,886 |
| Mississippi [11] | 1,010,752 | -- | -- | 1,746 | -- |
| Missouri | 2,067,247 | 178,526 | 867,936 | 2,240 | 18,740 |
| Montana [12] | -- | -- | -- | 411 | 4,422 |
| Nebraska [13] | 564,660 | 307,135 | 80,304 | 1,083 | 7,951 |
| Nevada | 247,291 | 656,140 | 543,461 | 288 | 3,904 |

| State | Total In-Person Election Day Ballots Cast and Counted | Total Mail Ballots Cast and Counted (Excluding UOCAVA) | Total In-Person Early Ballots Cast and Counted | Total Polling Places | Total Poll Workers |
|---|---|---|---|---|---|
| New Hampshire [14] | 730,273 | 92,945 | 0 | 307 | -- |
| New Jersey [15] | -- | 828,200 | -- | 4,620 | 13,242 |
| New Mexico | 252,629 | 111,527 | 556,395 | 668 | 4,221 |
| New York | 4,320,467 | 836,987 | 2,986,704 | 5,197 | 102,259 |
| North Carolina [16] | 1,175,905 | 298,269 | 4,224,909 | 3,360 | 28,374 |
| North Dakota | 181,998 | 89,429 | 99,007 | 172 | -- |
| Northern Mariana Islands | 5,571 | 915 | 6,124 | 13 | 96 |
| Ohio | 3,130,240 | 1,060,236 | 1,536,604 | 3,267 | 40,084 |
| Oklahoma | 1,174,876 | 98,548 | 294,037 | 2,067 | 7,269 |
| Oregon [17] | -- | 2,253,114 | -- | 36 | -- |
| Pennsylvania [18] | 5,043,808 | 1,933,707 | -- | 7,752 | 46,172 |
| Puerto Rico [19] | 1,071,954 | 132,157 | 4,004 | 1,337 | -- |
| Rhode Island | 290,699 | 51,995 | 173,547 | 430 | 3,709 |
| South Carolina | 977,341 | 98,782 | 1,476,843 | 2,088 | 18,122 |
| South Dakota | 273,648 | 159,335 | 0 | 493 | 2,697 |
| Tennessee | 856,491 | 86,904 | 2,132,535 | 1,889 | 16,750 |
| Texas | 2,329,171 | 384,221 | 8,703,181 | 6,135 | 42,324 |
| U.S. Virgin Islands | 6,832 | 613 | 8,506 | 11 | 140 |
| Utah | 104,350 | 1,341,595 | 36,381 | 114 | 1,110 |
| Vermont [20] | 122,386 | 234,038 | 2,631 | 262 | -- |
| Virginia | 2,053,905 | 474,332 | 1,840,239 | 2,673 | 29,760 |
| Washington [21] | -- | 3,890,945 | 171 | 67 | -- |
| West Virginia | 431,925 | 22,377 | 310,305 | 1,486 | 8,602 |
| Wisconsin [22] | 1,870,285 | 570,657 | 977,648 | 2,696 | -- |
| Wyoming [23] | 154,579 | 38,217 | 76,943 | 218 | 2,079 |
| U.S. Total | 52,816,493 | 46,846,449 | 48,872,528 | 95,815 | 772,433 |

**Executive Summary Table 1 Calculation Notes:**

Total EAVS Jurisdictions uses a count of Federal Information Processing Standards (FIPS) code by state.
Total Active Registered Voters uses question A1b.

Total CVAP uses the 2023 one-year estimate of the CVAP from the U.S. Census Bureau.
Total Voter Turnout uses question F1a.
Turnout as % of Active Registration uses F1a/A1b x 100.
Turnout as % of CVAP uses F1a/CVAP x 100.
Total In-Person Election Day Ballots Cast and Counted uses question F1b.
Total Mail Ballots Cast and Counted (Excluding UOCAVA) uses the sum of questions F1d and F1g.
Total In-Person Ballots Cast Before Election Day and Counted uses question F1f.
Total Polling Places uses question D2a.
Total Poll Workers uses question D7a.

**Executive Summary Table 1 Data Notes:**

General Notes:

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation. For example, since there was no CVAP estimate for most U.S. territories, their turnout data (F1a) were not used for the calculation of "Turnout as % of CVAP" at the national level.
- Items that are displayed as a dash (--) indicate that all jurisdictions within the state responded "Data Not Available," "Does Not Apply," or "Valid Skip" to the EAVS item(s) used in the calculation or left the item(s) blank.
- The percentages shown in this table are rounded to one decimal place. Percentages that round to less than 0.1% are displayed as 0.0%.
- The CVAP is an estimate of the number of U.S. citizens 18 years of age or older in the state. This report used the one-year American Community Survey (ACS) state estimate for 2023 instead of the five-year estimate to ensure the CVAP was as current as possible. The estimate for the year 2024 was unavailable by the time this report was finalized. Some states may have reported more active registered voters than CVAP because the 2023 CVAP is being compared to 2024 data.
- The Total Voter Turnout column includes voters who cast a ballot that was counted.

**[1]** F1d includes ballots sent by electronic transmission (fax and online delivery).

**[2]** Some UOCAVA voters are also mail ballot voters.

**[3]** Mohave County noted that the total number reported in the official election canvass could differ from the voting history reports within the voter registration database because the system was live during the entirety of the voting period. This means voters who cast a ballot in the election and who were eligible to vote in Mohave County at the time the ballot was cast, moved from the county, or became ineligible after the ballot was tabulated. This reflects the discrepancy of ballots tabulated versus voters who received voting credit.

**[4]** In some jurisdictions, the totals for F1 exceed the totals for A1 because the source in A1 does not account for same day registration.

**[5]** Responses reflect data submitted by each respective county election official.

**[6]** Idaho does not have inactive voters.

**[7]** Data provided come from 108 different election authorities and not from a single source. Data might not provide a completely accurate picture because there are different available data within each election authority.

**[8]** The total reported in F1 includes voters who were given credit for voting but whose ballots may have been blank or otherwise invalidated after acceptance.

**[9]** Provisional ballots are not counted separately from other ballots. Provisional ballot totals are reflected in F1b, F1d, or F1f as applicable.

**[10]** Voters reported in A1 are eligible to vote. Those defined as "inactive" need only to confirm their address before receiving a ballot. Participation in past elections is not a factor in defining eligibility.

**[11]** The number of absentee ballots (in-person and mail-in) is calculated together and cannot be separated.

**[12]** The total number of registered/eligible voters consists of active and inactive voters. Montana reports a total registered/eligible voters of 800,573. The difference between this number and what is reported in EAVS is provisional and pending voters. The reported number of ballots counted is from the state canvass report. Data in F1b-F1g cannot be provided because some ballots marked for counting in the system were not actually counted due to issues with the ballot.

**[13]** Nebraska does not have "inactive" voters. Nineteen counties in Nebraska are entirely vote by mail and some precincts are also vote by mail.

**[14]** The information provided is based on the local officials' entries into the state voter registration system as of March 27, 2025. These numbers may continue to fluctuate as cities and towns add additional entries or make corrections.

**[15]** F1a is taken from statewide certified results. These results do not break down the ballots cast by Election Day (F1b) and early voting (F1f) ballots cast.

**[16]** The results of this survey include point-in-time data from multiple datasets and log files and thus may differ slightly from other publicly posted datasets. UOCAVA ballots are reported with mail ballots.

**[17]** Oregon does not track the number of inactive voters. The data reported in F1 include ballots returned and accepted for counting.

**[18]** The Pennsylvania Department of State cannot provide a number for F1f because in-person return of mail ballots is not explicitly tracked in the voter registration system.

**[19]** In Puerto Rico, voters classified as inactive must first reactivate their voter status before being allowed to cast a ballot. This process requires the voter to verify their address and update their registration information with the Puerto Rico State Election Commission (Comisión Estatal de Elecciones [CEE]). Depending on the circumstances, reactivation may involve completing a specific form or providing a document that confirms their residence. Once their status is updated, the voter is allowed to vote in their assigned precinct without restrictions. This process differs from the classification under the NVRA in the United States, which refers to voters who are still eligible but require address verification before voting. For the 2024 elections in Puerto Rico, the voter registration deadline was September 21, 2024. Any voter who did not update their registration before this date would remain classified under their previous status until the next registration period.

**[20]** Some jurisdictions may have entered incorrect or incomplete data; therefore, some calculations and datasets may be misconstrued. We have updated the data as best we can.

**[21]** Washington remains a vote-by-mail state where voters can register and vote on or before Election Day. The total reported in F1g, which includes voters who cast a mailed ballot in jurisdictions that conduct elections entirely by mail, also accounts for in-person voters who were issued a mailed ballot packet at a voting center and could deposit it in a ballot drop box or return it by mail. Additionally, the total reported in F1f, representing voters who cast a ballot at an in-person early voting location and whose ballots were counted, includes those who used a disability access unit.

**[22]** The number of jurisdictions in Wisconsin changed over the two-year period covered by the 2022 EAVS due to incorporations, mergers, and similar mechanisms. Wisconsin is not subject to the NVRA and does not have inactive registered voters. The reported registration totals include military voters, even though they are not required to "register" in Wisconsin because they still have a voter record created. Wisconsin is not a vote-by-mail state but does allow voters to request that an absentee ballot be mailed to them. Poll worker data are no longer tracked by the state. Wisconsin canvass-required data track individual contests, and therefore, the total ballots cast in any election is highly unlikely to match the total votes cast in any one contest. Wisconsin voters are not required to vote in each contest on the ballot and undervotes are the likely cause of data on the total ballots cast being higher than the number of votes in a contest. Some data in Sections A-E will not match with their equivalent in Section F for the following reasons: In cases where two voter records for the same voter are

merged together, the election participation record moves with the merge; however, the absentee ballot record does not, the system does not see them as being associated with the same voter. Or, because in Wisconsin, provisional ballot data have to be recorded into the database on election night, voters who register on Election Day are usually not entered into the database until after Election Day, and these two records cannot be linked in our database, since voter records may be created after Election Day, and are therefore not always connected to their provisional ballot record.

**[23]** In Wyoming, voters designated as "inactive" are not considered registered and eligible voters. They may be eligible upon re-registration or may be inactive due to becoming ineligible (e.g. felony, moved out of state).

# Table of Contents

**Executive Summary** ..... i
Voting and Election Administration Findings ..... ii
Election Administration Policy Survey Findings ..... iii
The National Voter Registration Act (NVRA) Findings ..... iii
The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) Findings ..... iv
Appendix A: Descriptive Tables ..... vi
Executive Summary Table 1: 2024 EAVS at a Glance ..... vi
**Chapter 1. Overview of Election Administration and Voting in the 2024 General Election** ..... 1
Key Findings ..... 1
Election Administration in the United States ..... 2
The 2024 Election Administration and Voting Survey (EAVS) ..... 4
EAVS Response Rates ..... 5
Turnout in the 2024 General Election ..... 6
In-Person Voting ..... 11
Voting By Mail ..... 12
Provisional Voting ..... 18
UOCAVA and Other Methods of Voting ..... 21
Polling Places and Poll Workers ..... 22
Election Technology ..... 26
Voting Equipment ..... 26
Electronic Poll Books ..... 29
Voter Registration Systems ..... 30
Recommendations from the EAC to Congress ..... 31
Exempt the EAC From the Paperwork Reduction Act (PRA) ..... 31
Authorize and Appropriate Funds to Purchase VVSG 2.0 Voting Systems ..... 31
Extend the EAVS Reporting Deadline to September 30 of the Year Following a Federal Election ..... 32
Authorize and Appropriate Funding to Conduct a Study on Election Staffing Challenges and Solutions to Improve Federal Elections ..... 32
Amend HAVA to Allow Greater Operational Efficiency of the Technical Guidelines Development Committee ..... 32
Authorize and Appropriate Funding for Poll Worker Recruitment, Training, and Retention ..... 33
Appendix A: Descriptive Tables ..... 34
Overview Table 1: Mail Voting in the 2024 General Election ..... 34
Overview Table 2: In-Person Voting and Other Modes of Voting ..... 41

Overview Table 3: Polling Places and Poll Workers ..... 47
Overview Table 4: Election Technology and Ballot Counting ..... 53
**Chapter 2. Election Law and Procedure: The Policy Survey ..... 59**
Key Findings ..... 59
Introduction ..... 60
Responding to the 2024 EAVS ..... 60
Voter Registration ..... 61
Database Systems ..... 62
State Election Office Websites ..... 64
Voter Registration Methods ..... 64
List Maintenance ..... 68
Mail Voting ..... 71
Ballot Drop Boxes ..... 72
Ballot Curing ..... 74
Deadlines For Returning Mail Ballots ..... 75
Electronic Transmission and Return of Mail Ballots ..... 75
UOCAVA Voting ..... 76
UOCAVA Voting Deadlines ..... 77
Provisional Voting ..... 77
In-Person Voting ..... 79
In-Person Voting Before Election Day ..... 79
Vote Centers ..... 81
Poll Workers and Poll Worker Training ..... 82
Curbside Voting ..... 83
Voter Identification ..... 84
Criminal Convictions and Voting ..... 85
Securing, Certifying, and Auditing Elections ..... 87
Election Technology ..... 88
Election Certification and Recounts ..... 89
Election Audits and Election Security ..... 91
Appendix A: Descriptive Tables ..... 95
Policy Survey Table 1: Voter Registration Policies ..... 95
Policy Survey Table 2: Mail Voting Policies ..... 100
Policy Survey Table 3: UOCAVA Voting ..... 108
Policy Survey Table 4: In-Person Voting ..... 113
Policy Survey Table 5: Election Certification and Audits ..... 119

**Chapter 3. Voter Registration: The NVRA and Beyond ........ 125**
Key Findings ........ 125
Introduction ........ 126
Laws and Policies Regulating and Protecting Voter Registration ........ 127
The Voter Registration Process ........ 128
Changes in Section A for the 2024 EAVS ........ 130
Voter Registration Rates ........ 131
How Americans Registered to Vote for the 2024 General Election ........ 135
Automatic Voter Registration and Motor Vehicle Office Registrations ........ 139
Same Day Registration ........ 142
Other Modes of Registration ........ 144
Types of Registration Transactions Processed for the 2024 General Election ........ 145
Valid Registrations ........ 145
Rejected and Duplicate Registrations ........ 147
Registration List Maintenance ........ 148
Confirmation Notices ........ 150
Voters Removed from the Voter Lists and Merged Registration Records ........ 152
Appendix A: Descriptive Tables ........ 156
Voter Registration Table 1: Registration History ........ 156
Voter Registration Table 2: Total Registration Transactions Processed by Source ........ 162
Voter Registration Table 3: Registration Transactions Processed ........ 173
Voter Registration Table 4: Voter List Maintenance — Confirmation Notices ........ 179
Voter Registration Table 5: Voter List Maintenance — Removal Actions ........ 185
**Chapter 4. Military and Overseas Voting in the 2024 General Election ........ 193**
Key Findings ........ 193
Introduction ........ 194
Federal Laws Regulating Military and Overseas Voting ........ 194
The Uniformed and Overseas Citizens Absentee Voting Act of 1986 (UOCAVA) ........ 194
The Military and Overseas Voter Empowerment (MOVE) Act of 2009 ........ 195
The UOCAVA Voting Process ........ 196
UOCAVA Registration and Ballot Requests ........ 197
UOCAVA Ballots Transmitted ........ 201
Modes of UOCAVA Ballot Transmission ........ 201
UOCAVA Ballots Returned and Submitted for Counting ........ 204
Federal Write-In Absentee Ballots ........ 207
Appendix A: Descriptive Tables ........ 210
UOCAVA Table 1: Registered and Eligible UOCAVA Voters ........ 210

UOCAVA Table 2: Federal Post Card Applications (FPCA) ..... 213
UOCAVA Table 3: UOCAVA Ballots Transmitted, Returned, Counted, and Rejected ..... 218
UOCAVA Table 4: Federal Write-in Absentee Ballots (FWAB) ..... 221
**Chapter 5. Survey Methodology ..... 225**
Survey Questions ..... 226
Policy Survey ..... 226
Section A: Voter Registration ..... 231
Section B: UOCAVA ..... 231
Section C: Mail Voting ..... 232
Section D: In-Person Polling Operations ..... 232
Section E: Provisional Ballots ..... 232
Section F: Voter Participation and Election Technologies ..... 233
Data Collection Procedures ..... 233
Needs Assessment ..... 233
Collecting the Policy Survey Data ..... 234
Collecting the EAVS Data ..... 234
Technical Assistance ..... 237
Resources for EAVS Respondents ..... 238
Data Reporting and Calculations ..... 238
Recommendations for Analyzing and Interpreting the EAVS Data ..... 239
Appendix A: Survey Response Rates ..... 241
Appendix B: Data Collection Template Validation Rules ..... 244
Table 1: Math Validation Rules ..... 244
Table 2: Logic Validation Rules ..... 251
Table 3: Policy Survey Validation Rules ..... 255
Table 4: Policy Survey Pre-Fills ..... 266
Table 5: Valid Skips ..... 268
Table 6: Other Pre-Fills ..... 270
Table 7: Special Conditions and Data Missingness ..... 270
Appendix C: Post-Submission Validation Rates ..... 280
Table 1: Validation Rates and Outlier Thresholds ..... 280
Table 2: Comparisons to 2020 EAVS Data ..... 282
Appendix D: How To Calculate Selected EAVS Rates ..... 283

# Chapter 1. Overview of Election Administration and Voting in the 2024 General Election

## Key Findings

The 2024 Election Administration and Voting Survey (EAVS) collected data on ballots cast, voter registration, overseas and military voting, voting technology, and other important issues related to voting and election administration. Notable findings from the 2024 EAVS include:

- More than 211 million individuals were active registered voters for the 2024 general election, marking an all-time high. More than 85% of the voting age citizens were registered as active voters.
- Turnout for the 2024 general election was 64.7% of the citizen voting age population (CVAP) nationwide, which is the second-highest turnout in the last five presidential elections. More than 158 million voters cast ballots were counted.
- More than two-thirds of voters in the 2024 general election cast their ballots in person, with approximately half of in-person turnout occurring on Election Day and half occurring before Election Day. About three in 10 ballots were cast through mail voting. Most states saw the percentage of ballots cast by mail decrease between the 2020 and 2024 general elections.
- Nearly 15 million ballots were reported as being returned at ballot drop boxes. Among states that made ballot drop boxes available for both the 2022 and 2024 general elections, the percentage of mail ballots returned by voters at drop boxes increased by nearly 10 percentage points between these two elections.
- Among states that allow ballot curing, 1.5% of mail ballots entered the cure process and over half of these ballots were successfully cured.
- The age distribution of poll workers was notably older in 2024 compared to the 2020 general election. For 2024, more than half of poll workers were age 61 or older. States reported that 15.5% of poll workers who assisted with the 2024 general election had not served as poll workers in a previous election. The 2024 EAVS continued a trend that began in 2020 of jurisdictions reporting that recruiting poll workers was becoming easier.
- The use of voting equipment that uses paper ballots or produces a paper record, including direct electronic recording (DRE) devices with a voter-verified paper audit trail (VVPAT), ballot marking devices (BMD), scanners that tabulate paper records marked by voters or by BMDs, and hand counting of paper ballots, increased compared to 2022. The use of DREs without VVPAT decreased, and nearly 100% of EAVS jurisdictions used voting equipment that uses a paper ballot or produces an auditable paper record of voters' choices.
- Nearly 40% of jurisdictions nationwide reported using electronic poll books, which is the highest percentage recorded in the EAVS.

## Election Administration in the United States

The United States holds elections for many different levels of government, including local, state, and federal office. However, responsibility for administering these elections and tabulating, reporting, and certifying election results is largely exercised by local jurisdictions, with oversight from states and in accordance with federal law. The U.S. Constitution and various federal laws govern specific aspects of federal elections, and a small number of federal agencies, such as the U.S. Election Assistance Commission (EAC) and the Federal Voting Assistance Program (FVAP), play a supportive role in election administration. Broad legal and procedural authority rests with the states,[1] territories, the District of Columbia, and local jurisdictions. As a result, wide variation exists in the policies and practices for conducting elections across and sometimes within states, and these policies and practices are constantly changing. Nevertheless, U.S. elections generally follow a standard process. As shown in Figure 1, the election process can be viewed as a cycle.

**Figure 1. The U.S. Election Process**




[1] Throughout this report, unless otherwise specified, the term "state" can be understood to apply to the 50 U.S. states, the District of Columbia, and five U.S. territories (American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands) that submit Election Administration Policy Survey and EAVS data. Puerto Rico provides EAVS data only in presidential election years, as it does not hold elections for federal candidates in midterm election years. American Samoa did not participate in the 2016 EAVS. The Northern Mariana Islands participated in the EAVS for the first time in 2020.

1. The legal and procedural framework for elections is generally established in advance of a general election. This legal framework determines which individuals are eligible to vote in an election; how, when, and where voters may cast their ballots for the election; and what technology will be used to support elections. Supported by state election offices, most of these policies and procedures are implemented by election officials at the local level (e.g., county, township, parish, or municipality).

2. To participate in elections, eligible citizens typically must register to vote pursuant to the eligibility rules established by federal law and by their state.[2] In many states, voters must register in advance of a set registration deadline; in others, eligible individuals may register on the same day they cast their ballot, whether during an early voting period or on Election Day. Depending on state policy, eligible citizens may have multiple avenues for submitting their registration applications, such as by mail, fax, or email; online registration websites; in person at an election office; at a motor vehicle office; at other state government agency offices; at an armed forces recruitment office; or through a registration drive. States are also required to periodically examine their voter list and remove the records of voters who are no longer eligible; for instance, because the voter no longer resides in the state or jurisdiction in which they are registered, the voter has failed to respond to a notice sent to them by mail and has not voted in the two most recent federal general elections, the voter is deceased, or the voter is incarcerated or has received a criminal conviction that disqualifies them from voting. The process of updating voter registration lists and removing ineligible voters is referred to as "list maintenance."

3. When a federal general election is approaching, voting begins well in advance of Election Day for many voters, including eligible military voters and overseas citizens who are absent from their voting residence, for whom the right to participate in federal elections is protected under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA). In addition, all states provide avenues for voters to cast ballots before Election Day. This may include voting using a ballot that is mailed to an eligible voter by an election office, casting a ballot in person at a dedicated voting site before Election Day (often called "early voting"), or receiving and casting a ballot at an election office. Some states allow any eligible voter to cast their ballot before Election Day, whereas others limit it only to certain segments of the population, such as voters who are absent from their home jurisdiction on Election Day, voters with illnesses or disabilities, voters over a certain age, or voters who provide a statutorily valid excuse. The voting options that are available to voters and the timelines for mail voting and in-person voting vary by state and by local jurisdiction.

4. Voters who do not cast ballots beforehand may vote on Election Day at in-person voting sites. In most states, individuals whose eligibility to vote cannot be verified at the time of voting may cast a provisional ballot. Election officials then investigate the eligibility of individuals who cast provisional ballots to determine whether their ballots should be counted, either in full or in part, or rejected.

5. After the polls close on Election Day, the process of counting ballots to determine the final election results begins. This may also be referred to as "tabulation" or "canvassing." State

[2] North Dakota is the only state that does not require citizens to register before casting a ballot in an election.

policies vary on when counting may begin — some states may begin pre-processing mail ballots (e.g., verifying the mail voter's eligibility to cast a ballot, opening envelopes, removing the ballots from secrecy envelopes to prepare them for counting) before Election Day, whereas other states require in-person polls to be closed before any mail ballots can be processed. Some states also accept mail ballots, particularly those cast by UOCAVA voters, if they are received after Election Day, so long as they were postmarked on or before Election Day. Depending on state law and on what equipment is used to process the ballots, ballot counting may take several days to weeks to complete.

6. Once the unofficial results of an election are known, state and local election officials review the results for accuracy and certify them as final. Many states conduct audits of their election results and voting equipment to ensure that the established election procedures were followed and that the equipment functioned correctly. Certain election races may also be recounted if the margin of victory is close; if a candidate, party, or other authorized group requests a recount; if a court orders a recount to be conducted; or for other reasons specified by state law.

The election process can be viewed as a cycle in the sense that the experiences from previous elections are used to inform decision-making for the legal and procedural framework for subsequent elections. Often, the successful approaches and innovations implemented in one state or local jurisdiction during an election are adopted by other states or localities in subsequent elections. As this process begins anew with each federal election cycle, policymakers and administrators at every level benefit from the insights available in the state and local election data the EAC publishes in the EAVS.

## The 2024 Election Administration and Voting Survey (EAVS)

Since 2004, the EAC has conducted the EAVS following each federal general election.[3] The EAVS collects data from all 50 U.S. states, the District of Columbia, and five U.S. territories — American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands — on the ways in which Americans vote and how elections are administered. Data are provided at the jurisdiction level.[4]

The EAVS provides the most comprehensive source of state- and local jurisdiction-level data about election administration in the United States. These data play a vital role in helping election officials, policymakers, and other election stakeholders identify trends, anticipate and respond to changing

---

[3] The EAVS does not collect data on primary elections, run-off elections, or special elections. The data provided by states were only for the November 5, 2024, federal general election.

[4] What constitutes a jurisdiction for EAVS reporting is defined by how each state chose to provide data. For the 2024 EAVS, most states reported data at the county level (or county equivalent, such as parishes for Louisiana). The territories, the District of Columbia, and Alaska each reported as a single jurisdiction. Illinois, Maryland, Missouri, Nevada, and Virginia reported data for independent cities in addition to counties. Rhode Island reported data at both the city and town levels. Wisconsin reported data at the city, town, and village levels. Connecticut, Maine, Massachusetts, New Hampshire, and Vermont reported data at the town or township level. Maine also reported its UOCAVA data in Section B as a separate jurisdiction because this information is only collected at the state level. Michigan reported data at the county level, but most election administration activities take place in the 1,520 cities and townships in the state. Elections for Kalawao County in Hawaii are administered by Maui County; although Kalawao is included as a jurisdiction in the EAVS data, Kalawao's data are included with Maui's data.

voter needs, invest resources to improve election administration and the voter experience, and better secure U.S. elections infrastructure. The EAVS data make it possible to examine the details of the U.S. election infrastructure and to produce a general understanding of the core aspects of the election process and the management challenges faced by election officials at the state and local levels. The survey provides policymakers and the public with crucial information every two years about how federal elections are conducted, and it helps the EAC fulfill its congressionally mandated reporting requirements. The EAVS is also invaluable to election officials themselves. These officials use the EAVS to manage election oversight, conduct issue analysis and strategic planning, and create training and outreach materials.

The EAC also uses the EAVS data to create research and clearinghouse resources to advance the agency's mission to help election officials improve the administration of federal elections and help Americans participate in the voting process, as well as to inform lawmakers and national-level stakeholders about the impact of federal voting laws and the changing landscape of U.S. elections. The EAVS helps the EAC meet its mandate under the Help America Vote Act (HAVA) to serve as a national clearinghouse and resource for the compilation of information and to review procedures with respect to the administration of federal elections. The EAVS sections related to voter registration and UOCAVA voting allow states to satisfy their data reporting requirements established, respectively, by the National Voter Registration Act (NVRA) and UOCAVA. The EAVS also helps FVAP fulfill its obligations under UOCAVA to reduce obstacles to ensure military and overseas voting success by collecting data about how UOCAVA voters participate in elections.

The EAVS project consists of two separately administered surveys. The first survey is the Policy Survey, which is administered to each state or territory election office in advance of each federal general election, collects data on the election laws and policies in the states and territories. These data are used to provide context for states' EAVS submissions and to reduce the response burden associated with the EAVS. The second survey is the EAVS itself, which is due after each federal general election is complete and captures data at the jurisdiction level. The data collected include information on voter registration, UOCAVA voters, mail voting, in-person voting operations, provisional ballots, voter participation, and election technology. Although the EAVS gathers data at the jurisdiction level, providing these data is frequently a joint task undertaken by state and local election officials. Twenty-four states were able to provide all EAVS data from the state's centralized election database, whereas 32 states relied on local jurisdictions to provide data for some or all the EAVS questions. The full scope of the data collection procedures for both the Policy Survey and EAVS are detailed in Chapter 5 of this report.

Chapter 1 of this report covers turnout and modes of voting in the 2024 general election, polling places and poll workers, and election technology. This chapter also comprises a non-exhaustive overview of the data provided by states and jurisdictions in the EAVS. State election policies and practices are featured in Chapter 2, "Election Law and Procedure: The Policy Survey." Voter registration and list maintenance are covered in greater detail in Chapter 3, "Voter Registration: The NVRA and Beyond." UOCAVA voting is discussed further in Chapter 4, "Military and Overseas Voting in the 2024 General Election."

## EAVS Response Rates

The analysis in this report is based on information and data submitted and certified by the 50 U.S. states, five territories, and the District of Columbia. These 56 entities comprise 6,461 jurisdictions.

The state-level response rate for the EAVS was 100% (56 of 56 states, territories, and districts provided data) and the jurisdiction-level response rate was 100% (6,461 of 6,461 jurisdictions provided data).[5] During the data collection period, efforts were made to maximize the completeness and accuracy of the data reported. These efforts are outlined in the methodology of this report (Chapter 5). Instances when a state's data were not included in a calculation because of missing data or data quality issues are described in the footnotes and source notes that accompany the analysis in this report.

## Turnout in the 2024 General Election

According to the EAVS data submitted by states, there were 234,504,358 individuals who were registered to vote in the United States as of November 5, 2024. Of this number, 211,144,275 individuals were classified as active registered voters (meaning they had no additional processing requirements to fulfill before voting), 23,184,185 were considered inactive voters (meaning they required address verification under the provisions of the NVRA before they would be permitted to vote), and 207,400 individuals were categorized as another type of registered and eligible voter aside from active and inactive.[6] As a percentage of the 2023 citizen voting age population (CVAP) estimate calculated by the U.S. Census Bureau, 86.6% of voting age citizens were registered as active voters for the 2024 general election.[7] This represents a decrease of 1.5 percentage points compared to the active voter registration rate for the 2020 general election (88.2%).[8] Further details about voter registration, including how voters registered to vote, the use of same day voter registration (SDR), and list maintenance, can be found in Chapter 3 of this report.

States also reported that 158,211,780 voters cast ballots that were counted for the 2024 general election. This represents a CVAP turnout rate of 64.7% nationwide, which is the second highest turnout in the last five presidential elections.[9] Turnout for the 2024 general election decreased by

---

[5] Appendix A of Chapter 5 of this report contains an analysis of state-level response rates to each section of the EAVS. Although 100% of EAVS jurisdictions provided a response to the survey, there is variance in the completeness of those responses to each section and to specific survey questions.

[6] The total number of registered voters was collected in item A1a of the EAVS. Data on active registered voters were collected in A1b, data on inactive registered voters were collected in A1c, and data on other types of registered and eligible voters were collected in A1d. The sum of active, inactive, and other registered voters did not correspond exactly to the total number of registered voters in all jurisdictions that reported these data. According to Q13 of the 2024 Policy Survey, six states (Guam, Idaho, Minnesota, New Hampshire, North Dakota, and Puerto Rico) did not distinguish between active and inactive voters in their registration records. These states were not required to provide data in items A1c and A1d of the EAVS.

[7] This report uses the one-year American Community Survey (ACS) state CVAP estimate for 2023 instead of the five-year estimate to ensure the CVAP is as current as possible. The CVAP estimates for 2024 were not available by the time this report was finalized.

[8] The active CVAP registration rates for 2020 and 2024 were calculated as A1b/CVAP x 100. American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands were not included in this calculation because the U.S. Census Bureau does not calculate a CVAP for these territories. North Dakota was not included in this calculation because this state does not have voter registration. Casewise deletion at the state level was used in these calculations.

[9] The total number of voters who cast a ballot that was counted was reported in item F1a of the EAVS. The CVAP turnout rates for 2020 and 2024 were calculated as F1a/CVAP x 100. All calculations use the one-year ACS state CVAP estimate for the year prior to the general election to account for the

### Calculating Turnout Rates

There are several valid ways of calculating turnout, or the percentage of a population that voted in an election. The EAVS provides a measure of the total number of voters who cast a ballot that was counted for a general election in F1a, but there are multiple possible denominators.

- **Number of registered voters or active voters**. States report the number of individuals in their state who are registered and eligible to vote in A1a, and some states separately report the number of active voters (who have no additional processing requirements to fulfill before voting) in A1b. This number is available for states and sub-state EAVS jurisdictions.
- **Citizen voting age population (CVAP)**. The U.S. Census Bureau's American Community Survey (ACS) estimates the total number of U.S. citizens 18 years of age or older. This number is available for states and most sub-state EAVS jurisdictions but not for U.S. territories, except for Puerto Rico.
- **Voting-eligible population (VEP)**. This measure uses the CVAP but excludes those who are ineligible to vote (such as individuals with disqualifying felony convictions) and individuals who are in the military or who are citizens living overseas. This number is available for states, but not territories or for sub-state jurisdictions.

Relying on the number of registered or active voters can be problematic for calculating turnout because it is often challenging for states to keep voter registration lists fully up to date (see Chapter 3 of this report for a discussion of list maintenance practices). Using VEP as the denominator in turnout calculations would overrepresent voter turnout — since EAVS data explicitly include individuals covered by UOCAVA — and would restrict the ability to estimate turnout for sub-state jurisdictions. Using the CVAP as a denominator provides greater coverage of sub-state jurisdictions but also includes citizens over the age of 18 who are ineligible to vote due to certain state laws. Although each denominator has its limitations, the EAC uses the CVAP to calculate turnout in this report because of its availability for the majority of jurisdictions that report EAVS data and because it provides a more accurate picture of the population covered by the EAVS. Appendix D of Chapter 5 of this report includes recommendations on how to calculate additional EAVS rates.

3 percentage points from the 2020 CVAP turnout rate of 67.7%,[10] but increased by 3.7 percentage points from the 2016 CVAP turnout of 61%.[11] Nationwide CVAP turnout for the 2006 to 2024 EAVS is shown in Figure 2.

---

unavailability of the election-year CVAP at the time of reporting the EAVS. American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands were not included in these calculations because the U.S. Census Bureau does not calculate CVAP for these territories. Casewise deletion at the state level was used in these calculations.

[10] Beginning with the 2020 EAVS, the question about voter participation was reworded. In 2018 and earlier, this question collected data on ballots cast (independent of outcome), whereas in 2020 and later, it collected data on ballots cast and counted.

[11] The CVAP turnout rate for 2016 was calculated as item F1a divided by the 2015 CVAP from the one-year ACS and multiplied by 100. Casewise deletion at the state level was used in this calculation.

**Figure 2. 2024 CVAP Turnout Was Second-Highest Since 2006**




*Source*: CVAP turnout was calculated as F1a/CVAP x 100 for all years. All calculations use the one-year ACS state CVAP estimate for the year prior to the general election to account for the unavailability of the election-year CVAP at the time of reporting the EAVS. The CVAP for 2006 to 2014 was obtained by totaling the estimated numbers of native and naturalized citizens over 18 years of age reported by the corresponding one-year ACS. Territories for which CVAP is not available were excluded from the calculations; 2006 does not include data from Maryland, New York, and Wisconsin; 2008 does not include data from Mississippi, New Hampshire, New Mexico, and Rhode Island; 2014 does not include data from Alabama, Illinois, and Mississippi; and 2016 does not include data from Hawaii. Casewise deletion was used at the state level in calculating the national turnout level.

**Figure 3. Turnout Decreased In Most States From 2020 To 2024**




*Source*: CVAP turnout was calculated as F1a/CVAP x 100 for 2020 and 2024. All calculations use the one-year ACS state CVAP estimate for the year prior to the general election to account for the unavailability of the election-year CVAP at the time of reporting the EAVS. American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands are not shown because CVAP is not available for these territories. Casewise deletion was used at the state level in calculating the national turnout level. Turnout change between 2020 and 2024 is measured in percentage points.

Figure 3 shows the change in CVAP turnout among states between the 2020 and 2024 general elections. Most states saw their turnout decrease between these elections. The largest decreases were in Utah, Hawaii, California, Washington, New Jersey, Oregon, and Idaho; each of these states saw its turnout decrease by 5 or more percentage points between elections. Turnout increased in six states — North Carolina, the District of Columbia, Pennsylvania, Georgia, Michigan, and Wisconsin — but only marginally, with the largest turnout increase being only 1 percentage point. In addition, although all states reported at least 50% turnout in the 2020 general election, three states fell below 50% voter turnout in 2024 — Puerto Rico, Arkansas, and Hawaii.

EAVS data also show that the ways American voters cast their general election ballots have changed significantly in the last three election cycles. Figure 4 shows the percentage of voters who cast their ballots in person on Election Day, by mail, in person during early voting, and by other modes of voting (including UOCAVA voting and provisional voting).[12] Prior to the 2020 general election, a majority of voters tended to cast their votes at an in-person polling place on Election Day; 58.2% of voters chose this mode of voting for the 2018 general election. The 2020 general election saw a large increase in mail voting, as many states made mail voting easier to reduce crowding at in-person polling places as a COVID-19 pandemic measure. In-person voting saw a resurgence in 2022 and mail voting saw a corresponding decrease. For the 2024 general election, more than two-thirds of voters cast their ballots in person either before or on Election Day. Approximately three in 10 voters cast their ballots by mail. Although the percentage of voters who cast mail ballots decreased between 2020 and 2024, the level of mail voting in 2024 was still elevated compared to pre-pandemic elections; for both 2016 and 2018, mail voting comprised approximately one-quarter of voter turnout.

---

[12] For all election years, the percentage of voters who cast their ballots in person on Election Day was calculated as F1b/F1a x 100. The percentage of voters who cast their ballots by mail was calculated as (F1d+F1g)/F1a x 100. The percentage of voters who cast their ballots in person before Election Day was calculated as F1f/F1a x 100. The percentage of voters who cast their ballots by other methods was calculated as (F1c+F1e+F1h)/F1a x 100. Casewise deletion at the state level was used in these calculations. Montana was unable to report data in F1b-F1h. Alabama, Connecticut, Iowa, New Jersey, Oregon, and Washington did not report data in F1b. Alabama, Connecticut, Hawaii, Iowa, Mississippi, the Northern Mariana Islands, and the U.S. Virgin Islands did not report data in F1c. Iowa and Mississippi did not report data in F1d; California and the District of Columbia also did not report data in F1d because they are all-mail election states Alabama did not report data in F1e; Idaho, Maine, Minnesota, and North Dakota also did not report data in F1e because they do not use provisional ballots. Alabama, Iowa, Mississippi, New Jersey, Oregon, and Pennsylvania did not report data in F1f. Vermont reported being an all-mail election state but noted that the state was "unable to answer F1g separately from F1d."

**Figure 4. In-Person Voting Was the Most Common Mode of Turnout In 2024**




*Source*: Election Day turnout was calculated as F1b/F1a x 100 for all years. Mail turnout was calculated as (F1d+F1g)/F1a x 100 for all years. In-person early turnout was calculated as F1f/F1a x 100 for all years. UOCAVA, provisional, and other turnout was calculated as (F1c+F1e+F1h)/F1a x 100 for all years. Casewise deletion was used at the state level in calculating the national turnout levels for each mode, and because of this, percentages for each year do not equal 100%. Early voting includes all modes of casting a ballot in person at a polling site or election office before Election Day; see Chapter 2 for a discussion of the types of early voting available in states.

## In-Person Voting

In-person voting was the most common method of casting a ballot in the 2024 general election, with this proportion approximately evenly split between voting on Election Day and voting before the election. In-person voting takes place at designated polling places on Election Day and at polling places, election offices, or other designated sites before Election Day. All states allowed voters to cast ballots in person before Election Day for the 2024 general election.[13] For the purposes of EAVS, in-person early voting generally falls into two categories:

[13] Information on early voting was collected in Q34 of the Policy Survey. Although this report primarily uses the terminology "early voting," there are a variety of terms that states use to refer to the process of allowing individuals to cast their ballots in person at a polling location, vote center, or election office before Election Day. See Chapter 2 of this report for a full discussion of states' policies on early voting.

- A voter who casts a ballot at a physical polling location, vote center, or an election office before Election Day.
- A voter who cast an in-person absentee ballot in person at an election office or other designated polling site before Election Day.

Some states and territories offer both of these types of voting. Nine states require voters to provide a valid excuse to be permitted to vote early, whereas 47 states have no-excuse early voting that is open to any registered voter.[14] For a complete discussion of state policies on in-person voting, including the length of time in-person early voting was available, the use of vote centers, and the use of poll workers to assist with in-person voting, see Chapter 2 of this report.

States reported that 48,872,528 ballots were cast through in-person early voting and counted for the 2024 general election, an increase of 18% over the 41,415,710 early voting ballots cast for the 2020 general election.[15] The number of ballots cast in person on Election Day in 2024 was 52,816,493, an increase of 12% from the 47,148,389 ballots cast on Election Day for the 2020 general election.[16]

On average, states saw a 7.5-percentage point increase of in-person Election Day turnout between 2020 and 2024, with the states of New Hampshire, Maryland, North Dakota, Guam, and Kentucky reporting increases of more than 20 percentage points.[17] On average, states saw an increase in early voting turnout of 3.5 percentage points, with South Carolina and Delaware reporting the largest increases of 22.1 percentage points and 39.9 percentage points, respectively.[18]

## Voting By Mail

All states and territories and the District of Columbia offer registered voters the opportunity to cast their ballots by mail in federal general elections, although the number of citizens who cast their ballots using this method and the circumstances under which citizens can vote by mail vary widely among states. Some states use the term "absentee voting" instead of "mail voting."[19] For purposes of this report, mail voting refers to the process by which:

1. An individual receives a ballot in the mail before an election. In some states or jurisdictions, election offices automatically send a mail ballot to all registered voters (often referred to as "all-mail elections"), whereas others automatically send mail ballots only to individuals on a permanent mail voting list. In other states, individuals must complete an application to

---

[14] Information on whether an excuse was required for early voting was collected in Q34a of the 2024 Policy Survey.
[15] Data on early voting ballots were collected in item F1f of the 2020 and 2024 EAVS.
[16] Data on ballots cast in person on Election Day were collected in item F1b of the 2020 and 2024 EAVS.
[17] The percentage of voters who cast their ballots in person on Election Day was calculated as F1b/F1a x 100 for all years. This percentage could not be calculated for Alabama, Connecticut, Iowa, Montana, New Jersey, Oregon, and Washington because they did not provide data for item F1b in 2024.
[18] The percentage of voters who cast their ballots early and in person was calculated as F1f/F1a x 100. This percentage could not be calculated for Alabama, Connecticut, Iowa, Mississippi, Missouri, Montana, New Hampshire, New Jersey, Oregon, and Pennsylvania because they did not provide data for item F1f in 2020 or 2024.
[19] Because many states no longer require a person to be absent from their election jurisdiction in order to be permitted to cast a ballot by mail, the EAVS uses the term "mail voting."

request a ballot for each election for which they wish to vote using a mail ballot. Some states require an individual to provide a valid excuse to be able to receive a mail ballot.

2. The individual marks the mail ballot with their preferences at home instead of at an election office or polling location.

3. The individual returns the voted ballot to election officials, typically by sending the voted ballot through the mail, by returning the voted ballot to an in-person voting site or election office, or by depositing the voted ballot in a designated ballot drop box. The options that voters have for returning their voted mail ballots are dictated by state policy.

Chapter 2 of this report describes a full analysis of the laws that states had in place regarding mail voting for the 2024 general election. In total, 18 states required an excuse to vote by mail, whereas 38 states did not.[20] Twelve states conducted all-mail elections for the 2024 general election — nine of these states did so statewide and three in certain jurisdictions only.[21] In 25 states, voters could be placed on a permanent absentee voting list.[22]

The number of voters in the United States who have participated in federal general elections using mail voting has changed significantly in recent election cycles, with these numbers being higher in presidential election years than in midterm election years and a significant increase corresponding with the COVID-19 pandemic. For the 2016 EAVS, states reported 33,140,081 ballots cast by mail. That number more than doubled for the 2020 election to 69,337,349 ballots, as many states expanded opportunities to vote by mail in response to the COVID-19 pandemic. In the 2024 EAVS, states reported that 46,846,449 voters cast mail ballots that were counted.[23]

Accordingly, mail voting showed the greatest change between the 2020 and 2024 general elections. Figure 5 shows the change in mail voting turnout by state between these two elections. Only four states saw a higher percentage of mail voting in 2024 than in 2020: Washington (0.1 percentage points), Utah (1.6 percentage points), South Dakota (7.9 percentage points), and Indiana (36.4 percentage points).[24] On average, states saw their mail turnout decline by 12.7 percentage points between these two elections.[25]

---

[20] Data on requiring an excuse to vote by mail were collected in item Q24 of the 2024 Policy Survey.
[21] Data on all-mail elections were collected in items Q25 and Q25a of the 2024 Policy Survey. All-mail elections are defined as elections for which all registered voters, or all active registered voters, are automatically sent a mail ballot without having to file a mail ballot request. Some in-person voting may take place in an all-mail election.
[22] Data on permanent absentee voting policies were collected in item Q26 of the 2024 Policy Survey. Voters who received a mail ballot because they resided in a state or jurisdiction that automatically sent mail ballots to all registered voters (or to all active registered voters) were excluded from being considered permanent absentee voters.
[23] The number of ballots cast by mail and counted was the sum of F1d and F1g for all years. For the 2016 EAVS, these items collected data on ballots cast (independent of outcome), whereas in 2020 and 2024 they collected data on ballots cast and counted.
[24] Utah and Washington are all-mail election states that automatically send mail ballots to all registered and eligible voters for elections.
[25] Mail turnout was calculated as (F1d+F1g)/F1a x 100 for the 2020 and 2024 EAVS. Change was measured by subtracting 2020 mail turnout from 2024 mail turnout. Casewise deletion was used at the state level in calculating the national percentage.

**Figure 5. Mail Turnout Decreased In All But Four States Between 2020 and 2024**




*Source*: Mail turnout was calculated as (F1d+F1g)/F1a x 100 for the 2020 and 2024 EAVS. Turnout change is measured in percentage points (p.p.).

In addition to data on turnout, the EAVS collected data on mail ballots transmitted to voters (excluding military and overseas voters covered by UOCAVA) from election offices that were returned by voters, counted, and rejected. States reported transmitting 66,867,671 mail ballots for the 2024 general election (a decrease of 26.3% over the 90,687,978 mail ballots transmitted for the 2020 general election), of which 47,957,093 were returned by voters, for a rate of 72% of transmitted mail ballots being returned by voters.[26] Of the mail ballots that were returned by voters, 47,629,437 were reported as being counted and 584,463 were reported as being rejected, for a count rate of 98.8% of the mail ballots that were returned and a rejection rate of 1.2% of the mail ballots that were

[26] Data on the number of mail ballots transmitted were collected in item C1a, and data on mail ballots returned were collected in item C1b of the 2020 and 2024 EAVS. The return rate was calculated as C1b/C1a x 100. Casewise deletion was used at the state level in calculating the national percentage. Alabama, Connecticut, Mississippi, and the Northern Mariana Islands did not report data in C1b for the 2024 EAVS.

**Table 1. Most Common Reason For Mail Ballot Rejection Was a Non-Matching Or Incomplete Signature**

| Reason | Percentage of Rejected Mail Ballots |
|---|---|
| Ballot envelope had a non-matching or incomplete signature | 40.7% |
| Other reason not listed | 18.1% |
| Ballot was not received on time/missed the deadline | 17.8% |
| Voter already cast another ballot that was accepted | 11.1% |
| Ballot envelope did not have a voter signature | 10% |
| Ballot envelope did not have a witness signature | 5.6% |
| Voter did not provide the required documentation (e.g., identification, affidavit, statement) or documentation was incomplete | 4.4% |
| Ballot was not placed in a required secrecy envelope | 3.7% |
| Voter was not eligible to cast a ballot in the jurisdiction | 3.4% |
| Envelope was not sealed | 2% |
| Voter was deceased | 1.5% |
| Ballot was missing from the envelope | 1.1% |
| Returned ballot envelope did not have required postmark | 0.9% |
| Ballot was returned in an unofficial envelope | 0.4% |
| No resident address was on the envelope | 0.2% |
| Multiple ballots were returned in one envelope | 0.2% |
| No ballot application on record | 0% |

*Source*: Ballot had a non-matching or incomplete signature was calculated as C9e/C9a x 100. Other reason not listed was calculated as (C9r+C9s+C9t)/C9a x 100. Ballot was received late was calculated as C9b/C9a x 100. Voter already cast another ballot that was accepted was calculated as C9n/C9a x 100. Ballot did not have a voter signature was calculated as C9c/C9a x 100. Ballot did not have a witness signature was calculated as C9d/C9a x 100. Voter did not provide documentation or provided incomplete documentation was calculated as C9o/C9a x 100. Ballot was not placed in a required secrecy envelope was calculated as C9h/C9a x 100. Voter was not eligible to cast a ballot in the jurisdiction was calculated as C9p/C9a x 100. Envelope was not sealed was calculated as C9j/C9a x 100. Voter was deceased was calculated as C9m/C9a x 100. Ballot was missing from the envelope was calculated as C9g/C9a x 100. Returned ballot did not have required postmark was calculated as C9k/C9a x 100. Ballot was returned in an unofficial envelope was calculated as C9f/C9a x 100. No resident address was on the envelope was calculated as C9l/C9a x 100. Multiple ballots were returned in one envelope was calculated as C9i/C9a x 100. No ballot application on record was calculated as C9q/C9a x 100; this percentage is displayed as 0% due to rounding. Casewise deletion was used at the state level in calculating national percentages, and because of this, percentages do not total 100%.

returned.[27] The mail ballot return rate for the 2024 EAVS was statistically significantly higher than the rate for 2022 (59.7%), but was similar to the return rate for 2020 (77.8%). The percentage of

[27] Data on the number of mail ballots counted were collected in item C8a, and data on mail ballots rejected were collected in item C9a of the 2024 EAVS. The count rate was calculated as C8a/C1b x 100,

returned mail ballots that were counted and rejected was not significantly different across these three elections. For the 2024 general election, the percentage of counted and rejected mail ballots was not significantly different when comparing states that conducted an all-mail election at a state level to those that did not.[28]

Table 1 shows the most common reasons that states reported for rejecting mail ballots for the 2024 general election. By far the most common reason states reported for rejecting a mail ballot was that the voter's signature did not match what was on file for the voter or was incomplete. About two-fifths of the mail ballots that were rejected for this election were rejected for this reason. About one-fifth of rejected mail ballots were rejected for reasons not listed in the survey question. The states with the largest number of mail ballots rejected for other reasons were Oregon (36,982 ballots), Arizona (9,289 ballots), Pennsylvania (5,663 ballots), New York (4,873 ballots), New Jersey (3,624 ballots), and Florida (3,557 ballots). The states with the highest percentage of mail ballots rejected for other reasons were Oregon (96.1%), Idaho (65.1%), Ohio (41.5%), Wisconsin (38.6%), Virginia (37.4%), and Arizona (37.1%). Other common reasons for rejection reported in the data descriptions included "All signature issues," "Neither returned undeliverable nor returned by the voter," multiple issues with a single mail ballot, and the rejection reason not being specified.[29]

Additional common reasons for rejecting mail ballots were that the ballot was received after the state's deadline for returning mail ballots (17.8%), that the voter had already cast another ballot that was accepted (11.1%), and the ballot envelope lacked a voter signature (10%). Together, the top five reasons for rejecting mail ballots accounted for more than eight out of 10 of the mail ballots that were rejected for the 2024 general election.

**Ballot Drop Boxes**

In the 2024 Policy Survey, 36 states reported using ballot drop boxes to collect mail ballots from voters.[30] Drop boxes are locked containers (located either indoors or outdoors) where voters (or voters' authorized representatives, if allowed under state law) may deliver their voted mail ballots for collection. Drop boxes are staffed or unstaffed and are operated or controlled by election officials. Drop boxes are separate from ballot boxes that are located at in-person polling places for voters to place their ballots immediately after voting in person. Some states use alternative terms for ballot drop boxes, such as "place of deposit" or "secure ballot intake station."

Among 36 states that reported using ballot drop boxes, 32 were able to track data on the number of drop boxes used to support the 2024 election. In these 32 states, a total of 14,958 drop boxes were

---

and the rejection rate was calculated as C9a/C1b x 100 for the 2022 and 2024 EAVS. For the 2020 EAVS, the count rate was calculated as C3a/C1b x 100, and the rejection rate was calculated as C4a/C1b x 100. Casewise deletion was used at the state level in calculating the national percentages; the count and rejection rate may not total 100% because of the casewise deletion and due to rounding. Mississippi and the Northern Mariana Islands did not report data for C8a, and Mississippi did not report data for C9a for the 2024 EAVS. The sum of counted and rejected mail ballots did not match the reported number of mail ballots returned in the 2024 EAVS in Arizona, Arkansas, Florida, Illinois, Kansas, New Hampshire, New Jersey, Ohio, South Dakota, the U.S. Virgin Islands, Utah, and Vermont.

[28] *T* tests that were noted as being statistically significant were significant at the $p < 0.05$ level.

[29] Descriptions of other reasons why mail ballots were rejected were reported in C9r_other, C9s_other, and C9t_other of the 2024 EAVS.

[30] Data on whether states allowed the use of drop boxes were collected in item Q27 of the 2024 Policy Survey.

used.[31] Of the 13,553 drop boxes that were available on Election Day, 20.1% were located at election offices and 80.1% were located at other sites, such as at non-election office polling places, county government buildings, or other locations that are conveniently accessible to voters. Of the 10,648 drop boxes available before Election Day, 27.2% were located at election offices and 73% were located at other sites.[32]

Among the 21 states that were able to track data on the number of mail ballots that were returned at ballot drop boxes, 14,933,114 mail ballots were reported as being returned through this method.[33] In these states, this accounted for 44.6% of the mail ballots that were returned by voters and for 20.8% of all ballots that were cast and counted for this election.[34] Of the states that reported data on mail ballots returned at drop boxes for both the 2022 and 2024 elections, the percentage of mail ballots returned by voters at drop boxes increased by an average of 9.2 percentage points between these two elections.[35] In only two states did this percentage drop from 2022 to 2024: New Mexico (by 3.4 percentage points) and Maryland (by 2.1 percentage points). States that saw double-digit percentage point increases in the percentage of returned mail ballots that were returned at drop boxes were California (11.1 percentage points), Kansas (13.9 percentage points), Nevada (17.3 percentage points), and Utah (23.4 percentage points).

**Ballot Curing**

Another part of the election administration process that is specific to mail voting is mail ballot curing. When voters return their mail ballots to election offices, election workers verify that the envelope has all the required voter information and that the ballot is eligible to be counted. This process varies by state, but can include comparing the voter's signature with the one on file at the election office and verifying the date the ballot envelope was signed as well as other required information. If any of this information is missing, if it does not match the records on file in the election office, or if it is otherwise incomplete, then each state and territory has laws and procedures on how to treat these ballots. A

---

[31] The total number of drop boxes was collected in item C3a of the 2024 EAVS. The number of drop boxes deployed on Election Day was collected in C4a, and the number of drop boxes deployed before Election Day was collected in C5a. Drop boxes that were deployed both before and on Election Day are reported in both C4a and C5a. Indiana, Iowa, New York, and Wisconsin reported using drop boxes but were unable to report data on the number of drop boxes used.

[32] For Election Day drop boxes, the percentage located at election offices was calculated as C4b/C4a x 100 and the percentage located at other sites was calculated as C4c/C4a x 100. For early voting drop boxes, the percentage located at election offices was calculated as C5b/C5a x 100 and the percentage located at other sites was calculated as C5c/C5a x 100. Casewise deletion was used at the state level; percentages may not sum to 100% because of this casewise deletion or because of rounding.

[33] The number of mail ballots returned at drop boxes was reported in item C6a of the 2024 EAVS. Alaska, Connecticut, Georgia, Idaho, Indiana, Iowa, Maine, Massachusetts, Michigan, Minnesota, New York, North Dakota, Pennsylvania, Vermont, and Wisconsin reported using ballot drop boxes but were unable to report data on the number of ballots returned at drop boxes.

[34] The percentage of mail ballots returned by voters that were returned at drop boxes was calculated as C6a/C1b x 100 for the 2022 and 2024 EAVS. The percentage of all ballots cast and counted that were returned at drop boxes was calculated as C6a/F1a x 100 for both years. Casewise deletion was used at the state level in calculating national percentages. Data from Colorado were excluded from these calculations because several counties that had reported these data for 2022 could not do so for 2024.

[35] The percentage point change was calculated by subtracting the 2022 drop box return rate from the 2024 drop box return rate. Data from Colorado were excluded from these calculations because several counties that had reported these data for 2022 could not do so for 2024.

certain percentage of those ballots may initially be rejected for counting — for instance, because the voter forgot to sign the ballot envelope so the election office was unable to verify their identity; because the voter's signature does not match the signature that the election office has on file; or because the voter neglected to include other information such as a required affidavit, statement, or copy of their identification to assist in verifying their identity and ability to cast a mail ballot.

According to the 2024 Policy Survey, 43 states allowed voters to cure their mail ballots for the 2024 general election — that is, making their ballot eligible to be counted for the election by correcting missing information or signature errors.[36] The EAVS collected data on the number of mail ballots that entered the curing process, as well as how many of those ballots were successfully cured by the voter and were ultimately counted for the election, and how many ballots were not successfully cured and were rejected. Among states that reported these data, 585,457 ballots were reported to have been set aside for curing, of which 317,191 were successfully cured by voters and 270,753 were ultimately rejected.[37] The states with the highest numbers of ballots that were set aside for curing were California (153,097), Colorado (65,629), Washington (65,561), Arizona (55,010), and Utah (35,410); each of these five states had about three-quarters or more of its turnout take place through mail voting.[38]

At the national level, 1.5% of returned mail ballots entered the curing process, with 54.3% of these ballots being successfully cured by voters.[39] Maryland had the highest successful cure rate at 94.8% and the District of Columbia had the lowest rate at 21.4%.

Additional information about mail voting in the 2024 general election, including statistics by state, can be found in Appendix A of this chapter.

## Provisional Voting

HAVA expanded and standardized the use of provisional voting as a way for a voter to cast a ballot when their registration status cannot be verified at the time of voting, when there is some indication that the voter may have already cast another ballot (e.g., by mail), or when the voter's eligibility to vote in an election is challenged. Provisional ballots are kept separate from other election ballots and are later fully counted, partially counted, or rejected depending on whether the provisional voter's eligibility can be verified in the days following the election according to the state's rules for this process. The provisional ballot process helps ensure each qualified voter casts only one ballot that is counted and allows the voter additional time to prove their eligibility to vote if necessary. Five states — Idaho, Minnesota, New Hampshire, Wisconsin, and Wyoming — are exempt from HAVA's provisional ballot requirements because they allowed for SDR (i.e., the ability to register to vote and

---

[36] Information on state ballot curing policy was collected in item Q28 of the 2024 Policy Survey.
[37] Not all states that cure ballots were able to report data on the number of ballots that were cured. Georgia, Idaho, Iowa, Maine, Massachusetts, Mississippi, New Hampshire, North Dakota, Oregon, Pennsylvania, West Virginia, and Wisconsin were unable to report data on the total number of mail ballots that entered the cure process in C7a. New Jersey was able to report data on successfully cured mail ballots in C7b only. Indiana was able to report data in C7a on total mail ballots that entered curing and on mail ballots unsuccessfully cured in C7c. Kansas was able to report data in C7a, but not in C7b and C7c.
[38] The percentage of a state's turnout that took place through mail voting was calculated as (F1d+F1g)/F1a x 100.
[39] The percentage of returned mail ballots that entered the cure process was calculated as C7a/C1b x 100. The percentage of successfully cured mail ballots was calculated as C7b/C7a x 100. Casewise deletion was used at the state level in calculating the national percentages.

cast a ballot on the same day) at the time the law was enacted, although Wisconsin and Wyoming reported using provisional ballots. North Dakota is exempt from this HAVA provision because it does not require citizens to register to vote. In addition, some states that are subject to HAVA use provisional ballots as an SDR method, including California, Nevada, and Virginia.

In the 2024 Policy Survey, most states and territories reported offering provisional ballots to voters. Only four states — Idaho, Minnesota, New Hampshire, and North Dakota — did not.[40] Chapter 2 of this report includes a detailed analysis of additional policies on provisional voting, including under which circumstances a state may offer a provisional ballot to a voter and how states handle provisional ballots cast by a voter who is in the wrong precinct.

The percentage of ballots cast provisionally has been steadily declining over the past few election cycles; 2018 EAVS data show that 1.3% of voters who cast a ballot did so by provisional ballot, and that percentage declined to 0.8% of the electorate in the 2020 EAVS and 0.5% for the 2022 EAVS. For the 2024 general election, 0.9% of voters who cast a ballot that was counted did so by provisional ballot.[41] This represented a reported 1,736,209 provisional ballots that were cast among states that reported these data.[42] States reported that 73.8% of the provisional ballots that were cast were counted (either partially or fully), 25.1% were rejected, and 3% reached another outcome.[43] Analysis shows that the provisional ballot adjudication percentages for 2024 did not change significantly compared to the 2020 or 2022 EAVS.[44]

EAVS data in Table 2 show that the most common reason states reported for their voters to cast provisional ballots was that the person attempting to cast a ballot did not appear on the list of eligible voters; these accounted for 40.2% of provisional ballots cast nationwide. The next most common reason was that the voter had registered to vote on the same day they cast a ballot in person, otherwise known as SDR. Ten states — Alaska, Arkansas, Kansas, Montana, Nevada, New Mexico, New York, Utah, Virginia, and West Virginia — reported in the Policy Survey that provisional ballots are routinely used for SDR voters, and SDR accounted for slightly more than one-quarter of all provisional ballots cast in this election.[45] Other common reasons included that the voter's registration was not updated with their current name or address and that the voter was issued a mail ballot but did not surrender the ballot to poll workers when they came to vote in person; each of these reasons accounted for slightly less than 15% of provisional ballots cast. Other reasons for casting provisional

---

[40] Information on states' use of provisional voting was collected in item Q46 of the 2024 Policy Survey.
[41] The percentage of provisional voters is calculated as F1e/F1a x 100 for all years. Casewise deletion was used at the state level in calculating the national percentage. For the 2018 EAVS, F1 collected data on all ballots cast, regardless of outcome, whereas the 2020, 2022, and 2024 versions of F1 collected data on ballots cast and counted.
[42] The total number of provisional ballots cast by voters was collected in item E1a of the 2024 EAVS. American Samoa and Hawaii reported using provisional ballots but were unable to report data on these ballots in E1. The number of provisional ballots states and jurisdictions reported in Section E may differ from the number of provisional ballots cast and counted reported in Section F.
[43] The percentage of counted provisional ballots was calculated as (E1b+E1c)/(E1b+E1c+E1d+E1e) x 100. The percentage of rejected provisional ballots was calculated as E1d/(E1b+E1c+E1d+E1e) x 100. The percentage of provisional ballots that reached another adjudication was calculated as E1e/(E1b+E1c+E1d+E1e) x 100. Casewise deletion was used at the state level in calculating the national percentage.
[44] *T* tests were statistically insignificant at $p > 0.05$.
[45] Data on whether states offered provisional ballots to voters who used SDR was collected in item Q46a of the 2024 Policy Survey.

ballots (including other reasons not listed, the voter not being a resident of the precinct in which they were attempting to vote, the voter not having proper identification, an election official challenging the voter's eligibility, another person challenging the voter's eligibility, and a federal or state judge extending polling place hours) were comparatively rare.[46]

**Table 2. Most Common Reason For Voters To Cast Provisional Ballots Was Not Being On Eligible Voter List**

| Reason For Casting Provisional Ballot | Percentage of Provisional Ballots Cast |
|---|---|
| Voter did not appear on the list of eligible voters | 40.2% |
| Voter registered to vote on the same day they cast a ballot in person | 26.2% |
| Voter's registration was not updated with their current name or address | 14.3% |
| Voter was issued a mail ballot but did not surrender the ballot to poll workers when they came to vote in person | 14.3% |
| Other reasons not listed | 6.4% |
| Voter was not a resident of the precinct in which they were attempting to vote | 6.3% |
| Voter did not have proper identification (as defined by state law) | 2.7% |
| Election official asserted that the voter was not eligible to vote | 0.6% |
| Another person (not an election official) challenged the voter's qualifications and poll workers were unable to resolve the challenge | 0.1% |
| A federal or state judge extended the polling place hours for the election | 0% |

*Source*: Voter did not appear on the list of eligible voters was calculated as E2a/E1a x 100. Voter registered on the same day as casting a ballot in person was calculated as E2i/E1a x 100. Voter's registration was not updated with their current name or address was calculated as E2f/E1a x 100. Voter was issued a mail ballot but did not surrender the ballot to poll workers when they came to vote in person was calculated as E2g/E1a x 100. Other reasons not listed was calculated as (E2j+E2k+E2l)/E1a x 100. Voter was not a resident of the precinct in which they were attempting to vote was calculated as E2e/E1a x 100. Voter did not have proper identification (as defined by state law) was calculated as E2b/E1a x 100. Election official asserted that the voter was not eligible to vote was calculated as E2c/E1a x 100. Another person (not an election official) challenged the voter's qualifications and poll workers were unable to resolve the challenge was calculated as E2d/E1a x 100. A federal or state judge extended the polling place hours for the election was calculated as E2h/E1a x 100; this percentage is displayed as 0% because of rounding. Casewise deletion was used at the state level in calculating the national percentages, and because of this, percentages do not total 100%.

The EAVS also collects data on the reasons why provisional ballots are rejected. By far, the most common reason states reported for rejecting provisional ballots was that the voter who cast the provisional ballot was not registered in the state; this reason alone accounted for 52.2% of the

---

[46] Eleven states that used provisional ballots were unable to report data on the number of provisional ballots according to the reason for the ballots being cast. These states were Alaska, Colorado, Connecticut, Hawaii, Indiana, Iowa, Louisiana, New Jersey, New Mexico, Vermont, and Washington.

provisional ballots that were reported as rejected by states. The next most common reason was a reason that was not listed in the survey question. These ballots comprised 16.3% of rejected provisional ballots; the high percentage of ballots being rejected for other reasons may be a reflection of the differing and nuanced ways that states use provisional ballots beyond what is mandated by HAVA. Voters who were registered in the state but attempted to vote in the wrong jurisdiction accounted for 14.2% of rejections. Other reasons for rejecting provisional ballots that the EAVS collects data on — the voter attempting to vote in the wrong precinct, the voter failing to provide sufficient identification, the envelope and/or ballot being incomplete and/or illegible, the ballot being missing from the envelope, the ballot lacking a signature, the ballot having a non-matching signature, and the voter already having voted — collectively accounted for approximately one-quarter of all provisional ballots that were rejected nationwide.[47]

## UOCAVA and Other Methods of Voting

Absentee and mail voting have long been used to facilitate participation in federal elections for individuals in the military, eligible family members of service members, and U.S. citizens who live overseas. The distinct needs of members of the uniformed services and overseas citizens remain an area of focus in election administration, and these individuals are given special voting protections under UOCAVA and its amendments.[48] UOCAVA voters are provided certain rights to fully participate in federal elections and are given special considerations as to when their ballots are sent, how their blank ballots can be transmitted, and how and when they may return their voted ballots.

The 2024 general election represented the second-highest rate of ballots cast and counted from UOCAVA voters in a presidential election since 2012. The highest rate recorded in EAVS was in 2020, which saw 0.6% of all voter turnout being from UOCAVA voters; in 2024, this percentage fell slightly to 0.5%.[49] EAVS data for the 2024 general election show that 1,327,324 UOCAVA ballots were transmitted from election offices to UOCAVA voters; 806,743 of these ballots were returned by

---

[47] Voter was not registered in the state was calculated as E3b/E3a x 100. Other reasons not listed was calculated as (E3k+E3l+E3m)/E3a x 100. Voter was registered in the state but attempted to vote in the wrong jurisdiction was calculated as E3c/E3a x 100. Voter was registered in the state but attempted to vote in the wrong precinct was calculated as E3d/E3a x 100. Voter failed to provide sufficient identification was calculated as E3e/E3a x 100. Envelope and/or ballot was incomplete and/or illegible was calculated as E3f/E3a x 100. Ballot was missing from the envelope was calculated as E3g/E3a x 100. Ballot did not have a signature was calculated as E3h/E3a x 100. Ballot had a non-matching signature was calculated as E3i/E3a x 100. Voter already voted was calculated as E3j/E3a x 100. Casewise deletion was used at the state level in calculating the national percentages; percentages may not total 100% for this reason. Five states that use provisional ballots were unable to report data on the reasons why provisional ballots were rejected: Connecticut, Maine, Mississippi, Oregon, and Vermont.

[48] The uniformed services are the armed forces — the Army, Navy, Marine Corps, Air Force (including Space Force), and Coast Guard — and the U.S. Public Health Service (USPHS) Commissioned Corps, the National Oceanic and Atmospheric Administration (NOAA) Commissioned Officer Corps, and the U.S. Merchant Marine. Uniformed services members, their spouses, and their eligible dependents are, together, referred to as uniformed services voters. Overseas citizens are U.S. citizens living outside of the United States who are not uniformed services voters but who are also protected by UOCAVA.

[49] The percentage of voters who cast UOCAVA ballots was calculated as F1c/F1a x 100 for all years. For 2012 and 2016, this item collected data on ballots cast regardless of outcome; for 2020 and 2024, it collected data on ballots cast and counted. Casewise deletion was used at the state level in calculating the national percentages.

voters, for a UOCAVA ballot return rate of 68.4%.[50] Of these ballots, states reported that 96.3% were counted and 3.7% were rejected.[51] This is in addition to 28,140 Federal Write-In Absentee Ballots (FWAB) that were sent to election offices by UOCAVA voters, of which 20,065 were counted (71.5%).[52]

Chapter 4 of this report contains a complete discussion of the EAC's history of collecting data on voters covered by UOCAVA; a full analysis of the data collected about these voters and their ballots in 2024, including ballots transmitted, returned, counted, and rejected; and the use of the FWAB. Chapter 2 of this report contains a complete discussion of state policies regarding UOCAVA voting.

In addition to ballots that were cast at a physical polling place either on Election Day or during the early voting period, by mail, by provisional voting, and by UOCAVA voters, states reported data on any other modes of voting that were offered in the state in 2024. Only 104,743 of these ballots were cast among 11 states, which accounted for 0.2% of all ballots cast and counted in the 2024 general election. Puerto Rico reported both the highest number (62,134) and highest percentage (4.8%) of these ballots among all EAVS respondents. The territory described these ballots as including absentee votes received from individuals who were not UOCAVA voters but were domiciled in Puerto Rico.[53] The state with the next highest percentage of these voters was Kentucky, in which 0.6% of ballots cast were described as "supplemental." In the remaining nine states that reported other types of turnout, other modes of voting accounted for 0.2% or less of the state's total turnout.[54]

## Polling Places and Poll Workers

To organize elections, registered voters are typically assigned to precincts according to the residential addresses listed in their voter registration records. These precincts are contiguous, bounded geographic areas that form the basis for determining the contests and issues on which the voters legally residing in that area are eligible to vote.[55] Precincts are then assigned to polling locations, which are physical locations where in-person voting takes place. One precinct may be

---

[50] The number of UOCAVA ballots transmitted was collected in B5a and the number of UOCAVA ballots returned was collected in item B11a. The UOCAVA ballot return rate was calculated as B11a/B5a x 100. Casewise deletion was used at the state level in calculating the national percentage.
[51] The percentage of UOCAVA ballots counted was calculated as B18a/B11a x 100. The percentage of UOCAVA ballots rejected was calculated as B24a/B11a x 100. Casewise deletion was used at the state level in calculating the national percentages.
[52] The number of FWABs returned by UOCAVA voters was collected in item B29a. The number of counted FWABs was collected in item B30a.
[53] Puerto Rico provided this comment in its EAVS Section B submission: "As part of absentee voting, Puerto Rico, in addition to the UOCAVA categories — uniformed services members, eligible dependents, U.S. Merchant Marine members, and overseas civilian voters — also provides absentee voting options for voters who are physically outside of Puerto Rico on Election Day but are not classified as overseas citizens. This includes Puerto Rico residents who are temporarily in the United States for work, study, or other personal reasons but maintain their official residence in Puerto Rico."
[54] The number of ballots cast by another mode of voting and counted was reported in item F1h of the 2024 EAVS. The percentage of these ballots cast was calculated as F1h/F1a x 100. Casewise deletion was used in calculating the national percentage. The description of states' other mode of voting was based on what the state submitted in item F1h_Other of the 2024 EAVS. Additional states that reported ballots cast in F1h were Arkansas, California, Florida, Illinois, Ohio, Texas, Utah, West Virginia, and Wisconsin.
[55] Some states use the terms "ward" or "voting district" to describe their voting precincts.

assigned to a polling place, or multiple precincts may vote together at a single polling place. Some states use a vote center model, which allows people to vote at any polling location within their jurisdiction rather than at a specifically assigned polling place. State laws dictate which voting location or locations a voter must go to in order to cast a ballot in person. Chapter 2 of this report reports findings from the 2024 Policy Survey on how states trained the poll workers who assisted with this general election.

For the 2024 general election, states reported having 177,708 precincts in use and operating 95,815 physical polling places.[56] A total of 87,736 polling places were reported as being operated on Election Day 2024, and 13,163 were reported as being in use during in-person early voting before Election Day.[57] Among Election Day polling places, 2.8% were reported by states as being located at an election office and 97.5% were reported as being located at another site, such as a library, school, or a mobile voting location. For early voting polling places, 44.2% were located at election offices and 61.4% were located at other sites.[58]

In-person voters who vote at polling places are assisted by poll workers. These poll workers are typically not full-time election workers or employees of election offices; rather, they are recruited and trained to assist temporarily during election periods. Typical activities that poll workers perform include checking in voters, setting up voting equipment, providing ballots to voters, and performing other functions as dictated by the state or local election authority.[59] States reported that 772,433 poll

---

[56] The number of precincts was collected in item D1a, and the total number of polling places was collected in D2a. The instructions for D2a stated that each polling place was to be counted only once, regardless of the number of voting days it was open for.

[57] The total number of Election Day polling places was collected in D3a, and the total number of early voting polling places was collected in D4a. Hawaii and Washington did not report data in D3a; Alabama, Missouri, New Hampshire, Oregon, and Pennsylvania did not report data in D4a. Arkansas is excluded from analysis in this section that uses D3 or D4 data because the state reported higher numbers in each of D3a and D4a than total polling places in D2a. The EAC cautions against doing a year-over-year analysis of polling places as reported in the EAVS because these items have been underreported in previous years.

[58] The percentage of Election Day polling places at election offices was calculated as D3c/(D3b+D3c) x 100. The percentage of Election Day polling places at other sites was calculated as D3b/(D3b+D3c) x 100. The percentage of early voting polling places at election offices was calculated as D4c/(D4b+D4c) x 100. The percentage of early voting polling places at other sites was calculated as D4b/(D4b+D4c) x 100. Casewise deletion was used at the state level in calculating the national percentages; the percentages for each election period may not sum to 100% because of this. Alabama, Arkansas, Missouri, and North Carolina did not report data on where Election Day polling sites were located; Hawaii, North Carolina, and the Northern Mariana Islands did not report data on where early voting polling sites were located. "Early voting" refers to any in-person voting that took place before Election Day.

[59] Some states and jurisdictions use other titles for poll workers, such as election judges, booth workers, wardens, or commissioners. The EAVS instructions stated that observers stationed at polling places, regular office staff who did not fulfill poll worker functions during the election, or temporary election staff who were not hired specifically to serve voters in either early or Election Day voting should not be counted as poll workers for purposes of the EAVS. However, regular office staff who performed poll worker duties during early voting or on Election Day were to be counted as poll workers in these survey items.

**Figure 6. Age Distribution of Poll Workers has Skewed Older Since 2020**




*Source*: Percentage of poll workers under age 18 was calculated as D7b/(D7b+D7c+D7d+D7e+D7f+D7g) x 100 for all years. Percentage of poll workers ages 18-25 was calculated as D7c/(D7b+D7c+D7d+D7e+D7f+D7g) x 100 for all years. Percentage of poll workers ages 26-40 was calculated as D7d/(D7b+D7c+D7d+D7e+D7f+D7g) x 100 for all years. Percentage of poll workers ages 41-60 was calculated as D7e/ (D7b+D7c+D7d+D7e+D7f+D7g) x 100 for all years. Percentage of poll workers ages 61-70 was calculated as D7f/(D7b+D7c+D7d+D7e+D7f+ D7g) x 100 for all years. Percentage of poll workers ages 71 or older was calculated as D7g/(D7b+D7c+D7d+D7e+D7f+D7g) x 100 for all years. Data for Alaska were excluded for 2022 and 2024 and data for South Carolina were excluded for all years because these states only tracked data on poll workers under 18 years of age in the years for which they were excluded. Casewise deletion was used at the state level for calculating national percentages, and because of this, percentages do not total 100%.

workers assisted with in-person voting for the 2024 general election, with 675,434 poll workers assisting with voting on Election Day and 149,321 assisting with early voting.[60]

---

[60] The total number of poll workers was collected in item D7a. The total number of Election Day poll workers was collected in item D5a. The total number of early voting poll workers was collected in item D6a. D7a was not intended to match the sum of D5a and D6a because the instructions in D7 were to count each poll worker only once, regardless of the number of days of voting the poll worker assisted with. Iowa, Mississippi, North Dakota, Oregon, Puerto Rico, Vermont, Washington, and Wisconsin were

Thirty-seven states also reported data on the age breakdown of the poll workers who assisted with the 2024 general election.[61] Among these states, a majority of poll workers were reported as being age 61 or older. The age distribution of poll workers in the 2020, 2022, and 2024 general elections is shown in Figure 6. This figure shows a clear increase in older poll workers since the 2020 general election. For that election, the age group that showed the highest percentage of poll workers was age 41 to 60; for 2024, the most common age category reported was 61 to 70, and an outright majority of poll workers were age 61 or older. Although the age distribution of poll workers was not significantly different from 2022 to 2024, the 2020 age distribution was notably younger than the subsequent two elections.[62] States reported that 94,466 of the poll workers who assisted with the 2024 general election were new poll workers, which made up 15.5% of the poll worker population for this election year. This was similar to the 16.7% of poll workers who were new that was reported for the 2022 general election.[63]

The data collected by EAVS on how easy or difficult it was for jurisdictions to obtain a sufficient number of poll workers shows a consistent trend toward recruitment becoming easier over the last three general elections, as displayed in Figure 7. Although recruitment is still a challenge for many officials, the number of jurisdictions that reported a "somewhat easy" recruitment experience showed marked improvement between 2022 and 2024 and the number of jurisdictions that reported a "somewhat difficult" experience trended downward. More than half of jurisdictions reported a difficult recruiting experience in the 2020 and 2022 elections, but the comparable number for 2024 was less than half. Analysis confirms that poll worker recruitment was easier in 2024 than it was in 2020.[64] However, it remains highly correlated with jurisdiction size, with jurisdictions having 10,000 or fewer total registered voters reporting that recruitment was easier compared to jurisdictions with more than 10,000 total registered voters.[65]

---

unable to report data on poll workers in any of these three items. In addition, New Hampshire was unable to report data in D7a or D6a. Alabama, Connecticut, Idaho, and Montana were unable to report data in either D5a or D6a. Louisiana, Maine, Massachusetts, Missouri, Pennsylvania, and Rhode Island were unable to report data in D6a.

[61] Data on poll workers' ages were collected in items D7b-D7g of the 2024 EAVS. In addition to the nine states that did not report data in D7a, 10 states that reported data on the total number of poll workers in D7a were unable to provide an age breakdown of poll workers: American Samoa, Connecticut, Idaho, Louisiana, Massachusetts, Minnesota, New Jersey, the Northern Mariana Islands, Utah, and Virginia.

[62] Comparisons for age categories between 2020 and 2024 were significant at the $p < 0.05$ level. Comparisons for age categories between 2022 and 2024 were insignificant at $p > 0.05$.

[63] Data on new poll workers were collected in item D9a of the 2024 EAVS; the percentage of new poll workers was calculated as D9a/D7a x 100 for 2022 and 2024. Casewise deletion at the state level was used in calculating the national percentage. Twenty-seven states (Alaska, American Samoa, Connecticut, Delaware, Guam, Idaho, Indiana, Iowa, Maine, Maryland, Massachusetts, Mississippi, Missouri, Montana, New Hampshire, New Jersey, North Dakota, the Northern Mariana Islands, Oregon, Puerto Rico, Rhode Island, South Carolina, Vermont, Virginia, Washington, Wisconsin, and Wyoming) were unable to track data on new poll workers for 2024.

[64] *T* tests comparing D8 for 2024 and 2022 were statistically significant at $p < 0.01$. *T* tests comparing D8 for 2024 and 2020 were statistically insignificant at $p > 0.05$.

[65] For this comparison, jurisdictions were classified according to the total number of registered voters as reported in item A1a of the 2024 EAVS. This comparison was statistically significant at $p < 0.001$.

**Figure 7. Poll Worker Recruitment Has Trended Easier Since the 2020 Election**




*Source*: Ease of recruiting poll workers was collected in item D8 for all years. Jurisdictions that responded "Not enough information to answer," "Data Not Available," "Does Not Apply," or left this item blank were excluded from this analysis.

## Election Technology

The use of technology in polling places and vote tally locations varies widely across and even within states. The 2024 EAVS collected data on the type of voting equipment and other election technology that is used, including the type of voting that the equipment supports, the specific makes and models of the equipment, and how many were deployed for the election. The voting equipment landscape continues to evolve with each election.

### Voting Equipment

The 2024 EAVS collected data on five types of voting systems used in the 2024 general election:

- Direct-recording electronic (DRE) devices that are not equipped with a voter-verified paper audit trail (VVPAT);
- DRE voting devices that are equipped with a VVPAT;

- Electronic systems that produce a paper ballot but do not tabulate votes, often referred to as ballot marking devices (BMD);
- Scanners (either optical or digital) that tabulate paper ballots that voters mark by hand or via a BMD; and
- Electronic poll books, which are a type of hardware, software, or a combination of both and are used in place of paper poll books that list all registered voters.

**Figure 8. Percentage of EAVS Jurisdictions Using BMDs, Scanners, Hand Counting, and DREs with VVPAT Increased From 2022 To 2024; Use of DREs Without VVPAT Decreased**




*Source*: Data on use of BMDs were collected in item F5a in the 2024 EAVS and in F7a for 2022. Data on use of scanners were collected in item F6a for 2024 and in F8a for 2022. Data on use of hand counting were collected in item F7a for 2024 and in F9a for 2022. Data on use of DRE with VVPAT were collected in item F4a in 2024 and in F6a for 2022. Data on use of DRE without VVPAT were collected in item F3a for 2024 and in F5a for 2022. Percentages were calculated as the number of jurisdictions responding "Yes" to the listed item divided by the total number of EAVS jurisdictions. Many jurisdictions use more than one type of equipment.

The EAVS also collected information on whether jurisdictions counted ballots by hand without the use of any optical or digital scanning system.[66]

Nationally, states reported deploying 367,682 voting systems to assist with the 2024 general election.[67] Figure 8 shows the percentage of jurisdictions that reported using each type of voting equipment in the 2022 and 2024 EAVS. The most commonly used types of voting equipment in EAVS jurisdictions were BMDs and scanners, which were used in 90.5% and 86.4% of jurisdictions, respectively. The use of both types of equipment increased slightly from the 2022 election. The use of hand counting also increased between these two elections, and in 2024 it was used by just over one-fifth of jurisdictions that reported data.[68] Use of hand counting to tabulate ballots for the 2024 general election was not correlated with jurisdiction size.[69] DREs continue to be the least-used type of voting equipment in the United States, with only 8.9% of jurisdictions using DREs with VVPAT and 1.2% using DREs without VVPAT.

DREs without VVPAT are of special concern to some experts because these systems do not use a paper ballot or produce a paper record of the votes that are cast, which raises security concerns and can make it difficult to conduct certain types of post-election audits. The percentage of jurisdictions that reported using these systems decreased significantly since the previous general election. In the 2022 EAVS, 434 jurisdictions in nine states reported using DRE without VVPAT; in the 2024 EAVS, that dropped to 80 jurisdictions in three states. Only Louisiana reported using these systems statewide; other states that reported using this equipment in 2022 or 2024 used it only in select jurisdictions. Illinois, Indiana, Kentucky, Mississippi, New Jersey, Tennessee, and Vermont reported discontinuing use of DREs without VVPAT between the 2022 and 2024 elections. Furthermore, the number of jurisdictions that use DRE without VVPAT *only*, without any other voting systems or counting methods that rely on a paper ballot or produce a VVPAT, continues to decrease. For the 2020 general election, 32 jurisdictions (12 in Indiana, one in Tennessee, and 19 in Texas) used only

---

[66] Information on DREs without VVPAT was collected in F3 of the 2024 EAVS. Information on DREs with VVPAT was collected in F4. Information on BMDs was collected in F5. Information on scanners was collected in F6. Information on hand counting was collected in F7. Information on electronic poll books was collected in F8. Alabama did not provide data for any of the election technology questions in F3-F8 for 2024. Kansas did not provide responses on the use of hand counting in F7; one jurisdiction in Texas and two jurisdictions in Wisconsin also did not respond to this question. Most jurisdictions in Mississippi did not provide responses on the use of electronic poll books in F8. Previously, the EAVS also collected information on the use of punch card and lever-voting systems; starting with the 2022 EAVS, these questions were eliminated because no jurisdiction in the United States had reported using either of these types of equipment since the 2016 EAVS, marking three election cycles in which no jurisdiction reported using this equipment. Both VVPAT and paper ballots are considered to be paper records that can assist in conducting post-election audits.

[67] The number of voting systems deployed was calculated as the sum of F3c_1, F3c_2, F3c_3, F4c_1, F4c_2, F4c_3, F5c_1, F5c_2, F5c_3, F6c_1, F6c_2, and F6c_3 in the 2024 EAVS.

[68] The EAVS did not collect information on whether jurisdictions used hand counting for all ballots or all ballot contests within a jurisdiction.

[69] For this comparison, jurisdictions were classified according to the total number of registered voters as reported in item A1a and according to the number of voters who cast ballots that were counted in item F1a of the 2024 EAVS. These comparisons were statistically insignificant at $p > 0.05$. Jurisdictions that did not provide a response in F7a of the 2024 EAVS were excluded from this analysis. No jurisdiction in the 2024 EAVS reported using only hand counting; all jurisdictions used some other form of voting equipment to assist with ballot casting or tabulation. However, the EAVS did not collect information on whether jurisdictions used hand counting for all ballots or all ballot contests within a jurisdiction.

DRE without VVPAT. For the 2022 general election, that number decreased to only four jurisdictions (one in Tennessee and three in Texas). For the 2024 EAVS, one jurisdiction in Arkansas reported that DREs without VVPAT were the only type of voting equipment used. This means that nearly 100% of jurisdictions in the United States use voting equipment that has voters mark a paper ballot (including BMDs, scanners, and hand counting) or produces an auditable paper record of voters' ballot preferences (including DRE with VVPAT).

## Electronic Poll Books

When voters go into polling places to cast ballots in person, their identity is checked against voter registration information that is contained in poll books to ensure the voters are registered to vote and did not already cast a ballot (either in person or by mail). These poll books can be paper based and printed before the election, or they can be electronic. The use of electronic poll books has steadily increased in recent elections, from 38 states using them for the 2020 general election to 41 for the

**Figure 9.Electronic Poll Books Were Used Statewide In One-Third of States**




*Source*: Data on the use of electronic poll books in jurisdictions were collected in item F8a of the 2024 EAVS. Percentages were calculated as the number of jurisdictions that responded "Yes" to F8a divided by the number of EAVS jurisdictions in the state.

2024 general election.[70] This includes Massachusetts, which reported using electronic poll books for the first time for this election.

In 2024, 39.9% of jurisdictions used electronic poll books to assist with voting, which represents the highest percentage reported to date in the EAVS and an increase of more than 4 percentage points over 2022 levels.[71] Figure 9 shows the percentage of jurisdictions in each state that reported using electronic poll books in this election. In 19 states, all EAVS jurisdictions used electronic poll books. Top-down states (in which the state's voter registration database is hosted on a single, central platform or mainframe and is generally maintained by the state with information supplied by local jurisdictions) were not more likely to use electronic poll books than were bottom-up or hybrid states (in which the voter registration database generally uploads information retained at the local level and compiles it at regular intervals to form the statewide voter registration list).[72]

## Voter Registration Systems

The 2024 EAVS marks the first time that the EAC collected data on the use of voter registration systems (VRS) deployed to voting sites to assist with elections. VRSs are a combination of hardware, software, or firmware and materials and documentation used to streamline the process of voter registration and to secure voter information in a county, state, or election jurisdiction by election administrators. VRSs are connected to a private network, administered through state or local jurisdictions, and hold the capability of administrative functions to aid in the voting process on Election Day. In some jurisdictions, VRSs may be interoperable with electronic poll books, election night reporting systems, and/or election management systems. VRSs are designed by either private sector manufacturers or in-house jurisdictions and are managed by manufacturers and jurisdictions based on high-level standards of cybersecurity and data infrastructure maintenance. Collecting data on VRSs is vital, as most states' election infrastructures rely heavily on these systems and are deeply integrated with them.

Thirty-four states were able to report data on deployed VRSs.[73] Of these states, nearly half (16) reported not deploying VRSs.[74] Of the 18 that did, eight states (Alaska, Connecticut, Indiana, Louisiana, Minnesota, Montana, Rhode Island, and the U.S. Virgin Islands) deployed VRSs at the

---

[70] Data on the use of electronic poll books were collected in item F8a of the 2024 EAVS and in items F3a, F3b, F3c, and F3d of the 2020 EAVS. For the latter year, a jurisdiction was considered to have used an electronic poll book if it responded "Yes" to at least one of those questions.

[71] Data on the use of electronic poll books were collected in items F3a, F3b, F3c, F3d, F3e, and F3f of the 2022 EAVS. A jurisdiction was considered to have used an electronic poll book if it answered "Yes" to at least one of those questions. Puerto Rico was not included in the calculation of percentage of jurisdictions that used this equipment in 2022 because it was not required to respond to the 2022 EAVS. This territory used electronic poll books in the 2020 and 2024 general elections.

[72] Data on state voter registration database type was collected in item Q4 of the 2024 Policy Survey. The comparison was statistically insignificant at $p > 0.05$.

[73] Data on the number of VRSs deployed was collected in item F11a of the 2024 EAVS. The states that were unable to report these data were Alabama, American Samoa, Colorado, the District of Columbia, Florida, Hawaii, Iowa, Idaho, Kansas, Maine, Michigan, the Northern Mariana Islands, Mississippi, North Carolina, North Dakota, New Hampshire, New Jersey, New Mexico, New York, Pennsylvania, Vermont, and Washington.

[74] States that reported deploying zero VRSs at the polling place in any of their EAVS jurisdictions were Delaware, Georgia, Guam, Kentucky, Massachusetts, Maryland, Missouri, Nebraska, Nevada, Ohio, Oklahoma, Oregon, Puerto Rico, South Carolina, Wisconsin, and Wyoming.

polling place in all of their EAVS jurisdictions. The remaining states (Arkansas, Arizona, California, Illinois, South Dakota, Tennessee, Texas, Utah, Virginia, and West Virginia) reported deploying VRSs in only some jurisdictions; these percentages ranged from 0.8% of jurisdictions in Virginia to 33.3% of jurisdictions in Arizona. Nationwide, states reported deploying 7,697 VRSs at voting sites for the 2024 general election.[75]

## Recommendations from the EAC to Congress

### Exempt the EAC From the Paperwork Reduction Act (PRA)

The EAC recommends that Congress exempt it from the PRA. The EAVS collects election information that the EAC must report to Congress by June 30 of the year following a federal election, per HAVA. To collect the required information from state and local election officials, the EAC must undergo the time-consuming and resource-intensive PRA process. The EAC regularly collects information from state and local election officials and receives time-sensitive requests for information from stakeholders, including Congress. For example, election guidance is often unique to a given election cycle, and the EAC needs to respond immediately to emerging threats by distributing alerts or resources. However, compliance with the PRA involves a lengthy process that requires considerable time and resources.

When the PRA was established in 1980, the Federal Election Commission (FEC), which handled election administration duties, was exempt from this law. This exemption continued in the PRA of 1995. However, when HAVA transferred election administration duties from the FEC, the exemption was not extended to the EAC.

### Authorize and Appropriate Funds to Purchase VVSG 2.0 Voting Systems

The EAC recommends that Congress provide dedicated funding to support the implementation and certification of voting systems that comply with the Voluntary Voting System Guidelines (VVSG) 2.0. This funding will ensure that states and jurisdictions can upgrade their voting systems to meet the latest standards for security, accessibility, and reliability.

When HAVA was enacted, it provided approximately $3.5 billion in federal funds to replace punch card and lever-voting systems with more modern, electronic systems. This initial funding was crucial in modernizing the nation's voting infrastructure and enhancing the integrity of the electoral process.

Since the passage of HAVA, the EAC has continued to develop and update the VVSG to reflect technological advancements and emerging security threats. The latest iteration, VVSG 2.0, represents a comprehensive set of standards to ensure that voting systems are secure, accessible, and reliable. However, the transition to VVSG 2.0-compliant systems requires substantial investment.

---

[75] This calculation excludes data from 36 jurisdictions in Arkansas that may have reported erroneous numbers.

## Extend the EAVS Reporting Deadline to September 30 of the Year Following a Federal Election

The EAC recommends that Congress extend the EAVS reporting deadline to September 30 of the year following a federal election. This legislative change will align the EAVS deadline with the FVAP reporting requirements and provide election officials with additional time needed to submit accurate and complete data.

Since its inception, EAVS has been a critical tool for collecting data on election administration and voting practices. Given the evolving landscape of election administration and the increasing importance of accurate data for policymaking, it is essential to provide election officials with the necessary time to complete their reporting obligations. The June 30 deadline has often posed challenges for election officials, particularly in years with high voter turnout or significant changes in election procedures. The extension to September 30 will ensure that the EAVS data are as accurate and comprehensive as possible, supporting the EAC's mission to improve election administration and voter experience.

## Authorize and Appropriate Funding to Conduct a Study on Election Staffing Challenges and Solutions to Improve Federal Elections

The EAC recommends that Congress authorize and appropriate funds to conduct a study on election staffing challenges and solutions to improve federal elections, pursuant to its mandate under HAVA Section 241.

HAVA mandated the EAC to conduct studies and issue reports to improve the administration of federal elections. Recent elections have indicated challenges in recruiting and retaining an election workforce. Additional funding would provide detailed information on the current state of election staffing and enhance understanding of the necessary support to maintain a resilient and effective election workforce.

## Amend HAVA to Allow Greater Operational Efficiency of the Technical Guidelines Development Committee

Amend section 221(c)(1) of the Help America Vote Act of 2002 (52 U.S.C. § 20961(c)(1)) as follows:

> "The Development Committee shall be composed of the Director of the National Institute of Standards and Technology (who shall serve as its chair), together with a group of 14 other individuals appointed jointly by the Commission and the Director of the National Institute of Standards and Technology, consisting of the following:..."

The statutorily mandated Technical Guidelines Development Committee is charged with helping the Executive Director of the Commission develop the voluntary voting system guidelines. Currently, the Technical Guidelines Development Committee is chaired by the Director of the National Institute of Standards and Technology (NIST). All other members are appointed jointly by the Commission and the Director of NIST. As the voluntary voting system guidelines are the core responsibility of the EAC and only a secondary consideration for the Director of NIST, there have been long delays in getting members of the committee appointed. As such, the EAC recommends removing the Director as Chair and allowing the EAC to appoint members. This would create efficiencies in allowing

vacancies to be filled faster, ensuring full membership when the Technical Guidelines Development Committee is required to meet.

## Authorize and Appropriate Funding for Poll Worker Recruitment, Training, and Retention

The EAC recommends that Congress allocate dedicated federal funding to support the recruitment, training, and retention of poll workers.

Poll workers are critical in administering elections, performing essential duties such as setting up voting equipment, verifying voter identities, and providing ballots. However, 47.9% of jurisdictions reported facing significant challenges in recruiting and retaining a sufficient number of poll workers for the 2024 general election.

The initial funding provided under HAVA was instrumental in modernizing the nation's voting infrastructure. However, the challenges faced by election officials today require continued investment in the human resources that support election administration. Federal funding will ensure that states and jurisdictions have the necessary resources to maintain a robust and well-prepared workforce of poll workers, which is essential for the smooth and secure administration of federal elections.

# Appendix A: Descriptive Tables

## Overview Table 1: Mail Voting in the 2024 General Election

| State | % Turnout by Mail | Total Mail Ballots Transmitted | Total Mail Ballots Returned | % Mail Ballots Returned | Mail Ballots Counted | |
|---|---|---|---|---|---|---|
| | | | | | Total | % of Returned |
| Alabama | 5.5% | 140,558 | -- | -- | 126,018 | -- |
| Alaska [1] | 14.3% | 60,695 | 49,616 | 81.7% | 48,744 | 98.2% |
| American Samoa [2] | 1.9% | 207 | 190 | 91.8% | 189 | 99.5% |
| Arizona [3] | 74.7% | 3,582,082 | 2,859,348 | 79.8% | 2,816,885 | 98.5% |
| Arkansas | 2.1% | 29,173 | 25,976 | 89.0% | 24,552 | 94.5% |
| California | 80.8% | 23,003,434 | 13,185,566 | 57.3% | 13,062,318 | 99.1% |
| Colorado [4] | 91.3% | 4,090,266 | 3,000,301 | 73.4% | 2,957,550 | 98.6% |
| Connecticut | 6.5% | 129,996 | -- | -- | 127,354 | -- |
| Delaware | 6.5% | 40,728 | 35,475 | 87.1% | 33,659 | 94.9% |
| District of Columbia | 51.1% | 453,858 | 169,280 | 37.3% | 168,111 | 99.3% |
| Florida [5] | 26.8% | 3,524,965 | 2,960,238 | 84.0% | 2,947,371 | 99.6% |
| Georgia [6] | 5.1% | 327,241 | 273,512 | 83.6% | 268,751 | 98.3% |
| Guam [7] | 0.3% | 77 | 54 | 70.1% | 45 | 83.3% |
| Hawaii | 92.5% | 755,841 | 487,239 | 64.5% | 483,078 | 99.1% |
| Idaho [8] | 19.6% | 196,032 | 182,434 | 93.1% | 179,777 | 98.5% |
| Illinois [9] | 17.8% | 1,177,760 | 1,030,362 | 87.5% | 1,022,256 | 99.2% |
| Indiana [10] | 53.7% | 1,616,735 | 1,607,247 | 99.4% | 1,603,815 | 99.8% |
| Iowa | -- | 235,170 | 221,210 | 94.1% | 220,041 | 99.5% |
| Kansas | 11.0% | 165,077 | 149,591 | 90.6% | 149,350 | 99.8% |
| Kentucky | 5.6% | 131,762 | 120,400 | 91.4% | 116,324 | 96.6% |
| Louisiana [11] | 5.9% | 167,577 | 122,627 | 73.2% | 119,706 | 97.6% |
| Maine [12] | 25.5% | 224,646 | 215,753 | 96.0% | 215,242 | 99.8% |
| Maryland | 24.6% | 878,815 | 747,040 | 85.0% | 744,244 | 99.6% |
| Massachusetts [13] | 33.4% | 1,349,590 | 1,186,310 | 87.9% | 1,173,112 | 98.9% |
| Michigan | 35.4% | 2,213,167 | 2,081,265 | 94.0% | 2,017,704 | 96.9% |
| Minnesota | 13.7% | 576,563 | 455,698 | 79.0% | 446,576 | 98.0% |
| Mississippi [14] | -- | 28,558 | -- | -- | -- | -- |
| Missouri | 5.7% | 199,327 | 183,764 | 92.2% | 178,526 | 97.1% |
| Montana [15] | -- | 503,295 | 432,394 | 85.9% | 430,159 | 99.5% |
| Nebraska [16] | 31.8% | 323,237 | 308,601 | 95.5% | 307,135 | 99.5% |
| Nevada | 44.1% | 2,069,339 | 669,445 | 32.4% | 656,140 | 98.0% |
| New Hampshire | 11.2% | 98,762 | 94,362 | 95.5% | 92,945 | 98.5% |
| New Jersey [17] | 19.2% | 1,100,762 | 839,944 | 76.3% | 828,200 | 98.6% |

| State | % Turnout by Mail | Total Mail Ballots Transmitted | Total Mail Ballots Returned | % Mail Ballots Returned | Mail Ballots Counted | |
|---|---|---|---|---|---|---|
| | | | | | Total | % of Returned |
| New Mexico | 12.0% | 122,478 | 112,494 | 91.8% | 111,527 | 99.1% |
| New York | 10.0% | 975,377 | 862,737 | 88.5% | 836,987 | 97.0% |
| North Carolina [18] | 5.2% | 451,176 | 307,185 | 68.1% | 298,269 | 97.1% |
| North Dakota | 24.0% | 94,676 | 89,930 | 95.0% | 89,429 | 99.4% |
| Northern Mariana Islands | 7.3% | 1,168 | -- | -- | -- | -- |
| Ohio | 18.1% | 1,131,278 | 1,066,229 | 94.2% | 1,058,400 | 99.3% |
| Oklahoma | 6.3% | 124,664 | 103,025 | 82.6% | 98,548 | 95.7% |
| Oregon [19] | 99.3% | 3,038,435 | 2,291,579 | 75.4% | 2,253,114 | 98.3% |
| Pennsylvania [20] | 27.3% | 2,204,273 | 1,952,372 | 88.6% | 1,933,102 | 99.0% |
| Puerto Rico [21] | 10.3% | 149,339 | 134,396 | 90.0% | 132,157 | 98.3% |
| Rhode Island | 10.0% | 56,663 | 52,301 | 92.3% | 51,995 | 99.4% |
| South Carolina | 3.8% | 108,922 | 101,585 | 93.3% | 98,782 | 97.2% |
| South Dakota | 36.6% | 155,015 | 152,146 | 98.1% | 151,762 | 99.7% |
| Tennessee | 2.8% | 98,452 | 88,748 | 90.1% | 86,904 | 97.9% |
| Texas | 3.3% | 463,200 | 398,270 | 86.0% | 384,221 | 96.5% |
| U.S. Virgin Islands | 3.8% | 648 | 613 | 94.6% | 613 | 100.0% |
| Utah | 91.5% | 1,475,522 | 1,268,103 | 85.9% | 1,239,070 | 97.7% |
| Vermont [22] | 64.7% | 441,666 | 237,565 | 53.8% | 240,375 | 101.2% |
| Virginia | 10.5% | 531,154 | 479,139 | 90.2% | 474,332 | 99.0% |
| Washington [23] | 98.5% | 5,169,231 | 3,927,132 | 76.0% | 3,890,945 | 99.1% |
| West Virginia | 2.9% | 24,830 | 22,624 | 91.1% | 22,377 | 98.9% |
| Wisconsin [24] | 16.6% | 614,367 | 575,257 | 93.6% | 572,434 | 99.5% |
| Wyoming | 14.1% | 39,842 | 38,421 | 96.4% | 38,217 | 99.5% |
| U.S. Total | 30.3% | 66,867,671 | 47,957,093 | 72.0% | 47,629,437 | 98.8% |

| State | Mail Ballots Not Counted | | Total Drop Boxes | Ballots Returned by Drop Box | | Mail Ballots That Underwent Curing | |
|---|---|---|---|---|---|---|---|
| | Total | % of Returned | | Total | % of Returned | Total | % of Returned |
| Alabama | 1,779 | -- | -- | -- | -- | -- | -- |
| Alaska [1] | 872 | 1.8% | 5 | -- | -- | -- | -- |
| American Samoa [2] | 1 | 0.5% | -- | -- | -- | -- | -- |
| Arizona [3] | 25,071 | 0.9% | 544 | 411,280 | 14.4% | 55,010 | 1.9% |
| Arkansas | 2,274 | 8.8% | -- | -- | -- | 209 | 0.8% |
| California | 123,248 | 0.9% | 2,854 | 6,200,937 | 47.0% | 153,097 | 1.2% |
| Colorado [4] | 42,751 | 1.4% | 434 | 317,337 | 10.6% | 65,629 | 2.2% |
| Connecticut | 2,642 | -- | 201 | -- | -- | -- | -- |
| Delaware | 1,816 | 5.1% | -- | -- | -- | 33 | 0.1% |
| District of Columbia | 1,169 | 0.7% | 55 | 96,610 | 57.1% | 1,487 | 0.9% |
| Florida [5] | 21,126 | 0.7% | 542 | 745,254 | 25.2% | 32,652 | 1.1% |
| Georgia [6] | 4,761 | 1.7% | 196 | -- | -- | -- | -- |
| Guam [7] | 9 | 16.7% | -- | -- | -- | -- | -- |
| Hawaii | 4,161 | 0.9% | 62 | 190,545 | 39.1% | 6,979 | 1.4% |
| Idaho [8] | 2,657 | 1.5% | 41 | -- | -- | -- | -- |
| Illinois [9] | 16,559 | 1.6% | 510 | 156,532 | 15.2% | 9,474 | 0.9% |
| Indiana [10] | 3,432 | 0.2% | -- | -- | -- | 4,756 | 0.3% |
| Iowa | 1,169 | 0.5% | -- | -- | -- | -- | -- |
| Kansas | 561 | 0.4% | 154 | 59,925 | 40.1% | 2,919 | 2.0% |
| Kentucky | 4,076 | 3.4% | 186 | 49,258 | 40.9% | 5,873 | 4.9% |
| Louisiana [11] | 2,921 | 2.4% | -- | -- | -- | 3,608 | 2.9% |
| Maine [12] | 511 | 0.2% | 359 | -- | -- | -- | -- |
| Maryland | 2,796 | 0.4% | 286 | 363,317 | 48.6% | 1,124 | 0.2% |
| Massachusetts [13] | 13,198 | 1.1% | 874 | -- | -- | -- | -- |
| Michigan | 63,561 | 3.1% | 1,711 | -- | -- | 16,862 | 0.8% |
| Minnesota | 9,122 | 2.0% | 53 | -- | -- | -- | -- |
| Mississippi [14] | -- | -- | -- | -- | -- | -- | -- |
| Missouri | 5,238 | 2.9% | -- | -- | -- | -- | -- |
| Montana [15] | 2,235 | 0.5% | -- | -- | -- | 10,440 | 2.4% |
| Nebraska [16] | 1,466 | 0.5% | 121 | 216,022 | 70.0% | 1,322 | 0.4% |
| Nevada | 13,305 | 2.0% | 342 | 299,601 | 44.8% | 32,909 | 4.9% |
| New Hampshire | 1,552 | 1.6% | -- | -- | -- | -- | -- |
| New Jersey [17] | 11,191 | 1.3% | 448 | 398,300 | 47.4% | -- | -- |
| New Mexico | 967 | 0.9% | 62 | 6,533 | 5.8% | 1,614 | 1.4% |
| New York | 25,750 | 3.0% | -- | -- | -- | 23,235 | 2.7% |

| State | Mail Ballots Not Counted | | Total Drop Boxes | Ballots Returned by Drop Box | | Mail Ballots That Underwent Curing | |
|---|---|---|---|---|---|---|---|
| | Total | % of Returned | | Total | % of Returned | Total | % of Returned |
| North Carolina [18] | 8,916 | 2.9% | -- | -- | -- | 5,539 | 1.8% |
| North Dakota | 501 | 0.6% | 63 | -- | -- | -- | -- |
| Northern Mariana Islands | 13 | -- | -- | -- | -- | -- | -- |
| Ohio | 8,335 | 0.8% | 90 | 181,688 | 17.0% | 5,326 | 0.5% |
| Oklahoma | 4,477 | 4.3% | -- | -- | -- | -- | -- |
| Oregon [19] | 38,465 | 1.7% | 318 | 1,484,470 | 64.8% | -- | -- |
| Pennsylvania [20] | 19,270 | 1.0% | 175 | -- | -- | -- | -- |
| Puerto Rico [21] | 2,239 | 1.7% | -- | -- | -- | 7,130 | 5.3% |
| Rhode Island | 306 | 0.6% | 459 | 21,374 | 40.9% | 327 | 0.6% |
| South Carolina | 2,803 | 2.8% | -- | -- | -- | -- | -- |
| South Dakota | 738 | 0.5% | -- | -- | -- | -- | -- |
| Tennessee | 1,844 | 2.1% | -- | -- | -- | 483 | 0.5% |
| Texas | 14,049 | 3.5% | -- | -- | -- | 23,226 | 5.8% |
| U.S. Virgin Islands | 6 | 1.0% | -- | -- | -- | -- | -- |
| Utah | 23,819 | 1.9% | 308 | 1,018,405 | 80.3% | 35,410 | 2.8% |
| Vermont [22] | 467 | 0.2% | 158 | -- | -- | 1,320 | 0.6% |
| Virginia | 4,807 | 1.0% | 2,764 | 94,192 | 19.7% | 11,903 | 2.5% |
| Washington [23] | 36,187 | 0.9% | 575 | 2,616,566 | 66.6% | 65,561 | 1.7% |
| West Virginia | 247 | 1.1% | -- | -- | -- | -- | -- |
| Wisconsin [24] | 2,823 | 0.5% | -- | -- | -- | -- | -- |
| Wyoming | 204 | 0.5% | 8 | 4,968 | 12.9% | -- | -- |
| U.S. Total | 584,463 | 1.2% | 14,958 | 14,933,114 | 41.8% | 585,457 | 1.5% |

**Overview Table 1 Calculation Notes:**

% Turnout by Mail uses (F1d+F1g)/F1a x 100.
Total Mail Ballots Transmitted uses question C1a.
Total Mail Ballots Returned uses question C1b.
% Mail Ballots Returned uses C1b/C1a x 100.
Mail Ballots Counted, Total uses question C8a.
Mail Ballots Counted, % of Returned uses C8a/C1b x 100.
Mail Ballots Not Counted, Total uses question C9a.
Mail Ballots Not Counted, % of Returned uses C9a/C1b x 100.
Total Drop Boxes uses question C3a.
Ballots Returned by Drop Box, Total uses question C6a.
Ballots Returned by Drop Box, % of Returned uses C6a/C1b x 100.
Mail Ballots That Underwent Curing, Total uses question C7a.
Mail Ballots That Underwent Curing, % of Returned uses C7a/C1b x 100

**Overview Table 1 Data Notes:**

General Notes:

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.
- Items that are displayed as a dash (--) indicate that all jurisdictions within the state responded "Data Not Available," "Does Not Apply," or "Valid Skip" to the EAVS item(s) used in the calculation or left the item(s) blank.
- The percentages shown in this table are rounded to one decimal place. Percentages that round to less than 0.1% are displayed as 0.0%.
- Because each percentage was calculated independently, the percentages of mail ballots counted and rejected may not sum to 100% for some states or at the national level.
- The Total Mail Ballots Transmitted column captures the total number of mailed ballots that states reported transmitting, regardless of whether the ballot was returned or not. The number of ballots transmitted typically exceeds the number of ballots returned because some voters who were transmitted a mailed ballot choose to vote by another mode or to not vote at all. Total Mail Ballots Returned typically exceeds Total Mail Voters because some returned mailed ballots are rejected for not meeting state requirements. Mail Ballots Counted may not match Total Mail Voters because states may have different methodologies for calculating these numbers.
- The Total Mail Ballots Returned column includes both counted and rejected ballots that were returned to election offices.

**[1]** Data reported in C1a, C8a, C9, and F1d include ballots sent by electronic transmission (fax and online delivery).

**[2]** Some UOCAVA voters are also mail ballot voters.

**[3]** Some Arizona counties do not track data for C7. Mohave County noted that the total number reported in the official election canvass could differ from the voting history reports within the voter registration database because the system was live during the entirety of the voting period. This means voters who cast a ballot in the election and who were eligible to vote in Mohave County at the time the ballot was cast, moved from the county, or became ineligible after the ballot was tabulated. This reflects the discrepancy of ballots tabulated versus voters who received voting credit.

**[4]** Eight counties were unable to report data on ballots returned via drop box in C6.

**[5]** Responses reflect data submitted by each respective county election official. Differences may exist between survey data and official data/reports generated and/or filed by a specific date or deadline.
1. Official voting history including voting methods for the 2024 General Election, is contained in the post-election legislative recap report pursuant to s. 98.0981, FS.
2. For official election data and voter registration statistics, refer to statistics: dos.fl.gov/elections/data-statistics/.

**[6]** Any ballots received after the certification of the election on November 22, 2024, are considered unreturned. Absentee voter reports in Georgia reflect the status of absentee ballots, but they do not reflect how ballots were delivered. Absentee ballot reports in Georgia track the status of absentee ballots as of a particular moment in time. Therefore, our reports show the number of ballots that were still in the cure process at the conclusion of the election, but they do not show the number of ballots that entered the cure process during the entirety of the election.

**[7]** Local law allows for ballots to be transmitted via email, but all ballots must be returned by mail.

**[8]** Voters are contacted if their ballot is rejected; however, the curing process is not tracked in the system. Voters can have absentee ballots both rejected and accepted but it is unclear whether it is result of curing.

**[9]** Data provided come from 108 different election authorities and not from a single source. Data available might not be able to gather a completely accurate picture because there are different available data within each election authority. The number of Total Mail Voters is lower than Total Mail Ballots Transmitted, Returned, etc., likely because Illinois was unable to gather a completely accurate picture of data from all jurisdictions for this section in the survey.

**[10]** County election boards set their own policies but drop boxes must be under county election board control based on IC 3-11-10-24. Counties do not track data related to drop boxes in the statewide voter registration system.

**[11]** The data reported in C8 include voters who were given credit for voting but whose ballots may have been blank or otherwise invalid for acceptance. This explains the mismatch with data reported in F1d and F1g.

**[12]** Provisional ballots are not counted separately from other ballots. Provisional ballot totals are reflected in F1b, F1d, or F1f as applicable.

**[13]** Drop box returns are not tracked separately from hand-delivered ballots. Voters can correct errors by completing a new ballot and affidavit, which are not tracked separately.

**[14]** Mississippi is unable to provide data in C1 because this series of questions specifically asks for mail-in ballots and not absentee ballots. The state can only provide the total number of absentee ballots returned, which includes in-person and mail-in. The state's election management system does not distinguish between the two.

**[15]** Montana does not track data on ballots returned via drop box. Data reported in C8 are the number of ballots returned and accepted. Ballot secrecy laws prevent staff from opening the secrecy envelope before the ballot is separated from the voter information. A ballot secrecy envelope may not contain an actual ballot. Because of this, Montana does not report details in F1 for ballots that were counted.

**[16]** Nineteen counties in Nebraska are entirely vote by mail and some precincts are also vote by mail.

**[17]** F1a is taken from statewide certified results. These results do not break down the ballots cast by Election Day (F1b) and early voting (F1f) ballots cast. Data are unavailable for ballots not successfully cured because the data are not specifically recorded.

**[18]** The results of this survey include point-in-time data from multiple datasets and log files and thus may differ slightly from other publicly posted datasets. UOCAVA ballots are reported with mail ballots.

**[19]** The data reported in F1 include ballots returned and accepted for counting. C7 data are not tracked.

**[20]** Data on ballots collected via drop boxes are not tracked in the system. Whether a ballot undergoes curing and its final status is not recorded.

**[21]** Puerto Rico experienced a significant increase in mail ballot requests compared to 2020. This increase is due to an extensive promotion campaign encouraging the use of mail voting, as well as the elimination of early voting at the precinct level, which led more voters to opt for mail ballots.

**[22]** Some jurisdictions may have entered incorrect or incomplete data; therefore, some calculations and datasets may be misconstrued. We have updated the data as best we can. Vermont has no way of capturing and tracking the ballots received via a drop box.

**[23]** Data reported on cured ballots include only those cured due to non-matching or missing signatures. Reports of in-person voters before Election Day reflect county data on individuals who cast their ballots at voting centers using accessible voting units (AVU). However, ballots cast using AVUs are not tracked separately from mail ballots.

**[24]** Due to a recent court ruling, municipal clerks may (but are not required to) choose to use drop boxes in their jurisdictions as a lawful method of absentee ballot return. Priorities USA v. Wis. Elections Comm'n, 2024 WI 32, 412 Wis. 2d 594, 8 N.W.3d 429. In the State of Wisconsin, municipalities are not required to report their use of drop boxes with the state. A total of 77 municipalities have reported the use of 113 drop boxes; however, this number is an incomplete reporting. Data in C8a will not match exactly with data in F1d due to how voter record merges happen in our database. When two voter records for the same voter are merged together, the election participation record moves with the merge, but the absentee ballot record does not. The system does not see them as being associated to the same voter. In Section C, we look only at absentee ballot records whereas in Section F, we

look for election participation and an absentee ballot record. Those voters not recorded in F1d are recorded in F1h. Wisconsin does not gather data on whether or how absentee ballots may have been received back by the clerk with missing data or whether these missing data were cured.

## Overview Table 2: In-Person Voting and Other Modes of Voting

| State | In-Person Election Day Voters | | In-Person Early Voters | | Provisional Voters | |
|---|---|---|---|---|---|---|
| | Total | % | Total | % | Total | % |
| Alabama | -- | -- | -- | -- | -- | -- |
| Alaska | 175,541 | 51.5% | 92,281 | 27.1% | 14,786 | 4.3% |
| American Samoa [1] | 9,035 | 88.4% | 991 | 9.7% | 0 | 0.0% |
| Arizona [2] | 496,753 | 14.3% | 349,129 | 10.0% | 15,699 | 0.5% |
| Arkansas | 294,235 | 26.2% | 810,714 | 72.2% | 1,389 | 0.1% |
| California | 1,836,518 | 11.4% | 878,489 | 5.4% | 289,935 | 1.8% |
| Colorado | 141,556 | 4.4% | 109,209 | 3.4% | 205 | 0.0% |
| Connecticut | -- | -- | 715,275 | 39.3% | 36 | 0.0% |
| Delaware | 268,718 | 52.2% | 210,295 | 40.9% | 14 | 0.0% |
| District of Columbia | 82,396 | 25.1% | 72,914 | 22.2% | 93 | 0.0% |
| Florida [3] | 2,596,761 | 23.6% | 5,364,821 | 48.8% | 6,168 | 0.1% |
| Georgia [4] | 1,239,125 | 23.4% | 3,768,395 | 71.1% | 3,718 | 0.1% |
| Guam | 24,291 | 80.2% | 5,774 | 19.1% | 65 | 0.2% |
| Hawaii | 0 | 0.0% | 39,158 | 7.5% | 0 | 0.0% |
| Idaho | 508,734 | 55.4% | 225,973 | 24.6% | -- | -- |
| Illinois [5] | 2,666,185 | 46.6% | 2,001,203 | 35.0% | 8,316 | 0.1% |
| Indiana | 1,372,508 | 46.0% | 1,397,345 | 46.8% | 1,939 | 0.1% |
| Iowa | -- | -- | -- | -- | 749 | 0.0% |
| Kansas | 604,319 | 45.0% | 557,906 | 41.6% | 27,441 | 2.0% |
| Kentucky | 1,267,653 | 60.8% | 687,057 | 32.9% | 194 | 0.0% |
| Louisiana | 1,047,445 | 51.8% | 849,784 | 42.0% | 535 | 0.0% |
| Maine [6] | 463,500 | 55.0% | 157,116 | 18.6% | -- | -- |
| Maryland | 1,145,134 | 37.8% | 974,945 | 32.2% | 145,763 | 4.8% |
| Massachusetts | 1,713,191 | 48.8% | 600,225 | 17.1% | 1,797 | 0.1% |
| Michigan | 2,453,252 | 43.0% | 1,214,409 | 21.3% | 10 | 0.0% |
| Minnesota | 1,960,360 | 59.9% | 850,705 | 26.0% | -- | -- |
| Mississippi [7] | 1,010,752 | 82.5% | -- | -- | 14,685 | 1.2% |
| Missouri | 2,067,247 | 66.1% | 867,936 | 27.8% | 5,534 | 0.2% |
| Montana [8] | -- | -- | -- | -- | -- | -- |
| Nebraska | 564,660 | 58.5% | 80,304 | 8.3% | 10,651 | 1.1% |
| Nevada | 247,291 | 16.6% | 543,461 | 36.6% | 28,242 | 1.9% |
| New Hampshire | 730,273 | 88.1% | 0 | 0.0% | 0 | 0.0% |
| New Jersey [9] | -- | -- | -- | -- | 116,528 | 2.7% |
| New Mexico | 252,629 | 27.2% | 556,395 | 60.0% | 1,597 | 0.2% |
| New York | 4,320,467 | 51.5% | 2,986,704 | 35.6% | 194,588 | 2.3% |
| North Carolina [10] | 1,175,905 | 20.4% | 4,224,909 | 73.4% | 24,989 | 0.4% |
| North Dakota | 181,998 | 48.9% | 99,007 | 26.6% | -- | -- |

| State | In-Person Election Day Voters | | In-Person Early Voters | | Provisional Voters | |
|---|---|---|---|---|---|---|
| | Total | % | Total | % | Total | % |
| Northern Mariana Islands | 5,571 | 44.2% | 6,124 | 48.6% | 0 | 0.0% |
| Ohio | 3,130,240 | 53.5% | 1,536,604 | 26.3% | 104,848 | 1.8% |
| Oklahoma | 1,174,876 | 74.7% | 294,037 | 18.7% | 1,598 | 0.1% |
| Oregon [11] | -- | -- | -- | -- | 52 | 0.0% |
| Pennsylvania [12] | 5,043,808 | 71.3% | -- | -- | 69,506 | 1.0% |
| Puerto Rico | 1,071,954 | 83.5% | 4,004 | 0.3% | 12,576 | 1.0% |
| Rhode Island | 290,699 | 55.7% | 173,547 | 33.2% | 2,514 | 0.5% |
| South Carolina | 977,341 | 38.1% | 1,476,843 | 57.5% | 4,517 | 0.2% |
| South Dakota | 273,648 | 62.8% | 0 | 0.0% | 201 | 0.0% |
| Tennessee | 856,491 | 27.7% | 2,132,535 | 69.0% | 3,139 | 0.1% |
| Texas | 2,329,171 | 20.3% | 8,703,181 | 75.8% | 20,511 | 0.2% |
| U.S. Virgin Islands | 6,832 | 42.8% | 8,506 | 53.3% | 1 | 0.0% |
| Utah | 104,350 | 7.1% | 36,381 | 2.5% | 41,114 | 2.8% |
| Vermont [13] | 122,386 | 33.8% | 2,631 | 0.7% | 0 | 0.0% |
| Virginia | 2,053,905 | 45.5% | 1,840,239 | 40.8% | 111,390 | 2.5% |
| Washington [14] | -- | -- | 171 | 0.0% | 12 | 0.0% |
| West Virginia | 431,925 | 56.2% | 310,305 | 40.3% | 2,905 | 0.4% |
| Wisconsin [15] | 1,870,285 | 54.5% | 977,648 | 28.5% | 57 | 0.0% |
| Wyoming | 154,579 | 57.0% | 76,943 | 28.4% | 63 | 0.0% |
| U.S. Total | 52,816,493 | 37.4% | 48,872,528 | 35.2% | 1,290,670 | 0.9% |

| State | UOCAVA Voters | | Other Voters | |
|---|---|---|---|---|
| | Total | % | Total | % |
| Alabama | -- | -- | -- | -- |
| Alaska | 9,629 | 2.8% | -- | -- |
| American Samoa [1] | 132 | 1.3% | -- | -- |
| Arizona [2] | 18,449 | 0.5% | -- | -- |
| Arkansas | 898 | 0.1% | 60 | 0.0% |
| California | 83,937 | 0.5% | 13,133 | 0.1% |
| Colorado | 32,234 | 1.0% | -- | -- |
| Connecticut | -- | -- | -- | -- |
| Delaware | 1,681 | 0.3% | -- | -- |
| District of Columbia | 5,357 | 1.6% | -- | -- |
| Florida [3] | 85,692 | 0.8% | 7 | 0.0% |
| Georgia [4] | 17,511 | 0.3% | -- | -- |
| Guam | 49 | 0.2% | -- | -- |
| Hawaii | -- | -- | -- | -- |
| Idaho | 2,985 | 0.3% | -- | -- |
| Illinois [5] | 18,487 | 0.3% | 12,371 | 0.2% |
| Indiana | 7,629 | 0.3% | -- | -- |
| Iowa | -- | -- | -- | -- |
| Kansas | 5,160 | 0.4% | -- | -- |
| Kentucky | 3,078 | 0.1% | 11,784 | 0.6% |
| Louisiana | 4,130 | 0.2% | -- | -- |
| Maine [6] | 6,589 | 0.8% | -- | -- |
| Maryland | 18,727 | 0.6% | -- | -- |
| Massachusetts | 24,605 | 0.7% | -- | -- |
| Michigan | 21,128 | 0.4% | -- | -- |
| Minnesota | 13,428 | 0.4% | -- | -- |
| Mississippi [7] | -- | -- | -- | -- |
| Missouri | 7,604 | 0.2% | -- | -- |
| Montana [8] | -- | -- | -- | -- |
| Nebraska | 2,395 | 0.2% | -- | -- |
| Nevada | 11,163 | 0.8% | -- | -- |
| New Hampshire | 5,872 | 0.7% | -- | -- |
| New Jersey [9] | 22,195 | 0.5% | -- | -- |
| New Mexico | 5,775 | 0.6% | -- | -- |
| New York | 50,880 | 0.6% | -- | -- |
| North Carolina [10] | 32,034 | 0.6% | -- | -- |
| North Dakota | 1,540 | 0.4% | -- | -- |
| Northern Mariana Islands | -- | -- | -- | -- |
| Ohio | 17,184 | 0.3% | 2,162 | 0.0% |

| State | UOCAVA Voters | | Other Voters | |
|---|---|---|---|---|
| | Total | % | Total | % |
| Oklahoma | 4,215 | 0.3% | -- | -- |
| Oregon [11] | 16,442 | 0.7% | -- | -- |
| Pennsylvania [12] | 27,854 | 0.4% | -- | -- |
| Puerto Rico | 803 | 0.1% | 62,134 | 4.8% |
| Rhode Island | 3,409 | 0.7% | -- | -- |
| South Carolina | 8,921 | 0.3% | -- | -- |
| South Dakota | 2,542 | 0.6% | -- | -- |
| Tennessee | 11,092 | 0.4% | -- | -- |
| Texas | 51,704 | 0.5% | 32 | 0.0% |
| U.S. Virgin Islands | 0 | 0.0% | -- | -- |
| Utah | 6,116 | 0.4% | 63 | 0.0% |
| Vermont [13] | 2,549 | 0.7% | -- | -- |
| Virginia | 31,987 | 0.7% | -- | -- |
| Washington [14] | 58,682 | 1.5% | -- | -- |
| West Virginia | 1,618 | 0.2% | 76 | 0.0% |
| Wisconsin [15] | 12,617 | 0.4% | 2,921 | 0.1% |
| Wyoming | 1,321 | 0.5% | -- | -- |
| U.S. Total | 780,029 | 0.5% | 104,743 | 0.2% |

**Overview Table 2 Calculation Notes:**

In-Person Election Day Voters, Total uses question F1b.
In-Person Election Day Voters, % uses F1b/F1a x 100.
In-Person Voters Before Election Day, Total uses question F1f.
In-Person Voters Before Election Day, % uses F1f/F1a x 100.
Provisional Voters, Total uses question F1e.
Provisional Voters, % uses F1e/F1a x 100.
UOCAVA Voters, Total uses question F1c.
UOCAVA Voters, % uses F1c/F1a x 100.
Other Voters, Total uses question F1h.
Other Voters, % uses F1h/F1a x 100.

**Overview Table 2 Data Notes:**

General Notes:

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.
- Items that are displayed as a dash (--) indicate that all jurisdictions within the state responded "Data Not Available," "Does Not Apply," or "Valid Skip" to the EAVS item(s) used in the calculation or left the item(s) blank.
- The percentages shown in this table are rounded to one decimal place. Percentages that round to less than 0.1% are displayed as 0.0%.

- Question F1f includes all voters who participated in the election in person prior to Election Day. This includes in-person early voting, in-person absentee voting, and any other terminology the state used to refer to in-person voting that took place before Election Day (as reported in question Q34 of the 2024 Policy Survey).
- Question F1h was not mandatory. States only reported data in this item if they offered another mode of voting aside from those listed in questions F1b-F1g or if there were counted ballots that could not be categorized in questions F1b-F1g.
- Because each percentage was calculated independently, the percentages of turnout by mode in this table and the previous table may not sum to 100% for some states or at the national level.

**[1]** Some UOCAVA voters are also mail ballot voters.
**[2]** Mohave County noted that the total number reported in the official election canvass could differ from the voting history reports within the voter registration database due to the system being live during the entirety of the voting period. This means voters who cast a ballot in the election and who were eligible to vote in Mohave County at the time the ballot was cast, moved from the county, or became ineligible after the ballot was tabulated. This reflects the discrepancy of ballots tabulated versus voters who received voting credit.
**[3]** Responses reflect data submitted by each respective county election official. Differences may exist between survey data and official data/reports generated and/or filed by a specific date or deadline. Official voting history including voting methods for the 2024 General Election, is contained in the post-election legislative recap report pursuant to s. 98.0981, FS.
**[4]** The total number of provisional ballots counted in E1b may not exactly match the total in F1e. Data in E1b were collected via survey of county election officials, and data in F1e report the official reported results. Additionally, some provisional ballots were reported in the results category in which they were cast. For example, if a provisional absentee by mail ballot is cast and counted, then the county election official may choose to report the results in the absentee category rather than provisional.
**[5]** Data provided come from 108 different election authorities and not from a single source. Data available might not be able to gather a completely accurate picture because there are different available data within each election authority.
**[6]** Provisional ballots are not counted separately from other ballots. Provisional ballot totals are reflected in F1b, F1d, or F1f, as applicable.
**[7]** The number of absentee ballots (in-person and mail-in) is calculated together and cannot be separated.
**[8]** The reported number of ballots counted is from the state canvass report. Data in F1b-F1g cannot be provided because some ballots marked for counting in the system were not actually counted because of issues with the ballot.
**[9]** F1a is taken from statewide certified results. These results do not break down the ballots cast by Election Day (F1b) and early voting (F1f) ballots cast.
**[10]** The results of this survey include point-in-time data from multiple datasets and log files and thus may differ slightly from other publicly posted datasets. UOCAVA ballots are reported with mail ballots.
**[11]** The data reported in F1 include ballots returned and accepted for counting.
**[12]** The Pennsylvania Department of State cannot provide a number for F1f because in-person return of mail ballots is not explicitly tracked in the voter registration system.
**[13]** Some jurisdictions may have entered incorrect or incomplete data; therefore, some calculations and datasets may be misconstrued. We have updated the data as best we can.
**[14]** Washington is a vote-by-mail state where voters can register and vote on or before Election Day. The total reported in F1f, which represents voters who cast a ballot at an in-person early voting location and whose ballots were counted, includes individuals who used a disability access unit. The number of in-person voters is based on county reports of those who voted at voting centers using accessible voting units (AVU), but ballots cast via AVUs are not tracked separately from mail ballots.

**[15]** In Wisconsin, if a UOCAVA voter is in the local area on Election Day or during in-person absentee voting, they may choose to vote through one of those methods instead of an absentee ballot by mail. In those cases, the voter is not recorded in the UOCAVA section of the EAVS but instead under the sections that apply to voting at the polls or in-person absentee. In Wisconsin, provisional ballot data has to be recorded into the database on election night, any voters who register to vote in person at their polling places on Election Day are recorded after Election Day as state law permits local clerks 45 days to enter election data after a general election. Wis. Stat. § 6.33(5)(a)3. These two records then cannot be linked in the state's voter registration database. Therefore, data in the section about provisional ballots specifically will show more provisional ballots counted than the section that shows participations received by having a provisional counted. Other modes of voting included voters who voted absentee with incomplete data.

## Overview Table 3: Polling Places and Poll Workers

| State | Total Precincts | Total Polling Places | | Total Poll Workers | |
|---|---|---|---|---|---|
| | | Election Day | Early Voting | Election Day | Early Voting |
| Alabama | 2,283 | 2,010 | -- | -- | -- |
| Alaska [1] | 402 | 412 | 100 | 2,751 | 233 |
| American Samoa | 17 | 41 | 1 | 295 | 5 |
| Arizona [2] | 1,735 | 730 | 241 | 7,551 | 1,834 |
| Arkansas | 2,910 | 7,200 | 17,339 | 5,366 | 2,684 |
| California [3] | 25,127 | 3,777 | 1,807 | 39,482 | 21,901 |
| Colorado | 3,243 | 366 | 325 | 7,307 | 6,629 |
| Connecticut | 718 | 739 | 171 | -- | -- |
| Delaware | 537 | 282 | 19 | 3,312 | 485 |
| District of Columbia | 144 | 75 | 25 | 1,071 | 1,367 |
| Florida [4] | 5,798 | 4,024 | 467 | 42,664 | 13,484 |
| Georgia [5] | 2,699 | 2,292 | 366 | 13,736 | 4,844 |
| Guam [6] | 72 | 22 | 1 | 360 | 22 |
| Hawaii | 248 | -- | 13 | 198 | 129 |
| Idaho [7] | 976 | 814 | 50 | -- | -- |
| Illinois [8] | 8,498 | 5,040 | 394 | 37,994 | 3,730 |
| Indiana [9] | 4,982 | 1,642 | 304 | 14,425 | 2,532 |
| Iowa [10] | 1,653 | 1,663 | 99 | -- | -- |
| Kansas | 4,141 | 1,042 | 108 | 8,507 | 1,879 |
| Kentucky | 3,117 | 1,475 | 252 | 11,988 | 2,376 |
| Louisiana [11] | 3,805 | 1,955 | 111 | 16,580 | -- |
| Maine | 533 | 514 | 483 | 6,251 | -- |
| Maryland | 1,991 | 1,458 | 97 | 22,735 | 7,750 |
| Massachusetts [12] | 2,389 | 1,222 | 469 | 9,556 | -- |
| Michigan | 4,340 | 3,135 | 2,034 | 33,858 | 11,505 |
| Minnesota | 4,103 | 2,578 | 247 | 33,012 | 1,874 |
| Mississippi | 1,746 | 1,746 | 92 | -- | -- |
| Missouri [13] | 3,974 | 2,240 | -- | 18,739 | -- |
| Montana | 727 | 390 | 77 | -- | -- |
| Nebraska | 1,326 | 997 | 93 | 7,646 | 238 |
| Nevada | 1,667 | 248 | 94 | 3,510 | 1,951 |
| New Hampshire [14] | 333 | 307 | -- | 3,564 | -- |
| New Jersey [15] | 6,402 | 4,518 | 160 | 13,200 | 852 |
| New Mexico [16] | 2,169 | 548 | 142 | 3,982 | 1,119 |
| New York | 13,324 | 4,758 | 439 | 67,010 | 20,001 |

| State | Total Precincts | Total Polling Places | | Total Poll Workers | |
|---|---|---|---|---|---|
| | | Election Day | Early Voting | Election Day | Early Voting |
| North Carolina [17] | 2,659 | 2,748 | 612 | 31,194 | 11,693 |
| North Dakota | 385 | 172 | 14 | -- | -- |
| Northern Mariana Islands | 7 | 13 | 3 | 96 | 23 |
| Ohio | 8,868 | 3,231 | 85 | 40,531 | 1,285 |
| Oklahoma | 1,986 | 1,980 | 87 | 6,504 | 765 |
| Oregon [18] | 1,304 | 36 | -- | -- | -- |
| Pennsylvania [19] | 9,153 | 7,752 | -- | 46,246 | -- |
| Puerto Rico [20] | 114 | 1,241 | 96 | -- | -- |
| Rhode Island | 453 | 430 | 39 | 3,709 | -- |
| South Carolina [21] | 2,308 | 2,005 | 137 | 16,085 | 1,903 |
| South Dakota | 710 | 490 | 12 | 2,629 | 68 |
| Tennessee | 1,996 | 1,759 | 228 | 16,216 | 3,067 |
| Texas | 9,704 | 5,620 | 1,355 | 37,811 | 16,544 |
| U.S. Virgin Islands | 22 | 11 | 3 | 140 | 30 |
| Utah | 2,979 | 103 | 44 | 1,047 | 361 |
| Vermont [22] | 262 | 262 | 247 | -- | -- |
| Virginia | 2,865 | 2,472 | 201 | 26,090 | 3,670 |
| Washington [23] | 8,111 | -- | 67 | -- | -- |
| West Virginia | 1,652 | 1,437 | 95 | 8,418 | 477 |
| Wisconsin [24] | 3,603 | 2,696 | 533 | -- | -- |
| Wyoming [25] | 438 | 218 | 24 | 2,068 | 11 |
| U.S. Total | 177,708 | 94,936 | 30,502 | 675,434 | 149,321 |

| State | Poll Workers' Ages | | | | | | % of New Poll Workers |
|---|---|---|---|---|---|---|---|
| | % Age <18 | % Age 18-25 | % Age 26-40 | % Age 41-60 | % Age 61-70 | % Age 71+ | |
| Alabama | 0.2% | 1.6% | 4.4% | 22.5% | 33.3% | 38.0% | 1.0% |
| Alaska [1] | -- | -- | -- | -- | -- | -- | -- |
| American Samoa | -- | -- | -- | -- | -- | -- | -- |
| Arizona [2] | 1.1% | 2.3% | 6.7% | 23.0% | 34.1% | 32.7% | 20.0% |
| Arkansas | 2.0% | 1.8% | 4.0% | 17.1% | 36.9% | 38.1% | 12.9% |
| California [3] | 13.7% | 6.5% | 12.6% | 23.8% | 22.5% | 20.9% | 22.9% |
| Colorado | 2.9% | 1.9% | 4.5% | 16.7% | 38.4% | 35.7% | 30.7% |
| Connecticut | -- | -- | -- | -- | -- | -- | -- |
| Delaware | 0.0% | 3.1% | 6.2% | 24.1% | 35.8% | 30.8% | -- |
| District of Columbia | 5.0% | 10.8% | 26.1% | 35.9% | 14.7% | 7.5% | 72.3% |
| Florida [4] | 0.4% | 2.7% | 6.3% | 23.2% | 33.5% | 33.8% | 14.8% |
| Georgia [5] | 0.0% | 2.3% | 4.2% | 26.3% | 41.8% | 25.4% | 6.7% |
| Guam [6] | 0.0% | 20.0% | 30.8% | 33.1% | 12.8% | 3.3% | -- |
| Hawaii | 0.0% | 2.1% | 3.2% | 24.5% | 34.0% | 36.2% | 6.0% |
| Idaho [7] | -- | -- | -- | -- | -- | -- | -- |
| Illinois [8] | 10.7% | 5.9% | 9.0% | 23.9% | 27.9% | 22.6% | 22.6% |
| Indiana [9] | 5.4% | 4.2% | 10.1% | 21.3% | 33.1% | 25.9% | -- |
| Iowa [10] | -- | -- | -- | -- | -- | -- | -- |
| Kansas | 2.8% | 2.5% | 5.5% | 18.9% | 34.1% | 36.3% | 21.2% |
| Kentucky | 0.3% | 3.6% | 10.2% | 31.1% | 31.1% | 23.7% | 8.9% |
| Louisiana [11] | -- | -- | -- | -- | -- | -- | 13.3% |
| Maine | 0.6% | 2.0% | 7.4% | 26.2% | 33.4% | 30.4% | -- |
| Maryland | 3.6% | 4.1% | 8.2% | 28.4% | 32.1% | 23.7% | -- |
| Massachusetts [12] | -- | -- | -- | -- | -- | -- | -- |
| Michigan | 1.2% | 3.0% | 7.3% | 22.5% | 34.2% | 31.9% | 16.2% |
| Minnesota | -- | -- | -- | -- | -- | -- | 0.7% |
| Mississippi | -- | -- | -- | -- | -- | -- | -- |
| Missouri [13] | 3.5% | 2.3% | 6.5% | 20.3% | 35.0% | 32.5% | -- |
| Montana | 0.1% | 1.4% | 4.3% | 17.4% | 36.8% | 40.1% | -- |
| Nebraska | 0.2% | 1.5% | 9.4% | 27.1% | 31.9% | 29.9% | 17.2% |
| Nevada | 2.2% | 3.6% | 8.4% | 24.3% | 32.0% | 29.6% | 40.2% |
| New Hampshire [14] | -- | -- | -- | -- | -- | -- | -- |
| New Jersey [15] | -- | -- | -- | -- | -- | -- | -- |
| New Mexico [16] | 4.2% | 9.1% | 10.8% | 21.7% | 27.0% | 27.1% | 10.2% |
| New York | 0.4% | 7.2% | 14.3% | 27.7% | 27.4% | 23.0% | 19.5% |

| State | Poll Workers' Ages | | | | | | % of New Poll Workers |
|---|---|---|---|---|---|---|---|
| | % Age <18 | % Age 18-25 | % Age 26-40 | % Age 41-60 | % Age 61-70 | % Age 71+ | |
| North Carolina [17] | 1.7% | 2.4% | 5.8% | 22.3% | 35.0% | 32.9% | 19.2% |
| North Dakota | -- | -- | -- | -- | -- | -- | -- |
| Northern Mariana Islands | -- | -- | -- | -- | -- | -- | -- |
| Ohio | 2.9% | 3.8% | 7.6% | 23.2% | 33.9% | 28.5% | 16.1% |
| Oklahoma | 0.0% | 0.5% | 3.3% | 13.9% | 33.8% | 48.5% | 5.5% |
| Oregon [18] | -- | -- | -- | -- | -- | -- | -- |
| Pennsylvania [19] | 2.6% | 5.6% | 11.5% | 25.7% | 30.7% | 23.9% | 0.0% |
| Puerto Rico [20] | -- | -- | -- | -- | -- | -- | -- |
| Rhode Island | 3.3% | 4.1% | 7.2% | 21.3% | 29.5% | 34.6% | -- |
| South Carolina [21] | -- | -- | -- | -- | -- | -- | -- |
| South Dakota | 0.1% | 0.6% | 4.3% | 19.7% | 40.7% | 34.6% | 7.7% |
| Tennessee | 2.9% | 2.6% | 5.9% | 19.2% | 33.6% | 35.8% | 17.3% |
| Texas | 6.5% | 7.8% | 7.9% | 22.9% | 29.6% | 25.3% | 21.3% |
| U.S. Virgin Islands | -- | 7.1% | 17.9% | 28.6% | 35.7% | 10.7% | 17.9% |
| Utah | -- | -- | -- | -- | -- | -- | 40.3% |
| Vermont [22] | -- | -- | -- | -- | -- | -- | -- |
| Virginia | -- | -- | -- | -- | -- | -- | -- |
| Washington [23] | -- | -- | -- | -- | -- | -- | -- |
| West Virginia | 0.3% | 5.7% | 12.5% | 28.3% | 31.1% | 22.1% | 8.2% |
| Wisconsin [24] | -- | -- | -- | -- | -- | -- | -- |
| Wyoming [25] | 0.7% | 1.2% | 5.1% | 22.9% | 36.1% | 34.0% | -- |
| U.S. Total | 3.3% | 4.5% | 9.1% | 24.0% | 31.1% | 28.1% | 15.5% |

**Overview Table 3 Calculation Notes:**

Total Precincts uses question D1a.
Total Polling Places, Election Day uses question D3a.
Total Polling Places, Early Voting uses question D4a.
Total Poll Workers, Election Day uses question D5a.
Total Poll Workers, Early Voting uses question D6a.
Poll Workers' Ages, % Age <18 uses D7b/(sum of D7b-D7g) x 100.
Poll Workers' Ages, % Age 18-25 uses D7c/(sum of D7b-D7g) x 100.
Poll Workers' Ages, % Age 26-40 uses D7d/(sum of D7b-D7g) x 100.
Poll Workers' Ages, % Age 41-60 uses D7e/(sum of D7b-D7g) x 100.
Poll Workers' Ages, % Age 61-70 uses D7f/(sum of D7b-D7g) x 100.
Poll Workers' Ages, % Age 71+ uses D7g/(sum of D7b-D7g) x 100.
% of New Poll Workers uses D9a/D7a x 100.

**Overview Table 3 Data Notes:**

General Notes:

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation.
- Items that are displayed as a dash (--) indicate that all jurisdictions within the state responded "Data Not Available," "Does Not Apply," or "Valid Skip" to the EAVS item(s) used in the calculation or left the item(s) blank.
- The percentages shown in this table are rounded to one decimal place. Percentages that round to less than 0.1% are displayed as 0.0%.
- The sum of the number of Election Day poll workers (D5a) and the number of early voting poll workers (D6a) may not equal the total number of poll workers reported (D7a) because the instructions for D7a instructed respondents to count poll workers in D7a only once regardless of how many days of voting the poll worker assisted with.
- Because percentages for each age category were calculated independently, the percentages for each age category may not sum to 100% for some states or at the national level.
- In calculating percentages for poll worker age categories, the sum of questions D7b-D7g was used instead of D7a because some states did not report data in all age categories.
- States that only track data for poll workers who are under age 18 do not have data on poll worker ages displayed in this table.

**[1]** Alaska only tracks data on the ages of poll workers under the age of 18.

**[2]** Some Arizona counties do not gather data on poll worker ages or all age categories. Maricopa County has 935 precincts, which includes 29 without any residents or voters.

**[3]** Some California jurisdictions were unable to report data on poll worker ages.

**[4]** Responses reflect data submitted by each respective county election official.

**[5]** Information in D7 was collected through a survey distributed by the Georgia Secretary of State's elections division. The data in D7a represent the sum of the number of poll workers that worked in early voting and on Election Day. It is possible that a single individual could have been counted twice.

**[6]** Early voting is staffed with full-time employees.

**[7]** Data on ages of poll workers were not tracked.

**[8]** Data provided come from 108 different election authorities and not from a single source. Data available might not be able to gather a completely accurate picture because there are different available data within each election authority.

**[9]** There are instances of calculation errors by the counties who did not report all of their poll worker's ages, but the state chose to report exactly what the county responded with in their CEB-9 Section II.

**[10]** Satellite polling locations before Election Day are allowed in Iowa by petition, but data are not readily available for the state from each county on if or how many satellites were operated.

**[11]** The Department of State cannot distinguish between poll workers who worked on Election Day and those who worked during early voting. The total in D5 includes both Election Day and early voting poll workers. The Department of State does not track the ages of poll workers.

**[12]** Early voting staff varied each day of early voting and was not reported by jurisdictions. Poll workers are not reported by age.

**[13]** At least one polling place is a central office. Information is not available for D4 but each county at least maintained its own office. The number of absentee poll workers was not available, but most counties used office staff.

**[14]** In-person absentee voting is permissible in the town or city clerk's office over the counter. The town or city clerk's office is not a polling place. Information on poll workers provided in D5 and D6 is the minimum required. Totals vary by location.

**[15]** Some counties do not use the poll worker module of the voter registration system. Age is not tracked for reporting.

**[16]** Some New Mexico counties do not track poll worker age data.

**[17]** The results of this survey include point-in-time data from multiple datasets and log files and thus may differ slightly from other publicly posted datasets. Ages of some poll workers are unknown.

**[18]** Oregon is a wholly vote-by-mail state and has no polling places or traditional poll workers. Counties may hire temporary staff as necessary to conduct an election. The number of temporary staff is not tracked.

**[19]** County election boards can maintain two or more precincts at the same polling location. County election boards are responsible for staffing polling places based on statutory requirements. The Department of State collects the number of poll workers via a survey and the total number of poll workers represented in this section would be impacted by counties not answering the survey by the data submission deadlines.

**[20]** Currently, there are no available data on poll workers. This information will not be known until the list depuration process is complete, which is expected to be finalized by June 2025. Poll workers are officials selected by political parties.

**[21]** South Carolina only tracks data on the ages of poll workers under the age of 18.

**[22]** Some jurisdictions may have entered incorrect or incomplete data; therefore, some calculations and datasets may be misconstrued. We have updated the data as best we can.

**[23]** Washington does not have traditional polling places, as it conducts elections primarily by mail. Instead, voting centers are available throughout the entire voting period rather than on a single designated day. Each county is required to have at least two certified election administrators and may hire election workers to assist with processing returned ballots.

**[24]** Physical Election Day polling places cannot be located in election offices. Municipalities may provide information about in-person absentee voting locations with the state, but they are not required to. Therefore, data cannot be provided for all municipalities. Where these data were provided, the data cannot distinguish whether the in-person absentee voting locations are an election office or another location. Wisconsin no longer tracks data on poll workers.

**[25]** Data are not available for how many poll workers worked during both early voting and Election Day.

## Overview Table 4: Election Technology and Ballot Counting

| State | Total Number of Voting Systems Deployed | DRE Without VVPAT | | DRE With VVPAT | | Ballot Marking Devices | |
|---|---|---|---|---|---|---|---|
| | | Total Systems Deployed | % of Total Voting Systems Deployed | Total Systems Deployed | % of Total Voting Systems Deployed | Total Systems Deployed | % of Total Voting Systems Deployed |
| Alabama | -- | -- | -- | -- | -- | -- | -- |
| Alaska | 718 | -- | -- | 145 | 20.2% | 275 | 38.3% |
| American Samoa | -- | -- | -- | -- | -- | -- | -- |
| Arizona [1] | 1,806 | -- | -- | 18 | 1.0% | 1,181 | 65.4% |
| Arkansas | 6,312 | 77 | 1.2% | 691 | 10.9% | 4,344 | 68.8% |
| California | 23,670 | -- | -- | -- | -- | 22,157 | 93.6% |
| Colorado | 1,727 | -- | -- | -- | -- | 1,545 | 89.5% |
| Connecticut | 2,154 | -- | -- | -- | -- | 718 | 33.3% |
| Delaware | 1,363 | -- | -- | 1,353 | 99.3% | -- | -- |
| District of Columbia | 440 | -- | -- | -- | -- | 337 | 76.6% |
| Florida [2] | 13,882 | -- | -- | -- | -- | 5,177 | 37.3% |
| Georgia | 22,214 | -- | -- | -- | -- | 19,441 | 87.5% |
| Guam | 10 | -- | -- | -- | -- | 6 | 60.0% |
| Hawaii | 108 | -- | -- | -- | -- | 62 | 57.4% |
| Idaho [3] | 1,962 | -- | -- | -- | -- | 1,238 | 63.1% |
| Illinois [4] | 18,911 | -- | -- | 46 | 0.2% | 10,881 | 57.5% |
| Indiana | 14,494 | -- | -- | 7,854 | 54.2% | 5,266 | 36.3% |
| Iowa | -- | -- | -- | -- | -- | -- | -- |
| Kansas | 8,419 | -- | -- | -- | -- | 5,182 | 61.6% |
| Kentucky | 5,903 | -- | -- | -- | -- | 2,808 | 47.6% |
| Louisiana | 9,612 | 9,535 | 99.2% | -- | -- | -- | -- |
| Maine | 1,116 | -- | -- | -- | -- | 516 | 46.2% |
| Maryland | 6,104 | -- | -- | -- | -- | 6,104 | 100.0% |
| Massachusetts [5] | 4,637 | -- | -- | -- | -- | 1,671 | 36.0% |
| Michigan | 4,340 | -- | -- | -- | -- | 4,340 | 100.0% |
| Minnesota | 5,939 | -- | -- | -- | -- | 2,963 | 49.9% |
| Mississippi | -- | -- | -- | -- | -- | -- | -- |
| Missouri | 4,930 | -- | -- | -- | -- | 2,289 | 46.4% |
| Montana [6] | 508 | -- | -- | -- | -- | 367 | 72.2% |
| Nebraska | 1,443 | -- | -- | -- | -- | 1,284 | 89.0% |
| Nevada | 6,597 | -- | -- | 6,428 | 97.4% | 121 | 1.8% |
| New Hampshire | 596 | -- | -- | -- | -- | 307 | 51.5% |

| State | Total Number of Voting Systems Deployed | DRE Without VVPAT | | DRE With VVPAT | | Ballot Marking Devices | |
|---|---|---|---|---|---|---|---|
| | | Total Systems Deployed | % of Total Voting Systems Deployed | Total Systems Deployed | % of Total Voting Systems Deployed | Total Systems Deployed | % of Total Voting Systems Deployed |
| New Jersey | 11,226 | -- | -- | -- | -- | 11,161 | 99.4% |
| New Mexico | 1,575 | -- | -- | -- | -- | -- | -- |
| New York | 16,175 | -- | -- | -- | -- | 5,382 | 33.3% |
| North Carolina [7] | 9,775 | -- | -- | -- | -- | 6,192 | 63.3% |
| North Dakota | 939 | -- | -- | -- | -- | 429 | 45.7% |
| Northern Mariana Islands | 6 | -- | -- | -- | -- | -- | -- |
| Ohio | 24,764 | -- | -- | 5,865 | 23.7% | 13,440 | 54.3% |
| Oklahoma | 2,071 | -- | -- | -- | -- | -- | -- |
| Oregon | -- | -- | -- | -- | -- | -- | -- |
| Pennsylvania [8] | 24,079 | -- | -- | -- | -- | 13,044 | 54.2% |
| Puerto Rico | 4,785 | -- | -- | -- | -- | -- | -- |
| Rhode Island | 1,202 | -- | -- | -- | -- | 495 | 41.2% |
| South Carolina | 18,805 | -- | -- | -- | -- | 15,659 | 83.3% |
| South Dakota | 508 | -- | -- | -- | -- | 437 | 86.0% |
| Tennessee | 9,259 | -- | -- | 2,930 | 31.6% | 4,632 | 50.0% |
| Texas | 55,522 | 1,030 | 1.9% | -- | -- | 46,027 | 82.9% |
| U.S. Virgin Islands | 130 | -- | -- | -- | -- | 100 | 76.9% |
| Utah | 933 | -- | -- | 667 | 71.5% | 169 | 18.1% |
| Vermont [9] | 522 | -- | -- | 260 | 49.8% | 262 | 50.2% |
| Virginia | 6,857 | -- | -- | -- | -- | 3,066 | 44.7% |
| Washington | 179 | -- | -- | -- | -- | 94 | 52.5% |
| West Virginia | 7,551 | -- | -- | -- | -- | 5,872 | 77.8% |
| Wisconsin [10] | -- | -- | -- | -- | -- | -- | -- |
| Wyoming | 904 | -- | -- | -- | -- | 510 | 56.4% |
| U.S. Total | 367,682 | 10,642 | 2.9% | 26,257 | 7.1% | 227,551 | 61.9% |

| State | Scanners | | Hand Counting | | Electronic Poll Books | |
|---|---|---|---|---|---|---|
| | Total Systems Deployed | % of Total Voting Systems Deployed | Total Jurisdictions | % of Jurisdictions | % of Total Voting Systems Deployed | % of Jurisdictions |
| Alabama | -- | -- | -- | -- | -- | -- |
| Alaska | 298 | 41.5% | 1 | 100.0% | -- | -- |
| American Samoa | -- | -- | 1 | 100.0% | -- | -- |
| Arizona [1] | 607 | 33.6% | 0 | -- | 3,765 | 100.0% |
| Arkansas | 1,200 | 19.0% | 3 | 4.0% | 3,072 | 97.3% |
| California | 1,513 | 6.4% | 0 | -- | 12,360 | 60.3% |
| Colorado | 182 | 10.5% | 1 | 1.6% | -- | 100.0% |
| Connecticut | 1,436 | 66.7% | 0 | -- | -- | -- |
| Delaware | 10 | 0.7% | 0 | -- | 840 | 100.0% |
| District of Columbia | 103 | 23.4% | 0 | -- | 153 | 100.0% |
| Florida [2] | 8,705 | 62.7% | 0 | -- | 18,038 | 100.0% |
| Georgia | 2,773 | 12.5% | 0 | -- | 6,137 | 100.0% |
| Guam | 4 | 40.0% | 0 | -- | -- | -- |
| Hawaii | 46 | 42.6% | 0 | -- | -- | 80.0% |
| Idaho [3] | 724 | 36.9% | 8 | 18.2% | -- | 81.8% |
| Illinois [4] | 7,984 | 42.2% | 0 | -- | 10,064 | 23.1% |
| Indiana | 1,374 | 9.5% | 0 | -- | 5,297 | 100.0% |
| Iowa | -- | -- | 0 | -- | -- | 100.0% |
| Kansas | 3,237 | 38.4% | -- | -- | 2,709 | 81.9% |
| Kentucky | 3,095 | 52.4% | 120 | 100.0% | 5,527 | 100.0% |
| Louisiana | 77 | 0.8% | 64 | 100.0% | -- | -- |
| Maine | 600 | 53.8% | 162 | 32.6% | -- | -- |
| Maryland | -- | -- | 0 | -- | 6,104 | 100.0% |
| Massachusetts [5] | 2,966 | 64.0% | 351 | 100.0% | 2,502 | 65.5% |
| Michigan | -- | -- | 0 | -- | 4,825 | 100.0% |
| Minnesota | 2,976 | 50.1% | 5 | 5.7% | 6,792 | 71.3% |
| Mississippi | -- | -- | 0 | -- | -- | 12.2% |
| Missouri | 2,641 | 53.6% | 53 | 45.7% | 6,599 | 74.1% |
| Montana [6] | 141 | 27.8% | 16 | 28.6% | -- | -- |
| Nebraska | 159 | 11.0% | 0 | -- | -- | -- |
| Nevada | 48 | 0.7% | 0 | -- | 3,033 | 100.0% |
| New Hampshire | 289 | 48.5% | 122 | 38.1% | -- | -- |
| New Jersey | 65 | 0.6% | 0 | -- | 14,228 | 100.0% |
| New Mexico | 1,575 | 100.0% | 33 | 100.0% | 1,834 | 100.0% |

| State | Scanners | | Hand Counting | | Electronic Poll Books | |
|---|---|---|---|---|---|---|
| | Total Systems Deployed | % of Total Voting Systems Deployed | Total Jurisdictions | % of Jurisdictions | % of Total Voting Systems Deployed | % of Jurisdictions |
| New York | 10,793 | 66.7% | 62 | 100.0% | 17,629 | 98.4% |
| North Carolina [7] | 3,583 | 36.7% | 0 | -- | -- | 78.0% |
| North Dakota | 510 | 54.3% | 0 | -- | 987 | 100.0% |
| Northern Mariana Islands | 6 | 100.0% | 0 | -- | -- | -- |
| Ohio | 5,459 | 22.0% | 3 | 3.4% | 10,759 | 96.6% |
| Oklahoma | 2,071 | 100.0% | 0 | -- | -- | -- |
| Oregon | -- | -- | 0 | -- | -- | -- |
| Pennsylvania [8] | 11,035 | 45.8% | 0 | -- | 6,557 | 37.3% |
| Puerto Rico | 4,785 | 100.0% | 1 | 100.0% | 8,584 | 100.0% |
| Rhode Island | 707 | 58.8% | 0 | -- | 1,621 | 100.0% |
| South Carolina | 3,146 | 16.7% | 46 | 100.0% | 5,378 | 100.0% |
| South Dakota | 71 | 14.0% | 3 | 4.5% | 168 | 18.2% |
| Tennessee | 1,697 | 18.3% | 38 | 40.0% | 3,124 | 44.2% |
| Texas | 8,465 | 15.2% | 9 | 3.5% | 15,751 | 87.0% |
| U.S. Virgin Islands | 30 | 23.1% | 0 | -- | 40 | 100.0% |
| Utah | 97 | 10.4% | 1 | 3.4% | 637 | 69.0% |
| Vermont [9] | -- | -- | 73 | 29.6% | -- | -- |
| Virginia | 3,791 | 55.3% | 31 | 23.3% | 7,998 | 95.5% |
| Washington | 85 | 47.5% | 0 | -- | -- | -- |
| West Virginia | 1,679 | 22.2% | 0 | -- | 884 | 54.5% |
| Wisconsin [10] | -- | -- | 149 | 8.0% | -- | 15.5% |
| Wyoming | 394 | 43.6% | 1 | 4.3% | 130 | 30.4% |
| U.S. Total | 103,232 | 28.1% | 1,357 | 21.0% | 194,126 | 39.9% |

**Overview Table 4 Calculation Notes:**

Total Number of Voting Systems Deployed uses the sum of questions F3c_1, F3c_2, F3c_3, F4c_1, F4c_2, F4c_3, F5c_1, F5c_2, F5c_3, F6c_1, F6c_2, and F6c_3.

DRE without VVPAT, Total Systems Deployed uses F3c_1+F3c_2+F3c_3.

DRE without VVPAT, % of Total Voting Systems Deployed uses (F3c_1+F3c_2+F3c_3) / total voting systems from first column x 100.

DRE with VVPAT, Total Systems Deployed uses F4c_1+F4c_2+F4c_3.

DRE with VVPAT, % of Total Voting Systems Deployed uses (F4c_1+F4c_2+F4c_3) / total voting systems from first column x 100.

Ballot Marking Devices, Total Systems Deployed uses F5c_1+F5c_2+F5c_3.

Ballot Marking Devices, % of Total Voting Systems Deployed uses (F5c_1+F5c_2+F5c_3) / total voting systems from first column x 100.
Scanners, Total Systems Deployed uses F6c_1+F6c_2+F6c_3.
Scanners, % of Total Voting Systems Deployed uses (F6c_1+F6c_2+F6c_3) / total voting systems from first column x 100.
Hand Counting, Total Jurisdictions uses the count of number of jurisdictions that responded "Yes" to F7a.
Hand Counting, % of Jurisdictions uses the count of number of jurisdictions that responded "Yes" to F7a / number of FIPS by state x 100.
Electronic Poll Books, Total Systems Deployed uses F8c_1+F8c_2+F8c_3.
Electronic Poll Books, % of Jurisdictions uses the count of the number of jurisdictions that responded "Yes" to F8a / number of FIPS by state x 100.

**Overview Table 4 Data Notes:**

General Notes:

- Although other descriptive tables in this chapter use casewise deletion at the state level in calculating percentages, this table does not. When a state reported not using a type of equipment, the number of devices of that type was filled with zero to better capture at the national level the prevalence of each type of election technology or counting method in the 2024 general election.
- Items that are displayed as a dash (--) indicate that all jurisdictions within the state responded "Data Not Available," "Does Not Apply," or "Valid Skip" to the EAVS item(s) used in the calculation or left the item(s) blank.
- The percentages shown in this table are rounded to one decimal place. Percentages that round to less than 0.1% are displayed as 0.0%.

**[1]** Some counties used different election equipment for early voting versus Election Day voting.
**[2]** Responses reflect data submitted by each respective county election official.
**[3]** Use of voting technology not tracked in Idaho's election management system. Data reported are only data provided by counties.
**[4]** Data provided come from 108 different election authorities and not from a single source. Data available might not be able to gather a completely accurate picture because there are different available data within each election authority.
**[5]** Ballot marking devices are used for voters with disabilities. Jurisdictions that used scanners hand counted provisional ballots.
**[6]** Ten of 56 counties perform a complete hand count of all ballots. Six additional counties hand count certain types of ballots.
**[7]** The results of this survey include point-in-time data from multiple datasets and log files and thus may differ slightly from other publicly posted datasets.
**[8]** County election boards work with the manufacturer to determine the number of voting machines deployed after reviewing the Secretary's certification report. The department collects the number of machines deployed via a survey and the total number of machines represented in this section would be impacted by counties not answering the survey by the data submission deadlines.
**[9]** Some jurisdictions may have entered incorrect or incomplete data; therefore, some calculations and datasets may be misconstrued. We have updated the data as best we can.
**[10]** Wisconsin does not track the number of pieces of voting equipment each municipality has, just what type they use. Wisconsin does not allow for direct-recording electronic (DRE) without a voter-verifiable paper audit trail (VVPAT) for any municipalities.

# Chapter 2. Election Law and Procedure: The Policy Survey

## Key Findings

The 2024 Election Administration Policy Survey (Policy Survey) provides information about the policy context in which states and territories conducted the 2024 general election.[1] This survey asked states to identify the election laws and procedures that govern voter registration, election technology, voter eligibility, modes of voting, and election audits in their state. Notable findings from this survey include:

- Top-down voter registration databases continue to be the most common type of database system reported, used by nearly three-quarters of states.
- A majority of states reported making automatic and electronic voter registration programs available. Each of these states permits automatic or electronic registration at their state's motor vehicle agency, and some states make it available through at least one other government agency.
- For the 2024 general election, just over half of states allowed a form of same day voter registration, in which individuals can register on the same day that they cast a ballot in person.
- Fifty-four states reported sending confirmation notices to voters to assist in maintaining accurate and up-to-date voter lists. The most common reasons reported for sending confirmation notices included the voter's election mail being returned as undeliverable, the voter changing addresses, and the voter not voting in a certain number of consecutive general elections.
- All states allow mail voting for at least some voters. About one-fifth of states offer all-mail elections, two-thirds of states allow voters to return mail ballots at ballot drop boxes, and more than three-quarters of states allow voters to cure errors on their returned mail ballot envelopes.
- Fifty-two states offered provisional ballots during the 2024 general election, most commonly to voters whose names did not appear on the voter list and voters who were not residents of the precinct in which they attempted to vote.
- All states offer some form of in-person voting before Election Day. Two-thirds of states allow vote centers, and just over half of states offer curbside voting.
- States reported conducting a variety of auditing activities to validate the accuracy of voting equipment and election procedures. Over ninety percent of states conduct logic and accuracy testing, nearly two-thirds conduct post-election tabulation audits, and more than half conduct ballot reconciliation audits.

[1] Throughout this report, unless otherwise specified, the term "state" can be understood to apply to the 50 U.S. states, the District of Columbia, and five U.S. territories (American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands) that submit Election Administration Policy Survey and EAVS data. Puerto Rico provides EAVS data only in presidential election years, as it does not hold elections for federal candidates in midterm election years. American Samoa did not participate in the 2016 EAVS. The Northern Mariana Islands participated in the EAVS for the first time in 2020.