# JOINT APPENDIX

# VOLUME VII

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

August 14, 2025

Via Mail and Email

The Honorable Deidre Henderson
Lieutenant Governor
P.O. Box 142220
Salt Lake City, UT 84114-2220
deidrehenderson@utah.gov

Re: **Complete Utah's Voter Registration List with All Fields**

Lieutenant Governor Henderson:

We have received Utah's statewide voter registration list ("VRL"). However, as the Attorney General requested, the electronic copy of the statewide VRL must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We have requested Utah's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq*. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

The Help America Vote Act ("HAVA"), 52 U.S.C. § 20501, *et seq*., also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide Voter Registration List requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Utah's complete and current VRL. The purpose of the request is to ascertain Utah's compliance with the list maintenance requirements of the NVRA and HAVA.

When providing the electronic copy of the statewide VRL, Utah must ensure that it contains *all fields*, which includes the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[2] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

Moreover, HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act.

---

[2] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

In charging the Attorney General with enforcement of the voter registration list requirements in HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are preempted by federal law.

To that end, please provide the requested electronic Voter Registration List[3] to the Justice Department within seven days or by August 21, 2025.

The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc: Ryan Cowley
Director of Elections
350 N. State Street, Suite 200
Salt Lake City, UT 84114-2220
ryancowley@utah.gov

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

September 8, 2025

Via Mail and Email

The Honorable Sarah Copeland Hanzas
Secretary of State
128 State Street
Montpelier, VT 05633
Sarah.CopelandHanzas@vermont.gov

Re: **Request for Complete Vermont's Voter Registration List with All Fields**

Dear Secretary Copeland Hanzas:

We write to you as the chief election official for the State of Vermont concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*. Please provide a copy of Vermont's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We request Vermont's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner*

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

*v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of Vermont's complete and current VRL. The purpose of this request is to ascertain Vermont's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File

---

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

Sharing ("JEFS"). If Vermont would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc: Seán Sheechan
Director of Elections
128 State Street
Montpelier, VT 05633
Sean.Sheehan@vermont.gov

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

July 15, 2025

Via Mail and Email

The Honorable Susan Beals
Commissioner, Virginia Department of Elections
1100 Bank Street, First Floor
Richmond, Virginia 23219
susan.beals@elections.virginia.gov

Dear Commissioner Beals:

We write to you as the chief election official for the Commonwealth of Virginia to request information regarding Virginia's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Virginia's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

> The current electronic copy of Virginia's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. A review of the most recent report from EAVS report indicates that in response to Question A1b, there are nearly as many registered voters listed as active as the citizen voting age population in Virginia, with a registration rate in 2024 of 92.2 percent of the citizen voting age population. Please explain what actions Virginia is taking to ensure that voters who should not be on the voter roll are being removed.

2. In the EAVS data for Question A3d, Virginia had 1,074,543 voters (33.2 percent) with duplicate registrations, almost three times as high as the nationwide average of 12.7 percent. In response to the same question for the 2022 EAVS Report, Virginia had 1,226,754 duplicate registrations (36.3 percent). Please explain why duplicate registrations are such a high percentage of the total registration applications received. Please explain what actions Virginia is taking to identify duplicate registrations and to remove those duplicates from the voter registration list.

3. In the EAVS data for Question A10a, Virginia sent 521,339 confirmation notices, which is 8.8 percent of all active registered voters and well below the national average of 19.5 percent. Please explain why Virginia sent confirmation notices to so few registered voters.

4. In the EAVS data for Question A12b, Virginia had 536,460 voters (68.4 percent) removed because they moved out of the commonwealth, which was twice as high as the national average. Please explain how Virginia identifies voters who have moved out of the commonwealth and determines their removal from the voter registration list.

5. In the EAVS data for Question A12e, Virginia had 61,151 voters (7.8 percent) removed due to failure to respond to confirmation notices and did not vote in the two most recent federal elections, which was well below the national average. Based on the responses to Question A10f, 415,181 (79.6 percent) of the confirmation notices were unreturned. Please explain why so few voters are being removed in Question A12e. Please provide a list of all registrations that were cancelled because of failure to respond to confirmation notices and did not vote in the two most recent federal election cycles.

6. No data was listed in the EAVS survey for Question A12h for Virginia regarding duplicate registrants who were removed from the statewide voter registration database. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list. If they were merged or linked with another record, please provide that information.

Please provide a description of the steps that Virginia has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures the commonwealth used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen
2. Adjudicated incompetent
3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

August 14, 2025

Via Mail and Email

The Honorable Susan Beals
Commissioner, Virginia Department of Elections
1100 Bank Street, First Floor
Richmond, Virginia 23219
susan.beals@elections.virginia.gov

Re: **Complete Virginia's Voter Registration List with All Fields**

Commissioner Beals:

We understand that the time the Justice Department has provided your state to respond to the request for a statewide voter registration list ("VRL") and other information has not reached its deadline.

Given responses from other states thus far, we want to clarify that the Justice Department's request to provide an electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We have requested Virginia's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq*. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

The Help America Vote Act ("HAVA"), 52 U.S.C. § 20501, *et seq*., also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Virginia's complete and current VRL. The purpose of the request is to ascertain Virginia's compliance with the list maintenance requirements of the NVRA and HAVA.

When providing the electronic copy of the statewide VRL, Virginia must ensure that it contains *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[2] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to

---

[2] In charging the Attorney General with enforcement of the voter registration list requirements in HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act.

To that end, please provide the requested electronic Voter Registration List[3] to the Justice Department by the date set for your delivery by our original letter, or by August 21, 2025, whichever is later.

The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

September 8, 2025

Via Mail and Email

The Honorable Steve Hobbs
Secretary of State
PO Box 40220
Olympia, WA 98504-0220
steve.hobbs@sos.wa.gov;
secretaryofstate@sos.wa.gov

Re: **Request for Complete Washington's Voter Registration List with All Fields**

Dear Secretary Hobbs:

We write to you as the chief election official for the State of Washington concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*. Please provide a copy of Washington's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We request Washington's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of Washington's complete and current VRL. The purpose of this request is to ascertain Washington's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter. The information and materials may be sent by encrypted email to

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). If Washington would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc: Stuart Holmes
Director of Elections
416 Sid Snyder Ave SW
Olympia, WA 98501
stuart.holmes@sos.wa.gov

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

September 8, 2025

Via Mail and Email

The Honorable Kris Warner
Secretary of State
1900 Kanawha Blvd.
Bldg. 1, Suite 157-K
Charleston, WV 25305
wvsos@wvsos.com

Re: **Request for Complete West Virginia's Voter Registration List with All Fields**

Dear Secretary Warner:

We write to you as the chief election official for the State of West Virginia concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*. Please provide a copy of West Virginia's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We request West Virginia's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of West Virginia's complete and current VRL. The purpose of this request is to ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). If West Virginia would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc: Brittany Westfall
Elections Director
1900 Kanawha Blvd.
Bldg. 1, Suite 157-K
Charleston, WV 25305
bwestfall@wvsos.gov

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

June 4, 2025

Wisconsin Elections Commission
201 W. Washington Avenue
Madison, WI 53703
elections@wi.gov

The U.S. Election Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001
ckelliher@eac.gov

Re: State of Wisconsin elections violation under Help America Vote Act

Election Commissioners,

As the State of Wisconsin's chief election officials, you are required to follow federal laws, including the Help America Vote Act ("HAVA"). Ensuring election integrity is of the highest degree of importance for my administration at the Civil Rights Division of the Department of Justice. As the Supreme Court has recognized the preservation of the integrity of the election process is a compelling interest. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 647 (2021).

Section 21112 (Sec. 402) of HAVA requires that each state establish a state-based administrative complaint procedure to enable voters to file a complaint regarding a HAVA violation they may observe or experience while voting. Meeting this requirement is a condition of receiving HAVA funding from the federal government. Records indicate that to date, Wisconsin has received over $77,000,000 in federal funding from the U.S. Election Assistance Commission.[1]

Under HAVA, the administrative process is required to be:

(1) Uniform and nondiscriminatory,
(2) Allow any person who believes that there is a violation of any provision of subchapter III of HAVA (including a violation which has occurred, is occurring, or is about to occur) to file a complaint,
(3) If the complainant requests, there shall be a hearing on the record,
(4) If the state determines that there is a violation, it shall provide an appropriate remedy, and

[1] https://www.eac.gov/funding-levels-by-state

(5) If the state determines that there is no violation, the state shall dismiss the complaint and publish the results.

Quite surprisingly, we have learned that the Wisconsin Elections Commission has refused to provide any administrative complaint process or hearing regarding HAVA complaints against the Commission. Rather, Wisconsin has decided to rely on a 2022 state court case opining that the Commission cannot police itself. (See attached letter).

These very actions by the Commission have left complainants alleging HAVA violations by the Commission without any recourse. The consequences were summarized by a federal judge who opined that the Commission's failure to provide a hearing to those who allege a HAVA complaint against the Commission are left without any decision or interpretation of the law. With no opportunity or means to appeal, complainants are left stranded with their grievances. *See Wis. Voter All. v. Millis, 720 F. Supp. 3d 703.*

We are hereby notifying the U.S. Election Assistance Commission of Wisconsin's failure to follow federal elections laws. Your actions justify a bar against the Wisconsin Elections Commission receiving any future funding from the U.S. Election Assistance Commission.

In addition to this formal notification, we fully expect that Wisconsin's Election Commission will immediately come into compliance with all federal election laws, including HAVA, forthwith. If you have any questions about this letter, please contact Deputy Assistant Attorney General of the Civil Rights Division, Michael Gates, at michael.gates2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Attachment: 2022 WEC letter

Scott Johnson Commissioner
CIF - Northern Section sjohnson@cifns.org

Ryan Tos Commissioner
CIF - Central Section ryantos@cifcs.org

Mike Garrison Commissioner
CIF - Sac-Joaquin Section mgarrison@cifsjs.org

Francisco Navarro Commissioner
CIF - Oakland Section francisco.navarro@ousd.org

Joe Heinz Commissioner
CIF - San Diego Section jheinz@cifsds.org

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

June 17, 2025

The Honorable Meagan Wolfe
Administrator, Wisconsin Elections Commission
201 W Washington Ave
Madison, WI. 53703
meagan.wolfe@wisconsin.gov
elections@wi.gov

Re: Request for Information Related to HAVA Compliance

Dear Ms. Wolfe:

As you are already aware, we have received several complaints regarding the Wisconsin Election Commission's ("WEC") compliance with the Help America Vote Act ("HAVA") 52 U.S.C. 20901 - 21145. Many of these complaints allege that WEC is failing to comply with the list maintenance procedure requirements of Section 303 of HAVA. To enable the Attorney General to determine if WEC is complying with these requirements, we are requesting the following information:

(1) Describe how Wisconsin's computerized statewide voter registration list ("voter registration list") is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for coordination, as well as how often the databases are coordinated with the voter registration list;

(2) Describe the process by which voters who have been deemed ineligible are removed from the voter registration list pursuant to the list maintenance procedures referenced in HAVA Section 303(a)(2), the number of the voters currently deemed ineligible that remain on the voter registration list, and the basis for not having already removed them from the voter registration list;

(3) Describe how WEC determines who is an "inactive" voter, pursuant to the list maintenance procedures referenced in HAVA Section 303(a)(2), and explain the process for removal of inactive voters from the voter registration list;

(4) Describe the process by which any duplicate voter registrations are identified, including how the State determines what constitutes a duplicate voter registration record, and the process for their removal from the voter registration list under HAVA Section 303(a)(2)(B)(iii);

(5) Describe the process by which voters who have moved outside the state and subsequently registered to vote in another state are identified and removed from the voter registration list under HAVA Section 303(a)(4)(A);

(6) Describe the process by which registrants who are ineligible due to non-citizenship are identified and removed from the voter registration list; and

(7) Please send us the current voter registration list. Please include both active and inactive voters.

Please provide this information within 20 days of the date of this letter. The information and materials may be sent by email to voting.section@usdoj.gov or by FedEx or UPS to:

U.S. Department of Justice, Civil Rights Division
Voting Section
4 Constitution Square
150 M Street NE, Room 8.923
Washington, DC 20002

If you have any questions, please contact Kevin Muench at kevin.muench@usdoj.gov. We very much appreciate your cooperation in our effort to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Voting Section, Acting Chief

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

**From:** Neff, Eric (CRT)
**To:** elections@wi.gov
**Subject:** Demand for Full Voter Roll from DOJ CRT
**Date:** Tuesday, December 2, 2025 10:54:00 AM
**Attachments:** VRLData Sharing Agreement DOJ-WI.pdf
image001.png

---

To the Wisconsin Elections Commission:

Please consider this email a demand to provide within 7 days:

- An electronic copy of the full Wisconsin statewide voter registration list
    - This list is to include, pursuant to the Help America Vote Act, either the last four digits of the social security number, the driver's license number, or both.

This request is for the purpose of ensuring compliance with minimum standards and routine voter registration list maintenance.

If you have any questions, do not hesitate to contact me.

Thanks,

**Eric Neff**
Trial Attorney
Civil Rights Division
Department of Justice
150 M St. NE, Ste. 8-139
Washington, DC 20002
Eric.Neff@usdoj.gov
Cell: 202-532-3628

*State of New Jersey*
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
25 MARKET STREET
PO BOX 0112
TRENTON, NJ 08625-0112

PHILIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

MATTHEW J. PLATKIN
*Attorney General*

MICHAEL C. WALTERS
*Acting Director*

August 21, 2025

Via Email (maureen.riordan2@usdoj.com)
Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW – 4CON
Washington, DC 20530

Re: Request for Voter Registration List

Dear Ms. Riordan:

On behalf of the Division of Elections ("DOE") in the New Jersey Department of State, I write in response to Assistant Attorney General Harmeet K. Dhillon's letter to Lieutenant Governor Way dated August 14, 2025, to respectfully seek clarification of the request.

By way of background, in response to the letter from you and Deputy Assistant Attorney General Michael E. Gates to Lieutenant Governor Way dated July 15, 2025, DOE provided the U.S. Department of Justice ("DOJ") with a copy of New Jersey's current voter registration list. That list contained the names, addresses, and other information about individual registered voters that may be disclosed consistent with New Jersey privacy laws, and without exposing certain especially sensitive, confidential personally identifiable information such as Social Security and driver license numbers. *See, e.g.*, N.J. Stat. Ann. § 47:1A-5.3(b). This is the same version of the voter registration list that DOE regularly discloses in response to proper requests under the National Voter Registration Act ("NVRA"), *see* 52 U.S.C. § 20507(i)(1), and other legal authorities.

In her follow-up letter dated August 14, 2025, Assistant Attorney General Dhillon requests an "electronic copy of the statewide [voter registration list] ... contain[ing] *all fields*, including the registrant's ... state driver's license number or the last four digits of the registrant's social security number" (emphasis in original). This request raises important legal questions, and the New Jersey Department of State and DOE take very seriously their responsibility to safeguard information that is protected under New Jersey law and entrusted to DOE by New Jersey residents in order to enable them to exercise their fundamental right to vote. Accordingly, and in light of the invitation in the August 14 letter to contact you "[s]hould further clarification [of the request] be required," we would be grateful for additional information to enable us to sufficiently consider and respond to the request.

First, the August 14 letter states that the purpose of requesting New Jersey's entire voter registration list, including fields containing confidential personally identifiable information, is "to assess [New Jersey's] compliance with the statewide VRL maintenance provisions of the [NVRA]." The NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" death or a change in residence. 52 U.S.C. § 20507(a)(4); *see also Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) ("Nothing in HAVA [the Help America Vote Act] broadens the scope of the NVRA's list-maintenance obligations."). It is not clear that obtaining confidential personally identifiable information of individual registered voters is necessary to determine whether New Jersey is conducting a general program that makes a reasonable effort to remove the names of individuals who are deceased or have changed residence.[1] Nor is it apparent how the DOJ intends to use the requested information to make its compliance determination. *Cf. Chao v. Community Trust Co.*, 474 F.3d 75, 79 (3d Cir. 2007) ("To enforce an administrative subpoena, an agency must demonstrate" that "the inquiry [is] within the authority of the agency" and "the information sought [is] reasonably relevant to the authorized inquiry."). We would therefore appreciate clarification regarding the DOJ's need for and intended use of the information sought.

Second, the August 14 letter invokes the federal Civil Rights Act of 1960, a statute "designed to secure a more effective protection of the right to vote." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961). The Civil Rights Act of 1960 grants the U.S. Attorney General the authority to demand from state and local officials "records and papers" retained "for a period of twenty-two months from the date of any general, special, or primary [federal] election ... relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," *see* 52 U.S.C. §§ 20701, 20703, to enable the Attorney General to investigate "question[s] concerning infringement or denial of [individuals'] constitutional voting rights," *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962); *see also id.* (The "purpose [of authorizing demands by the U.S. Attorney General for records under Title III of the Civil Rights Act of 1960] is to enable the Attorney General to determine whether [42 U.S.C.] § 1971 [currently codified as amended at 52 U.S.C. § 10101] suits or similar actions should be instituted."). Any such demand for records "shall contain a statement of the basis and the purpose therefor." *Id.* § 20703. The August 14 letter states that "[t]he purpose of [DOJ's] request" for New Jersey's complete voter registration list, including confidential personally identifiable information, "is to ascertain New Jersey's compliance with the list maintenance requirements of the NVRA and HAVA." But the letter does not provide the *basis* for the request pursuant to 52 U.S.C. § 20703, which is separate and distinct from the purpose of the request. *Id.* (requiring that a demand for records must contain "a statement of the basis *and* the purpose therefor" (emphasis added)). To aid our evaluation of the DOJ's request under the Civil Rights Act, we respectfully ask you to provide, pursuant to 52 U.S.C. § 20703, the basis for the request.

Third, as the August 14 letter appears to acknowledge, the request for New Jersey to transfer massive amounts of confidential personally identifying information to the DOJ raises issues regarding compliance with the federal Privacy Act, 5 U.S.C. § 552 *et seq.*, as well as the DPPA, as noted above. However, the August 14 letter does not address whether there is an existing System of Records Notice ("SORN") that adequately covers the requested records, or whether DOJ intends to publish a new SORN and the expected timeline for such publication. Nor does the letter address whether the DOJ anticipates

---

[1] Understanding how the information requested would further a proper law-enforcement function of the DOJ will also help my office assess the August 14 letter's assertion that the requested disclosure of driver license numbers falls within the exception set forth in the Drivers Privacy Protection Act ("DPPA") (described in the August 14 letter as the "Drivers License Protection Act") for use by a government agency "carrying out its functions." 18 U.S.C. § 2721(b)(1).

disclosing any of the records sought to other federal agencies or other entities or individuals, and if so, under what circumstances and for what purpose or purposes. *See, e.g.*, 5 U.S.C. § 552a(b). We would be grateful for clarity on these points. Again, to ensure adequate protection of the requested personally identifiable information consistent with New Jersey law, the State would like to better understand how the information may be used and with whom it may be shared.

New Jersey's elections officials take extremely seriously their election duties. We appreciate the opportunity to seek clarification and thank you in advance for providing the information requested above.

Very truly yours,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By: ____________________________
Melissa Dutton Schaffer
Assistant Attorney General

cc: Harmeet K. Dhillon
Assistant Attorney General
U.S. Department of Justice
Civil Rights Division

Donna Barber, Director
Department of State
Division of Elections

ALABAMA STATE CAPITOL
600 DEXTER AVENUE
SUITE S-105
MONTGOMERY, AL 36130

(334) 242-7200
WWW.SOS.ALABAMA.GOV
WES.ALLEN@SOS.ALABAMA.GOV

WES ALLEN
SECRETARY OF STATE

December 10, 2025

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
4CON 8th Floor
Washington, DC 20530
voting.section@usdoj.gov

**VIA ELECTRONIC EMAIL TRANSMISSION**

Dear Chief Riordan,

Election integrity has been a top priority for Secretary of State Allen since the beginning of his tenure, positioning Alabama as a national leader in effective voter-file maintenance—even in the face of litigation from the Biden administration. Secretary Allen now looks forward to continuing that work in coordination with President Trump's Department of Justice.

This letter confirms transmission of the State of Alabama's statewide voter registration list to the Voting Section of the Civil Rights Division of the U.S. Department of Justice on this date, pursuant to the National Voter Registration Act (NVRA), the Help America Vote Act (HAVA), Title III of the Civil Rights Act of 1960, and the Privacy Act of 1974.

As we have discussed with your team, Alabama's voter-list-maintenance process is comprehensive and multilayered. It involves coordinated efforts by both state and county officials; detailed data analysis; multiple rounds of correspondence with registrants and local election authorities; review of various state and federal records; and the application of several statutory timelines, depending on the circumstances. Alabama has also recently begun incorporating SAVE data in partnership with DHS/USCIS. Using this data, the state is currently in the process of removing 188 non-citizens from the voter rolls, 26 of whom have cast ballots in Alabama elections. A number of additional deceased registrants have likewise been identified and are currently being processed for removal.

Given these complexities, Secretary Allen respectfully requests that the Department share its methodology for reviewing Alabama's file—as well as any preliminary findings—before issuing any public statements. In his view, this step is essential to preventing inadvertent errors and ensuring that only accurate information is released, thereby protecting public confidence in Alabama's elections.

Paul D. Pate
Secretary of State

State Capitol
Des Moines, Iowa 50319

## OFFICE OF THE IOWA SECRETARY OF STATE

March 5, 2026

Eric Neff
Acting Chief
Civil Rights Division, Voting Section
U.S. Dep't. of Justice
Washington, DC

Dear Mr. Neff:

After consulting with and receiving advice from the Iowa Attorney General's office, and reviewing the legal citations included in your proffered MOU, this office has concluded that it is likely that the U.S. Attorney General has authority under the Civil Rights Act of 1960 ("CRA") to demand voter registration data, including elements normally considered personally identifiable information ("PII") such as driver's license and social security numbers. We are further persuaded by language in the proffered MOU and other comments your office has made publicly that the data will be protected as appropriate under federal law. Because of these considerations, we will comply with your demand for unredacted voter registration data.

It is important to note that this office does not routinely provide sensitive PII such as driver's license numbers or any part of a voter's SSN. We are only releasing the information to USDOJ because the scope of the federal CRA appears to support your office's demands to access the data and is supreme over Iowa's limitation on the release of voter information under the voter registration chapter and the state's privacy laws. Similarly, the federal Drivers Privacy Protection Act of 1994 permits the sharing of certain driver's license data between government agencies if the use of the shared data is in support of the receiving agency's legal duties.

Even now, we do not take lightly our obligation to turn this information over. For many years, we have worked diligently with local, state, and federal partners to ensure the security of Iowa's elections – including data within our voter registration database. This work includes ensuring that we have the cleanest voter list possible. With the support of the Iowa General Assembly, we have increased the ability of this office to receive data from third-party agencies. In December 2024, we took the extraordinary step of suing the Biden administration to ensure we had free, long-term access to use the SAVE database. That work will continue apart from the data comparisons that your office plans to conduct.

Additionally, we are aware of ongoing litigation between USDOJ and states that have refused to provide data. This includes the decisions of federal courts in California and Oregon that cast doubt on USDOJ's entitlement to enhanced voter registration data. We will continue to monitor those situations for better insight into USDOJ's right to access this information.

Finally, we are not interested in signing the proffered MOU. As other states have noted in their communications with your office, there are potential conflicts between the terms of the MOU and the National Voter Registration Act of 1993 ("NVRA"). Any potential issues that USDOJ shares with this office will be acted upon under the terms of the NVRA and state law.

Phone 515-281-6230 Fax 515-242-5952 www.sos.iowa.gov Paul.Pate@sos.iowa.gov

**Michael Watson**
SECRETARY OF STATE

December 24, 2025

**VIA upload to Justice Enterprise Filing System**
Eric Neff
United States Assistant Attorney General
Civil Rights Division

Dear Mr. Neff,

Thank you and AAG Dhillon for meeting with us on December 15, 2025, to discuss this important issue. We appreciated your sincerity and willingness to hear our concerns. Though we may disagree on some points, we believe 52 U.S.C. § 20703, in line with current Fifth Circuit Court of Appeals decisions on the same, does authorize the Department of Justice to ask for the information requested via your August 14, 2025, letter. As such, the Mississippi Secretary of State's Office herein provides a copy of its statewide voter list, which includes all information contained in the statewide voter list provided on August 21, 2025, with the additions of the voter's date of birth, driver's license number, and last four of his/her social security number. The Mississippi Secretary of State's Office is aware of litigation in other states regarding access to statewide voter files under 52 U.S.C. § 20703. We will be monitoring these cases for any clarification regarding the scope of authority to request such information in the future.

Mississippi has set up an aggressive voter roll maintenance program under federal and state law far exceeding the minimum accuracy standards for voter registration records required by 52 U.S.C § 21083(a)(4). While we have been as aggressive as any state in the country when it comes to voter roll maintenance, we will always utilize new sources of reliable and accurate information to further improve our list maintenance efforts. Accordingly, should you find any individuals who are suspected to be ineligible, please send any and all identifying information used along with the reason they are suspected to be ineligible. Please also include any source(s) of information used in determining potential ineligibility. This information is needed to ensure eligible voters are not removed in error in accordance with 52 U.S.C § 21083(a)(4)(B). Should any individuals meet the threshold for removal from the voter roll based on both state and federal law, we will communicate those results to our Election Commissioners.

In accordance with the August 14, 2025, letter and information contained in a proposed Memorandum of Understanding, to which we could not agree due to reasons unrelated to the security provisions provided as outlined in our December 9, 2025, letter, the Mississippi Secretary of State's Office understands the Department of Justice will not disclose any of the provided records, including dates of birth, driver's license numbers, and/or the last four of a voter's social security number to an entity except as it is authorized to do so under 52 U.S.C. §

**From:** Neff, Eric (CRT) [Eric.Neff@usdoj.gov]
**Sent:** 2/5/2026 3:23:31 PM
**To:** Austin.James@mt.gov [austin.james@mt.gov]
**Subject:** RE: Voicemail F/U

Austin, cancel that, we figured out on our end why I kept getting told we did not have the list. They were looking in the wrong place in our files. We do have that data. Thanks for your help. We'll be in touch when/if we have any paths forward on maintenance.

**From:** Neff, Eric (CRT)
**Sent:** Wednesday, February 4, 2026 3:29 PM
**To:** Austin.James@mt.gov
**Subject:** Voicemail F/U

Austin,

Just hoping we can hop on a call to get on the same page regarding the SVRL.

Thanks,
Eric

**Eric Neff**
Acting Chief
Civil Rights Division, Voting Section
Department of Justice
150 M St. NE, Ste. 8-1807
Washington, DC 20002
Eric.Neff@usdoj.gov
Cell: 202-532-3628
Office: 202-307-2767

# STATE OF NEBRASKA

**ROBERT B. EVNEN**
**SECRETARY OF STATE**

**P.O. Box 94608**
**State Capitol, Suite 2300**
**Lincoln, NE 68509-4608**
**Phone: 402-471-2554**
**Fax: 402-471-3237**
**www.sos.ne.gov**

February 12, 2026

VIA EMAIL

Eric Neff
Trial Attorney
Civil Rights Division
U.S. Department of Justice
Eric.Neff@usdoj.gov

Dear Mr. Neff:

This letter is regarding the September 8, 2025, correspondence in which the U.S. Department of Justice requested a statewide voter registration list including the registrant's full name, date of birth, residential address, driver's license number or the last four digits of the registrant's social security number for purposes of determining compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act, 52 U.S.C. § 20901, *et seq.*

Pursuant to the advice of the Nebraska Attorney General, the release of the data is called for pursuant to the authorities cited in your letter, the National Voter Registration Act, the Help America Vote Act, the Civil Rights Act of 1960, codified at 52 U.S.C. § 20701, *et seq.*, as well as state law, Neb. Rev. Stat. 32-330 (1) which allows for copies of the voter registration register to be made for law enforcement purposes.

The requested data contains information that would otherwise not be publicly released pursuant to a request for the list of registered voters, including date of birth, driver's license number or the last four digits of the registrant's social security number. The transmission of the data is not intended to constitute a public release of the data.

The data is being released to the U.S. Department of Justice with the understanding that the U.S. Department of Justice will follow all applicable laws or regulations of the federal government and the State of Nebraska with respect to the data, including, but not limited to the National Voter Registration Act, the Help America Vote Act, the Civil Rights Act, The Privacy Act of 1974, 5 U.S.C. § 552a, as amended, and the Nebraska Election Act, Neb. Rev. Stat. § 32-101 to 32-1552.

It is also being released with the understanding that nothing alters the duties of the Office of the Nebraska Secretary of State with respect to list maintenance activities as specified in applicable federal law and the Nebraska Election Act.

Sincerely,

Robert B. Evnen
Secretary of State
State of Nebraska

# State of Tennessee

The Secretary of State
State Capitol
Nashville, Tennessee 37243-0305

Tre Hargett
Secretary of State

615-741-2819
Tre.Hargett@tnsos.gov

December 18, 2025

David D. Vandenberg
Trial Attorney
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW 4CON
Washington, D.C. 20530

Mr. Vandenberg,

We are preparing to transfer Tennessee's statewide voter file per your request. Our goal is to have this data submitted to you as soon as possible taking into consideration the holidays.

It is our understanding that despite the concerns raised by a group of Secretaries of State earlier this week, no amendments will be made to the draft Memorandum of Understanding ("MOU"). Since our concerns have not been addressed, we must decline to sign the MOU.

We are concerned that the 45-day deadline in Section VIII to remove voters identified by the Justice Department contradicts the same laws the MOU seeks to enforce, namely the National Voter Registration Act ("NVRA").

As you know, the NVRA has safeguards on behalf of the voter to ensure an eligible voter is not removed inappropriately. *See* 52 U.S.C. § 20507. In some instances, notice to the voter is required, followed by an additional time period in which they may vote or otherwise respond to confirm their continued eligibility. The NVRA also places limits on systematic list maintenance activities within 90 days of a federal election. We cannot agree to a blanket removal provision with a 45-day deadline given the MOU's conflicting language with both Tennessee and federal law.

Also, based on our 17 years of taking list maintenance seriously, we have learned that when dealing with this much data, there are going to be false positives. Our work as one of the first two states to take advantage of the enhanced SAVE program provides an example. We are proud to use the enhanced SAVE program, and the team that has assisted Tennessee with SAVE is outstanding. We have been a strong proponent for the adoption of SAVE to our colleagues on both sides of the aisle, encouraging them to use the enhanced SAVE system to identify potential non-U.S. citizens. Tennessee law requires us to give notice to the identified individual and an

opportunity for that individual to prove citizenship before they are removed. Through this process, we identified several false positives, particularly among cases involving derived citizens. On paper, the number of potential non-U.S. citizens is inflated since the reality is that many of those individuals were in fact U.S. citizens.

We are aware of the litigation filed by the Justice Department in other states regarding access to statewide voter files. While we believe the Justice Department has authority to request the data, we will be monitoring these cases for any clarification of the scope of the Justice Department's authority to make similar requests in the future.

We ask that any notice regarding concerns about specific voters contain sufficient information to explain why the record is being flagged. For example, if the voter record matches a record from another federal agency or another state that indicates the voter is ineligible to vote in Tennessee, please provide us with the matching data that provides the basis for the voter's potential ineligibility. We will need this information to confirm the records match and to determine the appropriate next steps for the record in question. Any action we take will be consistent with state and federal law.

Our main concern that we have consistently expressed is the protection of the personal identification information of our 4 million registered voters. This is a reasonable concern, as voters have trusted we will keep their data safe. We will submit our data via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). You have assured us and the public that you will protect the data of our fellow Tennesseans. As we submit this data, please remember the trust that is being placed in your office.

Again, please know that for the last almost 17 years, our office has been committed to accurate voter rolls because we know how critical they are to honest elections. Our commitment to this integrity has not wavered. If you have any questions, please let us know.

Sincerely,

Tre Hargett
Secretary of State

Mark Goins
Coordinator of Elections

# Wyoming Secretary of State
## Chuck Gray

July 24, 2025
***Via E-mail***

Maureen Riordan
Acting Chief, Voting Section
Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW- 4CON
Washington, D.C. 20530
Voting.Section@usdoj.gov

Dear Ms. Riordan and Mr. Gates:

This letter serves as a response to your letter dated June 25, 2025, in which you inquired about Wyoming's compliance with several provisions of the Help America Vote Act ("HAVA"), and for processes, controls, and procedures pertaining to voter registration and voter list maintenance. I truly appreciate you reaching out, and I appreciate President Trump's and the entire Trump Administration's commitment to election integrity. Our office is committed to maintaining accurate voter rolls, and working to continually improve statutes, processes, and procedures to ensure proper voter roll hygiene, secure voter registration and list maintenance, and ongoing compliance with HAVA. The below answers and documents referenced and shared via the Justice Enterprise File Sharing ("JEFS") System outline our office's work to ensure Wyoming's voter registry list, as set forth in Wyoming statute, is adequately maintained in accordance with federal law.

1) **Describe how the State processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.**

Wyoming has several processes and procedures in place to ensure a uniform process by which new applications to register to vote are processed by counties in accordance with HAVA Section 303. The Wyoming Election Code defines "registration" as the "entry and verification of the name and voter information of a qualified elector on the official registry list," as provided in W.S. 22-3-104(f) and W.S. 22-3-108. *See* W.S. 22-1-102(a)(xxvii). The Wyoming Secretary of State's Office oversees several processes and procedures to ensure only eligible applicants register to vote in Wyoming. To be eligible to register to vote in Wyoming, a person must be a United States citizen, as evidenced by providing proof of United States citizenship, at least 18 years of age on the day of the next general election, a bona fide resident of Wyoming, must not be adjudicated mentally incompetent or convicted of a felony (or if convicted, had his voting

rights restored), and a bona fide resident of Wyoming for not less than thirty days before the date of the election at which he offers to vote. *See* W.S. 22-3-102(a). As discussed further below, our office has entered into data sharing agreements with other agencies to run a cross-check upon voter registration to verify the applicant's registration information as entered on the voter registration application with driver's license information, social security information, and information obtained by the Wyoming Department of Health, Wyoming Division of Criminal Investigation, the Wyoming Department of Transportation, and Wyoming Department of Corrections to determine eligibility for purposes of voter registration.

When a qualified elector registers to vote, their name, date of birth, and either their driver's license number or the last four digits of their Social Security number are run through what is commonly referred to as a "HAVA" check. This check uses data received from the state agencies referenced above to confirm the individual's eligibility. If the elector fails the "HAVA" check, they are given the opportunity to provide additional documentation to verify that they are, in fact, qualified to vote. For example, they may submit a Certificate of Naturalization if the "HAVA" check indicates non-citizen status, or a Restoration of Rights Certificate if it indicates a felony conviction. If they do not have those documents, the county clerk denies registration, and may refer the case to the county's prosecuting attorney.

This area has been a large priority of my administration. To that end, prior to the 2025 Legislative Session, I launched our election integrity reform agenda, which included a series of safeguards to increase the confidence and security in the voter registration process. My number one priority was requiring documentary proof of citizenship and proof of residency for registering to vote. During the 2025 Legislative Session, the Wyoming Legislature passed 2025 House Enrolled Act 57, "Proof of voter residency-registration qualifications," which became law without the Governor's signature on March 21, 2025. *See* HEA 57 and press release on our election integrity agenda, shared via JEFS. The passage of HEA 57, which became effective July 1, 2025, requires documentary proof of United States citizenship and Wyoming residency to register to vote in Wyoming, and also requires electors to attest that they have been a bona fide resident of the state of Wyoming for not less than thirty (30) days before the date of the election in which they offer to vote.

HEA 57 was the number one priority of our administration's election integrity reform agenda announced ahead of the 2025 Legislative Session, and follows an administrative rulemaking to ensure documentary proof of residency, which was adopted by our office in 2023 and vetoed by the Governor. As a result, we decided to go to the Legislature to work to pass a bill on the subject and we were able to do so. With HEA 57's effective date of July 1, 2025, our office has promulgated rules to amend Chapter 2 of its Election Procedures Rules pertaining to Identification for Voter Registration to provide further clarity and uniformity for purposes of providing proof of a voter's identity, residency, and United States citizenship for voter registration as authorized by HEA 57. Copies of these rules may be found here, and have been shared via JEFS. During the intervening period between the effective date of HEA 57, July 1, 2025, and the time for which the regular rulemaking process is completed, the Secretary of State's Office has also adopted emergency rules which are identical to the regular rules. The emergency rules packet can be found here and has been provided via JEFS. Once regular rules become effective, the emergency rules will be superseded.

HEA 57 makes Wyoming a leader in implementing President Trump's Executive Order Preserving and Protecting the Integrity of American Elections by requiring documentary proof of United States citizenship and Wyoming residency at the time of voter registration. Unlike many other states' proof of citizenship laws, which fall under the requirements of the National Voter Registration Act, Wyoming's HEA 57 applies to all elections, including federal, and doesn't contain any exceptions. It is thus largely patterned off of the SAVE Act, with a defined list of acceptable documents for providing proof of citizenship for voter registration, as specified. HEA 57 is in full force and effect to protect the integrity of Wyoming's elections and ensure non-citizens and non-Wyomingites are not entered onto Wyoming's voter registration list through 2026 and beyond.

On May 9, 2025, I was sued in my official capacity by a coalition of individuals through their attorney Marc Elias and the Elias Law Group in a federal lawsuit challenging the constitutionality of HEA 57 in the United States District Court for the District of Wyoming. Elias later filed a motion to enjoin HEA 57 from taking effect. We worked quickly to bring a vigorous defense of HEA 57 through our counsel by filing an opposition to Elias' request for an injunction, as well as a motion to dismiss the lawsuit in its entirety. We were very thankful to the Trump Administration and the Department of Justice for filing a statement of interest in the case. On July 22, the court granted our motion to dismiss this lawsuit.

Upon voter registration, successful registrations are entered into Wyoming's voter registration system, otherwise known as the official registry list. W.S. 22-3-108(a) specifies that the "official registry list" contains at least the following information as to each registered elector: name in full, residence by street number and name, voting district and precinct numbers, party affiliation, if declared, house and senate district numbers, date of birth, driver's license number, or, if no driver's license, the last four digits of the elector's social security number or unique identifying number generated by the state, information related to absentee ballot status, and date of registration. W.S. 22-3-108(b) specifies that the registry list may contain county of residence, municipal corporation of residence, if any, school district number, mailing address, gender, and telephone number, if any.

2) **Describe the process by which Wyoming assigns a unique identifier to each legally registered voter in Wyoming, as required by HAVA Section 303(a)(1)(A).**

At the time of voter registration for a first-time registrant, Wyoming's statewide voter registration system automatically assigns a unique identification number to each voter in compliance with HAVA Section 303(a)(1)(A). The Wyoming Election Code's definition of "Registry List," found in W.S. 22-1-102(a)(xxix), includes a unique identifying number generated by the State of Wyoming. As set forth by policy of our office in early 2023, and later codified into law with the Wyoming Legislature's passage of 2023 House Enrolled Act 30, shared via JEFS, Wyoming law mandates that unique identifying numbers of voters are public record, and are to be released in all election records, including voter registry lists furnished under W.S. 22-2-113.

Importantly, this unique identifying number remains associated with the voter's record, regardless of registration status (i.e. active, pending, or inactive). Therefore, a voter whose registration is cancelled and inactivated for any reason set forth in W.S. 22-3-115 (e.g. removal

of residency from one county to another), will retain that unique identifier in the event they register to vote again.

3) **Describe how the statewide voter registration list is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.**

Our office has entered into several perpetual agreements with various state agencies in Wyoming to ensure proper voter list maintenance, not just at the time of registration as discussed above, but also to ensure ongoing voter list maintenance and removal in accordance with HAVA Section 303 and Wyoming law. W.S. 22-3-102(e) provides statutory authority to our office to enter into agreements with the Wyoming Department of Transportation, the Wyoming Attorney General, the Department of Health, and the Wyoming Department of Corrections to ensure individuals on Wyoming's voter rolls are eligible to vote.

A. <u>Data Sharing for Driver's License, Social Security, and Immigration Records through the Wyoming Department of Transportation</u>

W.S. 22-3-102(e)(i) specifically authorizes our office to enter into an agreement with the Wyoming Department of Transportation for verification of driver's license information, and states as follows:

> (i) The secretary of state and the director of the department of transportation shall enter into an agreement to match voter registration data with information maintained by the department regarding driver's licenses, in order to verify the information provided on applications for voter registration;

In accordance with W.S. 22-3-102(e)(i), the Wyoming Secretary of State's Office and the Wyoming Department of Transportation have entered into a memorandum of understanding outlining the processes of our office's ingestion of data from the Wyoming Department of Transportation to match voter registration data with information maintained by the Wyoming Department of Transportation, including driver's license information and social security number verification through the Social Security Administration. The memorandum of understanding with the Wyoming Department of Transportation, has been shared via JEFS, as redacted in accordance with W.S. 16-4-203(d).

Another key priority of our administration was to ensure passage of 2025 House Enrolled Act 62 (HEA 62), "Maintenance of Voter Lists," which passed the Legislature and was signed into law on March 18, 2025. HEA 62, shared via JEFS, enables our office to enhance our relationship with the Wyoming Department of Transportation to obtain data that will allow us to analyze and communicate to Wyoming's county clerks if a registered voter in the State of Wyoming should have their registration cancelled by virtue of a number of new data metrics to be shared by the Wyoming Department of Transportation. First, HEA 62 amends W.S. 22-3-102(e)(i) as follows:

> (i) The secretary of state and the director of the department of transportation shall

> enter into an agreement to match voter registration data with information maintained by the department regarding driver's licenses, in order to verify the information provided on applications for voter registration, determine if any alien identification number or other evidence of non-United States citizenship is kept within corresponding driver's license records, determine if any voters listed in the Wyoming voter registration system have subsequently received a driver's license from another state as indicated by information received from other states, including but not limited to information received from the state-to-state verification service operated by the American association of motor vehicle administrators or verify any other information indicating a voter should be ineligible to vote at the request of the secretary of state;

While giving our office statutory authority to receive information indicating a voter may have moved out of state, it also amends W.S. 22-3-116 to provide that this information may be used to further investigate if an individual's registration should be cancelled based on this information.

HEA 62 also amends W.S. 22-3-102 to allow for enhanced tools for verification and maintenance of Wyoming's voter registration list concerning non-citizen status. HEA 62 specifies through the creation of a new subsection (f) that the Wyoming Department of Transportation shall, in addition to the other data, provide additional data of individuals who have indicated independently that they are a noncitizen as follows:

> (f) The department of transportation shall furnish monthly to the secretary of state a complete list of all persons who have indicated a noncitizen status in obtaining any document, or renewal thereof, issued pursuant to W.S. 31-7-115 and 31-8-102. The secretary of state may transmit the information from the list to appropriate county clerks. Information in these lists shall be kept confidential and available only for official use.

As discussed further below, this information obtained by the Wyoming Department of Transportation will be utilized to conduct enhanced searches for potential non-citizen status conducted in partnership with the Department of Homeland Security, U.S. Citizenship and Immigration Services Systematic Alien Verification System, otherwise known as the SAVE System.

Our office is currently in the process of revising our memorandum of understanding with the Wyoming Department of Transportation to ensure the new data contemplated by HEA 62, including immigration enumerators, as well as information obtained by the Wyoming Department of Transportation from the State-to-State Verification Service, can be ingested into Wyoming's voter registration system. Concurrently, the Wyoming Department of Transportation has begun sharing this information with our office pursuant to HEA 62 to manually enter this information.

B. Data Sharing for Removal of Convicted Felons from Voter Registry List

To ensure new and existing felons are not registered to vote pursuant to the requirements under Wyoming law, our office has undertaken several measures, including direct integration of

Wyoming felony records obtained by the Wyoming Division of Criminal Investigation, as well as manual cross-checks of felony records received from other states. W.S. 22-3-102(e)(ii) states as follows:

> (ii) The secretary of state and the attorney general shall enter into an agreement to compare data in the voter registration system with information maintained by the division of criminal investigation regarding state felony convictions in order to deny voter registration to, and remove from voter registration lists, individuals who are not qualified electors;

In accordance with the Memorandum of Understanding between our office and the Division of Criminal Investigation, shared via JEFS as redacted in accordance with W.S. 16-4-203(d)(xii), the Division of Criminal Investigation provides felony records to our office to be ingested into the Wyoming voter registration system in order to deny voter registration to, and remove from voter registration lists, individuals who are not qualified electors. Once records obtained by the Division of Criminal Investigation are ingested by the Wyoming voter registration system, they are used to match against records during voter registration to deny registrants who match this information. These records are also used to match against existing registrants, and will notify counties of registrations which match the felony record to begin the cancellation process at the county level.

C. <u>Data Sharing for Removal of Deceased Individuals from Voter Registry List</u>

Our office has also been working to streamline the process for processing and ingestion of death records to ensure new registrants are cross-checked with Wyoming mortality records to prevent registration fraud and that registered voters who have died are removed from Wyoming's voter rolls in an expeditious manner, as authorized by Wyoming law. In this regard, W.S. 22-3-102(e)(iii) provides the following:

> (iii) The secretary of state and the director of the department of health shall enter into an agreement to match information in the voter registration system with death records in the office of vital records services within the department of health in order to remove names of deceased individuals from voter registration lists;

In order to implement this statute, our office has entered into an agreement with the Wyoming Department of Health requiring the Department to export mortality data daily, to be ingested into Wyoming's voter registration system. These records are matched, both at the time of registration to prevent any new registrants whose records match those of deceased individuals and weekly to match against existing registrants. The voter registration system will notify counties of registrations which match a death record to begin the cancellation process at the county level.

In 2023, upon our administration beginning, we began a comprehensive review of Wyoming's voter rolls to reduce the opportunity for fraud. In August of 2023, we endeavored to streamline this process further to expedite the removal of deceased voters from Wyoming's voter rolls through the modification of the data sharing agreement with the Department of Health to increase the speed of the transfer and ingestion of death records. Whereas mortality records previously took as many as four weeks to be processed and received, they are now received in as

little as 3-7 days, shortening the time period between a registered voter's death and the entry of the death record into Wyoming's voter registration system by more than 75%. Shared via JEFS, please find the revised data sharing agreement dated August 22, 2023 streamlining this process, as well as a media release discussing these enhancements in more detail.

D. Data Sharing and Processing Records Related to Restoration of Voting Rights

Similarly, our office has also entered into data sharing agreements to ensure timely processing of restoration of voting rights. W.S. 22-3-102(e)(iv) also authorizes our office to enter into an agreement with the Wyoming Department of Corrections to ensure accurate entry of registration of voting rights into the voter registration system in order to verify voter qualifications, stating as follows:

> (iv) The secretary of state, the state board of parole and the department of corrections shall enter into an agreement to match information in the voter registration system with records regarding restoration of voting rights maintained by the state board of parole or the department of corrections in order to verify voter qualifications;

Similar to other records, our office ingests data received from the Wyoming Department of Corrections to ensure voting rights restorations are communicated to ensure individuals who have had their voting rights restored are allowed to register to vote, so long as they are otherwise entitled to register to vote under Wyoming law. Shared via JEFS please find the Memorandum of Understanding with the Wyoming Department of Corrections, as redacted in accordance with W.S. 16-4-203(d)(xii), outlining this process.

4) **Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.**

As noted above, Wyoming law requires voter registration to be conducted by the county clerk. If a duplicate voter record is created by the county clerk, it is therefore the responsibility of the county to merge the records in accordance with HAVA Section 303(a)(2)(B)(iii). During this process, the original unique identifier is preserved, and the duplicate unique identifier is archived in the voter's audit log for historical tracking. While it is the responsibility of the county clerk to merge records, our office employs several processes through Wyoming's statewide voter registration system to identify and resolve duplicate records.

First, Wyoming's voter registration system provides real-time checks at the time of registration. When a registrant submits a Wyoming voter registration application, the county clerk is responsible for entering the information into Wyoming's voter registration system. The system automatically checks for existing records using the **registrant's name, date of birth, driver's license number, and the last four digits of their social security number**. This search includes active, pending, and inactive records. If a match is found, the system automatically notifies the county clerk and displays the existing record, thereby preventing a duplicate record from being created.

Additionally, Wyoming's voter registration system employs ongoing checks for duplicate records in the event a duplicate record is created. This includes regular, periodic system-wide scans for potential duplicates using the same identifying data. Suspected duplicates are placed in a queue for the county clerk to review and, if necessary, merge the records.

Clerks may also manually search for potential duplicate records using a module specifically created for this function within Wyoming's voter registration system. After manual review, the county clerk may merge the records if necessary.

5) **Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).**

As noted above, Wyoming employs numerous protections to ensure felons are properly identified and either prevented from registering or removed in accordance with HAVA Section 303(a)(2)(A)(ii)(I) through collaboration with other agencies.

Like voter registration, cancellation of voter registration is performed at the county level, but our office employs several systems and processes to ensure proper oversight. W.S. 22-3-115 specifies the grounds for cancellation of a voter's registration, and includes removal for disqualification to vote, which includes felony status. In accordance with the MOU between our office and the Division of Criminal Investigation, shared via JEFS, the Division of Criminal Investigation provides felony records to our office to be ingested into the Wyoming voter registration system in order to deny voter registration to, and remove from voter registration lists, individuals who are not qualified electors. Once records obtained by the Division of Criminal Investigation are ingested by the Wyoming voter registration system, they are used to match against existing registrants, and will notify counties of registrations which match the felony record to begin the cancellation process at the county level.

Upon receipt of a notification pertaining to felony status, in accordance with W.S. 22-3-116, the county clerk shall mail a notice of intent to cancel a voter's registration, allowing an opportunity for the voter to respond as prescribed below:

> When the county clerk has information that a registration should be cancelled, he shall mail a notice of intent to cancel to the elector at his address on the registry list stating the reason for cancellation. The notice shall state that cancellation shall occur within twenty (20) days unless the elector asks that his name remain on the registry list. A copy of the notice of cancellation shall be retained by the county clerk for three (3) years. A notice is not required if the clerk has received a receipt of notification that the elector has registered to vote in another jurisdiction or if the elector requested cancellation in writing.

While these cancellation records are maintained by the counties, our office has taken many steps to ensure adequate and timely removal of voters from Wyoming's voter rolls through the ongoing data sharing information agreements and ingestion of data into Wyoming's voter registration system, as well as individual communications.

In addition to the bulk records we receive as part of our memorandum of understanding with the Wyoming Division of Criminal Investigation, we also undertake to remove ineligible voters from voter rolls based on information concerning felony convictions in other states. In October of 2023, our office conducted an investigation into an individual named Eli Alan Hunt, who was registered to vote in Campbell County. Following his attempted registration in Crook County, it was discovered by our office that Hunt had a felony conviction from South Dakota from 1994, and that there was no evidence of any restoration of Wyoming voter rights.

In response to this investigation, we again requested, via the attached letter to the Campbell County Clerk and Campbell County Attorney, removal of Hunt from Wyoming's voter rolls, as well as referral of the case to the Campbell County Attorney for further investigation and criminal prosecution, citing Hunt's falsely swearing on his voter registration form that he was either not a felon or that his voting rights had been restored, which is a felony pursuant to W.S. 22-26-108. Hunt was subsequently removed from Wyoming's voter registration list by the Campbell County Clerk. This shows the continued prioritization of this office to ensure proper removal of individuals ineligible to vote from Wyoming's voter rolls.

6) **Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).**

As noted above, Wyoming employs numerous protections to ensure deceased registrants are properly identified and removed from Wyoming's voter registration list as required by HAVA Section 303(a)(2)(A)(ii)(II).

In fact, since 2023 our administration has been working to streamline the process for processing and ingestion of death records to ensure new registrants are cross-checked with Wyoming mortality records to prevent registration fraud and ensure that registered voters who have died are removed from Wyoming's voter rolls in an expeditious manner, as authorized by Wyoming law. As noted earlier, W.S. 22-3-102(e)(iii) provides the statutory authority used to enter into data sharing agreements with the Wyoming Department of Health to obtain mortality data. In order to implement this statute, my administration has entered into a new agreement with the Wyoming Department of Health requiring the Department to export mortality data daily, to be ingested into Wyoming's voter registration system. These records are used both to prevent new registrations that match deceased individuals and to identify existing registrants who have died. At the time of registration, any applicant whose information matches a death record is flagged and prevented from registering. If a potential registrant provides the last four digits of their social security number on their application, as opposed to their Wyoming driver's license number, the voter registration system runs a check with the Social Security Administration to attempt to match the identity of the registrant. If the SSA identifies that the social security number is a match to the name and date of birth provided, but belongs to a deceased individual, the SSA will return a message of "Match – Deceased" which indicates to the county clerk that they should not complete registration or should request additional information of the applicant to ensure the SSA match was a false-positive. Additionally, mortality records are routinely compared against the voter rolls, and when a match is found, counties are notified so they can begin the cancellation process.

As noted above, in 2023, we began a comprehensive review of Wyoming's voter rolls to

reduce the opportunity for fraud and enhance our ability to remove ineligible voters in a timely manner. In August of 2023, we endeavored to streamline this process to expedite the removal of deceased voters from Wyoming's voter rolls through the modification of the data sharing agreement with the Department of Health to increase the speed of the transfer and ingestion of death records. Whereas mortality records previously took as many as four weeks to be processed and received, they are now received in as little as 3-7 days, shortening the time period between a registered voter's death and the entry of the death record into Wyoming's voter registration system by more than 75%. Shared via JEFS, please find the revised data sharing agreement dated August 22, 2023 streamlining this process, as well as a media release outlining more details on the revised data sharing agreement.

**7) Describe all technological security measures taken by the state to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).**

In accordance with HAVA Section 303(a)(3), Wyoming has implemented a number of technological security measures to prevent unauthorized access to Wyoming's statewide voter registration system.

First, the state employs a process of "whitelisting" on the computer network that hosts the Wyoming voter registration system to ensure that no outside networks have access to the voter registration system network. This means that only networks which have been explicitly authorized (i.e. state and county networks) are permitted access to the login page and network. The state also enforces unique user IDs and passwords for system users, strong password requirements, role-based permissions, two-factor authentication, and requires reporting to the state of new user accounts created by county election administrators.

Additionally, to monitor and audit changes and modifications to voter registration records, the voter registration system produces audit logs which record username and timestamp on all modifications, and utilizes a Center for Internet Security (CIS) monitored Albert Sensor installed on the registration system's network to monitor for unauthorized or malicious network activity.

Finally, Wyoming has engaged with federal partners, including the Department of Homeland Security, to ensure monthly cyber hygiene scanning of the network in order to identify potential network vulnerabilities.

**8) Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).**

In compliance with HAVA and Wyoming law, our office removes voters from Wyoming's voter registration list upon notice received from other states indicating the voter has registered to vote in that state. Our office verifies that the individual is registered to vote in Wyoming, and on the first business day of each month, we send copies of the notices via encrypted email to applicable county clerks in the county where the voter last resided. In the month leading up to an election, our office increases the frequency of these notifications to ensure timely updates for the clerks.

This issue has been a key priority of my administration and a key priority of my election integrity agenda. As part of our commitment to ensure a rigorous process, we worked to pass HEA 62 to increase the vigorousness of this capability beyond notices received from other states, providing new statutory authority to enhance this process.

First, HEA 62 amends W.S. 22-3-102(e)(i) to provide as follows:

> (i) The secretary of state and the director of the department of transportation shall enter into an agreement to match voter registration data with information maintained by the department regarding driver's licenses, in order to verify the information provided on applications for voter registration, determine if any alien identification number or other evidence of non-United States citizenship is kept within corresponding driver's license records, determine if any voters listed in the Wyoming voter registration system have subsequently received a driver's license from another state as indicated by information received from other states, including but not limited to information received from the state-to-state verification service operated by the American association of motor vehicle administrators or verify any other information indicating a voter should be ineligible to vote at the request of the secretary of state;

This access to the state-to-state verification system is a pivotal advancement. While giving our office statutory authority to receive information indicating a voter may have moved out of state, it also amends W.S. 22-3-116 to provide that this information may be used to further investigate if an individual's registration should be cancelled based on this information, noting in pertinent part:

> When the county clerk has information that a registration should be cancelled, he shall mail a notice of intent to cancel to the elector at his address on the registry list stating the reason for cancellation. When the secretary of state or county clerk receives information indicating that there is evidence that an elector may have moved to another state, the secretary of state and the county clerk may use any lawful means to investigate whether the registration should be cancelled, and based on this investigation, the county clerk may mail a notice of intent to cancel to the elector in accordance with this section.

Our administration is fully implementing HEA 62 with our partners at the Wyoming Department of Transportation to ensure "notices of surrender" received from other states to provide to our office in accordance with HEA 62. Once received, pertinent information will be provided to county clerks for further investigation and removal in accordance with Wyoming law.

**9) Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.**

As explained above, the number one priority of my 2025 election integrity agenda was requiring up-front, documentary proof of citizenship for voter registration. We successfully passed this bill, and have successfully defended it in court. Additionally, identification and

removal of non-citizens from Wyoming's voter registration list has also been a top priority.

Although cancellation of registration is performed at the county level pursuant to Wyoming law, our administration has been diligent to request removal of ineligible voters from Wyoming's voter registration list, including those who are not qualified to vote by virtue of non-citizen status. As an example, in August of 2023, we pursued an investigation which led to the removal of an illegal alien from Wyoming's voter rolls, who had voted in the November 3, 2020 Election in Campbell County.

Working with other interested partners, our office discovered that Jesus Lopez Sanchez, an illegal alien who had fraudulently obtained a U.S. passport, registered to vote in Campbell County, listing his address as an industrial building in Campbell county, Wyoming. Our records indicated he even voted in the 2020 General Election. As outlined in the attached letter to Campbell County Clerk and Campbell County Attorney, our office requested removal of Sanchez from Wyoming's voter registration list as an ineligible non-citizen. Due to his suspected violations of the Wyoming Election Code, we also referred Sanchez for criminal prosecution for knowingly voting in an election in which he was not entitled to vote, submitting a false voter registration record, falsely swearing on his voter registration application that he was a U.S. citizen, registering to vote when he was not qualified under Wyoming law, and falsely claiming under oath that he was a United States citizen.

Sanchez was subsequently removed from Wyoming's voter registration list.

In an effort to enhance the amount of data available to our office, our 2025 election integrity reform agenda also included explicit statutory authority to utilize the SAVE System for purposes of verifying that voters listed in the Wyoming voter registration system are United States citizens. With the passage of HEA 62, W.S. 22-3-102(e) provides as follows:

> (vi) The secretary of state may utilize the systematic alien verification for entitlements (SAVE) program operated by the United States citizenship and immigration services for purposes of verifying that voters listed in the Wyoming voter registration system are United States citizens.

In accordance with HEA 62, on July 1 our office entered into a Memorandum of Agreement with the Department of Homeland Security, U.S. Citizenship and Immigration Services, to allow for increased voter list maintenance services through the SAVE System. This executed MOA and media release outlining our commitment to utilizing the SAVE System has been shared via JEFS. I want to thank the Trump Administration for the tremendous optimization of the SAVE System. In coordination with the Wyoming Department of Transportation and DHS's internal optimizations, our office is actively engaging to upload a significant dataset of Wyoming voters who have indicated to the Wyoming Department of Transportation they are a non-citizen to the SAVE System for further review via the SAVE System. Once reviewed, if any in this search are determined by this review to be non-citizens, appropriate notice will be provided to county clerks for further investigation and removal in accordance with the procedures set forth in Wyoming statute.

**10) HAVA requires states to verify voter registration information by mandating that**

**applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.**

Wyoming law outlines the contents and process of voter registration, and prescribes the Wyoming Voter Registration Application form. Specifically, W.S. 22-3-103 specifies the contents of the voter registration application, which is on our website. It has also been shared via JEFS. With the passage of HEA 57, the Wyoming Voter Registration Form was modified to require documentary proof of United States citizenship, as well as Wyoming residence, in addition to proof of identity, which was previously required for voter registration. Additional instructions outlining the requirements for proof of identity, United States citizenship, and Wyoming residency can be found on the instructions page of the statewide VR form.

Wyoming is exempt from the National Voter Registration Act, because Wyoming law allows election-day voter registration. This dates back to the passage of the NVRA. There is no distinction between the registration form used for election-day registrations and for all other registrations.

11) **Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.**

Upon voter registration, county clerks enter in pertinent information required to be furnished by the applicant into Wyoming's voter registration system in what is commonly referred to as the "HAVA" check to verify the information listed by the individual on their Voter Registration Application. As noted above, this information, which includes the registrant's full name, date of birth, driver's license number, and/or the last four digits of the applicant's social security number, is automatically checked against several data sources and agency databases designed to verify the information supplied by the registrant. Through leveraging the data sharing agreements noted above, the information entered is cross-checked with the Wyoming Department of Transportation and the Social Security Administration to verify identity and citizenship status, Wyoming Department of Health to identify deceased individuals, Wyoming Department of Corrections and Division of Criminal Investigation to identify records related to felony convictions.

If this search results in a potential match with a record that would be ineligible to register to vote under Wyoming law, the Wyoming Voter Registration System automatically notifies county election officials of the potential match. It is then up to the local county election official to request additional documentation from the registrant in order to manually determine eligibility. For example, a HAVA check which returns a status of a potential felon would notify the clerk to require the registrant to provide evidence that their civil or voting rights have been restored by a competent Wyoming authority.

12) **Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.**

As elaborated on in more detail in response to question (3) above, the Wyoming Secretary of State's Office has entered into a perpetual MOU with the Wyoming Department of Transportation. The current agreement has been shared via the JEFS System.

In implementing and streamlining the processes set forth in HEA 62, our office is currently working with the Wyoming Department of Transportation to revise this agreement.

**13) Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).**

In response to this question, our office contacted the Wyoming Department of Transportation, who is in custody of records and materials responsive to this request. Once received, this document will be provided through JEFS via a supplement to this response.

**14) Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.**

In order to ensure compliance with HAVA Section 303(b), Wyoming law and administrative rule provides for a uniform process whereby new registrants who register by mail are required to furnish the same information as those who register in person.

As noted above, W.S. 22-3-103 provides that the county clerk shall furnish voter registration oath forms and require certain voter information from applicants when they register to vote, including acceptable identification as defined pursuant to W.S. 22-1-102(a)(xxxix) and further enumerated in Chapter 2 of the Secretary of State's Election Procedures pertaining to identification for voter registration, the applicant's driver's license number or the last four digits of his social security number, a tribal identification card, proof of residence, and proof of United States citizenship. *See* W.S. 22-3-103(a).

W.S. 22-3-104(d) specifies that the requirements set forth in W.S. 22-3-103, including providing the documentation sufficient to satisfy HAVA Section 303(b), be required for applicants who register by mail, noting in pertinent part:

> (d) An applicant may only register to vote in person or by mail at which time he shall provide the information required by W.S. 22-3-103(a) and sign the registration oath as required by W.S. 22-3-103(b).

Thus, in this way, HAVA Section 303(b) is satisfied.

**15) Please send us Wyoming's current statewide voter registration list. Please include both active and inactive voters.**

As discussed further above, Wyoming's voter registration list, or "registry list," is defined as "the list by precinct of the names, addresses, party affiliations, unique identifying numbers

generated by the state, information relating to absentee ballot status, registration dates and precinct and district numbers of the registered electors in the county prepared by the secretary of state or county clerks for distribution as provided in W.S. 22-2-113." *See* W.S. 22-1-102(a)(xxix). In essence this list is the list of active registered voters at the time of export. W.S. 22-2-113 outlines the process of exporting registry lists upon request to eligible recipients. Subsection (d) also outlines that unless otherwise provided, all election records of the county clerk are public, and shall be made in accordance with the Wyoming Public Records Act. In accordance with these provisions, our office has furnished previously exported registry lists and history files upon receipt of a public records request, and has routinely provided previously exported lists when requested. Accordingly, a voter registry list exported on July 10, 2025, which is now a public record, has been shared via JEFS.

**16) Commitment to HAVA Compliance**

In Wyoming, we continue to make great strides to improve statutes, policies, and procedures to ensure compliance with HAVA. We will strive to continue these efforts throughout the remainder of my term as Secretary of State. Should you have any questions or concerns, please don't hesitate to contact our office.

I want to thank President Trump and the entire Trump Administration for prioritizing enhanced procedures for voter list maintenance, and for supporting additional safeguards to ensure eligible voters are able to register to vote and vote in American elections.

Sincerely,

Chuck Gray
Wyoming Secretary of State

CACI
(/)

## Description

The MEGA 5 contract is a competitively awarded vehicle with the U.S. Department of Justice (DOJ) for purposes of providing information technology and automated litigation support services to DOJ offices, boards and divisions as well as other federal government agencies. The contract period of performance is 12/1/20-5/31/27 and has an estimated value of $1.5B.

## Eligible Buyers

- U.S. Department of Justice (DOJ) Divisions
  - Antitrust
  - Civil
  - Civil Rights
  - Criminal
  - Environment and Natural Resources
  - Tax
  - Executive Office for U.S. Attorneys
- Other DOJ components
- Other federal government agencies

## Scope of Work

Litigation support encompasses a wide range of professional services and products that help attorneys acquire, organize, develop and present evidence throughout the course of litigation, from pre-filing investigation, through complaint, discovery and trial, to post-trial briefs and the appeals process.

Using professional litigation support services and advanced tools for litigation support, the litigating attorney can better utilize evidence and information to win or settle lawsuits. Professional litigation support products and services enable the litigator to control and manage much larger volumes of case material, and much more complex information - much more quickly and to greater effect than would be otherwise possible.

### Document Acquisition Document Acquisition

- Research, identify, review and select relevant documents and other materials - including electronic data, files and records - locally and in the field
- Organize documents
- Number documents
- Create box or file level indices
- Capture document images

(Slip Opinion)

# Authority to Obtain and Share Statewide Voter Roll Data

The Department of Justice's Civil Rights Division has authority to seek statewide voter lists and share them with the Department of Homeland Security as part of its effort to identify individuals who are ineligible to vote, which other provisions of law do not limit.

May 12, 2026

MEMORANDUM OPINION FOR THE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

As part of his efforts to preserve and protect the integrity of the American electoral process, President Trump has directed the Attorney General to "prioritize enforcement of 18 U.S.C. [§§] 611 and 1015(f) and similar laws that restrict non-citizens from registering to vote or voting, including through use of . . . databases or information maintained by the Department of Homeland Security" ("DHS") and "similar records relating to citizenship." Exec. Order No. 14248 § 2(e) (2025). He has further directed the Attorney General to "take appropriate action with respect to States that fail to comply with the list maintenance requirements of the National Voter Registration Act and the Help America Vote Act contained in 52 U.S.C. [§] 20507 and 52 U.S.C. [§] 21083." *Id.* § 3(c).

In response to the President's order to identify those who may be voting illegally (whether by reason of alienage or otherwise), the Civil Rights Division ("Division" or "CRT") proposed to seek statewide voter lists, and then to share the lists with Homeland Security Investigations ("HSI") or another unit within DHS. In connection with that proposal, you asked us whether (1) the Civil Rights Act of 1960 authorizes the Division to seek these records from states, (2) the Division may compel states to produce their voter registration lists notwithstanding other federal laws or principles of estoppel, and (3) the Division may share such lists with DHS for the purpose of identifying illegal aliens who are ineligible to vote. In early September 2025, we informally answered each question in the affirmative. At your subsequent request, we now memorialize and expand upon the basis of our advice.

# I.

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam); *see also, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (opinion of Stevens, J.). "Common sense, as well as constitutional law, compels the conclusion that" such confidence requires "substantial regulation" if "some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). It also requires "the prevention of fraud." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021); *see also, e.g.*, *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). "Fraud can affect the outcome of a close election . . . ." *Brnovich*, 141 S. Ct. at 2340; *cf. Bush v. Gore*, 531 U.S. 98, 100–03 (2000) (per curiam) (discussing the outcome of an election decided by a few hundred votes). Indeed, voter fraud "dilute[s] the right of citizens to cast ballots that carry appropriate weight," *Brnovich*, 141 S. Ct. at 2340, and even the *perception* of "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government," *Purcell*, 549 U.S. at 4. Congress has passed numerous statutes to prevent just such an outcome, and your question arises out of efforts to enforce those statutes.

## A.

### 1.

Although regulating elections is primarily the purview of states, Congress has exercised its enumerated powers to enact several statutes intended to ensure that only those who are entitled to vote in federal elections do so. U.S. Const. art. I, § 4, cl. 1; *id.* amend. XIV, § 5; *accord id.* amends. I, XV, XIX, XXVI. As relevant here, the National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 ("NVRA"), "has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). "To achieve the latter goal, the NVRA requires States to 'conduct a general program that makes a reasonable effort to remove the names' of voters who are ineligible

'by reason of' death or change in residence." *Id.* (quoting 52 U.S.C. § 20507(a)(4)); *see also Crawford*, 553 U.S. at 192. And it permits the Attorney General to "bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary" to ensure that the NVRA's voter-list maintenance is "carr[ied] out." 52 U.S.C. § 20510(a).

The Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 ("HAVA"), reinforces this obligation by "requir[ing] every State to create and maintain a computerized statewide list of all registered voters," *Crawford*, 553 U.S. at 192 (citing 42 U.S.C. § 15483(a) (Supp. V 2000), currently codified at 52 U.S.C. § 21083(a)), which must meet certain specified requirements, 52 U.S.C. § 21083(a)(1), (4). It also requires state and local election officials to "perform list maintenance with respect to the computerized list on a regular basis," *id.* § 21083(a)(2)(A), and that states "make[] a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," *id.* § 21083(a)(4)(A).[1] Again, "[t]he Attorney General may bring a civil action against any State or jurisdiction . . . as may be necessary to carry out" HAVA's election "administration requirements." *Id.* § 21111.

To assist in enforcing these and other election laws, Congress has long granted the Attorney General broad investigative authority. In particular, section 301 of Civil Rights Act of 1960 provides, in relevant part, that "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of" any federal election "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." Pub. L. No. 86-449, § 301, 74 Stat. 86, 88 (codified at 52 U.S.C. § 20701) ("CRA" or "Civil Rights Act"). Section 303, in turn, requires that "[a]ny record or paper required by [section 301] to be retained and preserved shall, upon demand in writing" by a representative of the Attorney General "be made available for inspection, reproduction, and copying." 52 U.S.C. § 20703.[2] Section 303 further provides that "[t]his

---

[1] Although not immediately relevant to your question, we note that states must also design their election systems to contain "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(B).

[2] To be sure, 52 U.S.C. § 20703 does require the materials to be made available "at the principal office of their custodian." As you did not indicate that the location of any review

demand shall contain a statement of the basis and the purpose therefor." *Id.* Should an election officer refuse to comply with a demand for production under section 303, the Attorney General may sue in district court "to compel the production of such record or paper." *Id.* § 20705.

**2.**

The Attorney General may wish to investigate whether illegal aliens are being removed from voter-registration lists as part of those lists' ordinary maintenance.[3] Federal law protects the priceless value of citizenship by prohibiting illegal aliens from registering to vote or voting. Thus, for example, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") makes it a crime punishable by up to a year in prison for an alien to vote in federal elections, subject to certain exemptions not relevant here. Pub. L. No. 104-208, div. C, § 216(a)–(b), 110 Stat. 3009-546, 3009-572–73 (codified at 18 U.S.C. § 611(a)–(b)). It further provides, again with certain exceptions not relevant here, that

> [w]hoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum) . . . [s]hall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1015(f).

Although their exact scope differs, the NVRA and Voting Rights Act of 1965 also criminalize the submission of certain materially false statements when establishing one's eligibility to vote or when casting one's ballot.

---

would be an issue, we have not examined what the provision requires during an era where many voting records are maintained electronically.

[3] Other issues include whether the individuals who appear in a state's list are felons; are mentally incompetent; are not of age to vote; have not provided the required registration information; do not reside in the relevant jurisdiction; or appear in the list multiple times. *See* 52 U.S.C. § 20507(a)(3)(B), (a)(4); *id.* § 21083(a)(2)(A)(ii), (a)(2)(B)(iii), (a)(5)(A), (b)(4)(A)(i)–(iii). Federal law may vary somewhat regarding how it applies to each of these grounds for exclusion from the list. Either way, in focusing much of our discussion on alienage, we do not mean to take a position (or depart from a prior position) on such issues on behalf of the Department of Justice. We merely describe the context in which your question was raised to us.

*See* 52 U.S.C. §§ 10307(c), 20511(2). Because illegal aliens are ineligible to vote, these generally applicable laws are also implicated by an illegal alien's presence on a state's voter rolls.

### B.

To ensure (among other things) that states are complying with Congress's demand to remove those who are ineligible to vote from their rolls—whether due to illegal presence in this country or otherwise—the Division has sent states letters demanding that they produce copies of their statewide voter registration lists. Those letters reflect that the Division seeks these lists as part of what we understand to be a good-faith effort to determine whether it needs to institute enforcement actions against such states pursuant to 52 U.S.C. §§ 20510(a) and 21111. *See, e.g.*, Memorandum for Steve Hobbs, Secretary of State, State of Washington, from Harmeet K. Dhillon, Assistant Attorney General, Civil Rights Division, *Re: Request for Complete Washington's Voter Registration List with All Fields* at 1–2 (Sept. 8, 2025), https://perma.cc/6N9J-CQBB ("Dhillon Memorandum"). Specifically, the Division informed states that it demands the lists to assess each "[s]tate's compliance with the statewide voter registration list maintenance provisions of the" NVRA and HAVA, and it invoked the Attorney General's investigatory authority under the Civil Rights Act. *Id.* at 1 & n.1.

As part of that compliance-ensuring effort, the Division has proposed to share these lists with HSI or another unit within DHS, which would enable cross-referencing the lists against existing databases in order to identify illegal aliens who are ineligible to vote. Although this activity may have incidental immigration consequences by providing DHS updated information regarding the location of illegal aliens, *cf. Padilla v. Kentucky*, 559 U.S. 356, 369 (2010) (acknowledging that the collateral immigration consequences of a criminal plea or conviction can be "complex"), your staff has represented that the purpose of its activity is to facilitate ordinary list maintenance. If the search reveals that an alien unlawfully has registered to vote or voted in an election, the Division may seek to strike the alien's name from the voter registration list for future elections, refer the alien for prosecution, or both.[4] Senior leadership offices within

[4] CRT generally is authorized to enforce "all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. § 0.50(a). "Notwithstanding

the Department of Justice ("DOJ") have further represented to us that, at the time the requests were made, DOJ did not intend to use these lists for immigration enforcement.[5]

Before seeking to enforce state compliance with your letters, you asked our Office whether the Civil Rights Act allows the Attorney General to compel states to turn over statewide voter lists, and whether federal law permits the Attorney General to share those records for the purpose of investigating voter fraud. In consultation with HSI, you further asked whether federal law authorizes DHS to *receive* that information. We provided informal advice in the affirmative as to each question, which you have subsequently asked us to memorialize. We now do so.[6]

## II.

To start, we conclude that federal law authorizes the Division to compel states to produce their statewide voter registration lists regardless of whether the Division intends to share them with HSI or another unit within DHS so that DHS may cross-check them against existing databases. Such lists fall within the scope of the data that Congress has permitted the Attorney General to demand: A state's voter registration list falls within CRA section 301's scope, and no state is entitled to withhold responsive materials based on privacy or confidentiality provisions found in state law. Section 303's requirement that the Division include in its demand for such a list "a statement of the basis and the purpose therefor,"

---

the provisions of the foregoing sentence, the responsibility for the enforcement of" 18 U.S.C. § 611 and 52 U.S.C. § 10307 "is assigned to the Assistant Attorney General, Criminal Division," 28 C.F.R. § 0.50(a) (listing section 1973i of title 42, which is now section 10307), although CRT may refer matters under these statutes to the Criminal Division for prosecution, *see id.* § 0.50(d)–(e); *see also id.* § 0.55(m)(1)–(2) (Criminal Division is responsible for these matters).

[5] To be clear, we have received no information as of the time of signature that this intent has changed. But consistent with the purpose of this memorandum to record past advice, it reflects facts as we understood them at the time of our advice.

[6] We are aware that CRT's efforts have come under significant scrutiny in litigation. Consistent with this Office's longstanding practice, this memorandum reflects the facts as we understood them when we provided our advice in mid-September 2025. We address additional counterarguments raised by litigation only to explain why they do not change our prior advice.

52 U.S.C. § 20703, meanwhile, imposes relatively minimal burdens that the Division has satisfied here.[7]

**A.**

As noted above, the Civil Rights Act requires state election officers to retain for a period of twenty-two months after an election "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." CRA § 301, 74 Stat. at 88 (codified at 52 U.S.C. § 20701). Because statewide voter registration lists both "relat[e] to" voter "registration" and "come into [the] possession" of state election officers, 52 U.S.C. § 20701, they fall within section 301's scope. Moreover, nothing in section 303 allows a state to withhold or redact the voter registration list based on privacy protections in *state* law.

**1.**

A state's statewide voter registration list is perhaps the archetypical example of a "record" that "relat[es]" to voter "registration." *Id.* "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). And "[t]he ordinary meaning of" the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 566 n.1 (2011) (noting that the term "related" is "expansive"). Since a statewide voter registration list is the method by which a state records who has registered

---

[7] For the avoidance of doubt, we do not think that CRT's statement of purpose in this case is subject to judicial review. But we do not expound upon that issue here, which is subject to significant litigation and outside the scope of the question upon which we were asked to opine. *See, e.g.*, Maine's Opposition to the United States's Motion for Order to Show Cause at 11–13, *United States v. Bellows*, No. 1:25-CV-00468-LEW (D. Me. Dec. 12, 2025), Dkt. No. 55; Proposed Notice of Motion & Motion to Dismiss at 18 n.8, *United States v. Weber*, No. 2:25-CV-09149-DOC-ADS (C.D. Cal. Nov. 17, 2025), Dkt. No. 62-1.

to vote, one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute enumerates," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384)—namely, voter "registration," 52 U.S.C. § 20701.[8]

**2.**

Some might argue that, because state election officers create statewide voter registration lists,[9] those lists do not "come into [their] possession," *id.*, but this is not the best reading of the statute. Instead, the ordinary meaning of the term "possession" encompasses "enjoyment of a thing which a man holds or exercises by himself, or by another who keeps or exercises it in his name"—regardless of how such dominion is obtained. *Bouvier's Law Dictionary: Baldwin's Students Edition* 955 (1934); *see also Webster's Seventh New Collegiate Dictionary* 663 (1967 ed.) ("the act of having or taking into control"); *Webster's Third New International Dictionary* 1770 (1971 ed.) ("something owned, occupied, or controlled"). Moreover, one can "come into" possession of a thing that one created oneself; the phrase does not carry a requirement that the thing is received from a third party. 52 U.S.C. § 20701. Instead, it means simply "to acquire as a possession or achievement." *Merriam-Webster's Collegiate Dictionary* 228 (10th ed. 2002) ("*Merriam-Webster's Tenth*"); *The Random House Dictionary of the English Language* 294 (1979 ed.) ("*Random House*") ("to acquire; get"). And one may "acquire" something by creating it. *See Merriam-Webster's Tenth* at 10 (defining "acquire" as "to come into possession or control of often by unspecified means"); *Random House* at 13 ("to come into possession of; get as one's own" or "to gain for oneself through one's actions or efforts"). Case law[10]—not to mention

---

[8] For this reason, the statutory text belies any assertion that section 301 is limited to voter-created records or voter-taken action; it specifically enumerates an "application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701.

[9] *See, e.g.*, Intervenors John Schneck & Marpheen Chann's Motion to Dismiss & Memorandum in Support at 14–18, *Bellows*, No. 1:25-CV-00468-LEW (D. Me. Dec. 12, 2025), Dkt. No. 61.

[10] *See, e.g.*, *United States v. Malik*, 385 F.3d 758, 759 (7th Cir. 2004); *U.S. Coachways, Inc. v. Vaccarello*, No. 1:17-CV-05983-EK-SMG, 2018 WL 3716888, at *2

common sense[11]—amply demonstrates that it is not unusual to say that one comes into possession of a thing that one created oneself. This is particularly true when the entity that comes into possession of an item is a *state*: The item (in this case, a list) can be created by local employees, compiled by municipalities, and ultimately used by a statewide agency. The state comes into possession of the list created by local employees and compiled by municipalities.

If Congress had meant to limit section 303 to materials that a third party has provided state election officers, it had other, more specific words available. For example, ordinarily the term "receive" is used to mean "[t]o come into possession of, get, acquire, or the like, from any source outside of oneself." *Webster's New International Dictionary* 2076 (2d ed. 1958) ("*Webster's New International*"); *see also* 75 *Corpus Juris Secundum* 642–43 (Francis J. Ludes & Harold J. Gilbert eds., 1952) ("It indicates a transfer of possession from one person . . . to another . . . . [I]n order to receive there must be one person to offer and another to take."). Accordingly, Congress has made it a crime to "receive" or "possess" various items, including (depending on the circumstances) certain firearms, 26 U.S.C. § 5861; *see also* 18 U.S.C. § 926A; tobacco products, 26 U.S.C. § 5751; ransom money, 18 U.S.C. § 1202; and various weapons of mass destruction, *id.* § 2332h (radiological dispersal devices); *id.* § 175c (the variola virus). Listing both verbs would be redundant if one cannot be considered to "possess" an object merely because one has "receive[d]" it, or "g[ot it] from some outside source." *Black's Law Dictionary* 1523 (12th ed. 2024) ("*Black's Twelfth*") (defining "receive"). These definitions, read in their larger statutory context, confirm that the states "come into [the] possession" of their statewide voter registration

(E.D.N.Y. Aug. 3, 2018); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 8:10-ML-02151-JVS-E, 2010 WL 2901798, at *5 (C.D. Cal. July 20, 2010).

[11] For example, there can be little dispute that Aaron still possessed the golden calf when Moses retuned from Mount Sinai, *see Exodus* 32:1–6, 22–24; that a motor enthusiast continues to possess a kit car after it is constructed, Peter Jones, *Are Kit Cars Street Legal? Rules Explained (With Examples)*, Motor & Wheels (Oct. 23, 2023), https://perma.cc/7PAP-CXBN; or that homeowners expect to retain possession of the results of their do-it-yourself home improvements indefinitely, *e.g.*, *DIY Projects and Ideas*, Home Depot, https://perma.cc/YW59-ZW6L (last visited May 6, 2026).

lists within section 301's meaning, 52 U.S.C. § 20701, even though they create such lists themselves.[12]

To be sure, at times, Congress has used the phrase "in the possession of," *e.g.*, 30 U.S.C. § 1732(b); 6 U.S.C. § 1502(a), to reflect items that a person currently possesses. But the "construction of statutory language often turns on context, which certainly may include the definitions of related words," *FCC v. AT&T Inc.*, 562 U.S. 397, 404 (2011) (citation omitted)—not to mention "common sense," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Absent contrary indication, ordinary English language reflects that cognates—such as "possess" and "possession"—"typically reflect the meaning of corresponding" words. *AT&T*, 562 U.S. at 402. We see no such contrary indication here.

Moreover, for those who find legislative history useful or persuasive, the Civil Rights Act's accompanying House Report, too, suggests that section 303's drafters understood it to encompass "all records and papers in the possession of election officers relating to . . . act[s] requisite to voting," not just materials received from others. H.R. Rep. No. 86-956, at 6 (1959).

Unsurprisingly, then, courts long have recognized that section 301 encompasses materials in a state election officer's possession regardless of whether he received them from another or created them himself. *See, e.g.*, *Kennedy v. Lynd* ("*Lynd II*"), 306 F.2d 222, 227 (5th Cir. 1962); *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960), *aff'd sub nom.*, *Dinkens v. Att'y Gen.*, 285 F.2d 430 (5th Cir. 1961). Indeed, courts specifically have recognized that section 301 encompasses "records of voting registration," *United States v. Mississippi*, 380 U.S. 128, 134, 136–38 (1965), including voter registration lists, *see, e.g.*, *United States v. Maine*, No. 1:06-CV-0086-JAW, 2007 WL 1059565, at *5 (D. Me. Apr. 4, 2007); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985).

---

[12] We are aware that, since the time we originally conveyed our advice, at least one court has held the opposite. *See United States v. Benson*, No. 1:25-CV-01148-HYJ-PJG, 2026 WL 362789, at *9–10 (W.D. Mich. Feb. 10, 2026). Because rulings in these cases postdate the informal advice we have since been asked to memorialize, we do not discuss them at length in this memorandum. Consistent with our ongoing obligation to provide our best view of the law to the Executive Branch, we have continued to monitor the evolving litigation landscape. As of the date of this memorandum's signing, none of these cases has provided reasoning that has led us to doubt or revise our advice from last fall.

In reaching this conclusion, courts have recognized that limiting section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. That is, section 303 was "designed to secure a more effective protection of the right to vote" by enabling "preliminary investigations of registration practices . . . in order to determine whether or not such practices conform to constitutional principles." *Gallion*, 187 F. Supp. at 853.[13] Interpreting section 301 to exclude materials that state election officers have created themselves—including statewide voter registration lists—would subvert that purpose by frustrating the Division's ability to acquire evidence that could shed light on whether a violation of the law has occurred. And though purpose cannot overcome plain text, courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers.'" *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson v. United States*, 400 U.S. 517, 533 (1971)); *accord N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

**3.**

Section 303 does not permit a state to redact or withhold any information from its statewide voter registration list based on privacy or confidentiality provisions of state law. Section 303's scope "is sweeping," *Lynd II*, 306 F.2d at 226, providing without qualification that "[*a*]*ny* record or paper required by [section 301] to be retained and preserved *shall*" be produced. 52 U.S.C. § 20703 (emphases added). Because that mandatory language preempts contrary state law, a state must produce information that lies within section 303's scope upon demand—period.

"Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*,

---

[13] *See also, e.g.*, *Lynd II*, 306 F.2d at 228 ("Its purpose is to enable the Attorney General to determine whether . . . actions should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed."); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962) ("The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred."), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

520 U.S. 1, 5 (1997) (quoting *Webster's Third New International Dictionary* 97 (1976)). Although Congress *could* have included a saving provision for state privacy laws, *see, e.g.*, 18 U.S.C. § 1838; 42 U.S.C. § 300jj-19(c)(4), "Congress did not add any language limiting the breadth of that word," *Gonzales*, 520 U.S. at 5, in enacting section 303.

To the extent of an irreconcilable conflict between section 303 and state-law privacy or confidentiality protections, section 303 wins. The Constitution's Supremacy Clause provides that "the Laws of the United States which shall be made in Pursuance" of the Constitution "shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "This means that when federal and state law conflict, federal law prevails and state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018); *see also Preemptive Effect of Defense Production Act Order on State Law*, 50 Op. O.L.C. __, at *4, *7–9 (Mar. 3, 2026). State privacy laws that require election officials to withhold or redact information that Congress has mandated they produce are thus "preempted because [they] impose[] a duty that [i]s inconsistent . . . with federal law." *Murphy*, 584 U.S. at 478; *see also Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) ("[S]tate law [is] impliedly pre-empted where it is 'impossible for a private party to comply with both state and federal requirements.'" (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990))).

A state seeking to withhold information it deems private or confidential from its response to a section 303 demand will not find support in the Elections Clause. To the contrary, that Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives[] shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators." U.S. Const. art. I, § 4, cl. 1. As described to the people of New York before ratification, that provision "authorises the national Legislature to regulate in the last resort the election of its own members," and ensures that the Constitution "contain[s] in itself the means of its own preservation." *The Federalist* No. 59, at 397–98 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (emphasis omitted). Far from creating a special rule of state power to override Congress, "the federalism concerns" surrounding preemption "are somewhat *weaker*"

under the Elections Clause precisely because "the [s]tates' role in regulating congressional elections . . . has always existed subject to the express qualification that it '*terminates* according to federal law.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14–15 (2013) (emphasis added) (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)). That is, the Elections Clause is a rare instance in which the Framers granted Congress "a revisionary power . . . to counter state legislatures." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2495 (2019).

To be sure, as with other aspects of "the regulation of elections for the Federal Government," the Framers granted authority "in the first instance to the local administrations; which in ordinary cases, and when no improper views prevail, may be both more convenient and more satisfactory." *The Federalist* No. 59, at 399. But "whenever extraordinary circumstances might render [an] interposition necessary to its safety," *id.*, a state's authority to protect the privacy or confidentiality of election-related personal information must yield to Congress's superior authority under the Clause, *see Ex parte Siebold*, 100 U.S. (10 Otto) 371, 384 (1880); *Inter Tribal Council*, 570 U.S. at 14—not to mention the Fourteenth and Fifteenth Amendments, *see City of Rome v. United States*, 446 U.S. 156, 179–80 (1980)—to require that states produce the materials unredacted.

One counterargument is that courts "sometimes" presume that federal law does not preempt state law "unless that was the clear and manifest purpose of Congress." *Inter Tribal Council*, 570 U.S. at 13 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). But for at least three reasons, such a presumption cannot justify withholding or redacting information sought under section 303.

*First*, the Elections Clause, *see* U.S. Const. art. I, § 4, cl. 1, authorizes Congress to enact regulations that displace state law. Such regulations include those "relating to 'registration,'" *Inter Tribal Council*, 570 U.S. at 8–9 (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)), such as section 303, *see Gallion*, 187 F. Supp. at 853 & n.6. On its face, the Elections Clause "empower[s] Congress to override state election rules." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 814–15 (2015). "Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive in-

tent," free from any presumption about preemption one way or another. *Inter Tribal Council*, 570 U.S. at 14.

*Second*, presuming Congress did not intend to preempt state privacy laws would be irreconcilable with the context of section 303. After all, Congress enacted section 303 for the "clear and manifest purpose," *Inter Tribal Council*, 570 U.S. at 13 (citation omitted), of overcoming the "refusal of some State and local authority to permit such inspection," H.R. Rep. No. 86-956, at 7; *see also, e.g.*, *Message to Congress*, Pub. Papers of Pres. Dwight D. Eisenhower at 166 (1959). And far from leaving the effectiveness of federal investigations to the vagaries of state privacy laws, Congress has in the Civil Rights Act, together with the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 ("Privacy Act"), created "a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies." *FAA v. Cooper*, 566 U.S. 284, 287 (2012). This scheme lays out in full what Congress itself has deemed to be adequate privacy and confidentiality protections for election-connected information. The states need not supplement them—and, in this case, cannot. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001); *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943).

*Third*, even when one applies the presumption against preemption, that presumption only presumes that Congress did not intend to preempt "innocuous" rules, which burden federal law only in "incidental" ways. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 325 (2016). The same presumption would not apply to "a state law that enters a fundamental area of [a federal] regulation" or that "counters the federal purpose." *Id.* at 325–26. In this instance, any applicable state-law privacy or confidentiality provision would enter "a fundamental area" of section 303, *id.*, because it would require a state to withhold the very material that section 303 requires a state to produce on demand, such that the presumption against preemption simply would be rebutted. *See id.* at 325; *see also Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148–50 (2001). Thus, even if the presumption against preemption would otherwise apply (and it would not), it does not justify the redaction or withholding of information that Congress specifically required states to provide.

**B.**

Based on the facts as they have been communicated to us, the Division can also satisfy section 303's requirement that a "demand shall contain a statement of . . . the purpose therefor." 52 U.S.C. § 20703. Because the Civil Rights Act does not limit the purposes for which the information may be sought (or on what basis), this requirement imposes a minimal burden. And an effort to ensure that states are complying with the NVRA's and HAVA's list-maintenance requirements is a proper "purpose" for demanding that the states produce those lists. *Id.*

**1.**

The Civil Rights Act imposes only one requirement when it comes to such a demand for information: that the Attorney General state his "purpose," *id.*—that is, his "object to be attained" or "end or aim to be kept in view," *Webster's New International* at 2018. Congress could have limited the purposes for which the Division may invoke section 303. "But that is not the text of the statute Congress enacted." *Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207, 215 (2012). And we generally "resist reading words or elements into a statute that do not appear on its face," *Duty to Report Suspected Child Abuse Under 42 U.S.C. § 13031*, 36 Op. O.L.C. 167, 181 (2012) ("*Duty to Report*") (quoting *Dean v. United States*, 556 U.S. 568, 572 (2009)), as doing so would violate the "fundamental principle of statutory interpretation that 'absent provisions cannot be supplied by'" an interpreter, *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019) (alteration accepted) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012)).[14]

Nor can we infer that section 303 may be used only for the purpose of enforcing the Civil Rights Act itself. After all, much of that law is about issues besides voting, *see* CRA, tits. II, V, VII, 74 Stat. at 86–88, 89–90, 92, and title III (in which section 303 is located) imposed no new substantive requirements on states or localities with respect to voting, *see generally*

[14] *See also, e.g.*, *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 701–02 (1995); *Howe v. Smith*, 452 U.S. 473, 480–82 (1981); *Detroit Tr. Co. v. The Thomas Barlum*, 293 U.S. 21, 37–38 (1934).

*ally id.*, tit. III, 74 Stat. at 88–89.[15] Since the availability of records under section 303 is tied to acts requisite to voting, limiting the set of permissible purposes for section 303 demands to those that enforce provisions that have nothing to do with voting would render the provision a nullity. "It is an 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'" *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 510 n.22 (1986) (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)); *see also, e.g.*, *United States v. Tohono O'odham Nation*, 563 U.S. 307, 315 (2011); *Dublino*, 413 U.S. at 419–20.

Limiting the statute's scope by atextual interpretive "supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske*, 140 S. Ct. at 361. Other statutes authorize agencies to obtain certain materials for only specified purposes.[16] "So if we needed any proof that Congress knew how to" limit the purposes for which an agency can obtain information "when it meant" to do so, "here we find it." *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012); *see also United States v. Shabani*, 513 U.S. 10, 14 (1994) ("In light of this additional element in [one] statute, Congress' silence in [a different statute] speaks volumes."). Congress chose not to do so here.

**2.**

One counterargument rests on legislative history indicating that Congress enacted section 303 to provide DOJ with additional tools to enforce existing voting laws, including the voting provisions of the Civil Rights Act of 1957, Pub. L. No. 85-315, pt. IV, 71 Stat. 634, 637–38, which was

[15] Title VI of the Civil Rights Act admittedly expanded the *remedies* available when a court finds a deprivation of certain preexisting rights or privileges with respect to voting, but it does not create any such rights or privileges. *See* CRA, tit. VI, 74 Stat. at 90–92.

[16] *See, e.g.*, 8 U.S.C. § 1446(b) ("For [the] purposes" of "conduct[ing] examinations upon applications for naturalization," an agency "is authorized . . . to require by subp[o]ena the attendance and testimony of witnesses" and "production of relevant books, papers, and documents."); 12 U.S.C. § 1467a(g)(2) ("any investigation under this section"); 29 U.S.C. § 2616(d) ("any investigation provided for in this section"); 46 U.S.C. § 12140(b)(1) ("any investigation conducted under this section"); 50 U.S.C. § 4101(c)(1) ("any hearing, examination, or investigation under this subchapter").

the first "civil rights measure to pass the Congress in 85 years," *Statement by the President Upon Signing the Civil Rights Act of 1960*, Pub. Papers of Pres. Dwight D. Eisenhower 398, 398 (May 6, 1960) ("*Statement*"). For example, the House Report accompanying the CRA observed that "[e]xperience has shown the need for this legislation," because "lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit" rendered "the authority of the Attorney General . . . relatively ineffective." H.R. Rep. No. 86-956, at 7. Others involved in the legislation echoed this sentiment.[17] We are unpersuaded.

For one, this would be a novel way to read a statutory provision. As even a court that has since disagreed with our advice has recognized, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." *Benson*, 2026 WL 362789, at *8. To the contrary, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133. "Th[e] classic [interpretive] task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988).

It would be particularly problematic to apply such a view to a procedural statute that, on its face, stretches across different substantive protections. Congress can and does adopt procedures to enforce substantive legal rules already on the books and then modifies or adds to those legal rules without changing the legal scheme. For example, Congress passed the Administrative Procedure Act ("APA") in 1946, Pub. L. No. 79-404, 60 Stat. 237, *amended by*, Pub. L. No. 89-554, 80 Stat. 378 (1966), to govern federal agency action as it enforced existing organic statutes, *see*

---

[17] *See Statement* at 398 ("One provision, which requires the retention of voting records, will be of invaluable aid in the successful enforcement of existing voting rights statutes."); *Special Message to the Congress on Civil Rights*, Pub. Papers of Dwight D. Eisenhower 164, 166 (Feb. 5, 1959) ("*Message to Congress*") (calling for "[s]upplemental legislation" to address "[a] serious obstacle" to the 1957 law); S. Rep. No. 86-1205, at 2 (1960) (noting that the 1957 law failed to "provide sufficient mechanisms and alternatives to overcome systematic disfranchisement").

Admin. Conf. of the U.S., *Administrative Procedure Act*, https://perma.cc/8ALK-D9Q7 (last visited May 6, 2026) (providing a brief overview of the APA and its history). The APA has never been understood as applying only to the agencies that existed when Congress enacted it, and no court has suggested that subsequently created agencies need not heed its dictates. *Id.*; *see also* 5 U.S.C. § 551(1) (providing expressly which kinds of agencies are exempted from the APA's rules). Rather, agencies that Congress created quite recently still abide by that 80-year-old statute. *Compare, e.g.*, Homeland Security Act of 2002, Pub. L. No. 107-296, § 101, 116 Stat. 2135, 2142 ("Homeland Security Act" or "HSA") (establishing the Department of Homeland Security), *with, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (applying the APA to DHS actions).

For another, legislative history "can assist in" the interpretive process "to the extent [that it] demonstrate[s] the manner in which the public used or understood a particular word or phrase," *McDonald v. City of Chicago*, 561 U.S. 742, 828 (2010) (Thomas, J., concurring in part and concurring in judgment); *see also Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 50 (1911) (substantively similar), but "legislative history is not the law," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). Rather, when interpreting a statute, the "proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where, as here, that examination yields a clear answer, [we] must stop." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (citation omitted).[18]

But even taking this legislative history on its own terms, it shows at most that Congress intended section 303 to aid DOJ in enforcing existing voting laws—not that Congress meant section 303 to be unavailable for enforcing other laws within DOJ's jurisdiction, including voting laws that Congress would enact in the future such as the NVRA or HAVA.

---

[18] *See also, e.g.*, *Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 809 (1989) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 618 (2013) (Scalia, J., concurring in part and dissenting in part) ("We do not inquire what the legislature meant; we ask only what the statute means." (quoting Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899))).

"[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Congress might have had in mind voting laws that were already on the books (and the 1957 law in particular) when it enacted section 303, but "Congress for cogent reasons chose to enact a more general statute, one which, although it had [existing voting rights laws] as its focus, was not limited in application" to those laws. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248 (1989).

If anything, other aspects of section 303's legislative history demonstrate that it does *not* limit the purposes for which it can be used to enforce preexisting voting statutes. For example, an early version of what eventually would become section 303 would have authorized DOJ, when "conducting any investigation in carrying out the powers and authority conferred in [section 131(c) of the 1957 law] . . . , to require by subp[o]ena the production of such [materials] as may be relevant or material to such investigation." S. 499, 86th Cong. § 301 (1959). As enacted and signed into law, section 303 conspicuously omits that limitation. *See* CRA § 303, 74 Stat. at 88 (codified at 52 U.S.C. § 20703). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–42 (1987) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 392–93 (1980) (Stewart, J., dissenting)); *see also, e.g.*, *Russello*, 464 U.S. at 23–24; *Gen. Acct. Off. v. Gen. Acct. Off. Pers. Appeals Bd.*, 698 F.2d 516, 525 n.52 (D.C. Cir. 1983).[19]

[19] "[F]loor statements by individual legislators rank among the least illuminating forms of legislative history," *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017), even when made by sponsors of the bill, *see Brnovich*, 141 S. Ct. at 2350 (rejecting a "cat's paw" theory of legislative history as inconsistent with legislators' "duty to exercise their judgment and to represent their constituents"). But for those who find such materials helpful, *see, e.g.*, *Corley v. United States*, 556 U.S. 303, 317–20 (2009), "one of the principal spokesmen for the bill in the Senate," *Coleman*, 313 F.2d at 868, unequivocally stated that "[c]learly a sufficient statement would be the assertion that the demand was made for the purpose of investigating possible violations of a Federal statute," 106 Cong. Rec. 7767 (1960) (Sen. Kenneth Keating).

**3.**

Even if section 303 *were* limited to enforcing voting-rights legislation, the Division's stated purpose here would satisfy this minimal burden. In each section 303 demand to the states, the Division stated that it requests the state's statewide voter registration list "to assess [the] state's compliance with the statewide [list-]maintenance provisions of the NVRA." *E.g.*, Dhillon Memorandum at 1. Although perhaps aimed at a larger group of states than has been done in the past, this request is entirely in line with the Division's historical practice of invoking section 303 to demand materials, including statewide voter registration lists, from the states when enforcing a variety of voting statutes. These statutes include both the NVRA and HAVA, as well as the Voting Rights Act of 1965 and the Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. No. 99-410, 100 Stat. 924 (1986).[20] That level of application is to be expected: Even assuming that section 303 is limited to enforcement of voting statutes, bringing it to bear on the NVRA's and HAVA's list-maintenance provisions, which are designed to ensure that only those who are entitled to vote actually do so, is consistent with such a limitation.

We do not think that the Division's decision to use the statewide voter-registration lists to investigate voter fraud (whether by illegal aliens or otherwise) alters this analysis. By requiring that a demand specify "*the* purpose therefor," 52 U.S.C. § 20703 (emphasis added), section 303 "uses the definite article to reference the particular" purpose that the Division had for making it, *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433, 1440 (2023). The Division has represented to us that it decided to use the voter registration lists to investigate voter fraud, including by illegal aliens, only after issuing the section 303 demands in question. A secondary purpose such as this does not, in our view, constitute part of "*the* purpose" for these demands that section 303 requires the Division to state. 52 U.S.C. § 20703 (emphasis added); *cf. TIG Ins. Co. v. Republic of*

---

[20] *See, e.g.*, Letter for R. Tamar Hagler, Chief, Voting Section, Civil Rights Division, from Michael L. Jones Jr., General Counsel, Office of the Secretary of State of Alabama at 1 (Sept. 19, 2024); Order at 2, *United States v. Alabama*, No. 2:08-CV-00920-WKW-CSC (M.D. Ala. Mar. 27, 2009), Dkt. No. 24; Memorandum of Understanding Between the Department of Justice and the Office of the Texas Secretary of State (May 13, 2008), https://perma.cc/GEL3-2287; Consent Judgment & Decree, *United States v. Georgia*, No. 1:06-CV-02442-CC (N.D. Ga. Oct. 27, 2006), Dkt. No. 4.

*Argentina*, 967 F.3d 778, 783 (D.C. Cir. 2020) (noting that, under "the usual rules governing civil litigation, . . . district courts generally assess facts at the time of filing"). Regardless, such a purpose is permissible under section 303 given that, as explained, section 303 does not limit the purposes for which the Division may invoke it. And, beyond this fact, even were section 303 limited to the enforcement of voting statutes, statutes that criminalize voter fraud would satisfy any such condition.

### C.

The Division also has articulated a valid "basis" for its demands that States produce their statewide voter registration lists. 52 U.S.C. § 20703. Again, this is a fairly minimal requirement, which the Division satisfied in saying that it requests the state's statewide voter-registration list "to assess [the] state's compliance with the statewide [list-]maintenance provisions of the NVRA." *E.g.*, Dhillon Memorandum at 1.

The general rule is that an administrative subpoena's validity does not turn on "the strength of the underlying complaint." *McLane Co. v. EEOC*, 581 U.S. 72, 76 (2017); *see also EEOC v. Shell Oil Co.*, 466 U.S. 54, 72 n.26 (1984) (noting that an administrative subpoena's validity does not depend on the underlying charge being "'well founded' or 'verifiable'" (citation omitted)). Congress often empowers a federal agency to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950). That general rule applies here because section 303 demands are in the nature of "subpoenas." Aram A. Gavoor & Steven A. Platt, *Administrative Investigations*, 97 Ind. L.J. 421, 434 & n.94 (2022); *see also Black's Twelfth* at 1732 (noting that an "administrative subpoena" is "issued by an administrative agency to compel an individual to provide information to the agency").

Congress knows how to depart from that general rule: It can condition an agency's authority to compel the production of materials on the agency's demonstration of adequate grounds to believe that a legal violation has occurred. The Stored Communications Act, Pub. L. No. 99-508, tit. II, 100 Stat. 1860 (1986), *amended by* Pub. L. No. 103-414, § 207(a)(2), 108 Stat. 4279, 4292 (1994), for example, authorizes the government to obtain certain communications or records thereof only if it "offers specific and articulable facts showing that there are reasonable grounds to believe" the

materials sought "are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Another provision of that statute requires a warrant. *See id.* § 2703(a). When sought from a federal district court, that warrant must be issued pursuant to the Federal Rules of Criminal Procedure, *see id.*, which require a showing of "probable cause," Fed. R. Crim. P. 41(d)(1). And another statute allows the Federal Bureau of Investigation to obtain a court order for acquiring certain records only if it "specif[ies] that . . . there are specific and articulable facts giving reason to believe that the person to whom the records pertain is a foreign power or an agent of a foreign power." 50 U.S.C. § 1862(b)(2). Section 303's absence of any similar requirement is revealing. *See Duty to Report*, 36 Op. O.L.C. at 181; *Rotkiske*, 140 S. Ct. at 360–61.

Here, Congress instead requires only that the Attorney General (or his designee) offer a "basis"—that is, "foundation" or "support"—for a section 303 demand. *Oxford Dictionary of English Etymology* 77 (1966). A section 303 demand does not require "detailed information" or "specific details of voter discrimination," *United States v. Lynd* ("*Lynd I*"), 301 F.2d 818, 822 (5th Cir. 1962),[21] and cannot be defeated for purportedly lacking a "proper basis" merely by virtue of election officials denying that a violation has occurred, *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962). Further, reading such a requirement into section 303 would frustrate the statute's "very purpose," which "is to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if . . . the facts thus discovered should justify doing so." *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 201 (1946); *see also Lynd II*, 306 F.2d at 225, 228; *Coleman*, 208 F. Supp. at 200–01; *Gallion*, 187 F. Supp. at 853.

Nor does Congress require a demand's "basis" to be distinct from its "purpose." Section 303's use of the terms "basis" and "purpose" reflects "a lawyerly penchant for doublets (aid and abet, cease and desist, null and void)." *King v. Burwell*, 576 U.S. 473, 502 (2015) (Scalia, J., dissenting);

---

[21] True, in *Lynd I*, the Fifth Circuit stated that a "simple assertion . . . that there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county" was a sufficient condition that justifies the request. 301 F.2d at 822. But *Lynd I* did not hold that "a sufficient condition" to justify a section 303 demand was also "a necessary one" to justify any request. *Clark v. Arizona*, 548 U.S. 735, 753 (2006).

*accord Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation*, 49 Op. O.L.C. __, at *8 n.3 (Mar. 14, 2025) (same). That is, section 303's use of the phrase "the basis and the purpose therefor" is best understood to require the Attorney General or his designee to tell a state what he is looking for and a high-level explanation as to why. *See* 52 U.S.C. § 20703. As a result, as in other legal contexts, the same explanation can furnish both an action's "conceptual basis and purpose[]." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 533–34 (1984); *see also, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 841 (1985) (Marshall, J., concurring in judgment).

Contrary to one counterargument we have seen,[22] such an interpretation does not improperly render the term "basis" superfluous. "Doublets in our language of the law often are not redundancies but rather the result of the merger of the Anglo-Saxon and Norman French strands of modern day legal English," Paul Brickner, *How Judges Think*, 59 Case W. Rsrv. L. Rev. 793, 800 (2009) (book review),[23] and thus often function "as a single unit of analysis to convey only a single meaning," Ethan J. Leib & James J. Brudney, *The Belt-and-Suspenders Canon*, 105 Iowa L. Rev. 735, 741 (2020). This grammatical usage, unsurprisingly, tracks investigative reality: Although the "basis" of an investigation can be distinct from its "purpose" if someone approaches investigators with a specific factual reason to think records will reveal wrongdoing, it is common in the early days of an investigation for the "basis" of the inquiry to overlap with its "purpose," especially when an agency undertakes the investigation simply to ensure that the law is being followed. In this instance, the purpose for asking for the lists is to investigate states' NVRA and HAVA compliance, and the basis for asking for the lists is that they contain critical evidence in assessing NVRA and HAVA compliance, which Congress has tasked

[22] *See, e.g.*, Maine's Motion to Dismiss at 14–16, *Bellows*, No. 1:25-CV-00468-LEW (D. Me. Dec. 12, 2025), Dkt. No. 54.

[23] In the Norman Conquest's wake, "official proceedings were conducted in Norman French, while the parties themselves almost invariably spoke Old English, a Germanic tongue. This led to the practice of including both the French and Old English words in every critical phrase in a document." Drury Stevenson, *Forensic Linguistics: An Introduction to Language in the Justice System*, 77 U. Colo. L. Rev. 257, 261 (2006) (book review).

the Division with investigating. And, as already noted, section 303 does not require the Division to have some pre-existing level of suspicion to justify an investigation. *McLane Co.*, 581 U.S. at 76; *EEOC*, 466 U.S. at 72 n.26.

Even if a section 303 demand's "purpose" is legally distinct from its "basis," and "the same [information] may prove two separate elements, this does not mean that the two elements collapse into one." *Boyle v. United States*, 556 U.S. 938, 950 n.5 (2009).[24] For example, the Division's purpose may be to investigate whether a state is failing to adequately maintain its voter rolls, or improperly imposing a poll tax, but the investigation's starting point may be "reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county" within that state. *Lynd I*, 301 F.2d at 822. As a practical matter, such circumstances may be rare, but "[l]anguage in a statute is not rendered superfluous merely because in some contexts that language may not be pertinent." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *see, e.g.*, *Kawashima v. Holder*, 565 U.S. 478, 488 (2012); *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 545–46 (1994).[25]

## III.

Having concluded that section 303 allows the Division to seek statewide voter registration lists, you also asked us whether the Privacy Act, Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, tit. XXX, 108 Stat. 2099 ("Driver's Privacy Protection Act"), or E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899

[24] *See also, e.g.*, *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 781 (6th Cir. 2000) ("[T]he plaintiff may allege the separate elements . . . through the same facts . . . ."); *Vitaline Corp. v. Gen. Mills, Inc.*, 891 F.2d 273, 275 (Fed. Cir. 1989) ("Although abandonment requires both non-use and intent not to resume use of the mark, the element of intent can be established inferentially by the same facts that establish non-use."); *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985) ("[S]eparate elements . . . may be proved by the same evidence.").

[25] Even if this were not the case, the canon against surplusage does not compel such a construction, as it "is not an absolute rule" and "certainly does not require us to favor an unusual meaning that will avoid surplusage over a more natural one." *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2066 (2025) (cleaned up); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) ("The canon against surplusage is not an absolute rule" and "has considerably less force in" some contexts than in others.).

("E-Government Act"), prevent the Division from obtaining these lists (in whole or in part). We advised that they do not.

### A.

The Privacy Act's limitation on an agency's ability to maintain records that "describ[e]" the exercise of First Amendment rights, 5 U.S.C. § 552a(e)(7), does not prevent the Division from retaining statewide voter registration lists under section 303. Even if we assume the Privacy Act is implicated by these lists, the Division's demands fall within the scope of an authorized law enforcement activity. These lists also fall within the scope of a published Privacy Act System of Records Notice ("SORN"). And finally, the Privacy Act's restrictions on disclosure for use in a computer-matching program do not apply here.

#### 1.

For agencies that maintain records systems, the Privacy Act provides that federal agencies can "maintain no record describing how any individual exercises rights guaranteed by the First Amendment" unless the record falls within a specified exception. *Id.* § 552a(e)(7). It is clear that the First Amendment protects the "rights of voters." *Burdick*, 504 U.S. at 434; *see also generally* Armand Derfner & J. Gerald Hebert, *Voting Is Speech*, 34 Yale L. & Pol'y Rev. 471 (2016). It is far *less* clear that statewide lists of who is registered to vote "describ[e] how any individual exercises" that right. 5 U.S.C. § 552a(e)(7). Assuming they do, however, the Division may retain them in this instance, as the Division's actions are "within the scope of an authorized law enforcement activity" for two independent reasons—necessarily implying that they can *obtain* the materials consistent with the Privacy Act. *Id.*

*First*, enforcing the NVRA's and HAVA's list-maintenance requirements satisfies the Privacy Act law enforcement exception regardless of whether either statute carries criminal penalties. The NVRA and HAVA are laws that the DOJ may enforce through "declaratory or injunctive relief." 52 U.S.C. § 20510(a) (NVRA); *id.* § 21111 (HAVA). Both Congress and the courts have recognized that "law enforcement" extends beyond "investigation of . . . criminal activity." *Jabara v. Webster*, 691 F.2d 272, 280 (6th Cir. 1982) (finding that 5 U.S.C. § 552a(e)(7)'s excep-

tion for authorized law-enforcement activities is not limited "to investigation of . . . criminal activity").

*Second*, even if the potential for criminal penalties were necessary (and they are not here), we understand that the Division further intends to use the voter-registration lists to identify those (including illegal aliens) who are ineligible to vote. "Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government," *United States v. Nixon*, 418 U.S. 683, 694 (1974); *see also* 28 U.S.C. §§ 516, 533(1), 547(1), including the enforcement of federal statutes that ban voter fraud, *see* 18 U.S.C. § 1015(f); 52 U.S.C. § 20511(2). And by regulation, the Division has been delegated powers to assist in that effort. *See* 28 C.F.R. § 0.50(a).[26] Because the Division's proposed uses of the lists are "pertinent to and within the scope of an authorized law enforcement activity," 5 U.S.C. § 552a(e)(7), the Privacy Act permits the Division to retain them.

**2.**

At the time of the Division's demands, its collection of statewide voter registration lists also satisfied the Privacy Act's requirement that each agency maintaining a system of records shall "publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records"—that is, a SORN. *Id.* § 552a(e)(4). That "notice shall include," as relevant here, both "the categories of individuals on whom records are maintained in the system" and "the categories of records maintained in the system." *Id.* We understand, based on our conversations with CRT, that the Division intends to retain the lists sought in a system of records known as the "Central Civil Rights Division Index File and Associated Records" ("Central Index File"). *See* Privacy Act of 1974; Systems of Records, 68 Fed. Reg. 47,610, 47,611 (Aug. 11, 2003). Because a published SORN has covered both the categories of individuals who appear in the lists and the lists themselves, the Division's collection of the lists satisfies the Privacy Act's SORN requirements.

[26] By regulation, the Criminal Division enforces 18 U.S.C. § 611 and 52 U.S.C. § 10307. *See* 28 C.F.R. §§ 0.50(a)(1)–(2), 0.55(m)(1)–(2). Thus, we do not consider these statutes in our analysis of 5 U.S.C. § 552a(e)(7) as they apply to matters CRT enforces.

*First*, the SORN that announced the Central Index File's establishment states that "categories of individuals covered by the system . . . may include: [s]ubjects of investigations" and "victims." 68 Fed. Reg. at 47,611 (capitalization omitted). Both of these categories cover persons who appear in the lists.

The term "subject" is a "term[] of art in the context of DOJ investigations," *Am. Oversight v. DOJ*, 45 F.4th 579, 582 n.2 (2d Cir. 2022), which, for as long as the relevant SORN has existed, has included anyone whose "conduct is within the scope of the . . . investigation," Justice Manual § 9-11.151 (Jan. 2020), https://perma.cc/9HVT-HLZC.[27] Standing in contrast to a "target"—who is considered "a putative defendant" because of "substantial evidence" linking that individual to a crime, *id.*—a "subject's" conduct may be entirely "innocent." *Am. Oversight*, 45 F.4th at 594 n.19. "Here, the context of these words—the water in which they swim—indicates that [the SORN] used them as terms of art." *United States v. Hansen*, 143 S. Ct. 1932, 1943 (2023). The Justice Manual "sets forth internal [DOJ] policies and procedures" for all Department components, Justice Manual § 1-1.100 (Mar. 2024), https://perma.cc/9JXJ-2X9U—including the Division, the author of the SORN, *cf. id.* § 8-1.010. Context thus suggests that the SORN uses the term "subject" to mean a person whose conduct is within an investigation's scope.[28]

Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into voter fraud. The Division has represented to us that it must examine every individual entry in a statewide voter registration list to determine whether the list satisfies

[27] *See* United States Attorneys' Manual § 9-11.150 (Oct. 1, 1990); United States Attorneys' Manual § 9-11.260 (Apr. 4, 1985). Because DOJ renamed *United States Attorneys' Manual* to *Justice Manual* in 2018, *see Justice Manual*, Dep't of Just., https://perma.cc/387L-XCEY, we refer to it herein as "the Manual."

[28] Even if "[s]ubjects of investigations" were *not* a term of art, 68 Fed. Reg. at 47,611, we would still look to the Manual. It "was compiled by experts in the field of federal prosecution for the guidance of professionals in that field," *In re North*, 11 F.3d 1075, 1077 (D.C. Cir. 1993), making its longstanding provisions represent "a body of experience and informed judgment to which [interpreters] may properly resort for guidance." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

the NRVA's and HAVA's list-maintenance requirements. *Accord* 52 U.S.C. § 20507(a)(3)(B), (a)(4); *id.* § 21083(a)(2)(A)(ii), (a)(2)(B)(iii), (a)(5)(A), (b)(4)(A)(i)–(iii). These persons' registrations thus are "within the scope of the [Division's] investigation" of a state's compliance with the NVRA's and HAVA's list-maintenance requirements. Justice Manual § 9-11.151.

Moreover, legitimate voters who appear on these lists are the potential "victims" of voter fraud, 68 Fed. Reg. at 47,611, which "deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process," 52 U.S.C. § 20511(a)(2). Their role in the electoral process suffers "unlawful 'dilution,'" *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 304–05 (1978) (opinion of Powell, J.) (citing *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144 (1977)), which can be severe enough to "affect the outcome of a close election," *Brnovich*, 141 S. Ct. at 2340. Although often downplayed in public discourse, courts have repeatedly recognized that "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell*, 549 U.S. at 4 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).[29] As such, persons who appear legitimately in the voter-registration lists are potential victims within the SORN's meaning.

*Second,* the same SORN also covers the statewide voter registration lists themselves, which include "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the . . . Division." 68 Fed. Reg. at 47,611. For the reasons already discussed, these lists "relat[e]" to efforts by the Division to "enforce[] . . . civil rights laws." *Id.*; *see supra* Part II.A.1. The lists thus fall within the SORN's scope, satisfying this aspect of the Privacy Act.

A counterargument could be that the Division's proposed *collection* of the voter rolls does not satisfy the SORN requirement unless HSI's SORN

---

[29] *See also, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion); *Anderson v. United States*, 417 U.S. 211, 226–27 (1974); *Gray v. Sanders*, 372 U.S. 368, 379–81 (1963); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 952 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

(or that of another component within DHS for that matter) similarly encompasses the lists' data. Not so. An agency must publish a new SORN whenever it "establish[es] or revis[es]" a "system of records," 5 U.S.C. § 552a(e)(4), a term defined in relevant part as "a group of any records under the control of any agency," *id.* § 552a(a)(5). The Division has represented to us that DOJ will access an account on DHS's Systematic Alien Verification for Entitlements system that DOJ controls and that belongs to DOJ for oversight and audit functions. DOJ will upload the files for a DHS employee to access individual records; no one at DHS will download the lists to a server or place them in a directory that it controls. If events occur as thus described, review of names from the lists would not appear to entail placing the lists in a DHS "system of records"—that is, a group of records under DHS's "control." *Id.* Because such read-only access neither "establish[es]" nor "revis[es]" a DHS "system of records," the lists need not fall within the scope of any DHS SORN at all. *Id.* § 552a(e)(4). The Division has thus complied with the only SORN requirement to which the demand is subject.

**3.**

The Division's efforts similarly do not run afoul of the Privacy Act's bar against the provision of information "for use in a computer matching program," *id.* § 552a(o)(1), as one commentator has suggested.[30] At a high level, a "matching program" involves "any computerized comparison" between either (i) federal and non-federal records to make certain eligibility or recoupment decisions "with respect to[] cash or in-kind assistance or payments under Federal benefit programs," or (ii) "two or more automated Federal personnel or payroll systems of records or a system of Federal personnel or payroll records with non-Federal records." *Id.* § 552a(a)(8)(A). The Privacy Act further defines the phrase "Federal benefit program" as encompassing "any program administered or funded by the Federal Government, or by any agent or State on behalf of the Federal Government, providing cash or in-kind assistance in the form of payments, grants, loans, or loan guarantees to individuals." *Id.* § 552a(a)(12).

[30] *See* Justin Levitt, *The Recent Rash of DOJ Voter File "Requests,"* Election L. Blog (July 18, 2025), https://perma.cc/9AHQ-GURL.

As we understand the facts, the Division's efforts to obtain information from the states do not run afoul of this prohibition because the Division would not use such lists for any prohibited purpose. As the lists are not personnel or payroll records, they fall entirely outside section 552a(a)(8)(A)(ii). And, even if done electronically, collection and review of statewide voter registration lists to enforce the NVRA and HAVA have no conceivable connection to "cash or in-kind assistance or payments under Federal benefit programs," let alone to the recoupment of payments or debts thereunder. *Id.* § 552a(a)(8)(A)(i).

This conclusion is fully consistent with the Privacy Act's contemplation of matching programs that involve states, local governments, and agencies thereof. *See id.* § 552a(a)(11), (o)(1). Although a record in the possession of a state, local government, or agency thereof can be part of a matching program, the Privacy Act's limits on disclosure for use in a matching program apply only to records in the federal government's possession. This fact accords with the Privacy Act's goal of "protect[ing] the privacy of individuals identified in information systems maintained *by Federal agencies*." Privacy Act § 2(a)(5), 88 Stat. at 1896 (emphasis added). Thus, the Privacy Act does not preclude the Division from obtaining information from states under the present scenario.

### B.

For similar reasons, the Driver's Privacy Protection Act does not prevent the Division from obtaining the statewide voter registration lists either. That statute provides that a state department of motor vehicles (or an affiliated person) "shall not knowingly disclose or otherwise make available . . . personal information . . . about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a). Like the Privacy Act, however, it excepts disclosure "[f]or use by any government agency, including any . . . law enforcement agency, in carrying out its functions." *Id.* § 2721(b)(1). And, as just discussed, the Division intends to use the lists "in carrying out its functions," *id.*, of enforcing the NVRA's and HAVA's list-maintenance requirements.

### C.

The E-Government Act similarly does not apply to the Division's efforts to obtain statewide voter registration lists. Section 208 of that

statute requires an agency to conduct, review, and, if practicable, publish a privacy-impact assessment before "initiating a new collection of information that . . . includes any information in an identifiable form permitting the physical or online contacting of [10 or more] specific" persons or entities.[31] E-Government Act § 208(b)(1)(A)(ii), 116 Stat. 2899, 2921–22 (codified at 44 U.S.C. § 3501 note). But the section 303 demands at issue here neither pose "questions" to nor impose "reporting requirements" on states. *See id.* Neither aspect of the E-Government Act applies here.[32]

*First*, the Division's section 303 demands do not pose "questions" to the states. *See id.* § 208(b)(1)(A)(ii)(II), 116 Stat. at 2921–22. Paradigmatic "questions" subject to section 208's requirements are those found on the decennial-census questionnaire. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 99 (D.C. Cir. 2019). The section 303 demands do not ask, "What is all the information in your statewide voter registration list?" Rather, as noted above, they take the form of administrative subpoenas. *See supra* Part II.C. The distinction between subpoenas and interrogatories or deposition by written question is well known in the law. *See, e.g.*, *United States v. Clinesmith*, No. 2:23-CV-20063-DDC-1, 2025 WL 974262, at *5 & n.1 (D. Kan. Apr. 1, 2025); *Sekerke v. Arkwright*, No. 3:20-CV-01045-JO-AHG, 2023 WL 1453147, at *5 (S.D. Cal. Feb. 1, 2023). Congress is presumed to have acted deliberately and in full knowledge of that distinction when it declined to impose section 208 requirements on administrative subpoenas (and other devices of such a nature, whether or not formally styled as "subpoenas"). *See Gallardo ex rel. Vassallo v. Marstiller*, 142 S. Ct. 1751, 1761 (2022) ("We must also read [a statute's] text in light of background legal principles . . . .").

*Second*, the Division's section 303 demands do not impose "reporting requirements" on states. E-Government Act § 208(b)(1)(A)(ii)(II), 116 Stat. at 2921–22. Like the word "subject," *see supra* Part III.A.2, the phrase "reporting requirement" is a term of art that is well understood to

---

[31] Section 201 defines the term "persons" in section 208 to cover states. *See* E-Government Act §§ 201, 208(b)(1)(A)(ii)(II), 116 Stat. at 2910, 2921–22; 44 U.S.C. § 3502(10).

[32] For the avoidance of doubt, we do not suggest that, apart from these reasons, the E-Government Act may bar CRT's demands for information. We simply do not reach the questions, as they are unnecessary to our inquiry herein.

be conceptually distinct from a subpoena by courts;[33] by Congress, *see, e.g.*, 49 U.S.C. § 20107(a)(1); and by commentators, *see, e.g.*, Robert A. Mikos, *Can the States Keep Secrets from the Federal Government?*, 161 U. Pa. L. Rev. 103, 115 (2012). Although both can result in the provision of similar information, reporting requirements generally are fixed by law in advance to require certain people or entities to provide certain information under certain circumstances. *See, e.g.*, *District of Columbia v. Carter*, 409 U.S. 418, 429–30 n.25 (1973); *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 26–30 (1974); 31 U.S.C. § 5314; Homebuyers Privacy Protection Act, Pub. L. No. 119-36, § 4(b), 139 Stat. 493, 494 (2025). By contrast, although subpoenas can require ongoing production, they generally issue on an ad hoc basis as part of (or as prelude to) an enforcement action or other litigation, typically about something that happened in the past. *See* Fed. R. Civ. P. 45; Fed. R. Crim. P. 17. Because a section 303 demand is in essence a backward-looking subpoena, *see supra* Part II.C, it does not impose a forward-looking reporting requirement on a state.

Even if section 303 demands were deemed to pose "questions" to or impose "reporting requirements" on states, the E-Government Act still would not apply because the demands do not "initiat[e] a new collection of information" within section 208's meaning. E-Government Act § 208(b)(1)(A)(ii), 116 Stat. at 2921–22; *see also id.* § 201, 116 Stat. at 2910; 44 U.S.C. §§ 3502(3), 3518(c). Neither "initiating" nor "new" has a statutory definition provided by this statute. *See* 44 U.S.C. 3502. "Contemporary dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, "start" (a course of action, practice, etc.'" *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 356 F. Supp. 3d 85, 89 (D.D.C. 2019) (alteration in original) (citations omitted), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019). The relevant definition of "new" is "[h]aving been made or come into being only a short time ago; recent" or "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002); *see also Merriam-Webster's Tenth* at 780 ("having existed or having been

---

[33] *See, e.g.*, *McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 995 (6th Cir. 1988); *United States v. D.F.*, 63 F.3d 671, 684 n.20 (7th Cir. 1995), *judgment vacated on other grounds*, 517 U.S. 1231 (1996); *Canal Refin. Co. v. Corrallo*, 616 F. Supp. 1035, 1037–38 (D.D.C. 1985).

made but a short time" or "different from one of the same category that has existed previously"). Here, the Division seeks information that states are already required to collect and maintain. *See* 52 U.S.C. § 21083(a)(1)(A); 44 U.S.C. § 3502(3)(A). As a result, the Division's demands for election-related information do not require states to introduce any recordkeeping or collection requirements that did not previously exist.

One could argue that the collection is new to the federal government even if states had already collected the information from their local governments. It is far from apparent to us that the transfer of data that has already been collected implicates the type of privacy interests that Congress had in mind. But even if it did, through a series of statutory cross-references, Congress has excluded most (if not all) federal enforcement proceedings. Specifically, section 208 takes its definition of "collection of information" from 44 U.S.C. § 3502(3), *see* E-Government Act § 201, 116 Stat. at 2910, which excludes any "collection of information described under section 3518(c)(1)," 44 U.S.C. § 3502(3)(B). Section 3518(c)(1) generally exempts from section 208 the collection of information in federal criminal investigations, *see id.* § 3518(c)(1)(A); civil actions to which the federal government or an agency is party, *see id.* § 3518(c)(1)(B)(i); and most "administrative action[s] or investigation[s]," *id.* § 3518(c)(1)(B)(ii). With that said, section 208 does apply "to the collection of information during the conduct of general investigations" outside of the antitrust context "undertaken with reference to a category of individuals or entities such as a class of licensees or an entire industry." *Id.* § 3518(c)(2). Apart from that proviso for general investigations, your inquiry would fall squarely into one of the three excluded categories. We do not think the general-investigations proviso, however, applies. Your inquiry is certainly widespread, but the phrasing of that proviso—and particularly the exclusion of antitrust actions—indicates that a "general investigation" of a class or industry refers to an investigation *of the group as a group* rather than widespread investigation of such a group or industry's members, such as your investigation in to HAVA and NVRA compliance by various states.[34]

---

[34] *See, e.g.*, 30 U.S.C. § 3 (empowering the Bureau of Mines to investigate the "mining, quarrying, metallurgical, and other mineral industries"); 43 U.S.C. § 316n (authoriz-

## IV.

Finally, we have identified no impediment to the Division sharing with HSI or another unit within DHS—or DHS receiving—the statewide voter registration lists for the purpose of identifying individuals (including illegal aliens) who are ineligible to vote. Neither the Civil Rights Act itself nor the doctrine of equitable estoppel restricts the Division from sharing the lists.[35] The Privacy Act imposes certain restrictions, but the Division's proposed sharing can be done in a way that satisfies at least two of the statute's exceptions.

### A.

The Civil Rights Act imposes no limits on the Division's ability to share the statewide voter registration lists acquired pursuant to section 303 under circumstances presented here. Congress knows how to "establish[] an absolute prohibition on disclosure of information." *Telematch, Inc. v. U.S. Dep't of Agric.*, 45 F.4th 343, 352 (D.C. Cir. 2022). Congress also knows how to pass a statute under which "[d]isclosure . . . is prohibited unless for a purpose permitted by an exception." *Maracich v. Spears*, 570 U.S. 48, 52 (2013); *see also, e.g.*, *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 498–99 (1994); *United States v. Woodward*, 256 U.S. 632, 634 (1921). The CRA falls in the latter category: Although it generally prohibits disclosure of materials obtained pursuant to section 303, one of the exceptions available under the Privacy Act is disclosure "to . . . governmental agencies." 52 U.S.C. § 20704.

### B.

This analysis is not changed by the Division having represented to certain states that it would use their voter registration lists solely for list-

ing the Secretary of Agriculture to investigate the reindeer industry in Alaska); *cf.* 19 U.S.C. § 1862(b)(1)(A) (empowering the Secretary of Commerce to investigate the import of "articles" on national security).

[35] HAVA requires a state motor-vehicle authority to enter into an agreement with the Commissioner of Social Security for the purposes of verifying that applicable information is accurate, *see* 52 U.S.C. § 21083(a)(5)(B)(ii), and this agreement shall "include . . . safeguards to assure the maintenance of [such information's] confidentiality," 42 U.S.C. § 405(r)(9)(A)(ii). But nothing in either the Civil Rights Act or HAVA restricts CRT's ability to share voter registration lists obtained under section 303.

maintenance purposes. Any argument to the contrary would sound in equitable estoppel, which does not preclude the Division from using lists acquired in such a manner for other purposes.

"From [its] earliest cases," the Supreme Court has "recognized that equitable estoppel will not lie against the Government as it lies against private litigants." *OPM v. Richmond*, 496 U.S. 414, 419 (1990). The Court has acknowledged that arguments for "a flat rule that estoppel may not in any circumstances run against the Government" are "substantial." *Id.* at 423 (quoting *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984)). And although the Court has yet to adopt such a categorical rule in most contexts,[36] it has (1) declined to hold that even "some type of 'affirmative misconduct' might give rise to estoppel against the Government," *id.* at 421; (2) suggested that, at a minimum, "extreme circumstances" would be necessary in order to equitably estop the United States, *id.* at 434; and (3) "reversed every finding of estoppel" against the United States that it has reviewed, *id.* at 422.

Even if equitable estoppel could run against the government, a party cannot successfully invoke it against the United States "without at least demonstrating that the traditional elements of an estoppel are present." *Heckler*, 467 U.S. at 61. These include (among other things) that (1) the United States made "a definite misrepresentation of fact" upon which (2) the party seeking estoppel acted "in reasonable reliance," resulting in a "detrimental change in position." *Id.* at 59, 61. A state could not establish either in this circumstance.

*First*, based on the facts as we understand them, the states cannot show that the Division has made "a definite misrepresentation of fact," *id.* at 59, because there are no facts supporting any "allegation that [a federal] official knowingly misled" any state. *Statute of Limitations and Settlement of Equal Credit Opportunity Act Discrimination Claims Against the*

---

[36] The Supreme Court has suggested that estoppel will not lie against the United States "in matters of national and international concern." *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 427 (1925); *see also United States v. California*, 332 U.S. 19, 39–40 (1947). Because a state cannot satisfy even the traditional elements of equitable estoppel here, as explained further in this Part, we do not consider whether a state's estoppel claim also would fail on the ground that it implicates matters of national concern. *See Rann v. Chao*, 346 F.3d 192, 197 (D.C. Cir. 2003); *United States v. Harvey*, 661 F.2d 767, 775 (9th Cir. 1981).

*Department of Agriculture*, 22 Op. O.L.C. 11, 28 (1998) ("*Equal Credit*"); *see also, e.g.*, *Henshaw v. Bissell*, 85 U.S. (18 Wall.) 255, 271 (1874) (requiring "some degree of turpitude in his conduct which has misled others to their injury"). The Division has represented to us that it had no intention of using the statewide voter registration lists to identify illegal aliens for immigration enforcement at the time that it demanded these lists from states, and we are aware of no such intention today. There cannot be "estoppel by silence concerning facts of which defendants may have had no actual knowledge," *Wiser v. Lawler*, 189 U.S. 260, 270 (1903), because no one "knowingly misled" states regarding the purpose for seeking the lists, *see Equal Credit*, 22 Op. O.L.C. at 28.

*Second*, we do not think that the states can demonstrate a "detrimental change in position," *Heckler*, 467 U.S. at 59, resulting from any claimed misrepresentation by the Division. A party "cannot raise an estoppel without proving that it will be significantly worse off than if" the party it seeks to estop "had never" made the alleged misrepresentation in the first place. *Id.* at 63. Had the Division informed the states ahead of time that it would use their statewide voter registration lists to identify illegal aliens as well as others who are ineligible to vote, the states still would have needed to produce their lists to the Division upon its demand, for all the reasons that we have already explained above. *See supra* Parts II–IV.A. A party cannot, for example, estop the United States from recovering funds "to which [the party] was not entitled . . . in the first place," for the simple reason that the party is not made "significantly worse off than if it had never obtained the . . . funds in question." *Heckler*, 467 U.S. at 53, 61, 63. And of course, a state that refused to comply with the Division's section 303 demand plainly cannot show detrimental reliance.

### C.

By contrast, the Privacy Act *does* restrict the Division from "disclos[ing] any record" that falls within the Division's ambit "except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless an enumerated exception to the general prohibition on disclosure applies. 5 U.S.C. § 552a(b). But at least two such exceptions apply in this circumstance: the law-enforcement exception and the routine-use exception.

**1.**

Most directly on point, the Privacy Act authorizes disclosure for law-enforcement purposes. Specifically, it allows disclosure to a broad range of "agenc[ies]" or "instrumentalit[ies]" (1) "for a civil or criminal law enforcement activity" that (2) "is authorized by law," if (3) "the head of the agency or instrumentality has made a written request" that meets certain requirements. *Id.* § 552a(b)(7). Although we have not been provided a copy of any relevant request from HSI (or any other DHS unit), we see no reason why the Division sharing the voter registration lists could not be done in a way that satisfies each of these elements.

*First*, for many of the reasons already discussed, because HSI would use the voter registration lists to investigate voter fraud by (among others) illegal aliens, disclosure would be for a law-enforcement activity. *See supra* Part III.A.1; *see also, e.g.*, *United States v. Collins*, 596 F.2d 166, 169 (6th Cir. 1979); *Manivannan v. U.S. Dep't of Energy*, No. 2:18-CV-00297-MPK, 2024 WL 3046476, at *14 (W.D. Pa. June 18, 2024), *aff'd*, No. 24-2337, 2025 WL 1742785 (3d Cir. June 24, 2025); *Gonzalez v. United States*, No. 8:07-CR-00202-DOC-6, 2021 WL 9747618, at *4 (C.D. Cal. June 11, 2021); *SEC v. Dimensional Ent. Corp.*, 518 F. Supp. 773, 777 (S.D.N.Y. 1981).

*Second*, although an admittedly closer question, our view is that HSI is authorized by law to investigate such voter fraud. As already noted, the Attorney General is authorized to "conduct the criminal litigation of the United States Government." *Nixon*, 418 U.S. at 694. Prior to Congress's enactment of the Homeland Security Act, the Attorney General also had full authority, which he had delegated to the Immigration and Naturalization Service ("INS"), to "administer and enforce the Immigration and Nationality Act and all other laws relating to immigration (including but not limited to admission, exclusion, and deportation)," subject to certain limited exceptions not relevant here. 28 C.F.R. § 0.105(a) (2002); *see also* 8 C.F.R. § 100.2(a) (2002). Sections 611(a) and 1015(f) of title 18 to the U.S. Code, which criminalize voter fraud by illegal aliens and were enacted as part of IIRIRA, are in any reasonable sense "laws relating to immigration." 8 C.F.R. § 100.2(a) (2002); 28 C.F.R. § 0.105(a) (2002); *see also Coventry Health*, 581 U.S. at 96; *Milner*, 562 U.S. at 566 n.1; *Morales*, 504 U.S. at 383.

The Homeland Security Act transferred from INS to the newly established DHS, as relevant here, the law-enforcement "functions performed under . . . [t]he investigations program." HSA § 441, 116 Stat. at 2192 (codified at 6 U.S.C. § 251); *see also* 6 U.S.C. § 542(a) (directing the President to transmit to certain congressional committees the corresponding reorganization plan for DHS). The Secretary of Homeland Security, in turn, delegated to Immigration and Customs Enforcement ("ICE") what had been "[INS's] interior enforcement functions, including. . . the investigations program." H.R. Doc. No. 108-32, at 3 (2003). As with many issues relating to the organization of DHS, the exact mechanisms are a bit messy.[37] But the upshot is that since 2003, *see Flores v. Bondi*, No. 2:85-CV-04544-DMG-AGR, 2025 WL 2995478, at *1 (C.D. Cal. Aug. 15, 2025) (recognizing that the 2003 reorganization plan remains in force), ICE has had the authority to investigate violations of 18 U.S.C. §§ 611(a) and 1015(f). Our understanding based on our conversations with the Division is that ICE has delegated such authority to HSI. For these reasons, HSI's investigation of voter fraud by illegal aliens "is authorized by law." 5 U.S.C. § 552a(b)(7).[38]

*Third*, the Division should have little difficulty satisfying the law-enforcement exception's procedural requirements. The exception authorizes disclosure of information to an agency "if the head of the agency" seeking the record "has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought." *Id.*

This requirement "assur[es] some high level evaluation of the need for the information," but is not particularly onerous. *Doe v. DiGenova*, 779 F.2d 74, 84 (D.C. Cir. 1985). The request must be in writing. *See United States Secret Service Use of the National Crime Information Center*, 6 Op. O.L.C. 313, 323 n.22 (1982); *Covert v. Harrington*, 876 F.2d 751,

---

[37] *See* Dep't of Homeland Sec., Delegation No. 7030.2, *Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement* § 2(C) (Mar. 1, 2003), https://perma.cc/8X3S-J87F; *see also Umanzor-Chavez v. Noem*, No. 8:25-CV-01634-SAG, 2025 WL 2467640, at *5 (D. Md. Aug. 27, 2025); *Margallo-Gans v. USCIS*, No. 1:21-CV-02898-APM, 2024 WL 1212778, at *4 (D.D.C. Mar. 20, 2024).

[38] Because 6 U.S.C. § 251(4) authorizes DHS to investigate violations of 18 U.S.C. §§ 611(a) and 1015(f), we do not address here whether 8 U.S.C. § 1103(a)(1) and 19 U.S.C. § 1589a(3) do as well.

754 n.2 (9th Cir. 1989). And it should specify that DHS seeks the statewide voter registration lists for the purpose of investigating violations of 18 U.S.C. §§ 611(a) and 1015(f), and specifically to identify illegal aliens who have registered to vote or have voted. There are, however, several officials within DHS who can likely provide the request that the information be shared, as the Privacy Act's definition of "agency" includes both cabinet departments and their various components. *See Loc. 2855, Am. Fed'n of Gov't Emps. v. United States*, 602 F.2d 574, 578 n.5 (3d Cir. 1979); *Ramer v. Saxbe*, 522 F.2d 695, 697 (D.C. Cir. 1975); *cf. Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 136–37 (D.D.C. 2019), *aff'd*, 798 F. App'x 649 (D.C. Cir. 2020).

In this instance, the Secretary of Homeland Security, the Senior Official Performing the Duties of the Director of ICE, and the Acting Executive Associate Director for HSI, or their designees, among others, may request the statewide voter registration lists from the Division under the law-enforcement exception. 5 U.S.C. § 552a(b)(7); 6 C.F.R. § 5.20(b)(1), (c). So long as any of these officials make the request, we believe that the request would satisfy the law-enforcement exception's requirements.

**2.**

Even apart from the law-enforcement exception, the Privacy Act authorizes disclosure of covered information "for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section." 5 U.S.C. § 552a(b)(3). As explained above, whenever an agency establishes or revises a system of records, it must publish a new SORN. *See supra* Part III.A.2. The SORN must include "each routine use of the records contained in the system, including the categories of users and the purpose of such use." 5 U.S.C. § 552a(e)(4)(D).

Because the Division's sharing of the voter rolls would comply with its longstanding SORN, it also complies with the routine-use exception to the Privacy Act. Specifically, the SORN for the Central Index File provides, in relevant part:

> A record maintained in this system of records may be disseminated as a routine use of such records as follows: . . . In the course of . . . the investigation or litigation of a case or matter, a record may be disseminated to a Federal . . . agency . . . if there is reason to believe

> that such agency . . . possesses information or has the expertise in an official or technical capacity . . . to analyze information relating to the investigation . . . and the dissemination is reasonably necessary to elicit such . . . information or expert analysis . . . .

68 Fed. Reg. at 47,611. Here, the Division is investigating, among other things, voter fraud, including by illegal aliens. *E.g.*, Dhillon Memorandum at 1 (citing 52 U.S.C. § 21083(a)(5)(A)(i)). As it is the entity charged with maintaining databases relating to illegal immigration, we see little doubt that DHS "possesses information or has the expertise in an official or technical capacity . . . to analyze information relating to the investigation." 68 Fed. Reg. at 47,611. And the Division does not have the capacity internally to identify illegal immigrants who are on states' voter rolls, so its sharing these lists with DHS also "is reasonably necessary to elicit such assistance, information or expert analysis." *Id.*

One counterargument is that this understanding of what use qualifies as routine runs against the principle recognized by the D.C. Circuit that an agency "may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act." *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988). Although we have characterized that ruling as "reasonable" and "likely" to be "followed in future decisions," Memorandum for Donald L. Ivers, Acting General Counsel, Department of Veterans Affairs, from William P. Barr, Assistant Attorney General, Office of Legal Counsel, *Re: Interpretation of Subsections 552a(b)(3) and (b)(7) of the Privacy Act (5 U.S.C. § 552a) in Light of* Doe v. DiGenova*, 779 F.2d 74 (D.C. Cir. 1985) and* Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988)* at 11 (Aug. 28, 1989), it must be read in conjunction with the principle that the very purpose of the routine-use exception is to enable disclosures "which would otherwise violate the [Privacy] Act," *Swenson v. U.S. Postal Serv.*, 890 F.2d 1075, 1078 (9th Cir. 1989).

Neither we nor the courts have elucidated a clear standard for when a routine use crosses the line to circumventing more specific provisions in the Privacy Act, but we do not understand CRT to be attempting to circumvent the law enforcement exception for at least three different reasons. *First*, we have already concluded that the more specific provision—the law-enforcement exception—is satisfied. *See supra* Part IV.C.1. *Second*, the normal concerns that inhere in circumvention are not present here because no one appears to be attempting to use the routine-use

exception to evade the limitations on the law-enforcement exception.[39] Instead, whereas the law-enforcement exception's purpose is to facilitate the receiving entity's own law-enforcement activity, *see* 5 U.S.C. § 552a(b)(7), the routine-use exception's purpose is to enable a receiving entity to assist the sharing agency's investigation, *see* 68 Fed. Reg. at 47,611. Because these provisions serve different purposes, relying on the routine-use exception would not circumvent the limits on the law-enforcement exception. *Third*, precisely because the routine-use exception only applies to facilitate the Division's *own* investigation, it is actually the *more* restrictive exception, as the law-enforcement exception allows the receiving agency to use the record for *any* authorized law-enforcement activity. *Compare* 68 Fed. Reg. at 47,611, *with* 5 U.S.C. § 552a(b)(7). Under such circumstances, circumvention is not a concern, and either exception will allow the Division to share the records with DHS.

## V.

In sum, we conclude that section 303 of the Civil Rights Act authorizes the Division to seek statewide voter registration lists from states. Moreover, the Privacy Act, Driver's Privacy Protection Act, and E-Government Act do not limit that authority. Finally, no other legal restriction impedes the Division from sharing the lists with DHS as part of its effort to identify individuals who are ineligible to vote, including—in DHS's specific jurisdiction—illegal aliens.

LANORA C. PETTIT
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[39] *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 131 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 40 (1st Cir. 1980); *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 990 (D.C. Cir. 1973); *United States v. Amalgamated Sugar Co.*, 48 F.2d 156, 158 (10th Cir. 1931); *Barnsdall v. Owen*, 200 F. 519, 522 (8th Cir. 1912).

website [sosmt.gov] | email | map [protect2.fireeye.com]

*CONFIDENTIALITY NOTICE:*

*This email message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential or privileged material, including attorney-client communications and attorney work product. Any unauthorized review, use, disclosure, or distribution is prohibited. This electronic transmission does not constitute a waiver of privilege. If you are not the intended recipient, and have received this message in error,*

---

**From:** Riordan, Maureen (CRT) <(b)(6)>
**Sent:** Monday, July 14, 2025 1:28:32 PM
**To:** James, Austin (b)(6)
**Cc:** Neff, Katie (CRT) <(b)(6)>
**Subject:** [EXTERNAL] Follow up request to our discussion today

Hello Austin, it was very nice to meet you today and thank you for being a willing partner in the Administration's quest for election integrity. As I stated today, we are requesting a copy of Montana's statewide voter registration list, so that we can facilitate a review for noncitizens and dead voters via DHS. Additionally, as I indicated we will also have the ability to determine if there are duplicate registrations . This information will be provided to you, so that you can make the adjustments as needed. As you are likely already aware, under both the National Voter Registration Act, ("NVRA") and the Help America Vote Act, ("HAVA"), the attorney General is authorized to request the information from you. Also, we are Privacy act compliant and have secure data sharing capabilities.
Thanks again for your time and cooperation,
Best,
Maureen

Maureen S. Riordan
Senior Counsel
Acting Chief, Voting Section
Civil Rights Division
(b)(6)
(b)(6)

**From:** Gates, Michael (CRT)
**Sent:** Friday, July 18, 2025 10:23 AM
**To:** Riordan, Maureen (CRT) <(b)(6)>; Mellett, Timothy F (CRT) <(b)(6)>
**Cc:** Neff, Katie (CRT) <(b)(6)>
**Subject:** Tasks - Elections Enforcement Status

Maureen and Tim,

I want to keep things moving. There is another call with the White House next week on progress. So, we need to show what progress has been made since the last call. Below is what was communicated regarding status then. Feel free to update the list below by MONDAY so we can track. Katie should also be maintaining the State's Tracker that we have.

Short-term goal (b)(5) The long-term goal (b)(5) (b)(5) To that end, our work over the next few weeks still includes:

**(b)(5)**

HAVA Letters out already, more going out this week.

1. Arizona
2. Orange County, CA HAVA
3. Los Angeles County, CA HAVA
4. San Diego County, CA HAVA
5. San Francisco County, CA HAVA
6. Wisconsin
7. Wyoming
8. Pennsylvania
9. Minnesota
10. Nevada
11. New Hampshire
12. New York

NVRA Letters out already, more going out this week.

1. Alaska
2. New Jersey

3. Michigan
4. Massachusetts
5. North Carolina
6. Delaware
7. California
8. Maryland
9. DC
10. Utah
11. Indiana
12. Kentucky
13. Virginia
14. Iowa
15. Orange County, CA NVRA
16. Los Angeles County, CA NVRA
17. San Diego County, CA NVRA
18. San Francisco County, CA NVRA

Voter Registration Databases Received and on hand

1. Colorado
2. New Mexico
3. New Jersey
4. Connecticut
5. South Dakota

Voter Registration Databases that we anticipate receiving within a week based on representations from the state(s)

1. Florida
2. Indiana
3. Texas

List of DOJ lawsuits and/or imminent filing

1. North Carolina – NVRA/HAVA failure to register voters requiring ID
2. Orange County, CA NVRA and HAVA failure to provide the DL license number and the last 4 of the SS number of non-citizens removed from the voter list
3. Arizona – HAVA Registration Form is not HAVA compliant
4. Alaska – NVRA/HAVA failure list maintenance failure as the Registration is 104% of the Citizen Voting Age population

**Michael E. Gates**
Deputy Assistant Attorney General
Civil Rights Division, U.S. Department of Justice
Cell: (b)(6)

**To:** Percival, Allan (CRT) <(b)(6)>
**Subject:** Records/Privacy Act

Hi Allan,

We are collecting voter registration list data from various states that contains PII. We have it locked down on the P Drive with Lit Support and the attorneys who are working with the data having access to those folders for their investigations. I wanted to make sure that everyone knows their obligations in working with the data. I have the attached regarding Records obligations of which I am aware. Is there anything else I should be sharing with folks regarding their obligations? I'm also happy to chat about this. Thanks,

Tim Mellett
Deputy Chief, Voting Section
(b)(6)

**From:** Mellett, Timothy F (CRT) <(b)(6)>
**Sent:** Monday, August 25, 2025 6:19 PM
**To:** Bryce, Amanda (CRT) (b)(6)
**Subject:** Voting Section -- Privacy Act Questions

Hi Amanda,

Thanks for discussing the Privacy Act/data sharing questions the other week. We have requested voter registration lists from states to conduct searches that assess the List Maintenance of voter registration lists under the National Voter Registration Act and the Help America Vote Act (statutes that the Voting Section enforces). Some states have asked us a few Privacy Act questions because the data contains PII. At the moment, we are looking to write a letter to states that have asked the following questions:

1. Please provide a citation within the Federal Register to the system of records under which DOJ intends to collect and maintain the records it has requested.
   (We are thinking that it would be CRT-1, but we wanted to be sure, and we did not know if there would be others).
2. Please describe how DOJ plans to store, maintain, and use the requested voter registration information.
   (We can answer the "use" question but we don't know what we should say about store and maintain. Lit Support has this on the P Drive.)
3. Please explain who will have access to the information contained in the Voter Registration List.
   (Lit Support has permissions limited to managers and those attorneys and analysts working on the matters. I did not know how big of scope there could be while complying with the Privacy Act. Voting only? CRT only? DOJ only?)

Ideally, we would like to send the letters out on Wednesday. Happy to chat if you have questions. Thanks,

Tim Mellett
Deputy Chief, Voting Section
(b)(6)

**From:** Osete, Jesus (CRT (b)(6)
(b)(6)
**Sent:** 9/2/2025 10:28:47 PM
**To:** Gates, Michael (CRT) (b)(6)
**Subject:** RE: NASS call

Thanks. Can you please provide a recap of the R SOS meeting today when you get a chance?

**Jesus A. Osete**
Principal Deputy Assistant Attorney General
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20579
(b)(6)
(b)(6)

**From:** Gates, Michael (CRT) (b)(6)
**Sent:** Sunday, August 31, 2025 7:17 PM
**To:** Osete, Jesus (CRT) <(b)(6)>
**Cc:** Mehr, Benjamin (OASG) <(b)(6)>
**Subject:** NASS call

Jesus, want to give you a recap of the call with National Association of Secretaries of State last Thursday – I had sent you and Ben the link to the meeting. The meeting was almost 30 minutes and about 7 or 8 questions were presented to me, some variations of the same basic question(s).

At open, Leslie announced that no media was welcome in the meeting, that it was only for Secretaries of State. She introduced me and allowed me to start off with a few comments about what we are doing and the meaning of our recent letters asking for Voter Registration Lists (VRLs). I stated that our aim is simply to fulfill our (AG) duties to enforce the NVRA and HAVA – particularly for list maintenance. I emphasized that we are here to help states test their lists, identify for areas that may require maintenance, and to provide that feedback to the states – all to be done discreetly and securely – outside of the view of the public.

Leslie asked the following questions, which I provided answers to:

1. Why is the DOJ doing this now?
    a. We have a duty to work with states to ensure that states have list maintenance programs and that the maintenance programs are working. It is a priority of this administration, and this Civil Rights Division, to ensure that the federal elections statutes are being followed. Historically, no administration or Civil Rights Division in previous administrations have really enforced these elections statutes (NVRA/HAVA). This is now a priority and our goal is to ensure compliance with federal law in advance of the 2026 elections.
2. What about PII, why do we need it?
    a. The more information we have for each voter (including DL or last 4SSN) the more reliable the VRL tests are going to be. The less information we have, the more error that will occur in our

list test results. It benefits both the DOJ (ensuring compliance) and the states that we are able to test VRLs and produce reliable results so that our feedback to states about their VRLs is reliable. Having the DL or the last 4SSN does that very thing – it ensures, or will prove, that the voters on the VRL are unique.

3. Is a state proving that they submit their VRL to ERIC enough to satisfy the DOJ?
    a. No because only the AG has the charge from Congress to ensure HAVA compliance – for instance, there is no private right of action under HAVA – only the AG can bring a HAVA action. We have a duty from Congress to ensure list maintenance and federal elections law compliance. We have to perform that duty. And, there is no way to verify that simply because a state has a contract with ERIC to submit data, does not mean that the VRLs are clean, free of ineligible voters, and NVRA/HAVA complaint.
4. Would the DOJ be willing to enter into MOU's with the states?
    a. Yes but the DOJ would present a standard MOU to those states – and the DOJ would not be negotiating 50 different MOUs that may consume months of time. If a state insists on an MOU, it will have to be entered into quickly and in a uniform way (the same or similar MOU presented to other states). I did make the point that the DOJ is primarily looking for name, address, DOB, and DL or last 4SSN and that most states already produce most of that information to any member of the public who requests a state's VRL pursuant to the NVRA. So, the MOU may be viewed as extra, unnecessary process to obtain largely the same information states are already producing as a public record.
5. What will be done with state's VRL data once we are done analyzing? Will the data go into a master voter database.
    a. The VRL data will be treated as information gathered pursuant to an investigation. It will be kept by the Civil Rights Division in accordance with records retention laws. Having said this, as VRLs are updated regularly with new voter registrations and more list maintenance by states, the VRLs sent to us won't be current for very long – with updates, they will become obsolete. So, there should be no concern for the DOJ's holding onto of the VRLs for the records retention period.

**Michael E. Gates**
Deputy Assistant Attorney General
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(b)(6)
(b)(6)

**From:** Mellett, Timothy F (CRT) <(b)(6)>
**Sent:** Monday, August 25, 2025 6:19 PM
**To:** Bryce, Amanda (CRT) (b)(6)
**Subject:** Voting Section -- Privacy Act Questions

Hi Amanda,

Thanks for discussing the Privacy Act/data sharing questions the other week. We have requested voter registration lists from states to conduct searches that assess the List Maintenance of voter registration lists under the National Voter Registration Act and the Help America Vote Act (statutes that the Voting Section enforces). Some states have asked us a few Privacy Act questions because the data contains PII. At the moment, we are looking to write a letter to states that have asked the following questions:

1. Please provide a citation within the Federal Register to the system of records under which DOJ intends to collect and maintain the records it has requested.
   (We are thinking that it would be CRT-1, but we wanted to be sure, and we did not know if there would be others).
2. Please describe how DOJ plans to store, maintain, and use the requested voter registration information.
   (We can answer the "use" question but we don't know what we should say about store and maintain. Lit Support has this on the P Drive.)
3. Please explain who will have access to the information contained in the Voter Registration List.
   (Lit Support has permissions limited to managers and those attorneys and analysts working on the matters. I did not know how big of scope there could be while complying with the Privacy Act. Voting only? CRT only? DOJ only?)

Ideally, we would like to send the letters out on Wednesday. Happy to chat if you have questions. Thanks,

Tim Mellett
Deputy Chief, Voting Section
(b)(6)

**Sent:** 1/13/2026 6:31:34 PM
**To:** Neff, Eric (CRT) [(b)(6)]; Gupta, Kamran (CRT) [(b)(6)]; Wake, Brittany (CRT) (b)(6)
**Subject:** RE: Virginia rolls

Eric,
Sorry for any confusion! I went out to JEFs to check recent uploads and Tennessee, Mississippi, Soth Dakota, and Louisiana (b)(5) (b)(5)




**From:** Neff, Eric (CRT) <(b)(6)>
**Sent:** Tuesday, January 13, 2026 12:15 PM
**To:** Hayes, Chris (CRT) <Chris.(b)(6)>; Gupta, Kamran (CRT) <(b)(6)>; Wake, Brittany (CRT) (b)(6)
**Subject:** RE: Virginia rolls

I'm not clear on the response to No. 3. (b)(5)

**From:** Hayes, Chris (CRT) (b)(6)
**Sent:** Tuesday, January 13, 2026 11:40 AM
**To:** Neff, Eric (CRT) <(b)(6)>; Gupta, Kamran (CRT) <(b)(6)>; Wake, Brittany (CRT) <(b)(6)>
**Subject:** RE: Virginia rolls

Eric,
Please see my comments highlighted below.

-Chris

**From:** Neff, Eric (CRT) <(b)(6)>
**Sent:** Tuesday, January 13, 2026 10:55 AM
**To:** Gupta, Kamran (CRT) (b)(6) Hayes, Chris (CRT) (b)(6) Wake, Brittany

**From:** Neff, Eric (CRT) (b)(6)
(b)(6)
**Sent:** 11/18/2025 11:01:54 PM
**To:** Osete, Jesus (CRT) [(b)(6)]; Riordan, Maureen (CRT) [(b)(6)@usdoj.gov]
**CC:** Zandi, Matt (CRT) [(b)(6)]
**Subject:** RE: Letters from Secretaries of State to DOJ and DHS

This is likely fishing to try to trap us with contradictory statements later (or tomorrow, as CA is one of the states) in court. The claim that data has been shared with DHS has no citation and is too vague to even know what they are referring to.

I believe our reply should always be: "We will use the data in a manner consistent with Federal law" and say nothing more. HAVA, NVRA, CRA – none of them require to give the states information about what we are going to do with the data. No judge will have authority to limit us beyond a promise of Federal law compliance.

**duplicated in** CREW v. DOJ - CRT - 001155-001158

**From:** Watson, John (CRT) (b)(6)
**Sent:** 1/12/2026 7:07:35 PM
**To:** Kagle, Kilian (CRT) (b)(6)
**CC:** Cononie, Sean (CRT) (b)(6)
**Subject:** Upcoming Requirements for CRT-JCON system
**Attachments:** RE: Voting Section Support - Data Requests

Kilian,
We have been informed about some requirements from Voting and Education that I wanted to reach out and ensure I am aware of any required compliance actions for CRT-JCON, CRT-ECS, and potentially CRT-RDMS or CRT-RDMS One.
We are aware of upcoming requirements that will involve large datasets with PII and may potentially introduce new information types or require processing information in new ways:

1) Voting Section:
    a. Ingestion of bulk confidential Voter Registration Data from multiple states
    b. Storage of bulk confidential Voter Registration Data from multiple states
    c. Potential analysis of ingested data by litigative consultant.
2) Education Section

(b)(5)

Attached is my email to Sean regarding this information, with some more details on the type of PII data. My initial thoughts are included under "Dataset would contain" and "Comments" fields within the table.

Please let me know if you have time to discuss,

**John Watson**
Team Lead, Engineering and Infrastructure Services.
U.S. Department of Justice | Civil Rights Division
Email Address: (b)(6)
Mobile: (b)(6)

**Sent**: 7/15/2025 1:47:00 PM
**To**: Bruzzone, Callie (CRT) [(b)(6)]; Song, Harin C. (CRT)(b)(6) Lott, Jasmin (CRT) [(b)(6)]; Rosenberg, Mary E. (CRT) [(b)(6)]
**CC**: Reid, Arielle (CRT) [(b)(6)]; Shikari, Roshni (CRT) [(b)(6)]; Daniel, Tamica (CRT) [(b)(6)]
**Subject**: FW: Privacy Act Questions
**Attachments**: 2025 07 14 Utah NVRA Draft.docx

All,

I wanted to let you know that I sent the email below and had a discussion with Maureen this morning. She does appreciate the thoughtfulness regarding the Privacy Act, (b)(5)

(b)(5)

Please send me your draft letters. I owe comments on Virginia.

Thanks,

Tim

---

**From:** Mellett, Timothy F (CRT)
**Sent:** Tuesday, July 15, 2025 7:20 AM
**To:** Riordan, Maureen (CRT) <(b)(6)
**Subject:** Privacy Act Questions

Hi Maureen,

I wanted to let you know that I had received a couple of very good questions from the Housing attorneys about the NVRA List Maintenance Project. (b)(5)

(b)(5)

(b)(5)

(b)(5) If that is incorrect, please let me know. Happy to discuss either of these points when I get in this morning. Thanks,

Tim

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536

**U.S. Immigration and Customs Enforcement**

March 6, 2026

*Via email harmeet.dhillon@usdoj.gov*

Harmeet K. Dhillon
Assistant Attorney General for Civil Rights
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

SUBJECT: Request for data related to voter records maintained by Department of Justice

This letter serves as a written request under subsection 552a(b)(7) of the Privacy Act of 1974, 5 U.S.C. § 552a. U.S. Immigration and Customs Enforcement, Homeland Security Investigations (HSI) is undertaking a Voter Fraud Initiative to ensure the integrity of the electoral process within its authority. In furtherance of this initiative, I formally request the Department of Justice provide HSI with the public Statewide Voter Registration Lists (SVRLs) in its possession, in order for HSI to conduct appropriate investigation of potential violations of federal election law. The information in the records provided to HSI will be vetted through Department of Homeland Security indices.

Please provide the relevant points of contact for the transfer of the datasets containing these records, as well as technical parameters for which the information will be transferred. If there are other technical limitations or restrictions on the release or use of certain data, these should also be identified to ensure all data received will be handled in compliance with applicable privacy, security, and data protection law and regulations.

Thank you for your cooperation and support in safeguarding the integrity of American elections.

Sincerely,

Todd M. Lyons
Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*
*Washington, D.C. 20530*

March 12, 2026

Todd M. Lyons
Senior Officer Performing the Duties of Director
U.S. Immigrations and Customs Enforcement
U.S. Department of Homeland Security
500 12th St., SW
Washington, DC 20536

SUBJECT: Request for data compiled by Department of Homeland Security

This letter is in reference to Immigration and Customs Enforcement's written request under subsection 552a(b)(7) of the Privacy Act of 1974, 5 U.S.C. § 552a[1] dated March 6, 2026. As the Acting Chief of the Voting Section at the Civil Rights Division (DOJ-CRT), I am writing to coordinate the exchange of records maintained by your agency that are necessary to carry out an authorized law enforcement activity by the DOJ in which the Department of Homeland Security (DHS) may rely on routine use provisions in its applicable SORN(s) to share.

By way of background to this request, on January 20, 2026, DOJ CRT and the Department of Homeland Security, United States Citizenship and Immigration Services (DHS-USCIS) executed a Memorandum of Understanding to facilitate information sharing between DHS-USCIS and DOJ-CRT and establish the terms and conditions for the DOJ-CRT's participation in SAVE to verify the U.S. citizenship and immigration status information of registrants or registered voters on state voting rolls (January 20 MOU). The information sharing is intended to facilitate DOJ CRT's oversight and enforcement responsibilities as it relates to the Civil Rights Act of 1960 (CRA), Pub. L. No. 86-449, 74 Stat. 86, the National Voter Registration Act of 1993 (NVRA), Pub. L. No. 103-31, 107 Stat. 77; 52 U.S.C. 20501 *et seq.*, and the Help America Vote Act (HAVA), Pub. L. No. 107-252, 116 Stat. 1666; 52 U.S.C. 20901 *et seq.*, as well as other applicable federal election statutes.

Further, the Department of Justice received publicly available State Voter Registration lists (SVRLs) in the summer and fall of 2025.[2] On March 6th of this year, DOJ-CRT received a

[1] "No agency shall disclose any record which is contained in a system of records by any means of communication to . . . another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be— to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought . . . ." 5 U.S.C. § 552a(b)(7).

[2] As of the date of this letter, some of the states who sent these publicly available SVRLs to DOJ-CRT declined to share their non-public SVRLs. Those states are Connecticut, Georgia, Idaho, Illinois, Iowa, Kentucky, Michigan, Missouri, Nevada, New Jersey, New Mexico, and Wisconsin.

written b(7) request from DHS to share this data in order for Homeland Security Investigations "to conduct appropriate investigation of potential violations of federal election law." Separate from its b(7) request, but in conjunction with the same investigative activities, DHS indicated its ability and intent to enrich the SVRL datasets with DHS records to allow for vetting via the SAVE system. After DHS signed the appropriate DOJ-CRT Use Agreement on March 12, 2026, DOJ-CRT granted the appropriate DHS counterpart access to the data via DOJ-CRT's secure file-sharing system, Justice Enterprise File Sharing ("JEFS").

In furtherance of the January 20 MOU, I am confirming the understanding between DOJ and DHS that DHS will return to DOJ-CRT the enriched data SVRLs. When received, DOJ-CRT will subsequently query the SAVE system pursuant to the terms enclosed in the January 20 MOU.

Of course, in connection with this process, DHS and DOJ-CRT will take reasonable efforts to limit impacts to the privacy and civil liberties of United States citizens.

Thank you for your cooperation and support in safeguarding the integrity of American elections.

Sincerely,

Eric V. Neff
Acting Chief, Voting Section
Department of Justice, Civil Rights Division

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

August 14, 2025

Via Mail and Email

The Honorable Chuck Gray
Secretary of State
Herschler Building East
122 West 25th Street, Suite 100
Cheyenne, WY 82002-0020
(b)(6); secofstate@wyo.gov

Re: **Complete Wyoming's Voter Registration List with All Fields**

Secretary Gray:

We have received Wyoming's statewide voter registration list ("VRL"). However, as the Attorney General requested, the electronic copy of the statewide VRL must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We have requested Wyoming's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq*. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

The Help America Vote Act ("HAVA"), 52 U.S.C. § 20501, *et seq.*, also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide Voter Registration List requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

(2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Wyoming's complete and current VRL. The purpose of the request is to ascertain Wyoming's compliance with the list maintenance requirements of the NVRA and HAVA.

When providing the electronic copy of the statewide VRL, Wyoming must ensure that it contains *all fields*, which includes the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[2] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

Moreover, HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing.

---

[2] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

That said, all data received from you will be kept securely and treated consistently with the Privacy Act.

In charging the Attorney General with enforcement of the voter registration list requirements in HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are preempted by federal law.

To that end, please provide the requested electronic Voter Registration List[3] to the Justice Department within seven days or by August 21, 2025.

The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Should further clarification be required, please contact Maureen Riordan at (b)(6)

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc: Charles Young, Director, Elections Division
Herschler Building East
122 West 25th Street, Suite 99
Cheyenne, WY 82002-0019
Elections@wyo.gov

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

# Wyoming Secretary of State

## Chuck Gray

August 28, 2025
***Via E-mail***

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave NW- 4CON
Washington, D.C. 20530
Voting.Section@usdoj.gov

Dear Ms. Dhillon:

This letter serves as a response to your letter dated August 14, 2025. Following a review of your letter that also included the Wyoming Attorney General's Office, we are satisfying this request via the Justice Enterprise File Sharing ("JEFS") System. Upon review of the provisions cited in your letter, and discussion of the applicable provisions of the Civil Rights Act with the Wyoming Attorney General, we agree that disclosure of the requested records is proper under the Civil Rights Act.

With your assurances that the federal privacy protections, including the application of Section 304 of the Civil Rights Act, apply to these records, we anticipate that the Department of Justice will maintain the confidentiality of these records in accordance with Wyoming law.

As noted in our first letter, Wyoming continues to make great strides to improve statutes, policies, and procedures to ensure compliance with HAVA. We will strive to continue these efforts throughout the remainder of my term as Secretary of State. Should you have any questions or concerns, please don't hesitate to contact me.

Sincerely,

Chuck Gray

Chuck Gray
Wyoming Secretary of State