**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

COMMON CAUSE, *et al.*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

*Defendants*.

No. 1:26-cv-01352-SLS

Hon. Sparkle L. Sooknanan

**DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

## INTRODUCTION

Defendants the Department of Justice and Attorney General Blanche respectfully move for a stay pending appeal of this Court's order vacating the alleged "DOJ Voter List Maintenance Policy." There is no such policy. By concluding otherwise the Court's decision has hamstrung DOJ's ability to enforce the election laws that Congress has empowered it to enforce. DOJ must be allowed to enforce those statutes given Congress's express instruction to do so and the continuing need for election oversight. Indeed, the indeterminacy of the purported "Policy" that the Court vacated both illustrates the inapplicability of the APA's final agency action requirement and the need for a stay pending appeal.

In addition to the irreparable harm imposed by the Court's decision, DOJ is likely to succeed on the merits of its appeal. As noted, there is no policy that is sufficiently discrete to be reviewable under the APA, and multiple of the supposed elements of that supposed policy are not final agency action. The Court also incorrectly ruled that Title III of the Civil Rights Act does not permit DOJ's requests for state voter rolls, that the supposed policy violates the Privacy and the Paperwork Reduction Act, and that DOJ acted arbitrarily and capriciously.

The Court should stay its order pending appeal.

## BACKGROUND

On October 9, 2026, this Court entered judgment for the Plaintiffs on their claims that a purported policy of DOJ's Civil Rights Division was unlawful. *See* ECF No. 51 (Mem. Opn.); ECF No. 52 (Order). Plaintiffs had challenged what they labeled a "Voter List Maintenance Policy," which they described as "collecting" and "stockpiling in a centralized system of records" the "sensitive personal data" of Americans before "funneling entire state voter files" to be queried into DHS's Systematic Alien Verification for Entitlements ("SAVE") system. ECF No. 29-1 at 1;

*see also* Mem. Opn. 43 (adopting and applying essentially the same description). The Court rejected DOJ's arguments that Plaintiffs lacked standing, *see* Mem. Opn. 15–40, and that the Administrative Procedure Act (APA) forecloses review of the policy as Plaintiffs had identified it, *see id.* at 40–46. The Court went on to hold that various aspects of the alleged policy were not authorized by Title III of the Civil Rights Act of 1960, the National Voter Registration Act ("NVRA"), and the Help America Vote Act of 2002 ("HAVA"). *See id.* at 46–55. The Court further concluded that DOJ has acted arbitrarily and capriciously, *see id.* at 55–56, and that the policy violated the Privacy Act and the Paperwork Reduction Act, *see id.* at 57–76. "Accordingly, the Court set[] aside and vacate[d] DOJ's Voter List Maintenance Policy." *Id.* at 77; *see also* Order, ECF No. 52.

After consideration of the Court's memorandum opinion and decision, DOJ has appealed the Court's decision, ECF No. ###, and is filing this motion seeking a stay of that decision pending appeal. In keeping with Local Civil Rule 7(m), Defendants conferred with Plaintiffs via email prior to filing this motion. Plaintiffs have requested that Defendants report the following position: "Plaintiffs oppose the stay motion and, given that Defendants have taken at least a week to seek a stay, Plaintiffs request the 14 days to respond to Defendants' motion allotted by Local Rule 7(b)."

## LEGAL STANDARD

On a motion for a stay pending appeal, courts must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Media Matters for Am. v. FTC*, No. 25-cv-1959, 2025 WL 2434196, at *1 (D.D.C. Aug. 22, 2025) (Sooknanan, J.) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). When the Government

is a party, the factors regarding the public interest and any harm to the Government merge. *See Nken*, 556 U.S. at 435. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34.

**ARGUMENT**

Taken together, the stay factors strongly support staying the Court's entry of judgment pending the resolution of any appeal of that order.

**I. The Government Stands A Substantial Chance Of Success On The Merits.**

As to the first factor, the chance of success on the merits must be "substantial." *Media Matters for America*, 2025 WL 2434196, at *1. "The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, . . . may grant a stay even though its own approach may be contrary to [the] movant's view of the merits." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).

DOJ appreciates and understands that the Court rejected its merits arguments at the dispositive-motion stage. Nonetheless, DOJ respectfully submits that this Court's analysis does not reflect a case in which DOJ lacks a substantial chance of success on the merits of its appeal. For all the reasons articulated in DOJ's dispositive-motion briefing, DOJ is substantially likely to prevail on appeal. But, in this motion, DOJ highlights certain specific points that especially reflect its ultimate chance of success.

**A. The Alleged Policy Is Not A Discrete or Final Agency Action Reviewable Under the APA.**

First, the Court ruled that the "Voter List Maintenance Policy" is sufficiently discrete such that it "constitutes agency action that is reviewable under the APA." Mem. Opn. 45. The Court referred to the alleged policy as a "policy choice" and a "categorical" policy, *i.e.* a "particular

measure" applied by DOJ "across the board." *Id.* at 42. The Court further read the administrative record as clarifying the "contours of the policy being challenged." *Id.* at 43.

The APA's prohibition on programmatic challenges does not allow the Court to amalgamate a "boatload of individual agency actions," *Ctr. for Bio. Diversity v. Burgum*, 826 F. Supp. 3d 18, 34 (D.D.C. 2026, and then fly a "Policy" banner over them. ). Yet, respectfully, the Court's own analysis did just that. The Court's "Voter List Maintenance Policy" constitutes a series of individualized enforcement actions specific to each State. The Court defined the alleged policy,"[b]roadly speaking," as when DOJ "began requesting states' unredacted voter rolls, disclosing the lists to other federal agencies, comparing them against a federal database to identify purportedly ineligible voters, and demanding that states remove voters from their rolls based on the results of those comparisons." Mem. Opn. 9; *see also id.* at 43 (adding to this list the offer of MOUs to States and filing of enforcement action). On its face, that description includes multiple types of administrative actions—requesting information from States, storing any information received, disclosing that information via queries of the SAVE system, and asking (rather than compelling) States to take action based on what DOJ learned. The breadth of these administrative actions, all of which the Court has vacated, emphasize that the Court has used the APA not as a "remedial scalpel," but as a tool to "bludgeon through" a broad programmatic attack. *Ass'n for Educ. Finance and Policy v. McMahon*, 786 F. Supp. 3d 13, 22 (D.D.C. 2025). And it is not true that the alleged policy is reviewable because it "can be complete, with identifiable purposes that can be accomplished." Mem. Opn. at 43. The same is true of "a weapons procurement program of the Department of Defense or a drug interdiction program of the Drug Enforcement Administration[,]" yet those programmatic actions are not reviewable under the APA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990) (quotation marks omitted).

The Court also downplayed the tailoring that DOJ did when it came to each State. The DOJ did not submit identical requests to each State—each request depended on what each State had reported in the Election Assistance Commission's Election Administration and Voting Survey ("Survey"). *Compare, e.g.*, CRT-2327 (mentioning one survey item to Alaska), *with* CRT-2679, CRT-2783, CRT-3501 (requesting information from other States based on six survey items). And States responded differently, prompting DOJ to take subsequent actions specific to each State's response, whether that was accepting the lists without an MOU, *see* ECF No. 32-1 at 9 n.3 (listing States), signing the offered MOU, *see* CRT-5; CRT-2054; signing a modified MOU, *see* CRT-21, or initiating enforcement actions. *Accord* Mem. Opn. 9 ("States responded in different ways."). The point is that DOJ did not take a "cookie-cutter" approach, *id.* at 44; each State received different treatment depending on their response to DOJ's request. The APA does not permit fabrication of a policy in order to vacate all those individual enforcement actions with one broad brush.

Even if the alleged policy is a sufficiently discrete agency action reviewable under the APA, its individual components are not *final* agency actions reviewable under that statute. *Contra* Mem. Opn. 45–46. Requesting unredacted voter rolls does not determine legal rights or obligations. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). States had the option to provide the requested information; many did, many did not. And contrary to the Court's conclusion, "each" letter was not "phrased in mandatory language," Mem. Opn. 45, but rather as requests for States to "please" provide information, *see, e.g.*, CRT-2107; CRT-2327; CRT-3051. In that sense, DOJ's letters did not "require anyone to do anything[,]" a hallmark of non-final agency action. *Cal. Communities Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). If any legal consequences arise, therefore, they stem from each State's decision on whether or not to provide

voter rolls. Indeed, the Court's examples of legal consequences from the letters—"settlement agreements, memoranda of understanding, and enforcement litigation"—can only occur once a State makes a decision on how to comply with DOJ's letters and then DOJ responds to *that* decision. Mem. Opn. 45. Those consequences, then, do not "flow" from the letters themselves. *Bennett*, 520 U.S. at 178 (citation omitted). And if they did as a legal matter, then any interlocutory action that leads to final agency action is also reviewable under the APA.

The Court also stated that "nonconsensual sharing of individuals' confidential information *itself* creates legal consequences[.]" Mem. Opn. 46. That is not correct—when DOJ runs names through SAVE, it shares information with another department within the Executive Branch. Article II creates a unitary Executive, and sharing information among arms of that unitary entity is not an "appreciable legal consequence." *Bennett*, 520 U.S. at 178. Indeed, in this case, a positive hit in SAVE at most notifies DOJ that a particular person *might* be an ineligible voter, but the *decision* to remove that person from voter rolls is made by the State, not by DOJ.

**B. The Government Is Likely To Demonstrate Success On The Merits.**

The Court identified four grounds for invalidating the alleged policy, but none are likely to prevail on appeal.

**1. The Civil Rights Act authorizes DOJ's requests for voter rolls.**

The Court determined that the alleged policy is in excess of statutory authority, but in so holding, the Court misapplied and misinterpreted Title III of the Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 89. That statute requires state election officials to "retain and preserve" certain records related to voting in federal elections and, "upon demand by the Attorney General or his representative," to make those papers "available for inspection, reproduction, and copying." 52 U.S.C. § 20703. The Court held that DOJ's letters do not state a cognizable request under Title

III because they do not "contain a statement of the basis and the purpose" for each request, as Title III requires. 52 U.S.C. § 20703; *see* Mem. Opn. 50–52.

That conclusion was erroneous. As a textual matter, Title III's requirement that the Attorney General state "the basis and the purpose" for his request does not require separate statements. *Contra* Mem. Opn. 49 (holding that "the basis" and "the purpose" "must have distinct meanings"). "[T]he basis and the purpose" is a legal doublet, much like "aid and abet," "cease and desist," and "null and void." Those phrases do not require separate meanings for each term in the doublet. *Accord* Antonin Scalia & Bryan Garner, *Reading Law* 177 (2012) ("Doublets and triplets abound in legalese."). The Court was wrong to require as much here, particularly given the background rule that agencies endowed with investigatory powers by Congress "can investigate merely on suspicion that the law is being violated, or even just because [the agency] wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950). Given that the Attorney General's authority under Title III is "purely investigative[,]" *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney General of the U.S.*, 285 F.2d 430 (5th Cir. 1961), Title III requires DOJ to state at most the legal basis for its request. DOJ's letters did so, making clear that they relied on Title III of the Civil Rights Act, and were propounded to ascertain compliance with other federal statutes. *See, e.g.*, CRT-2594; CRT-2949.

In any event, DOJ did explain "the basis" for many of its requests. 52 U.S.C. § 20703. In most of those requests, DOJ identified discrepancies and potential anomalies in the State's responses to the Survey. *See, e.g.*, CRT-2700; CRT-2767; CRT-3160. Those potential irregularities provided ample basis to investigate whether States were complying with various voting laws and sufficiently articulated DOJ's belief "that states had not been complying with their

list-maintenance obligations under the NVRA and HAVA." Mem. Opn. 50. The Court does not mention DOJ's reference to those Survey items in many letters and instead faults DOJ for not explicitly stating that those potential anomalies created a belief that States were violating the law. Respectfully, there is no such plain-statement requirement in Title III and, even if there was, the letters when read as a whole clearly state DOJ's belief that Survey irregularities caused suspicion of unlawful behavior.

Indeed, the fact that different letters took different approaches in different contexts further supports the fact the purported policy is not itself an actual final agency action, but on a view of the law that the Court viewed legally incorrect. Indeed, "'[a]n agency merely express[ing] its view of what the law requires of a party,' is typically not final agency action under the APA." *Delaware Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*, 678 F. Supp. 3d 73, 81 (D.D.C. 2023) (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.)).

**2. DOJ Has Not Violated the Privacy Act.**

DOJ continues to assert that its actions have not violated the "procedural and substantive protections" of the Privacy Act for all the reasons mentioned in its brief. Mem. Opn. 57. Two arguments bear mentioning here in support of a stay pending appeal.

*First* is the effect of 8 U.S.C. § 1373.[1] Subsection (a) provides that, "[n]otwithstanding any other provision" of law, no one may "prohibit, or in any way restrict, any government official

---

[1] Defendants reject any suggestion that they waived any argument based on § 1373. *See* Mem. Opn. 11 n.4 (observing that "[n]either Party argues that Section 1373 is implicated in this case"). Defendants cited § 1373 twice in their opening brief and argued that it requires DHS "to respond to requests by a sister state or local agency for the immigration status of any individual." ECF No. 32-1 at 31. Defendants also cited § 1373 to argue that DOJ's use of SAVE cannot violate the Privacy Act because, pursuant to that statute, Congress "has statutorily authorized the SAVE system and its use by other agencies." *Id.* at 45–46. That is the same reasoning the Supreme Court recently adopted. *See DHS v. League of Women Voters*, No. 26A308, slip op. at 4–5 (U.S. Sept. 25, 2026). Section 1373 is a part of this case, and Defendants raised it to this Court's attention.

from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. 1373(a). And subsection (b) precludes anyone, "[n]otwithstanding any other provision" of law, from "prohibit[ing], or in any way restrict[ing]," a federal agency from "doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual": (1) "[s]ending such information to, or requesting or receiving such information from, [DHS]," (2) "[m]aintaining such information," or (3) "[e]xchanging such information" with other governmental entities. 8 U.S.C. 1373(b). Those subsections "necessarily authoriz[e] DHS" to engage in the activities listed therein, and the Supreme Court has explained that § 1373's "notwithstanding clauses" supersede restrictions on disclosure "elsewhere in the [U.S.] Code[,]" including laws "like . . . the Privacy Act." *League of Women Voters*, No. 26A308, slip op. at 4–5.

That holding by the Supreme Court controls this case. DOJ's maintenance of citizenship-related information obtained from States and its sharing of that information with DHS and other federal agencies fall squarely within § 1373's references to "[m]aintaining such information," 8 U.S.C. 1373(b)(2), and to "sending" such information to or "[e]xchanging" it with DHS, 8 U.S.C. 1373(a), (b)(1) and (3). DOJ therefore can engage in those activities notwithstanding the Privacy Act's restrictions. *See League of Women Voters*, No. 26A308, slip op. at 4.

*Second* is the inability for Plaintiffs to enforce the Privacy Act through the APA. Plaintiffs cannot "exploit[] the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). The Privacy Act authorizes injunctive relief in only two circumstances—amendment of a record and access to a record, 5 U.S.C. § 552a(g)(2)-(3)—and for all other violations permits only damages, and even then, only when the violation is intentional or willful," *id.* § 552a(g)(4). Within

such a reticulated scheme, "the omission" of a remedy "is sufficient reason to believe that Congress intended to foreclose [it]." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 347 (1984). Congress thus forbade any vacatur relief, a decision that would be rendered meaningless if Plaintiffs could simply invoke the APA and obtain vacatur in all circumstances.

Moreover, the D.C. Circuit has not already rejected this argument, as the Court concluded. *See* Mem. Opn. 58 (citing *Doe v. Stephens*, 851 F.2d 1457, 1465–67 (D.C. Cir. 1988)). *Stephens* permitted an APA action to enforce a *different* statute—the Veterans' Records Statute—that borrowed some of the Privacy Act's substantive standards but contained no remedial scheme of its own. *See* 851 F.2d at 1465–67. This Court also erroneously relied on the codification of the APA and the Privacy Act in Title 5. *See* Mem. Opn. 58. When Congress codified Title 5, it expressly instructed that "[a]n inference of a legislative construction is not to be drawn by reason of the location in the United States Code of a provision enacted by this Act." Act of Sep. 6, 1966, Pub. L. No. 89-554, § 7(e), 80 Stat. 631. Such "interpretation clauses are to be closely followed." Scalia & Garner 225; *see also United States v. Dixon*, 347 U.S. 381, 385–86 (1954). It also bears noting that the D.C. Circuit has applied the APA's other-adequate-remedy bar to the Freedom of Information Act, which is also codified in Title 5. *See Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1246 (D.C. Cir. 2017). The Privacy Act's placement therefore does not support the Court's conclusion.

**3. DOJ Has Not Violated the Paperwork Reduction Act.**

The Court concluded that DOJ's letters constituted a "collection of information" under the Paperwork Reduction Act (PRA). Mem. Opn. 73–76. The Court rested this determination on the fact that the letters "imposed an identical *reporting* requirement on each state by demanding that each state produce its [voter roll]." *Id.* at 74. That is incorrect. Although each letter "ask[ed] for

a common piece of data," *id.* at 75, the letters were not identical, as the Court acknowledged, *see id.* at 74 ("To be sure, the administrative record reveals differences among the letters that DOJ sent to every state."). The PRA's requirements apply only when an agency imposes "identical" reporting requirements. 44 U.S.C. § 3502(3). Because the letters request different things from each State, they are not identical.

Moreover, the Court disregarded the PRA's exclusion of any "collection of information" undertaken "during . . . an administrative action or investigation involving an agency against specific individuals or entities." 44 U.S.C. § 3518(c)(1)(B). The word "specific" serves to distinguish between investigations targeting generic issues (such as a generic investigation into how to improve federal election laws) and investigations targeting identifiable individuals or entities who may have violated federal law (such as the investigation here). An investigation that targets "specific individuals or entities" does not become any less specific simply because, as here, its targets are numerous.

**4. DOJ Has Not Acted Arbitrarily or Capriciously.**

The Court faulted DOJ for supposedly "fail[ing] to consider the substantial risk" that SAVE's gaps "would result in the erroneous removal of eligible voters from states' [voter rolls]." Mem. Opn. 55. Respectfully, the Court appears to assume that any risk of its supposed policy originates from DOJ, even though DOJ has not required States to remove anyone from voter rolls simply because SAVE cannot confirm that person as a citizen. At most, DOJ notifies States when DOJ cannot confirm a registered voter's eligibility. It is up to the States to decide how to respond to the notification consistent with the State's duties under HAVA and/or the NVRA. And the administrative record in this case shows that multiple States, rather than commit to removing voters flagged by SAVE, asked DOJ to provide all information substantiating DOJ's suspicion that an individual voter was ineligible. *See* CRT-1800; CRT-1995; CRT-3126; CRT-3261; CRT-3276.

This makes sense because each State's independent legal obligation to maintain "safeguard[s] to ensure that eligible voters are not removed in error from the official list of eligible voters," 52 U.S.C. § 21083(a)(4)(B), continues after a State receives information from DOJ. DOJ's supposed failure to consider the risk of erroneous removals could not have been arbitrary or capricious given that it is States, and not DOJ, that make voter removal decisions.

## II. The Remaining Stay Factors Weigh Decisively In Favor Of A Stay.

DOJ is suffering significant irreparable harm as a result of the Court's decision. And when the Government is a party, the stay factors regarding the public interest and any harm to the Government merge. *See Nken*, 556 U.S. at 435.

The Court's decision has derailed ongoing efforts by DOJ to enforce election laws. As described in the attached declaration, DOJ can no longer compare voter rolls to determine if those rolls "contain[] the names of duplicate voters." Neff Decl. ¶ 9a. Although this case has largely focused on efforts to identify non-citizens that are eligible to vote, *see* Mem. Opn. 11–12, voters who are registered to vote in multiple States similarly risk diluting the franchise for other Americans that have followed all applicable laws and registered to vote in only one State. *See, e.g.*, 52 U.S.C. § 10307(e). Comparing state voter rolls is the best and most efficient way to identify duplicate voters, yet because the Court has vacated DOJ's policy to "identify ineligible voters" using the voter rolls in its possession, Mem. Opn. 43, DOJ cannot conduct those comparisons. The decision therefore creates gaps in DOJ's ability to enforce voting laws. One such gap would arise if DOJ were to learn that a State's voter roll contains ineligible voters; under the Court's decision, DOJ could not investigate that violation based on the contents of a State's voter roll. *See* Neff Decl. ¶ 9b.

The Court's decision might also threaten to impact ongoing judicial enforcement actions that are not before it, though the reach of the Court's decision in this regard is unclear. To be clear, DOJ does not interpret the Court's decision as pretermitting or requiring dismissal of ongoing Article III actions that are seeking to obtain voter rolls, including any appeals. *See* Mem. Opn. 10 n.3 (listing out several enforcement actions). But if the Court's decision does extend that far, the decision exacts an even more extraordinary harm on the Executive Branch by dictating that it cannot pursue ongoing enforcement actions. *See United States v. Texas*, 599 U.S. 670, 678 (2023) ("Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions." (citation omitted)). That would be even more reason to enter a stay given the effect on the Executive Branch's prerogative to bring enforcement actions. At the very least, the decision has already affected DOJ's ability to litigate one pending appeal. *See* Neff Decl. ¶ 10.

To be clear—and contrary to the implication in Plaintiffs' recent Notice that it is "implicated", ECF No. 52—DOJ does not believe the Court's vacatur order forecloses a recent complaint recently filed by the United States against California. *See United States v. California*, No. 2:26-cv-12025 (C.D. Cal.). That suit does not arise from the purported policy that this Court vacated. Before filing suit, no government agency requested California's unredacted voter roll—DHS obtained the publicly accessible voter roll through a lawful purchase. *See* Cal. Elec. Code § 2188 (making California's voter roll available for purchase). DHS is not a defendant in this case, nor is it subject to this Court's order. Indeed, the Court described the enjoined policy as that of "the Civil Rights Division." Mem. Op. at 2. DHS also did not use SAVE to identify the potentially ineligible voters that form the crux of that complaint. *See* ECF No. 1 at 9 n.1, *United States v. California*, No. 2:26-cv-12025 (C.D. Cal.). DOJ's purported policy included, as an element,

"comparing SVRLs to SAVE," which did not occur in the lead-up to the United States' recent complaint. Mem. Opn. 43. The Court's decision does not extend to using other methods to identify potential ineligible voters. Indeed, Plaintiffs' suggestion that materially different types of activities are covered by this Court's order, simply because they involve DOJ's efforts to ensure ineligible voters do not vote, is further illustration of why there is no discrete final agency action at issue here. As noted, though, if the Court's decision does extend that far, the infringement on the Executive Branch's authority is added reason to grant a stay pending appeal.

It is vitally important that DOJ be able to conduct its investigatory and oversight role without unnecessary roadblocks. Congress has required nothing less by giving DOJ enforcement authority in the NVRA and HAVA. The Court's order threatens DOJ's ability to perform that role right now and derails the "need for effective oversight" ahead of multiple elections, including the upcoming midterms. Neff Decl. ¶ 10.

## CONCLUSION

The Court should stay its order entering judgment for Plaintiffs, ECF No. 52, pending the resolution of Defendants' appeal of that order to the D.C. Circuit.

Dated: October 16, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

*/s/ Joseph E. Borson*
JOSEPH E. BORSON
Assistant Director
Federal Programs Branch

CHRISTIAN DIBBLEE
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 598-5389
Email: Joseph.Borson@usdoj.gov

*Counsel for Defendants*