**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMON CAUSE, *et al*.

Plaintiffs,

v.

U.S. DEPARTMENT OF JUSTICE, *et al*.

Defendants.

Case No. 1:26-cv-01352-SLS

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. Defendants' Voter List Maintenance Policy ........ 3

II. DOJ's subsequent litigation. ........ 5

LEGAL STANDARD ........ 6

ARGUMENT ........ 7

I. Defendants are not substantially likely to succeed on the merits. ........ 7

A. The Policy is a final agency action. ........ 8

1. The Policy is a discrete agency action. ........ 8

2. The Policy is final. ........ 11

B. Defendants' Policy lacks statutory authorization ........ 13

1. Title III of the Civil Rights Act does not authorize the Policy. ........ 14

2. Defendants are not likely to succeed in showing that DOJ's demands for unredacted SVRLs satisfy Title III's requirements. ........ 16

C. Defendants' Policy violates the Privacy Act. ........ 20

1. Defendants' Section 1373 argument fails. ........ 20

a. Defendants forfeited their new argument that Section 1373(a) and (b) impliedly repealed the Privacy Act. ........ 20

b. Section 1373 does not excuse DOJ's collection and sharing of SVRLs from the protections of the Privacy Act. ........ 22

2. The APA provides a remedy for Defendants' Privacy Act violations. ........ 28

D. Defendants' Policy violates the Paperwork Reduction Act. ........ 29

E. Defendants' Policy is arbitrary and capricious. ........ 31

II. Defendants will not be irreparably harmed absent a stay. ........ 34

III. The balance of equities and public interest weigh heavily in Plaintiffs' favor. ........ 37

CONCLUSION ........ 41

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
585 U.S. 579 (2018)....................36

*AFL-CIO v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025)....................12

*Am. Hosp. Ass'n v. Kennedy*,
164 F.4th 28 (1st Cir. 2026)....................7

*Bostock v. Clayton County., Georgia*,
590 U.S. 644 (2020)....................28

*Center for Biological Diversity v. Burgum*,
826 F. Supp. 3d 18 (D.D.C. 2026)....................10

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)....................39

*Citizens for Resp. & Ethics in Wash. v. FEC*,
904 F.3d 1014 (D.C. Cir. 2018)....................8

*City & County of San Francisco v. Garland*,
42 F.4th 1078 (9th Cir. 2022)....................25

*Danco Lab'ys, LLC v. Louisiana*,
146 S. Ct. 1192 (2026)....................36

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)....................35

*DHS v. League of Women Voters*,
2026 WL 2879700 (U.S. Sept. 25, 2026).................... *passim*

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025)....................35

*District of Columbia v. Air Fla., Inc.*,
750 F.2d 1077 (D.C. Cir. 1984)....................7

*Doe v. Chao*,
540 U.S. 614 (2004)....................30

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988)....................30

*E. Band of Cherokee Indians v. United States Dep't of the Interior*,
534 F. Supp. 3d 86 (D.D.C. 2021)....................14

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*,
396 F.3d 1265 (D.C. Cir. 2005)....................30

**Cases—cont.**

*Frederick Douglass Found., Inc. v. D.C.*,
531 F. Supp. 3d 316 (D.D.C. 2021)........14

*Freeman v. Quicken Loans, Inc.*,
566 U.S. 624 (2012)........18

*Garcia v. Vilsack*,
563 F.3d 519 (D.C. Cir. 2009)........30

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989)........39

*Hyatt v. OMB*,
998 F.3d 423 (9th Cir. 2021)........32

*Jenner & Block LLP v. DOJ*,
784 F. Supp. 3d 76 (D.D.C. 2025)........43

*Jud. Watch, Inc. v. FBI*,
2019 WL 4194501 (D.D.C. Sept. 4, 2019)........12

*KalshiEX LLC v. CFTC*,
119 F.4th 58 (D.C. Cir. 2024)........6, 7

*League of United Latin Am. Citizens v. EOP*,
818 F. Supp. 3d 34 (D.D.C. 2026)........40, 41

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)........43

*League of Women Voters v. DHS*,
2026 WL 1972055 (D.D.C. July 8, 2026)........*passim*

*League of Women Voters v. DHS*,
2026 WL 2643439 (D.C. Cir. Sept. 4, 2026)........7, 24

*League of Women Voters v. DHS*,
835 F. Supp. 3d 79 (D.D.C. 2026)........30, 31

*Loughrin v. United States*,
573 U.S. 351 (2014)........27, 29

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)........11, 12

*Make The Rd. New York v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020)........31

*McCammon v. United States*,
588 F. Supp. 2d 43 (D.D.C. 2008)........7

*Meharry Med. Coll. v. Nat'l Lab. Rels. Bd.*,
2025 WL 1372842 (M.D. Tenn. May 12, 2025)........14

**Cases—cont.**

*Ndongala v. Wesling*,
2026 WL 1534981 (D. Mass. June 1, 2026) ........ 14

*Nenninger v. United States Forest Serv.*,
2007 WL 9724286 (W.D. Ark. June 28, 2007) ........ 14

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 41

*Pub. Int. Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025) ........ 20

*United States v. Alaska*,
26-cv-00376 (D. Alaska Oct. 22, 2026) ........ 11

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) ........ 15

*United States v. Amore*,
No. 26-1665 (1st Cir. Oct. 22, 2026) ........ 39

*United States v. Bellows*,
834 F. Supp. 3d 113 (D. Me. 2026) ........ *passim*

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) ........ 15, 17, 40

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ........ 25

*United States v. California*,
No. 26-cv-12025 (C.D. Cal. Oct. 15, 2025) ........ 6, 34, 41

*United States v. City of Boston*,
833 F. Supp. 3d 30 (D. Mass. 2026) ........ 26

*United States v. Evans*,
2026 WL 2267774 (D.D.C. Aug. 6, 2026) ........ 40

*United States v. Fontes*,
832 F. Supp. 3d 944 (D. Ariz. 2026) ........ 17

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) ........ 18, 19

*United States v. Illinois*,
796 F. Supp. 3d 494 (N.D. Ill. 2025) ........ 26

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ........ 19

*United States v. Oliver*,
2026 WL 2031479 (D.N.M. July 14, 2026) ........ 19

**Cases—cont.**

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) ....................15, 16, 20, 40

*United States v. Raffensperger*,
2026 WL 3002013 (N.D. Ga. Sept. 30, 2026) ....................6, 36

*United States v. Scanlan*,
838 F. Supp. 3d 150 (D.N.H. 2026)....................17, 20

*United States v. Schmidt*,
835 F. Supp. 3d 697 (W.D. Pa. 2026)....................20, 40

*United States v. Texas*,
599 U.S. 670 (2023)....................39, 40

*United States v. Thomas*,
2026 WL 2070437 (D. Conn. July 17, 2026) ....................17

*United States v. Warner*,
840 F. Supp. 3d 446 (S.D. W.Va. 2026)....................15, 19, 21

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .................... *passim*

*United States v. Wisc. Elections Comm'n*,
833 F. Supp. 3d 949 (W.D. Wis. 2026) ....................15, 17

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)....................39

**Statutes & Regulations**

5 U.S.C. § 552a(b) ....................13

8 U.S.C.
§ 1373.................... *passim*
§ 1373(a) .................... *passim*
§ 1373(b).................... *passim*
§ 1373(c) .................... *passim*

38 U.S.C. § 5701(j)....................30

42 U.S.C. § 3502(3)(A)....................32

44 U.S.C.
§ 3501(1)....................32
§ 3518(c)(2) ....................32

**Statutes & Regulations—cont.**

52 U.S.C.
§ 10307(e) .......... 37, 38
§ 20507(i) .......... 16
§ 20507(a)(4) .......... 17, 21
§ 20507(c)(2)(A) .......... 37
§ 20510(a) .......... 21
§ 20701 .......... 17
§ 20704 .......... 17
§ 21083(a)(1)(A) .......... 16, 17
§ 21083(a)(4)(A) .......... 21
§ 21111 .......... 21

IIRIRA, Pub. L. No. 104-208, div. C, § 110, 110 Stat. 3009 (1996) (amended 2000) .......... 29

**Other Authorities**

DHS, SAVE User Reference Guide, *8.2 How to Submit Cases in Bulk* .......... 29

Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) .......... 3, 9

F.A. United States Attorney Bill Essayli (@USAttyEssayli), X (Oct. 16, 2026) .......... 5

*Black's Law Dictionary* (6th ed. 1990) .......... 28

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1994) .......... 28

Miles Parks & A Martinez, *DOJ sues California to block the counting of mail-in ballots from alleged noncitizens,* NPR (Oct. 16, 2026) .......... 41

Miles Parks, *The Justice Department begins notifying counties where it wants to monitor elections,* NPR (Oct. 21, 2026) .......... 11

Press Release, U.S. Att'ny Off. C.D. Cal., *11 Foreign Nationals Arrested in California on Federal Charges Alleging They Illegally Registered and Voted in U.S. Elections* .......... 11

Press Release, U.S. Att'ny Off. E.D.N.C., *EDNC Unveils Ten Federal Indictments Alleging Noncitizens Voted in the 2024 Election*, DOJ (Oct. 15, 2026) .......... 11

Sarah Lynch, *DOJ threatens criminal action against states that allow noncitizens to vote*, CBS News (July 8, 2026) .......... 5

*Tracker: DOJ Lawsuits Seeking States' Sensitive Voter Data*, University of Wisconsin-Madison State Democracy Research Initiative (last updated Oct. 22, 2026) .......... 14

## INTRODUCTION

Two weeks ago, this Court entered summary judgment for Plaintiffs, finding that the Department of Justice and the Attorney General (collectively "DOJ" or "Defendants") adopted a Voter List Maintenance Policy (the "Policy") of making "every American citizen who registers to vote . . . the subject of a voter fraud investigation . . . simply because they registered to vote." Memo. Op., ECF 51 at 2. As the Court correctly concluded, the Policy "represents the federal government's attempt to decide who gets to vote," even though "Congress has left that authority where our Constitution has always placed it: with the states." *Id.* And in the process, Defendants have "run roughshod over longstanding laws that were carefully crafted to protect the rights of the American people." *Id.* A week later, Defendants asked this Court to stay its summary judgment order. Defs.' Mot. for Stay Pending Appeal, ECF 57. That motion should be denied.

To start, Defendants are not substantially likely to prevail in arguing that "[t]here is no . . . Policy." ECF 57 at 1. Thousands of pages in the Administrative Record ("AR") establish Defendants' Policy of collecting states' voter data and voter rolls ("SVRLs") and using that information to superintend states' responsibility to determine voter eligibility, an effort DOJ described internally as its "list maintenance project." *See* ECF 51 at 9 (quoting CRT-7; CRT-27). Voluminous evidence thus demonstrates Defendants' Policy and its implementation. "Only by ignoring the elephant in the room could the Defendants argue that this is not agency action." *Id.* at 44.

Nor are Defendants substantially likely to succeed in establishing the lawfulness of their unprecedented Policy. This Court held that Defendants' actions are unlawful for four independent reasons: "First, the Defendants' claimed authorities—Civil Rights Act of 1960, the National Voter Registration Act, and the Help America Vote Act—do not authorize the policy." *Id.* at 2. "Second, the policy is arbitrary and capricious under the Administrative Procedure Act." *Id.* "Third, the

policy violates both substantive and procedural protections in the Privacy Act, a statute designed to ban federal data banks and preserve the American tradition of limited, transparent government." *Id.* "And fourth, the policy violates limits imposed by the Paperwork Reduction Act." As a result, the Court set aside and vacated "a policy that flies in the face of duly enacted laws designed to protect Americans." *Id.* at 3. Defendants' claim that they are substantially likely to succeed on appeal is based on arguments identical to the ones the Court already rejected, plus a forfeited and meritless argument regarding 8 U.S.C. § 1373 raised for the first time in this stay posture. Those are not grounds for the extraordinary remedy of a stay.

Finally, Defendants lump together irreparable harm, the public interest, and the balance of the equities to try to obscure that none of these factors weigh in favor of a stay. The public interest and balance of equities weigh heavily in favor of protecting the privacy and voting rights of the tens of millions of Americans targeted by Defendants' illegal Policy. Via the Policy, Defendants are trying to collect sensitive data—like Social Security numbers and driver's license numbers—to put every voter in America, more than 170 million people, under investigation. And if Defendants collect that information, they plan to consolidate it in databases vulnerable to hackers, and force states to purge voters from the voter rolls using systems that frequently make "misclassifications lead[ing] to misidentifications of lawful voters as wrongfully registered." ECF 51 at 35.

On the other side of the ledger, none of the "harms" identified by Defendants are irreparable. *See* ECF 57 at 12-14; *see generally* Neff Declaration, ECF 57-2. Rather, Defendants have merely been ordered to pause their illegal, unprecedented, and reckless efforts to usurp states' roles as election administrators, which this Court and 27 other federal courts across the country have rejected as contrary to law. The Court was unequivocal: its vacatur Order merely returns DOJ

to what it did for decades prior to the Policy; it remains free to robustly enforce federal voter protection statutes through proper legal mechanisms. *See* ECF 51 at 3.

## BACKGROUND

### I. Defendants' Voter List Maintenance Policy

To implement the directives of President Trump's Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025), Defendants enacted a Policy "to identify those who may be voting illegally (whether by reason of alienage or otherwise)." ECF 51 at 44 (quoting CRT-3330). Out of the public eye, Defendants referred to the Policy as their "list maintenance project" or "NVRA List Maintenance Project." *Id.* at 9 (quoting CRT-7; CRT-27; CRT-3397). "The head of DOJ's Civil Rights Division described the policy as a 'comprehensive effort' to 'request the voter rolls from all states and the District of Columbia' for 'voting hygiene.'" *Id.* at 44 (cleaned up). And DOJ sought an opinion from its Office of Legal Counsel ("OLC") on the Policy's legality. *See id.* at 42 n.11; *see also id.* at 44. The Policy consisted of Defendants "'seeking statewide voter lists, and then sharing the lists with Homeland Security Investigations or another unit within DHS' to 'enable cross-referencing the lists against existing databases in order to identify illegal aliens who are ineligible to vote' so that DOJ could 'seek to strike the individual's name from the voter registration list for future elections.'" *Id.* at 44 (quoting CRT-3330, CRT-3334) (cleaned up); *see also id.* at 42 ("OLC provided its opinion on the Division's 'proposal'—made 'in response to the President's order'—'to seek statewide voter lists, and then to share the lists' with DHS." (quoting CRT-3330)).

To execute this Policy, DOJ "began requesting states' unredacted voter rolls, disclosing the lists to other federal agencies, [and] comparing them against" federal databases. *Id.* at 9. DOJ contemporaneously sent its demands for unredacted SVRLs "to 49 states and the District of Columbia." *Id.* And at the same time, "DOJ offered each state a memorandum of understanding

that was 'constructed as an offer to *all states*' and could not 'be redlined in any fashion.'" *Id.* at 43 (quoting CRT-1875).

"At least 18 states fully cooperated, turning over their unredacted SVRLs." *Id.* at 9-10. Other states did not provide DOJ their *unredacted* SVRLs, but did provide or make available copies of SVRLs without certain identifying data, such as Social Security Numbers and driver's license numbers. *See id.* at 65 (noting that one component of the Policy was DOJ's collection and disclosure of "public Statewide Voter Registration Lists (SVRLs)"); *see also* CRT-964 (stating California "made available for public inspection a copy of California's voter registration list at my office in Sacramento, with appropriate redactions of social security numbers, driver's license numbers, and similar protected personal identifying information as required under California law and allowed under the NVRA"); CRT-1709 (stating Michigan was "providing the public version of our statewide voter registration list").

DOJ also partnered with the Department of Homeland Security ("DHS") to implement the Policy. First, DHS ran data obtained by Defendants through the Systematic Alien Verification for Entitlements ("SAVE") system administered by the U.S. Citizenship and Immigration Services ("USCIS"), a component of DHS. *See* ECF 51 at 11. Second, DOJ entered into a separate "arrangement" with a different DHS component, Homeland Security Investigations ("HSI"), "so that HSI could 'conduct appropriate investigation of potential violations of federal election law' and 'enrich the [public] SVRL datasets with DHS records to allow for vetting via the SAVE system.'" *Id.* at 12 (quoting CRT-3400); *see also* CRT-3398-3400. DOJ also "reserved the option to share SVRLs outside of DOJ and DHS," including with contractors. *Id.* at 13.

The AR makes clear that the ultimate goal of Defendants' Policy was to dictate to states who could and could not vote. In Defendants' memoranda of understanding with certain states

who turned their unredacted SVRLs over to DOJ, Defendants stated they would "alert the states of any voters listed on the SVRLs whom it deemed to be noncitizens," and the states "in turn, agreed to 'clean' their SVRLs within 45 days of notification by DOJ by removing those voters deemed ineligible by the Division." *Id.* (collecting AR cites). Defendants also pursued the same goal by attempting to enforce the Policy against the states who refused to turn over their unredacted SVRLs: as DOJ emphasized in its litigation against non-complying states, DOJ was seeking the states' unredacted SVRLs "to run these lists against other databases to be able to tell if there are bad registrations on their rolls." Hill Decl., ECF 29-2 Ex. 5, p. 70.[1]

## II. DOJ's subsequent litigation.

DOJ has sued each of the thirty states, as well as the District of Columbia, that have declined to turn over their unredacted voter files. ECF 51 at 10, 45. So far these suits have uniformly failed. As the Court noted in its Memorandum Opinion, no court has accepted DOJ's theory that it may compel the production of states' unredacted voter files; 26 federal district courts have dismissed those actions, and one circuit court has affirmed dismissal. ECF 51 at 10, n.3; *United States v. Raffensperger*, 2026 WL 3002013, at *6-9 (N.D. Ga. Sept. 30, 2026). In the words of one such decision, DOJ's requests to states are "unprecedented and illegal." *United States v.*

[1] Defendants have also repeatedly taken the position that, once they identified individuals they determine should be removed from the voter rolls, they have the authority to subject local officials to criminal legal consequences for knowingly facilitating unlawful voting if those local officials refuse to purge alleged non-citizen voters. Assistant Attorney General Harmeet Dhillon sent a letter to state election officials in all 50 states stating: "Any election officer, including the chief election officer of the state, who knowingly retains noncitizens on the state's SVRL or facilitates noncitizens in receiving and casting ballots could be subject to criminal liability." Sarah Lynch, *DOJ threatens criminal action against states that allow noncitizens to vote*, CBS News (July 8, 2026), https://perma.cc/M363-ELS4. More recently, Acting Deputy Attorney General Trent McCotter sent a letter to election officials in California threatening criminal liability if officials refuse to comply with an instruction to segregate mail ballots cast by individuals identified by DOJ. F.A. United States Attorney Bill Essayli (@USAttyEssayli), X (Oct. 16, 2026), https://perma.cc/3R6Q-N6ML.

*Weber*, 816 F. Supp. 3d 1168, 1174 (C.D. Cal. 2026) (finding DOJ's request "unprecedented and illegal"); *see also United States v. Bellows*, 834 F. Supp. 3d 113, 125 (D. Me. 2026) (the NVRA and HAVA do not contemplate "the line-by-line audit of each state's computerized SVRL by the federal government").[2]

## LEGAL STANDARD

"A stay pending appeal is an 'extraordinary' remedy." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024). "It is 'an intrusion into the ordinary processes of administration and judicial review and accordingly is not a matter of right.'" *League of Women Voters v. DHS*, 2026 WL 1972055, at *1 (D.D.C. July 8, 2026) ("*LWV* Stay Op.") (quoting *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020)).[3] "To obtain such exceptional relief, the stay applicant must (1) make a

[2] On October 13, 2026—four days after the Court's decision in this case—DOJ sent letters to California Secretary of State Shirley Weber and Los Angeles County Registrar-Recorder/County Clerk Dean Logan, giving them two days to review a list of purported "likely noncitizens who were sent a vote-by-mail ballot" and directing the officials to (1) segregate already-returned ballots from listed voters who could not immediately be verified as citizens, and (2) refrain from sending a ballot to any such individual on the list to whom a ballot had not yet been sent. *See* Notice Exs. 1 & 2, ECF 42-1, 42-2. Both officials declined to acquiesce. *See id.* On October 15, 2026, the federal government sued California, Secretary Weber, and Registrar-Recorder/County Clerk Logan. Compl., ECF 1, *United States v. California*, No. 26-cv-12025 (C.D. Cal. Oct. 15, 2025). That complaint describes a process in which USCIS and HSI reviewed voter data, enriched the data seemingly using the same process outlined in DOJ's arrangement with HSI, and transmitted the enriched voter data to DOJ. *Compare id.* ¶¶ 33-43 *with* ECF 51 at 12-13; CRT-3398-3400 (describing HSI enrichment process when assisting DOJ with implementation of Policy). On October 19, 2026, the government filed an *ex parte* motion for a temporary restraining order and order to show cause why a preliminary injunction should not issue, which remains pending. TRO Mot., ECF 22, *California*, No. 26-cv-12025 (C.D. Cal. Oct. 19, 2025); *see also* Mem. in Support of TRO, ECF 22-2 ("TRO"). On October 22, 2026, although the TRO motion remained pending, the government appealed to the Ninth Circuit because "the Court's silence is a constructive denial of the United States' emergency application for preliminary injunctive relief." Notice of Appeal, ECF 74, *California*, No. 26-cv-12025 (C.D. Cal. Oct. 22, 2026).

[3] Although the Supreme Court ultimately entered a stay pending appeal in *LWV*, *see DHS v. League of Women Voters*, 2026 WL 2879700 (U.S. Sept. 25, 2026) (per curiam), it did not disturb this Court's conclusions on forfeiture, *see generally id.*, with which the D.C. Circuit agreed, *see League of Women Voters v. DHS*, 2026 WL 2643439, at *5-8 (D.C. Cir. Sept. 4, 2026) (per curiam).

'strong showing that [it] is likely to succeed on the merits'; (2) demonstrate that it will be 'irreparably injured' before the appeal concludes; (3) show that issuing a stay will not 'substantially injure the other parties interested in the proceeding'; and (4) establish that 'the public interest' favors a stay." *KalshiEX*, 119 F.4th at 63 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

Because "granting a stay pending appeal is always an extraordinary remedy, . . . the moving party carries a heavy burden to demonstrate that the stay is warranted." *McCammon v. United States*, 588 F. Supp. 2d 43, 47 (D.D.C. 2008); *accord LWV* Stay Op., 2026 WL 1972055, at *10. And "[i]t is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984); *see also Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 35-36 (1st Cir. 2026) (denying motion for stay pending appeal because government could not establish strong likelihood of success on argument that was "waived because the federal government did not develop it" in merits briefing below). Thus, "a motion to stay should not be used to relitigate matters, submit new evidence, or raise arguments which could, and should, have been made before the judgment issued." *LWV* Stay Op., 2026 WL 1972055, at *2 (cleaned up).

## ARGUMENT

### I. Defendants are not substantially likely to succeed on the merits.

To obtain a stay pending appeal, "the chance of success on the merits must be 'substantial.'" *Id.* at *1 (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). Failure to satisfy this standard is "an arguably fatal flaw for a stay application." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1017-19 (D.C. Cir. 2018) (per curiam). Defendants fall far short of making such a substantial showing.

### A. The Policy is a final agency action.

The Court correctly concluded that the Policy is a final agency action that is reviewable under the APA. *See* ECF 51 at 40-46. Defendants' contrary arguments merely rehash the same two failed assertions the Court already rejected when it granted summary judgment: First, Defendants again attempt to characterize Plaintiffs' challenge as a "broad programmatic attack," ECF 57 at 4, ignoring the overwhelming record evidence confirming their own conception and implementation of the Policy as a discrete agency action. Second, Defendants reiterate their claim that the Policy has no legal consequences, *see id.* at 5-6, notwithstanding, among other things, the privacy implications of collecting millions of voters' data and the thirty lawsuits Defendants launched against states for refusing to comply with the Policy. Each of Defendants' recycled arguments fails for the same reasons this Court has already articulated.

#### 1. The Policy is a discrete agency action.

To start, the Policy is a discrete agency action. The Court defined the Policy as Defendants' decision, in response to Executive Order 14248, to collect voter data from across the country and use that data (for example, by cross-referencing federal databases like SAVE) to try to identify and purge purportedly ineligible voters. *See* ECF 51 at 8-13, 41-45. Defendants' own statements (including describing the scope of the Policy and giving the Policy a name), their actions, and their consultation with OLC each confirms they conceived of the Policy as a single "comprehensive" "list maintenance project." *See supra* p. 3.

The AR therefore squarely refutes Defendants' misframing of their Policy as a "series of individualized enforcement actions specific to each State." *Contra* ECF 57 at 4. Among other things, Defendants made materially identical requests for unredacted SVRLs from every state that has a voter roll and the District of Columbia. *See* ECF 51 at *9-10 & n.2 (collecting requests).

These requests were made in quick succession, all sought the same information, and all rested on the same (incorrect) legal premise. *See id.*[4] Defendants even construed the requests to all states as a single, categorical "offer," taking the position that Defendants' proposed memorandum of understanding was "'constructed as an offer to all states' and could not 'be redlined in any fashion.'" *Id.* at 43 (quoting CRT-1875).[5] When Defendants received data from states, Defendants stored that data all in a single "parent folder" for Defendants' "2025 List Maintenance." CRT-3387. And when Defendants sought guidance from OLC about the Policy, they sought OLC's opinion on the Policy as a whole—not on any one constituent action. As the Court underscored "OLC provided its opinion on the Division's 'proposal'—made 'in response to the President's order'—'to seek statewide voter lists, and then to share the lists' with DHS." ECF 51 at 42.

Defendants' reliance on *Center for Biological Diversity v. Burgum*, 826 F. Supp. 3d 18 (D.D.C. 2026), is misplaced. Unlike in *Burgum*, where the plaintiffs sought to link together separate unrelated agency actions, "for example, granting a lease or approving an oil producer's decommissioning application," *id.* at 33, Defendants' Policy here was a single "categorical"

---

[4] Defendants bristle at the Court's characterization of their dragnet effort as employing a "cookie-cutter" approach, suggesting that because some of the 49 letters Defendants sent states included a modicum of tailoring, "each State received different treatment." ECF 57 at 5. This ignores that in Defendants' letters to states, Defendants requested the same SVRL data, made the same legal arguments, often recycled the same language, stored the data they received from states all in the same folder under the same "project" name, and took the same action when states refused to comply—uniformly suing, regardless of the objections raised.

[5] As the Court already observed, it is of no moment that in one instance, Defendants ultimately reversed their position and allowed one state to make minor "clarifications" to its memorandum of understanding. *See* ECF 51 at 43-44, n.12.

decision to obtain every state's voter data and use that information to try to grab the power to micromanage who can and cannot vote. ECF 51 at 42-43 (collecting cases).

Defendants are also wrong that the Court "defined the alleged Policy" as "multiple types of administrative actions." ECF 57 at 4. Rather, the Court recognized a single overarching Policy of Defendants collecting voter data in an "attempt to decide who gets to vote," ECF 51 at 2—or, in Defendants' own words for "voting hygiene," *id.* at 44—and described the various types of administrative actions that Defendants took to *implement* that single policy. *See id.* ("That policy involved 'seeking statewide voter lists, and then sharing the lists with Homeland Security Investigations or another unit within DHS' to 'enable cross-referencing the lists against existing databases in order to identify illegal aliens who are ineligible to vote' so that DOJ could 'seek to strike the individual's name from the voter registration list for future elections.'" (quoting CRT-3330, CRT-3334) (cleaned up)).

At bottom, Defendants' objections to the Policy turn on their mischaracterization of this litigation. This case is not a "generic challenge to all aspects of" Defendants' election integrity and voter-eligibility related actions. *Contra Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890, n.2 (1990). In fact, Defendants' efforts on that front are continuing unfettered by the Court's vacatur.[6] Rather, this case presents precisely the sort of discrete challenge that the Supreme Court sanctioned as permissible in *Lujan*: Plaintiffs challenge Defendants "applying some particular measure across

---

[6] *See*, *e.g.*, Compl., ECF 1, *United States v. Alaska*, 26-cv-00376 (D. Alaska Oct. 22, 2026) (challenging inclusion of candidate Daniel J. Sullivan on ballot for U.S. Senate); Miles Parks, *The Justice Department begins notifying counties where it wants to monitor elections*, NPR (Oct. 21, 2026), https://tinyurl.com/2kch4dmt; Press Release, U.S. Att'ny Off. C.D. Cal., *11 Foreign Nationals Arrested in California on Federal Charges Alleging They Illegally Registered and Voted in U.S. Elections*, https://archive.ph/ECUQX; Press Release, U.S. Att'ny Off. E.D.N.C., *EDNC Unveils Ten Federal Indictments Alleging Noncitizens Voted in the 2024 Election*, DOJ (Oct. 15, 2026), https://perma.cc/458X-ZMRZ.

the board." *Id.*; *see also* ECF 51 at 42 (stating same); *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 77 (D.D.C. 2025) (rejecting argument that plaintiffs launched a "broad programmatic attack" where they did "not challenge the individual decisions of the agency defendants to give particular [DOGE] personnel access to agency systems," but rather challenged "defendants' across-the-board policies"); *Jud. Watch, Inc. v. FBI*, 2019 WL 4194501, at *6 (D.D.C. Sept. 4, 2019) (similar). Plaintiffs are challenging Defendants' application of one particular measure—collecting voter data to identify and stop purportedly ineligible voters from voting—across the country. The Court therefore correctly rejected Defendants' now-repeated criticism that Plaintiffs' challenge is a "broad programmatic attack." *Compare* ECF 57 at 4 (citing *Ass'n for Educ. Finance and Policy v. McMahon*, 786 F. Supp. 3d 13, 22 (D.D.C. 2025)) *with* ECF 51 at 41-42 (rejecting Defendants' same argument).

**2. The Policy is final.**

Defendants also reiterate the same arguments about the Policy's legal consequences that the Court already rejected.[7] Defendants erroneously seek to unwind the Policy by separately analyzing the actions taken to implement it, rather than assessing the legal consequences of the Policy as a whole. *See* ECF 57 at 5 ("Requesting unredacted voter rolls does not determine legal rights or obligations."). The Policy itself created legal consequences because its entire purpose was "'to identify illegal aliens who are ineligible to vote' so that DOJ could 'seek to strike the individual's name from the voter registration list for future elections.'" ECF 51 at 44 (quoting CRT-3330, CRT-3334) (cleaned up). This unquestionably affects the legal rights of all investigated and especially those ultimately disenfranchised. In any event, the Court already catalogued the many ways "[e]ach component of the policy carries legal consequences." *Id.* at 45.

[7] Defendants do not dispute the other prong of the final agency action test. *See* ECF 51 at 3-6.

That includes Defendants collecting voter rolls, which of course affects the privacy rights of Plaintiffs protected by the Privacy Act. *See id.* at 46 ("The nonconsensual sharing of individuals' confidential information itself creates legal consequences, without any need for further action."). And according to a letter DOJ sent to election officials in every state, election officials are required to remove the individuals that DOJ identifies or else face criminal liability for facilitating unlawful voting. *See supra* n.1.[8]

Defendants' own declaration confirms the legal consequences resulting from the Policy. *See* ECF 57-2 ¶¶ 4, 9 (describing DOJ's lawsuits against non-complying states and "additional work" DOJ was conducting on complying states' SVRL data, which would have led to investigation of and purging voters from SVRLs). Further, Defendants' contention that "'each' letter was not 'phrased in mandatory language,' but rather as requests for States to 'please' provide information," ECF 57 at 5, is belied by the facts in the AR, including DOJ's communications with states that did not immediately comply with its demands, *see, e.g.*, CRT-1604; CRT-2856; CRT-2884; CRT-2887; CRT-2889; CRT-2903 ("If I do not hear anything by end of day today, the DOJ will take that as a refusal to comply.");[9] the "bevy of lawsuits" DOJ filed when states did not

---

[8] Defendants also argue that sharing voter data does not create legal consequences because "when DOJ runs names through SAVE, it shares information with another department within the Executive Branch. Article II creates a unitary Executive, and sharing information among arms of that unitary entity is not an 'appreciable legal consequence.'" ECF 57 at 6. To start, this ignores that DOJ's receipt of voter data from a state itself creates legal consequences under the Privacy Act's procedural requirements and protections for records implicating the First Amendment. *See* ECF 51 at 59-61, 71-73. Defendants also ignore that the inaccuracy of SAVE's records further creates legal consequences under the Privacy Act's accuracy protections. *See id.* at 69-71. Defendants' argument also would entirely upend the Privacy Act's prohibition on "agencies" disclosing any individually identifying record "to any person, or to another agency." 5 U.S.C. § 552a(b); *see also* ECF 51 at 61-68.

[9] *See also* CRT-3199, CRT-3212 ("No response by COB today will be treated as a refusal.").

comply, ECF 51 at 10; and the fact that "OLC construed the letters as designed to 'compel states to turn over statewide voter list,'" *id.* at 45-46. The Policy was plainly a final agency action.

### B. Defendants' Policy lacks statutory authorization

In furtherance of its Policy, DOJ filed 31 lawsuits seeking to obtain 30 states' and Washington D.C.'s unredacted SVRLs. *See Tracker: DOJ Lawsuits Seeking States' Sensitive Voter Data*, University of Wisconsin-Madison State Democracy Research Initiative (last updated Oct. 22, 2026), https://perma.cc/WB5P-5PBE; *see also* ECF 51 at 10, 45. Every court that has opined upon the validity of these actions—now 27 in all, including the Sixth Circuit—has rejected DOJ's arguments. *See id.*; *see also* ECF 51 at 10, n.3. Defendants have now abandoned their efforts to justify the Policy under the NVRA and HAVA. *See* ECF 57 at 6-8 (arguing only that Title III of CRA authorizes the Policy); *see also, e.g.*, *E. Band of Cherokee Indians v. United States Dep't of the Interior*, 534 F. Supp. 3d 86, 119 (D.D.C. 2021) (holding that issues not raised until the reply brief are forfeited). And as to Title III, the stay motion continues to press only arguments that this Court has already rejected. None of those arguments, especially given DOJ's remarkable losing record on these exact questions, can demonstrate a strong likelihood of success on appeal. *See Frederick Douglass Found., Inc. v. D.C.*, 531 F. Supp. 3d 316, 345 (D.D.C. 2021) (holding that plaintiffs were "not likely to succeed on the merits" in part because they relied on a "recycled assertion" that had "already [been] rejected on multiple occasions").[10]

[10] *See also Ndongala v. Wesling*, 2026 WL 1534981, at *3 (D. Mass. June 1, 2026) ("To continue to press arguments that every single judge in this District to consider the issue had already rejected, often repeatedly, does not strike the Court as reasonable under the circumstances. . ."); *Nenninger v. United States Forest Serv.*, 2007 WL 9724286, at *2 (W.D. Ark. June 28, 2007) (holding plaintiff "is not likely to succeed on the merits" in part because "other courts have likewise rejected similar challenges"); *Meharry Med. Coll. v. Nat'l Lab. Rels. Bd.*, 2025 WL 1372842, at *5 (M.D. Tenn. May 12, 2025) (holding plaintiff had not demonstrated irreparable harm needed for a preliminary injunction in part because theory had been "rejected" by "several other district courts" and the "Court agrees with the reasoning in these cases").

**1. Title III of the Civil Rights Act does not authorize the Policy.**

As Plaintiffs set forth in their prior briefing, the Policy exceeds the statutory authority conferred by Title III for multiple, independent reasons. *See* Pls.' Reply in Support of Mot. for Partial Summ. J., ECF 35 at 31-33. Defendants' stay motion, however, addresses none of those arguments and instead focuses exclusively on whether their demands for unredacted SVRLs satisfy Title III's threshold requirement that DOJ provide a statement of the purpose and the basis for the record request. *See* ECF 57 at 6-8. By failing even to address the majority of Plaintiffs' statutory arguments, each of which is sufficient to defeat Defendants' Title III theory, Defendants have undoubtedly failed to carry their heavy burden in seeking a stay.[11]

First, Defendants ignore that multiple courts have held that Title III only authorizes DOJ to seek records for purposes of investigating individual cases of discrimination or disenfranchisement. *See Weber*, 816 F. Supp. 3d at 1175, 1182-83; *United States v. Amore*, 831 F. Supp. 3d 149, 158 (D.R.I. 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092, 1104 (D. Or. 2026)*; United States v. Warner*, 840 F. Supp. 3d 446, 455 (S.D. W.Va. 2026). Congress enacted Title III to combat discrimination and disenfranchisement. *See*, *e.g.*, *United States v. Benson*, 179 F.4th 470, 474 (6th Cir. 2026); *Bellows*, 834 F. Supp. 3d at 126; *United States v. Wisc. Elections Comm'n,* 833 F. Supp. 3d 949, 955 (W.D. Wis. 2026). Indeed, the fact that the Attorney General must provide a statement of "the purpose" of his demand for documents under Title III indicates that Defendants may only exercise this power for limited purposes, or else the required statement "would serve no function." *Oregon*, 828 F. Supp. 3d at 1104-05. Here, nothing in the AR indicates

[11] This Court reserved decision on Plaintiffs' statutory arguments after concluding that Defendants failed to provide a sufficient statement of the basis and the purpose of their requests for unredacted SVRLs. *See* ECF 51 at 52 n.15 ("Because this Court finds that DOJ's Title III demands fail at the threshold, it does not consider the Plaintiffs' broader textual argument.").

that DOJ's "extraordinary request for the personally identifying information of millions of" Americans is animated by concerns of discrimination or disenfranchisement. *See Weber*, 816 F. Supp. 3d at 1175. That alone forecloses Defendants' reliance on Title III of the CRA to justify the Policy.

Second, even if Title III were not limited to investigating cases of discrimination or disenfranchisement, Defendants fail to explain why Title III may be used to enforce the NVRA or HAVA or to conduct list maintenance. As the court held in *Bellows*, "whatever investigatory purposes may support a Title III records demand, voter list maintenance is not among them," and nothing in Title III empowers DOJ to direct the removal of voters from the rolls." 834 F. Supp. 3d at 124.[12] The "[u]niform, centralized statewide voter registration lists . . . were not even required until the passage of HAVA in 2002." *Id.* Nor does anything in the NVRA or HAVA indicate that those statutes are to be enforced via Title III. To the contrary, the NVRA contains its own disclosure mechanism, 52 U.S.C. § 20507(i), and HAVA does not provide for any federal access or duplication of each state's "statewide voter registration list," which must be maintained as "a single, uniform, official, centralized" system at the state level. 52 U.S.C. § 21083(a)(1)(A). And most importantly, both the NVRA and HAVA assign the function of list maintenance to the states and the states alone. 52 U.S.C. § 20507(a)(4) (NVRA); § 21083(a)(4) (HAVA); *accord* ECF 51 at 53 ("the NVRA and HAVA place *states* at the helm of maintaining their voter rolls.").

Third, Defendants fail to acknowledge that numerous courts have held that SVRLs are not subject to disclosure under Title III. Specifically, Title III only pertains to records that "come into [the state's] possession," 52 U.S.C. § 20701, whereas SVRLs are created (and continuously

[12] Indeed, "Title III was not passed as a tool for NVRA compliance. . . . [b]ecause the passage of Title III in 1960 preceded the NVRA by several decades." *Weber*, 816 F. Supp. 3d at 1183.

updated) by the state and therefore are not obtained from another party. *See Benson*, 179 F.4th at 478-82 (defining "come into possession" to mean "acquire, obtain, or receive" and holding that "[a] construction that makes all voting records and papers in the election officers' possession subject to Title III would render 'come into' superfluous"); *see also e.g.*, *United States v. Fontes*, 832 F. Supp. 3d 944, 951 (D. Ariz. 2026); *United States v. Scanlan*, 838 F. Supp. 3d 150, 157 (D.N.H. 2026); *Bellows*, 834 F. Supp. 3d at 123; *Wis. Elections Comm'n*, 833 F. Supp. 3d at 954; *United States v. Thomas,* 2026 WL 2070437, at *5 (D. Conn. July 17, 2026).

Finally, Defendants have previously acknowledged in this case that DOJ intends to disclose the data it obtains to private contractors as part of the Policy, *see* Defs.' Combined Mem. of Law, ECF 33 at 15, 43; *see also* ECF 51 at 13, but they fail to address why such disclosures are not contrary to Title III. The text of Title III is unequivocal that the DOJ may not disclose any records obtained thereunder "except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury." 52 U.S.C. § 20704. Contractors do not fall within any of those categories, and Title III cannot authorize the Policy.

**2. Defendants are not likely to succeed in showing that DOJ's demands for unredacted SVRLs satisfy Title III's requirements.**

Defendants disagree with this Court's ruling that DOJ failed to provide a sufficient statement of the basis and the purpose for its demands for unredacted SVRLs, *see* ECF 57 at 6-7, but none of those arguments are likely to succeed either. This Court has already rejected those points in its Memorandum Opinion, and, even after filing dozens of cases nationwide, not a single court has adopted Defendants' position.

Consistent with the plain text of Title III, this Court correctly held that the Attorney General must provide a statement of "the basis *and* the purpose" for the records it seeks. ECF 51 at 48 (quoting 52 U.S.C. § 20703). Defendants now argue that "basis" and "purpose" in fact have the

same meaning because the terms form a "legal doublet," like "aid and abet," "null and void" or "cease and desist." ECF 57 at 7. This argument is forfeited because Defendants raise it now for the first time in their stay motion. And Defendants do not identify a single instance in which the phrase "the basis and the purpose" has been recognized as a legal doublet. *See id.*

The absence of legal authority supporting Defendants' interpretation is unsurprising. A doublet consists of two words that have the same ordinary meaning, such that one necessarily encompasses the other. *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) (interpreting statute using phrase "portion, split, or percentage" and noting that "'portion,' 'split,' and 'percentage' all mean the same thing—a perhaps regrettable but not uncommon sort of lawyerly iteration. . . . It is impossible to imagine a 'portion' . . . or a 'split' that is not also a 'percentage.'"). But here, "basis" and "purpose" have distinct definitions. *See* ECF 51 at 49-50 (defining "purpose" as "an end, intention, or aim, object, plan, project" and "basis" as "groundwork, support, or foundation"). And as this Court found when rejecting a similar argument that was advanced by OLC (but *not* by Defendants in this litigation), the distinction between "basis" and "purpose" is further clarified by Section 20703's requiring "'a statement of *the* basis and *the* purpose' . . . rather than, for instance, a statement of 'the basis and purpose.'" *Id.* at 49 n.14; *accord United States v. Galvin*, 830 F. Supp. 3d 122, 128 (D. Mass. 2026). That is because "a grammatical construction that combines a 'definite article with a singular noun' typically denotes 'a discrete thing.'" *Id.* (quoting *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021)); *see also United States v. Oliver*, 2026 WL 2031479, at *9 (D.N.M. July 14, 2026). Defendants' interpretation would render critical text mere surplusage and should be rejected.[13] *Id.*

---

[13] Defendants also suggest that an inquiry into DOJ's basis and purpose should be minimal because of a supposed "background rule that agencies endowed with investigative powers by Congress 'can investigate merely on suspicion that the law is being violated, or even just because [the

This Court also correctly applied Title III's requirements when it found that Defendants' demand letters "fail[ed] to articulate *any* reason to believe that states had not been complying with their list-maintenance obligations under the NVRA and HAVA," even assuming DOJ could validly investigate NVRA- and HAVA-compliance under this provision. ECF 51 at 50. Defendants contend that DOJ did provide a factual basis, because, in its letters to Iowa, Maryland, and Utah, DOJ included several questions regarding the state's responses to the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). ECF 57 at 7 (citing CRT-2700; CRT-2767; CRT-3160). But none of the letters cited by Defendants purport to provide a basis for a Title III request. *See* CRT-2699; CRT-2766; CRT-3159. Nor did Defendants make a Title III request for unredacted SVRLs in any of the other near-identical demand letters based on states' EAVS responses. *See*, *e.g.*, CRT-2396; CRT-2407; CRT-2428; CRT-2489; CRT-2522; CRT-2548; CRT-2679; CRT-2688; CRT-2730; CRT-2763; CRT-2774; CRT-2783; CRT-2838; CRT-2923; CRT-3051; CRT-3068; CRT-3190. And while those letters do inquire about the state's EAVS responses, the letters do not provide a basis to believe that the states are violating NVRA or HAVA. *See id.*; *Scanlan*, 838 F. Supp. 3d at 164 (finding that DOJ's assertions regarding state's lower or slower rates of removal do not indicate a violation of HAVA); *Weber*, 816 F. Supp. 3d at 1191-92 (similar); *cf. Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624-27 (6th Cir. 2025) (describing statutorily required "reasonable effort" for purposes of NVRA and HAVA as "a serious

---

agency] wants assurance that it is not." ECF 57 at 7 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950)). Defendants' only authority appears to be a 75-year-old case about an administrative hearing process before the Federal Trade Commission that bears little resemblance to the demands at issue. *See Morton Salt*, 338 U.S. at 634-35. But regardless of whether such a background rule exists, it matters little when Congress has specifically enacted a requirement that DOJ provide a statement of the basis and the purpose of its record requests under Title III. DOJ's position that all that is needed is for DOJ to invoke, on an unreviewable basis, Title III or the name of any other statute it purports to be enforcing would render that requirement virtually meaningless. *See*, *e.g.*, *Warner*, 840 F. Supp. 3d at 452, 454.

attempt" which "need not be perfect, or even optimal"), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2, 2026). Defendants' letters seeking unredacted SVRLs based on Title III, on the other hand, each make only the same conclusory assertion that "[t]he purpose of the request is to ascertain [your state's] compliance with the list maintenance requirements of the NVRA and HAVA." ECF 51 at 50 (citing CRT-2347; CRT-2401; CRT-2412). "While that statement appears to explain DOJ's purpose, it fails to articulate its basis." *Id.*

Not only do the demand letters fail to provide an adequate factual basis for invoking Title III, but the letters similarly fail to provide an adequate statement of the purpose behind DOJ's request for unredacted SVRLs. Nothing in the letters indicates that DOJ sought the unredacted SVRLs to help answer any questions about the states' EAVS responses, which are identified separately from the SVRL demand. Moreover, as multiple courts have found and as explained in Plaintiffs' summary judgment briefing, any claimed interest in enforcing the NVRA or HAVA is likely pretextual and cannot justify DOJ's demands for full, unredacted SVRLs. *See*, *e.g.*, *Oregon*, 828 F. Supp. 3d at 1107 (noting that DOJ's public statements and demands "cast[] serious doubt as to the true purposes for which [DOJ] is seeking voter registration lists in this and other cases, and what it intends to do with that data"); *United States v. Schmidt*, 835 F. Supp. 3d 697, 699-700 (W.D. Pa. 2026); *Weber*, 816 F. Supp. 3d at 1184. Congress limited DOJ's role under the NVRA and HAVA to bringing civil actions when states fail to maintain "a 'program' or 'system' that 'makes a reasonable effort' to remove ineligible voters." 52 U.S.C. §§ 20507(a)(4), 20510(a) (NVRA); §§ 21083(a)(4)(A), 21111 (HAVA). Nowhere have Defendants explained why accessing unredacted SVRLs (and demanding that states remove voters identified by Defendants) is necessary to investigate whether a state's *processes* for removing ineligible voters is reasonable. *E.g.*, *Warner*, 840 F. Supp. 3d at 455 (finding that DOJ failed to provide "any reasonable

explanation for why obtaining highly sensitive voter data serves those purposes"); *Weber*, 816 F. Supp. 3d at 1183.

* * *

Defendants have failed to demonstrate a strong likelihood of success on their argument that the Policy is authorized by statute. They rely solely on Title III of the CRA but fail to address the legion of court opinions holding that DOJ's demands for unredacted SVRLs exceed the agency's limited authority under that statute in a multitude of ways. And even if Defendants could somehow overcome each of those legal hurdles, this Court correctly found that DOJ's demands for unredacted SVRLs fail to comply with Title III's requirement of a statement of basis and purpose. And just as there is no authority for DOJ's demands for unredacted SVRLs, so too do Defendants lack statutory authority for the Voter List Maintenance Policy as a whole.

### C. Defendants' Policy violates the Privacy Act.

The Court correctly found that the Policy violates the Privacy Act multiple times over. ECF 51 at 57-73. Specifically, Defendants violated the Act by: (1) collecting SVRLs without "issuing a statutorily compliant SORN," *id.* at 59-61; (2) disclosing SVRLs to contractors and other federal agencies, *id.* at 61-68; (3) taking "no steps to ensure the accuracy" of the records maintained, *id.* at 69-71; and (4) improperly "maintaining records of protected First Amendment activity," *id.* at 71-73. In their stay motion, Defendants do not specifically challenge these findings but instead present two threshold claims. *See* ECF 57 at 8-10. Each fails.

#### 1. Defendants' Section 1373 argument fails.

##### a. Defendants forfeited their new argument that Section 1373(a) and (b) impliedly repealed the Privacy Act.

Defendants now argue for the first time, in only two paragraphs of their stay motion, that the Policy does not violate the Privacy Act because 8 U.S.C. § 1373(a) and (b) supersede its

safeguards. ***See id.*** at 8-9. "[T]he Court need not address this new argument because . . . it appears nowhere in [Defendants'] merits briefing and was thus forfeited." *LWV* Stay Op., 2026 WL 1972055, at *3 (cleaned up).

Presumably in anticipation of this dispositive hurdle, Defendants preemptively protest their forfeiture in a footnote, pointing to two places in its summary judgment briefing in which it cited Section 1373. *See* ECF 57 at 8 n.1 (citing Mem. in Support of Mot. to Dismiss, ECF 32-1 at 31, 45-46). These references, however, did not present the argument that Defendants make now: Defendants did not previously argue that Section 1373(a) and (b) supersede the protections of the Privacy Act. In fact, Defendants' summary judgment briefing did not mention Section 1373(a) or (b) at all. *See generally* ECF 32-1.

Rather, Defendants twice cited a different provision of the statute—Section 1373(c)—which governs *DHS's* duty to respond to other government agencies attempting to verify citizenship or immigration status and is irrelevant to *DOJ's* obligations under the Privacy Act. *See id.* at 31; *id.* at 45-46.[14] These mentions of Section 1373(c) do not even hint at the argument that Defendants make now by asserting that Section 1373(c) supersedes the Privacy Act. Instead, Defendants cited Section 1373(c) in support of their arguments that: (1) "Plaintiffs do not challenge a discrete and final agency action," *id.* at 31 (cleaned up); and (2) the Policy does "not violate[ ] the accuracy provisions of the Privacy Act," *id.* at 45-46 (cleaned up). Even the second of these assertions (which relates to one of the four ways in which the Court found Defendants had

---

[14] Defendants also cited Section 1373(c) in the "Factual Background" section of their brief: "And as a component of DHS, USCIS is required to 'respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual . . . by providing the requested verification or status information.'" ECF 32-1 at 7 (quoting 8 U.S.C. § 1373(c)). As above, this did not advance the argument that Defendants make now.

violated the Privacy Act) does not reflect a claim that Section 1373(c) *supersedes* the Privacy Act; rather, this assertion seeks to harmonize the two. *See id.* at 45-46.

The Court should not excuse Defendants' forfeiture. "A motion to stay should not be used to . . . raise arguments which could, and should, have been made before the judgment issued." *LWV* Stay Op., 2026 WL 1972055, at *2 (cleaned up). "[T]ardy and overdue arguments are 'not only unfair to [a litigant] but also entails the risk of an improvident or ill-advised opinion on the legal issues' by reducing the time in which the Court may engage in meaningful review." *Id.* at *4 (quoting *McBride v. Merrell Dow & Pharmaceuticals, Inc.*, 800 F.2d 1208, 1210 (D.C. Cir. 1986)). "[T]he Court spent significant time reviewing the record and the Parties' arguments, resulting in a [78]-page Memorandum Opinion. Yet [Defendants] now want another bite at the apple to raise new arguments . . . through a stay motion—arguments that they had every opportunity to raise earlier. And rather than acknowledge that they are asking for just that and explain why the Court should consider their belated arguments, [Defendants] feign that these arguments are fair game. The Court [should] not tolerate such gamesmanship." *Id.*[15]

#### b. Section 1373 does not excuse DOJ's collection and sharing of SVRLs from the protections of the Privacy Act.

Even if the Court were to excuse Defendants' forfeiture, their Section 1373 argument would fail on the merits. Neither Section 1373(a) nor (b) excuses DOJ's failure to comply with the requirements of the Privacy Act in implementing its Policy.

---

[15] The Court granted summary judgment a full two weeks after the Supreme Court issued its decision in *DHS v. League of Women Voters* regarding Section 1373. Defendants did not seize this window of opportunity to file a notice of supplemental authority with the Court. And after the Court granted summary judgment, Defendants did not ask the Court to excuse their forfeiture under Rule 52(b) or Rule 59(e). *See DHS v. League of Women Voters*, 2026 WL 2643439, at *6 & n.*.

Preliminarily, it is important to note that Defendants' Section 1373 argument is limited in scope. Even now, Defendants do not claim that Section 1373 authorizes DOJ to *demand and collect* SVRLs from states without complying with the Privacy Act. *See* ECF 57 at 8-9. Nor do Defendants claim that Section 1373 authorizes DOJ to disclose SVRL data to DOJ *contractors* without complying with the Privacy Act. *See id.* Thus, even if the Court were to find merit in Defendants' forfeited Section 1373 argument, the Court's findings that DOJ violated the Privacy Act by collecting SVRL data from states and disclosing it to DOJ contractors would remain intact. *See* ECF 51 at 59-61 (finding violation of Privacy Act's procedural requirements, rejecting Defendants' argument that they "can collect data on every registered voter in America without complying with procedural protections that Congress deemed necessary"); *id.* at 61-65 (finding that DOJ's "disclosures of SVRLs to its contractors" violate the Privacy Act). As all subsequent steps of the Policy flow from DOJ's unlawful collection of SVRL data, this alone is sufficient to reject Defendants' newly presented claim at this juncture.

Nonetheless, the argument presented in Defendants' stay motion also fails. Defendants cursorily claim that Privacy Act restrictions do not apply to DOJ's "maintenance of citizenship-related information obtained from States and its sharing of that information with DHS and other federal agencies" because these specified actions "fall squarely within" the bounds of Section 1373(a) and (b). ECF 57 at 9. The statutory language of Section 1373 does not support this undeveloped claim for multiple independent reasons.[16]

[16] Defendants' perfunctory treatment of a complex statutory framework (and its application to the Policy) does not properly tee up this issue, underscoring the impropriety of considering this claim for the first time in the stay posture. Nonetheless, in this section, Plaintiffs sketch out a number of ways in which Defendants' new argument is inconsistent with Section 1373.

**First**, the SVRL data maintained and shared by DOJ is *not* "information regarding [] citizenship or immigration status," the category of information with which Section 1373(a) and (b) are concerned.

Courts have consistently construed this key phrase—"information regarding . . . citizenship or immigration status"—narrowly, finding that it is "a reference to a person's legal classification under federal law," and does not include personally identifiable information such as an individual's home address. *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019); *see also id.* ("[T]he United States argues that § 1373 actually applies to more information than just immigration status[.] . . . We disagree."); *City & County of San Francisco v. Garland*, 42 F.4th 1078, 1085 (9th Cir. 2022) ("Section 1373 only covers immigration-status information—i.e., 'what one's immigration status is.'"); *United States v. City of Boston*, 833 F. Supp. 3d 30, 48 (D. Mass. 2026) (noting that prisoner "release date and time and limited personally identifying information[] falls squarely outside the ambit of § 1373"); *United States v. Illinois*, 796 F. Supp. 3d 494, 516-17 (N.D. Ill. 2025) (inmate "contact information, custody status, and release date," do not constitute information "directly related to citizenship or immigration status" (collecting cases)).

Unredacted SVRLs include "voters' full names, dates of birth, residential addresses, and state driver's license numbers or last four digits of Social Security numbers," ECF 51 at 9 (citing CRT-2496), and, in at least some instances, "party affiliations." *id.* at 29-31. None of these data elements constitute "information regarding . . . citizenship or immigration status." Thus, even if Section 1373 did allow DOJ to maintain and share certain information without regard for Privacy Act protections, there can be no doubt that maintaining and sharing SVRLs exceeds the scope of this allowance.

**Second**, neither Section 1373(a) nor (b) authorizes DOJ to maintain information about U.S. citizens or share such information with non-DHS agencies without regard for the protections of the Privacy Act.

Section 1373(a) provides that government entities may not be prohibited or restricted from "*sending* . . . information regarding the *citizenship or immigration status* . . . of any individual" to, or "*receiving*" such information from, *DHS*. 8 U.S.C. § 1373(a) (emphasis added). It does not itself authorize non-DHS entities (like DOJ) to collect or maintain such information. *DOJ's receiving* SVRLs from states (not DHS), maintaining such information, and *sending* that information to non-DHS entities falls outside the scope of Section 1373(a).

Section 1373(b) only addresses immigration status information of non-U.S. citizens. Unlike Section 1373(a), which refers to "*citizenship* or immigration status" information, Section 1373(b) only refers to non-citizen "immigration status" information. 8 U.S.C. § 1373(b) (emphasis added).[17] It provides that government entities may not be prohibited or restricted from handling "information regarding the *immigration status* . . . of any individual" in a number of ways, including: "[s]ending" it to DHS, "requesting" or "receiving" it from DHS, "[m]aintaining" it, or "[e]xchanging" it with other government entities. *Id.* (emphasis added). Section 1373(b), therefore, cannot grant DOJ authority to maintain or distribute information about *U.S. citizens* without regard for the protections of the Privacy Act. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("[W]hen 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—[courts should] 'presume[ ]' that Congress intended a difference in meaning." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

[17] In federal law, a U.S. citizen does not have an "immigration status." Under the Immigration and Nationality Act, immigration status refers to the legal standing of an alien. Once a person naturalizes and becomes a U.S. citizen, their "immigration status" ceases to exist.

**Third**, Defendants overstate the relevance of the Supreme Court's decision in *DHS v. League of Women Voters*, 2026 WL 2879700. *See* ECF 57 at 9 (asserting, without explanation, that *LWV* "controls this case"). There, the Supreme Court addressed *DHS's* likely authority under Section 1373 to operate the Modified SAVE system. It did not address the authority of *DOJ* to carry out the Policy. Moreover, the Supreme Court's analysis in *LWV* is entirely consistent with the points laid out above. Thus, regardless of Section 1373's effect on the lawfulness of Modified SAVE, Defendants' Policy—including their collection, maintenance, and distribution of voter data—remains unlawful.

**Finally**, Section 1373 is a statute targeted at information concerning specific individuals—not a statute that contemplates the wholesale treatment of data of 170 million plus registered voters. Each of Section 1373's provisions is expressly limited to information regarding "any individual." *See* 8 U.S.C. § 1373(a) (addressing "information regarding the citizenship or immigration status, lawful or unlawful, of any individual"); 8 U.S.C. § 1373(b) (addressing "information regarding the immigration status, lawful or unlawful, of any individual").[18] By contrast, Defendants' Policy is not individualized. The Policy is wholesale in nature, meant to encompass states' entire SVRLs.

By including "any individual" in each of Section 1373's provisions, Congress necessarily limited the scope of the statute to information regarding specified persons. This language requires specific identification of the individuals about whom information will be exchanged, maintained, or distributed—and does not permit wholesale treatment of citizenship information for *all* registered voters in any given state. *See Bostock v. Clayton County., Georgia*, 590 U.S. 644, 658-660 (2020) (construing statute that "tells us three times . . . that our focus should be on individuals," explaining that the "consequences" of Congress's "focus on individuals rather than groups are

[18] Section 1373(c) includes similar "any individual" language.

anything but academic," and noting that "the meaning of 'individual'"—i.e., "'[a] particular being as distinguished from a class, species, or collection'"—is "uncontroversial"); *Merriam-Webster's Collegiate Dictionary* 593 (10th ed. 1994) ("Individual" means "a particular being or thing as distinguished from a class, species, or collection[ ] as . . . a single human being as contrasted with a social group or institution" or "a particular person."); *Individual, Black's Law Dictionary* 773 (6th ed. 1990) ("Individual. As a noun, this term denotes a single person as distinguished from a group or class[.]").[19]

Any construction ignoring Section 1373's express limitation to records concerning "individual[s]" would "run[] afoul of the 'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin*, 573 U.S. at 358 (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). Indeed, a more expansive reading of Section 1373—i.e., one that contemplates the wholesale maintenance and exchange of citizenship information for every registered voter in a state—would read "any individual" entirely out of the statute.[20]

---

[19] Congress knew how to use broader language when necessary. Indeed, elsewhere in the same legislation, Congress used much broader language when discussing records concerning "*every* alien." *See* IIRIRA, Pub. L. No. 104-208, div. C, § 110, 110 Stat. 3009, 3009-558-559 (1996) (amended 2000) (emphasis added).

[20] The Supreme Court's decision in *DHS v. League of Women Voters* does not suggest a broader reading. There, the Supreme Court concluded that Section 1373 likely authorizes Modified SAVE, including its bulk-search functionality. But Modified SAVE *requires* the identification of specified individuals to run a bulk search. 2026 WL 2879700, at *1 ("modified SAVE . . . allowed state and local authorities to conduct bulk searches of multiple *individuals* at once" (emphasis added)). For every bulk upload, a user must still identify the "First and last name;" "Date of birth;" "Numeric identifier such as A-Number/USCIS number, Naturalization/Citizenship Certificate number, or Social Security number;" and "Benefit the applicant is seeking (each bulk upload must be for the same benefit(s))" for each individual "case." DHS, SAVE User Reference Guide, *8.2 How to Submit Cases in Bulk*, https://perma.cc/YY5A-GUKT. Indeed, in describing the workings of Modified SAVE, the Supreme Court made clear its understanding that any data sharing under that system is predicated on the submission of a verification request that identifies specific individuals. *See* 2026 WL 2879700, at *1.

**2. The APA provides a remedy for Defendants' Privacy Act violations.**

The Court correctly concluded that the APA provides a remedy for Defendants' Privacy Act violations. ECF 51 at 57-59; *see also League of Women Voters v. DHS*, 835 F. Supp. 3d 79, 120-123 (D.D.C. 2026) ("*LWV* MSJ Op.").[21] Defendants' rehashing of their already rejected arguments, *see* ECF 57 at 9-10, does not warrant reconsideration of the Court's decision. Indeed, Defendants' arguments are foreclosed by holdings of the D.C. Circuit and this Court.

APA review is available for statutory violations absent "clear and convincing evidence" of legislative intent to preclude it. *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265, 1272 (D.C. Cir. 2005) (cleaned up). The mere existence of an alternate remedial scheme does not preclude judicial review, particularly one offering "only doubtful and limited relief." *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (cleaned up). The D.C. Circuit has held that the Privacy Act's limited remedies do not preclude all APA relief, upholding the availability of declaratory and injunctive relief for Privacy Act violations. *See Doe v. Stephens*, 851 F.2d 1457, 1467 (D.C. Cir. 1988). The Supreme Court has suggested the same. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004); *Cooper*, 566 U.S. at 303 n.12.

Defendants protest that *Stephens* "permitted an APA action to enforce a *different* statute—the Veterans' Records Statute." ECF 57 at 10. But *Stephens* explicitly considered "the Veterans' Records Statute, *as amended by the Privacy Act*." 851 F.2d at 1466 (emphasis added). And that statute's remedial scheme *is* the Privacy Act. 38 U.S.C. § 5701(j) (disclosures "shall be made in accordance with the provisions of section 552a of title 5"). Thus, *Stephens'* grant of "declaratory relief against" future unauthorized disclosures and "invalidat[ion of] the" agency's "'routine use'

[21] The Supreme Court's grant of a stay did not disturb this Court's conclusions on the Privacy Act and that the APA provides a remedy for certain Privacy Act violations. *See generally DHS v. League of Women Voters*, 2026 WL 2879700.

regulation" under the APA, 851 F.2d at 1467, controls here.

That *other* statutes may preclude APA relief, *see* ECF 57 at 10 (discussing the Freedom of Information Act), is irrelevant since this Court and the D.C. Circuit have held otherwise for the Privacy Act. Moreover, contemporaneous OMB Privacy Act guidelines confirm that the Act did not preclude APA review, and subsequent amendments show that Congress knew to use explicit language when making the Act's remedies exclusive. *See LWV* MSJ Op., 835 F. Supp. at 123. Finally, Defendants ignore the "'well-settled' and 'strong presumption' in favor of judicial review [that] is so embedded in the law that it applies even when determining the scope of statutory provisions specifically designed to limit judicial review." *Make The Rd. New York v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020) (citing *Kucana v. Holder*, 558 U.S. 233, 251 (2010) ("When a statutory provision is 'reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'")). While Defendants "may not like it," there is no "bar to the Plaintiffs' APA claims." *LWV* MSJ Op., 835 F. Supp. at 123.

### D. Defendants' Policy violates the Paperwork Reduction Act.

Defendants' response to this Court's PRA ruling is paper thin. Once again, "[t]he Defendants do not attempt to show compliance with the PRA's procedural requirements, so the only question is whether the Policy involved a 'collection of information' under the PRA." ECF 51 at 74. Defendants rehash two arguments that the Court has already rejected; they do not present any serious reason to second-guess the Court's conclusions.

First, Defendants reprise their contention that DOJ's demand letters to states did not pose "'identical' [questions or] reporting requirements." ECF 57 at 11 (citing 44 U.S.C. § 3502(3)). Yet Defendants concede that every letter demanded "'[t]he current electronic copy' of the State's

'computerized statewide voter registration list,'" including "'all fields contained within the list' in electronic form." ECF 32-1 at 6. This concession is supported by the Administrative Record. *See* Mem. in Support of Mot. for Partial Summ. J., ECF 29-1 at 6 n.7 (citing DOJ's demand letters to the states). Without citing any authority, Defendants say that these identical reporting requirements fall outside the PRA's ambit because "the letters" also sometimes demanded additional information from particular states. ECF 57 at 11. As Plaintiffs have previously argued, this interpretation defies the text of the PRA, which refers to identical "questions" or "reporting requirements," not identical *documents*. 42 U.S.C. § 3502(3)(A); *cf. Hyatt v. OMB*, 998 F.3d 423, 429 n.4 (9th Cir. 2021) (rejecting "assertion that only collections that . . . [use] standardized forms impose 'identical' requirements"). It would also subvert the PRA's guiding purpose of "minimiz[ing] the paperwork burden . . . resulting from the collection of information by or for the Federal Government." 44 U.S.C. § 3501(1). On Defendants' theory, an agency can circumvent the PRA's requirements by starting with identical questions and then adding bespoke additional questions for some recipients—an approach that would inevitably make collections *more* burdensome. The Court properly rejected this theory.

Second, Defendants once again invoke Section 3518(c)(1)(B)'s exception for investigations targeting "specific" individuals or entities. But Defendants fail to even acknowledge the very next provision, which specifies that the PRA "applies to the collection of information during the conduct of *general investigations* . . . undertaken with reference to a category of individuals or entities." 44 U.S.C. § 3518(c)(2) (emphasis added). Defendants' omission is especially glaring since that provision was central to the Court's ruling on this issue. *See* ECF 51 at 75-76. As the Court noted, Defendants' Policy "is an investigation of the entire class of entities

regulated by the NVRA and HAVA." *Id.* at 76. Defendants have not a word to offer in response. Their silence speaks volumes.

**E. Defendants' Policy is arbitrary and capricious.**

This Court has already found that Defendants failed "to consider the risks that its policy posed to U.S. citizens who hold a fundamental right to vote." ECF 51 at 56.[22] Defendants argue that the Court erred, asserting they are insulated from the requirement to consider the risks of their own Policy—notwithstanding its stated goals or coercive implementation—because DOJ is not the *final* actor to effectuate its results. ECF 57 at 11-12. Defendants tellingly do not dispute the risk that citizens will be removed from states' voter rolls in connection with their Policy. *Id*. Nor do Defendants dispute that it would be arbitrary and capricious as a matter of law to require states to remove voters based on SAVE's unreliable data results. *Id*. Rather, Defendants merely seek refuge behind states' role as the final link in the chain of causation. *Id*. (citing "each State's independent legal obligation to maintain 'safeguard[s] to ensure that eligible voters are not removed in error"). This argument is disingenuous at best: the Policy imposes on states and seeks to "enforce" Defendants' own novel interpretation of states' legal obligations. ECF 57 at 1; *see also* CRT-3334. Any suggestion that states remain free to interpret and meet their obligations under the NVRA and HAVA—and therefore Defendants bear no responsibility to consider the results of their actions—

[22] Defendants also cannot meet their high burden of establishing their likelihood of success on the merits because the Policy is independently arbitrary and capricious for several additional reasons: DOJ failed to explain the Policy; it "relied on factors which Congress has not intended it to consider;" and it "entirely failed to consider" additional "important aspect[s] of the problem" including the privacy and cybersecurity risks posed by the Policy as well as the reliance interests and reasonable privacy expectations of the millions of Americans who did not consent to their voter data being compiled, analyzed, and shared by DOJ. *See* ECF 29-1 at 37-42 (citations omitted). While the Court did "not reach [these] additional arguments" because it found that DOJ failed to consider the risk that its Policy would result in disenfranchisement of eligible voters, ECF 51 at 56, n.17, these are several additional reasons Defendants not substantially likely to succeed on the merits.

is inconsistent with the Policy itself and Defendants' stated conception of their goals: "to decide who gets to vote." ECF 51 at 2; *see also id.* at 13 (memorandum of understanding requiring states to "clean" their SVRLs "by removing ineligible voters"); *id.* at 44 (head of DOJ's Civil Rights Division stating DOJ was "request[ing] the voter rolls from all states and the District of Columbia" for "voting hygiene").

Moreover, Defendants' argument ignores every other link in the chain of causation designed to yield those intended results. As the AR describing the Policy shows, DOJ's demand letters to states "reflect that the Division seeks these lists" to "ensure" that "states are complying" with Defendants' novel interpretation of the NVRA and HAVA. CRT-3334. Defendants' stated position was that, after sharing the states' SVRLs with DHS "in order to identify illegal aliens who are ineligible to vote," "[i]f the search reveals that an alien unlawfully has registered to vote… the Division may seek to strike the alien's name from the voter registration list for future elections." CRT-3334. The Policy further contemplates other efforts "to enforce state compliance with [DOJ]'s letters." CRT-3335.

Defendants' argument relies on an additional erroneous claim: under the Policy, "[a]t most DOJ notifies States when DOJ cannot confirm a registered voter's eligibility." ECF 57 at 11. Not only is this assertion belied by the Administrative Record, *see*, *e.g.*, CRT 3334-3335, it is further refuted by DOJ's recent history of threatened and realized investigations and litigation against states that do not comply with DOJ's voter roll-related demands. *See* ECF 51 at 10 (states' refusal to turn over their unredacted SVRLs led "DOJ to file a bevy of lawsuits seeking to compel compliance"); *see also* CRT-1604, CRT-2856, CRT-2884, CRT-2887, CRT-2889, CRT-2903 ("If I do not hear anything by end of day today, the DOJ will take that as a refusal to comply."); *California*, *supra* n.2. The assertion that DOJ does no more than "notify" states of its findings

strains credulity—and is belied by DOJ's repeated threats that election officials who fail to purge voter rolls of individuals identified by the federal government face criminal liability for facilitation of unlawful voting. *See supra* n.1.

Even if states' compliance with the Policy had been optional, however, that still would not defeat Plaintiffs' arbitrary-and-capricious claim: when any complying state uses DOJ's "notification" of ineligible voters to remove a voter from its rolls until it receives documentary proof of citizenship, this creates the same burdens on voting and risk of disenfranchisement that Defendants concededly refused to consider. *See* CRT-5 (Alaska) (directing state to use DOJ's notice of voter roll issues to clean voter rolls); CRT-2058 (Texas) (same). Thus, the fact that DOJ has attempted to conscript state officials through various means of compulsion ultimately has no bearing on the arbitrary-and-capricious analysis. At the very least, the Policy poses the grave risk of burdening voters and causing disenfranchisement on a massive scale, even if state officials are the ones who ultimately demand proof of citizenship or hit the "delete" button on their voter rolls. Defendants' total failure to consider these risks render the Policy arbitrary and capricious.

Defendants cannot simultaneously claim, on the one hand, that "the Court's decision has hamstrung DOJ's ability to enforce [] election laws," while, on the other hand, disclaiming the intended results of its scheme that purports to do so. *Compare* ECF 57 at 1 *with* ECF 57 at 11-12. This argument asks the Court not only to sanction, but also to adopt, Defendants' willful ignorance that their Policy will likely result in burdening the right to vote and disenfranchising American citizens. This Court should again decline to do so. *See* ECF 51 at 55-56; *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025) ("When third party behavior is predictable, commonsense inferences may be drawn."); *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (courts are "not required to exhibit a naiveté from which ordinary citizens are free.").

## II. Defendants will not be irreparably harmed absent a stay.

Defendants have not and cannot establish that they are likely to suffer irreparable harm absent a stay. After sitting on this Court's ruling for a week, Defendants now claim that the vacatur Order "has hamstrung DOJ's ability to enforce [] election laws." ECF 57 at 1. Not so. *See supra* n.6. The Court merely vacated the illegal Policy, and Defendants are not harmed by their desire to continue doing that which they were never allowed to do in the first instance. *See Danco Lab'ys, LLC v. Louisiana*, 146 S. Ct. 1192, 1196 (2026) (Alito, J., dissenting) (noting that "inability to engage in [unlawful] conduct" cannot constitute irreparable harm); *Abbott v. Perez*, 585 U.S. 579, 602 (2018). Were it otherwise, a federal defendant would *always* be irreparably harmed when subject to an order vacating agency action.

Tellingly, never before has DOJ embarked on a comparable quest to federalize voter list maintenance, and 26 federal district courts "have dismissed enforcement actions brought by DOJ to obtain SVRLs, and one circuit court has affirmed dismissal." ECF 51 at 10 n.3; *see also Raffensperger*, 2026 WL 3002013, at *6-9. The overwhelming majority of Defendants' supposed harms are based on DOJ's purported need to "be able to conduct its investigatory and oversight role without unnecessary roadblocks." ECF 57 at 14. But for all the reasons this Court correctly identified in its opinion, the investigation and oversight that Defendants can no longer conduct exceeded DOJ's authority and contravened the Privacy Act, Paperwork Reduction Act, and APA. Defendants' inability to steamroll past these supposedly "unnecessary roadblocks"—a premise with which Congress has chosen to disagree—hardly constitutes irreparable harm. Moreover, as no court in 27 attempts has permitted what this Court has vacated, it is difficult to square the claim of extraordinary harm with DOJ's record of losses across the board.

To the extent that Defendants identify any harms beyond their inability to continue implementing the Policy itself, they offer only a mix of paper tigers and speculation. Among the

actions Defendants lament is their inability to continue their "project" of commanding voter purges, ECF 51 at 9, before the "nationwide election [which] is in less than three weeks." ECF 57-2 ¶ 9; *see also id.* at 10 ("Expedition is particularly necessary given the schedule of elections and the need for effective oversight well before these elections."). But Defendants cannot claim any harm from allowing the normal appeals process to play out, because any such project or program of voter purges cannot be executed during the NVRA's 90-day quiet period, which began more than two months ago on August 5, 2026. *See* 52 U.S.C. § 20507(c)(2)(A). The NVRA bars "any program the purpose of which is to systematically remove the names of ineligible voters" within "90 days…[of] the date of a primary or general election for Federal office." *Id.* Indeed, the government has recently conceded in other litigation that the "90-day limitation was 'fatal' to a claim of imminent harm premised on systematic voter-roll maintenance" because "state voter roll maintenance in the ninety days prior to a federal primary or general election would be unlawful." *LWV* Stay Op., 2026 WL 1972055, at *7 (citing Federal Defendants previous representations to this Court in *LWV*); *see also DHS v. League of Women Voters*, 2026 WL 2879700, at *3 (indicating that use of SAVE for systematic list maintenance would be prohibited during the NVRA's 90-day "moratorium"). Defendants' "comprehensive effort" to conduct "voting hygiene" in all 50 states falls easily within the scope of the NVRA provision imposing a quiet period. ECF 51 at 44.

Defendants also now argue for the first time that their Policy is necessary to enforce the Voting Rights Act's prohibition on "dual voting." *See* ECF 57-2 ¶ 9; 52 U.S.C. § 10307(e). Defendants have pointed to nothing in the AR suggesting that cross-checking states to identify "duplicates" was the purpose of the Policy. *Cf.* ECF 57 at 12 (admitting that DOJ's defense of Policy has "largely focused on efforts to identify non-citizens"). Nor does vacating the Policy stop DOJ from using lawful methods of identifying duplicate voting, as has been the case in every

previous election. *See* ECF 51 at 3. Moreover, this pretextual and *post-hoc* argument—which DOJ failed to raise in its summary judgment papers and thus forfeited—does not justify staying the order while DOJ appeals. Section 10307(e) permits enforcement only *after* a person casts more than one ballot. *Id.* In the weeks preceding an election, there is no harm related to the enforcement of § 10307(e) because no one has voted yet. And even assuming DOJ was authorized to perform such searches and had the technical capability to do so (none of which is established by the AR or the Neff Declaration), with only 18 out of the 51 relevant jurisdictions having provided their SVRLs, DOJ's ability to identify duplicates by cross-referencing between state SVRLs is already limited and essentially random.

Next, Defendants claim without any basis that "if DOJ were to learn that a State's voter roll contains ineligible voters; under the Court's decision, DOJ could not investigate that violation based on the contents of a State's voter roll." ECF 57 at 12. Similarly, Defendants speculate that they might face harm if they are unable to respond to "state election officials [who] might identify potential irregularities in their SVRLs." ECF 57-2, ¶ 9. Again, this is not true. As the Court made clear, the vacatur Order "does not prevent the federal government from taking *lawful* steps to support states' efforts to maintain accurate voter rolls." ECF 51 at 3. DOJ can, of course, investigate violations of federal law and enforce voter protection statutes using the proper legal mechanisms; it just cannot break the law itself in the process. Indeed, DOJ has purported to continue doing that since the Court's order. *See supra* n.6.

Finally, Defendants' speculation about the potential actions of other federal courts gets them nowhere. They argue that this Court's decision is "unclear," so it "might also threaten" pending enforcement suits in other jurisdictions. *See* ECF 57 at 13; ECF 57-2 ¶ 10. But this Court need not assume that other Article III courts will improperly expand the scope of its well-defined

Order, and DOJ can file and has filed responses to the Court's order in other litigation. *See*, *e.g.*, Resp. to Defs.-Appellees' Rule 28(j) letter, *United States v. Amore*, No. 26-1665 (1st Cir. Oct. 22, 2026); *see also* ECF 57-2, ¶ 10 (describing intent to respond). And to the extent that Defendants mean the vacatur Order will prevent DOJ from relying on the Policy elsewhere, that is the ordinary function and purpose of vacatur: "[w]hen a reviewing court determines that agency [actions] are unlawful, the ordinary result is that the [actions] are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989).[23]

Defendants have failed to show irreparable harm that is "both certain and great," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), and "of such imminence that there is a clear and present need for equitable relief," *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006). That too is an independent basis to deny the stay motion.

**III. The balance of equities and public interest weigh heavily in Plaintiffs' favor.**

The balance of equities and public interest—which merge when the government is the defendant—weigh decisively against a stay for three reasons: (1) the public has a strong interest in preserving the states' role in maintaining their voter rolls, as required by statute and the Constitution; (2) the Policy substantially injures Common Cause's interest institutionally and the individual Plaintiffs' and Common Cause's members' interest in the fundamental right to vote; and (3) Plaintiffs and the public have a strong interest in keeping their confidential, First

[23] Defendants' citation to *United States v. Texas* does not change this analysis. *See* ECF 57 at 13. As the Supreme Court in that case noted, "[t]he Federal Judiciary of course routinely and appropriately decides justiciable cases involving statutory requirements or prohibitions on the Executive." *United States v. Texas*, 599 U.S. 670, 684 (2023).

Amendment-protected information private. Conversely, there is no public interest in enforcing an illegal policy or usurping the proper role of the states in conducting voter list maintenance.

First, as this Court held,"[c]onsistent with our constitutional structure, the NVRA and HAVA place *states* at the helm of maintaining their voter rolls." ECF 51 at 53. Conversely, "neither the NVRA nor HAVA empowers DOJ to demand SVRLs from states," *id.* at 53, and neither statute "authorize[s] the *federal* government to demand the removal of purportedly ineligible voters." *Id.* at 54.[24] Beyond the statutes, Article I "assigns no direct role to the President in either" the "domain[s]" of "voter qualifications" or "election procedures." *League of United Latin Am. Citizens v. EOP*, 818 F. Supp. 3d 34, 89-90 (D.D.C. 2026). Plaintiffs and the public therefore have a strong interest in maintaining this statutory and constitutional structure and avoiding a DOJ "fishing expedition" that tramples on the separation of powers. *Id.* at 73.

[24] The states have successfully litigated this issue as well. 30 states and the District of Columbia refused DOJ's demands. *See Tracker: DOJ Lawsuits Seeking States' Sensitive Voter Data, supra*. Of the 26 district courts (plus the Sixth Circuit) that have reached the merits on this issue, each has rejected the Policy. *See id.* Some courts noted the Policy's "unprecedented effort to collect sensitive information about voters." *United States v. Evans*, 2026 WL 2267774, at *1 (D.D.C. Aug. 6, 2026); *see also Weber*, 816 F. Supp. 3d at 1176 ("There cannot be unbridled consolidation of all elections power in the Executive without action from Congress and public debate"); *Oregon*, 828 F. Supp. 3d at 1104 (Congress never gave DOJ "such expansive and unfettered authority to invade citizens' right to keep their sensitive information private). Some courts have also accused DOJ of asserting pretextual rationales. *See, e.g., Weber*, 816 F. Supp. 3d at 1184 ("[I]t appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database"); *United States v. Schmidt*, 835 F.Supp.3d 697, 699-700 (W.D. Pa. 2026) (officials' public statements revealed an intent to use the data "as a tool for immigration enforcement"); *Bellows*, 834 F. Supp. 3d at 119, n.6 (DOJ's assurance that no "national database" would be created was "almost immediately undermined" by executive order directing DHS to compile a "State Citizenship List"). And almost every court has raised urgent concerns about the Policy's direct assault on core voting rights. *See, e.g., Benson*, 179 F.4th at 474 (the "government invokes Title III for an inverse purpose—to ensure that some people have not voted"); *Oregon*, 828 F. Supp. 3d at 1109 (the Policy "may very well lead to an erosion of voting rights and voter participation").

Second, continued implementation of the Policy would "substantially injure" Plaintiffs, *see Nken v. Holder*, 556 U.S. 418, 426 (2009)—a requisite consideration conspicuously absent from Defendants' motion. As this Court found, Common Cause will continue to suffer multiple injuries if the Policy continues to be implemented. ECF 51 at 17-24. And Common Cause's members and the individual Plaintiffs (as well as millions of other Americans) are also in danger of burdens on their right to vote and "wrongful removal" from the voter rolls "because of SAVE's inaccurate citizenship data." *Id.* at 33.

Defendants' recent actions confirm as much. While Defendants are now bound by the NVRA's imposition of a quiet period on list maintenance, they have shown a willingness to undertake last minute interventions to disenfranchise voters and litigate whether it implicates the NVRA later. *See, e.g., California*, *supra* n.2. Defendants' recent actions show their willingness to jeopardize lawfully registered voters' access to the franchise, *see* Mot. to Dismiss at 19, ECF 68, *California*, No. 26-cv-12025 (C.D. Cal. Oct. 21, 2026) (stating that large sample of voters identified by DOJ as purported non-citizens had records that "indicated that they were born in the United States"), as well as establishing Defendants' disregard for the privacy rights of 20,000 California voters, *see* Miles Parks & A Martinez, *DOJ sues California to block the counting of mail-in ballots from alleged noncitizens*, NPR (Oct. 16, 2026), https://tinyurl.com/yc4rcj53 (stating that when DOJ transmitted sensitive voter data for 20,000 people to Los Angeles County, "the password for the drive was literally included on a Post-it note with the delivery of it.").[25]

A stay here would allow Defendants' Policy to continue unabated on the eve of an election, placing the individual Plaintiffs and Common Cause's members at imminent risk of being caught

---

[25] Moreover, were the Court to determine that some or all of the actions underlying the *California* litigation, such as the data-sharing between DOJ and HSI, are encompassed by the Policy, that would further counsel in favor of denying Defendants' stay motion.

up in Defendants' efforts on a national scale. This would cause further chaos, uncertainty, and litigation. Defendants' declaration confirms as much: "with regard to the eighteens states who delivered their unredacted SVRLs to the Voting Section," but for the vacatur Order, DOJ would still be "analyz[ing] those SVRLs to determine if any state's SVRL lists a person who is ineligible to vote in federal elections." ECF 57-2, ¶ 8. Defendants' memoranda of understanding with complying states require the states to "clean" their voter rolls pursuant to DOJ's say-so, and the memoranda make no exceptions for the NVRA quiet period. *See generally* CRT-5; CRT-2058; CRT-25. Plaintiffs are thus at "imminent risk of future injury because their citizenship status—along with that of other voters—is likely still outdated in the SAVE database, making them subject to future removal by their states under DOJ's Voter List Maintenance Policy." ECF 51 at 34. Several plaintiffs in this proceeding have already been erroneously flagged by DOJ's error-ridden verification process and face the possibility of unlawful removal. Compl. ¶¶ 125-126; ECF 29-1 at 17-18. "Those consequences," as this Court found, "are not hypothetical." ECF 51 at 71.

Third, the Policy also threatens the individual Plaintiffs', Common Cause's members', and the public's strong interest in keeping sensitive and First Amendment protected information private, particularly for naturalized, derived, and acquired citizens concerned about sharing their household's data with immigration agencies. *See* ECF 35 at 3. As the Court found and Defendants did not contest, SVRLs are First Amendment protected records. *See* ECF 51 at 72. DOJ cannot "evade the Privacy Act's free-speech protections," *id.* at 73, in which "there is always a strong public interest." *Jenner & Block LLP v. DOJ*, 784 F. Supp. 3d 76, 114-15 (D.D.C. 2025). There is "no doubt that DOJ's Voter List Maintenance Policy violates the Privacy Act's prohibition on maintaining records of protected First Amendment activity," ECF 51 at 73, and thus the public interest weighs heavily against a stay.

By contrast, DOJ cannot claim the public has an interest in continued implementation of the Policy. As discussed above, the Policy contravenes the Privacy Act, the Paperwork Reduction Act, the APA, the NVRA, HAVA, and Article I's design, and there is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8-9, 12 (D.C. Cir. 2016) (cleaned up); *see also LWV* Stay Op., 2026 WL 1972055, at *8 ("To the extent that manufactured harms can be considered injury, the public's 'substantial' interest 'in having governmental agencies abide by the federal laws that govern their existence and operations' overrides it."). At its core, the vacatur Order both ensures that DOJ can no longer "run roughshod over longstanding laws that were carefully crafted to protect the rights of the American people," ECF 51 at 2, while neither "prevent[ing] the federal government from taking *lawful* steps to support states' efforts to maintain accurate voter rolls" nor "prevent[ing] states from maintaining their own voter rolls." *Id.* at 3. The only way to protect the public interest is to leave the vacatur Order in place and deny Defendants' stay motion.

## CONCLUSION

Defendants' motion for a stay pending appeal should be denied.

Dated: October 23, 2026

*/s/ Nikhel S. Sus*
Nikhel S. Sus (D.C. Bar No. 1017937)
John B. Hill (N.Y. Bar No. 5505508)*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
Tel: (202) 408-5565
nsus@citizensforethics.org
jhill@citizensforethics.org

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #340
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Jane Bentrott (D.C. Bar No. 1029681)
Naomi Gilens (D.C. Bar No. 90037831)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite #163
Washington DC 20006
Tel: (202) 579-4582
jane.bentrott@protectdemocracy.org
naomi.gilens@protectdemocracy.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

John Haubenreich*
PROTECT DEMOCRACY PROJECT
1108 McKennie Ave., Suite #223
Nashville, TN 37206
Tel: (202) 579-4582
john.haubenreich@protectdemocracy.org

Laurence M. Schwartztol
(D.D.C. Bar No. MA0007)
DEMOCRACY AND RULE OF LAW CLINIC,
HARVARD LAW SCHOOL
1525 Massachusetts Avenue
Cambridge, MA 02138
Tel: (617) 998-1877
lschwartztol@law.harvard.edu

Ming Cheung*
Ari J. Savitzky*
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
Tel: (212) 549-2500
mcheung@aclu.org
asavitzky@aclu.org
tlee@aclu.org
slakin@aclu.org

Laura K. Follansbee (D.C. Bar No. 1782046)
Arthur B. Spitzer (D.C. Bar No. 235960)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
Tel: (202) 457-0800
lfollansbee@acludc.org
aspitzer@acludc.org

* *Admitted pro hac vice*

*Counsel for Plaintiff*